# Exhibit 342

# Office of Appellate Operations

# Division of Quality

# Report on Dr. Black and the Center for Asbestos Related Disease

# December 5, 2019

**Table of Contents**

I.      Background……………………………………...……………………………3

II.     Summary of Significant Findings……………………..……..……………………5

III.    What type of records were provided by CARD/Dr. Black and did SSA adjudicators rely on such evidence? If yes, what was the extent of the SSA adjudicator's reliance in each?..............................................................................................................................6

   A. Types of records provided by CARD/Dr. Black…………………………………7

   B. General structure of CARD patient involvement/interaction……………..…………8

   C. Reliance on opinion evidence by SSA Adjudicators……..…….…………………9

   D. Reliance on pulmonary function tests performed by CARD to equal a listing……..11

IV.     If the evidence from CARD/Dr. Black were disregarded, how many claimants would still be found disabled by a preponderance of the remaining evidence………..…...13

   A. Limited evidence from sources other than CARD…………………………………14

   B. Well-developed evidentiary record and weight afforded to CARD/Dr. Black records………………………………………………………………………...……..15

V.      Was the evidence from CARD/Dr. Black consistent with the evidence provided by other sources? In claims in which Dr. Black provided a medical opinion, was the opinion consistent with the objective and opinion evidence from other sources?.....16

   A. Inconsistent chest CT interpretations……………………………………..………17

   B. Dr. Black's opinion was consistent with the evidence of the claimant's asbestos related or other respiratory impairments submitted by other medical providers…18

   C. Dr. Black's opinion was inconsistent with objective evidence provided by CARD or other sources…………………………………………………………..………18

   D. Are treatment records from CARD/Dr. Black consistent with the claimant's subjective complaints?.............................................................................................19

## I. Background

On September 9, 2019, the Social Security Administration's (SSA) Office of the Inspector General (OIG) asked the Division of Quality (DQ) in the Office of Appellate Operations (OAO) in the Office of Analytics, Review, and Oversight (OARO) to review certain disability claims with files containing evidence from the Center for Asbestos Related Disease (CARD) and/or Charles Bradford Black, M.D. (Dr. Black), the CEO and Medical Director of CARD.[1]  OIG requested this review after it received a request from the Department of Health and Human Services to review a qui tam referral.  The referral alleged that Dr. Black made misstatements to the federal government by submitting written reports for Medicare beneficiary applicants allegedly diagnosed with asbestosis in order to receive federal grant awards.

OIG asked DQ to evaluate specific favorable claims identified by the Center for Automation, Security and Integrity (CASI) in the Office of Central Operations and the Analytics Center for Excellence (ACE) in OARO in connection with the investigation of the qui tam referral against Dr. Black (See EHH Cases with Disability Indicators and Attachment 1 to V19002672-O18 (ACE Data Analysis)).  The lists provided by CASI and ACE contained a combined 412 claims; however, DQ ultimately identified 322 unique favorable claims for review after removing 41 duplicates, 31 claims that did not have an electronic claims file, and 18 claims that did not contain evidence from CARD/Dr. Black.  OIG requested that DQ review these 322 claims and identify the types of evidence submitted by CARD/Dr. Black, whether there was reliance on evidence from CARD/Dr. Black in making disability determinations, whether the evidence provided by CARD/Dr. Black was consistent with evidence from other medical sources and the claimant's subjective complaints, and whether the ultimate finding of disability would still be supported by a preponderance of the evidence absent evidence from CARD/Dr. Black.  DQ additionally focused on identifying any trends, irregularities, or inconsistencies.

In addition to these questions, OIG requested that DQ validate data previously provided by ACE and the Office of Quality Review (OQR) in OARO.  ACE previously identified 158 favorable claims that contained metadata identifying CARD/Dr. Black as a medical source or provider of supporting medical documentation (Attachment 1 to V19002672-O18 (ACE Data Analysis)), while OQR reviewed a sample of claims from the list provided by CASI (EHH Cases with Disability Indicators).  DQ's findings as compared to those provided by ACE and OQR are as follows:

ACE:

From the 158 identified favorable claims provided by ACE, 73 claims were favorable at the initial level, 13 claims were favorable at the reconsideration level, and 72 claims were favorable at the hearing level.  The Intelligence and Analysis Division (IAD) of OIG analyzed

---

[1] Medical records from CARD were present in the electronic claims files under a variety of metadata, such as: "CARD," "C A R D," "CARD CLINIC," "Center for Asbestos Related Disease," and other variations. Similar variations of "Dr. Black" also appeared in the metadata. Citations in this report refer to medical records provided by CARD or Dr. Black using the abbreviation "CARD," and further identify the cited records by the date received into the electronic claims file(s), page number(s), and total number of pages.

the ACE data and determined that 58 out of 73 of the favorable initial level claims and 11 out of 13 of the favorable reconsideration level claims contained supporting medical documentation from CARD/Dr. Black[2] (V19002672-O18 (ACE Data Analysis)).  In contrast, DQ found 67 of the favorable initial level claims and 12 of the favorable reconsideration level claims contained supporting medical documentation from CARD/Dr. Black.[3]  IAD additionally determined that, from the 72 favorable hearing level claims, 12 claims contained supporting medical documentation from CARD/Dr. Black that held either limited or significant weight toward the Administrative Law Judge's (ALJ) favorable decision while 60 claims contained no affiliation with CARD/Dr. Black.  DQ, however, found 68 claims contained evidence from CARD/Dr. Black and the ALJ relied[4] on records submitted by CARD/Dr. Black in 21 claims.

Favorable Claims Containing Supporting Medical Documentation from CARD/Dr. Black:

|  | IAD: | DQ: |
|---|---|---|
| Initial Level | 58 | 67[5] |
| Reconsideration Level | 11 | 12 |
| Hearing Level | 12[6] | 68[7] |

OQR:

OQR sampled 47 of the 254 claims from the EHH Cases with Disability Indicators list.  OQR indicated that 31 of the 47 claims sampled revealed that CARD/Dr. Black reported medical conditions were more severe than the severity supported by the medical records; however, 15 claims (31 percent of the total sampled) would have been allowed benefits regardless of CARD/Dr. Black's evaluation because of other medical evidence of record.  In contrast, DQ reviewed all available claims from the EHH Cases with Disability Indicators list that were not also part of the ACE data analysis, had an electronic claim(s) file, and contained evidence from CARD/Dr. Black – a total of 175 claims.  Of those 175 claims, DQ found 80 (46 percent) would have been allowed benefits regardless of evidence from CARD/Dr. Black because of other medical evidence of record.

---

[2] Based on DQ's review of the data provided by IAD, DQ concluded that although IAD's "Analysis of ACE Data" only identified these claims contained medical documentation from Dr. Black, it appears IAD considered evidence from CARD alone also to substantiate an "affiliation" with Dr. Black; thus, DQ concluded that IAD considered Dr. Black and CARD as a single entity for this analysis.

[3] From the list of favorable claims identified by ACE, DQ was unable to review three initial level claims and one hearing level claim because the claim files are not electronic.

[4] By "relied" we mean that the SSA adjudicators cited and/or appear to have found the records from CARD/Dr. Black supportive of the finding of disability, regardless of whether the SSA adjudicators gave explicit weight to these records.

[5] Of these 67 claims, 51 contained evidence from Dr. Black and 16 contained evidence from CARD but without reference to Dr. Black.

[6] This number also represents those claims in which the ALJ granted either limited or significant weight to the supporting medical documentation provided by CARD/Dr. Black.

[7] Of these 68 claims, 51 contained evidence from Dr. Black and 17 contained evidence from CARD but without reference to Dr. Black.

| | OQR: | DQ: |
|---|---|---|
| % of claims that would have been allowed benefits regardless of evidence from CARD/Dr. Black | 31% | 46% |

OIG asked DQ to identify the total number of Environmental Health Hazard (EHH) Medicare approvals since 2010.  A spreadsheet was provided to DQ which the OIG obtained from CASI which contained 3,469 EHH Medicare application SSNs from 2010 to the present. DQ asked ACE to review the MBRs of these SSNs using automated tools, looking for SMI HHAZ and/or SMI HHAZ fields on the record with start dates (these fields indicate EHH entitlement).  ACE concluded that of the 3,469 SSNs, 206 SSNs were duplicate, leaving 3,263 unique SSNs.  ACE further found that 3,027 out of 3,263 SSNs contained the aforementioned fields on the MBR.  Based on this, it appears at least 3,027 EHH claims were approved.

OIG also asked DQ to identify the number of Social Security Disability Insurance (SSDI)/ Supplemental Security Income (SSI) disability allowances in which CARD/Dr. Black was involved.  As discussed above, DQ ultimately conducted a detailed review of the 322 unique favorable claims.  The remainder of this report will discuss our findings.

## II. Summary of Significant Findings

We identified the type of records provided by CARD/Dr. Black, SSA adjudicators'[8] reliance on these records, and the extent of the reliance.  In most claims, CARD submitted treatment notes.  Dr. Black submitted a medical opinion (including an Environmental Health Hazards (EHH) Checklist) in 185 of the 322 claims (57 percent) we reviewed.  SSA adjudicators relied on CARD/Dr. Black records in 222 of the 322 claims (69 percent) we reviewed.  Of 183 claims containing an opinion from Dr. Black, SSA adjudicators relied on the opinion in 74 claims, did not cite the opinion in 68 claims, cited but did not identify the weight given in 36 claims, and gave negative or other weight in only seven claims.

We found that in 158 of the 322 claims we reviewed, if the CARD records were disregarded, disability would not have been supported by a preponderance of the remaining evidence.[9]  Of the 158 claims, 105 claims would not have been supported directly due to the disregarded evidence, and 53 claims would not have been supported for other reasons, such as vocational considerations, insured status, and unsupported established onset dates.  Of the 164 claims in which disability would have been supported by a preponderance of the remaining evidence, 95 were supported primarily due to non-respiratory impairments, 24 were supported

---

[8] SSA adjudicators at the initial and reconsideration levels are State agency disability examiners and State agency medical and psychological consultants, while an ALJ is the SSA adjudicator at the hearing level.
[9] Preponderance of the evidence means such relevant evidence that as a whole shows that the existence of the fact to be proven is more likely than not (20 CFR 404.901 and 416.1401).

due to a non-asbestos related respiratory impairment, and only 45 were supported due to an asbestos related impairment.

We considered whether the evidence from CARD, including opinions from Dr. Black, was consistent with evidence provided by other sources. We found a number of claims in which non-opinion evidence from CARD was inconsistent with evidence from other sources. Most significant was the disparity between Dr. Black's interpretation of imaging performed by an outside radiologist as compared to what the radiologist wrote in his or her own report. In many of the claims containing an opinion from Dr. Black, his opinion was inconsistent with the available medical records from CARD and/or other providers.

In 90 percent of the claims reviewed, CARD's records were consistent with the claimant's subjective complaints documented elsewhere in the record, often in the disability report (Form SSA-3368) or function report (Form SSA-3373).

### III. What type of records were provided by CARD/Dr. Black and did SSA adjudicators rely on such evidence? If yes, what was the extent of the SSA adjudicator's reliance in each claim?

SSA adjudicators cited the records submitted by CARD/Dr. Black in 261 of the 322 claims (81 percent) we reviewed. Further, SSA adjudicators relied[10] on the CARD/Dr. Black records in 181 of these 261 claims (or 69 percent of the 322 claims we reviewed). When SSA adjudicators relied on evidence from CARD/Dr. Black, they usually considered narrative opinion letters written by Dr. Black; Dr. Black's interpretation of x-ray and CT imaging; results of pulmonary function testing; and the claimant's subjective complaints

In 255 of the 322 claims (79 percent), the claimants alleged an asbestos related disease in their initial disability report (Form SSA-3368). In 163 of the 322 claims (51 percent), asbestosis (code 5010) was listed as the primary impairment code on the Disability Determination Transmittal (Form SSA-831). In 46 claims (14 percent), asbestosis was listed as the secondary impairment code. In 113 of 322 claims (35 percent), asbestosis was not listed as a primary or secondary impairment.

---

[10] In many claims, SSA adjudicators at the initial or reconsideration level did not specify the medical evidence upon which allowance was based. In those claims we inferred whether the adjudicator relied on records provided by CARD based on the disabling impairment and whether CARD evidence was sole or majority evidence regarding such impairments.



When excluding claims where the primary and/or secondary impairment codes involved lung/pleura cancers, respiratory impairments, or sleep related breathing disorders, in 82 of 322 claims (25 percent), the claimant was found disabled mainly based on other, non-asbestosis-linked impairments.

From this data, we inferred that SSA adjudicators significantly relied on the diagnosis of asbestosis or another asbestosis related disease (ARD) by Dr. Black in about half of the claims we surveyed, partially relied on the diagnosis in a quarter of the claims, and did not significantly rely on the diagnoses in a quarter of the claims.

### A. Types of records provided by CARD/Dr. Black

Of the 322 claims we reviewed, CARD submitted treatment notes (demonstrating multiple patient encounters) in 296 claims (92 percent), and Dr. Black submitted a medical opinion in 185 claims (57 percent).  Other records submitted by CARD in the 322 claims included one-time examinations and/or remote (telephonic) consultations.

Treatment notes (and/or one-time examinations) generally included initial encounters at CARD, where claimants described their respiratory complaints, symptoms, and their history of Libby asbestos/vermiculite exposure utilizing a CARD prepared form.  The form included a list of potential means of asbestos exposure in the area.[11]  Treatment notes also included a physical examination report and a pulmonary function testing (PFT) report prepared by CARD/Dr. Black.

---

[11] See "Incidental Asbestos Exposure in Lincoln County, MT" form (Wolleat, 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, Initial: 6/6/2016, CARD, EF received 5/6/2016, pages 16-22).

CARD Intake
Form.pdf

In addition, the records generally included x-rays and CT imaging, often performed and interpreted at outside medical facilities; however, medical providers at CARD, typically Dr. Black, also provided their own interpretations of the x-rays and CTs.
Dr. Black provided medical opinions that included:

- Narrative statements, typically in the form of two-page letters, in which Dr. Black described the claimant's history of vermiculite exposure and residence in Libby, Montana, summarized treatment history at CARD including results of chest imaging and/or PFT results, described other impairments and/or alleged limitations, and concluded the claimant was not a candidate for employment and recommending he or she be considered for Social Security disability benefits. (See █████████████, ALJ: 3/16/2016, Exhibit 4F, pages 1-2).



- Checkbox standardized forms indicating the claimant's impairments, symptoms, functional capacity and limitations (See █████████████, Initial: 9/3/2013, CARD, EF received 11/4/2013, page 15 of 21).
- Comments by Dr. Black in the assessment/plan portion of his treatment notes that generally described the claimant's symptoms, limitations, and encouraged the claimant to apply for Social Security disability or other benefits (See █████████████, Initial: 12/8/2009, CARD, EF received 11/24/2009, page 29 of 39).
- EHH Checklists[12] indicating the claimant had an ARD, typically pleural thickening / pleural plaques, and supporting the claimant's presence/history residing in Lincoln County, Montana (See █████████████, ALJ: 3/16/2016, Exhibit 7F, page 4).

**B. General structure of CARD patient involvement/interaction**

The CARD records generally reflect a similar patient encounter structure, as demonstrated in the following example: █████████████, Reconsideration: 11/3/2015.

1. The claimant attends a new patient screening visit at CARD, during which Dr. Black fills out forms describing his history of asbestos/vermiculite exposure while living in Libby, Montana. The claimant also undergoes a physical examination and receives pulmonary function testing (CARD, EF received 10/6/2015, pages 6-17 and 20-22 of 22; and CARD, EF received 8/4/2015, pages 15-18 and 24-25 of 29).
2. On the same day, the claimant obtains chest x-rays at an outside facility, which was often at St. John's Lutheran Hospital or Cabinet Peaks Medical Center (CARD, EF received 10/6/2015, page 19 of 22).
3. The chest x-rays described in a CARD examination report are abnormal and suggestive of pleural thickening and/or asbestos exposure (See CARD, EF received

---

[12] We considered the completion of an EHH Checklist to be a medical source statement.

8/4/2015, pages 18 and 24 of 29).  As discussed in greater detail below, the interpretation of the x-rays by Dr. Black or another CARD employee is often inconsistent with the interpretation by the outside radiologist unaffiliated with CARD/Dr. Black (c.f. CARD, EF received 10/6/2015, page 19 of 22).

4. At the end of the initial screening visit, the claimant is assessed with a history of asbestos exposure, and is referred for a chest CT (which generally occurs at the same outside facility that conducted the chest x-ray) (CARD, EF received 10/6/2015, page 8 of 22; and CARD, EF received 8/4/2015, pages 17 and 25 of 29).

5. The patient obtains a chest CT (CARD, EF received 10/6/2015, page 18 of 22).

6. There is a follow-up encounter (in person or telephonic) with a CARD medical provider, who relays CARD's (generally, Dr. Black's) interpretation of the CT imaging.  A diagnosis of ARD is generally established at this time.  As discussed in greater detail below, in many claims Dr. Black's CT interpretation is inconsistent with the interpretation provided by the outside radiologist unaffiliated with CARD/Dr. Black  (See CARD, EF received 10/6/2015, compare pages 3-4 and 18 of 22).

7. At the end of the follow-up encounter, the claimant is provided benefits counseling and advised on future follow-up visits with CARD (CARD, EF received 10/6/2015, page 4 of 22).

8. Thereafter, the patient is provided documents detailing his test results and CARD's (generally, Dr. Black's) assessment, and follow-up recommendations (CARD, EF received 8/4/2015, pages 23-29 of 29).

9. The documents provided to the claimant often included an EHH Checklist and/or medical opinion provided by Dr. Black (CARD, EF received 8/4/2015, page 28 of 29).

**See also:** ▮▮▮▮▮▮▮▮▮, Initial: 8/2/2018; and ▮▮▮▮▮▮▮▮, Initial: 11/22/2013.

## C. Reliance on opinion evidence[13] by SSA adjudicators

CARD/Dr. Black provided a medical opinion,[14] including an EHH Checklist, in 185 of the 322 claims (57 percent) we reviewed.  In all 185 of these claims, Dr. Black's opinions generally

---

[13] SSA policy regarding the evaluation of opinion evidence changed on March 27, 2017.  For claims filed before March 27, 2017, a treating source's opinion may be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the record. If controlling weight is not given to a treating source's opinion, we must evaluate it by applying the regulatory factors, including length and frequency of treatment, nature and extend of the treatment relationship, supportability, consistency, and specialization. For claims filed on or after March 27, 2017, we will not defer or given any specific evidentiary weight, including controlling weight, to any medical opinion, including from a claimant's medical sources. We will evaluate opinions applying same regulatory factors, with supportability and consistency being the most important factors.

[14] While Dr. Black provided most of the opinion statements, in a small number of claims, a different CARD medical provider offered a medical opinion (See ▮▮▮▮▮▮▮▮▮▮, Initial: 3/15/2007, CARD, EF received 2/20/2007, page 3 (Alan Whitehouse, M.D.) and ▮▮▮▮▮▮▮▮▮▮, ALJ: 9/24/2014, Exhibit 1F, page 1 (Michelle Boltz,

reflected a finding of asbestosis or pleural thickening/plaquing in the EHH Checklist, or conclusively stated the claimant was unable to perform current or other employment, and recommended that he or she pursue disability benefits. The following table represents the treatment of Dr. Black's opinions by the adjudicators:



We assigned the level of weight or persuasiveness based on the following considerations. We assigned "opinion was relied on but no weight was given," if the opinion was simply referred to by the adjudicator.  We assigned "controlling weight," when the adjudicator said the opinion was controlling[15].  We assigned "positive weight" when the weight was not controlling but described as substantial (e.g., "full weight," "great weight," "significantly more weight," "significant weight," or "most weight"; or when adjudicators found the opinion to be helpful, consistent with the evidence, or concurred with the opinion).  We assigned "negative weight," when the adjudicators rejected the opinion, or assigned "less weight," "limited weight," or "no weight."  We assigned "other weight" when the adjudicator noted this was an issue reserved to the Commissioner (See 20 CFR 404.1527(d) and 416.927(d)).

The adjudicators relied on Dr. Black's opinions in 74 of the 185 claims (41 percent).  In 36 claims, the opinion was cited but not weighed; in these cases, disability was generally supported due to nonrespiratory impairments.  The adjudicators did not rely on or cite Dr. Black's opinions

N.P.)).  Our review did not differentiate between opinion statements provided by Dr. Black and another provider at CARD.  We observed that in all 66 of the 322 claims that contained an EHH Checklist, Dr. Black signed the EHH Checklist.
[15] See Social Security Ruling 96-2p, rescinded March 27, 2017.

in 68 claims in which an opinion was provided.  In 35 of these 68 claims, a finding of disability was based on impairments other than respiratory impairments, mainly musculoskeletal, mental, and cardiac impairments.

██████████████████, **Initial: 4/22/2014.**  This claimant of advanced age was found disabled as of June 22, 2012, due to asbestosis resulting in the residual functional capacity (RFC) to perform less than sedentary work, including lifting less than 10 pounds frequently and occasionally, and standing and/or walking "significantly less" than two hours, among other limitations (Disability Determination Explanation (DDE), EF received 4/22/2014, pages 6-9 of 9).  The medical record included a narrative opinion from Dr. Black, dated March 31, 2014, describing lung changes that "were very typical of the asbestos related pleural disease relating to the Libby amphibole exposure" (CARD, EF received 4/4/2014, page 3 of 35).  Dr. Black further indicated that, "[b]ecause of these findings, [he] anticipate[d] [the claimant] will continue to progress, and will have difficulties with the environment around her due to her reactive airway disease, associated with her asbestos related disease.  [He] would highly recommend [she] be considered to receive Social Security disability benefits" (CARD, EF received 4/4/2014, page 4 of 35).  The State agency medical consultant, David Jordan, M.D., cited this opinion and afforded it controlling weight (DDE, EF received 4/22/2014, page 6 of 9).  Dr. Jordan also noted that Dr. Black was an expert in the field of asbestos related disease and that Dr. Black had stated that the claimant's disease was progressing and currently limiting her ability to perform activities of daily living (DDE, EF received 4/22/2014, page 6 of 9).  Other evidence, including chest x-rays interpreted by Michael Henson, M.D. on October 9, 2013; a chest CT scan interpreted by radiologist Stephen Becker, M.D., of Cabinet Peaks Medical Center on February 28, 2014; and lung examinations by the claimant's primary care provider on January 3, 2014, and October 25, 2014, reflected no evidence of prior asbestos exposure (St. John's Lutheran Hospital, EF received 3/5/2014, pages 21 and 25 of 41; Northwest Community Health Center, EF received 3/8/2014, pages 9-11 and 14 of 55).

**See also:** ██████████████, ALJ: 8/17/2009; ████████████████████, Initial: 7/2/2014; █████████████, Initial: 7/17/2013; ██████████████, ALJ: 9/13/2016; ████████████, Initial: 6/20/2011; ███████████████, Initial: 10/18/2013; ████████████, Initial: 3/7/2011; █████████████████, Reconsideration: 11/25/2015; and ██████████████ Initial: 3/11/2013.

**D.  Reliance on pulmonary function tests performed by CARD to equal a Listing**

In 52 of the 322 claims we reviewed, the severity of the claimants' impairments were found to meet or medically equal[16] the criteria of listing 3.02 (Chronic Respiratory Disorders).

---

[16] Social Security Ruling (SSR) 06-01p provides guidance on evaluating claims involving tremolite asbestos-related impairments at step three of the sequential evaluation process.  The SSR explains: "We evaluate chronic pulmonary insufficiency under listing 3.02. The listing contains criteria based on spirometry, single breath DLCO [diffusing capacity of the lungs for carbon monoxide], or ABGS [arterial blood gas study]. Chronic pulmonary insufficiency caused by exposure to tremolite asbestos *may not have findings at rest that satisfy these criteria. If exercise ABGS*

We found that 35 of the 52 claims (67 percent) were not supported by a preponderance of the evidence.  As explained more fully below, in 33 of the 35 unsupported claims, the severity of the claimants' impairments were found to medically equal the criteria of listing 3.02.

In claims where the State agency or other designee of the Commissioner makes the initial or reconsideration disability determination, a State agency medical or psychological consultant or other designee of the Commissioner has the overall responsibility for determining medical equivalence (20 CFR 404.1526(e) and 416.926(e)).  In a number of claims we reviewed, the State agency medical consultants opined the severity of the claimants' impairments equaled listing 3.02,[17] without providing adequate rationale supporting the medically equals finding, and often instead relied on evidence from CARD/Dr. Black.

███████████████ **Initial: 2/4/2009.**  The State agency determined that listing 3.02A was medically equaled based on the opinion of the State agency medical consultant, David Jordan, M.D.  However, Dr. Jordan provided no rationale to support his opinion.  It also appears that Dr. Jordan deferred to the disability examiner's judgment on whether the severity of the claimant's impairment medically equaled listing 3.02.  Comments on the DDS worksheet show that on January 26, 2009, the disability examiner, asked Dr. Jordan to "see the sedentary RFC for this asbestos case," cited Dr. Black's December 2008 opinion, and noted a psychological consultative examination had been ordered (DDS Disability Worksheet, EF received 2/4/2009, pages 3-4 of 5).  On February 1, 2009, Dr. Jordan stated, "A superficial review of the evidence suggests to me that he would equal the listings, specifically 3.02" and in that case, a mental status examination was not needed.  Dr. Jordan also stated, "[i]f you don't think he is an equals, please weed out the unnecessary bookmarks for me."  The next day, the examiner asked Dr. Jordan to "please complete a 416 for equaling the listing of 3.02 as you indicated in your previous review" (DDS Disability Worksheet, EF received 2/4/2009, page 4 of 5).  The next day, Dr. Jordan opined "[h]is impairment is at least equal to listing 3.02A in severity" with no rationale (Medical Evaluation/Case Analysis, EF received 2/3/2009, page 1 of 1).  A review of the records showed that the claimant's impairments did not meet the criteria of listing 3.02 based on CARD's May 7, 2008 PFT results.  Pre-bronchodilator FEV1 was 3.45, FVC was 4.50, and DLCO was 18.62 (63 percent of predicted), and the claimant was 71.8 inches tall (CARD, EF received 3/23/2009, page 75 of 101).  These values were well above the criteria of listing 3.02A, B, and C.1.  As listing 3.02 was written at the time, the "A" criteria required FEV1 of 1.55 or less, the "B" criteria required FVC of 1.75 or less, and the "C.1" criteria required DLCO of less than 10.5 or less than 40 percent of the predicted value.  The "C.2" and "C.3" criteria required measurement of the arterial blood gas values at rest and during exercise,

_cannot be obtained in these situations, we evaluate the impairment(s) at step 4, and if necessary, step 5 of the sequential evaluation process"_ (emphasis added).  Additionally, Social Security Regulations at 20 CFR 404.1526(b)(1) and 416.926(b)(1), provide that, if the claimant does not exhibit one or more of the findings specified in the particular listing, or the claimant exhibits all of the findings, but one or more of the findings is not as severe as specified in the particular listing, the Agency will find that the claimant's impairment is medically equivalent to that listing if the claimant has other findings related to his or her impairment that are at least of equal medical significance to the required criteria.

[17] The regulatory criteria of listing 3.02 changed on May 23, 2002, April 12, 2006, and October 6, 2016.  In evaluating whether an adjudicator's finding that the claimant met or medically equaled the criteria of listing 3.02, we considered the regulatory criteria in effect at the time of the favorable determination or decision.

respectively.  As the record did not contain any arterial blood gas values, the C.2 and C.3 criteria could not be evaluated.  Notably, on May 16, 2008, a non-CARD medical provider documented decreased breath sounds and assessed asbestos-related disease causing fatigue and pain, but the claimant did not need any supplemental oxygen (Lincoln County Community Health Center, EF received 12/16/2008, page 29 of 59).  While the claimant had clinically documented pulmonary disease, the required findings were not as severe as specified in the listing criteria, and Dr. Jordan did not identify other findings related to the impairment that at least equaled the listing criteria.

**See also:** ███████████████, Initial: 5/21/2014; ███████████████, Initial: 12/8/2009; ███████████ Initial: 10/20/2011; ███████████ Initial: 2/23/2007; ██████████ Initial: 12/7/2015; █████████ Initial: 9/23/2009; ███████; ██████████████, Initial: 8/24/2006; ██████████████, Initial: 7/5/2012; ██████████████, Initial: 11/10/2015; ████████████, Initial: 1/17/2012; and ██████████████, Initial: 7/30/2015.

## IV. If the evidence from CARD/Dr. Black were disregarded, how many claimants would still be found disabled by a preponderance of the remaining evidence?

In 158 of the 322 claims (49 percent) reviewed, we found that, if the evidence of the claimant's asbestos related or respiratory impairment created by CARD/ Dr. Black were disregarded,[18] the finding of disability would not have been supported by a preponderance of the evidence.  Of the 158 claims in which disability would not have been supported by a preponderance of the evidence in the absence of the evidence created by CARD/Dr. Black, we found that 105 claims (67 percent) would not have been supported as a result of the disregarded evidence.  We also found that in 53 claims (34 percent), the finding of disability would not have been supported by a preponderance of the evidence due to other issues unrelated to CARD/Dr. Black.  These issues include errors in the application of the sequential evaluation process, or other eligibility factors unrelated to evaluation of the claimant's medical impairments.[19]

In 95 out of the 164 claims (58 percent) in which disability would have been supported in the absence of the evidence created by CARD/Dr. Black, disability was most often supported primarily due to non-respiratory impairments.  In the remaining 69 out of 164 claims (42 percent) in which disability would have been supported in the absence of the evidence created by

---

[18] We disregarded evidence "created" by CARD/Dr. Black under the guidelines set forth in SSR 16-1p, which specifies that in claims of fraud or similar fault, evidence is to be disregarded if there is reason to believe that fraud or similar fault was involved in the providing of the evidence, even if the evidence was prepared or signed by another source.  In many claims, imaging was performed and interpreted by physicians at other facilities (e.g., St. John's Lutheran Hospital) but submitted into the record only by CARD/Dr. Black.  We did not disregard such evidence.

[19] Such errors included underdeveloped evidence regarding past relevant work; lack of consideration of transferable skills; lack of necessary vocational expert evidence; failure to consider earnings under the relevant self-employment income tests, including as related to whether self-employment wages were sufficient to qualify a job as past relevant work; lack of insured status for Title II claims; lack of medical evidence prior to the expiration of insured status in Title II claims; unsupported established onset dates; failure to address Appeals Council remand reasons; and insufficient support for the non-respiratory disabling impairments.

CARD/Dr. Black, disability was supported either due to asbestos related impairments or due to a non-asbestos related respiratory impairment.



Therefore, in a substantial portion of claims, 105 out of 322 claims (33 percent), disregarding evidence created by CARD/Dr. Black directly resulted in insufficient support for the finding of disability.  Many of the claims, particularly those decided at the initial level, contained only limited records from other sources and those records were insufficient to support disability.  In other claims, the non-CARD/Dr. Black evidence was not consistent with the disregarded evidence from CARD/Dr. Black and the adjudicator significantly relied on the evidence and/or afforded weight to CARD's records or Dr. Black's opinions.

**A.  Limited evidence from sources other than CARD**

████████████**, Initial: 4/25/2012.**  Richard Friedman, M.D., of St. John's Lutheran Hospital, provided the only other non-CARD/Dr. Black evidence in the file that was not provided by CARD/Dr. Black.  This evidence was a chest CT scan interpretation in March 2012 concluding there was, "1. Stable left hemithoracic noncalcified thin pleural plaques, nonspecific but compatible with prior asbestos exposure.  No evidence of significant interval change, or developing interstitial lung disease identified.  2. No evidence or pleural effusion or adenopathy".  (St. John's Lutheran Hospital, EF received 3/28/2012, page 8 of 8).  While Michelle Boltz, N.P., of CARD stated that the claimant's PFT results showed his diffusion of oxygen had declined from 85 percent in 2010 to 64 percent in 2011, indicating a marked increase of interstitial fibrosis, the PFT reports are not in the file (CARD, EF received 4/9/2012, page 3 of 13).  Therefore, the evidence from CARD does not contain supportive objective test results, and the only evidence not

created by CARD lacks clinical examination findings to support disability.  As such, if we were to disregard the evidence from CARD/Dr. Black, the file is devoid of any other evidence to support the sedentary RFC or any other limitations.  Therefore, the claimant should be able to perform other work at step five of the sequential evaluation process.

███████████████, Initial: 2/6/2018.   There are no treatment records from any provider other than CARD/Dr. Black, and diagnostic imaging from other sources is not sufficient on its own to support a finding of disability.  The State agency medical consultant relied on Dr. Black's December 2017 letter supporting disability, his treatment notes, and his interpretation of imaging to support a sedentary RFC (Disability Determination Explanation (DDE), EF received, 2/6/2018, pages 5-8 of 11; CARD, EF received 12/19/2017, pages 3, 4, 6, and 27 of 28).  A July 2017 CT scan interpreted by Jared Heimbigner, D.O., indicated that there was likely pleural parenchymal scarring in the claimant's lungs (Cabinet Peaks Medical Center, EF received 11/13/2017, page 8 of 9).  However, without any clinical examination findings from non-CARD providers, there is no support for the ultimate finding of disability if the CARD/Dr. Black evidence is disregarded.

**See also:** ████████████████, Initial: 7/2/2014; █████████████, Initial: 2/24/2015; ████████████████, Reconsideration: 3/19/2009; ███████████████, Initial: 8/17/2012; ██████████████, Initial: 12/15/2008; ██████████ Initial: 2/22/2007; ███████████, Initial: 8/24/2006; ████████ Initial: 1/17/2012; ████████████, Initial: 10/1/2010; ██████████, Initial: 6/7/2010; and ████████████, Initial: 5/24/2011.

## B.  Well-developed evidentiary record and weight afforded to CARD/Dr. Black records

███████████████, ALJ: 8/17/2009.   If the CARD records were disregarded, the record would not support the ALJ's findings that the claimant was disabled.  During a physical examination performed by Stephen Jackson, M.D., in January 2009, some crackles in the lungs were heard, and the claimant was diagnosed with acute bronchitis, but she had normal gait, full strength in all extremities, and normal reflexes (Exhibit 15F, page 3).  Furthermore, examinations by Dr. Jackson in June 2008 and June 2009 document clear lungs (Exhibits 15F, pages 1 and 4).  Dr. Becker interpreted a CT scan in August 2008 as showing, "[n]o evidence to suggest previous asbestos exposure.  Of the two lesions in the apex of the right lung, previously noted on the CT scan from October of 2007, one has resolved, the other is less pronounced in appearance and size…probably represents some scarring.  There are emphysematous bullae noted in the apex of both lungs.  In addition there is a new stellate type lesion in the apex of the left lung" (Exhibit 12F, page 1).  In February 2009, Radiologist Christopher Altenhofen M.D., indicated that chest x-rays showed no pleural calcification or thickening (Exhibit 13F, page 1).  While the ALJ afforded Dr. Black's April 2008 and August 2009 opinions with the most weight (Exhibits 5A, page 7), the ALJ did not address evidence that was inconsistent with the opinions that the claimant had significant asbestos related disease and should strongly be considered for disability benefits (Exhibit 3F, pages 4-5; Exhibit 16F).  Instead, the ALJ relied on the CARD records and found the claimant disabled as of April 14, 2008 with a sedentary RFC (Exhibit 5A, pages 6-7).

███████████████, ALJ: 9/24/2014. The finding of disability would not be supported in the absence of the records from CARD. The decision found the claimant limited to light work, except that the claimant would be off task for fifteen percent of the workday due to shortness of breath, dyspnea, and fatigue. In support of this finding, the ALJ afforded "significant weight" to the opinions of Michelle Boltz, N.P., and Dr. Black (Decision, page 5). The record, however, does not contain an opinion from Dr. Black. Ms. Boltz's opinion, however, indicates the claimant is recommended for "full disability" based on, "the progressive course of disease this patient has experienced and her restrictive lung functions with associated functional consequences" (Exhibit 1F, page 1). The decision provides no specific explanation for the off-task limitation, and the record, with or without disregarding the evidence from CARD, does not support such a limitation. PFT results from CARD was above the listing level, showing FVC and FEV1 of 75% of predicted values and DLCO of 104% of predicted value (Exhibit 1F, page 7). CARD treatment notes dated March 5, 2013, state that the claimant's CT indicates pleural thickening and pleural plaquing "per Dr. Black" (Exhibit 1F, page 2). However, Dr. Becker's interpretation of the CT scan, dated February 25, 2013, noted "no interstitial fibrosis to suggest asbestosis" (Exhibit 6F, page 71), while chest x-rays also interpreted by Dr. Black on that date showed equivocal pleural changes (Exhibit 6F, page 70). Physical examination findings from CARD were largely unremarkable, with clear lung sounds (Exhibit 1F, page 4). The record reflects minimal treatment for respiratory impairments, with generally unremarkable findings during physical examinations with non-CARD treatment providers consistently noting clear lung sounds (e.g., Exhibit 4F, page 6) and one note indicating that the claimant's symptoms were likely due to asthma rather than asbestos-related disease (Exhibit 6F, page 16).

See also: ████████████████ ALJ: 3/16/2016; ████████ Reconsideration: 4/30/2015; ████████████ ALJ: 3/13/2014; and ████████████ ALJ: 2/19/2019.

## V. Was the evidence from CARD/Dr. Black consistent with evidence provided by other sources? In claims in which Dr. Black provided a medical opinion, was the opinion consistent with the objective and opinion evidence from other sources?

In evaluating the records submitted by CARD/Dr. Black, we considered both the consistency of the objective (non-opinion) medical records from CARD with records provided by other sources, and the consistency of opinion statements provided by Dr. Black with his own medical records and those of other providers.

We noted several broad categories of claims in which we identified inconsistencies: (1) Dr. Black's interpretation of chest CT examinations; (2) claims in which the evidence created by CARD was inconsistent with evidence provided by other sources;[20] and (3) claims in which the

---

[20] In 73 of the 322 claims (23 percent) we reviewed, the record contained no other evidence of an asbestos related or respiratory impairment apart from records submitted by CARD/Dr. Black. In these claims, we were generally unable to evaluate the consistency of the records provided by CARD with that provided by other medical sources. We were unable determine whether the absence of other evidence of an asbestos related or other respiratory impairment was due to a lack of existence of such records, or whether they had not been developed. For example, in claims allowed at the initial level our policies do not require further development of the medical record.

opinion of Dr. Black was inconsistent with evidence provided by other sources. Yet, in some cases we also found consistency between CARD/Dr. Black and the records from other sources.

### A.  Inconsistent chest CT scan interpretations

In most of the 322 claims we reviewed, Dr. Black diagnosed the claimant with an ARD based on his interpretation of one or more CT scans. We noted that Dr. Black's interpretations of the CT imaging frequently differed from the initial interpretation of the CT imaging by the outside medical provider who administered the CT. Frequently, Dr. Black's interpretation established the presence of pleural-based changes, asbestosis, or asbestos exposure, while the initial interpretation described the absence of asbestos related changes, or equivocal findings. In other instances, Dr. Black's interpretations noted more significant findings than the interpretations of the same images by outside medical provider. For example:

█████████████ **Initial: 3/20/2017.** In reviewing the claimant's January 9, 2017, chest CT scan, radiologist Michael Henson, M.D., of Cabinet Peaks Medical Center, found the claimant had evidence of prior granulomatous disease including bilateral calcified and noncalcified lung granulomas, unchanged compared to prior studies, but there were no peripheral reticular or honeycomb opacities, pleural spaces were clear, and there was no pleural plaque. Dr. Henson concluded there was no evidence of asbestosis or asbestos related pleural disease (CARD, EF received 3/15/2017, page 26 of 42). Dr. Black interpreted the same January 2017 CT scan as showing, "thin lamellar pleural thickening in both sides of the chest, [that] has become more noticeable in the posterior low chest; it is a little more prominent on the right than left, but remains very subtle, but typical of the noncalcified pleural disease seen with the Libby amphibole exposure." Dr. Black assessed ARD circumscribed pleural plaque and ARD lamellar pleural thickening; and he concluded, "The prognosis is poor that he will be able to continue working and I encouraged him to strongly consider, and I support him applying for disability benefits because of the severity of the chest disease" (CARD, EF received 3/15/2017, pages 9-11 of 42). At the initial level, State agency medical consultant, Tim Schofield, M.D., gave controlling weight to the assessment and opinion of Dr. Black, noting, "Dr. Black is a Libby MT Tremolite Asbestos Related Lung Disease specialist." Dr. Schofield then found the claimant would be unable to sustain any work activity and was disabled (Disability Determination Explanation (DDE), EF received 3/20/2017, pages 3-7).

We noted numerous instances of similar inconsistencies between Dr. Black's interpretations of CT imaging and those of other outside providers as detailed in the chart below.



Black_CT_Comparis
on_FINAL.xlsx

CARD/Dr. Black occasionally explained differing interpretations in treatment notes and patient correspondences. See █████████████, ALJ: 3/16/2016, Exhibit 4F, page 25, with Dr. Black noting, "I'm going to have him reapply to the Grace Medical Plan. He really should be accepted with presence of some pleural thickening. Though perhaps it's subtle to the average examiner, it has clinical significance." See also █████████████, Initial: 2/6/2015, EF received 1/26/2015, page 7 of 24, in which Dr. Black noted "These would be considered very

17

equivocal findings on CXR, except in this population where it is suspicious for some increasing diffuse pleural disease;" and ███████████, Initial: 8/6/2018, CARD, EF received 8/13/2018, pages 57-58 of 82, in which CARD provider Michelle Boltz, FNP, wrote the claimant a letter describing, "It is common for radiologists to disagree with CARD diagnosis (sic). Radiological reading only includes image interpretation, whereas CARD medical providers combine health history, exposure history, breathing test results, and other clinical information to determine a diagnosis."

**B. Dr. Black's opinion was consistent with the evidence of the claimant's asbestos related or other respiratory impairments submitted by other medical providers.**

In 63 of the 185 claims (34 percent) in which Dr. Black provided an opinion,[21] the opinion was consistent with the evidence of the claimant's asbestos related or other respiratory impairment from other medical providers.

███████████ **ALJ: 5/14/2018.** Dr. Black opined in August 2012 that the claimant needed to avoid fumes, dust, perfumes, gases, solvents/cleaners, cigarette smoke, and chemicals due to ARD (Exhibit B3F, pages 2, 6, and 7). Dr. Black also opined in October 2017 that, due to ARD, the claimant needed to avoid exposure to respiratory irritants in the air (Exhibit B25F, page 1). Mary Carraway, LCSW, an employee of CARD, opined the same in August 2017 (Exhibit B23F, page 1). These opinions are consistent with the opinion of the primary care practitioner Patricia Cole, M.D., dated April 2018, who opined that the claimant should never tolerate exposure to dust, odors, fumes, and pulmonary irritants, extreme cold, extreme heat and have only occasional exposure to humidity and wetness (Exhibit B32F, pages 5 and 6). These opinions were also consistent with the CT findings from sources other than CARD, reflecting pleural plaquing consistent with asbestos exposure (Exhibit B18F, pages 10-11, and 13).

**See also:** ███████████ Initial: 9/8/2010; ███████████ Initial: 2/2/2009; ███████████ Reconsideration: 3/19/2009; ███████████ 2/6/2014; ███████████ Initial: 8/30/2006; ███████████ Initial: 12/18/2013; ███████████, Initial: 1/7/2010; ███████████ Initial: 9/18/2007; ███████████ Initial: 8/30/2007; and ███████████ Initial: 6/16/2011.

**C. Dr. Black's opinion was inconsistent with objective evidence provided by CARD or other sources**

In 78 of the 185 claims (42 percent) in which Dr. Black provided an opinion, the opinion evidence was not consistent with the evidence of the claimant's asbestos related or other respiratory impairment.[22] [23]

---

[21] As noted above, our review did not differentiate between opinions provided by Dr. Black or another CARD employee.

[22] 44 of these 185 claims (24 percent), did not contain any evidence of an asbestos related or other respiratory impairment apart from the opinion submitted by CARD/Dr. Black. This includes claims in which the only evidence from CARD/Dr. Black was an EHH Checklist.

[23] In 58 of these 78 claims (74 percent), we found that that if the records created by CARD/Dr. Black were disregarded, the ultimate finding of disability would not be supported by a preponderance of the remaining evidence.

███████████████████████ **Initial: 12/16/2011.** Dr. Black submitted a narrative statement that the claimant's "pulmonary function testing shows significant restrictive process," and most likely, "will continue to progress in the pattern that is seen," and as a result, opined that the claimant "should strongly be considered for receiving Social Security Disability Benefits" (CARD, EF received 12/12/2011, pages 3-4 of 16). However, the other medical records from other providers indicated no more than equivocal findings regarding asbestos related impairments. In September 2009, the claimant's breath sounds were clear (Kalispell Gastroenterology, EF received 9/14/2011, page 19 of 20). CT scans in July 2010 interpreted by Dr. Becker, noted no evidence to suggest previous asbestos exposure and no pleural based thickening or plaquing and no interstitial fibrosis (St. John's Lutheran Hospital, EF received 9/12/2011, page 6 of 13). CT scans in July 2010 also reflected some vague faint thin linear areas of pleural based prominence, posteromedially in the lung bases, that may or may not be due to previous asbestos exposure, no calcified plaques, and no interstitial fibrosis noted (St John's Lutheran Hospital, EF received 9/12/2011, pages 8 and 9 of 13). In August 2010 to February 2011, the claimant's lungs were clear to auscultation (Tamarack Medical Clinic, EF received 9/27/2011, pages 5-8 of 15). Additionally, a PFT conducted by CARD in July 2010 showed FVC, FEV1, and DLCO values of at least 82 percent of predicted (CARD, EF received 12/12/2011, page 15 of 16).

███████████████████████ **Initial: 4/29/2015.** Dr. Black completed an EHH Checklist on October 21, 2014, indicating that the claimant had pleural thickening and pleural plaques (CARD, EF received 10/25/14, page 2 of 2). However, internal CARD records contradict Dr. Black's opinion. On March 11, 2014, CARD records noted, "Per Dr. Black, *no* evidence of asbestos related disease" (CARD, EF received 2/17/15, page 3 of 15) (emphasis added). Furthermore, the January 2014 PFT from CARD showed pre-bronchodilator FVC value of 6.47 and a FEV1 value of 5.07, both at least 100 percent of predicted value, and noted the claimant gave good effort and cooperation (CARD, EF received 2/17/2015, page 15 of 15). The record does not contain other evidence of an asbestos related or respiratory impairment. Additionally, the claimant did not allege an asbestos or respiratory related impairment in his disability filing (Disability Report-Adult (Form SSA-3368), EF received 10/14/2014, page 2 of 18).

**See also:** █████████████████ Reconsideration: 12/17/2018; Initial: 8/4/2016; ███████████████ Initial: 1/14/2013; ██████████ Initial: 8/17/2012; ███████. Initial: 9/27/2017; █████████████, Initial: 7/17/2013; ███████, Initial: 4/22/2014; ███████████, Initial: 11/2/2006; ██████, Initial: 4/3/2018; ████████, Initial: 2/17/2015; and ██████████, Initial: 12/7/2016.

### D. Are treatment records from CARD/Dr. Black consistent with the claimant's subjective complaints?

In 289 of the 322 claims (90 percent) we reviewed, we found that the claimant's subjective complaints were consistent with the medical records provided by CARD/Dr. Black. In the vast majority of claims, the claimant either alleged disability due to an asbestos related impairment, alleged another respiratory impairment, or the record contained subjective

allegations of respiratory limitations elsewhere in the file, for example, in the Disability Report - Adult (Form SSA-3368) or Function Report - Adult (Form SSA-3373).  In 33 of the 322 claims (10 percent), we found that the claimant's subjective complaints were not consistent with the records provided by CARD. These included claims in which the claimant did not allege an asbestos related or other respiratory impairment, claims in which the determination of disability was primarily based on a non-respiratory impairment, and claims in which the only evidence provided by CARD/Dr. Black was an EHH Checklist.