Chad M. Knight
James E. Roberts
Nadia Patrick
W. Adam Duerk
Brendan M. Johns (*Admitted Pro Hac Vice*)
KNIGHT NICASTRO MACKAY, LLC
283 W. Front Street, Suite 203
Missoula, Montana 59802
Telephone:  (406) 206-7052
Facsimile: (816) 396-6233
knight@knightnicastro.com
roberts@knightnicastro.com
npatrick@knightnicastro.com
duerk@knightnicastro.com
johns@knightnicastro.com
    *Attorneys for BNSF Railway Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, on behalf of THE UNITED STATES OF AMERICA | Civil Action No.: CV-19-40-M-DLC |
| Plaintiff, | |
| vs. | **BNSF'S SUPPLEMENTAL STATEMENT OF UNDISPUTED FACTS** |
| THE CENTER FOR ASBESTOS RELATED DISEASE, INC., | |
| Defendant. | |

Relator, BNSF Railway Company ("BNSF"), by and through its attorneys of

record, Knight Nicastro MacKay, LLC, hereby submits the following

Supplemental Statement of Undisputed Facts in support of its motion for partial

summary judgment (Doc. 78):

## CARD's Revised Statement of Disputed Facts

According to CARD's Revised Statement of Disputed Facts (Doc. 110), the

following Facts are now undisputed:

152.    CARD has submitted EHH forms to the Social Security

Administration (SSA) when CARD providers were aware that the individual

patient did not have a clinical diagnosis of asbestos-related disease. (Doc. 110,

pg. 1, SDF ¶69).

153.    According to Tanis Hernandez' sworn testimony, Dr. Black, Tanis

Hernandez and Tracy McNew knew about CARD's practice of submitting patient

EHH forms for Medicare benefits to Social Security for patients who did not have

a diagnosis of asbestos-related disease. (Doc. 110, pg. 2, SDF ¶80).

154.    CARD continues its practice of submitting patients' EHH forms to

SSA who do not have a diagnosis of asbestos-related disease. (Doc. 110, pg. 2,

SDF ¶131).

155.    CARD has submitted patients without a diagnosis of asbestos-related

disease to the Social Security Administration for Medicare benefits since at least

2013, and presumably since the Affordable Care Act was passed in 2010. (Doc.

110, pg. 2, SDF ¶132).

156.   CARD submitted an EHH form in multiple patients' cases based on a B-read alone when CARD's current Medical Director knew those patients did not have an asbestos-related disease diagnosis. (Doc. 110, pp. 2-3, SDF ¶135).

157.   CARD's medical director testified multiple patients' EHH forms were submitted to the Social Security Administration for Medicare benefits even though they do not have a CARD diagnosis of asbestos-related disease. (Doc. 110, pg. 3, SDF ¶136).

158.   CARD knowingly submitted EHH forms to the Social Security Administration in support of Medicare benefits [for patients] who had no clinical diagnosis of asbestos-related disease. (Doc. 110, pg. 3, SDF ¶151).

159.   CARD has been signing EHH forms for patients without a clinical diagnosis since the federal grant started. (Doc. 110, pg. 3, SDF ¶292).

**Testimony of Senator Max Baucus**

According to Senator Max Baucus' recent sworn testimony, the following Facts are now undisputed:

160.   In order to be eligible for Medicare benefits under the Affordable Care Act an individual must have a diagnosis of an asbestos-related disease. (Ex. 67: Dep. Senator Max Baucus 20:17-21; 73:21-74:4; 74:16-21, July 19, 2022 ("Dep. Baucus")).

3

161.   Senator Baucus' intention, and the intention of the EHH statutory provisions in the Affordable Care Act is that ***"if you got a diagnosis, you're covered; if there's no diagnosis, you're not covered… It's very simple."*** [Emphasis added]. (Dep. Baucus 74:9-15).

162.   The purpose of the Environmental Health Hazard (EHH) provisions in the Affordable Care Act was to provide Medicare benefits for people who were exposed to Libby asbestos, <u>not</u> to provide Medicare benefits to people who are <u>not</u> sick. [Emphasis added]. (Dep. Baucus 21:1-7; 21:19-22:1).

163.   Senator Baucus, Kathleen Sebelius and Christy Todd Whitman were not trying to draft legislation that would just make everyone in Libby, Montana Medicare eligible if they did not have asbestos-related disease.  (Dep. Baucus 43:2-15).

164.   It was never Sen. Baucus' intent to make it easier to defraud the Medicare program based on provisions he added to the Affordable Care Act. (Dep. Baucus 43:21-24).

165.   There is no provision stated in Section 1881 of the Affordable Care Act that creates an exception for a patient to be eligible for Medicare benefits without a diagnosis. (Dep. Baucus 18:25-19:6).

166.   In terms of the law itself, there is no provision in the Affordable Care Act EHH provisions that creates an exception for a patient to be eligible for

4

Medicare benefits <u>without</u> a diagnosis of asbestos-related disease – there <u>must</u> be a diagnosis. [Emphasis added]. (Dep. Baucus 74:16-21).

167.   If a patient does not have a diagnosis of an asbestos-related disease, if a patient is not sick from Libby amphibole, they should not be submitted for Medicare benefits – no exceptions. (Dep. Baucus 58:22-59:1; 74:22-75:4; 75:16-22).

168.   When a physician submits a Medicare claim form while knowing that the patient does not have a diagnosis of asbestos-related disease, that is fraud. (Dep. Baucus 60:17-62:6).

169.   Patients who have a finding of an abnormality on a B-read chest x-ray or CT scan (such as a fractured rib), but <u>no</u> signs of asbestos-related disease, should not be submitted for Medicare benefits. (Dep. Baucus 57:2-59:1).

170.   If CARD submitted Medicare claim forms for multiple patients when CARD knew that those patients did not have a diagnosis of asbestos-related disease, that would be *"fraud."* [Emphasis added]. (Dep. Baucus 60:17-25).

## <u>Testimony of Arthur L. Frank, M.D., Ph.D.</u>

According to CARD Expert Dr. Arthur Frank's recent sworn testimony, the following Facts are now undisputed:

171.   According to Dr. Frank, it would be perjury to tell a Court that a patient had a diagnosis of asbestos-related disease when the physician knows that

that patient does not have a diagnosis. (Ex. 68: Dep. Arthur L. Frank, M.D., Ph.D. 44:10-16, July 6, 2022 ("Dep. Frank")).

172.   Dr. Frank has never told any official with the federal government that a patient had a diagnosis of an asbestos-related disease when he knew the patient did not have a diagnosis. (Dep. Frank 44:17-45:8).

173.   If Dr. Frank saw a rib fracture - not any evidence of asbestos-related disease on a CT scan - it would be improper to report that finding as an asbestos-related disease diagnosis. (Dep. Frank 49:22-50:3).

174.   If Dr. Frank knew that a patient did not have an asbestos-related disease, he would not report to a judge, jury or the federal government that the patient has a diagnosis of asbestos-related disease.  (Dep. Frank 50:9-14).

175.   It would be improper to make a claim for Medicare benefits for a patient who is not eligible for Medicare. (Dep. Frank 61:7-20).

## Testimony of Albert Miller, M.D.

According to CARD Expert, NIOSH certified B-reader Dr. Albert Miller's recent sworn testimony, the following Facts are now undisputed:

176.   A B-reader does not diagnose asbestos-related disease, that is the job of the treating physician. (Ex. 69: Dep. Albert Miller, M.D., 71:23-74:17, July 25, 2022 ("Dep. Miller")).

177.   Dr. Miller has never knowingly testified on behalf of a plaintiff that he knew did not have a diagnosis of asbestos-related disease. (Dep. Miller 25:21-26:8).

178.   Dr. Miller would not knowingly testify that a patient had asbestos-related disease when he knows they do not because he values his objectivity and impartiality. (Dep. Miller 26:6-16).

179.   If Dr. Miller were aware of a medical expert who had been willing to state that a patient had asbestos-related disease when that expert knew the patient did not have a diagnosis of asbestos-related disease, his opinion of that person would markedly diminish. (Dep. Miller 27:11-20).

180.   Dr. Miller has never signed and dated a Medicare claim form listing a diagnosis for asbestosis when the patient did not have a diagnosis of asbestosis. (Dep. Miller 46:9-18).

181.   If Dr. Miller believed that a patient did not have a diagnosis of asbestos-related disease, he would not sign a form saying that they did. (Dep. Miller 57:10-59:2).

182.   Dr. Miller would not submit a Medicare claim form saying a patient has asbestosis when he knows the patient does not have that condition. (Dep. Miller 60:19-61:6).

183.   When Dr. Miller knows there is not asbestosis, he would not state that the person has been diagnosed with asbestosis. (Dep. Miller 119:6-9).

184.   Dr. Miller was not aware that CARD has submitted EHH Medicare claim forms to the SSA when CARD providers were aware that the individual patient did not have a diagnosis of asbestos-related disease. (Dep. Miller 102:5-11).

185.   No one at CARD ever told Dr. Miller that Dr. Black, Tanis Hernandez and Tracy McNew knew about CARD's practice of submitting patient EHH forms to the SSA who do not have a diagnosis of asbestos-related disease. (Dep. Miller 102:12-18).

186.   No one at CARD has ever told Dr. Miller that CARD submitted patients without a diagnosis of asbestos-related disease to the Social Security Administration for Medicare benefits since at least 2013. (Dep. Miller 103:19-24).

187.   No one at CARD ever told Dr. Miller – and he is not aware - that CARD has been signing EHH forms for patients without a clinical diagnosis since the federal grant started. (Dep. Miller 104:11-15).

## Testimony of Cristopher Meyer, M.D.

According to CARD B-reader Dr. Cristopher Meyer, M.D.'s sworn testimony, the following facts are now undisputed:

188.   Dr. Meyer is one of only a few hundred NIOSH certified B-readers in the world. (Ex. 70: Dep. Cristopher Meyer, M.D., 8:23-11:9, Aug. 17, 2022 ("Dep. Meyer")).

189.   Dr. Meyer was invited by Dr. Black and CARD to serve as a B-reader to review x-rays and CT scans for CARD patients.  (Dep. Meyer 16:1-10).

190.   B-readers on CARD's expert panel review no patient information, no exposure history – only de-identified patient x-rays and CT scans. B-readers check boxes on a B-reader form that may or may not be related to pneumoconiosis. (Dep. Meyer 16:10-19:23).

191.   B-readers make an <u>interpretation</u> of a chest x-ray or a CT scan and share that interpretive report with the diagnosing physician. (Dep. Meyer 26:7-16).

192.   B-readers on CARD's panel of outside readers do not diagnose patients with asbestos-related disease, that is the role of the treating physician. (Dep. Meyer 21:1-23:24).

193.   While radiologists as "a matter of pride, like to think we know what we're looking at," in the B-reading context, providing a clinical diagnosis for CARD patients was not ever Dr. Meyer's intent. (Dep. Meyer 27:3-28:6).

194.   The B-reader code of ethics states: "B-readers shall recognize the limitations of chest radiograph classifications and shall not make clinical diagnoses

about the pneumoconiosis based on chest radiograph classification alone." (Dep. Meyer 28:21-29:10).

195.   B-readers make an interpretation of a chest x-ray or a CT scan and share that interpretive report with the diagnosing physician.  (Dep. Meyer 26:7-16).

196.   At no point did anyone at CARD explain to Dr. Meyer that CARD was considering his B-reader interpretations as a stand-alone diagnosis. (Dep. Meyer 27:3-7).

197.   Dr. Meyer has never considered his interpretations as a B-reader as a stand-alone diagnosis. (Dep. Meyer 27:8-28:6).

198.   A B-reader on CARD's panel does not act in the role of a treating or diagnosing physician for CARD patients. (Dep. Meyer 24:14-25:12).

199.   B-readers on CARD's panel of radiologists do not sign EHH forms. (Dep. Meyer 23:25-24:20).

200.   Dr. Meyer, prior to his deposition, had never seen an EHH form, nor had he ever been asked to check the diagnosis box on an EHH form. (Dep. Meyer 85:15-86:3).

201.   Dr. Meyer has never reported to CARD any information indicating a date of diagnosis for any type of asbestos-related disease for any CARD patient. (Dep. Meyer 86:18-87:5).

202.    There is no box on a B-reader form indicating an interpretation of "asbestosis." (Dep. Meyer 87:2-5).

### Patient J.P.'s EHH Form

203.    There is no part of patient J.P.'s EHH form that shows an abnormality consistent with "asbestosis." (*See* Doc. 80-21: J.P's EHH form; Dep. Meyer 87:6-94:3).

204.    Any information on J.P.'s EHH form indicating that the patient has a diagnosis of "asbestosis" based on a B-read is false. (Dep. Meyer 93:17-94:17).

205.    By sending B-read forms to CARD via FedEx for patient J.P. (and any individual CARD patient), Dr. Meyer was <u>not</u> rendering a diagnosis of asbestos-related disease. (Dep. Meyer 94:24-95:11).

206.    Dr. Meyer would not ever tell another health care provider that patient J.P. had asbestosis based on his B-read alone. (Dep. Meyer 95:19-23).

207.    Although a diagnosis can be <u>established</u> by a B-reader's interpretation of a chest x-ray or a CT scan, that interpretation by the B-reader alone is not a diagnosis. (Dep. Meyer 95:24-96:6).

208.    The radiographic interpretation of a chest x-ray or CT scan alone is <u>not</u> a diagnosis of asbestos-related disease. (Dep. Meyer 96:7-97:14).

209.    Dr. Meyer was presented with a copy of a CARD letter during his deposition. (*See* Ex. 71: Ltr. from CARD, May 18, 2014).

210.    Dr. Meyer agrees with the statement in CARD's letter that "outside reader interpretations - in your case B-reader interpretations - would not be considered a diagnosis of an asbestos-related disease in this context." (*See* Ex. 71; Dep. Meyer 99:17-23).

211.    Based on Dr. Meyer's read of CARD's letter it appears that the author understood that a B-reader interpretation is not a diagnosis of asbestos-related disease. (Dep. Meyer 99:24-100:4).

212.    At no time did CARD disclose to Dr. Meyer that CARD was basing EHH Medicare eligibility requirements on his B-reads. (Dep. Meyer 101:15-18).

213.    CARD never communicated to Dr. Meyer that CARD intended to submit patient J.P.'s EHH form – or hundreds of other EHH forms - for lifetime Medicare benefits on his B-read alone. (Dep. Meyer 101:19-25).

214.    At no time did CARD inform Dr. Meyer that CARD planned to submit a patient for lifetime Medicare benefits for a patient CARD knew only had a fractured rib detected on radiographic scans based on Dr. Meyer's B-read alone. (Dep. Meyer 102:1-11).

215.    If Dr. Meyer had known that CARD intended to submit patients for Medicare benefits on his B-reads alone, when that patient only had a fractured rib, he stated: ***"I would have objected to it strongly and would have had a discussion***

*internally with our risk management to understand how to further proceed."*

[Emphasis added].  (Dep. Meyer 102:1-16).

### Affidavit of Jeffrey Kanne, M.D.[1]

According to CARD B-reader Dr. Jeffrey Kanne's Affidavit, the following facts are now undisputed:

216.   The only information CARD panel B-readers receive from CARD includes de-identified images, B-reader forms for each image and return Fed-Ex envelopes to CARD. (Ex. 72: Aff. Jeffrey Kanne, M.D., ¶¶6-7, Sept. 9*, 2022 ("Aff. Kanne")).

217.   It is not Dr. Kanne's job to diagnose any CARD patient, including for any asbestos-related disease. The responsibility for diagnosing lies with the CARD patient's physician. (Aff. Kanne ¶8).

218.   Dr. Kanne reviewed the CT image taken on August 20, 2013 (for CARD patient J.P.), apparently signed and dated by Dr. Kanne on August 21, 2014.  (Aff. Kanne ¶9).

219.   This B-reader classification form, by itself does not, nor could it, constitute a diagnosis of asbestos-related disease. (Aff. Kanne ¶10).

220.   This B-reader form indicates the presence of "Emphysema." (Aff. Kanne ¶11).

---

[1]* Dr. Kanne is anticipated to sign his affidavit on Thursday.  His affidavit will be filed with the Court upon receipt.

221.   Although this classification form can be read as saying that this patient had lung abnormalities on the date that this CT image was taken, this report does not conclude or even attempt to opine as to the cause of these lung abnormalities, this report does not conclude that this patient has "asbestosis," nor does this report conclude that the abnormalities are related specifically to asbestos exposure. (Aff. Kanne ¶12).

222.   After the deposition of Dr. Kanne's colleague, Christoper Meyer, it has come to Dr. Kanne's attention that the CARD clinic has apparently cited  B-read classification report or the B-read classification report of others of its NIOSH-certified B-reader panel as the sole basis for submitting claims for Medicare benefits for CARD patients. (Aff. Kanne ¶13).

223.   After the deposition of Dr. Kanne's colleague, Dr. Cristopher Meyer, it has also come to Dr. Kanne's attention that the CARD clinic has cited his B-read classification report for this individual (attached as Exhibit A to Dr. Kanne's Affidavit) as the sole basis for submitting a claim for Medicare benefits for this individual. (Aff. Kanne ¶14).

224.   Specifically, CARD has apparently represented to the Social Security Administration that Dr. Kanne's B-read report alone constitutes a "diagnosis" of asbestos-related disease. (Aff. Kanne ¶15).

225.   This is not true. As noted in paragraph 8 above, Dr. Kanne's role as a B-reader was not to diagnose any CARD patient, nor did Dr. Kanne's completion of any B-reader classification form constitute a diagnosis of any CARD patient. (Aff. Kanne ¶16).

226.   B-readers do not diagnose any individual, including those individuals who were patients of CARD within the context of CARD's screening program. (Aff. Kanne ¶17).

227.   To suggest that Dr. Kanne's B-read classification report, for patient J.P. (or any other CARD patient for that matter) constitutes a "diagnosis" of any kind, including any diagnosis of "Asbestosis" or any other asbestos-related disease, is false. (Aff. Kanne ¶18).

228.   Based on information presented to Dr. Kanne from Dr. Cristopher Meyer's recent deposition related to CARD's practice of using of B-readers' reports as a basis for making Medicare claims for their patients, Dr. Kanne's and Dr. Meyer's employer, the University of Wisconsin, has notified CARD that it intends to terminate its B-reader contract with CARD. (Aff. Kanne ¶19).

229.   Information that CARD has submitted patients for Medicare benefits using Dr. Kanne's B-read classifications as a basis for that submission, was unknown to him until after Dr. Meyer's deposition of August 17, 2022. (Aff. Kanne ¶20).

15

230.    A true and accurate copy of the Notice of Termination related to the University of Wisconsin's decision to terminate its B-reader contract with CARD is attached as Exhibit B to Dr. Kanne's Affidavit. (Aff. Kanne ¶21).

DATED this 7th day of September, 2022.

KNIGHT NICASTRO MACKAY, LLC


By: _/s/ W. Adam Duerk_
       W. Adam Duerk
       *Attorneys for BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 7th day of September, 2022, a copy of the foregoing
document was served upon the following persons by the following means:

<u>1-3</u>  CM/ECF
_____  Mail
_____  Hand Delivery
_____  Overnight Delivery Service
_____  Fax
_____  Email

1. Clerk, U.S. District Court

2. Michael Kakuk
  Assistant U.S. Attorney
  U.S. Attorney's Office
  P.O. Box 8329
  105 E. Pine, 2nd Floor
  Missoula, MT 59802
  Michael.kakuk@usdog.gov

3. Timothy Bechtold
  Bechtold Law Firm, PLLC
  PO Box 7051
  Missoula, MT 59807
  Facsimile: 406-830-3085
  tim@bechtoldlaw.net

KNIGHT NICASTRO MACKAY, LLC

By: _/s/ W. Adam Duerk_____
   W. Adam Duerk
   *Attorneys for BNSF Railway Company*

17