Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                 FOR THE DISTRICT OF MONTANA
 3
 4    BNSF RAILWAY COMPANY, on behalf of
 5    THE UNITED STATES OF AMERICA,
 6
 7              Plaintiff,
 8
 9     vs.                    Cause No. CV-19-40-M-DLC
10
11    THE CENTER FOR ASBESTOS RELATED
12    DISEASE, INC.,
13
14              Defendant.
15    _____
16        VIDEO DEPOSITION UPON ORAL EXAMINATION OF
17                  SENATOR MAX BAUCUS
18    _____
19        BE IT REMEMBERED, that the video-taped deposition
20    upon oral examination of SENATOR MAX BAUCUS, appearing at
21    the instance of the Defendant, was taken at the offices of
22    Fisher Court Reporting, 442 E. Mendenhall, Bozeman,
23    Montana, on July 19, 2022, beginning at 10:00 a.m.,
24    pursuant to Montana Rules of Civil Procedure, before Robyn
25    Ori English, Court Reporter - Notary Public.
```

Page 2

```
 1                  APPEARANCES OF COUNSEL
 2
 3        ATTORNEY APPEARING ON BEHALF OF THE
 4        PLAINTIFF:
 5
 6              W. ADAM DUERK
 7              Knight Nicastro Mackay, LLC
 8              283 West Front Street, Suite 203
 9              Missoula, MT  59802
10              duerk@knightnicastro.com
11
12        ATTORNEY APPEARING ON BEHALF OF THE
13        DEFENDANT:
14
15              TIMOTHY BECHTOLD
16              Bechtold Law Firm, PLLC
17              P.O. Box 7051
18              Missoula, MT  59807
19              tim@bechtoldlaw.net
20
21
22
23
24
25
```

Page 3

```
 1                       I N D E X
 2
 3
 4    EXAMINATION OF SENATOR MAX BAUCUS BY:          PAGE:
 5
 6        Mr. Adam Duerk, Esq......................... 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                     E X H I B I T S
 2
 3    DEPOSITION EXHIBITS:                          PAGE:
 4
 5    Previously marked as Exhibits 1 through 5.  Re-marked as
 6    follows:
 7
 8    Exhibit 108  Declaration of Senator Max .... 7
 9                 Baucus
10    Exhibit 109  CARD's Statement of Disputed .. 15
11                 Facts
12    Exhibit 110  Congressional Record - ........ 29
13                 Senate Proceedings and
14                 Debates of the 111th
15                 Congress, First Session,
16                 Saturday, December 19, 2009
17    Exhibit 111  CARD's Expert Witness ......... 30
18                 Disclosure
19    Exhibit 112  Congressional Record - ........ 32
20                 Senate Proceedings and
21                 Debates of the 111th
22                 Congress, First Session -
23                 Monday, December 21, 2009
24
25
```

Exhibit 67-1

Page 17

1  eligibility for benefits under this title an
2  individual must be determined to be an environmental
3  exposure affected individual."
4          "Undisputed."
5          Would you agree?
6      A.  Yep.  If that's in the -- if that's in
7  the statute.
8      Q.  All right.
9      A.  Is it in there?
10     Q.  It is in there, and it is considered
11 undisputed.
12     A.  Okay, if it's in there.
13     Q.  All right.
14     A.  No reason to dispute it.
15     Q.  Okay.  3, "An environmental exposure
16 affected individual means any individual who is
17 diagnosed with one or more conditions."
18         "Undisputed."
19         Would you agree?
20     A.  Yep.
21     Q.  Okay.  "Those conditions are:
22 Asbestosis, pleural thickening or pleural plaques as
23 established by interpretation by a 'B Reader'
24 qualified physician of a plain chest x-ray or
25 interpretation of a computed tomographic radiograph

Page 18

1  of the chest by a qualified physician, as determined
2  by the Secretary; or, two, such other diagnostic
3  standards as the Secretary specifies, except that
4  this clause shall not apply to pleural thickening or
5  pleural plaques unless there are symptoms or
6  conditions requiring medical treatment as a result
7  of these diagnoses.  Mesothelioma, or malignancies
8  of the lung, colon, rectum, larynx, stomach,
9  esophagus, pharynx, or ovary; any other diagnosis
10 which the Secretary, in consultation with the
11 Commissioner of Social Security, determines is an
12 asbestos-related medical condition, as established
13 by such diagnostic standards as the Secretary
14 specifies."
15         That fact is "Undisputed."
16         Would you agree?
17     A.  As far as I can tell.
18     Q.  "The language in the EHH provisions of
19 the Affordable Care Act uses the terms 'diagnosis,'
20 'established by,' and 'interpretation' when
21 describing environmental exposed individuals."
22         "Undisputed."
23         Would you agree?
24     A.  To the best of my knowledge.
25     Q.  Okay.  "There is no provision stated in

Page 19

1  Section 1881 of the Affordable Care Act that creates
2  an exception for a patient to be eligible for
3  Medicare benefits without a diagnosis."
4          "Undisputed."
5          Would you agree?
6      A.  Yep.
7      Q.  "Black's Law defines 'diagnosis' as:  'A
8  medical term, meaning the discovery of the source of
9  a patient's illness or the determination of the
10 nature of his disease from a study of its
11 symptoms.'"
12         "Undisputed."
13         Do you agree?
14     A.  I've never -- I haven't looked at my
15 Black's Law dictionary in 40 years.  I have no idea.
16     Q.  Fair enough.  Are there any facts that
17 you're aware of as you sit here today that would
18 lead you to dispute fact No. 7?
19     A.  No.
20     Q.  Okay.  This next one references CARD's
21 website.  And, sir, I'll probably ask you some
22 predicate questions here.  But have you ever seen
23 CARD's website that you can recall?
24     A.  No, no.
25     Q.  Okay.  I'll phrase it this way:  "In

Page 20

1  order to be eligible for Medicare benefits under the
2  Affordable Care Act, an individual must have a
3  diagnosis of an asbestos-related disease."
4          Would you agree?
5      MR. BECHTOLD:  Foundation.
6      THE WITNESS:  Would I agree?
7      Q.  (By Mr. Duerk)  Yes.
8      A.  I mean, it's -- "According to CARD's" --
9  I don't know.  I haven't seen it.
10     Q.  Okay.
11     A.  So how -- I can't respond.  I haven't
12 seen it.
13     Q.  And that's why I'm phrasing it just this
14 way.  Regardless of whether or not CARD's website
15 says that an individual must have a diagnosis of an
16 asbestos-related disease in order to be eligible for
17 Medicare, would you agree that in order to be
18 eligible for Medicare benefits under the Affordable
19 Care Act an individual must have a diagnosis of an
20 asbestos-related disease?
21     A.  To the best of my knowledge, yes.
22     Q.  Okay.  Now, again, the next question
23 starts with the language, "According to CARD."  So
24 I'm going to change this question just to see if
25 you'd agree.

Page 21

1          Senator Baucus, would you agree that the
2    purpose of the Environmental Health Hazard
3    provisions in the Affordable Care Act was to provide
4    Medicare benefits for people who were exposed to
5    Libby asbestos; not to provide Medicare benefits to
6    people who are not sick?
7          A.   Yes.
8          Q.   All right.  Sir, you're welcome to review
9    these if you would like.  However, I'll turn away
10   from this document as a basic line of questioning.
11   But based on your understanding of the Affordable
12   Care Act and your involvement in the Affordable Care
13   Act, is it your understanding that CARD's purpose
14   was to diagnosis individuals with asbestos-related
15   disease and where those patients were diagnosed to
16   submit them for Medicare benefits if they were
17   eligible?
18         A.   Generally correct, yeah.
19         Q.   Okay.  And consistent with what we've
20   been discussing here, it was not the purpose of the
21   Affordable Care Act, based on your understanding, to
22   allow people who were not sick to claim Medicare
23   eligibility --
24         A.   Correct.
25         Q.   -- for life, correct?

Page 22

1          A.   Correct.
2          Q.   Thank you.
3               I'd like to talk about your involvement,
4    Senator Baucus, in two pieces of legislation; not
5    only the Affordable Care Act and the EHH provisions
6    in the act, but also the Fair Act or the Fairness In
7    Asbestos Injury Resolution Act of 2005.
8               I recognize that you've signed the
9    declaration about provisions, the EHH provisions in
10   the Affordable Care Act.
11              In terms of The Fairness in Asbestos
12   Injury Resolution Act, do you recall having
13   involvement in that particular piece of legislation?
14         A.   I don't at this moment, but, my gosh,
15   that was what?  This is, what, 2022?  It was 18
16   years ago.  I'd have to talk to my staff.
17         Q.   And I'm happy to --
18         A.   I have no -- it sounds like something I'd
19   do, but I would have to stop and talk to my staff.
20         Q.   Okay.  Just as you sit here today, what
21   can you recall about The Fairness in Asbestos Injury
22   Resolution Act?
23         A.   Well, if you give the provisions to me, I
24   can look at it and be able to --
25         Q.   Sure.

Page 23

1          A.   -- come up with something.
2          Q.   Yep, you bet.
3          A.   Just out of the blue, this is the first
4    time anybody's referenced it in a long time.  So
5    this is the judiciary committee.  This is a huge,
6    big document.
7          Q.   It is.  And rather than having you -- or
8    asking you to try to refresh your recollection over
9    a very large document, I'll say at the outset that
10   this piece of legislation had what I'll label fairly
11   extensive history in Congress.  It appears that this
12   bill was discussed and went up for hearing multiple
13   times between September 25th, 2002 and June of 2005.
14   I'm seeing half a dozen committee meetings and
15   hearings about this bill.  So I don't want to ambush
16   you with what amounts to an Encyclopedia Britannica
17   full of information.
18         A.   It's pretty extensive here.
19         Q.   It is very -- it is very extensive.  If I
20   describe it generally in a way that sounds accurate
21   to you, maybe that might help speed things along.
22         A.   This is in the judiciary committee.
23         Q.   Okay.
24         A.   I can just tell by looking at it that's
25   what it says.

Page 24

1          Q.   Yep, yep.  In terms of the general goal
2    of The Fairness in Asbestos Injury Resolution Act or
3    the Fair Act, Senator, is it fair to say that in the
4    Senate, you and your colleagues were trying to
5    address a system or a method of addressing the
6    asbestos litigation difficulties in the United
7    States by coming up with some sort of fund to ensure
8    that people who were sickened by asbestos had a
9    remedy that would help them with their personal and
10   medical difficulties caused by asbestos exposure?
11         A.   I --
12         MR. BECHTOLD:  Foundation.
13         THE WITNESS:  What do you mean "foundation"?
14         Q.   (By Mr. Duerk)  I think, not to speak for
15   Mr. Bechtold, but he is preserving the record with
16   some objections.  By "foundation," I think he is
17   suggesting that maybe you don't know what I'm
18   talking about?
19         A.   Because you're right.
20         Q.   And that's what I'm trying to get at.
21         A.   Basically, that's right.  I mean, I
22   was -- I was part of anything to help people in
23   Libby.
24         Q.   Yes.
25         A.   I was not on this committee.

Page 41

1     A.   That's my understanding.
2     Q.   All right.  Is there any question in your
3  mind that Mr. Skramstad suffered from an
4  asbestos-related disease?
5     A.   No.
6     Q.   Your intent in terms of putting these EHH
7  provisions into the Affordable Care Act was to
8  protect individuals like Mr. Skramstad who had been
9  exposed to Libby amphibole and doctors determined to
10  have an asbestos-related disease, correct?
11     A.   That's correct.
12     Q.   Okay.  And one of the provisions drafted
13  into the Affordable Care Act is to enshrine those
14  protections for people like Les Skramstad by making
15  it clear that if someone has a diagnosis of an
16  asbestos-related disease, that they're sick from
17  exposure to Libby asbestos, they are Medicare
18  eligible?
19     A.   Whoever they are.  Anybody that fits that
20  description --
21     Q.   All right.
22     A.   -- including Les and anybody else.
23          Les died, as you know, because of this,
24  and his wife died and his kids died.  And it's
25  just -- so it's not just Les.  It's other people in

Page 42

1  the community.
2     Q.   Understood.  I know that this is --
3     A.   And even across the country it had --
4  exposed to asbestos.
5     Q.   I understand that this bill was not only
6  for Mr. Skramstad.
7     A.   Correct.
8     Q.   I understand that this bill --
9     A.   It's for the people of Libby primarily.
10     Q.   Yep, who were exposed to Libby --
11     A.   And I represented the state of Montana,
12  and I can do all I can for the people in the state
13  of Montana, including people who have suffered so
14  much and have no other remedy, frankly, but for me.
15     Q.   Understood.
16     A.   If it were not for me, those people would
17  still be suffering.
18     Q.   Understood.
19          In terms of Christine Todd Whitman,
20  Kathleen Sebelius, and the others that you mentioned
21  earlier in your testimony, is it your understanding
22  that they, like you, wanted to make sure that they
23  were providing protection from people who are
24  suffering from asbestos-related disease due to
25  exposure to Libby amphibole?

Page 43

1     A.   Yes.
2     Q.   Is it also true that Christine Todd
3  Whitman, Kathleen Sebelius, the others that you
4  mentioned, to the best of your understanding, like
5  you, were not trying to just give everyone in Libby
6  a free pass.  You were not drafting legislation that
7  would just make everybody in Libby, Montana,
8  Medicare eligible?
9     A.   Correct.
10     Q.   So if somebody lived in Libby but they
11  weren't sick, it wasn't your intent to draft a law
12  that would give them a Medicare free card for life
13  even though they didn't have asbestos-related
14  disease?
15     A.   Correct.
16     Q.   Okay.  Earlier, when I was talking about
17  the Fair Act and some of its similarities to the EHH
18  provisions in the Affordable Care Act, I was
19  talking -- I was asking you some questions about
20  antifraud provisions.
21          Sir, it was never your intent to make it
22  easier for anyone to defraud the Medicare program
23  based on provisions that you had a hand in passing?
24     A.   Correct.
25     Q.   Okay.

Page 44

1     A.   Don't want fraud.
2     Q.   Yep.
3     A.   Fraud's not a good thing.
4     Q.   I think we can all agree --
5     A.   We don't like fraud.
6     Q.   -- fraud's not a good thing.
7     A.   Okay.
8     Q.   Okay.  In terms of this case, you have
9  not seen any documents outlining the allegations of
10  fraud against the CARD clinic?
11     A.   No, I have not.
12     Q.   Okay.  Regardless of who is behind a
13  scheme to defraud the federal government, you would
14  be concerned about the potential of that fraudulent
15  activity, fair?
16     A.   Well, I don't -- I'd be concerned about
17  fraud.  It would have to be proven.
18     Q.   Right.  And in terms of any of the
19  evidence in this case related to fraudulent
20  activity, you have not reviewed that evidence?
21     A.   I am unaware of any fraud.  I don't think
22  I'd find any either with respect to the CARD clinic.
23  I don't think I'd find any either knowing what I do
24  about that clinic and Dr. Black and the people
25  involved.

Exhibit 67-4

Page 57

1        A.    Sure.
2        Q.    In -- in terms of Medicare eligibility, I
3    want to go through a hypothetical with you and get
4    your thoughts, okay?
5              The hypothetical is this:  Let's say an
6    individual who lives in Libby, Montana, goes to a
7    doctor and gets screened for asbestos-related
8    disease and that patient has an abnormality because
9    of a rib fracture that would appear on a chest
10   x-ray.
11             As part of the screening program, that
12   patient's chest x-ray and CT scan is sent out to a
13   panel of experts, and they identify that there's a
14   rib fracture there.
15             Those x-rays and CT's come back to the
16   diagnosing physician who reviews the CT scan and the
17   chest x-ray, and they sit down with the patient
18   after conducting an exposure history and a physical
19   exam, and they look at the CT scan and they say,
20   "You have a fractured rib, but you do not have a
21   diagnosis of asbestos-related disease."
22             Does that all make sense so far in terms
23   of the hypothetical?  We've got a patient with no
24   diagnosis of asbestos-related disease.
25             In your mind, would it be proper for that

Page 58

1    patient to be submitted for Medicare eligibility
2    under the EHH provisions of the Affordable Care Act?
3        A.    I'd want a second opinion.
4        Q.    All right.
5        A.    I think, my gosh, I've gone to a lot of
6    the doctors in my life, and sometimes it's better to
7    go see another one.
8        Q.    All right.  Well, within the context of
9    this hypothetical, let's say that the doctor with
10   the most information, the diagnosing physician, the
11   doctor who has the CT scan and the chest x-ray, the
12   doctor who's completed an inpatient assessment, the
13   doctor who's reviewed the exposure history of the
14   patient, the diagnosing physician in this instance
15   says, "You're not sick.  You don't have
16   asbestos-related disease."
17             Based on your understanding of the
18   Affordable Care Act, would it be proper for that
19   patient to be submitted for Medicare benefits?
20       A.    If the patient does not have disease, the
21   answer is no.
22       Q.    Right.  And so consistent with the
23   original purpose of the EHH provisions in the
24   Affordable Care Act, without a diagnosis, that
25   patient shouldn't be deemed Medicare eligible?

Page 59

1        A.    Without a diagnosis, that's correct.
2        Q.    Okay.  Doctor, in terms of your
3    background training and experience, and I think
4    these questions are all going to be real basic, but
5    you don't hold yourself out as a physician, correct?
6        A.    No, I don't.
7        Q.    Didn't go to medical school?
8        A.    I did not.
9        Q.    All right.  Don't claim to know or
10   understand the intricacies of what's required for a
11   diagnosis of asbestos-related disease under the
12   American Thoracic Society standard?
13       A.    That's correct.  It's not my deal.
14       Q.    All right.  So if CARD physicians have
15   admitted under oath that B Readers, just
16   radiologists who only look at a film, do not
17   diagnose, you wouldn't have a reason to disagree
18   with that?
19       A.    Again, if there's no diagnosis, that
20   person should not get -- should not be covered.
21       Q.    Okay.  And on the very narrow and
22   specific question, I think I might anchor this to
23   undisputed facts if we need to, but would you
24   dispute that radiologists, those doctors who just
25   look at films, are not responsible for diagnosing a

Page 60

1    patient?
2        MR. BECHTOLD:  Foundation.
3        THE WITNESS:  I was going to say I have no -- I
4    cannot -- I cannot answer that question.
5        Q.    (By Mr. Duerk)  Fair enough.
6        A.    I have no basis to answer that question.
7        Q.    Okay.  And if we could look at Exhibit 2
8    in front of you.  I'm looking at page 13 of 41.
9        A.    Okay.
10       Q.    Sir, if I told you that CARD does not
11   dispute the fact that B Readers do not diagnose,
12   would you have any reason to disagree with that?
13       A.    I -- I'm --
14       MR. BECHTOLD:  Foundation.
15       THE WITNESS:  I'm not qualified to answer that
16   question.
17       Q.    (By Mr. Duerk)  All right.  Back to the
18   hypothetical of the patient with the rib fracture,
19   if a doctor had submitted Medicare claims for over
20   100 patients knowing that those patients did not
21   have a diagnosis of asbestos-related disease, would
22   you find that problematic?
23       A.    Yes.
24       Q.    Why?
25       A.    Because it would be fraud.

Page 61

1    Q.   In your mind, why would that scenario
2  suggest fraud to you?
3    A.   It's inaccurate.  Benefits based on false
4  evidence.
5    Q.   Right.  Continuing on with this
6  hypothetical, if the doctor in that hypothetical
7  where the patient had the a rib fracture signed a
8  Medicare claim form stating that patient had
9  asbestosis and the date of diagnosis for that
10  asbestosis in support of the claim for Medicare
11  eligibility, would you find that fact problematic?
12    A.   Yeah.  I don't quite understand the
13  question.  Did the doctor find that there is
14  asbestos-related disease or not?
15    Q.   No.  In this hypothetical, the doctor
16  determined there was no diagnosis of
17  asbestos-related --
18    Q.   What did the doctor do?
19    Q.   The doctor in this hypothetical submitted
20  a Medicare claim form that stated the patient had
21  asbestosis.  Would you find that problematic?
22    A.   Yes, I would.
23    Q.   Would you -- in your words, would you
24  describe that as fraud?
25    A.   I'd have to look at the statute.  It --

Page 62

1  it certainly is wrong.  I'd have to look at the
2  statute legally.  All I know is it's -- it raises --
3  as I said problematic.  It raises questions and
4  seems wrong, and I'd have to dig into it a lot more
5  to find out what's going on here.
6    Q.   Understood.
7         Let's go into a separate hypothetical.
8  Assume there's the same doctor who sees a patient
9  and that patient had some experience in Libby,
10  Montana, so that they were in Libby for the
11  requisite period of time, and the doctor sent that
12  patient's x-rays and CT scans out for a read from
13  either a B Reader or a thoracic radiologist, a
14  pulmonologist, someone with experience reading
15  films, and all of those films, all of those chest
16  x-rays came back as negative for asbestos-related
17  disease, not just once but multiple times year after
18  year, assuming there was no outside evidence
19  according to radiologists and outside experts
20  showing any signs consistent with asbestos-related
21  disease, would you find it problematic if that
22  doctor submitted that patient for Medicare benefits?
23    A.   Yeah.  If there's no basis for finding
24  disease, yeah.
25    Q.   Same hypothetical:  Would you find it

Page 63

1  problematic if, in addition to all those negative
2  outside readings, that patient went to a local
3  pulmonologist who, similar to the hypothetical
4  doctor, had been treating patients for Libby
5  amphibole disease for years and said to the patient,
6  "You are not sick.  You do not have asbestos-related
7  disease," and that patient returned to the
8  hypothetical doctor, and the hypothetical doctor
9  told the patient, "Ignore that pulmonologist's
10  second opinion," would you find that problematic?
11    A.   No.
12    Q.   Why not?
13    A.   A lot of doctors are quacks, and I
14  just -- I just don't know what -- who that
15  pulmonologist is.  I have no idea who he is, so I --
16  based on what you said, I -- I do not have that
17  information.
18    Q.   But your statement is a lot of doctors
19  are quacks.
20    A.   Some are.  That's an overstatement.  Some
21  are.
22    Q.   All right.  Senator Baucus, in your
23  opinion are doctors from the Mayo Clinic in
24  Rochester, Minnesota, doctors that fall into that
25  quack category?

Page 64

1    A.   No.
2    Q.   Generally no, fair?
3    A.   Fair.
4    Q.   Okay.  Same hypothetical:  Let's assume
5  that patient, frustrated with the different opinions
6  he's hearing about his disease --
7    A.   Right.
8    Q.   -- takes a trip to Rochester.
9    A.   Right.
10    Q.   And he remains there for several days,
11  and he has his films over-read by radiologists, and
12  he has an in-person physical examination, and he
13  goes through a battery of tests.
14    A.   Right.
15    Q.   Let's assume that that patient is told by
16  the doctors at Mayo, "You have no signs of
17  asbestos-related disease.  In fact, we over-read all
18  of your scans going back for years, and none of them
19  show any signs consistent with asbestos-related
20  disease."  Would it concern you if the hypothetical
21  doctor still maintained and told that patient, "You
22  have asbestos-related disease despite what all of
23  these other doctors are saying"?
24    A.   I'd be concerned.
25    Q.   I would like to expand the hypothetical

Page 73

1    Q.    But in terms of what's passed into law,
2    the law is what's determinative of how this
3    legislation is enforced?
4         A.    Senators vote for all kinds of reasons.
5    It's hard to tell.
6         Q.    All right.  When we enforce the criminal
7    code, for example, or when we enforce the Affordable
8    Care Act and determine how the Affordable Care Act
9    should govern all of us, the first place we look is
10   the law itself?
11        A.    Right.
12        Q.    Not necessarily legislative history?
13        A.    Correct.
14        Q.    Okay.  And when we look to legislative
15   history, is it fair to say we look at the printed
16   record of your deliberations?
17        A.    Yeah.
18        Q.    Okay.  In terms of your declaration in
19   Exhibit 1, I think we've probably covered this at
20   length, but in terms of the opinions that you intend
21   to share at trial in this matter, is it your opinion
22   that in order to be Medicare eligible a patient must
23   have a diagnosis of asbestos-related disease?
24        A.    It helps.
25        Q.    It helps?

Page 74

1         A.    It helps.
2         Q.    All right.  Is a diagnosis required under
3    the Affordable Care Act?
4         A.    Under the law, yes.
5         Q.    Okay.
6         A.    But CMS may reject a claim.  I mean, CMS
7    may reject, and there are all kinds of steps here.
8         Q.    All right.  And then --
9         A.    But for the purposes of this discussion,
10   though, it's my intention that -- and I think it's
11   the intention of the statute -- that if you got a
12   diagnosis, you're covered; if there's no diagnosis,
13   you're not covered.
14        Q.    Right.
15        A.    It's very simple.
16        Q.    And in terms of the law itself, as we've
17   covered earlier, there's no provision stated in the
18   Affordable Care Act, the EHH provisions, that
19   creates an exception for a patient to be eligible
20   for Medicare benefits without a diagnosis.
21        A.    There must be a diagnosis.
22        Q.    And if a patient does not have a
23   diagnosis of asbestos-related disease, if a patient
24   is not sick from Libby amphibole, they should not be
25   submitted for Medicare benefits?

Page 75

1         A.    Generally that's correct.
2         Q.    Okay.  And again, is there any exception
3    that you can think of here?
4         A.    No.
5         Q.    All right.  So --
6         A.    But things are generally not black and
7    white.  I mean, someone may say, "That person is not
8    qualified.  That person" -- some other doctor may
9    say, "Yes, he is qualified."
10        Q.    Sure.
11        A.    So I mean, it's -- there are shades of
12   gray here.
13        Q.    Understood.  But in terms of --
14        A.    The principle, we're talking about the
15   principle.
16        Q.    And in terms of the language of the law.
17        A.    The language of the law, that's correct.
18        Q.    If a patient doesn't have a diagnosis --
19        A.    Correct.
20        Q.    -- of asbestos-related disease from Libby
21   amphibole, they should not be Medicare eligible?
22        A.    Correct.
23        MR. DUERK:  Sir, I would like to take a few minutes
24   to review my notes once more to make sure I'm not missing
25   anything, and then I anticipate we may be through with my

Page 76

1    part.  Thank you.
2         VIDEO OPERATOR:  We are going off the record.  The
3    time is 11:52 a.m.
4
5              (Whereupon, a recess was taken)
6
7         VIDEO OPERATOR:  We are back on the record.  The time
8    is 12:04 p.m.
9         Q.    (By Mr. Duerk)  Senator Baucus, during
10   your deposition today, it's appeared to me that
11   you've understood my questions.  When you've needed
12   clarification, you've asked for that clarification.
13   Has that been your impression also?
14        A.    Yes.
15        Q.    Sir, I thank you for your time.
16             Do you anticipate serving as a witness at
17   trial in this matter?
18        A.    Yes.
19        MR. DUERK:  Okay.  I have nothing further.  Thank
20   you, sir.
21        MR. BECHTOLD:  And I'll reserve --
22        THE WITNESS:  Sorry?
23        MR. BECHTOLD:  I'll reserve any questions for trial.
24        THE WITNESS:  Okay.
25        VIDEO OPERATOR:  That concludes the deposition.  The