```
1            IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MONTANA
2

3   BNSF RAILWAY COMPANY, on     )
    behalf of THE UNITED STATES  )
4   OF AMERICA,                  )       Civil Action
                                 )     No. CV-19-40-M-DLC
5           Plaintiff,           )
                                 )
6   vs.                          )
                                 )
7   THE CENTER FOR ASBESTOS      )
    RELATED DISEASE, INC.,       )
8                                )
            Defendant.           )
9   _____)

10

11

12

13          REMOTE VIDEO RECORDED EXPERT DEPOSITION

14                            OF

15              ARTHUR L. FRANK, M.D., Ph.D.

16          (Taken on behalf of the Plaintiff.)

17

18

19

20

21
                    Taken Remotely Via Zoom
22     Wednesday, July 6, 2022 - 1:28 p.m. (EDT)

23

24
       Reported by Beth Gilman, RPR and Notary Public
25      for the State of Montana, County of Flathead
```

**Asa & Gilman Reporting, Inc. - asagilman@centurytel.net**
**P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751**

Exhibit 68-1

**41**

What I would do in a case like that is, I would read the x-ray myself, I would make my own determination, and then I would look and see what other people have read.

The other, you know, piece of this that you haven't mentioned is if it is in a medical/legal context. I will tell you that I have seen -- as you probably know, there have been B-readers that have been prohibited from testifying in court because of over-reading. One particular individual comes to mind, and I never trusted his x-rays because he'd read the vast majority of them as positive. That said, the huge bulk of under-reading is from, you know, to my mind, predictable physicians who I learned -- you know, the worst thing I think I ever said about a colleague once was, you know, His own grandmother could have it and he'd read the x-ray as negative.

BY MR. DUERK:

Q. All right.

A. I mean, there was comments in the file from treating physicians, unrelated to any medical/legal work, who found certain things where CT scans were positive, where the diagnosis was -- you know, it was staring at you out of the pages of the medical records, and these so-called, you know, expert

**42**

B-readers would say, There's nothing on the film, and, you know, wouldn't find it. So there's a lot of factors that go into this.

I think at the end of the day any given physician ought to have enough trust in their own judgment and experience and validity as a doctor to call them as they see them. It doesn't mean you don't look at other people's, you know, views on it, but, you know, I -- the fact that there's something in a record that says that there's a positive film -- and, very frankly, you know, the fact that I still see hundreds of asbestos cases a year, and I see a number of so-called B-readers, I've actually questioned some of the attorneys, you know, Do you get a sense that this guy tends to over-read? And they say, No; we think he, you know, calls them reliably. But I even question that now. So I think at the end of the day I have to trust my own judgment in these cases no matter what another physician thinks.

Q. And in this particular case, just to clarify, you didn't over-read any of the individuals referenced in the Third Amended Complaint here. You didn't review the medical records or their CT scans; correct?

A. I can't answer that beyond saying this.

**43**

First of all, I don't know who those individuals are.

Q. Correct.

A. Secondly, I may have looked at charts of some of those individuals that I reviewed on one or another other occasion with Dr. Black, but even if you presented me right now with that list of names I couldn't answer you that I had seen any of these because I have absolutely no recollection of the name of any given individual whose chart or x-ray or CT I may have seen.

Q. All right. Doctor, I just want to cover a couple of things that appear in your report related to these medical/legal cases when you were working with attorneys. And I don't know if these are specific examples from the 200-case scenario that we spoke about or not, but I'll just run them by you.

In the case that you referenced where attorneys or colleagues were potentially over-diagnosing cases of asbestos-related disease, you indicate in your report that this is not proper practice. Fair?

A. Well, again, I -- I don't quite understand the question. Again, I think each doctor as honestly as possible will render a judgment. That doesn't mean that there aren't doctors who don't use honest

**44**

judgment. And if there are lawyers who work with those kinds of people, I don't work with them.

Q. Right. For example, Doctor, you have never told an attorney that you worked for that a patient had a diagnosis of asbestos-related disease when you knew that patient did not have a diagnosis. Fair?

A. That's a fair statement. I mean, any time I told a lawyer that I thought they had an asbestos disease, I honestly felt they had an asbestos disease.

Q. Okay. You've never told a court, a judge, or a jury that a patient had a diagnosis of asbestos-related disease when you knew that that patient did not have a diagnosis; correct?

A. That would be perjury, as far as I understand it, and I've hopefully never perjured myself.

Q. You've never told any official with the federal government that a patient had a diagnosis of an asbestos-related disease when you knew that patient did not have a diagnosis; correct?

A. I don't think I've ever had interactions with people at the federal level other than doing some criminal work for the EPA, and in all of those cases it was too soon for anybody to have developed asbestos disease, but I was being asked about what might happen

**45**

1  in the future rather than calling any one of those
2  people as having a disease at that period in time.
3      Q.    Understood. But in any event, you would not
4  yourself tell anyone from the federal government,
5  Medicare, ATSDR, CDC, that a person had a diagnosis of
6  an asbestos-related disease when you knew they did
7  not; correct?
8      A.    I would -- I would hope I would tell nobody
9  that people have a disease when I didn't believe they
10 had it. And to this day, other than perhaps some of
11 those radiology readings, I'm not aware of any other
12 physicians besides those radiologists that I'm
13 thinking about that I've known anybody to ever do
14 that.
15     I think much more serious is physicians or
16 people who have testified, or maybe even have told
17 the government -- I don't know that in any specific
18 case -- that people didn't have disease when they
19 actually did.
20     Q.    Sure. So either of those practices, telling
21 the government or a jury that someone had a diagnosis
22 that they knew didn't, that would be wrong and
23 improper in your mind; correct?
24     A.    Well, it's also a question of, you know, on
25 what basis they thought they did or didn't have the

**46**

1  disease, if there's an honest disagreement. But if
2  you're talking about willfully not telling the truth,
3  that's a different matter.
4      Q.    Okay. Let's go with just a hypothetical
5  here. Abnormalities of the pleural area appear on
6  x-ray and CT scan, but not all abnormalities that
7  appear on those radiographic studies are related to
8  asbestos-related disease. Fair?
9      A.    That's fair.
10     Q.    Okay. For example, a fractured rib can
11 appear as an abnormality on a chest x-ray or a CT
12 scan; correct?
13     A.    It can, yes.
14     Q.    And clearly a rib fracture is not an
15 abnormality on a CT scan or a chest x-ray that's
16 related to asbestos-related disease. Fair?
17     A.    Unless you slipped on a pile of wet asbestos
18 maybe it could be, but otherwise, no.
19     Q.    All right. And if the physician who read
20 the CT scan saw the abnormality caused by a rib
21 fracture and knew that it was an abnormality due to
22 the rib fracture, not asbestos-related disease, it
23 would be improper for that physician to report to
24 anyone, judge, jury, or the government, that that
25 patient had a diagnosis of asbestos-related disease

**47**

1  when they knew, the physician knew, they did not.
2  Fair?
3      A.    Well, there's too many "ifs" in there. I
4  mean, it depends on when the rib fracture was. If
5  it's a fresh rib fracture but an old scar, then you
6  could have both of those at the same time. If it was
7  an old rib fracture and a new scar, then you would
8  have to at least consider that it might be from the
9  rib fracture.
10     It would also depend if there was evidence
11 of other scarring elsewhere in the lung or the pleura,
12 then you could presume that maybe it had to do with
13 asbestos as well as the rib fracture. Not every rib
14 fracture gives you a scar, and not every scar comes
15 from asbestos.
16     Q.    Understood. I'll try to clean up this
17 hypothetical to get rid of the contingencies. Doctor,
18 I want you to assume that you've read a CT scan of a
19 patient that indicates they have some abnormality due
20 to a rib fracture.
21     A.    That's assuming you knew it was due to the
22 rib fracture. You're making -- you're pre-making a
23 judgment before you're describing the findings of the
24 film.
25     Q.    All right.

**48**

1      A.    So you get -- you're giving the answer you
2  want before you get to the real question. What -- you
3  know, I'm not telling you how to ask me the questions,
4  but you see a rib fracture --
5      Q.    Right.
6      A.    -- and there's evidence of scarring.
7      Q.    Yes.
8      A.    You have to ask yourself, is it due to the
9  rib fracture or is it possible this could be due to
10 something else? That's the question.
11     Q.    Yep.
12     A.    And then you make the best judgment you can.
13     Q.    All right. Let's assume that you look at
14 this film and you make the best judgment that you can,
15 and your best judgment is, The scarring I see is due
16 to a rib fracture, not anything else.
17     Are we on the same page now?
18     A.    Yes.
19     Q.    Okay. Suppose you know that the scarring is
20 due to a rib fracture, not an asbestos-related
21 disease. Would it be improper in your mind to report
22 to the jury, a court, or the federal government that
23 that patient had a diagnosis of asbestos-related
24 disease?
25     A.    Again, it would depend if somebody also had

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT 59903-0394 / (406)752-5751

Exhibit 68-3

**Page 49**

1  exposure to asbestos, how can you know for certain
2  that it was caused by the rib fracture and that it was
3  not necessarily caused or contributed to also by the
4  asbestos?
5      Q.   I understand that, but suppose that you --
6      A.   If you're telling me, you know -- again,
7  you're preordaining what the answer has to be by
8  putting those conditions on it.
9      Q.   Well, Doctor, I'm trying to make this as
10 simple as possible.
11     A.   Well, it's not a -- see, you know, medicine
12 isn't always simple.  You know, if somebody has a rib
13 fracture and has a scar --
14     Q.   Right.
15     A.   -- most radiologists would say, Oh, that's a
16 scar from a rib fracture.  But if you also tell them
17 that someone's exposed to asbestos, the radiology
18 report ideally should say, This could be the cause
19 of -- this could be because they were suffering from a
20 rib fracture, or it could be due to the asbestos.  And
21 they look the same so you don't really know.
22     Q.   Right.  Well, what if the radiologist's
23 report, the CT scan itself, and your own impression of
24 that CT are all the same; that this is a rib fracture
25 not related to any previous asbestos exposure?  So

**Page 50**

1  with that hypothetical in mind --
2      A.   Yeah, then it would be inappropriate to say
3  this is now caused by asbestos.  The only way that you
4  could know that a rib fracture and scarring was not
5  caused by asbestos would be to say there was evidence
6  of a rib fracture with scarring prior to someone being
7  exposed to asbestos.  That's the only way for certain
8  that you would know that that was the case.
9      Q.   Right.  And if you, yourself, knew that this
10 person didn't have an asbestos-related disease, you
11 would not report to the judge, the jury, or the
12 federal government that they had a diagnosis of
13 asbestos-related disease; correct?
14     A.   You're quite right.  I would not do that.
15     Q.   Okay.  In your review of radiographic scans
16 of CARD patients or medical records for any CARD
17 patients, you haven't seen any individual examples
18 where that scenario has played out, that being a
19 patient with a rib fracture, or without a diagnosis of
20 asbestos-related disease, that was reported to the
21 federal government as having a diagnosis of
22 asbestos-related disease; correct?
23     A.   I have no such knowledge; I've never seen
24 anything that was ever reported out of the CARD Clinic
25 to any federal agency.

**Page 51**

1      Q.   All right.  And so -- and I think we've
2  covered this, but you have not looked at the -- the
3  multiple individual CARD patient cases where there's
4  an allegation that CARD submitted Medicare claim forms
5  who had no diagnosis of asbestos-related disease;
6  correct?
7      A.   I'm not aware of any such cases.
8      Q.   All right.  In terms of your review of
9  testimony or facts or evidence in this case, have you
10 seen any information related to Dr. Black's error rate
11 on CT scans or chest x-rays?
12     A.   I have not.
13     Q.   Have you seen any information or testimony
14 related to the diagnostic dissension rate between
15 Dr. Black and outside radiologists?
16     A.   I have not.
17     Q.   Have you seen any information, evidence, or
18 testimony about Dr. Black's practices related to the
19 prescription for opioid pain medications in any
20 individual patient case?
21     A.   Other than knowing in some cases he has felt
22 it appropriate to prescribe opioids, I have no
23 knowledge beyond that.
24     Q.   Have you seen any information, evidence, or
25 testimony about Dr. Black's prescription rate for

**Page 52**

1  fentanyl compared to other physicians'?
2      A.   I've seen no such documentation.
3      Q.   In this case have you seen any documentation
4  related to a record known as the Libby screening
5  dataset, or the master data set?
6      A.   I believe I know there is such a database,
7  but I've not seen it or know nothing about it.
8      Q.   Have you performed any calculation of the
9  diagnostic dissension or radiographic read dissension
10 rate between Dr. Black and all outside physicians?
11     A.   I have not.
12     Q.   In terms of an EHH form itself, Doctor, are
13 you aware --
14     A.   I'm not even -- I don't know what an EHH
15 form is.
16     Q.   Okay.  In terms of your own clinical
17 practice, Doctor, do you recall ever submitting any
18 Medicare claim forms on a patient's half -- behalf to
19 the Social Security Administration?
20     A.   I've been fortunate in my academic practice;
21 I've never personally submitted a claim form to
22 anybody.  That's what the university billing
23 department does, and I care nothing about it because
24 none of my income came from whatever clinical fees I
25 generated.

**61**

1  A.  I left there in '83.
2  Q.  And aside from the meso or endstage cancer
3  patients that you referenced, do you have any specific
4  recollection of any individual patient that you wrote
5  a scrip for an opioid due to asbestos-related disease?
6  A.  No specific patient that I can recall.
7  Q.  All right.  Doctor, a couple of statements
8  here.  I'd just like to see if you agree with them.
9      It would be improper to make a claim for
10 Medicare benefits for a patient who is not eligible
11 for Medicare.  Fair?
12 A.  I think on its face that would be a true
13 statement.
14 Q.  Okay.  It would not be proper to include
15 false or misleading information on Medicare claim
16 forms.  Fair?
17 A.  If -- again, on the face of it, that's a
18 fair statement.  I mean, people should be honest and
19 they should believe what they're writing is true, and
20 have reason to believe so.
21 Q.  Okay.  Expert testimony must be based on
22 facts, science, and personal knowledge.  Fair?
23 A.  I was distracted by the phone for a second.
24 Q.  Oh, sure.
25 A.  Yeah.  Could you repeat the question,

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**62**

1  please?
2  Q.  Sure.  Expert testimony must be based on
3  facts, science, and personal knowledge; correct?
4  A.  That's what I believe.  I've seen any number
5  of situations from defense experts where that doesn't
6  seem to be the case.
7  Q.  Okay.  Fair to say that an expert who has
8  not reviewed any specific information about a specific
9  topic should not offer an opinion on that topic?
10 Fair?
11 A.  That's too general.  I mean, I don't know
12 what you mean by hasn't reviewed.  I mean, you know,
13 you're qualified in court as an expert in certain
14 areas, and either the court believes you have
15 expertise or you're not, and who knows when you
16 reviewed it.  So that's -- that's too general a
17 question that I can't answer.
18 Q.  All right.  Opinions about another
19 individual's character are not a proper subject for
20 expert witness testimony.  Agreed?
21 A.  No, I don't agree.  I think that's very
22 relevant.  I make statements about, you know, certain
23 other doctors, as they make statements about me.
24 Q.  Okay.  Do you intend to offer any opinions
25 about Dr. Black's character at trial in this matter?

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**63**

1  A.  Only to the extent that I know him to be --
2  in the best of my judgment and opinion to be an
3  honorable, thoughtful, caring physician.
4  Q.  Okay.  And I believe that, if I heard you
5  correctly, taking your time with a diagnosis is an
6  important -- is important in an effort to avoid
7  misdiagnosis of asbestos-related disease.  Fair?
8  A.  I didn't say that.  I think doctors need to
9  take whatever time is necessary to, you know, get to
10 the bottom of a case.
11 Q.  Okay.
12 A.  Sometimes cases -- sometimes cases are
13 self-evident in the first two minutes, and sometimes
14 it takes two weeks, sometimes it takes two years.
15 I've seen those kinds of cases when I did some work at
16 the NIH, and sometimes you never come up with a
17 diagnosis.
18 Q.  Okay.  And doctors should err on the side of
19 not making a misdiagnosis.  In other words, if a
20 doctor, if they feel like they're in a rush to
21 diagnose, should stop and consider all available
22 information before rendering a diagnosis.
23 A.  Again, that's -- you know, that's far too
24 vague.  I think every doctor should do the best they
25 can under whatever circumstances to render the best

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**64**

1  diagnosis.
2      Look, you know, we have far too many
3  shootings in this country.  It was the surgeon in
4  Highland Park, you know, who had him on TV, you know,
5  after the shooting there.  He says, I'm a trauma
6  surgeon; I went out and I did the best I could with
7  the tools at hand.
8      You make judgments under exigent
9  circumstances that you might not make if you had more
10 time.  You know, if you're working in an emergency
11 room you make judgments that sometimes are done
12 quickly, but in other settings you have more time to
13 contemplate and to get to diagnoses.  So it depends on
14 the circumstances.
15 Q.  All right.  Doctor, in a case where you were
16 the diagnosing physician and you knew that patient did
17 not have a diagnosis of asbestos-related disease, you
18 would not tell the patient, a judge, a jury, or anyone
19 else, that that patient had a diagnosis of
20 asbestos-related disease when you knew they did not.
21 Fair?
22 A.  I would hope that -- I'm not on trial.  I
23 would hope that any judgment that I've ever make in --
24 made about a patient is one that I carefully
25 considered and made.  Does that mean as a physician

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

Exhibit 68-5