```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF MONTANA

 3

 4   BNSF RAILWAY COMPANY, on      )
     behalf of THE UNITED STATES   )
 5   OF AMERICA,                   )    Civil Action
                                   )    No. CV-19-40-M-DLC
 6           Plaintiff,            )
                                   )
 7   vs.                           )
                                   )
 8   THE CENTER FOR ASBESTOS       )
     RELATED DISEASE, INC.,        )
 9                                 )
             Defendant.            )
10   _____)

11

12

13
            REMOTE VIDEO RECORDED PERPETUATION DEPOSITION
14
                               OF
15
                      CRISTOPHER MEYER M.D.
16
              (Taken on behalf of the Plaintiff.)
17

18

19

20

21

22                   Taken Remotely Via Zoom
            Wednesday, August 17, 2022 - 8:00 a.m. CDT
23

24
         Reported by Beth Gilman, RPR and Notary Public
25        for the State of Montana, County of Flathead
```

**Asa & Gilman Reporting, Inc. - asagilman@centurytel.net**
**P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751**

Exhibit 70-1

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 2 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

## Page 5

1  THE VIDEOGRAPHER:  This is an audiovisual
2 deposition taken in accordance with the Federal Rules
3 of Civil Procedure.  The recording equipment is being
4 operated by Rona Chenoweth, whose principal place of
5 business is Jeffries Court Reporting which is located
6 at 1015 Mount Avenue in Missoula, Montana.
7  Today is Wednesday, August 17th, 2022.  The
8 timed is 7:01 a.m. Mountain Time.  The deposition is
9 being taken remotely via Zoom videoconference.
10  The caption of the case is BNSF versus The
11 Center for Asbestos Related Disease, Inc., Civil
12 Action Number CV-19-40-M-DLC.
13  Will counsel and everyone present please
14 introduce themselves starting with the noticing
15 attorney?
16  MR. DUERK:  Adam Duerk for Relator, BNSF.
17  MR. BECHTOLD:  I'm Tim Bechtold on behalf of
18 CARD.
19  MS. KVITRUD:  Tricia Kvitrud on behalf of
20 Dr. Cris Meyer.
21  THE VIDEOGRAPHER:  The name of the witness
22 is Cristopher Meyer, M.D.  Per agreement of counsel
23 the oath will now be administered by the notary
24 remotely.
25  CRISTOPHER MEYER, M.D., after having

## Page 6

1 been duly sworn, was examined and testified as
2 follows:
3
4  EXAMINATION
5 BY MR. DUERK:
6  Q.  Good morning, Doctor.  I'm Adam Duerk.  Will
7 you please state your full legal name for the record?
8  A.  Cristopher Andrew Meyer.
9  Q.  Dr. Meyer, have you had your deposition
10 taken in the past?
11  A.  Yes, I have.
12  Q.  Okay.  I'll dispense with the lengthy list
13 of ground rules, but suffice it to say if I ask a
14 question that isn't clear, would you please stop me
15 and ask me to rephrase that question?
16  A.  Sure.  I will, yes.
17  Q.  Thank you, Doctor.  And at any time if you
18 need a break or you'd like to confer with counsel,
19 just please indicate that to me and we'll take a short
20 break; okay?
21  A.  Yes.
22  Q.  Doctor, you've been called today because
23 you're a B-reader.  Could you please tell me what a
24 B-reader is?
25  A.  Certainly.  A B-reader is a physician who

## Page 7

1 has been certified by NIOSH in the application of a
2 scoring system that originated in the screening for
3 coal workers' pneumoconiosis, but after that became a
4 more general scoring system for pneumoconiosis
5 overall.
6  Q.  In terms of the training that you received
7 to be a B-reader, what is your -- what is your
8 background professionally as a B-reader?
9  A.  Well, as I stated, all B-readers are
10 physicians.  It is not necessary for a B-reader to be
11 a radiologist, although my background personally is
12 that I'm a radiologist, and specifically an academic
13 radiologist who practices in the area of thoracic
14 imaging, so the chest, which is really what
15 B-reading's all about.
16  The original form of this examination was
17 designed back in -- gosh, it was the early '70s.  I
18 was not a B-reader then.  I was still in high school
19 then, but it was -- it was designed back in the '70s
20 by a group of primarily radiologists, and I don't
21 remember whether there were occupational lung
22 physicians involved too.  And it was essentially a
23 scoring system to classify findings on radiographs
24 because of -- because of a resurgence of coal workers'
25 pneumoconiosis back then that led to the Coal Mine

## Page 8

1 Health and Safety Act.
2  The training that was provided with the
3 original examination was a syllabus that NIOSH would
4 send along with a whole case of radiographs, and you
5 would do these practice examinations and practice
6 radiographs, and there were over a hundred of them,
7 and you would practice them basically until -- or, at
8 least I would practice them until I had them
9 completely memorized.
10  And then you'd go into either a testing
11 station after a weekend course, or go straight to
12 Morgantown and take the examination, and at that time
13 the qualifying examination was I think classifying 120
14 radiographs and receiving a passing score, and that
15 took about a six to eight -- I think it was over a
16 six-hour time period.
17  And then every four years after that there
18 was a certifying -- a recertifying requirement that
19 was a -- 50 radiograph examinations, similar to the
20 prior, that was over a four-hour time period and,
21 again, required a specific passing score to -- to
22 be -- to remain certified as a B-reader.
23  Q.  Doctor, how long have you been certified as
24 a B-reader?
25  A.  Since 1999.

**9**

Q. And in terms of the number of B-readers worldwide, is it fair to say that there are only a few hundred B-readers currently today?

A. Yeah. That's actually very fair to say. At the height of the B-reading program at the end of the -- I guess the last century, they had peaked at around 700 B-readers nationally and internationally, I guess. Most of the B-readers are U.S. physicians.

And there was actually concern by NIOSH because B-readers as a -- as a certification, fewer and fewer people were getting B-reader certification to the point where I think the program had decreased 170 B-readers in total, and so the NIOSH actually enlisted the ACR in trying to train new B-readers, and I was involved in that entire process. I was actually part of the ACR pneumoconiosis task force to first redesign the syllabus and resign the test so that it reflected current -- current conditions. The old examination was all a film examination, and the current examination is entirely digital.

And then I'm one of the co-directors of the B-reading course for the American College of Radiology to train new B-readers.

Q. Doctor, in terms of your experience as a radiologist, I'm assuming that you have a robust

**10**

practice outside of your responsibilities as a B-reader. What is it that you do in your professional practice?

A. Sure. So I'm an academic radiologist. That means that I spend time teaching medical students, teaching residents, and teaching folks that are sort of post residency. I also am a clinical radiologist, so I spend several days a week reading chest x-rays and chest CTs, in addition to some administrative and research responsibilities.

Q. Now, in terms of your experience as a radiologist, if you could give us an idea of how many radiographic studies, how many films, you read on a regular basis. It may be difficult for you to even estimate this number, but could you estimate for me how many films you've reviewed during the balance of your entire career?

A. Oh, my. Yeah. That may be impossible, especially -- I -- it's probably easier for me to give you a sense of what I'm doing currently on a weekly basis. Typically somewhere between 50 and 70 CTs, and over a couple hundred chest x-rays per week. You can sort of do the math over a -- and that is actually -- I'm currently part time, so I only read a couple days a week. You can imagine when that was a

**11**

five-day-a-week practice and over a 30-year career, so --

Q. All right. So fair to say that on average, and pardon my math, Doctor, but if we assume that one works approximately 50 weeks a year reading 50 CTs and a few hundred chest x-rays in a given year, you might read approximately 2,500 CTs and quite a few more chest x-rays --

A. Yes.

Q. -- each year. All right. Sir, I understand that you specialize in thoracic radiology. Could you describe what that means?

A. Certainly. Thoracic radiologists -- radiology as a specialty has become so diverse that in academic centers radiologists oftentimes pick specific areas of specialty. And so you've heard of neuroradiologists, probably, and they're interested in the brain. A thoracic radiologist essentially studies processes that go from where the neck meets the chest, so from the top of the -- from over the chest down to the diaphragm. That's my area of interest, and that primarily involves the heart, the coverings around the lung, and the lungs themselves in the chest wall. And that is a -- that's what a thoracic imager does. And primarily as a thoracic imager, chest radiographs and

**12**

chest CTs are the principal tools of our trade.

Q. Sir, how long have you specialized in thoracic radiology?

A. I actually started my career as a thoracic imager back when I was in the military, so that would have been -- 1992 was my -- my beginning as the chief of thoracic imaging at Madigan Army Medical Center.

Q. All right. Sir, just a few other pieces of background information. "Pneumoconiosis", if you could provide a definition or a description of the conditions or diseases that are part of that term, that would be helpful.

A. Sure. Well, that's actually a complex question that sort of depends on whether you're a lawyer or a doctor. So I'll -- I'll give you the doctor's answer to that, which is clinical pneumoconiosis. Clinical pneumoconiosis is the manifestation or the pathology that results from being exposed to -- to dusts, typically in the workplace. And the -- the major types of pneumoconiosis that we talk about are actually coal dust, silica dust, and asbestos. And so pneumoconiosis is when an individual is exposed to those -- to perhaps one of those dusts. And now there are many other occupational exposures that sort of fall under the general rubric of

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 4 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

**13**

occupational lung disease, but pneumoconiosis was really more related to those hard mineral dust exposures.

  Q. Doctor, in terms of your career, how long have you been reviewing chest x-rays and CT scans of pneumoconioses?

  A. So, again, that question is -- as a thoracic imager, so from the day I became a thoracic imager, I have been looking at chest radiographs, and so some of those chest radiographs would have manifestations of pneumoconiosis.

  With regard to having a concentrated area of specialty in occupational lung disease, it certainly became a larger component of my practice, obviously once I passed the B-reader exam in 1999 to present.

  Q. Understood. I'd like to speak about B-reading in particular. There has been some discussion, and many depositions, about the topic of B-reading in this case so far, so I'd like to just make sure that I have some facts established.

  When a radiologist B-reader is looking at chest x-rays and CT scans as a B-reader, not as a treating physician, does a B-reader diagnose anything?

  A. So I guess I ought to probably clarify one thing there, and that is, the B-reader program is, so

**14**

far, specifically devoted to chest radiographs. That classification form is only -- only applies to chest x-rays.

  There is a proposed classification form for CT scans that has gotten some international attention, but -- but to date that has not been -- it's not been formalized by the -- by NIOSH or by the B-reading program. So there is -- there is a form that very closely parallels the B-reading form for CT, but that's not something that we teach in the B-reading course because it's not part of that certification process.

  And, I'm sorry, can you repeat the question?

  Q. Sure. My question was whether B-readers diagnose, but I think a little bit more background information might be helpful first.

  In terms of the services that you performed in relation to the CARD Clinic's patient CTs and chest x-rays, when did you first begin to work with CARD or for CARD on a contract basis?

  A. Okay. So that -- that actually is a little complicated as well, in that I was asked earlier by the ATSDR, or enrolled in a research project by the ATSDR and by Dr. Lockey from the University of Cincinnati, to look at pleural disease in cases in

**15**

Libby, and I -- and that was coordinated through the CARD Clinic, gosh -- I don't even -- I don't remember when we went out to do that. Several decades ago. And I worked with Ted Larson from the ATSDR, and that was actually -- resulted in some papers discussing the dose response relationship of the pleural disease to -- to those -- the specific asbestos fibers from Libby, Montana. So that would predate the contract that was executed with the University of Wisconsin for the work that we did currently, if that makes sense.

  Q. It does. Doctor, I've got some e-mails that might help anchor our discussion in terms of when a contract was finalized between you and the CARD Clinic in terms of serving as a B-reader.

  A. Okay.

  Q. Do you happen to have what's been tabbed as Exhibit 8 in front of you? And we will redesignate these numbers as we go along.

  A. I do not. I -- I'm sorry. I've got you on the Zoom call, which is -- I have not -- I did not print up all those documents so I don't have it in front of me, and unfortunately to get to it through my computer would require going out of the Zoom call to get to it, so --

  Q. No problem, Doctor. What we can do is go

**16**

about it this way. At some point in 2011 were you invited by Dr. Black and CARD to serve as a B-reader for reviewing CTs and chest x-rays for CARD patients?

  A. Yes. I remember seeing that e-mail, and I reviewed it in the exhibit, and that looked correct, yes.

  Q. All right. And what was the nature of the contract that you and CARD were exploring at that time?

  A. So I think -- this gets back to your original question about B-reading, and that really is that B-read-- B-reading is a classification system of findings on a chest radiograph. The -- the nature of the contract that CARD had with the University of Wisconsin and me as a B-reader was to receive anonymized chest radiographs, so no patient information, no history, and to go through and objectively, but blind to any background information, provide a B-reading service. And that is going through and -- and I don't know if you have one of the B-reading forms to enter an exhibit, but it's checking a whole bunch of boxes --

  Q. Yes.

  A. -- or a few boxes, depending upon whether there's something there or not, to indicate various

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 5 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

**17**

components that are considered in pneumoconiosis; that is, lung findings, pleural findings, and there are a whole bunch of obligatory symbols, many of which are unrelated to pneumoconiosis that we check off.

Q. In terms of the information that you would have about each CARD patient before checking boxes on the B-reader form, aside from the films themselves, the chest x-rays, or the CT scan films, what would you know about that individual patient?

A. So the contract was written such that we would receive anonymized -- anonymized imaging. So really what would happen is, a whole bunch of CDs with numbers on them would show up, and a list of numbers that indicated whether they were chest x-rays or CT scans, and that is the sum total of what we knew about the patient other than the imaging.

And that honestly sort of jibes with what the B-reading program encourages for screeners that are B-readers is that they do not want our objectivity to be lost by having any background information. The concept is that you're just classifying the findings on the examination; you're not making a diagnosis, per se.

Q. All right. So with these CARD patients, let me just run through a quick set of questions to make

**18**

sure that we're on the same page.

A. Sure.

Q. You wouldn't have the patient's name; correct?

A. No, we did not have the patient's name.

Q. You wouldn't have the patient's age; correct?

A. Correct.

Q. You wouldn't have their height, weight, medical history, work history, or exposure history; correct?

A. Correct.

Q. Okay. So essentially when you say you were reading blindly, that is part of the design in the B-readers' program so that you wouldn't know any details about that patient as an individual or in terms of their medical history. Is that fair?

A. So --

MR. BECHTOLD: Leading.

BY MR. DUERK:

Q. I believe the objection is leading, and Mr. Bechtold is correct. I'm just trying to orient you, Doctor, so disregard what I'm saying. Go ahead.

A. So I think what -- what we can say is that the imaging that was provided to us was anonymized.

**19**

In my clinical practice, actually, name and age and B-reading classifications is not blinded, so --

Q. Right.

A. It certainly doesn't give us a ton of information, but even that information was absent on these examinations.

Typically B-readers do not -- I should say radiology B-readers typically do not get history prior to classifying an examination. There are some occupational lung physicians and pulmonologists that believe that's critical, but actually I believe the -- on the B-reading Website they encourage the interpretation of examinations without the history.

Q. Right. And in terms of the intent behind reading blindly, if you could share with us the -- the intent and purpose for reading CTs and -- or, sorry -- chest x-rays blindly as a B-reader.

A. So the intent is that the classification be purely applied to the -- to the imaging and, again, not be sort of led one way or the other by a history of years of exposure or days of exposure. The whole purpose is to just get at the chest radiograph as a data point.

Q. And why was that program designed in that manner, if you know, Doctor?

**20**

A. I -- I don't. I don't know. Actually, I should say I -- it was designed originally as an epidemiologic program, not as a medical/legal program, not as a -- not as a diagnostic program, per se. The whole purpose of the B-reading program with coal workers was to actually collect data on the population of patients, and so it was primarily designed by epidemiologists and has kind of morphed over the years.

Q. All right. In terms of the information that you received about CARD patients and the data that you considered prior to your interpretation of those chest x-rays and CTs, is there any other information about those individual patients that you have at your disposal that we haven't covered?

A. No.

Q. Okay. In terms of the work that you would do then related to these CARD B-reader patients, my understanding is you have a film, you'd have the B-reader form, and you'd have essentially a FedEx envelope. Was there anything else that you had in front of you when you were reading these films?

A. I had a pen to fill out the form, and that's about it, yeah, so that is correct.

Q. Okay. And so back to my original question

**21**

1 then. When you were serving as a B-reader within the
2 context of this contract with CARD when you were
3 reading and interpreting images on CT and chest x-ray,
4 Doctor, were you offering any clinical diagnoses of
5 any of these CARD patients?
6          MR. BECHTOLD: Leading.
7 BY MR. DUERK:
8     Q.   Doctor, I'll go ahead and respond to the
9 objection this way.
10          There have been some undisputed facts in
11 this case, and I'll -- I'd like to orient our
12 discussion by reading some of these undisputed facts
13 and just seeing if you agree with them; okay?
14     A.   Sure.
15     Q.   Undisputed fact 32, CARD providers have
16 stated that radiologists do not diagnose for any
17 condition; that is the treating physician's role.
18          Would you agree?
19     A.   I guess I -- I do not diagnose. So as a
20 radiologist and a physician, I like to think of myself
21 as a diagnostician. And so there are things on the
22 B-reading form like atherosclerotic disease in the
23 aorta, or a fractured rib, or a calcified granuloma,
24 that would be considered a diagnosis, and we indicate
25 those on the form.

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**22**

1     Q.   Right.
2     A.   So in that respect I'm not sure that that's
3 a correct statement.
4          With regard to the sum total of a patient
5 for pneumoconiosis, the B-reading is considered to be
6 a component of the diagnosis and not typically the
7 entire diagnosis.
8     Q.   All right. So in terms of interpreting
9 x-rays or CT scans, is it fair to say that you would
10 interpret signs visible on a scan that could be
11 consistent or inconsistent with pneumoconiosis?
12     A.   Yes, that is fair.
13     Q.   All right. And so undisputed fact 33, would
14 you agree with this statement? Radiologists, or I'll
15 apply this to B-readers, do not diagnose. They
16 observe conditions consistent with a health problem.
17 Fair?
18     A.   Yes, that's fair.
19     Q.   When a radiologist, or B-reading radiologist
20 in particular, is looking at a film, they are not
21 actually diagnosing asbestos-related disease. Fair?
22     A.   So there are certain findings on a -- a
23 chest x-ray and a chest CT that actually are
24 considered to be pathognomonic of asbestos exposure.
25 So as an example, as a radiologist, if I were to see

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**23**

1 bilateral pleural plaque --
2     Q.   Right.
3     A.   -- then my impression, so my diagnosis as a
4 radiologist, would be that those findings were
5 consistent with asbestos-related -- were consistent
6 with asbestos exposure.
7     Q.   Right. But in terms of the final diagnosis
8 of asbestosis or the final diagnosis of
9 asbestos-related disease overall, that's not something
10 that you would list on a B-reader interpretation form.
11 You would -- you would say, These -- I see pleural
12 thickening, for example, which is consistent with ARD,
13 but not -- but you would not diagnose the condition
14 yourself. Fair?
15     A.   That's a fair statement.
16     Q.   Okay. And, Doctor, what I'm trying to get
17 at here, in terms of the different roles between a
18 B-reader and the treating physician who has the
19 medical history, the exposure history, has
20 theoretically performed a face-to-face in-person
21 examination, between the B-reader and the treating
22 physician, it is the treating physician who renders
23 the diagnosis; correct?
24     A.   Yes. The final diagnosis, yes.
25     Q.   Right. Okay. Now, in terms of CARD

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

**24**

1 patients themselves, in your capacity as a B-reader
2 would you ever fill out any Medicare claim forms
3 listing a diagnosis of asbestos-related disease on
4 those forms?
5     A.   No.
6     Q.   And if you know, why not?
7     A.   Actually, as a radiologist I don't know that
8 I've ever filled out a Medicare claim form personally.
9 I'm sure that our coding and billing office
10 occasionally does that, but as a -- as a radiologist
11 we -- we just -- that's just not part of our daily
12 routine. So I did not -- do not do it in my clinical
13 practice, and did not see any of those forms for CARD.
14     Q.   All right. So in terms of your practice as
15 a B-reader, would it ever be part of your
16 responsibility to fill out a Medicare claim form
17 listing a diagnosis of an asbestos-related disease in
18 order to determine whether or not that patient
19 received Medicare benefits?
20     A.   No. The B-reader program is designed to
21 train individuals to do that specific task, which is
22 to fill out the B-reading form. That -- that
23 B-reading form is essentially one data point that goes
24 into the total sort of sum of the patient's clinical
25 presentation, and it is the treating physician's

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

Exhibit 70-6

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 7 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

25

1 responsibility to -- to fill out the Medicare form.
2 We do not discuss Medicare forms at the B-reading
3 training program.
4     Q.    So in terms of this division of
5 responsibility between the B-reader and the treating
6 physician, or the diagnosing physician, is it fair to
7 say that the treating physician could review the
8 interpretation of x-rays and CTs performed by the
9 B-reader as one of the data points in forming the
10 diagnosis of asbestos-related disease for that
11 individual patient?
12    A.    Yes, that's fair.
13          MR. BECHTOLD:  Leading.
14 BY MR. DUERK:
15    Q.    Doctor, do you recall ever having any
16 discussions with CARD, anyone employed by CARD or
17 Dr. Black, about the possibility that you would
18 diagnose CARD patients with asbestos-related disease?
19    A.    No, I do not.
20    Q.    And how would you respond to that general
21 proposition that you would be the one diagnosing CARD
22 patients with asbestos-related diseases?
23    A.    Essentially that's not in my lane.  I'm --
24 as a radiologist, I look at radiographs and CT scans,
25 but would not be comfortable clinically diagnosing

26

1 patients.
2          I think it is important to realize that
3 there are radiology findings that are highly
4 suggestive, if not virtually pathognomonic, of some of
5 these diseases, and so in that respect we may make a
6 radiology diagnosis but not a clinical diagnosis.
7     Q.    All right.  And in terms of the -- the
8 different terminology related to what B-readers see
9 and report, the language that I've seen is that
10 B-readers and some radiologists make an interpretation
11 of a chest x-ray or a CT scan and share that
12 interpretation or interpretive report with the
13 diagnosing physician.  Is that language that you've
14 also seen or used in the past?
15    A.    Yes, that's perfect.  That's a perfect
16 description.
17    Q.    All right.  And so as we go forward here,
18 you'll hear that word from me, "interpretation", or an
19 "interpretive report", and if I conflate
20 "interpretation" with "diagnosis", please understand
21 that I'm trying to maintain those clear lanes.
22    A.    Sure.
23    Q.    Would that adequately and accurately reflect
24 your view on what you would do with CARD patients in
25 terms of reading their scans and rendering a B-reader

27

1 interpretation on those B-reader forms?
2     A.    Yes, it does.
3     Q.    Okay.  So, Doctor, at no point did anyone at
4 CARD explain to you that they were considering your
5 B-reader interpretations as a stand-alone diagnosis.
6 Fair?
7     A.    Not that I recall.
8     Q.    All right.  Have you ever considered your
9 interpretations as a B-reader as a stand-alone
10 diagnosis in terms of patient care?
11    A.    No.  I -- no.
12    Q.    Is there more to that analysis that my
13 question failed to address?
14    A.    I think it gets back to your previous point,
15 which is, obviously as a radiologist we issue an
16 interpretive report and try to be as specific and as
17 diagnostic as we can.  So we make a radiology
18 diagnosis, and that diagnosis goes back to the -- the
19 treating physician, and the treating physician then
20 rolls that all up into their -- into their final
21 diagnosis.
22          So, again, it's more a matter of pride that
23 we, you know, like to think that we know what we're
24 looking at, do our best to make that interpretation as
25 accurate as possible.

28

1     Q.    Right.  But in terms of the mechanics of
2 actually making the clinical diagnosis in the
3 B-reading context, providing a clinical diagnosis for
4 any patient was not something that you ever intended
5 to do or did do with CARD patients; correct?
6     A.    That's accurate, yes.
7     Q.    Okay.  Doctor, in terms of the statement of
8 B-reader ethics, I'll -- I'll represent to you that
9 I've reviewed the NIOSH Website, or the CDC Website,
10 about ethical considerations for B-readers.  I've also
11 looked at the Wikipedia page related to B-readers, and
12 even the Wikipedia page on B-readers discusses ethical
13 considerations for B-readers.
14          I'll represent to you that ethical code
15 number 3, both on the CDC, NIOSH B-reader page, and
16 the Wikipedia page, offers a statement about whether
17 or not B-readers diagnose.  I'd like to read it to
18 you, and just tell me if you agree with this statement
19 or not; okay?
20    A.    Sure.
21    Q.    So from the NIOSH Code of Ethics for
22 B-readers, B-readers shall recognize the limitations
23 of chest radiograph classifications and shall not make
24 clinical diagnoses about the pneumoconioses based on
25 chest radiograph classification alone.

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751

Exhibit 70-7

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

## 29

1  Would you agree?
2  A. Yep. Yes.
3  Q. All right. And is that essentially the
4  standard that you follow as a B-reader in your
5  practice?
6  A. Yes, it is.
7  Q. And in terms of your contract with CARD, was
8  that also the ethical consideration that guided your
9  performance in reading those CARD radiographs?
10 A. Yes, it was.
11 Q. Doctor, I'd like to talk a little more
12 generally about some of the reasons for B-reading in
13 the blind and some of the ethical considerations for
14 B-readers.
15   Based on your training and experience as a
16 B-reader, were you ever confronted with any material
17 or did you have any discussions about the effort to
18 remove any bias from B-readers' interpretations?
19 A. Yes, and there is certainly case history, if
20 you will, of instances where that bias has been
21 introduced. So part of the ACR training program
22 involves a discussion of ethics, and there are past
23 instances where B-readers have allowed -- have
24 accepted contracts where they were paid differentially
25 based on how they read an examination, and I -- I --

## 30

1  and that was then demonstrated to significantly alter
2  the likelihood presumably of that individual to read
3  an examination as positive, if that was being paid
4  higher. And there have been since then other
5  individuals that you could say the exact opposite
6  about. So there are instances historically of loss of
7  objectivity based on incen-- other incentives.
8    And so we certainly -- what I would say with
9  this -- when I perform B-readings, the payment for
10 those B-readings is the same regardless of the boxes
11 that I check. They are -- and that in combination
12 with a lack of any of the background history -- you
13 know, there's a tendency for people to be empathic
14 about -- if you're sitting across from a patient you
15 may have empathy for that person; you understand their
16 history. All of that we're blinded to so that the
17 purpose is to be as objective as possible.
18 Q. Is it fair to say that part of the purpose
19 of the B-reader program, and part of the purpose of
20 bringing in a B-reader, is to attempt to remove bias
21 and subjectivity from the equation in performing these
22 reads?
23 A. Yes, that's fair.
24 Q. And, Dr. Meyer, consistent with those
25 objectives and that purpose, is it fair to say that

## 31

1  you yourself, aside from being paid for the work that
2  you do performing these reads, have no financial tie
3  to The Center for Asbestos-Related Disease, or CARD,
4  in any way?
5  A. I would actually correct that statement
6  because, in fact, I don't personally get paid even for
7  those B-reads that --
8  Q. Right.
9  A. The money that flows to -- from those
10 B-reads comes to the University of Wisconsin, and
11 although I'm sure my -- the chairman of my department
12 is happy that I'm generating income, it is not
13 directly reflected through to my personal income,
14 so --
15 Q. Right.
16 A. I guess I would say I receive no personal
17 remuneration from these B-reads and have no other
18 monetary ties to the CARD Clinic.
19 Q. Okay. I'd just like to run through a series
20 of questions, and tell me whether the statements are
21 correct or not.
22   You do not now nor have you ever had any
23 financial ties to The Center for Asbestos Related
24 Disease. Fair?
25 A. Fair.

## 32

1  Q. You do not now nor have you ever had any
2  ties to any litigated cases involving CARD patients
3  that you're aware of; correct?
4  A. That I'm aware of, yeah.
5  Q. Right.
6  A. I obviously function as a B-reader, so I
7  don't know what's been introduced, if I've filled out
8  a B-reading form for someone.
9  Q. Right. Well, maybe I'll ask the question
10 this way.
11   Fair to say that you've never testified on
12 behalf of a CARD patient in a personal injury claim?
13 A. That is -- that is correct.
14 Q. Okay. And in terms of having any -- any
15 type of relationship with plaintiffs' lawyers in
16 Montana, you have never received any monies from any
17 plaintiffs' attorneys or group of plaintiffs'
18 attorneys to fund any part of your professional
19 practice in Wisconsin related at all to the CARD
20 Clinic.
21 A. That is a true statement, yes.
22 Q. All right. Okay. Doctor, in terms of the
23 work that you do outside of your work as a B-reader,
24 are you based primarily in Wisconsin?
25 A. I'm based exclusively in Wisconsin, so, yes.

**85**

1    THE WITNESS:  Okay.  So I would say, again,
2 that I'm -- I don't practice clinically with these
3 patients.  I know what the textbook answer is.  So
4 pleural disease, pleural plaque, rarely even, if ever,
5 results in any measurable change in pulmonary
6 function, and should not result in pain.  Diffuse
7 pleural thickening causes restrictive findings and
8 should not cause pain.  But in that, you know, sort of
9 the broad rubric of asbestos-related disease in the
10 pleura, the one that may result in the need for
11 narcotics is mesothelioma, the cancer associated with
12 asbestos exposure.  But outside that neoplasm, I'm not
13 aware of the need for opiates.
14 BY MR. DUERK:
15    Q.   Right.  Doctor, I'd like to turn now to tab
16 6, what's been marked previously as Exhibit 46.
17         Doctor, do you have tab 6 in front of you?
18    A.   Yes.  It's up on the screen.
19    Q.   Okay.  Page 1 of Exhibit 46 I'll represent
20 to you is an Environmental Health Hazards Checklist
21 form.  Is this a form that you've seen in your
22 practice in the past?
23    A.   Only when you sent these -- so, no.  No.
24    Q.   Okay.  And I'm assuming that I already know
25 the answers to the following questions, but you've

**86**

1 never checked any boxes on an EHH form yourself;
2 correct?
3    A.   That is correct.
4    Q.   Okay.  In terms of the top of this form,
5 you've never been asked to check the box next to the
6 diagnosed impairment and print the date of diagnosis
7 for a single CARD patient; correct?
8    A.   That is correct.  I have never seen this
9 form.
10    Q.   Okay.  And if we go down to the bottom of
11 the page, do you see the Date of Diagnosis section
12 here in terms of Exhibit 46, page 1?
13    A.   Yes, I do.
14    Q.   In terms of the Date of Diagnosis, do you
15 see a Date of Diagnosis on this individual form of
16 what appears to be August 20th, 2013?
17    A.   Yes, I do.
18    Q.   Okay.  In terms of information reported by
19 you to the CARD Clinic as a B-reader, have you ever
20 reported any information to CARD indicating a date of
21 diagnosis for an asbestos-related disease for any of
22 the blinded CARD patient x-rays or CT scans you've
23 reviewed?
24    A.   No, I have not.  I've just filled out the
25 B-read form and put the date of my interpretation of

**87**

1 the B-read form on the -- on the appropriate line.
2    Q.   All right.  In terms of an interpretation of
3 asbestosis, is asbestosis a box that could be checked
4 or filled out on a B-reader interpretation form?
5    A.   No, it is not.
6    Q.   Okay.  Are there any parts of a B-read
7 interpretation form that could be checked that might
8 indicate signs consistent with asbestosis?
9    A.   So -- so the answer is yes.  The -- the
10 section number 2, which asks if there are any
11 classifiable parenchymal abnormalities -- or, I think
12 back in 2013 the actual question was a little
13 different; it was, Are there any findings consistent
14 with pneumoconiosis?  NIOSH has changed the form a
15 bit.  And the definition that -- sort of a
16 radiologist's definition of "asbestosis" is the
17 finding of fibrosis, but it presumes that the
18 individual has the appropriate exposure history.  And
19 the other time that a radiologist would feel fairly
20 confident in at least suggesting the diagnosis of
21 asbestosis is in the presence of pleural plaque, which
22 indicates asbestos exposure with underlying pulmonary
23 fibrosis.  But pulmonary fibrosis is an absolute
24 mandatory finding to call asbestosis, and that should
25 show up in section 2, the parenchymal section on the

**88**

1 B-reading form.
2    Q.   All right.  So if we could turn to page 12
3 of what's previously been marked as Exhibit 46, I'll
4 have a few questions for you about section 2 on this
5 form.  Section 2 on this form asks if there are any
6 parenchymal abnormalities consistent with
7 pneumoconiosis; correct?
8    A.   Correct.
9    Q.   Okay.  And this form is checked the -- for
10 the "no" box.  Is that right?
11    A.   That is correct.
12    Q.   Okay.  So if a patient were to have signs
13 consistent with asbestosis, would this box be checked
14 "no"?
15    A.   It should be checked "yes", and then the
16 subsequent sections, 2B and 2C, are required to be
17 filled.
18    Q.   All right.  And are sections 2B and 2C
19 filled out on this patient's form?
20    A.   No, they are not.  The -- since "no" is
21 checked, the instructions are to proceed to section 3
22 and skip over sections 2B and 2C.
23    Q.   Okay.  And regardless of what we might find
24 in sections 3 or 4 on this form, because boxes 2A, 2B,
25 and 2C either indicate a "no", or nothing, this B-read

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751
22 of 49 sheets                    Page 85 to 88 of 121                    08/29/2022 11:37:21 AM

Exhibit 70-9

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 10 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

**89**

1  form does not indicate signs consistent with
2  asbestosis. Is that fair?
3      A.   That is correct.
4      Q.   All right. We'll look at the bottom of page
5  12. Do you see your name on the bottom of this --
6  this form?
7      A.   Yes, I do.
8      Q.   Okay. And is it fair to say that you did a
9  reading in this patient's case on or about January
10 22nd, 2013?
11     A.   It's fair to say I did a reading on January
12 22nd, 2013, yes.
13     Q.   Okay. Thank you for that clarification.
14          In considering this entire form, would this
15 be a B-reader form for a chest x-ray or a CT scan?
16     A.   So the B-reader forms are for chest x-rays,
17 so this is for a chest x-ray.
18     Q.   Okay. Are there any places on this form
19 related to what's called costophrenic angle
20 obliteration?
21     A.   Yes, there are. Section 3C is Costophrenic
22 Angle Obliteration as part of the pleural component of
23 this form.
24     Q.   Okay. In terms of the significance of
25 costophrenic angle obliteration, would you expect to

**90**

1  see some costophrenic angle issues or obliteration in
2  a patient that had asbestosis?
3      A.   It could be variable. Costophrenic angle
4  obliteration occurs in the setting of what's called
5  diffuse pleural thickening. So more often the pleura
6  is the most sensitive to asbestos exposure. Most
7  often we see pleural plaque, and pleural plaque are
8  reported in I think 60 to 80 percent of patients who
9  have a decent asbestos exposure. Costophrenic
10 obliteration is much less common. Diffuse pleural
11 thickening -- I'm trying to remember the exact
12 numbers, but I think it was around 12 to 15 percent,
13 something like that. So it is not -- it is not an
14 absolute that costophrenic angle obliteration would
15 need to be present to diagnose asbestosis.
16     Q.   Okay. Do you see any indications on this
17 form about pleural abnormalities?
18     A.   So if we scroll up just a little bit, under
19 section 3B I did mark the possibility of a
20 diaphragmatic pleural abnormality on the left. So it
21 says, Any pleural abnormalities consistent with
22 pneumoconiosis? I did say "yes", and indicated the
23 possibility of a diaphragmatic pleural plaque. Again,
24 that, you know, would need to be clarified with -- or,
25 could be clarified with a CT scan.

**91**

1      Q.   Okay. And so in this case, do you -- do you
2  recall whether you saw both the chest x-ray or the CT
3  scan for this patient?
4      A.   I do not. I did not know what the number
5  was, as it's been redacted. So -- so without --
6  without being able to pull the images up and review
7  them, I can't comment on -- any more about that.
8      Q.   All right. In terms of the other boxes on
9  this form for diffuse pleural thickening or any other
10 abnormalities, or any of the other boxes on this form,
11 Doctor, what jumps out at you as significant on this
12 patient's particular B-read form, if anything?
13     A.   Honestly, nothing. The obligatory symbols
14 were actually put in there to make it easier for
15 B-readers to look at screening examinations in
16 hundreds of patients.
17          So the Xs that are there, one of them
18 indicates atherosclerotic calcification in the aorta,
19 which is common in elderly patients. The next one is
20 "cg", which is calcified granuloma, another very
21 common finding on chest-rays that we oftentimes don't
22 even describe when we're reading chest x-rays, it's so
23 common. And then the last one is "fr" for fractures,
24 which is that healed rib fracture.
25     Q.   Okay.

**92**

1      A.   And so you can see that based on that, in 4E
2  it said, Should the worker be notified because of the
3  findings in section 4? And I indicated "no" because
4  there were no -- there were no significant findings.
5  Those were all just incidental findings.
6      Q.   Okay. And in terms of the B-reader form
7  overall, did you fill out box 4E with a "no" related
8  to just the other symbols obligatory noted above
9  involving the rib fracture, the calcification, etc.,
10 or did you check the "no" in box 4E because you didn't
11 feel that the worker should see a personal physician
12 because of any of the findings in this scan?
13     A.   Yeah. So, actually, that -- the sections 2
14 and 3 are dependent on the occupational lung or
15 pulmonary physician who's seeing the patient. Section
16 4 is really designed to make sure people don't fall
17 through the cracks.
18          So as you look at some of the other
19 obligatory symbols, there's a symbol for cancer,
20 there's a symbol for emphysema, there's a symbol for a
21 pneumothorax. Those are things that we would get
22 immediately in touch with -- we would get in touch
23 with the party that requested the B-reading to make
24 sure that those patients don't fall through the
25 cracks. So the "no" is specifically in reference to

Exhibit 70-10

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 11 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

### Page 93

1  section 4, not to the remainder of the form.
2  Q. All right. Thank you.
3  In terms of this form overall, was there
4  anything about this patient's chest x-ray that
5  indicated to you they had signs consistent with
6  asbestosis?
7  A. No, there was not.
8  Q. All right. In fact, there was nothing that
9  you reviewed in this patient's scan that could be
10  considered a sign of asbestosis. Fair?
11  A. Nothing on this chest radiograph, no.
12  Q. All right. So if we could go back to page 1
13  here, the box marked Asbestosis on this form, is it
14  fair to say that there was not an interpretation by a
15  B-reader, you, that was consistent with asbestosis in
16  this particular patient's case?
17  A. It is -- it's fair to say that my B-reading
18  form does not support what's indicated on this -- on
19  the form that you've got up now, the EHH. I -- as we
20  discussed earlier, I don't know if there were multiple
21  B-readers involved in reading that individual, but --
22  but that -- this form does not conform with my
23  B-reading.
24  Q. All right. So would it be -- would it be
25  inaccurate -- would this checked box indicating that

### Page 94

1  there was a diagnosis of asbestosis be untrue or
2  incorrect based on your B-reader interpretation?
3  A. Yes, it would.
4  Q. Okay. And, Doctor, in your view, would it
5  be improper to suggest that the B-read performed by
6  you in this patient's case would be a proper basis for
7  a diagnosis of asbestos-related disease?
8  A. So if my B-reading was the only
9  interpretation, and the indication was, Interpretation
10  by a B-reader-qualified physician, that box should not
11  be checked.
12  Q. All right. And the information here on this
13  form that the patient has a diagnosis of asbestosis --
14  asbestosis, given the qualifications about you being
15  the only B-reader, this information is incorrect or
16  false in that regard; correct?
17  A. That is true, yes.
18  Q. Doctor, in terms of the procedures at CARD
19  for diagnosing patients, would any of CARD's staff or
20  physicians reach out to you before rendering a
21  diagnosis for any CARD patients, to the best of your
22  knowledge?
23  A. No, they did not.
24  Q. Were there any communications between you
25  and CARD about your interpretation of a chest x-ray or

### Page 95

1  CT scan other than the B-read form that you would
2  FedEx from Wisconsin to Libby, Montana?
3  A. No, there was not.
4  Q. In terms of this current patient and any
5  other current patient, by FedEx'ing those B-read
6  forms, you were not rendering a diagnosis of
7  asbestos-related disease in any of those individual
8  patients' cases yourself; correct?
9  A. That is correct. And as pointed out
10  previously, these were all anonymized, so we weren't
11  even aware of the patients as individuals.
12  Q. Right. And assuming that you were the only
13  B-reader involved in this one patient's case
14  represented in Exhibit 46, would you say it is true
15  that this patient, if basing it on your B-reader
16  interpretation alone, had a diagnosis of asbestosis?
17  A. I'm sorry. Could you rephrase that
18  question?
19  Q. Sure. I'll try to make it simpler. Would
20  you ever, based on your B-read interpretation of this
21  patient's radiographic scan, tell another care
22  provider, Yes, this patient has asbestosis?
23  A. No, I would not.
24  Q. Doctor, in terms of the general procedures
25  and the relationship between the treating or

### Page 96

1  diagnosing physician at CARD, and you as the B-reader,
2  fair to say that a diagnosis can be established by a
3  B-reader's interpretation of a chest x-ray or CT scan,
4  but that interpretation by the B-reader alone is not a
5  diagnosis? Would you agree?
6  A. Yes, I would agree to that.
7  Q. All right. And just to make sure that I'm
8  clear on this general distinction here, based on the
9  American Thoracic Society 2004 guideline, you cannot
10  have a diagnosis without an interpretation of a
11  structural abnormality on a CT or chest x-ray;
12  correct?
13  A. That is my reading of the ATS requirements
14  as well, yes.
15  Q. Okay. Though in --
16  A. Actually, I should clarify.
17  Q. Sure.
18  A. So -- so from an imaging standpoint,
19  obviously pathology trumps imaging, so there are
20  occasions when lung biopsies and things are done. So
21  a structural abnormality is required; usually imaging
22  is what's used to define that structural abnormality
23  because it's less invasive for the patient.
24  Q. Right. And pathology or histology, a
25  microscopic study, is another way of determining a

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 12 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

## 97

1  diagnosis. Fair?
2      A.   That's fair.
3      Q.   Okay. But you cannot have a diagnosis in
4  the context of CT reads and chest x-rays without a
5  radiographic interpretation indicating a sign or an
6  abnormality consistent with asbestos-related disease.
7      A.   So with regard to meeting the first
8  requirement of the ATS, the chest x-ray or CT scan
9  should be abnormal.
10     Q.   All right. Yeah. But the interpretation,
11 the radiographic interpretation, alone is not a
12 clinical diagnosis or a diagnosis of asbestos-related
13 disease. Fair?
14     A.   Correct. Correct.
15     Q.   Doctor, I'd like to turn to Tab 7.
16         MR. DUERK:  This is a document that we'll
17 mark as Exhibit 123.
18 BY MR. DUERK:
19     Q.   Doctor, you may not have ever seen this
20 record before, but I would like to address some topics
21 on it.
22         So, first, have you ever seen a letter from
23 the CARD Clinic, or this letter from the CARD Clinic,
24 apparently to a patient about the results of their
25 health screening?

## 98

1      A.   So only in the documents you sent
2  immediately prior to this deposition.
3      Q.   Okay. Doctor, I -- the way I want to
4  approach this, I'll focus on different sections of
5  this letter, with the understanding that you haven't
6  seen it before. I'm only using this letter as a
7  reference point; okay?
8      A.   Sure.
9      Q.   All right. So this letter begins, Dear
10 Blank, you participated in asbestos health screening
11 on December 11th, 2014. And at that time you were not
12 diagnosed with an asbestos-related disease, ARD. You
13 received a letter at the conclusion of your
14 appointment that informed you that your chest x-ray
15 and CT would be sent out for a second read by other
16 doctors specially trained in reading radiographic
17 images for dust diseases, like asbestos.
18         Did I read that correctly?
19     A.   Yes.
20     Q.   Okay. One of these doctors did identify a
21 small abnormality on your CT image. It is nothing
22 that has significant health implications, nor is it
23 considered a diagnosis of an asbestos-related disease.
24         Did I read that correctly?
25     A.   Yes, you did.

## 99

1      Q.   A diagnosis of asbestos-related disease is
2  based on exposure histories, time since exposure,
3  medical provider assessment, and radiographic images.
4  The reader who identified the abnormality did not have
5  the rest of this information.
6          Did I read that correctly?
7      A.   Yes, you did.
8      Q.   Okay. Doctor, in terms of the section that
9  I just read you about a diagnosis of asbestos-related
10 disease being based on exposure histories, time since
11 exposure, medical provider assessment, and
12 radiographic images, did you have any of that type of
13 information in your possession at any time when you
14 read any of these CARD patient x-rays or CT scans for
15 B-reader purposes?
16     A.   I had the radiographic images. That's all.
17     Q.   All right. And so would you agree with the
18 statement -- and the statement of -- from this letter
19 above, that outside reader interpretations, in your
20 case B-reader interpretations, would not be considered
21 a diagnosis of an asbestos-related disease in this
22 context?
23     A.   Yes, I would.
24     Q.   Okay. And based on your read of this
25 letter, does it appear to you that the authors of this

## 100

1  letter likewise understood that a B-reader
2  interpretation is not a diagnosis of asbestos-related
3  disease?
4      A.   That is what it appears to me, yes.
5      Q.   The fourth paragraph here, We are notifying
6  you of this finding because any type of abnormality
7  identified by the outside reader, even if it is not a
8  diagnosis of asbestos-related disease, qualifies you
9  for certain medical benefits. You are now eligible
10 for Medicare benefits regardless of your age based on
11 these findings. If you choose to enroll in Medicare,
12 you would also be eligible for the Medicare Pilot
13 Program for asbestos-related disease that covers
14 medically-necessary services not covered by usual
15 medical insurance programs; example, mileage, fitness
16 club memberships, assistance with daily living.
17 Information about these programs is enclosed.
18         Did I read that paragraph correctly?
19     A.   Yes, you did.
20     Q.   In addition, you continue to be eligible for
21 free ongoing screening for asbestos-related disease
22 through the CARD screening program.
23         Did I read that section correctly?
24     A.   Yes, you did.
25     Q.   Doctor, in terms of the Environmental Health

Exhibit 70-12

Case 9:19-cv-00040-DLC   Document 120-4   Filed 09/07/22   Page 13 of 13

REMOTE VIDEO RECORDED PERPETUATION DEPOSITION OF CRISTOPHER MEYER, M.D.

**101**

1  Hazard Medicare provisions in the Affordable Care Act,
2  have you read any of those provisions or reviewed them
3  at any time, to the best of your knowledge?
4      A.   No, I have not.
5      Q.   Okay.  In terms of the EHH requirements for
6  Medicare eligibility, is that information that you've
7  studied at all?
8      A.   No, it is not.
9      Q.   In terms of information communicated to you
10 by The Center for Asbestos Related Disease, the CARD
11 Clinic, has CARD shared with you any information about
12 Medicare eligibility requirements under the EHH
13 program?
14     A.   No, they have not.
15     Q.   At any time did CARD disclose to you that
16 they were basing EHH Medicare eligibility requirements
17 on your B-reads?
18     A.   No, they did not.
19     Q.   Using the patient referenced in Exhibit 46
20 in terms of the EHH form there and your B-read of that
21 patient's radiographic scan, did CARD communicate to
22 you that any time in any way or in any manner that
23 they intended to submit that patient for lifetime
24 Medicare benefits on your B-read alone?
25     A.   No, they did not.

**102**

1      Q.   Did CARD at any time in any manner express
2  to you that they planned to submit over 100 patients
3  for lifetime Medicare benefits on your B-read
4  interpretation alone?
5      A.   No, they did not.
6      Q.   At any time did CARD discuss with you that
7  they planned to submit a patient for lifetime Medicare
8  benefits for a patient that CARD knew only had a
9  fractured rib detected on radiographic scans based on
10 your B-read alone?
11     A.   No, they did not.
12     Q.   Had you known any of that information,
13 Doctor, what would your response have been?
14     A.   I would have objected to it strongly and
15 would have had a discussion internally with our risk
16 management to understand how to further proceed.
17     Q.   Is this the first time you've ever been
18 confronted with any information about CARD's
19 diagnostic practices and Medicare claims submission
20 practices that touches on any of these topics?
21     A.   Well, the -- the items that you sent me
22 prior to the deposition in the last couple days, this
23 is the first I've heard of it, yes.
24     Q.   Thank you, Doctor.
25          MR. DUERK:  If I could take a few minutes to

**103**

1  review the materials in front of me, I think I may be
2  able to streamline the rest of my questions and
3  conclude in a more hasty manner.  I'd like to take 10
4  minutes, if that works for everyone here.
5          MS. KVITRUD:  It does.  Just because we did
6  block sort of a certain amount of time, and we
7  certainly want to be collaborative --
8          MR. DUERK:  Trish, can we --
9          MS. KVITRUD:  -- I just want to get some
10 sense of how -- because Dr. Meyer -- I just want to
11 make sure and quickly check with Dr. Meyer whether he
12 has any clinical responsibilities this afternoon
13 because we're also ahead of you folks.
14         MR. DUERK:  Oh, that's right.  Trish, for my
15 part, I think I can wrap up in oftentimes a few
16 minutes.
17         MS. KVITRUD:  Oh, okay.  I just didn't know
18 if you were talking another five or ten or 60 minutes.
19 I just wanted to understand a little bit.
20         MR. DUERK:  Yep, I think I'm going to be
21 wrapped up in five minutes.
22         MS. KVITRUD:  Okay.  So we'll take a
23 10-minute break now then?  Is that what you're --
24         MR. DUERK:  If that's works for all of you.
25 I just want to review my notes and make sure that

**104**

1  we're all set to go, and then for my part I think I
2  will be finished.
3          MS. KVITRUD:  That's just fine with us.
4  Thank you.
5          MR. DUERK:  Yep.  All right.  Thank you so
6  much.
7          MR. BECHTOLD:  Hold on.  Just --
8          THE VIDEOGRAPHER:  Can I get us off the
9  record really quick?  Let the record reflect that
10 we're going off the record at 10:08 a.m.
11 (Short recess.)
12         THE VIDEOGRAPHER:  Let the record reflect we
13 are back on the record at 10:28 a.m.
14 BY MR. DUERK:
15     Q.   Dr. Meyer, after a short break I just have a
16 few follow-up questions.  I'd like to put Exhibit 124
17 in front of you on the screen.  This is an image dated
18 8-20-2013.
19     A.   Okay.
20     Q.   I believe this was just e-mailed to you.
21 Doctor, do you see what's been marked as Exhibit 124
22 in front of you?
23         MR. BECHTOLD:  Excuse me a second, counsel.
24 So I understand that you intend to use what I would
25 be -- as a cross examination?  I think you're welcome

Asa & Gilman Reporting, Inc. - asagilman@centurytel.net
P.O. Box 394 - Kalispell, MT  59903-0394 / (406)752-5751