Chad M. Knight
James E. Roberts
W. Adam Duerk
KNIGHT NICASTRO MACKAY, LLC
283 W. Front Street, Suite 203
Missoula, Montana 59802
Telephone:  (406) 206-7052
Facsimile: (816) 396-6233
knight@knightnicastro.com
roberts@knightnicastro.com
duerk@knightnicastro.com
        *Attorneys for BNSF Railway Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, on behalf of THE UNITED STATES OF AMERICA | Civil Action No.: CV-19-40-M-DLC |
| Plaintiff, | |
| vs. | **JOINT RESPONSE TO THE UNITED STATES' MOTION TO QUASH SUBPOENA TO SOCIAL SECURITY ADMINISTRATION** |
| THE CENTER FOR ASBESTOS RELATED DISEASE, INC., | |
| Defendant. | |

Relator, BNSF Railway Company (BNSF), and the Defendant, Center for

Asbestos Related Disease, Inc. (CARD), by and through their respective counsel of

record, jointly respond to the United States' Motion to Quash Subpoena to Social

Security Administration (Doc. 141).

## INTRODUCTION

The current subpoena duces tecum seeks important material and relevant information in this case from the Social Security Administration (SSA): Whether Medicare benefits should be awarded to CARD patients based solely upon a positive interpretation by a B reader qualified physician.

## PROCEDURAL BACKGROUND

CARD issued its Rule 45 subpoena to SSA on February 6, 2023. (Doc. 134-2). Two days later, the parties filed a joint motion to compel. (Docs. 133, 134). On February 14, 2023, that motion was granted by the Court. (Doc. 135).

The United States filed a request for leave to file a motion for reconsideration of that order under Local Rule 7.3, on March 1, 2023. (Doc. 136). On April 4, 2023, the Court denied the United States' motion, but ruled that the "United States may instead move to quash the relevant subpoenas, pursuant to Fed. R. Civ. P. 45(d)(3)." (Doc. 140). The Court further ordered that the United States (through its subpoenaed agencies) must meet and confer with BNSF and CARD "and attempt to resolve any disputes prior to filing a motion to quash under Rule 45." *Id*.

Counsel for the parties and SSA held a telephone conference on April 13, 2023, and discussed the 44 requests in the subpoena in some detail. The next day, at the request of SSA's counsel, counsel for BNSF and CARD provided a letter to

SSA to provide general background and context for the parties' 44 requests. According to the government, the letter was helpful for additional understanding.

As explained by the parties, the letter attempted to streamline 44 individual paragraphs contained in the subpoena by distilling the questions to a narrow set of topics. Ex. 1 ("Meet and Confer" Letter, Apr. 14, 2023). The parties' letter sought an answer to the "central question" of whether Medicare benefits should be awarded to CARD patients without a clinical diagnosis of asbestos-related disease. *Id.*, pg. 1.

Additional paragraphs in the subpoena were also streamlined under the aegis of other "central questions." *Id.*, pgs. 1-2. For example, the letter also asked whether SSA's Program Operation Manual Systems (the "POMS") provided any guidance on this main issue, and whether SSA had provided any training or instruction to CARD in terms of applying the POMS vis-à-vis CARD's practice of submitting EHH forms for Medicare benefits in cases without a provider's diagnosis. *Id.*

Further, the government has identified persons with knowledge for the various areas of inquiry, and tentative dates and locations for these depositions are being discussed.

## LEGAL STANDARD

The movant seeking to quash the subpoena bears the burden of showing why that discovery should not be permitted. *Goodman v. United States*, 369 F.2d 166, 169 (9th Cir. 1966). "A strong showing is required before a party will be denied

entirely the right to take a deposition." *City of Sterling Heights Gen. Employees'*
*Ret. Sys. v. Prudential Fin., Inc.*, No. 2:15-mc-0146 WBS AC, 2015 U.S. Dist.
LEXIS 171904, at *3 (E.D. Cal. Dec. 24, 2015) (quoting *Blankenship v. Hearst*
*Corp.*, 519 F.2d 418, 429 (9th Cir. 1975)). To meet its burden of persuasion, the
objecting party must provide specific facts that indicate the nature and extent of the
burden. *See, e.g., Nationstar Mortg., LLC v. Flamingo Trails No. 7 Landscape*
*Maint. Ass'n*, 316 F.R.D. 327, 334 (D. Nev. 2016) (citing *Jackson v. Montgomery*
*Ward & Co.*, 173 F.R.D. 524, 529 (D. Nev. 1997)). Conclusory or speculative
statements of harm, inconvenience, or expense are plainly
insufficient. *Id.* (citing *U.S. E.E.O.C. v. Caesars Ent't, Inc*, 237 F.R.D. 428, 432
(D. Nev. 2006)).

     "An evaluation of undue burden requires the court to weigh the burden to the
subpoenaed party against the value of the information to the serving party." *Moon*
*v. SCP Pool Corp.*, 232 F.R.D. 633, 637 (C.D. Cal. 2005) (quoting *Travelers*
*Indem. Co. v. Metropolitan Life Ins. Co.*, 228 F.R.D. 111, 113 (D. Conn. 2005)).
General arguments and hyperbole do not qualify as meaningful showing of costs or
inconvenience in complying with a subpoena. *Cardinali v. Pulusfour, Inc.*, No.
2:16-cv-02046-JAD-NJK, 2018 U.S. Dist. LEXIS 226459, at *11-12 (D. Nev.
Oct. 9, 2018). A motion to compel federal agency documents and data in a *Qui*

*Tam* action may be granted after issues are narrowed by the parties. *United States v. Mount Sinai Hosp.*,  169 F. Supp. 3d 538 (S.D.N.Y. 2016).

## ARGUMENT

The government begins its brief by attempting to re-litigate the motion to compel. (Doc. 142 at 3-4). In its argument, the government invites re-examination of whether a federal court is empowered to order discovery from a federal agency pursuant to the holding in *Exxon Shipping v. U.S. Dept. of Interior*, 34 F.3d 774 (9th Cir. 1994). But this issue is not currently before the Court.

The only issue now before the Court is whether the current subpoena is unduly burdensome pursuant to Fed. R. Civ. P. 45. On this point, the law is clear.

## I.    The Parties' Subpoena Does Not Present an Undue Burden and the Government Fails to Show Why the Subpoena Should be Quashed

There are three problems with the government's argument that the questions posed in both the original subpoena (and narrowed by the "Meet and Confer" letter) are overly burdensome, unreasonable or oppressive.

### A.    The Government has Failed to Make a "Strong Showing" of Undue Burden: Some of the Questions Posed by the Parties' Subpoena Have Already been Answered by SSA's Declaration

First, the government's declaration, digitally signed by an SSA Employee on April 24, 2023, shows that at least <u>some</u> of the questions posed in the subpoena apparently do have clear answers, although not based on the personal knowledge of the declarant. Ex. 2:  Decl. SSA Employee Heather Hillman, April 24, 2023.

5

The subpoena focuses on a handful of topics related to a central question posed in the parties' "Meet and Confer" letter dated April 14, 2023. That letter framed the question as follows:

> Whether Social Security Administration employees trained CARD staff to submit EHH checklists to the SSA Field Office in Kalispell in instances when no physician had diagnosed the patient with an asbestos-related disease, but an abnormality on an chest x-ray or CT scan had been detected by a B-reader radiologist.

Ex. 1: "Meet and Confer" ltr., Apr. 14, 2023.

The government's declaration squarely answered this question: contrary to the testimony of CARD personnel, SSA never provided CARD any such training:

> 4.     SSA personnel did not conduct a training for CARD nor did personnel instruct CARD on how to complete SSA's EHH Checklist, referenced in SSA's Program Operations Manual System (POMS) Health Insurance (HI) section 00803.050(B)(3). *See* https://secure.ssa.gov/apps10/poms.nsf./lnx/0600803050.

Ex. 2.

Furthermore, the declaration stated that not only did SSA ***not*** conduct training for CARD regarding how to fill out EHH forms, the declaration also stated that any instruction on how to complete EHH forms would be included in SSA's Program Operation Manual Systems ("the POMS"):

> 5.     SSA does not provide instruction on how to complete SSA's EHH Checklist beyond what may be described in the POMS HI 00803.000 *et seq.* sections titled "Medicare Entitlement for Individuals Exposed to Environmental Health Hazards (EHH)". *See* https://secure.ssa.gov/apps10/poms.nsf./lnx/0600803000.  Checklists are to be completed by the claimant's medical source and signed by the claimant's physician.

Ex. 2.

Based on the foregoing, obviously the government is capable of answering ***at least some*** of the questions posed in the subpoena. This cuts against their argument that answering questions in the subpoena would be overly burdensome, unreasonable, or oppressive.

**B.** **The Government has Failed to Make a "Strong Showing" of Undue Burden: The Government Concedes that Answers to Many Remaining Questions are "Self-Evident"**

Second, the government has not made the required "strong showing" that it cannot comply with the subpoena related to additional questions currently left unaddressed. The eight-paragraph SSA Employee's Declaration does not address many of the central topics in the subpoena. These unanswered questions are not overly burdensome. For example, these questions ask the SSA to explain whether a diagnosis of asbestos-related disease is required for Medicare eligibility as set forth in the POMS (*supra*); to confirm the steps for completing an EHH form as highlighted in the POMS (Requests 19-22); or to confirm the meaning of various terms contained in the POMS (Request 15).

The government argues that the answers to these follow-up questions are either "self-evident" or that the "terms speak for themselves" or that the answers are "readily available to the parties." (Doc 142 at 7-9). But these responses show that the questions posed are not overly burdensome. Rather, the opposite is true – the

answers to these questions should be obvious. The government – for whatever reason – has simply chosen not to provide an answer.

The government also objects that for some of the subpoena topics, it simply is unable to locate information that would provide a clear answer or that some questions ask for a legal interpretation. But this does not constitute an "undue burden."  In fact, these issues should be easy to address. If the deponent has researched the issue, searched for information and still cannot provide an answer, saying "I do not know" is also not unduly burdensome. In fact, "I do not know the answer" is occasionally a perfectly acceptable response at deposition, so long as a reasonable inquiry has been made for information. Fed. R. Civ. P. 30(b)(6). The parties accept this reality.

### C.    Practical Matters Regarding Admissibility of Evidence at Trial Weigh in Favor of Allowing a Deposition

The third and final problem with the government's response is a practical one. Although the government may prefer to provide responses to the subpoena in the form of a declaration, the declaration itself is not admissible as evidence at trial in this matter. The simplest way to resolve this problem is to make a witness available for questions at a preservation deposition for trial testimony.

In any scenario, an SSA declarant's answers at a live preservation deposition will greatly assist the parties. Currently, the declaration contains merely eight (8) paragraphs in response to the parties' questions. There has been no opportunity for

clarification or follow-up questions. Furthermore, the declaration is not admissible as evidence. The declaration was not made under oath. The Declarant has not stated that she is unavailable for trial. A deposition would resolve all of these issues.

## CONCLUSION

For all of the foregoing reasons, the government's motion to quash the parties' subpoena in this matter should be denied, and the Court should allow parties to depose the persons with knowledge to obtain necessary testimony without requiring the government's witnesses to appear at the time of trial. The parties respectfully request an expedited order related to this issue given the proximity of trial in this matter.

DATED this 27th day of April, 2023.

KNIGHT NICASTRO MACKAY, LLC

By: _/s/ W. Adam Duerk_____
        W. Adam Duerk
        *Attorneys for BNSF Railway Company*

## CERTIFICATE OF COMPLIANCE

Pursuant to the United States District Court for the District of Montana Local Rule of Procedure 7.1(d)(2)(E), I certify this pleading contains less than 6,500 words, as calculated by Microsoft Word, excluding the caption, certificate of service, certificate of compliance, table of contents, and table of authorities.

KNIGHT NICASTRO MACKAY, LLC


By:  */s/ W. Adam Duerk*
        W. Adam Duerk
        *Attorneys for BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 27th day of April, 2023, a copy of the foregoing document

was served upon the following persons by the following means:

| | |
|---|---|
| _1-3_ | CM/ECF |
| \_\_\_\_\_ | Mail |
| \_\_\_\_\_ | Hand Delivery |
| \_\_\_\_\_ | Overnight Delivery Service |
| \_\_\_\_\_ | Fax |
| \_\_\_\_\_ | Email |

1.    Clerk, U.S. District Court

2.    Michael Kakuk
      Assistant U.S. Attorney
      U.S. Attorney's Office
      901 Front Street, Suite 1100
      Helena, MT 59626
      michael.kakuk@usdoj.gov

3.    Timothy Bechtold
      Bechtold Law Firm, PLLC
      PO Box 7051
      Missoula, MT 59807
      Facsimile: 406-830-3085
      tim@bechtoldlaw.net

KNIGHT NICASTRO MACKAY, LLC

By: _/s/ W. Adam Duerk_____
      W. Adam Duerk
      *Attorneys for BNSF Railway Company*

# Exhibit 1

# Knight Nicastro MacKay

W. Adam Duerk
Member
283 West Front Street, Ste 203
Missoula, MT 59802
duerk@knightnicastro.com
T: 406-546-0881
F: 816-396-6233

April 14, 2023

*Via Email Only*

Michael Kakuk
Assistant U.S. Attorney
U.S. Attorney's Office
901 Front Street, Suite 1100
Helena, MT 59626
Michael.Kakuk@usdoj.gov

Sarah Van Arsdale Berry
Assistant Regional Counsel
Office of the General Counsel
Social Security Administration, Region VIII
Sarah.Berry@ssa.gov

Re:   *BNSF Railway ex rel U.S. v. Center for Asbestos Related Disease, Inc.*
U.S. District Court, District of Montana, Missoula Division, No. CV-19-40-M-DLC
**Subpoena for Trial Testimony**

Michael and Sara:

Yesterday morning, CARD counsel Tim Bechtold, AUSA Michael Kakuk, SSA attorney Sara Berry and Relator's Counsel, undersigned, convened for a meet and confer telephone conference as contemplated by F.R.Civ.P. 26(f); 30(b)(6) and 37. The goal of this meeting was to clarify and potentially narrow the topics of inquiry for the anticipated 30(b)(6) deposition of an SSA representative.

This meet and confer discussion occurred in light of the Subpoena for Trial Testimony issued on February 6, 2023, and followed by a joint motion to compel filed by CARD and Relator BNSF on February 8, 2023. Furthermore, this Court has since Ordered the SSA to make a deponent available responsive to the subpoena as of February 14, 2023.

Boulder   ▪   Billings   ▪   Kansas City   ▪   Missoula   ▪   Chicago   ▪   Peoria   ▪   St. Louis

**Exhibit 1-1**

Mr. Michael Kakuk
Ms. Sara Van Arsdale Berry
Re:  *BNSF v. CARD*
April 14, 2023
Page 2

Counsel for SSA stated on the call that a narrative description of the topics to be addressed at deposition would be helpful.  SSA Counsel Berry suggested that one potential path forward would be to reissue a subpoena with a different description of the topics.

Counsel for both Relator and CARD stated that they believe the 44 individual paragraphs in the subpoena adequately set forth the topics to be addressed.  However, at the government's suggestion, Relator and CARD agreed to provide general background in the form of this letter to assist the Social Security Administration to better understand the topics that the parties hope to have addressed at a 30(b)(6) deposition.  Pursuant to that request for clarification, CARD and Relator offer the following narrative for context.

**BACKGROUND:**

One of the central questions for the 30(b)(6) deponent is as follows:

Whether Social Security Administration employees trained CARD staff to submit EHH checklists to the SSA Field Office in Kalispell in instances when no physician had diagnosed the patient with an asbestos-related disease, but an abnormality on an chest x-ray or CT scan had been detected by a B-reader radiologist.

In short, parties crafted 44 separate areas of inquiry that each contribute specific elements to the larger questions of whether SSA personnel trained CARD staff on filling out EHH Checklists, how SSA personnel trained CARD staff to fill out EHH Checklists, and the regulatory and statutory bases guiding SSA's training in how to fill out EHH Checklists.

At least one CARD witness in this matter has testified that an SSA representative appeared in person in Libby, Montana sometime around 2010-2011 to "train" CARD to fill out EHH forms.[1]  According to that testimony, an SSA employee (Sonya Hymas, Mary Lewandowski, or other SSA personnel) "taught" CARD to submit EHH forms in support of EHH Medicare eligibility in cases where no physician (including Dr. Black at CARD) had diagnosed the patient with asbestos-related disease – but where a B-reader radiologist had detected an "abnormality" on either a chest x-ray or CT scan.

The 30(b)(6) subpoena seeks  answers to the central questions of whether this training occurred; whether SSA instructed CARD to submit EHH forms for patients without a clinical diagnosis of asbestos-related disease; and whether the SSA is in possession of any records showing that this training at CARD occurred or whether the topic of Medicare eligibility based on a "B-read only" was ever communicated by SSA or CARD. Paragraphs 17-22;26-28;31-40 of the subpoena address these issues.

---

[1] Deposition excerpts from Dr. Brad Black and Tanis Hernadez are attached to provide context.

Boulder   ▪   Billings   ▪   Kansas City   ▪   Missoula   ▪   Chicago   ▪   Peoria   ▪   St. Louis

**Exhibit 1-2**

Mr. Michael Kakuk
Ms. Sara Van Arsdale Berry
Re:  *BNSF v. CARD*
April 14, 2023
Page 3

     The 30(b)(6) subpoena also references the Program Operations Manual Systems (POMS) HI 00803.050 and 00803.001.  The parties have referenced the POMS in order to understand how the POMS was used within the Kalispell Field Office, and how its provisions were interpreted and applied regarding the EHH forms submitted by the CARD clinic in support of Medicare benefits. Paragraphs 1-14; 29; 30; 41- 44 of the subpoena address these issues. The parties seek answers about how the POMS has been interpreted and used by SSA employees – especially at the Kalispell Field Office – to determine whether CARD patients are eligible for Medicare benefits.

     Finally, the 30(b)(6) subpoena references several discrete issues not specifically referenced in the narrative above related to Medicare eligibility criteria and definitions included in either EHH forms, the POMS or the Affordable Care Act itself.  Paragraphs 15;16;23;24;25 of the subpoena address these issues.

     Parties hope this letter provides insight and background related to the questions posed in paragraphs 1-44 in the parties' Subpoena.  As discussed, we look forward to the government's response to this letter on Monday, April 24, 2023 by close of business.  Per our discussion, we have agreed that the government will either file a motion to quash our subpoena or provide specifics about a 30(b)(6) deposition by that date.

     Sincerely,

     KNIGHT NICASTRO MACKAY, LLC

     W. Adam Duerk

Attachments

Boulder  ▪  Billings  ▪  Kansas City  ▪  Missoula  ▪  Chicago  ▪  Peoria  ▪  St. Louis

**Exhibit 1-3**

1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF MONTANA

3

4    BNSF RAILWAY COMPANY, on      )
     behalf of THE UNITED STATES   )
5    OF AMERICA,                   )        Civil Action
                                   )     No. CV-19-40-M-DLC
6           Plaintiff,             )
                                   )
7    vs.                           )
                                   )
8    THE CENTER FOR ASBESTOS       )
     RELATED DISEASE, INC.,        )
9                                  )
            Defendant.             )
10   _____)

11

12

13                VIDEO RECORDED DEPOSITION

14                         OF

15               CHARLES BRAD BLACK, M.D.

16          (Taken on behalf of the Plaintiff.)

17

18

19

20

21        Taken at The Venture Inn Viking Room
                   1015 Ninth Street
22                  Libby, Montana
          Wednesday, January 19, 2022 - 9:00 a.m.
23

24
          Reported by Beth Gilman, RPR and Notary Public
25         for the State of Montana, County of Flathead

1      **A.**    Yes.

2      **Q.**    Okay.  Judy P<sup>Redacted</sup> did not have asbestosis;

3   correct?

4      **A.**    Not by my determination.

5      **Q.**    All right.  So any information on that form

6   that suggests that Judy P<sup>Redacted</sup> was diagnosed with

7   asbestosis on August 20th, 2013 is not true; correct?

8      **A.**    The way it reads, yes.

9      **Q.**    All right.  And just to be clear, there are

10  multiple places on this form that have untrue

11  information; correct?

12     **A.**    Multiple places?

13     **Q.**    Yes.

14     **A.**    I -- what does that mean?  How many?

15     **Q.**    I'll -- I can go through a few of them with

16  you.

17     **A.**    Okay.

18     **Q.**    First of all, Judy P<sup>Redacted</sup> does not have

19  asbestosis; correct?

20     **A.**    Correct.

21     **Q.**    Judy  <sup>Redacted</sup> was not diagnosed by the

22  provider, that being you, for asbestosis; correct?

23     **A.**    Right.

24     **Q.**    Judy P<sup>Redacted</sup> does not have a date of diagnosis

25  of August 20th, 2013; correct?

1       **A.**     Yes.

2       Q.     And Judy P<sup>Redacted</sup> did not have any CT scan read

3  by you or anyone else indicating asbestosis; correct?

4       **A.**     Yes.

5       Q.     All right.  So those sections on this EHH

6  form are untrue; correct?

7       **A.**     The way they fit on this form right now as

8  we look at it, yes.

9       Q.     All right.  So in terms of who taught you to

10  read these forms or deal with these forms -- I think

11  you mentioned that somebody taught you how to fill

12  this in.  Who -- who taught you how to do that?

13       **A.**     Well, when this first came up we -- we

14  actually had Social Security Administration personnel

15  came to Libby, sat down with our staff, and explained

16  how to fill these out, especially in view of the

17  provision in the law that says that a positive B-read

18  would qualify you if you were exposed six months or

19  more, greater than 10 years, and so it create-- you

20  know, it's one of these things that we had to follow

21  the law and had to fit it in.  And they helped us fill

22  this out in the way you're seeing it that looks like,

23  That's not right.  But they said this'll be the way we

24  do it, you know, and -- so the date of -- I think we

25  didn't get it right here.  So the date of the

1    diagnosis would be the date of the B-read, is kind of

2    what would be in that.  So that's the way they

3    directed us, and so we followed that with them and,

4    you know, they were happy with that, so --

5        Q.   Who?  Who --

6        A.   Social Security.

7        Q.   I know that's what you're saying.

8        A.   Yeah.

9        Q.   But who?  Who at Social Security?

10        A.   Oh, who?  There was -- I think the key

11   person was Sonya.

12        Q.   Sonya who?

13        A.   Sonya P[Redacted] , I think, yeah.

14        Q.   Okay.  And when?  When did Sonya P[Redacted]

15   tell you --

16        A.   Oh, it was -- it was back when we were

17   starting on this, you know, so I assume it was

18   somewhere in -- you would have to ask somebody that

19   knows.  I don't know that -- exactly when.  I know it

20   was early on when we learned how to --

21        Q.   What year?

22        A.   -- fill these out.

23        Q.   What general timeframe?

24        A.   Oh, it must be 2011 or -- I don't know.  I'm

25   just guessing, so --

Exhibit 1-7

```
 1        Q.    Okay.  Where?  Where did this --
 2        A.    They came to Libby.  They came to the CARD
 3   Clinic and they sat down with our staff, and I
 4   understand Sonya was the leader of that group, and
 5   they went over in detail how to fill these out because
 6   of the quandary -- I mean, the awkwardness of trying
 7   to fit in a positive B-read and, you know, when you
 8   didn't diagnose, yet, by the law, they have access.
 9   And so they explained to do it this way, and that's
10   the way our staff has done it, by the book.  And so if
11   you didn't know that, if you'd look at it and say,
12   Well, that doesn't look right, but that's how we were
13   instructed to do it, so --
14        Q.    Who else was at that meeting?
15        A.    I don't know.  I wasn't there.
16        Q.    You weren't at that meeting.
17        A.    I was not at that meeting.
18        Q.    Okay.  And you don't know who else was at
19   that meeting.
20        A.    I don't.  Other staff I think were with
21   Sonya, so -- but that's what I've heard; I wasn't
22   there, so --
23        Q.    Okay.  Where?  Where was that meeting?
24        A.    It was at CARD.
25        Q.    Okay.  Do you have any record of that
```

1   meeting?

2        **A.**   I don't have it, no.

3        **Q.**   Okay.

4        **A.**   Somebody might have it, but I don't have it,

5   so --

6        **Q.**   Do you have any written authorization from

7   the Social Security Administration to enroll people in

8   Medicare under the Pilot Program or Medicare for life

9   on the basis of an outside B-read only?

10       **A.**   That's something in the details you'll have

11   to ask the right people.  I don't know.

12       **Q.**   Well, and I'm asking -- who?  Who are the

13   right people to ask?

14       **A.**   Well, Sonya is probably the person to talk

15   to.

16       **Q.**   Okay.  Sonya, from how many years ago at the

17   Social Security office?

18       **A.**   I think she's still there.

19       **Q.**   Okay.

20       **A.**   So --

21       **Q.**   Who at CARD was a member of that meeting?

22       **A.**   Probably Tanis Hernandez.

23       **Q.**   Okay.  Tanis is no longer with CARD today;

24   correct?

25       **A.**   Right.  And I think probably -- I think --

1    I can't -- I don't -- I wasn't in the middle of it,

2    so --

3        Q.    Okay.  But as you sit here today, you are

4    not aware of whether or not there were any written

5    materials that resulted from that meeting provided --

6    providing authorization for CARD to follow this

7    B-reader procedure.

8        A.    You're asking the wrong person, yeah.  I

9    can't answer those things.

10       Q.    Did you seek anyone's advice about this

11   procedure for certifying patients as Medicare-eligible

12   aside from this conversation with Sonya that you

13   didn't participate in?

14       A.    What's that now?  I don't know what you're

15   asking.

16       Q.    Yeah.  I'm asking if you checked with

17   anybody else independent of the issue of a

18   conversation with Sonya.  Did you take the discussion

19   further than Sonya?

20       A.    That's who Social Security sent here to

21   train us to do -- fill out these forms.

22       Q.    Okay.

23       A.    And -- and figure out how to accommodate for

24   the situation of the positive B-read when there was

25   not an overt diagnosis.  We had to meet the law.

1      Q.    And this -- this happened -- and again, I

2    don't want to put a date in your mouth or anything

3    like that, but did you say 2009?  2010?  2011?

4      **A.**    It had -- well, it was -- it had to be, I

5    assume, early on.  I don't know.  I can't tell you if

6    it was -- probably maybe 2010, '11.  Probably 2011.

7    I -- it's just, once again, a guess, but it's probably

8    in that vicinity, but I don't know.  I don't know for

9    sure.

10     Q.    I'll represent to you that Exhibit 1

11   contains several different forms about Medicare, the

12   Pilot Program, and Social Security benefits, including

13   a sample form from I believe the Social Security

14   Administration, the Environmental Health Hazards

15   Checklist, and a sample form for Noridian

16   authorization under Medicare's Pilot Program.

17          Are these examples of the topics that would

18   have been discussed with anybody from Social Security

19   about the procedure to obtain Medicare benefits?

20     **A.**    I assume they would be, but I -- once again,

21   you're asking a person that was not part of it.  I

22   mean --

23     Q.    Okay.  But there was, to the best of your

24   knowledge, some communication back and forth between

25   CARD and the Social Security Administration.

1      **A.**    Yeah.

2      Q.    About the proper procedure for obtaining

3   Medicare benefits; correct?

4      **A.**    Sure.

5      Q.    And parts of that conversation are

6   consistent with the information that we have in

7   Exhibit 1; correct?

8      **A.**    So what you're -- you're saying the

9   conversation should surround all of these?

10      Q.    No, Doctor.  I'm just saying that in terms

11   of the discussions between CARD and the Social

12   Security Administration, certainly there were

13   discussions about who is eligible for Medicare

14   benefits.

15      **A.**    Sure.  Yes.

16      Q.    Right.  And in Exhibit 1, it defines who is

17   eligible for Medicare benefits by this language, You

18   must, number 1, be diagnosed with asbestos-related

19   disease by a medical provider; 2, have been present in

20   Lincoln County for at least six months; 3, the six

21   months in Lincoln County must be at least 10 years

22   before you were diagnosed with ARD.  You are not

23   considered disabled nor will you receive any cash

24   disability benefits.  Social Security disability is a

25   completely separate program with a separate

**Exhibit 1-12**

1     application process.

2              Did I read that correctly?

3       **A.**    Yes.

4       Q.    Okay.   Now, this form goes on to talk about

5     the specific steps to take for CARD patients when

6     seeking Social Security Administration benefits.   This

7     Exhibit also shows a -- appears to show an exemplar of

8     an Environmental Health Hazards Checklist form;

9     correct?

10      **A.**    Yes.

11      Q.    And the impairments listed, a diagnosis of

12    asbestos-related disease, the residency requirements

13    on the EHH form, these are all consistent with the

14    topics that appear to have been communicated about

15    between CARD and Social Security; correct?

16      **A.**    Yeah, but I -- once again, details are a --

17    not available to me at this time, so --

18      Q.    Yeah.   And looking at Exhibit 1 in terms of

19    Medicare Pilot Program and Medicare eligibility, I

20    don't see anything listed here that indicates that

21    there's a special category of patients who are

22    eligible for Medicare for life when they don't have an

23    asbestos-related disease.   Do you see anything

24    mentioned here about that?

25      **A.**    I think it's on the form.

**Exhibit 1-13**

1    Q.    Okay.

2    A.    Didn't it say on the EHH there?

3    Q.    I don't see anything on --

4    A.    Interpretation by a B-reader.

5    Q.    Yeah.  That is the minimum evidence required

6    for a diagnosis of one of these diagnosed impairments.

7    A.    Right.

8    Q.    And there is nothing in this form, or in any

9    of the literature, about Social Security benefits in

10   Exhibit 1 that indicates there is this special

11   carve-out category for patients who can get Medicare

12   without an asbestos-related disease; correct?

13   A.    Well, there's the Affordable Care Act law

14   that says it, so if you're reading that, you better

15   pay attention, so --

16   Q.    And you would acknowledge that you are not

17   an attorney; correct?

18   A.    Correct.

19   Q.    Okay.  And you're lucky for that.  But the

20   question that I'm also getting at, Doctor, is, in

21   terms of questioning whether or not this B-reader-only

22   category, or your interpretation of the law was

23   accurate, you did not consult with any attorney about

24   that topic; correct?

25   A.    We depended on Social Security to give us

1    direction on this.

2         Q.   All right.

3         A.   And that's what they did, so --

4         Q.   According to you, about a conversation that

5    you didn't participate in; correct?

6         A.   But my staff did.  They were actively

7    involved with it, so --

8         Q.   All right.  And in terms of Exhibit 1

9    related to Medicare benefits, there is nothing listed

10   in Exhibit 1 that says you can obtain Medicare

11   benefits without an asbestos-related disease

12   diagnosis.  In fact, Exhibit 1 seems to condition

13   Medicare benefits on, You must have an

14   asbestos-related disease; correct?

15             MR. BECHTOLD:  Asked and answered.

16   BY MR. DUERK:

17        Q.   Go ahead.

18        A.   I -- once again, I think -- if I looked

19   through this, it still says the same thing on the form

20   that they created for us, so --

21        Q.   Right.  And the form --

22        A.   And I don't think -- what you need -- I

23   mean, that's pretty clear; isn't it?  A B-read.

24        Q.   It says an environmental -- it says --

25        A.   But it says a positive B-read; right?

**Exhibit 1-15**

**In the Matter Of:**

# BNSF

vs

# CENTER FOR ASBESTOS RELATED DISEASE

## TANIS HERNANDEZ

### February 16, 2022



**Moburg Reporting**

33400 9th Ave. South, Suite 207

Federal Way, WA 98003

(206) 622-3110

www.MoburgReporting.com

**Exhibit 1-16**

1    testimony.  I felt we were on the same page, that in order

2    to obtain Medicare benefits, a CARD patient had to have a

3    diagnosis of asbestos-related disease?

4                    MR. BECHTOLD:  Is that a question?

5                    MR. DUERK:  That is -- I'm asking where we

6    missed one another.

7         Q.    (By Mr. Duerk) Where in any of these emails does

8    anybody from the Social Security Administration or any

9    government official, or CARD for that matter, say that

10   it's okay to submit patients for Medicare benefits when

11   they don't have a diagnosis of asbestos-related disease?

12        A.   That's why I requested to see the EHH because I

13   haven't seen one in so long.  I don't know if it says

14   diagnosed by an outside B-reader or a CT, blah blah blah.

15   But early on when you said -- just like when I was trying

16   to clarify that it's a Libby exposure from Libby, not a

17   Libby product in Michigan that we were clarifying who was

18   that patient population.

19        Q.   Right.

20        A.   Not necessarily what an EHH-qualifying condition

21   is for Medicare.

22        Q.   I've been talking about EHH-qualifying conditions

23   for Medicare this entire time.  And --

24        A.   Then I misunderstood your intention.

25        Q.   All right.  Let's look at CARD's website that I



**Exhibit 1-17**

1    pulled.  I'm going to mark this as Exhibit 84.  I'll

2    represent to you -- I'll represent to you that I pulled

3    this exhibit from CARD's website within the last week.

4                        (Exhibit No. 84 marked for

5                        identification.)

6        Q.   (By Mr. Duerk) Do you see on page 1 who is

7    eligible for Medicare benefits?

8        A.   Yes.

9        Q.   Okay.  And page 2 of Exhibit 84 states, "You must

10   one, be diagnosed with ARD by a medical provider, two,

11   have been present in Lincoln County for at least

12   six months, three, the six months in Lincoln County must

13   be at least ten years before you were diagnosed with ARD.

14   You are not considered disabled nor will you receive any

15   cash disability benefits.  Social Security disability is a

16   complete separate program with a separate application

17   process."

18       Did I read that correctly?

19       A.   Yes.

20       Q.   Okay.  So on CARD's own website, in answer to the

21   question, "Who is eligible for Medicare benefits," it says

22   "You must be diagnosed with asbestos-related disease by a

23   medical provider" as its first requirement, correct?

24       A.   That's what it says.

25       Q.   Okay.  Is there anywhere on CARD's website in

Moburg Reporting
206-622-3110

MOBURG
REPORTING

33400 9th Ave. South, Suite 207
Federal Way, WA 98003

Exhibit 1-18

1   Exhibit 84 that says it's appropriate for CARD to submit

2   patients for Medicare coverage if they don't have a

3   diagnosis of asbestos-related disease?

4       A.  Not in the section you read.

5       Q.  Okay.  And is there anything on CARD's web

6   page in Exhibit 84 that you see that says it's okay to

7   submit CARD patients for Medicare beneficiary for life

8   status without a diagnosis of asbestos-related disease?

9       A.  Repeat that.

10      Q.  If you could read that back, that would be great.

11                  (Record read by the reporter.)

12                  THE WITNESS:  I haven't read this

13  Exhibit 84.  This website is new since I was there.  But

14  I'm assuming it would have been in the section that you

15  read aloud.  And it is not there.

16      Q.  (By Mr. Duerk) Okay.  So CARD's website doesn't

17  discuss anything about submitting patients to Medicare --

18      A.  With the B-read only.

19      Q.  -- with the B-read only.  It doesn't say anything

20  about that, correct?

21      A.  Correct.

22      Q.  And fair to say that in all of the exhibits that

23  we've discussed so far, there isn't any discussion about

24  submitting patients without a diagnosis for ARD expecting

25  that they will get Medicare benefits, correct?



```
 1        A.   No, it does not acknowledge the B-read --
 2   positive B-read component.
 3        Q.   So based on your testimony, I didn't hear
 4   anything that indicated that you discussed with Sonya
 5   Redacted, or any other Social Security Administration
 6   official, the fact that CARD was submitting patients
 7   without an asbestos-related disease diagnosis for Medicare
 8   benefits?
 9        A.   When we fill out the EHH and it's a positive
10   B-read, we circle the word.  I believe it was like only on
11   there to indicate that it was a positive B-read EHH and
12   not a CARD diagnosis EHH.
13        Q.   Okay.  And so --
14        A.   So they knew when we were sending that, it was a
15   positive B-read.
16        Q.   And who did you discuss that topic with at Social
17   Security?
18        A.   What was to be discussed?
19        Q.   That you were submitting it -- submitting the EHH
20   form based on a positive B-read only.
21        A.   It's one of the options.
22        Q.   I understand that.  I think maybe we're having a
23   disconnect here and I'll back up.
24             It sounds to me like you and others at CARD have an
25   interpretation that submitting patients on a B-read only
```



MOBURG
REPORTING

**Exhibit 1-20**

Page 120

1   without a CARD diagnosis of asbestos-related disease is

2   appropriate, correct?

3       A.   Correct.

4       Q.   My question is:  Aside from circling B-read only

5   on the EHH form, who did you discuss that protocol with at

6   Social Security?

7       A.   I don't recall.

8       Q.   Okay.  As you sit here today, do you recall any

9   emails, any written correspondence, any phone calls with

10  anybody at Social Security about this topic?

11      A.   No.

12      Q.   Okay.  Do you recall any conversations with

13  anybody at the federal government involved in Medicare

14  benefits related to the notion that it's acceptable to

15  submit cards for Medicare benefits who do not have a

16  diagnosis of asbestos-related disease?

17      A.   No.  That EHH form was generated without our

18  involvement and presented to us when they came -- when

19  Medicare came, SSA came to town.

20      Q.   Understood.  So in terms of, you know, seeking

21  guidance or clarification from Social Security or Medicare

22  related to CARD's practice of submitting patients for

23  Medicare benefits without an ARD diagnosis, you don't

24  recall having a conversation with anybody at the

25  government about that topic; fair?


**Exhibit 1-21**

1      A.   Not specifically.

2      Q.   Okay.  And specifically in terms of Sonya

3      Redacted   or Sonya L^Redacted at the Social Security field

4   office that we've seen in these email correspondence in

5   these exhibits, do you recall any conversation with her

6   about that topic?

7      A.   No.

8      Q.   There was another person at Social Security,

9   Ms. Lewandowski?

10     A.   Yeah.

11     Q.   Do you recall any conversation with

12  Ms. Lewandowski about that topic?

13     A.   No.

14     Q.   Okay.  Ms. Hernandez, do you recall any email,

15  letter, written correspondence, authorization, memo, legal

16  opinion, or anything else in writing from Social Security

17  or Medicare or any branch of the federal government that

18  authorized CARD to submit patients without an

19  asbestos-related disease diagnosis for Medicare benefits?

20     A.   I believe there was no authorization requested or

21  received because the form was created by the federal

22  government by those agencies with the intent clearly

23  specified.

24     Q.   Okay.  And just so that I'm clear, no

25  clarification was ever sought by you or anyone else that



1   you know of at CARD related to this practice of submitting

2   patients who had no diagnosis of asbestos-related disease

3   to the federal government, correct?

4       A.  You're -- are you asking if we sought

5   authorization, any of us?

6       Q.  Yes.

7       A.  We did not seek authorization for a positive

8   B-read on the EHH.

9       Q.  Okay.  What kinds of materials would CARD submit

10  to the Social Security Administration along with an EHH

11  form?

12      A.  I believe just a release of information.

13      Q.  Okay.  And then what would happen after the

14  release of information was sent over to the Social

15  Security Administration?

16      A.  As I remember, the patient would call the Social

17  Security Administration and then -- to enroll, and the

18  release and EHH is all we sent them.  It was on the

19  patient to choose to contact Social Security for those

20  benefits.

21      Q.  Okay.  And then would CARD follow up by sending

22  any other records to anybody else?

23      A.  No.  Not that I'm aware of.

24      Q.  So help me to understand what that release was

25  for?

Moburg Reporting
206-622-3110

MOBURG
REPORTING
33400 9th Ave. South, Suite 207
Federal Way, WA 98003
**Exhibit 1-23**

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**

| | |
|---|---|
| BNSF RAILWAY COMPANY, on behalf of THE UNITED STATES OF AMERICA, <br><br> *Plaintiff,* <br><br> v. <br><br> THE CENTER FOR ASBESTOS RELATED DISEASE, INC., <br><br> *Defendant.* | Civil Action No. CV-19-40-M-DLC |

**DECLARATION OF EMPLOYEE**

I, Heather Hillmann, declare as follows:

1.     The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.  Beyond my personal knowledge, I have conducted an extensive search of the Social Security Administration's (SSA) records relating to agency interactions with the Center for Asbestos Related Disease (CARD) in the listed timeframe.  I searched SSA's electronic records which included archived policies and information stored on the agency's drive.  I have further consulted with current agency personnel who may have been involved in CARD interactions during this period.

2.     I am currently employed as the Medicare Lead and Subject Matter Expert in the Denver Regional Office at SSA.  I have been employed in this capacity since September 16, 2018.  My job responsibilities include providing policy analysis and technical support to the Denver

1

**Exhibit 2-1**

Region's local field offices and SSA's headquarters components.  In the past, I worked on issues related to the Libby, Montana, environmental disaster, including policy support and updates.

3.      SSA regional office personnel traveled to Kalispell, Montana in the 2010 or 2011 timeframe to set up an intake process for Environmental Health Hazard (EHH) Medicare claims. During this timeframe, regional office personnel interacted with employees from CARD because CARD prepared EHH Medicare claims for submission to SSA.

4.      SSA personnel did not conduct a training for CARD nor did personnel instruct CARD on how to complete SSA's EHH Checklist, referenced in SSA's Program Operations Manual System (POMS) Health Insurance (HI) section 00803.050(B)(3).  *See* https://secure.ssa.gov/apps10/poms.nsf./Inx/0600803050.

5.      SSA does not provide instruction on how to complete SSA's EHH Checklist beyond what may be described in the POMS HI 00803.000 *et seq.* sections titled "Medicare Entitlement for Individuals Exposed to Environmental Health Hazards (EHH)".  *See* https://secure.ssa.gov/apps10/poms.nsf./Inx/0600803000.  Checklists are to be completed by the claimant's medical source and signed by the claimant's physician.

6.      The POMS is an internal policy system intended as a reference for use by SSA employees.  SSA has published the internal instructions referenced herein on www.ssa.gov for transparency purposes.

7.      POMS HI 00803.000 *et seq.* sections titled "Medicare Entitlement for Individuals Exposed to Environmental Health Hazards (EHH)" are based on and mirror language from the Affordable Care Act.  The extent to which an individual may be eligible for EHH Medicare is based on eligibility criteria specified in the Affordable Care Act.

**Exhibit 2-2**

8.      SSA handles the entitlement and eligibility part of EHH Medicare and the Center for Medicare & Medicaid Services (CMS) handles the coverage, policy, and most of the billing aspects of EHH Medicare.


Dated this 24th day of April, 2023.


HEATHER HILLMANN          Digitally signed by HEATHER HILLMANN
                          Date: 2023.04.24 15:13:56 -06'00'

**Heather Hillmann**
Medicare Lead and Subject Matter Expert
Denver Regional Office
Social Security Administration

**Exhibit 2-3**