Chad M. Knight
James E. Roberts
W. Adam Duerk
Seamus Molloy
KNIGHT NICASTRO MACKAY, LLC
283 W. Front Street, Suite 203
Missoula, Montana 59802
Telephone:  (406) 206-7052
Facsimile: (816) 396-6233
knight@knightnicastro.com
roberts@knightnicastro.com
duerk@knightnicastro.com
molloy@knightnicastro.com
        *Attorneys for BNSF Railway Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, on behalf of THE UNITED STATES OF AMERICA | Civil Action No.: CV-19-40-M-DLC |
| Plaintiff, | **RELATOR'S TRIAL BRIEF** |
| vs. | |
| THE CENTER FOR ASBESTOS RELATED DISEASE, INC., | |
| Defendant. | |

Relator, BNSF Railway Company ("BNSF"), by and through its attorneys of

record, Knight Nicastro MacKay, LLC, hereby submit its Trial Brief.

1

## ANTICIPATED LEGAL ISSUES

One of the central issues in this case is whether a B-Reader interpretation of a plain chest x-ray noting an abnormality—by itself—is a "diagnosis" under 42 U.S.C. § 1395rr-1. The meaning of the requirements for Environmental Health Hazard Medicare eligibility established under 42 U.S.C. § 1395rr-1 is a purely legal question that this Court must decide.

Ultimately, whether "B-Read Only" claims are "false" under the False Claims Act depends on the Court's interpretation of the statute. Relator previously explained in its motion for partial summary judgment and supporting brief why the term "diagnosis" must be given its ordinary and commonly understood meaning. (*See* Docs. 78–79). Relator will rely on that briefing, but it is worth noting here that B-Readers do not believe their interpretations are a diagnosis. Even CARD does not believe a B-Reader radiographic interpretation is "diagnosis" of a medical condition. CARD even tells its patients in written correspondence that a B-Reader interpretation is not—and cannot be—a diagnosis and explains why:

Dear ▮▮

You participated in asbestos health screening on 12/11/2014 and at that time you were not diagnosed with an asbestos related disease (ARD). You received a letter at the conclusion of your appointment that informed you that your chest x-ray and CT would be sent out for a second read by other doctors specially trained in reading radiographic images for dust diseases (like asbestos).

One of these doctors did identify a small abnormality on your CT image. It is nothing that has significant health implications nor is it considered a diagnosis of an asbestos related disease.

A diagnosis of asbestos related disease is based on exposure histories, time since exposure, medical provider assessment, and radiographic images. The reader who identified the abnormality did not have the rest of this information.

While the reasonableness of CARD's interpretation of the statute may be relevant to whether it *knowingly* caused false claims to be submitted, the falsity of the "B-Read Only" claims depends on this Court's judicial interpretation of the meaning of "diagnosis" in 42 U.S.C. § 1395rr-1.

The Court denied Relator's partial summary judgment motion on the "B-Read Only" claims because there was insufficient evidence regarding whether the Social Security Administration was fully informed as to CARD's practices for EHH coverage certification. (*See* Doc. 131, 5–6). As a preliminary matter, government knowledge of the falsity of a claim is not a defense to liability. Under the False Claims Act: "[t]he requisite intent is the knowing presentation of what is known to be false. That the relevant government officials know of the falsity is not in itself a defense." *United States ex rel. Hagood v. Sonoma Cnty. Water Agency*, 929 F.2d 1416, 1421 (9th Cir. 1991); *see also United States ex rel. Kreindler & Kreindler v. United Techs. Corp.,* 985 F.2d 1148, 1156 (2d Cir. 1993) ("[T]he statutory basis for an FCA claim is the defendant's knowledge of the falsity of its claim, see § 3729(a) & (b), which is not automatically exonerated by any overlapping knowledge by government officials.").

If SSA had approved CARD's practices, that information would be relevant to whether CARD "knowingly" submitted false claims, but government knowledge that a claim is false does not make the claim any less false.

To the extent SSA's knowledge of CARD's certification practices is relevant, since the Court issued its order, the Social Security Administration has testified through a 30(b)(6) deposition. (Ex. 1: Dep. SSA 30(b)(6) Heather Hillman, May 16, 2023 ("Dep. SSA")).  SSA representative Heather Hillman testified that SSA has never trained nor instructed CARD how to fill out an EHH Checklist (Dep. SSA 36:08–37:15), and that the SSA had not approved submitting patients based on a B-Reader interpretation alone. (Dep. SSA 80:12–81:05). In fact, when made aware of the practice in April 2023—for the first time—SSA representatives informed CARD that any patient submitted based on a B-Read alone would be denied if the physician who completed the form did not agree that the patient had been diagnosed with one of the specified conditions. (Dep. SSA 79:12–84:04). The SSA further confirmed that this had always been SSA's standards and practice. *Id.*

Thus, the undisputed (and stipulated) facts establish that:

- B-Readers do not diagnose patients;

- CARD does not believe that a B-Reader interpretation is a diagnosis;

- CARD tells its patients a B-Reader interpretation is not a diagnosis of an asbestos-related disease, nor is it anything that "has significant health implications";

- the SSA did not train or instruct CARD on how to fill out an EHH Checklist;

4

- the SSA was unaware of CARD's practice of submitting patients for EHH Medicare based on a B-Read alone until April 2023; and

- SSA has never approved submitting patients based on a B-Read interpretation alone when the certifying medical provider does not believe the patient has been diagnosed with one of the specified conditions.

To clarify the issues that will be presented to the jury, the Court should rule before trial begins that an individual must be <u>diagnosed</u> with one of the specified conditions to be eligible for EHH Medicare under 42 U.S.C. § 1395rr-1 and that a B-Read interpretation, alone, is not a diagnosis of such a condition.

## ANTICIPATED EVIDENTIARY ISSUES

### 1.     Exclusion of Senator Baucus Testimony

Relator previously moved to exclude Senator Baucus's testimony. (Doc. 86). Relator argued (1) that Senator Baucus was not timely disclosed, (2) that Senator Baucus would impermissibly testify to establish legislative intent of 42 U.S.C. § 1395rr-1; (3) that Senator Baucus lacked the proper foundation to testify about the thoughts and opinions of Kathleen Sebelius or CARD, and (4) that the danger of unfair prejudice substantially outweighed the probative value of Senator Baucus's testimony. (Doc. 86).

The Court held that Senator Baucus had been timely disclosed but reserved ruling on the prejudicial effect and foundation of Senator Baucus's testimony until the testimony has been offered at trial. (Doc. 132, 7–8). It is anticipated that CARD

intends to offer Senator Baucus's testimony by videotaped deposition in lieu of live testimony. Relator thus renews its motion to exclude Senator Baucus's testimony.

Senator Baucus has been deposed twice. The transcripts from both depositions are submitted as Exhibits 2 and 3. Put simply, Senator Baucus can offer no testimony that is relevant to Relator's claims. Relator alleges that CARD violated the False Claims Act by presenting or causing to be presented false claims to the federal government for payment or approval and by creating false statements and records that were material to false or fraudulent claims. Senator Baucus was not involved in the CARD clinic's creation of statements and records or submissions of forms and claims. Nor did he advise CARD as to the meaning of 42 U.S.C. § 1395rr-1. Furthermore, Senator Baucus was not in communication with the CARD (nor the SSA) about how the SSA would interpret, administer or enforce the law. Accordingly, his testimony is irrelevant to CARD's mental state and whether they knowingly submitted false claims.

In response to Relator's motion to exclude Senator Baucus, CARD claimed the Senator would not be offered to establish legislative history (Doc. 100), but that is exactly what he attempts to testify to. As explained in Relator's previous brief, Senator Baucus's testimony about the meaning of the EHH provision of the Affordable Care Act is wholly irrelevant. The meaning of the statute must be interpreted by this Court, not Senator Baucus. The meaning of the statute is subject

to the ordinary rules of statutory construction. The Court must interpret the meaning of a statute according to its plain language. Here, the statute is clear—an individual must be diagnosed with one of the specified conditions to be eligible for EHH Medicare.

If the Court determines that the plain language of the statute is ambiguous, the Court can refer to legislative history to determine the legislative intent of the law. Importantly, the Supreme Court has made clear that the testimony of one legislator is not a proper source of legislative history. *Garcia v. United States,* 469 U.S. 70, 76 (1984). Senator Baucus does not speak for the entire Congress. To the extent the official legislative history is silent regarding the meaning of the EHH provision in the Affordable Care Act, the Court will have to resort to other rules of statutory construction.

Because Senator Baucus's testimony cannot be used to establish legislative history, his testimony regarding the circumstances that led to the inclusion of the EHH provision is also irrelevant. Senator Baucus played a role in enacting 42 U.S.C. § 1395rr-1, but after the statute was enacted, his role was over. It is, and has been, the SSA's role to enforce that law, and it is this Court's role to interpret that law. Senator Baucus cannot tell this Court what the statute means, tell SSA how it should enforce the law, or pardon CARD for submitting false claims under the law. Senator Baucus's testimony is thus irrelevant and should be excluded.

Even if the Court concludes that Senator Baucus may be able to offer relevant testimony, he should nevertheless be excluded from testifying under Fed. R. Evid. 403 because the probative value of his testimony would be substantially outweighed by the danger of unfair prejudice. The probative value of any relevant testimony Senator Baucus may be able to offer is minimal. But the danger of unfair prejudice from allowing Senator Baucus to testify - seemingly give his stamp of approval as a long-time senator - would be substantial.

CARD wants to have Senator Baucus testify as the champion for Libby in the Senate about Libby's health crisis in order to suggest that CARD could not have committed fraud because it purportedly had good intentions. There are obvious problems related to a witness testifying to another's knowledge, intent and good character. The danger of the unfair prejudice that would result if Senator Baucus is allowed to testify is made apparent by the titles for and descriptions of Senator Baucus in CARD's expert disclosures and response brief. In its expert disclosure and response brief, CARD refers to Senator Baucus as "Hon. Max Baucus," "Ambassador Baucus," a "beloved and highly respected 36-year Senator for the people of Montana," and "a champion for Libby." Accordingly, even if Senator Baucus offers some marginally relevant testimony, it should nevertheless be limited – if not outright excluded - under Fed. R. Civ. P. 403.

## 2.      Exclusion of Undisclosed Witnesses

CARD supplemented its initial disclosures on May 8, 2023, to identify three CARD patients as witnesses who had not previously been disclosed. (Ex. 4: CARD 2d Supp. Initial Discl.). Specifically, CARD disclosed for the first time that Gayla Benefield, Jimmie Sevre, and Judy Woller may be witnesses at trial. These witnesses should not be allowed to testify for several reasons. First, they were not timely disclosed under Fed. R. Civ. P. 26(a) or (e). Nor is there any justification for their late disclosure. Finally, none of these witnesses have any knowledge of the false claims at issue in this matter.  These CARD patients are not the subject of any false claims allegations. The only reason to have them testify is to have the jury hear potentially prejudicial testimony from those diagnosed with asbestos related disease. But this case is not about the CARD patients who are sick.  This case is about the patients who are not. These three witnesses have no probative evidence to offer on that topic. Accordingly, their testimony should also be precluded under Fed. R. Evid. 403.

Benefield, Sevre, and Woller were disclosed for the first time a month before trial. Their disclosures do not even identify the subjects of information each witness possesses, as required by Rule 26(a). Given the late timing, Relator has not been able to depose the late-disclosed witnesses or conduct any other discovery into what their testimony may be. It appears unlikely that the witnesses even possess any relevant

information. They are not the subject of any of the alleged false claims, and Relator does not expect that they would have any information about the medical treatment or diagnosis of any of the patients who are the basis of false claims. It is anticipated that these witnesses are merely intended to offer impermissible character evidence.

The same non-disclosure issue is true for CARD's witness, Jaimie Szeinuk. Dr. Szeinuk never submitted an expert witness report and no expert witness disclosure of any kind was submitted disclosing Dr. Szeinuk's proposed testimony. Whether Dr. Szeinuk is a fact witness or an expert witness, his proposed testimony has not been disclosed absent a Declaration related to Mount Sinai's sub-award, which is now moot.  Relator's counsel objected at the beginning of Dr. Szeinuk's proposed preservation deposition taken via Zoom on May 22, 2023.  For the same reasons stated above related to undisclosed CARD patient witnesses, Relator also moves to exclude the testimony of Dr. Szeinuk.[1]

The Court previously issued an order prohibiting testimony from witnesses who were not timely disclosed unless the failure was substantially justified or is harmless. (Doc. 132 at 4). The Court should apply that order to these late-disclosed witnesses and prohibit Gayla Benefield, Jimmie Sevre, Judy Woller and Dr. Szeinuk from testifying.

---

[1] We do not yet have Dr. Szeinuk's deposition.

### 3.      CARD's Discovery Violations and Waiver of Attorney Client Privilege

The parties deposed The Social Security Administration through Rule 30(b)(6) on May 16, 2023.[2] During the middle of the deposition, the SSA deponent testified that CARD had engaged in an email exchange with the SSA in March and April of 2023 regarding whether a patient can be submitted for EHH Medicare based on a B-Read interpretation alone. The SSA witness testimony caused CARD's counsel to produce *in the middle of the deposition* not only the March and April email chain, but a flash drive containing an additional 2,500 emails, between CARD and the SSA dating back to 2010 that had not previously been produced.

While CARD's counsel indicated that he only received the flash drive of emails the day before the deposition, Relator had longstanding discovery requests seeking production of any such emails for years. CARD's response clearly indicates it was on notice of this request since 2021. (*See* Doc. 93-23).

Included in the emails was an exchange between CARD and SSA directly relevant to one of the issues central to this case. Recall that in response to Relator's partial summary judgment motion, CARD contended both in briefing and at the hearing in this matter on September 12, 2022, without evidence, that it was following

---

[2] The parties will conclude the remaining 30(b)(6) SSA deposition on the morning of June 8, 2023.

the SSA's *instructions* by certifying "B-Read Only" patients for EHH coverage, and

that the SSA was well aware of this practice:

>CARD has been doing these environmental health
>hazard checklists 12 years the way SSA told them to, and
>obviously there's been many instances where the CARD staff
>have been informed, you know, the SSA staff, that this was a
>B-read-only.  And so it's not a surprise to CARD -- I mean, to
>SSA staff that there are B-read onlys, qualifications under
>the HH checklist.

Ex. 5:  Hrg. Tr. 21:14-20, Sept. 12, 2022.[3]

>So they know.  And, believe me, CARD staff has been
>in contact with the SSA virtually, you know, every week for
>years.  SSA staff know that this, that this is part of the
>lawsuit.  They know these issues, and they still keep
>accepting it.

Ex. 5:  Hrg. Tr. 28:21-25.

>So, Your Honor, just because CARD relied on all
>those B-readers for all those forms, all they were doing is
>following the law.  And that's what SSA told them to do, and
>that's what they've done ever since 2010, and every part of
>the government is aware of that, and every part of the
>government sustains it.  It can't be a false claim when
>everything that the CARD is doing is approved by the
>government.  It doesn't make sense.
>
>Thanks.
>
>THE COURT:  All right.  The matter is fully
>submitted.

Ex. 5:  Hrg. Tr. 100:1-11

---

[3] Relator is aware it will need to order the official transcript and will supplement this exhibit with a certified copy of the Excerpt of Transcript.

Based on what occurred at the SSA 30(b)(6) witness deposition, CARD's representations before this Court were flagrantly false.

The email exchange revealed at that deposition, written in early April 2023, proves that what CARD stated on the record at this hearing was false. SSA told CARD directly that an individual with a B-Read only is <u>not</u> considered diagnosed. (*See* Exs. 138 & 139). Furthermore, the SSA witness testified that the SSA had ***never*** trained, instructed or told CARD in any manner that this practice was acceptable in any way. (Ex. 1:  Dep. SSA 93:5-95:5.)

While the failure to produce all of the emails before the SSA deposition is problematic, the failure to produce this specific email chain in Exhibits 138 and 139 - which referenced a topic central to the purpose of the deposition  -is extremely troubling.

As the deposition concluded, CARD disclosed approximately 2,500 emails based on the request of Relator's counsel. Some of those emails contain communications between CARD and its counsel. These emails show that CARD's counsel drafted the response sent to SSA in April in an attempt to suggest that SSA was changing its policies. SSA's response makes it clear that is not the case: SSA's policies have <u>not</u> changed and SSA was <u>not</u> aware of CARD's practice of submitting patients for EHH Medicare without a diagnosis, let alone approve of such a practice. (Ex. 139). CARD's attempt to create a false record is worrisome, especially given

CARD's position - and CARD counsel's representations - at the summary judgment hearing.

CARD's counsel has attempted to claw back his emails with CARD, claiming that they were only produced to him by CARD the night before the SSA deposition and that he did not have time to review them. But CARD's willful failure to review the emails before they were produced is not tantamount to inadvertent disclosure. At the very least, the Court should find that CARD has waived attorney-client privilege and that any emails that have already been produced between CARD and its counsel are admissible. The Court should also sanction CARD for its untimely disclosure of highly relevant emails.

These are issues which Relator's counsel is prepared to address at the June 8, 2023 Pretrial Conference.

DATED this 1st day of June, 2023.

KNIGHT NICASTRO MACKAY, LLC

By: __/s/ W. Adam Duerk_____
        W. Adam Duerk
        *Attorneys for BNSF Railway Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify on this 1st day of June, 2023, a copy of the foregoing document was

served upon the following persons by the following means:


 1-3      CM/ECF
_____   Mail
_____   Hand Delivery
_____   Overnight Delivery Service
_____   Fax
_____   Email


1.    Clerk, U.S. District Court

2.    Michael Kakuk
      Assistant U.S. Attorney
      U.S. Attorney's Office
      901 Front Street, Suite 1100
      Helena, MT 59626
      michael.kakuk@usdoj.gov

3.    Timothy Bechtold
      Bechtold Law Firm, PLLC
      PO Box 7051
      Missoula, MT 59807
      Facsimile: 406-830-3085
      tim@bechtoldlaw.net



                    KNIGHT NICASTRO MACKAY, LLC


                    By:   */s/ W. Adam Duerk*_____
                          W. Adam Duerk
                          *Attorneys for BNSF Railway Company*

*BNSF*

*v.*

*CARD*

---

Heather Hillmann

May 16, 2023

---



**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

**Exhibit 1-1**

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA
——— ———
MISSOULA DIVISION

------------------------------------------------------------

VIDEO DEPOSITION OF HEATHER HILLMANN

May 16, 2023

------------------------------------------------------------

BNSF,                              Case No.

                                  CV-19-40-M-DLC

    Plaintiff,

vs.

CARD,

    Defendant.

------------------------------------------------------------

Page 2

1   APPEARANCES:
2
3      KNIGHT NICASTRO MACKAY, LLC
          By W. Adam Duerk, Esquire
4          283 W. Front Street, Suite 203
           Missoula, Montana 59802
5          duerk@knightnicastro.com
              On behalf of BNSF.
6
7      U.S Department of Justice
       United States Attorney's Office
          By Michael Kakuk, Assistant U.S. Attorney
8          901 Front Street, Suite 1100
           Helena, Montana 59626
9          michael.kakuk@usdoj.gov
              On behalf of the SSA.
10
11     BECHTOLD LAW FIRM, PLLC
          By Timothy Bechtold, Esquire
12         PO Box 7051
           Missoula, Montana 59807
13         tim@bechtoldlaw.net
              On behalf of CARD.
14
15     ALSO PRESENT:  Sarah Berry
                      Social Security Administration
16
                      Dwayne Beuthel
17                    Videographer
18
19
20
21
22
23
24
25

Page 3

1   Pursuant to Notice, the Video Deposition of HEATHER
2   HILLMANN, called by the Plaintiff, taken on May 16,
3   2023, commencing at 10:32 AM Mountain Time before
4   Annie Sager, Court Reporter and Notary Public within
5   and for the State of Colorado.
6
7   EXAMINATION                                      PAGE
8   Mr. Duerk:                                    6, 159
9   Mr. Bechtold:                               109, 169
10
11  EXHIBIT        DESCRIPTION                       PAGE
12  Exhibit 135    Subpoena                            5
13  Exhibit 136    Declaration                       106
14  Exhibit 137    Statement of Disputed Facts        95
15  Exhibit 138    E-mail                             66
16  Exhibit 139    E-mail                             76
17  Exhibit 140    HI 00803.001                      102
18  Exhibit 141    HI 00803.050                      102
19
20
21
22
23
24
25

Page 4

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  The time is 10:32.
3   Today is May 16th, 2023.  This begins the
4   video-recorded deposition of Heather Hillmann
5   taken in the matter of BNSF versus CARD.
6        This deposition is being taken at
7   1961 Stout Street, Denver, Colorado, 80202.  The
8   court reporter today is Annie Sager.  The
9   videographer is Dwayne Beuthel.
10       Counsel will introduce themselves and
11  the parties they represent beginning with the
12  plaintiff's counsel first.
13       MR. DUERK:  Adam Duerk for Relator BNSF.
14       MR. BECHTOLD:  This is Tim Bechtold on
15  behalf of the Center for Asbestos Related
16  Disease.
17       MR. KAKUK:  Michael Kakuk, U.S.
18  Department of Justice.
19       MS. BERRY:  Sarah Berry for the
20  Social Security Administration.
21       THE VIDEOGRAPHER:  Will our
22  court reporter please swear in the deponent.
23       (WHEREUPON, the oath was administered by
24  the court reporter.)
25       WITNESS RESPONSE:  Yes, I do.

**Exhibit 1-2**

**Page 5**

1   THE COURT REPORTER:  Thank you.  Go
2   ahead.
3   THE VIDEOGRAPHER:  You may begin.
4   HEATHER HILLMANN,
5   a witness in the above-entitled proceedings,
6   after having been first duly sworn,
7   testified under oath as follows:
8   MR. KAKUK:  Gentlemen, at the outset of
9   this I just want to point out that per our
10  e-mail yesterday, Ms. Hillmann is here on behalf
11  of SSA specifically for requests 17 through 22,
12  25 through 29, and 36 through 39.
13  We believe these are essentially the
14  factual requests that were in the 30(b)(6)
15  deposition notice.  The social security agency
16  has designated somebody else for the policy
17  questions.
18  MR. DUERK:  And in terms of the notice
19  of deposition, I am assuming we are taking about
20  the same paragraphs that align with what we will
21  mark as Exhibit 135, the subpoena to SSA for
22  30(b)(6) testimony.
23  (WHEREUPON, Deposition Exhibit 135
24  marked for identification by the reporter.)
25  MR. KAKUK:  That's correct.  Thank you.

**Page 6**

1   MR. DUERK:  Thank you.
2   MR. KAKUK:  I understand that factual
3   issues can bleed into policy questions.  I am
4   assuming that I will have to object if something
5   is outside the scope of the requests if we get
6   into any policy issues.
7   I just want us all to be clear from the
8   get-go that what that means on behalf of the
9   agency is that the agency was not required to
10  prepare Ms. Hillmann for that request, and any
11  answer that Ms. Hillmann chooses to give is not
12  on behalf of the agency.
13  So if I just say objection, scope, we
14  all understand moving forward what that means,
15  and then you can continue on with the questions
16  and answers.
17  Does that make sense?
18  MR. DUERK:  It does to relator.
19  MR. BECHTOLD:  Yes.
20  MR. KAKUK:  Thank you.
21  EXAMINATION
22  BY MR. DUERK:
23  Q   Would you please state your full legal name
24  spelling your last name.
25  A   Heather Marie Hillmann, H-I-L-L-M-A-N-N.

**Page 7**

1   Q   Ms. Hillmann, have you had your deposition taken
2   in the past?
3   A   No.
4   Q   Okay.  I will go over a few ground rules today.
5   The most important is if any of my
6   questions are unclear or you need a break for any
7   reason, including speaking with counsel in the
8   room, will you just indicate that to me so that we
9   can take a break?
10  A   Yes.
11  Q   All right.  Ms. Hillmann, what is your
12  professional title?
13  A   My professional title is subject matter expert
14  Medicare lead, and I am also a data exchange
15  coordinator.
16  Q   And who do you work for?
17  A   Social Security Administration.
18  Q   How long have you been employed with the
19  Social Security Administration?
20  A   21 years in September.
21  Q   Where have you primarily been based?
22  A   Denver.
23  Q   Okay.  And what are some of your job
24  responsibilities related to your position at SSA?
25  A   Training the field offices on different policy,

**Page 8**

1   providing additional support in regards to data
2   exchange and Medicare.
3   Q   Ms. Hillmann, it is my understanding that you've
4   been offered by the Social Security Administration
5   as the 30(b)(6) deponent pursuant to a subpoena
6   issued to the SSA?
7   A   Yes.
8   Q   All right.  Have you seen that subpoena and the
9   topics referenced?
10  A   I have.
11  Q   Okay.  And I have marked the subpoena itself as
12  Exhibit 135.
13  Do you have a copy of that in front of you?
14  A   I do.
15  Q   I think I can shoot through this pretty quickly,
16  but it's my understanding that you were prepared
17  to address paragraphs 17 to 22?
18  A   Correct.
19  Q   Paragraphs 25 to 29?
20  A   Yes.
21  Q   And paragraphs 36 to 39 as referenced in this
22  subpoena, is that your understanding also?
23  A   Yes.
24  Q   Ms. Hillmann, what did you do in order to prepare
25  to address these topics today?

**Exhibit 1-3**

Page 9

1   A   I reached out to a number of components in
2       headquarters, the office of information systems
3       and policy, and then the office of program support
4       as well and then the local Kalispell office in
5       addition to reaching out to my former Medicare
6       counterpart that mentored me and had a lot to do
7       with EHH cases, and she is now retired.  Her name
8       is Kathy Will, formerly Kathy Suarez.
9   Q   **In terms of any other SSA employees, do you recall**
10      **the names of any individual SSA employees that**
11      **have worked at the Kalispell field office in**
12      **Montana?**
13  A   Terra Whiteman, Sonya Hymas, and there is a number
14      of other field office technicians, but I don't
15      have them all memorized.  I do about six different
16      states.
17  Q   **Ms. Hillmann, was it your intent and understanding**
18      **in preparing for this 30(b)(6) deposition that you**
19      **were to seek and gather information and facts**
20      **related to the topics that you intend to address**
21      **today from a variety of different sources, both**
22      **human sources as well as paper sources?**
23  A   Correct.
24  Q   **And were you able to successfully accomplish that**
25      **task in your view?**

Page 10

1   A   I was.
2   Q   **All right.  In terms of the materials that you**
3       **reviewed, the paper records, if you could give me**
4       **a survey or a basic understanding of what kind of**
5       **paper records you reviewed that would be helpful.**
6   A   Okay.  I reviewed different policies that have
7       been in effect since roughly around 2010, and that
8       was HI 00803.50, HI 00803.001, emergency message
9       10042REV, and then a variety of e-mail contacts
10      back and forth regarding training for
11      social security employees.
12  Q   **All right.  And did these written materials help**
13      **inform the facts that you are going to establish**
14      **for the record today?**
15  A   Absolutely.
16  Q   **I would like to look first at what has been marked**
17      **previously as Exhibit 76.  You have a notebook in**
18      **front of you.  Behind tab 3 I believe you should**
19      **find Exhibit 76.**
20          **Do you recognize this?**
21  A   Yes, I do.
22  Q   **And what is it?**
23  A   This is HI 00803.050.  That is our policy
24      instructions for our social security technicians
25      for processing EHH claims.

Page 11

1   Q   **Ms. Hillmann, I will be referencing Exhibit 76 as**
2       **well as another exhibit under the program**
3       **operations manual system as the POMS today.**
4   A   Okay.
5   Q   **Does that make sense to you?**
6   A   Yes.
7   Q   **What generally is the POMS, if you can describe it**
8       **for me?**
9   A   It's basically our policy instructions and our
10      technicians instructions on how to process claims.
11  Q   **Okay.  In terms of Exhibit 76, is this**
12      **HI 00803.050 titled developing medical requirement**
13      **for entitlement to EHH Medicare?**
14  A   Yes.
15  Q   **Is this one of the POMS sections that you reviewed**
16      **in preparation for your testimony?**
17  A   Correct.
18  Q   **If you would look through Exhibit 76 related to**
19      **the enumerated POMS section at the top of page 1,**
20      **does this appear to be a true and accurate copy of**
21      **the POMS for the medical requirement for**
22      **entitlement to EHH Medicare?**
23  A   Yes.
24  Q   **I will move to admit if Exhibit 76 hasn't already**
25      **been admitted.**

Page 12

1           In terms of the POMS, what is the
2       significance of this particular section?
3   A   The significance of this particular section is
4       just these are instructions for the technicians
5       that are processing the EHH claims to follow.
6   Q   **Okay.**
7   A   It's the required documentation they have to
8       follow.
9   Q   **And in terms of those technicians, are we talking**
10      **about the SSA employees who may be working at the**
11      **Kalispell field office in Montana?**
12  A   Yes.
13  Q   **All right.  Is this essentially the set of working**
14      **instructions or their policy for how to look at**
15      **EHH forms?**
16  A   This is their instructions on how to process the
17      claim.
18  Q   **The claim itself?**
19  A   Uh-huh.
20  Q   **Okay.  If you would please read section A under**
21      **medical requirement for entitlement to EHH**
22      **Medicare that would be helpful.**
23  A   "An individual exposed to environmental health
24      hazards (EHH) in Lincoln County, Montana, must
25      meet a medical requirement for entitlement to EHH

**Page 13**

1    Medicare.  He or she must have been diagnosed with
2    an asbestos-related disease (ARD) established by
3    certain diagnostic methods."
4  Q  Ms. Hillmann, is it your understanding that this
5     policy is the same policy that has been in place
6     for at least the last decade related to Medicare
7     claims under the EHH program?
8  A  Yes.
9  Q  Okay.  What is the next section titled?
10 A  Developing and documenting medical requirement.
11 Q  Just generally, Ms. Hillmann, what does this
12    section address?
13 A  This section addresses how the technician would
14    address getting the required forms to process the
15    claim.
16 Q  All right.  And what are those required forms?
17 A  Depending on the type of claim that we are taking,
18    if it's EHH Medicare, we are obtaining one 827,
19    SSA-827 medical release form, and we are sending
20    that out with the EHH checklist to the medical
21    provider.
22        If it involves disability, we obtain two
23    signed SSA-827s which is the medical release form,
24    and then we also additionally send that out with
25    the EHH checklist to the medical provider.

**Page 14**

1  Q  All right.  And just so that we are on the same
2     page with the jury here, in terms of the medical
3     provider, is it fair to say that in EHH Medicare
4     claims or social security claims involving the
5     CARD clinic, the medical provider would be CARD?
6  A  For CARD claims, yes.  They're not the only ones
7     that take in this claim.  There's other
8     physicians.
9  Q  Right.
10 A  Yes.
11 Q  Understood.  And during the course of this
12    litigation, I will represent to you that we will
13    only be focusing on EHH claims related to CARD.
14 A  Okay.
15 Q  Okay?
16 A  Uh-huh.
17 Q  So if you could describe who is responsible for
18    sending out those SSA-827 forms to CARD that would
19    be helpful.
20 A  Those are field office technicians that take
21    claims, so those are claims specialists or claim
22    technicians or technical experts within the
23    Kalispell field office.
24 Q  All right.  Ms. Hillmann, I will represent to you
25    that the jury will have seen or heard several

**Page 15**

1    different names related to technicians in the
2    Kalispell field office by the time your testimony
3    airs.
4        One of those names is Sonya Hymas or
5    Sonya Peterson.  I believe she had several
6    different last names during that period.
7        To the best of your knowledge, was
8    Sonya Hymas an EHH technician in the Kalispell
9    field office?
10 A  I can probably speak on that in the last couple of
11    years that I have gotten to know her and know that
12    she takes Medicare claims.  I can't specifically
13    tell you if she has taken EHH claims, but I'm
14    assuming that she has within that field office.
15 Q  Fair enough.
16        So is it fair to say that it's the EHH
17    field office's responsibility for sending these
18    release forms to the CARD clinic to make sure that
19    the patients have authorized a release of their
20    medical information back to the
21    Social Security Administration related to EHH
22    claims or how does that work?
23 A  Okay.  So the medical release form goes with the
24    EHH checklist to give us authorization for the
25    medical provider to actually complete the form and

**Page 16**

1    send that back to social security.
2  Q  Got it.
3  A  Yeah.
4  Q  Okay.  So once these SSA-827 forms are sent to the
5     medical provider, what happens next?
6  A  Could you repeat that question?  I'm sorry.
7  Q  Sure.  I am just trying to give the jury an idea
8     of step-by-step what happens in the process of
9     obtaining EHH forms.
10 A  Okay.
11 Q  And processing these Medicare claims.
12 A  Okay.  So once, you know, we actually have the
13    claimant within the office or on the phone let's
14    say, for instance, we are going to complete step 1
15    which is their identifying information, their
16    social security number, and then their name and
17    their date of birth which is at the top of the EHH
18    checklist.  In addition, we complete the 827 and
19    leave, you know, the bottom for the claimant to
20    sign.
21        Once we obtain that, we send that medical
22    release form and the EHH checklist to the CARD
23    clinic or whatever physician that they have, and
24    then once that information is obtained from the
25    CARD clinic or whatever physician sends that back,

**Exhibit 1-5**

**Page 17**

1      that is when we are able to start the claims

2      processing.

3  Q  All right._ Just so that I'm as clear as I can be

4      in front of a jury, I am looking at page 4 of

5      Exhibit 76.

6           Is this a copy of a blank EHH form in terms

7      of an exemplar?

8  A  Yes.

9  Q  Okay.  And is this the form that the EHH field

10     technician would fill out in terms of step 1, the

11     top box, with the CARD patient's name,

12     social security number and date of birth?

13  A  Yes.  That is the only box that they complete.

14  Q  Okay.  Is there any other information or any other

15     box on this form that the patient would complete

16     with SSA?

17  A  No.

18  Q  Okay.

19     That would go to the physician.

20  Q  In terms of the box under step 2 on page 4, is

21     there any information here that would be completed

22     by the SSA?

23  A  No.  We are not expertised in that area.

24  Q  Okay.  So after step 1 is complete, box 1 is

25     complete, the EHH form then goes to CARD in this

**Page 18**

1      case, is that fair?

2  A  Correct.

3  Q  All right.  What happens at CARD with this EHH

4      checklist to the extent that you know?

5  A  They complete it to the best of their ability

6      following section 1881A of the act.  We don't get

7      involved past that point.  We are not medical

8      experts, and that's outside the scope of our jobs.

9  Q  All right.  And in fact, is that reflected in this

10     section of the POMS related to what is supposed to

11     happen with the EHH checklist?

12         MR. KAKUK:  Objection, scope.

13  A  Sorry.

14         MR. KAKUK:  Go ahead and answer.

15  Q  Go ahead.

16  A  I think it's just pretty laid out and it's pretty

17      clear in there what our job roles are within the

18      policy.

19     All right.  Let's go about it this way.

20     Does section 2 titled EHH checklist set out

21     your understanding of the goals and job

22     responsibilities for what is going to happen with

23     this EHH checklist at SSA?

24         MR. KAKUK:  The same objection.

25  Q  Okay.

**Page 19**

1  A  I can honestly just say that, you know, once we

2      have a completed checklist that shows that there

3      is a diagnosis underneath section 1881A of the act

4      which is with a completed form, then we would be

5      able to process this claim once step 2 and step 3

6      are completed.  We are not medical experts like

7      I've previously mentioned.  We don't get into the

8      diagnosis or the diagnosis codes.

9  Q  All right.

10  A  Yeah.

11         MR. KAKUK:  Mr. Duerk, I'm sorry.  I

12      might have misunderstood.  Were you talking

13      about section 2 of the form or section 2 of the

14      policy?

15         MR. DUERK:  I was talking about

16      section 2 of the form.

17         MR. KAKUK:  Okay.

18         MR. DUERK:  And I was about to go into

19      section 2 of the policy.

20         MR. KAKUK:  Apologize for anticipating.

21         MR. DUERK:  Okay.  No problem.

22  Q  Ms. Hillmann, let's go about it this way.  I'll

23     reference section 2 of the policy.

24  A  Okay.

25  Q  Which I believe corresponds to section 2 of the

**Page 20**

1      form, but to be clear, if we could look at the

2      policy itself, do you see the section titled EHH

3      checklist?

4  A  Yes.

5  Q  Would you please read that, the purpose of the EHH

6      checklist.

7  A  "The purpose of the EHH Checklist is to obtain

8      information from the claimant's medical source

9      regarding the claimant's diagnosis and presence in

10     Lincoln County, Montana.  The claims

11     representative (CR) will use the completed EHH

12     Checklist to determine if the claimant's condition

13     meets the medical requirement.  The EHH Checklist

14     may also provide evidence of presence in Lincoln

15     County, Montana.  (For policy on using the EHH

16     Checklist as proof of presence in Lincoln County,

17     Montana, see HI 00803.040B and HI 00803.040C.)

18     See images of the EHH Checklist and cover notice

19     in HI 00803.050B.3 in this section."

20  Q  All right.  So a couple of general questions here

21     about the EHH forms and the facts that you are

22     aware of related to how these forms are processed.

23     Is it your understanding based on the facts

24     related to you by EHH technicians and field

25     personnel that any information about a medical

1    diagnosis related to these EHH forms for CARD
2    patients is to be placed on section 2 of the EHH
3    form by the CARD physicians or the CARD medical
4    provider?
5  A  Correct.
6  Q  Okay.  And in terms of any direction, training,
7    instruction, teaching, on-site supervision, any
8    interaction with CARD employees at the CARD
9    facility, does the SSA provide any training or any
10   teaching or any instruction by any name to CARD
11   about how to complete an EHH checklist other than
12   what is shown here in these POMS sections?
13 A  No.  And I have actually checked with other
14   components including the Kalispell office, and
15   that has never been a former practice.
16 Q  Okay.  So to the best of your knowledge as the
17   30(b)(6) deponent, based on your review of
18   information in both report form and interviews
19   with SSA field staff and other SSA employees, is
20   it your understanding that SSA has ever taught
21   CARD how to fill out an EHH form in any regard
22   outside of what is included in these POMS?
23 A  No.
24 Q  Okay.  In terms of the form itself, and I'm
25   looking at page 4 on Exhibit 76, what if, based on

1    the facts that you're aware of, an EHH form would
2    be returned to the Social Security Administration
3    field office in Kalispell and there was a section
4    left blank, for example, if a form failed to
5    identify an asbestos-related condition or
6    conditions and its date of diagnosis, if a form
7    was lacking any information about the diagnosis or
8    diagnoses of asbestos-related conditions, would
9    the SSA be able to process that claim and approve
10   Medicare benefits for that CARD patient?
11 A  No.
12 Q  Why not?
13 A  Because they have to meet the listing and they
14   have to have a date of diagnosis, they have to
15   have the printed name of the physician, the
16   physician's signature, and the date listed as
17   well, as well as step 3, the information within
18   step 3 and step 2.
19     And we have actually put this out in policy
20   in an emergency message, it was 10042REV that gave
21   those specific instructions, and I believe it came
22   out in 2010, archived in 2011, the latter part of
23   2011, and it was a public-facing policy, so the
24   public did have access as well as CARD to that
25   policy online.

1  Q  Okay.  If you could just generally share with me
2    the information that was covered in that emergency
3    policy that would be helpful.
4  A  It basically laid out the guidelines of
5    HI 00803.50 and that if the environmental health
6    hazard checklist was not completed correctly
7    meaning that there was no diagnosis, no diagnosis
8    date, and it doesn't have to necessarily -- like
9    if they marked a diagnosis, but then there is not
10   a diagnosis date, we still have to deny the claim.
11 Q  All right.
12 A  Yeah.
13 Q  So without a diagnosis of an asbestos-related
14   condition, a CARD patient simply would not receive
15   Medicare eligibility or Medicare benefits
16   according to the SSA?
17 A  Correct.
18 Q  Okay.  Now, in terms of the SSA's reliance on
19   these forms, does the SSA do any fact-checking or
20   independent investigation or ask for any other
21   records to support a claim for Medicare benefits
22   other than this EHH checklist?
23 A  Not to my knowledge.  There is no additional
24   Medicare benefits quite like this, but our claims
25   technicians, I do want to state, you know, we

1    don't -- we don't check -- we are not medical
2    experts, so just like with our disability claims,
3    our claims technicians are not going to be the
4    ones checking medical references, checking,
5    you know, the medical evidence.  That is not their
6    job and that is outside of the scope of their job.
7  Q  All right.  And to the best of the information
8    you've been able to gather, the boundaries of
9    SSA's job and the procedure for what SSA will do
10   and will not do vis-a-vis these checklists is
11   communicated to CARD?
12 A  I don't know if it's communicated to CARD, but
13   it's communicated to our employees, and that's who
14   we are responsible for.
15 Q  All right.
16 A  Yeah.
17 Q  In terms of these program operation manual systems
18   or the POMS, are these available to the public
19   online?
20 A  They are.
21 Q  Okay.  And in terms of the emergency policy that
22   you just referenced, I'm assuming that that was
23   made available to any member of the public online
24   as well?
25 A  Absolutely.

**Exhibit 1-7**

1  Q   Okay.  So page back to page 4 of Exhibit 76 with
2      this EHH form, if the EHH form doesn't include a
3      diagnosis related to asbestos exposure, what
4      happens at that stage in the process when the SSA
5      field office gets the form based on the
6      information you've reviewed?
7  A   If the SSA field office gets this form and we do
8      not have a diagnosis that's listed within the
9      checklist, then it's a deny.
10 Q   All right.  And what would be some examples of
11     denials that might occur for diagnoses that don't
12     show up in the checklist if you could give me a
13     for instance.
14 A   Well, they don't meet the medical requirements of
15     the policy, so then it would be a denial based off
16     of that.  We have a special code for it.
17 Q   Okay.
18 A   Uh-huh.
19 Q   And so diagnoses that don't meet the medical
20     requirement, I'm assuming these would be diagnoses
21     of conditions that don't have anything to do with
22     asbestos exposure, for example, is that fair?
23 A   Well, I mean, I can't speak on that.  If we don't
24     have a completed form with, you know, the
25     impairments that are listed here and they haven't

1      marked that or they haven't even marked the date
2      of diagnosis, I mean, that would be a denial.
3  Q   Okay.
4  A   Yeah.  Because the physicians are required to be
5      following section 1881A of the act.
6  Q   In terms of any medical training that you're aware
7      of possessed by any of these field technicians,
8      are any of the field technicians at the Kalispell
9      office medical doctors?
10 A   No.
11 Q   Are any of the field technicians in the Kalispell
12     office pulmonologists?
13 A   No.
14 Q   Are any of them radiologists?
15 A   No.
16 Q   Are any of them medical professionals of any
17     designation as far as you're aware?
18 A   No.
19 Q   Okay.  Is it fair to say that the Kalispell field
20     office personnel are relying on CARD providers,
21     CARD doctors, to provide all of the accurate, all
22     the true and accurate information related to an
23     asbestos-related diagnosis in this EHH form?
24         MR. KAKUK:  Objection, scope.  Go ahead.
25 A   Yes.

1  BY MR. DUERK:
2  Q   Okay.  Now, in terms of the rest of this POMS
3      policy, I think we have read the EHH checklist
4      heading.  If you could go through each of the
5      steps that -- is it FO 872?
6          What does FO 872 stand for?
7  A   That's the field office for Kalispell, Montana.
8  Q   Okay.  If you could go through the steps that the
9      field office in Kalispell takes to obtain a
10     completed EHH checklist that would be helpful.
11 A   And you are wanting me to start on page 2?
12 Q   I am.
13 A   Okay.  "FO 872 takes the following actions to
14     complete an EHH Checklist:  Complete step 1
15     (identify the individual) on the EHH Checklist;
16     fill in the FO's fax number on the cover notice;
17     and forward the EHH Checklist with the cover
18     notice to the claimant's medical source with a
19     signed SSA-827.  The name of source will appear in
20     'Remarks' in the MCS claims path or the paper
21     application."
22 Q   In terms of that note, just so the jury isn't left
23     scratching their heads, what does that mean, what
24     does that indicate, the name of source will appear
25     in the "remarks" in the MCS claims path or the

1      paper application?
2  A   The name of the medical provider or the name of
3      the medical source.
4  Q   Okay.  Gotcha.
5          And so in terms of remarks here, would an
6      example of the provider just be CARD Clinic,
7      Libby, Montana, or something to that effect?
8  A   With their address.
9  Q   Understood.
10 A   Uh-huh.
11 Q   Okay.  Anything else that I failed to ask about
12     this first part, section A of the POMS?
13 A   No.
14 Q   Okay.  So what happens when the claimant's medical
15     source gets the EHH form?
16 A   So the claimant's medical source will take the
17     following actions to complete and return the EHH
18     checklist.  Complete step 2, identify the
19     asbestos-related condition and its date of
20     diagnosis, and step 3, identify presence in
21     Lincoln County, Montana, fill in the printed name,
22     physician's signature and date, and return it by
23     fax to the number provided on the cover notice or
24     mail it to the Kalispell field office located at
25     275 Corporate Drive, Ashley Square Mall, Suite D,

Page 29

1    Kalispell, Montana, 59901.
2  Q  All right.  Thank you.
3  A  Uh-huh.  ____
4  Q  There is another note here that I think touches on
5    the issue of whether any supporting medical
6    evidence needs to be provided by CARD.  If you
7    could first read it, then I have a few questions.
8  A  Okay.  "The medical source does not need to
9    provide the supporting medical evidence."
10 Q  Okay.  In terms of any other medical evidence that
11   is submitted along with the EHH form, based on
12   your review of the facts, your interviews in the
13   case, your review of the paperwork, to the best of
14   your understanding, is there anything other than
15   the EHH form that is submitted to the field
16   office, for example, any CT interpretive reports,
17   any medical records, any notes from the doctor so
18   to speak, or is it just the EHH form to the best
19   of your understanding based on the factual
20   information you've reviewed?
21 A  It's just the EHH checklist.
22 Q  Understood.  Okay.  All right.
23      If we could turn to page 3 of Exhibit 76.
24   It appears there is a section here about what the
25   Kalispell field office will do to store the

Page 30

1    completed EHH checklist.
2        Is that a fair representation?
3  A  Yes.
4  Q  Okay.  Would you please read this section.
5  A  Field office 872, which is the Kalispell field
6    office, "will take the following actions to store
7    the completed EHH Checklist: Obtain a bar code fax
8    coversheet via the Electronic Disability Collect
9    System," which is EDCS.
10       "And fax the completed EHH Checklist into
11   the Electronic Folder (EF) if the claimant is also
12   applying for disability benefits or has a pending
13   disability claim; and retain the completed EHH
14   Checklist until the MBR is established.  Once the
15   MBR is established, fax the EHH Checklist into the
16   EF using NDRed.  Use a Document Type of 'Other.'
17   The document description should show 'EHH
18   Checklist' and confirm that the EHH Checklist is
19   in the EF or electronic folder and legible, then
20   shred the original."
21 Q  All right.  To the best of your understanding and
22   based on your review of the factual information
23   and documents in this case, does this section of
24   the POMS describe what actually occurs with those
25   EHH forms?

Page 31

1  A  Yes.
2  Q  Okay.  Just a couple of questions.  There is a
3    reference to the MBR here on page 3.
4        What is the MBR?
5  A  That is the master beneficiary record, so that's
6    going to be a record that is established for
7    Medicare beneficiaries, retirement beneficiaries,
8    disability beneficiaries and survivor
9    beneficiaries.
10 Q  Okay.  The other acronym NDRed, what is that
11   reference?
12 A  That's an electronic file, and that actually
13   stands for -- there is a lot of acronyms.  Just
14   give me one second.
15 Q  It's the government.  It's okay.
16 A  Honestly, I can't remember off the top of my head.
17   I wish they had spelled it out like they did with
18   the Disability Collection System.
19 Q  That's okay.
20 A  But it's essentially what that electronic file
21   is for is for most of our Medicare retirement
22   survivors insurance beneficiaries.  For our
23   disability claimants we collect that information
24   in EDCS which is the Electronic Disability
25   Collection System.

Page 32

1  Q  All right.
2  A  Uh-huh.
3  Q  So turning to page 4 of the POMS again, we see
4    this EHH checklist, and so in terms of the EHH
5    checklist then based on your review of the facts
6    in this case, if an EHH checklist does not
7    indicate that the patient has a diagnosis of an
8    asbestos-related condition, does that patient
9    become eligible for Medicare?
10 A  Again, no, they would not.  If we don't have a
11   diagnosis that is listed within the checklist or a
12   date of diagnosis and step 2, step 3, printed
13   name, physician signature and date is not
14   complete, we will deny the claim.
15 Q  All right.  In terms of the next program operation
16   manuals system or POMS, I would like you to turn
17   to what's marked as Exhibit 75.  This is behind
18   tab 4 of your notebook.
19 A  Okay.
20 Q  Ms. Hillmann, do you have Exhibit 75 in front of
21   you?
22 A  I do.
23 Q  What is this?
24 A  This is the background for EHH Medicare, so the
25   hospital insurance HI entitlement for individuals

**Exhibit 1-9**

1    exposed to environmental health hazards, EHH.
2  Q  Is this a document that you've seen before?
3  A  Yes.
4  Q  And in fact, is this a document that you reviewed
5     in preparation for your deposition today?
6  A  Yes.
7  Q  If you would leaf through it.
8  A  Okay.
9  Q  And tell me if this appears to be a true and
10    accurate copy of the POMS section for
11    HI 00803.001, hospital insurance entitlement for
12    individuals exposed to environmental health
13    hazards.
14 A  Yes.
15 Q  Okay.  If we could just focus on Exhibit 75
16    generally, what is this and what is its
17    significance?
18 A  This is just the background information on EHH
19    Medicare in general, just how it came about
20    underneath the Affordable Care Act, how we added
21    the section into the Social Security Act, and it
22    just goes over the basic requirements for
23    entitlement.  It's not actually processing
24    instructions, but it's giving our technicians a
25    background on it.

1  Q  If we could focus on section A and the citations
2     above it, if you would read the citations.
3  A  Okay.  Section 1881A of the Social Security Act.
4  Q  And to the best of your knowledge, Ms. Hillmann,
5     is section 1881A of the Social Security Act
6     commonly referred to as the EHH provisions of the
7     Affordable Care Act?
8  A  Yes.
9  Q  Okay.  If you could read section A, that would be
10    helpful.
11 A  Okay.  "Background for EHH Medicare.
12    Section 10323 of the Affordable Care Act added
13    section 1881A of the Social Security Act effective
14    March 23rd, 2010.  This section extends
15    entitlement and medical hospital insurance (HI)
16    and eligibility to enroll in Supplemental Medical
17    Insurance or SMI to certain individuals exposed to
18    environmental health hazards (EHH) and diagnosed
19    with a medical condition caused by such exposure."
20 Q  All right.  I'll stop you right there.
21 A  Okay.
22 Q  In terms of providing background for EHH Medicare,
23    in terms of the information that you reviewed,
24    both in the POMS, in your interviews with other
25    SSA employees, in terms of all of the information

1     whether it was printed or through interviews of
2     living humans at SSA, does this section on the
3     background for EHH Medicare appear to be true and
4     accurate and to the best of your understanding
5     from what you learned from others during your
6     inquiry?
7            MR. KAKUK:  Objection, scope.
8  A  Yes.
9  Q  Okay.
10 A  To my knowledge.
11 Q  All right.  And does it appear to you that this
12    section, section 00803.001 states that in order to
13    receive EHH Medicare there must be certain
14    individuals exposed to environmental health
15    hazards and diagnosed with a medical condition
16    caused by such exposure?
17           MR. KAKUK:  The same objection.
18 A  Yes.
19 BY MR. DUERK:
20 Q  Okay.  Based on the language that we see here, is
21    there another section that we haven't read yet for
22    background for EHH Medicare?
23 A  No.
24 Q  Okay.  I am looking at the next paragraph that
25    starts with "currently." Could you read that part

1     as well, please.
2  A  "Currently, the only individuals eligible for
3     Medicare under this provision are those who were
4     present in Lincoln County, Montana and have an
5     asbestos-related disease diagnosis.  April 2010 is
6     the earliest possible effective date of
7     entitlement based on a March 2010 filing date."
8  Q  All right.  Now, in terms of these two POMS
9     sections, aside from these POMS sections are you
10    aware of any source of any other material that may
11    have been used to train, teach or instruct
12    individuals at the CARD clinic related to filling
13    out EHH forms?
14 A  No.
15 Q  Okay.  And I want to make sure that I'm as
16    exhaustive as I can be here, and I don't mean to
17    beat a dead horse.
18        Did you look for any evidence that SSA had
19    provided training or instruction, direction or
20    supervision to the CARD clinic in terms of the
21    proper way to submit or fill out EHH forms other
22    than what we see here in the POMS?
23 A  I did.  I reached out to headquarters, I reached
24    out to the Kalispell manager and I reached out to
25    my former counterpart that used to head Medicare

**Exhibit 1-10**

Page 37

```
 1      in my same position, she is now retired,
 2      Kathy Suarez or Kathy Will, and I could not find
 3      anything to that extent.
 4   Q  In terms of the way that you tried to turn up any
 5      information along those lines, did you ask
 6      questions about any type of training or any type
 7      of education or any type of instruction that may
 8      have occurred at any time in the history of SSA
 9      working with CARD on the EHH program?
10   A  I did.
11   Q  Okay.  And according to your search, is it fair to
12      say that the information you uncovered revealed no
13      training of CARD employees along these lines ever
14      existed?
15   A  SSA employees have never trained CARD.
16   Q  All right.
17   A  Uh-huh.
18   Q  So would it be fair to say that if there was any
19      claim that a training or an instruction by SSA in
20      Libby, Montana of CARD officials or CARD employees
21      in terms of filling out an EHH form, is it fair to
22      say that if anyone suggested that it had ever
23      occurred, you found no evidence or facts in your
24      search to support that?
25   A  Correct.
```

Page 38

```
 1   Q  Okay.  Did you find any information about any SSA
 2      individuals or employees ever visiting Libby,
 3      Montana or the CARD clinic?
 4   A  No.
 5   Q  Okay.  Did you find any information or any written
 6      materials related to anybody from the
 7      Social Security Administration ever providing CARD
 8      with any awards?
 9   A  I did reach out to our headquarters components and
10      they tried to track down monetary funds as well as
11      the exemplary awards, and we couldn't find any
12      records of that, but our regional commissioner
13      did -- she did mention the possibility that there
14      was a regional-level award, but she has no record
15      of it.
16   Q  Okay.  Ms. Hillmann, I will represent to you that
17      I have seen a photograph of what appears to be
18      some sort of a plaque or a trophy of some kind
19      giving CARD some recognition for something.
20          Perhaps Mr. Bechtold may ask you some
21      questions about that, but have you seen any
22      correspondence, any information about any type of
23      award outside of this photograph of a trophy?
24   A  No.
25   Q  Okay.  And in terms of any correspondence on file,
```

Page 39

```
 1      did you look for any correspondence from the CARD
 2      clinic requesting training or asking about having
 3      Social Security Administration field
 4      representatives or staff from the Kalispell office
 5      coming out to CARD and providing instruction or
 6      training or guidance about any matter related to
 7      EHH Medicare?
 8   A  I did not find any correspondence.
 9   Q  All right.  In terms of these POMS sections, both
10      Exhibit 75 and Exhibit 76, do you see any language
11      in either of these program operational manual
12      system publications that say anything about a
13      B read only being a sufficient basis for EHH
14      Medicare?
15   A  No.
16   Q  In terms of any communication outside of these
17      POMS in terms of other POMS sections, the
18      emergency policy that you mentioned earlier or any
19      of the other information that you've referenced
20      here today that you accessed during your
21      preparation for this 30(b)(6) deposition, did you
22      see any other materials from the
23      Social Security Administration advising CARD that
24      a B read only would itself qualify an individual
25      for EHH Medicare benefits?
```

Page 40

```
 1   A  No.
 2   Q  In terms of the appropriate route for obtaining
 3      Medicare benefits, outside of the EHH form, is
 4      there any other avenue for a CARD patient or
 5      anyone else to obtain EHH Medicare other than an
 6      EHH form being submitted to the
 7      Social Security Administration?
 8   A  No.
 9          MR. KAKUK:  Objection, scope.
10   A  Sorry.  No.
11  BY MR. DUERK:
12   Q  Okay.  Based on all of the facts that you
13      reviewed, based on all of your interviews in this
14      case, based on your review of information and
15      factual materials, did you see any correspondence
16      or any writings, e-mails of any kind from the SSA
17      saying that a B read by itself was sufficient to
18      trigger Medicare eligibility for a CARD patient?
19   A  No.
20   Q  In terms of the EHH form itself then, is the
21      submission of an EHH form that includes a
22      diagnosis of an asbestos-related disease or
23      condition the only avenue, route or mechanism that
24      you found through your factual inquiry of assuring
25      that a patient would be Medicare eligible under
```

**Exhibit 1-11**

Page 41

| | | |
|---|---|---|
| 1 | | the EHH Medicare program? |
| 2 | A | Yes. |
| 3 | Q | So for example, are you familiar with what a |
| 4 | | B read is? |
| 5 | A | Absolutely not.  That is outside the scope of my |
| 6 | | job. |
| 7 | Q | All right.  Understood.  Let me just describe it |
| 8 | | for you this way generally. |
| 9 | A | Okay. |
| 10 | Q | I will represent to you that a B read is -- it can |
| 11 | | be a report from a specialist radiologist who has |
| 12 | | been certified by NIOSH to read either a chest |
| 13 | | x-ray or in some circumstances a CT scan. |
| 14 | | First of all, is that information that |
| 15 | | you've ever heard before about B readers? |
| 16 | A | Uh-uh.  It's not within our listed policies, so I |
| 17 | | wouldn't know and neither would our technicians. |
| 18 | Q | All right. |
| 19 | A | It's outside the scope of our job. |
| 20 | Q | And in terms of whether or not it's relevant to |
| 21 | | you within the scope of your job, do you |
| 22 | | necessarily, not to put too fine a point on it, |
| 23 | | but do you necessarily even care what a B reader |
| 24 | | is? |
| 25 | A | No. |

Page 42

| | | |
|---|---|---|
| 1 | Q | Okay.  So my question is this.  Based on your |
| 2 | | review of all of the factual information, did you |
| 3 | | see any mechanism within the EHH Medicare program |
| 4 | | for a CARD patient to receive Medicare benefits if |
| 5 | | only a B reader's checklist or interpretive report |
| 6 | | for a chest x-ray or CT were submitted to the |
| 7 | | Kalispell field office? |
| 8 | | MR. BECHTOLD:  Foundation. |
| 9 | | THE COURT REPORTER:  Pardon? |
| 10 | | MR. BECHTOLD:  Foundation. |
| 11 | BY MR. DUERK: | |
| 12 | Q | I asked her if she ever saw any example of that |
| 13 | | occurring in her factual investigation.  Did you? |
| 14 | A | No. |
| 15 | Q | Okay.  So Ms. Hillmann, I am asking basically a |
| 16 | | logical question. |
| 17 | | Based on your review of the facts in this |
| 18 | | case, did you see any evidence that if a B read, |
| 19 | | an interpretive form was sent to the Kalispell |
| 20 | | field office, did you see any evidence of any CARD |
| 21 | | patients that would receive Medicare eligibility |
| 22 | | or Medicare benefits based on that B read alone? |
| 23 | A | Okay.  I guess I need you to repeat the question. |
| 24 | Q | Sure. |
| 25 | A | Because I think to be honest with you, our |

Page 43

| | | |
|---|---|---|
| 1 | | technicians don't get into B reads.  We don't get |
| 2 | | into all the medical issues with that.  We follow |
| 3 | | the checklist, and if everything is in the |
| 4 | | checklist, we process our claims that way |
| 5 | | following policy. |
| 6 | | It's just like any other type of Medicare. |
| 7 | | You have to have -- for international volunteers |
| 8 | | or for a disability SUP, you have to have required |
| 9 | | forms for each type of Medicare, and if you don't |
| 10 | | have those required forms, then you are going to |
| 11 | | be disallowed. |
| 12 | Q | Understood. |
| 13 | A | Yeah. |
| 14 | Q | So in terms of the EHH checklist form, is it fair |
| 15 | | to say that the technicians at SSA when it comes |
| 16 | | to box number 2 about the diagnosis and how it was |
| 17 | | arrived at, is it fair to say that SSA technicians |
| 18 | | are relying on CARD to provide true and accurate |
| 19 | | information on those forms based on the materials |
| 20 | | you've reviewed? |
| 21 | A | Correct. |
| 22 | Q | Okay.  And aside from the EHH form itself and, |
| 23 | | again, I am sorry to be beating this to death, but |
| 24 | | I just want to be really clear. |
| 25 | | Aside from getting an EHH form from the |

Page 44

| | | |
|---|---|---|
| 1 | | CARD clinic related to CARD patient Medicare |
| 2 | | claims, is there any additional avenue, any |
| 3 | | separate piece of paper, any work around, any |
| 4 | | exceptional route to getting Medicare benefits for |
| 5 | | a CARD patient that you came across during your |
| 6 | | review of facts in this case other than an EHH |
| 7 | | checklist? |
| 8 | A | No. |
| 9 | Q | Okay.  It's 11:30.  I would ask that we take a |
| 10 | | short rest break. |
| 11 | | THE VIDEOGRAPHER:  The time is 11:26. |
| 12 | | We are off the record. |
| 13 | | (Break taken.) |
| 14 | | THE VIDEOGRAPHER:  The time is 11:34. |
| 15 | | We are back on the record. |
| 16 | | MR. KAKUK:  Mr. Duerk, during the break |
| 17 | | I believe Ms. Hillmann had something that she |
| 18 | | wanted to clarify about people traveling to |
| 19 | | Montana to conduct training.  I believe the |
| 20 | | question was limited to Libby, but in case it |
| 21 | | wasn't, Ms. Hillmann, was there more information |
| 22 | | you wanted to provide? |
| 23 | | MR. DUERK:  Why don't I ask a question |
| 24 | | about that directly. |
| 25 | | MR. KAKUK:  Fair. |

**Exhibit 1-12**

**Page 45**

1  BY MR. DUERK:

2  Q   Ms. Hillmann, I was asking questions about

3      training in Libby.  I may have failed to ask if

4      there was training generally in Montana.

5          Based on what Mr. Kakuk is presenting on

6      the record, is there anything that comes to mind

7      for you related to that topic?

8  A   There was training for social security employees

9      from our regional office employees. Mary Lisa

10     Lewandowski, our regional commissioner.  Our

11     current regional commissioner was there.

12     Nancy Berrihill, Kathy Will or Kathy Suarez,

13     Kelly Hansen and Chris DiGiacomo.

14  Q   All right.  And in terms of each of the

15     individuals that you just named, is it fair to say

16     that they are governments employees, not CARD

17     employees?

18  A   Correct.

19  Q   Okay.  And so in terms of the trainings in Montana

20     likewise is it fair to say that the trainings

21     provided were trainings from government employees

22     to other government employees related to the EHH

23     Medicare program?

24  A   Correct.

25  Q   Okay.  In terms of the documents that you've

**Page 46**

1      reviewed and the interviews that you have

2      conducted, were there any aspects or elements of

3      those trainings that were inconsistent with what

4      we have already reviewed in terms of the POMS

5      sections?

6  A   No.

7  Q   Okay.  And during those trainings, based on the

8      information that you reviewed related to the

9      facts, was there any information that indicated

10     that that training of government employees

11     included any training that would allow for a CARD

12     patient to receive Medicare benefits without a

13     diagnosis of asbestos-related disease?

14  A   Can you repeat the question?

15  Q   Sure.  I am trying to focus just on this training

16     among government employees in Montana.

17  A   Okay.

18  Q   Based on the factual inquiry that you made, did

19     you see any information that indicated to you that

20     those trainings included anything about allowing

21     patients from CARD who did not have a diagnosis of

22     asbestos-related disease to become Medicare

23     eligible?

24  A   No.

25  Q   Okay.  And specifically did you see anything in

**Page 47**

1      the information that you reviewed that would have

2      allowed CARD patients to receive Medicare

3      eligibility for life with only a B read?

4  A   No.

5  Q   Ms. Hillmann, I would like to cover the individual

6      topics that you were asked to address in the

7      subpoena which has been marked as Exhibit 135 for

8      purposes of this deposition.  I will start with

9      paragraph 17 which is on page 11 of that subpoena.

10         Do you see that in front of you?

11  A   Yes.

12  Q   Okay.  I will read the topic for you.  Please tell

13     me if I have read it correctly.

14         "The Social Security Administration's

15     designated deponent must identify the SSA

16     employees who trained CARD staff to fill out the

17     environmental health hazards checklist in 2011."

18         Did I read paragraph 17 correctly?

19  A   Yes.

20  Q   Aside from the information that you have already

21     provided, is there any other information on

22     paragraph 17 that we haven't covered?

23  A   No, just that we have never trained CARD staff on

24     the EHH checklist.

25  Q   All right.  Paragraph 18, I will read it.  Please

**Page 48**

1      tell me if I have read it correctly, and then I

2      will have a few follow-ups.  Okay?

3  A   Okay.

4  Q   Paragraph 18.  "The

5      Social Security Administration's designated

6      deponent must testify whether CARD staff have

7      filled out the environmental health hazards

8      checklists according to the training SSA provided

9      CARD staff in 2011 from 2011 until the present

10     day."

11         Did I read that correctly?

12  A   Yes.

13  Q   Aside from the testimony that you have already

14     provided, do you have any additional information

15     to share on that topic?

16  A   No, just that we have never provided CARD staff

17     any type of training.

18  Q   All right.  Paragraph 19.

19         "When a physician at CARD determines a

20     patient has asbestosis by interpretation of a

21     computed tomographic radiograph of the chest, CARD

22     staff enter the patient's name, social security

23     number and date of birth in the step 1 section of

24     the environmental health hazards checklist.  Check

25     the asbestosis box in the impairment section of

**Exhibit 1-13**

**Page 49**

```
1    step 2 of the environmental health hazards
2    checklist, enter the date the CARD physician made
3    the interpretation and the date of diagnosis
4    section of step 2, enter the dates the patient was
5    present in Lincoln County, Montana in step 3, and
6    the CARD physician prints and signs the
7    physician's name and dates the environmental
8    health hazards checklist."
9            "The Social Security Administration's
10   designated deponent must testify whether this is
11   the SSA approved method of filling out the
12   environmental health hazards checklist."
13           Aside from the testimony that you have
14   already provided, do you have anything additional
15   to add in response to paragraph 19?
16 A  I do.  A step 1 is completed by social security.
17   We fill in the identifying information, and that's
18   in HI 00803.50.
19 Q  All right.  And in terms of section 1, just for
20   the jury's edification and reference, I am looking
21   at Exhibit 76, page 4, at the EHH exemplar.
22           Step 1 is basically the first box on the
23   EHH form on page 4, is that right?
24 A  Correct.
25 Q  Okay.  Anything else to add in response to
```

**Page 50**

```
1    paragraph 19?
2 A  No.
3 Q  Okay.  Paragraph 20.
4            "When a B reader qualified physician
5    determines a patient has asbestosis by
6    interpretation of plain chest x-ray or a computed
7    tomographic radiograph of the chest, CARD staff
8    enter the patient's name, social security number
9    and date of birth in the step 1 section of the
10   environmental health hazards checklist, check the
11   asbestosis box in the impairment section of step 2
12   of the environmental health hazards checklist,
13   enter the date the B reader physician made the
14   interpretation in the date of diagnosis section of
15   step 2, enter the dates the patient was present in
16   Lincoln County, Montana in step 3, and the CARD
17   physician prints and signs the CARD physician's
18   name and dates the environmental health hazards
19   checklist."
20           "The Social Security Administration's
21   designated deponent must testify whether this is
22   the SSA approved method of filling out the
23   environmental health hazards checklist."
24           First, did I read that accurately?
25 A  You did read it accurately, excuse me, but for
```

**Page 51**

```
1    step 1, social security completes step 1 in that
2    section of policy or on the EHH checklist.
3            And as far as step 2 and step 3, you know,
4    our technicians are not going to know the
5    background of a B reader.  We are just assuming
6    that the physician that completed section 2 and
7    section 3 followed section 1881A of the act and we
8    don't get into the medical interpretations or
9    background of this checklist.
10 Q  All right.  Is it fair to say that you rely on
11   CARD physicians to fill out boxes 2 and 3,
12   sections 2 and 3 of the EHH form truly and
13   accurately?
14          MR. KAKUK:  Objection, scope.
15 A  Yes.
16 BY MR. DUERK:
17 Q  Okay.  Paragraph 21.
18           "When a physician at CARD determines a
19   patient has pleural thickening or pleural plaques
20   by interpretation of a computed tomographic
21   radiograph of the chest, CARD staff enter the
22   patient's name, social security number and date of
23   birth in the step 1 section of the environmental
24   health hazards checklist, check the pleural
25   thickening and pleural plaques box in the
```

**Page 52**

```
1    impairment section of step 2 of the environmental
2    health hazards checklist, enter the date the CARD
3    physician made the interpretation in the date of
4    diagnosis section of step 2, enter the dates the
5    patient was present in Lincoln County, Montana in
6    step 3, and the CARD physician prints and signs
7    the physician's name and dates the environmental
8    health hazards checklist."
9            "The Social Security Administration's
10   designated deponent must testify whether this is
11   the SSA approved method of filling out the
12   environmental health hazard checklist."
13           Aside from the testimony that you have
14   already provided, anything else that you feel is
15   necessary to add in response to paragraph 21?
16 A  Yes.  Step 1 is completed by social security
17   again.  Anything within step 2 and step 3, the
18   physician should be following section 1881A of the
19   act.  We do not step into that realm of pleural
20   thickening or pleural plaques.  That's outside the
21   realm of our job.
22 Q  Whose job is that?
23 A  That is the physician.
24 Q  All right.  Not SSA's?
25 A  Correct.
```

**Exhibit 1-14**

Page 53

1   Q   Okay.
2   A   We are not qualified to make those determinations.
3   Q   All right.  And in fact, when it comes to any
4       information on section 2 or section 3 of the EHH
5       form in Exhibit 76, page 4, does SSA based on your
6       review of all the facts in this case wade into any
7       of these boxes to double-check, second-guess or
8       overread what the physicians have placed here from
9       the CARD clinic related to their patients?
10  A   No.
11  Q   Let's see.  I believe I was on paragraph 22.  I
12      will read it, and please tell me if I have read it
13      correctly.
14          "When a B reader qualified physician
15      determines a patient has pleural thickening or
16      pleural plaques by interpretation of plain chest
17      x-ray or a computed tomographic radiograph of the
18      chest, CARD staff enter the patient's name,
19      social security number and date of birth in the
20      step 1 section."
21          I am going to try to speed this up, because
22      I think the beginning of all of these is
23      essentially the same.
24  A   Okay.
25  Q   Okay.  At the bottom it says again, "The Social

Page 54

1       Security Administration's designated deponent must
2       testify whether this is the SSA approved method of
3       filling out the environmental health hazards
4       checklist."
5           Based on your view of paragraph 22 and in
6       light of the testimony you have provided already
7       today, is there any other response that you need
8       to give?
9   A   Again, step 1 is completed by social security.
10      Step 2 and step 3 should be followed by the
11      physician following section 1881A of the act.
12      Social security employees do not get involved with
13      step 2 and step 3.
14  Q   All right.  So looking at the EHH form itself
15      then, Exhibit 76, page 4, when it comes to making
16      any notes or any observations or any distinctions
17      in section 2 of the EHH form under the heading of
18      the column minimum medical evidence required, what
19      do SSA field staff do when looking at this form
20      based on the factual information you reviewed,
21      anything?
22  A   They just check to make sure that the individual
23      has a diagnosis that is listed within the EHH
24      checklist, that there is a date of diagnosis,
25      step 3 is completed, there is the printed name of

Page 55

1       the physician, the physician's signature and the
2       date.  Outside of that, that's outside of the
3       scope of our job.
4   Q   All right.  And I don't want to summarize
5       everything inaccurately, but I am going to attempt
6       to, and then tell me if I have done it unfairly.
7           It sounds to me like in terms of this EHH
8       form, what the SSA field techs are looking for is
9       whether there is a diagnosis of an
10      asbestos-related condition, is that fair?
11  A   Correct.
12  Q   Okay.  And if there is not an asbestos-related
13      condition or an asbestos-related disease, is it
14      also fair to say based on your review of the facts
15      that that patient isn't eligible for Medicare?
16  A   Correct.
17  Q   Okay.  But if the CARD physician has indicated in
18      section 2 of this form that there is a diagnosis
19      of an asbestos-related condition caused by
20      exposure to Libby asbestos, then the patient is
21      eligible for Medicare based on the information
22      you've reviewed, is that fair?
23  A   Correct.
24  Q   Okay.  What if the information that's included in
25      section 2 is false?

Page 56

1           For example, what if a patient's EHH form
2       was filled out completely perfectly and
3       completely, there was a first name, a middle
4       initial, a last name, a social security number and
5       a date of birth filled out by SSA, and then step 2
6       was also completed by the provider with
7       information indicating that a patient had an
8       asbestos-related disease diagnosis.
9           Are you with me so far?
10  A   Uh-huh.
11  Q   All right.  Let's also in this hypothetical look
12      at step 3, and is step 3 a section that is also
13      filled out by CARD?
14  A   Correct.
15  Q   Okay.  And then the bottom of section 3 below
16      whether the individual is present in Lincoln
17      County, Montana during the relevant time period,
18      there is the section for both the printed name of
19      the physician and the CARD physician's signature
20      and a date for that signature, right?
21  A   Uh-huh.
22  Q   Okay.  Is that a yes?
23  A   Yes.
24  Q   All right.  So in this hypothetical, all of the
25      information appears to indicate a diagnosis of an

**Exhibit 1-15**

1      asbestos-related condition with a date of
2      diagnosis, the presence in Lincoln County, Montana
3      section appears to have been met based on the
4      information that is there, and there is a doctor's
5      printed name from CARD, a physician's signature
6      and a date.
7            Are you with me?
8   A   Yes.
9   Q   Okay.  Let's say in this hypothetical the
10      impairment, the box that's checked next to the
11      diagnosed impairment is asbestosis.
12   A   Okay.
13   Q   Okay.  Let's also say that asbestosis has a
14      diagnosis code of 5010, is that right?
15   A   Uh-huh.
16   Q   Is that a yes?
17   A   Yes, that is correct.
18   Q   And that the date of diagnosis is filled out with
19      a handwritten or typed date section.
20   A   Uh-huh.
21   Q   In terms of that information, if SSA through any
22      means became aware that in fact there was not a
23      diagnosis of asbestos-related disease or that
24      there was not a date of diagnosis of
25      asbestos-related disease or that the impairment

1      that had been marked was in fact untrue or
2      incorrect, would that patient be Medicare eligible
3      based on all of the information, the facts and the
4      conversations that you had in preparation for your
5      deposition today?
6            MR. KAKUK:  Objection, scope.  Go ahead.
7   A   No.
8   BY MR. DUERK:
9   Q   Okay.
10   A   And I do want to expand on this a little bit.
11   Q   Sure.
12   A   I just recently received some e-mails from CARD
13      March 21st, 2023 where I believe it was --
14   Q   Wait.  I'm sorry.  When?
15   A   March 21st, 2023.
16   Q   So this would have been -- today's date is
17      May 16th, so you received these less than a month
18      ago?
19   A   That they had filled out two checklists for two
20      beneficiaries that they didn't feel were
21      diagnosed, and I instructed the Kalispell office
22      to follow the EM 10042REV and deny the claims.
23   Q   Wait.  I'm sorry.  So you learned from CARD --
24   A   Just recently in March.
25   Q   That two patients --

1   A   I didn't directly.  This e-mail was sent to
2      Terra Whiteman, the Kalispell manager.
3   Q   Okay.  And so the e-mail, I think it --
4   A   And this was our first time hearing of it, because
5      I have searched all the records all the way back
6      to 2010, so this is the first time ever seeing
7      anything like this come from CARD.
8   Q   All right.  There's a good starting place.  I'm
9      going to have some more questions about this
10      e-mail in a minute, but let's stick with the
11      hypothetical.
12   A   Okay.
13   Q   So it sounds like this hypothetical has happened.
14      You have learned information that an EHH form
15      completed by CARD was completed inaccurately in
16      some way, is that fair?
17   A   Uh-huh.
18   Q   Is that a yes?
19   A   That's a yes.
20   Q   Okay.  And once you learned that that EHH form was
21      filled out inaccurately, what did you do?
22            What did the Social Security Administration
23      do based on your review of the facts?
24   A   They contacted me, and I instructed them to deny
25      the claim.

1   Q   All right.  In those two cases did those
2      individuals have a diagnosis of an
3      asbestos-related disease?
4   A   I wouldn't be able -- they stated that they didn't
5      find that these were diagnosed with an
6      asbestos-related disease, but they had completed
7      the form.
8   Q   CARD said these cases --
9   A   Correct.
10   Q   And this happened just recently in March?
11   A   21st, 2023.
12   Q   And SSA's response was to deny the claim?
13   A   Absolutely.
14   Q   You seem confident about that.  Why was it
15      absolutely SSA's response to deny the claim?
16   A   Because you can't complete an EHH checklist and
17      state that somebody -- marking a person diagnosed
18      with one of these diseases, but stating that you
19      don't feel they are diagnosed with that disease.
20            As a qualified physician, you are signing
21      off stating that you feel that they have this
22      certain diagnosis, and you put the date of
23      diagnosis and you completed this form following
24      section 1881A of the act.
25   Q   And SSA is relying on CARD to be true and accurate

**Exhibit 1-16**

Page 61

1    in these EHH forms?
2  A  Correct.
3  Q  And so in this particular instance, somebody at
4    CARD indicated that the EHH form was for patients
5    that didn't have a diagnosis?
6  A  Correct.
7  Q  And SSA's concern or your concern was that the EHH
8    form that had been submitted was not accurate?
9  A  Correct.
10 Q  And so as a result what was the conclusion, what
11   happened?
12 A  We denied the claims.
13 Q  All right.  Is that action consistent with what
14   should occur with EHH Medicare claims that are
15   submitted when the information on them turns out
16   not to be true about a diagnosis?
17           MR. KAKUK:  Objection, scope.
18 A  Correct.
19 BY MR. DUERK:
20 Q  Okay.  And why do you say that?
21 A  Because that would be fraudulently filling out one
22   of these forms.  If you bring it to our attention
23   that you filled out a form like this, this EHH
24   checklist, and that you are marking that this
25   person is diagnosed with this impairment, with

Page 62

1    this date of diagnosis that you're signing off on
2    it and you're stating that you don't feel that
3    they're diagnosed with this condition, that to us
4    is fraud.
5  Q  In terms of this March 21st, 2023 e-mail, aside
6    from this e-mail, based on your review of the
7    facts, your interviews, your factual inquiry in
8    this case, have you seen any other correspondence
9    from CARD that alerted SSA that it was adopting
10   this same practice with EHH Medicare claim forms?
11 A  No.  This is the first e-mail that I have seen.
12   And as I mentioned, I went all the way back
13   looking through lots of documents and talking to
14   the Kalispell manager, talking to headquarter
15   components, looking through the Medicare lead's
16   previous information on EHH claims.
17 Q  And do you recall who at CARD sent this
18   March 21st, 2023 e-mail?
19 A  It was a technician under the director.
20 Q  A technician under the director?  And do you
21   recall from -- do you know who the director at
22   CARD was?  Were they listed on this e-mail?
23 A  No, they were not listed on that e-mail.
24 Q  Do you have a copy of this e-mail?
25 A  I'm sure I do.

Page 63

1  Q  I'd like to take a short break and obtain a copy
2    of that e-mail.
3  A  Okay.
4           THE VIDEOGRAPHER:  The time is 11:58 and
5    we are off the record.
6           (Break taken.)
7           THE VIDEOGRAPHER:  The time is 12:00.
8    We are back on the record.
9  BY MR. DUERK:
10 Q  All right.  Ms. Hillmann, I have a few more
11   questions for you about this e-mail from the
12   March 21st, 2023 timeframe.
13           In terms of any communication around this
14   issue, and by "issue" I mean CARD submitting EHH
15   records with information that was not true on it
16   related to a diagnosis of asbestos-related
17   disease, are there any communications about this
18   topic around this timeframe that you saw from the
19   CARD clinic in your search for information?
20 A  No.  The only -- this is the first piece of
21   communication from CARD that covered that piece of
22   material that you were just talking about.
23 Q  Okay.
24 A  Uh-huh.
25 Q  In terms of communication from CARD, is the e-mail

Page 64

1    from March 21st, 2023, did it include
2    communication directly from CARD?
3  A  Yes.
4  Q  Okay.  All right.  So here's the situation that
5    I'm in, and perhaps you can answer some of these
6    questions and help out.
7           I will represent to you that I have
8    requested any correspondence about any
9    communication related to a B read only program or
10   CARD patients who haven't been diagnosed with
11   asbestos-related disease, but submitted for
12   Medicare, and I have been asking for that kind of
13   communication for years from CARD or its
14   individual members or any other sources, and I
15   have not received anything along those lines, and
16   I understand that we are talking about March 21st,
17   less than a month ago here.
18           In terms of this topic, was it your intent
19   to try to look for any type of correspondence or
20   communication about this topic that came to SSA
21   from the CARD clinic?
22 A  I looked for everything within the subpoena
23   document.
24 Q  All right.
25 A  Yeah.

1  Q   And this one e-mail from March 21st, 2023 was the
2      only document you received?
3  A   Correct.  And this solely just covered the
4      diagnosis.
5  Q   All right.  Were there any other pieces of
6      correspondence from the CARD clinic that have been
7      forwarded to the SSA recently that you reviewed in
8      preparation for your deposition today?
9  A   I believe this correspondence was the only
10     continuing correspondence that I had with
11     Kalispell Montana's district manager.
12 Q   Okay.
13 A   To my recollection.
14 Q   Okay.
15         MR. KAKUK:  Can we go off the record for
16     a second?
17         MR. DUERK:  Yes.
18         THE VIDEOGRAPHER:  The time is 12:03.
19     We are off the record.
20         (Break taken.)
21         THE VIDEOGRAPHER:  The time is 1:25.  We
22     are back on the record.
23 BY MR. DUERK:
24 Q   Ms. Hillmann, we have come back from a little bit
25     of a break, and during that break I will represent

1      that we now have in front of us a handful of
2      e-mails that I will represent to you I have not
3      seen before today.
4          Do you have two e-mail strings in front of
5      you with the lead pages sent Tuesday, April 11th,
6      2023 and Friday, April 28th, 2023?  I tell you
7      what, why don't I give you the stapled copies.
8  A   Yeah.
9  Q   All right.
10 A   Yes.
11 Q   And what are these?
12 A   These are e-mail correspondence between
13     Stephanie Shaw and Terra Whiteman.  Terra Whiteman
14     is the district manager of Kalispell, and then
15     Stephanie Shaw appears to be from CARD.
16 Q   Okay.  And I will represent to you that the way
17     that we came into possession of these e-mails is
18     that after you provided some testimony about
19     e-mails from March 21st, 2023 timeframe, CARD's
20     attorney produced these e-mails for us.
21         In terms of these e-mails, I am going to
22     start with the April 11th e-mail which I would ask
23     the court reporter to mark as Exhibit 138.
24         (WHEREUPON, Deposition Exhibit 138
25      marked for identification by the reporter.)

1  BY MR. DUERK:
2  Q   All right.  Let's begin with Exhibit 138, and I
3      apologize if I'm a little slow with this.  I am
4      just getting used to this e-mail myself.  It
5      appears that the e-mail train begins on page 2 of
6      Exhibit 138.
7          Do you see that in front of you?
8  A   Yes.
9  Q   If you could describe generally what this e-mail
10     string is about to the best of your knowledge.
11 A   To the best of my knowledge, what it's conveying
12     is that Stephanie Shaw had some questions for our
13     district manager, Terra Whiteman.  Stephanie is
14     from CARD, and Terra was trying to set up a
15     possible time to speak.
16 Q   And what was the nature of the topic that CARD
17     wanted to discuss with Terra Whiteman from SSA?
18 A   It sounded like they wanted to discuss the EHH
19     checklist in general and, you know, one of Terra's
20     comments was that she relayed the information that
21     Stephanie had conveyed to her to the regional
22     office and "because you are telling me that CARD
23     does not consider the individual diagnosed based
24     on an interpretation by a B reader, we are unable
25     to approve an EHH Medicare claim involving the

1      B reader at this time.  Someone from our agency or
2      Medicare will be reaching out directly in the next
3      couple of weeks."
4          So Ms. Hillmann, does this e-mail address the
5      topic that we were discussing prior to the break
6      about a revelation that certain EHH forms
7      submitted to SSA had untrue or incorrect
8      information on them?
9  A   Yes.
10 Q   Okay.  And according to this general timeframe,
11     April 6th, 2023, based on your review of written
12     materials and interviews that you took, based on
13     your factual inquiry, is this roughly the very
14     first time that SSA is learning that some of the
15     EHH forms submitted to its field office have
16     untrue information on them?
17 A   Correct.
18 Q   Okay.  And what was SSA's response, if you can
19     recall?
20 A   Well, when Terra actually reached out to me, she
21     explained this to me in a way that they were
22     completing the EHH checklist with a diagnosis as
23     defined under section 1881A, but they truly didn't
24     feel that that individual was diagnosed, that
25     physician that signed the form.  And I explained

**Exhibit 1-18**

Page 69

| | |
|---|---|
| 1 | to her if they're stating that about a specific |
| 2 | beneficiary, then we have to deny the claim based |
| 3 | on policy.___ |
| 4 Q | Okay. And this is information related to a |
| 5 | conversation between you and Terra or you and |
| 6 | CARD? I'm sorry, if you could clarify. |
| 7 A | So Stephanie Shaw who reached out to Terra and |
| 8 | they eventually talked by phone had this |
| 9 | conversation, so Stephanie Shaw is from CARD, and |
| 10 | she was explaining this to Terra who is our |
| 11 | district manager in Kalispell, Montana. |
| 12 | And then Terra told her that she needed to |
| 13 | talk to the regional office Medicare expert, which |
| 14 | I am, and then I explained how the policy reads |
| 15 | and how we would have to deny the claims, and that |
| 16 | was our official response. |
| 17 Q | Had this type of issue from CARD ever been |
| 18 | elevated to you before? |
| 19 A | No. This is the first time I'm seeing anything |
| 20 | like this. |
| 21 Q | In 2023? |
| 22 A | Exactly. |
| 23 Q | Did it cause any surprise? |
| 24 A | It did, but, you know, by that time I think we |
| 25 | were aware of the subpoena, so it was just kind |

Page 70

| | |
|---|---|
| 1 | of, you know, I just assumed maybe this was tied |
| 2 | up with whatever was going on with the subpoena. |
| 3 Q | Okay. And in terms of the subpoena, are we |
| 4 | talking about the subpoena for your deposition |
| 5 | testimony? |
| 6 A | Absolutely. |
| 7 Q | Today? |
| 8 A | Yes. |
| 9 Q | Okay. So prior to this timeframe, and I am |
| 10 | including today in this timeframe because, |
| 11 | frankly, we are at May 16th and these e-mails are |
| 12 | dated in April, this is the first you've heard |
| 13 | about EHH forms that have incorrect information? |
| 14 A | Absolutely. |
| 15 Q | Okay. |
| 16 A | And in my position I have been doing this since |
| 17 | 2018, and prior to that I looked through all of |
| 18 | Kathy's stuff, and I haven't seen any kind of |
| 19 | correspondence like this. |
| 20 Q | So no correspondence that you're aware of -- |
| 21 A | Correct. |
| 22 Q | -- through your inquiry had elevated this issue to |
| 23 | your awareness related to EHH forms submitted to |
| 24 | the Social Security Administration field office |
| 25 | with untrue information on it? |

Page 71

| | |
|---|---|
| 1 A | Correct. |
| 2 Q | In terms of you spoke a moment ago about I think a |
| 3 | conversation between or among CARD staff and SSA |
| 4 | in which there was some claim that the CARD |
| 5 | employees felt that a patient wasn't diagnosed. |
| 6 | Did I hear that correctly? |
| 7 A | Correct. |
| 8 Q | Okay. And if you could share with me any factual |
| 9 | information you're aware of on that basis, what |
| 10 | was CARD essentially sharing with SSA about this |
| 11 | category of patients? |
| 12 A | Well, as I was previously mentioning, they just |
| 13 | basically said that they completed the checklist, |
| 14 | but they didn't feel that person was diagnosed |
| 15 | with that actual EHH diagnosis, the physician that |
| 16 | signed the form, and with that statement I told |
| 17 | and I instructed the Kalispell manager that we |
| 18 | cannot approve that claim. |
| 19 Q | Okay. I want to be very clear about what specific |
| 20 | information may have been shared with SSA during |
| 21 | that timeframe outside of a feeling that perhaps |
| 22 | this patient didn't have a diagnosis according to |
| 23 | CARD employees. Okay? |
| 24 A | Uh-huh. |
| 25 Q | Ms. Hillmann, at any time did CARD disclose to you |

Page 72

| | |
|---|---|
| 1 | or anyone else at SSA as far as you were aware |
| 2 | that CARD was knowingly submitting EHH forms in |
| 3 | support of Medicare beneficiary status for |
| 4 | patients who did not have a diagnosis of |
| 5 | asbestos-related disease prior to April of 2023? |
| 6 A | No. |
| 7 Q | Did CARD ever submit any correspondence authored |
| 8 | by CARD to the effect that CARD was knowingly |
| 9 | submitting patients for Medicare benefits who CARD |
| 10 | knew did not have a diagnosis of asbestos-related |
| 11 | disease? |
| 12 A | Prior to that date? |
| 13 Q | Prior to this timeframe in 2023. |
| 14 A | No. |
| 15 Q | For example, I would like you to turn to |
| 16 | Exhibit 7, I'm sorry, tab 7 in your book. |
| 17 A | Okay. |
| 18 Q | Do you see Exhibit 123 in front of you? |
| 19 A | Yes. |
| 20 Q | Now, what is the date at the top of this page? |
| 21 A | May 18, 2015. |
| 22 Q | Okay. And do you see CARD's letterhead? |
| 23 A | I do. |
| 24 Q | Now, I would like to ask some questions about |
| 25 | this. I believe this will already have been |

**Exhibit 1-19**

Page 73

1  admitted into evidence. Ms. Hillmann, if you
2  would read the first paragraph here.
3  A  Okay. "You participated in an asbestos health
4  screening on 12-11-2014, and at that time you were
5  not diagnosed with an asbestos-related disease
6  (ARD). You received a letter at the conclusion of
7  your appointment that informed you that your chest
8  x-ray and CT would be sent out for a second read
9  by other doctors specially trained in reading
10  radiographic images for dust diseases like
11  asbestos."
12  Q  Okay. If you would continue reading the second
13  paragraph.
14  A  Okay. "One of these doctors did identify a small
15  abnormality on the CT image. It is nothing that
16  has significant health implications, nor is it
17  considered a diagnosis of an asbestos-related
18  disease."
19  Q  All right. If you'd read the next paragraph.
20  A  "A diagnosis of asbestos-related disease is based
21  on exposure histories, time since exposure,
22  medical provider assessment and radiographic
23  images. The reader who identified the abnormality
24  did not have the rest of this information."
25  Q  The next paragraph, please.

Page 74

1  A  "We are notifying you of the finding because any
2  type of abnormality identified by the outside
3  reader, even if it not a diagnosis of an
4  asbestos-related disease, qualifies you for
5  certain medical benefits."
6  "You are now eligible for Medicare benefits
7  regardless of your age based on these findings.
8  If you choose to enroll in Medicare, you would
9  also be eligible for the Medicare Pilot Program
10  for ARD that covers medically necessary services
11  not covered by usual medical insurance programs.
12  An example would be mileage, fitness club
13  memberships, assistance with daily living.
14  Information about these programs is enclosed."
15  Q  The next paragraph.
16  A  "In addition, you can continue to be eligible for
17  free ongoing screenings for asbestos-related
18  disease through the CARD screening program."
19  Q  Ms. Hillmann, have you ever seen a letter like
20  this?
21  A  No.
22  Q  From CARD in any respect?
23  A  No.
24  Q  Has CARD ever sent to you any correspondence
25  remotely similar to this about any of their

Page 75

1  patients?
2  A  No.
3  Q  What does this letter indicate to you about the
4  individual patient here in terms of whether or not
5  they have a diagnosis of asbestos-related disease?
6  MR. KAKUK: Objection, scope.
7  MR. BECHTOLD: Foundation.
8  BY MR. DUERK:
9  Q  Let me put it this way.
10  If you were to see correspondence from CARD
11  indicating that they were telling patients that
12  that patient was eligible for social security EHH
13  Medicare benefits even though that patient did not
14  have a diagnosis of asbestos-related disease,
15  would you find that troublesome?
16  A  Yes.
17  Q  Why?
18  A  Because that would be a denial. We shouldn't be
19  putting individuals on EHH Medicare that don't
20  have the proper diagnosis under section 1881A of
21  the act.
22  Q  Based on all of the information that you uncovered
23  during the course of your inquiry, did you ever
24  see any correspondence from CARD or any e-mails,
25  any other documentation prior to this timeframe

Page 76

1  disclosing that CARD was telling patients that
2  they were eligible for Medicare without a
3  diagnosis of asbestos-related disease?
4  A  No.
5  Q  Would you or anyone else at the
6  Social Security Administration based on your
7  factual inquiry have ever written a letter like
8  this to CARD teaching them, training them,
9  instructing them that this practice of submitting
10  patients for Medicare benefits without a diagnosis
11  of ARD was appropriate, proper or authorized by
12  the Social Security Administration?
13  A  No.
14  Q  Why not?
15  A  Because that's outside of the scope of our job.
16  Q  If we could turn to what I would like to mark as
17  Exhibit 139, the e-mail dated at the top Friday,
18  April 28th, 2023, that would be helpful.
19  (WHEREUPON, Deposition Exhibit 139
20  marked for identification by the reporter.)
21  BY MR. DUERK:
22  Q  Ms. Hillmann, is Exhibit 139 an e-mail train that
23  you have seen before today?
24  A  Yes.
25  Q  And is Exhibit 139 and the e-mail train here from

**Exhibit 1-20**

Page 77

1  approximately the end of April 2023 and earlier
2  part of the same conversation that is related to
3  this March 21st, 2023 timeframe?
4  A  Correct.
5  Q  Okay.  And that timeframe, I will just represent
6     to you, is it fair to say this timeframe is the
7     first information you had heard of from CARD that
8     they were submitting people to Medicare or SSA for
9     Medicare benefits under the EHH program without a
10    diagnosis?
11  A  Yes.
12  Q  I would like to focus on the e-mail in the
13    beginning of this train, so page 3 of Exhibit 139,
14    an e-mail from Tracy McNew dated April 12th, 2023.
15          First off, who is Tracy McNew?
16  A  She is the executive director of the CARD clinic.
17  Q  And who is Terra Whiteman again?
18  A  Terra Whiteman is the Kalispell district manager.
19  Q  Okay.  And what is your understanding of how this
20    e-mail originated, if you know?
21  A  I believe this particular e-mail actually
22    originated from this Exhibit 138.
23  Q  Okay.  So the two Exhibits 138 and 139 are tied
24    together, is that fair?
25  A  Yeah.

Page 78

1  Q  Okay.  If you would please read this e-mail from
2     Tracy McNew to Terra Whiteman on April 12th that
3     would be helpful.
4  A  Okay.  "Hi Terra.  My name is Tracy McNew.  I am
5     the executive director of the CARD clinic.  Thanks
6     for your e-mail to Stephanie Shaw about EHH
7     checklists indicating that SSA will no longer be
8     approving Medicare based on positive reads by
9     B readers."
10  Q  If I could stop you right there, first of all, is
11    it true that SSA would no longer be approving
12    Medicare based on positive reads by B readers,
13    that is to say are you aware that prior to this
14    time or are you aware of whether or not SSA ever
15    had a practice of approving Medicare benefits
16    based only on positive B reads?
17          MR. KAKUK:  Objection, scope.  Go ahead.
18  A  Again, that's outside of the scope of the realm of
19    my job.  Honestly, I think this e-mail transpired
20    from a misinterpretation of what Terra was trying
21    to convey to Tracy's employee at CARD.
22  Q  If you could explain, that would be helpful.
23  A  Yeah.  So Terra came back, and I believe it was in
24    this e-mail, and she just explained to them that
25    she conferred with the regional office, and

Page 79

1  because you're telling me that CARD does not
2  consider the individual diagnosed based on
3  interpretation by a B reader, we are unable to
4  approve EHH Medicare claims involving a B reader
5  at this time, but this was a phone conversation
6  where they basically laid out that the physician
7  was completing the EHH checklist, but did not feel
8  that that person was diagnosed, so I think there
9  was some misinterpretation here from the
10 phone call with Terra to Stephanie to what was
11 relayed to Tracy.
12  Q  All right.  So in any event, in terms of this
13    e-mail on Exhibit 139, page 3, is this the first
14    that SSA is learning based on your factual
15    investigation of the matter that CARD is
16    apparently submitting EHH checklists based on
17    positive B reads alone?
18  A  This is the first time that I'm hearing about it
19    from the original time that Terra contacted me.
20  Q  And the original time that Terra contacted you
21    again was April of 2023?
22  A  Correct.
23  Q  And prior to that time were you aware of any
24    correspondence, any communication of any kind from
25    CARD in any way in which CARD had disclosed to the

Page 80

1  SSA that they were engaging in this practice of
2  submitting CARD patients for Medicare benefits on
3  a B read alone prior to this period?
4  A  No.
5  Q  Okay.  It sounds to me from the second sentence of
6     this e-mail, April 12th, 2023, Exhibit 139, that
7     Tracy McNew is saying that SSA will no longer be
8     approving Medicare based on positive reads by
9     B reads.
10         Do you see that sentence?
11  A  I do see that sentence, yes.
12  Q  Okay.  And just so that we are clear, have you
13    seen any materials anywhere ever from CARD that
14    indicate that this was an approved practice by the
15    Social Security Administration?
16  A  No.
17  Q  And you seem certain of that.  Why?
18  A  Just because I -- I mean, we don't, again, we
19    don't go outside the realm of that EHH checklist.
20    We don't get into the B reader part of this or
21    anything that has to do with the medical
22    interpretations or anything to do with that.  We
23    are not medical experts.
24          So the conversation between Terra and
25    Stephanie seems to be misconstrued here within

Exhibit 1-21

1   this e-mail.  Terra was trying to convey that this
2   employee said that this physician completed the
3   EHH checklist even though they did not agree with
4   the diagnosis, and that to us is a denial for EHH
5   Medicare.
6  Q  And is that because that individual patient does
7     not have a diagnosis of asbestos-related disease?
8  A  Correct.
9  Q  Okay.  Further down in this e-mail of April 12th,
10    2023 there is another sentence that I would just
11    like to read to you, and please tell me if I have
12    read it correctly.  Okay?
13 A  Uh-huh.
14 Q  That sentence begins about midway down this
15    e-mail.
16        It says, "Just to be clear, SSA has now
17    changed its position regarding Medicare
18    eligibility based on positive B reads, and CARD
19    should no longer fill out EHH forms for patients
20    with no CARD diagnosis even if they have a
21    positive outside B read or CT read."
22        Is that correct?  Did I read that
23    accurately?
24 A  You did.
25 Q  Okay.  So now I just want to be clear.

1  Q      Was there any change in SSA's position
2     regarding Medicare eligibility based on positive B
3     reads that you could find in any of your factual
4     inquiry?
5         MR. KAKUK:  Objection, scope.  Go for
6      it.
7  A  No, and I think Terra cleared that up in her
8     e-mail that's dated April 26th, 2023.
9  Q  Let's turn to that e-mail.
10 A  Okay.
11 Q  Are you looking at page 1 of Exhibit 139?
12 A  I believe it's page 2, correct?  Yeah, page 2.
13 Q  Page 2?  Okay.  I am looking at an e-mail sent
14    Wednesday, April 26th, 2023 at 2:47 PM.
15        Am I looking at the right one?
16 A  Correct.
17 Q  Okay.  If you would please read it.
18 A  "Good afternoon, Tracy.  I wanted to get you an
19    interim answer to this e-mail.  I think there may
20    be confusion.  Stephanie reached out to SSA and
21    made us aware that CARD does not consider the
22    patients as diagnosed despite signing off on the
23    checklist when a B reader is involved.  SSA has
24    not changed any of its rules.  I am forwarding
25    your information to our center for program support

1   so they can address any of your concerns.  I will
2   have them reach out to you directly.  Thank you."
3  Q  So is this the e-mail that clarifies that there
4     has been no change in SSA policy?
5  A  Yes.
6  Q  Okay.  When were you asked to look at these
7     e-mails?
8  A  I believe sometime in April.  I think that was
9     whenever Terra connected with Stephanie and
10    Stephanie had that question.
11 Q  And at any time prior to you looking at these
12    e-mails had anyone from CARD to the best of your
13    knowledge approached anyone at the
14    Social Security Administration outside of what we
15    are seeing here to ask questions about a practice
16    of submitting B read only patients for Medicare
17    benefits to SSA?
18 A  I mean, I can't really speak on that.  I know
19    there was continuing correspondence with Terra and
20    then I believe the executive director and
21    Stephanie, but I don't know if it was directly
22    related to that.
23 Q  At any point, and I think we have covered this,
24    but at any point to the best of your knowledge
25    according to your factual inquiry did the

1   Social Security Administration ever train or teach
2   or authorize this practice with CARD from 2010 at
3   any time?
4  A  No.
5  Q  The way that we got into this line of questioning
6     initially during your deposition today, I want to
7     try to return to that point.  If I remember
8     correctly, we were walking through the different
9     paragraphs that you were asked to respond to in
10    the subpoena.
11        Do you recall that part of your testimony?
12 A  Yes.
13 Q  Okay.  I would like to return to that part of the
14    inquiry, but before we leave off here, when this
15    topic first came up, you used the word "fraud."
16        Do you recall that?
17 A  Yes.
18 Q  What was your meaning?
19        What were you describing when you used that
20    word?
21 A  Fraud means you are completing a form like to me
22    it would be illegally, and you're signing off on a
23    diagnosis that you don't believe this person is
24    diagnosed so they can get onto Medicare benefits,
25    so that to me is a clear indication of fraud.

**Exhibit 1-22**

Page 85

1 Q  And when you reviewed this e-mail train in
2    Exhibits 138 and 139 about CARD's practices of
3    submitting patients without a diagnosis for
4    Medicare benefits, did you have concerns that this
5    was fraudulent?
6            MR. KAKUK:  Objection, scope.
7 A  I did have concerns, but now that it was on our
8    radar, we did make it clear to them that if they
9    were completing any checklists that they didn't
10   agree that person had a diagnosis that we would be
11   denying them and that they need to make us aware
12   of that.
13 Q  And when you asked for CARD to make you aware of
14   any of those cases, did CARD disclose to you how
15   many cases they have done this in, for how many
16   individual CARD patients?
17 A  I didn't directly talk to CARD, but Terra relayed
18   that information, and to my knowledge there was no
19   such reply.
20 Q  Okay.  So to the best of your knowledge based on
21   your factual inquiry as you sit here today as far
22   as you are aware there are two patients whose EHH
23   forms were submitted when CARD knew that patient
24   did not have an ARD diagnosis?
25 A  Correct.

Page 86

1 Q  Okay.  And you are aware of no more than just
2    those two patients from the spring of 2023?
3 A  Correct.
4 Q  At any time has CARD disclosed to you how many
5    patients actually fell into this category or fall
6    into this category?
7 A  I've had no direct correspondence with CARD and I
8    don't believe that to my knowledge, and I have
9    asked Terra, that they have reported anybody
10   outside of those two beneficiaries.
11 Q  Those two beneficiaries from the spring of 2023?
12 A  Correct.
13 Q  Okay.  Back to the subpoena, again, I am looking
14   at what has been marked as Exhibit 135.  I think
15   we made it to paragraph 22.
16 A  Okay.
17 Q  And just so that I'm clear, once you've had a
18   chance to review paragraph 22, is there anything
19   else that comes to mind that you have to offer in
20   response to paragraph 22 that we haven't talked
21   about today?
22 A  So on paragraph 22, again, step 1 is completed by
23   social security, and then CARD is to complete
24   step 2 and step 3 following section 1881A of the
25   act.  As far as the specifics, social security

Page 87

1    employees or technicians do not get into the
2    specifics of the medical condition listed on the
3    EHH checklist.
4 Q  In terms of paragraph 22, when a B reader
5    qualified physician determines a patient has
6    pleural thickening or pleural plaques by
7    interpretation of plain chest x-ray or computed
8    tomographic radiograph of the chest, SSA staff
9    doesn't wade into those facts to determine whether
10   or not what SSA is being told by CARD qualifies as
11   a diagnosis or not.
12       That's left up to the CARD physician to
13   state on the EHH form, is that fair?
14 A  Correct.
15 Q  Okay.  Turning to paragraph 25, I will read it and
16   please tell me if I have read it correctly.
17       "The Social Security Administration's
18   designated deponent must testify why the
19   Social Security Administration gave an award to
20   CARD for CARD's exemplary cooperation with the
21   Social Security Administration in implementing the
22   amendments enacted by the Affordable Care Act."
23       I think we have heard some of your
24   testimony here.  Do you have anything more to
25   offer on that topic?

Page 88

1 A  I do not.
2 Q  Okay.  So to the best of your knowledge based on
3    your factual inquiry, did you see evidence that
4    the Social Security Administration gave an award
5    to CARD for CARD's exemplary cooperation with the
6    SSA in implementing the amendments enacted by the
7    Affordable Care Act?
8 A  I did not, but as I previously mentioned, there
9    could have been a regional award.  Our Regional
10   Commissioner Mary Lisa Lewandowski did mention
11   that there was a potential that a regional
12   commissioner award was given out.
13 Q  Okay.
14 A  But she had no record of it.
15   All right.  And you communicated with
16   Mary Lewandowski about that?
17 A  Correct.
18 Q  Okay.  Paragraph 26.
19       "The Social Security Administration's
20   designated deponent must testify why the
21   Social Security Administration has designated to
22   CARD the task of filling out environmental health
23   hazards checklists."
24       What response do you have?
25 A  Well, I think that, you know, again, this aligns

**Exhibit 1-23**

Page 89

1  with section 1881A of the act.  The physicians are
2  completing these checklists and, you know,
3  following the guidelines of that act in order for
4  these beneficiaries to be put on EHH Medicare.  If
5  they're not diagnosed with one of those
6  conditions, then they will not be put on EHH
7  Medicare.
8  Q  And in terms of a physician's determination,
9  again, with the diagnosis, it's the physician at
10  CARD who fills out the EHH form, is that right?
11  A  Correct.
12  Q  And is SSA relying on the provider or the CARD
13  physician to communicate whether there is a
14  diagnosis of asbestos-related disease or not to
15  SSA?
16  A  Correct.
17         MR. KAKUK:  Objection, scope.
18  A  Sorry.  Correct.
19  Q  Anything else to offer on paragraph 26 aside from
20  what's already been covered?
21  A  No.
22  Q  Okay.  Paragraph 27.
23         "Because CARD physicians actually see
24  patients in a clinical setting, CARD physicians
25  make clinical diagnoses of the patients prior to

Page 90

1  filling out environmental health hazards
2  checklists for them.  Meanwhile, B readers who
3  interpret chest x-rays and outside readers who
4  interpret CT scans do not make clinical diagnoses
5  because they never see the patients in a clinical
6  setting, but rather make interpretations of x-rays
7  and CT scans."
8         First, did I read that correctly?
9  A  Yes.
10  Q  Okay.  In terms of your factual review of all the
11  information and material that was available to you
12  from SSA, do you have any comment on the first
13  part of paragraph 27 or is this something that
14  only a physician would know?
15  I believe only a physician would know.
16  Q  All right.  The second part of paragraph 27.
17         "Do the positive interpretations of these
18  non-CARD physicians qualify as diagnoses for
19  purposes of the environmental health hazards
20  checklists even though they are not clinical
21  diagnosis."
22         The same questions.  Is this information
23  information that you are able to obtain through
24  your factual review of the file, interviews with
25  SSA employees or any other sources?

Page 91

1  A  Again, this would be outside the expertise of our
2  position as technicians and as a Medicare lead.
3  Q  All right.  In your mind based on your review of
4  the facts is the answer to this question better
5  left to the CARD clinicians?
6  A  Correct.
7  Q  Okay.  Paragraph 28.
8         "Many patients whom CARD physicians have
9  not clinically diagnosed with asbestos-related
10  disease are found to have positive interpretations
11  of chest x-rays for asbestosis or pleural plaques,
12  pleural thickening by B reader qualified
13  physicians or positive interpretation of CT scans
14  for asbestosis or pleural plaques or pleural
15  thickening by other qualified physicians."
16         "Based on these outside interpretations,
17  CARD fills out environmental health hazard
18  checklists for these patients, a CARD physician
19  signs the checklist, and CARD submits the
20  checklist to SSA."
21         Did I read that correctly?
22  A  Yes.
23  Q  The question, is this the proper course of action
24  for CARD for these patients, did I read that
25  correctly?

Page 92

1  A  You did.
2  Q  In terms of the first part of response for
3  paragraph 28, is information about CARD physicians
4  clinically diagnosing patients compared to
5  B readers interpreting CTs and x-rays, is that
6  anything that is within your purview as an SSA
7  employee?
8  A  No.
9  Q  Do you have any response to paragraph 28 other
10  than what you just said or what we've been
11  discussing today?
12  A  No.
13  Q  Okay.  Paragraph 29.
14         "Does the EHH checklist form referenced in
15  SSA POMS section HI 00803.001 and .050 indicate
16  that step 2 of the form is to be completed by a
17  healthcare provider who will identify the
18  asbestos-related conditions and its date of
19  diagnosis."
20         Other than shortening those policy
21  sections, did I read this correctly?
22  A  Yes.
23  Q  Have you addressed this topic already in your
24  testimony?
25  A  I believe so.

Page 93

| | | |
|---|---|---|
| 1 | Q | Is there anything else that needs to be covered |
| 2 | | here in your view? |
| 3 | A | No. |
| 4 | Q | Turning to paragraph 36 of the subpoena. |
| 5 | | "Has anyone at CARD informed the SSA field |
| 6 | | office in Kalispell that CARD patients do not need |
| 7 | | to have a diagnosis of asbestos-related disease in |
| 8 | | order to qualify for federal benefits." |
| 9 | | Did I read that correctly? |
| 10 | A | Yes. |
| 11 | Q | Aside from these e-mails from the timeframe of |
| 12 | | March and April of 2023 which we have covered, has |
| 13 | | anyone at CARD informed the SSA field office in |
| 14 | | Kalispell that CARD patients do not need to have a |
| 15 | | diagnosis of asbestos-related disease in order to |
| 16 | | qualify for federal benefits? |
| 17 | A | No. |
| 18 | Q | Anything else on that topic? |
| 19 | A | No. |
| 20 | Q | Response 37.  "Has any employee at the SSA field |
| 21 | | office in Kalispell instructed CARD that patients |
| 22 | | do not need to have a diagnosis of |
| 23 | | asbestos-related disease in order to qualify for |
| 24 | | federal benefits." |
| 25 | | Did I read that correctly? |

Page 94

| | | |
|---|---|---|
| 1 | A | You did. |
| 2 | Q | And what is the answer? |
| 3 | A | With my correspondence with manager |
| 4 | | Terra Whiteman, we have never instructed CARD on |
| 5 | | how to complete an EHH checklist or go over the |
| 6 | | medical factors that are involved.  It's outside |
| 7 | | of our purview. |
| 8 | Q | All right.  And based on what you've learned from |
| 9 | | Terra Whiteman about her response to this B read |
| 10 | | only program, have you ever seen anything from |
| 11 | | Terra Whiteman that would indicate to you that she |
| 12 | | would have instructed CARD that patients do not |
| 13 | | need to have a diagnosis of asbestos-related |
| 14 | | disease in order to qualify for federal benefits? |
| 15 | A | No. |
| 16 | Q | And why not? |
| 17 | | MR. KAKUK:  Objection, scope. |
| 18 | A | There is no record of that, and that's not within |
| 19 | | policy.  There would be no reason for her to |
| 20 | | instruct her technicians on what a qualified |
| 21 | | physician does by following section 1881A of the |
| 22 | | act as it's outside the purview of our positions. |
| 23 | Q | All right.  Paragraph 28, and I will just ask the |
| 24 | | question.  Has any employee at the SSA field |
| 25 | | office in Kalispell instructed anyone that CARD |

Page 95

| | | |
|---|---|---|
| 1 | | patients qualify for Medicare benefits on a B read |
| 2 | | chest x-ray interpretation of a lung abnormality |
| 3 | | unrelated to asbestos exposure and without a |
| 4 | | diagnosis of asbestos-related disease? |
| 5 | A | No. |
| 6 | Q | Paragraph 39.  Has anyone at CARD informed the SSA |
| 7 | | that it has submitted in excess of 100 EHH forms |
| 8 | | signed by Dr. Black to the |
| 9 | | Social Security Administration field office in |
| 10 | | Kalispell on behalf of CARD patients when CARD had |
| 11 | | actual knowledge that those patients had not been |
| 12 | | diagnosed with asbestos-related disease? |
| 13 | A | This my first time seeing this, I think, besides |
| 14 | | reading the subpoena.  Hold on.  To my knowledge, |
| 15 | | no. |
| 16 | Q | Earlier I asked about whether or not CARD had |
| 17 | | disclosed certain facts to the |
| 18 | | Social Security Administration about the B read |
| 19 | | only program or about the topic of submitting |
| 20 | | undiagnosed patients to the SSA field office for |
| 21 | | Medicare benefits without asbestos-related disease |
| 22 | | diagnoses. |
| 23 | | Do you recall that line of questions? |
| 24 | A | Yes. |
| 25 | | (WHEREUPON, Deposition Exhibit 137 |

Page 96

| | | |
|---|---|---|
| 1 | | marked for identification by the reporter.) |
| 2 | | BY MR. DUERK: |
| 3 | Q | Okay.  I would like to show you now what I am |
| 4 | | marking as Exhibit 137, tab 8 in your book. |
| 5 | | Do you see Exhibit 137 in front of you? |
| 6 | A | Yes. |
| 7 | Q | I will represent to you that this document, |
| 8 | | document 110, has been filed in federal court in |
| 9 | | front of the trial judge in this matter. |
| 10 | A | Okay. |
| 11 | Q | I will also represent to you that there are |
| 12 | | several statements of fact here that are |
| 13 | | undisputed by the CARD clinic. |
| 14 | A | Okay. |
| 15 | Q | I would like to read these to you, and my question |
| 16 | | is this. |
| 17 | | During your factual investigation and |
| 18 | | inquiry did you see any documents or obtain any |
| 19 | | statements from any witnesses or learn any |
| 20 | | information that indicated that CARD had submitted |
| 21 | | these statements to the SSA at any time from 2010 |
| 22 | | until the spring of 2023? |
| 23 | A | No. |
| 24 | Q | Okay.  So what I want to do is go through them |
| 25 | | statement by statement. |

**Exhibit 1-25**

Page 97

1   A   Okay.

2   Q   So the first one, I will read it, and please tell

3       me if I have read it correctly.

4           "CARD has submitted EHH forms to the

5       Social Security Administration when CARD providers

6       were aware that the individual patient did not

7       have a clinical diagnosis of asbestos-related

8       disease.  Undisputed."

9           Ms. Hillmann, to the best of your knowledge

10      based on your factual inquiry, did you see any

11      evidence that CARD prior to March and April of

12      2023 had ever submitted any kind of statement like

13      this to the social security administration?

14  A   No.

15  Q   The next statement.  "Dr. Black, Tanis Hernandez

16      and Tracy McNew knew about CARD's practice of

17      submitting patient EHH forms for Medicare benefits

18      to social security for patients who did not have a

19      diagnosis of asbestos-related disease.  Undisputed

20      that this is Ms. Hernandez's testimony."

21          Prior to the spring of 2023 or at any time,

22      frankly, based on your factual inquiry did you

23      come across information that CARD had submitted a

24      statement like this for SSA to consider?

25  A   Prior to the spring of 2023, no.

Page 98

1   Q   The next statement.

2           "CARD continues its practice of submitting

3       patients EHH forms to Social Security

4       Administration who do not have a diagnosis of

5       asbestos-related disease.  Undisputed."

6           Prior to the spring of 2023 based on your

7       factual inquiry did you ever see that CARD

8       submitted this statement to the SSA?

9   A   No.

10  Q   The next statement.

11          "CARD has submitted patients without a

12      diagnosis of asbestos-related disease to the

13      Social Security Administration for Medicare

14      benefits since at least 2013 and presumably since

15      the Affordable Care Act was passed in 2010.

16      Undisputed."

17          The same question.  Ms. Hillmann, at any

18      time prior to the spring of 2023 did you see that

19      CARD had submitted any statements like this to the

20      Social Security Administration for any purpose,

21      for guidance, for response, for training, for any

22      reason?

23  A   No.

24  Q   The next statement.

25          "CARD submitted an EHH form on multiple

Page 99

1       patients' cases based on a B read alone when

2       CARD's current medical director knew those

3       patients did not have an asbestos-related disease

4       diagnosis."  Response, undisputed.

5           Did I read that correctly?

6   A   Yeah.

7   Q   The same question, Ms. Hillmann.

8           At any point to your knowledge did CARD

9       submit this statement to the Social Security

10      Administration?

11  A   No.

12  Q   The next statement.

13          "CARD's medical director testified multiple

14      patients' EHH forms were submitted to the Social

15      Security Administration for Medicare benefits even

16      though they did not have a CARD diagnosis of

17      asbestos-related disease."  Response, undisputed.

18          Ms. Hillmann, the same question.

19          At any time prior to the spring of 2023 did

20      you come across any information indicating that

21      CARD had come forward with this statement to the

22      Social Security Administration?

23  A   No.

24  Q   The next statement.

25          "CARD knowingly submitted EHH forms to the

Page 100

1       Social Security Administration in support of

2       Medicare benefits for patients who had no clinical

3       diagnosis of asbestos-related disease.

4       Undisputed."

5           Did I read that correctly with the changes

6       indicated here?

7   A   Yes.

8   Q   Prior to the spring of 2023, did CARD ever come

9       forward to the Social Security Administration

10      telling the Social Security Administration that

11      they planned to do something like this?

12  A   No.

13  Q   "CARD has been signing EHH forms for patients

14      without a clinical diagnosis since the federal

15      grant started."

16          Did I read that correctly?

17  A   Yes.

18  Q   The response, undisputed.

19          Did I read that correctly?

20  A   Yeah.

21  Q   During your factual investigation into this matter

22      did you come across any evidence that CARD had

23      ever shared anything remotely like any of these

24      statements, including the one I just read, to the

25      Social Security Administration?

**Exhibit 1-26**

Page 101

1   A   Prior to April of 2023, no.
2   Q   I'd like to take a short break.
3       THE VIDEOGRAPHER:  The time is 2:13.  We
4   are off the record.
5       (Break taken.)
6       THE VIDEOGRAPHER:  The time is 2:34.  We
7   are back on the record.
8   BY MR. DUERK:
9   Q   All right.  After a short break, I am looking at
10      the subpoena for trial testimony and all of the
11      topics and paragraphs that we have attempted to
12      cover today from paragraphs 17 to 22, paragraphs
13      25 to 29 and paragraphs 36 to 39.
14          Ms. Hillmann, have we now covered your
15      responses to each of the paragraphs as set forth
16      in the subpoena to the SSA?
17  A   Yes.
18  Q   Okay.  I've got a few clarifications, but in terms
19      of any substantive response in terms of the topics
20      covered in the subpoena to the SSA, have we now
21      essentially covered any response that you might
22      have based on your factual review of the evidence
23      and the underlying records that you examined in
24      your inquiry?
25  A   Yes.

Page 102

1       (WHEREUPON, Deposition Exhibit 140
2   marked for identification by the reporter.)
3       (WHEREUPON, Deposition Exhibit 141
4   marked for identification by the reporter.)
5   BY MR. DUERK:
6   Q   Okay.  So just a couple of clarifications.  I want
7       to put in front of you what I have marked or what
8       the court reporter has marked as Exhibit 140 and
9       141.
10          I will represent to you that each of these
11      exhibits represent the updated POMS for the
12      sections that we have been covering during your
13      testimony today.
14          Is that an accurate characterization in
15      your mind?
16  A   Yes.
17  Q   Okay.  Let's start with Exhibit 140.  This is
18      essentially the same POMS as Exhibit 75, POMS
19      008031.001, Hospital Insurance Entitlement for
20      Individuals Exposed to Environmental Health
21      Hazards.
22          Is that fair?
23  A   Yes.
24  Q   Okay.  Based on your review of the earlier POMS
25      published in Exhibit 75, is the same POMS section

Page 103

1       in Exhibit 140 different in any material way that
2       you see?
3       MR. KAKUK:  Objection, scope.  Go ahead.
4       MR. BECHTOLD:  Objection, foundation.
5   BY MR. DUERK:
6   Q   First of all, have you had a chance to look at
7       each of these?
8   A   I looked at 141, but I haven't fully looked at
9       140, but I am assuming that it was due to the
10      pronoun changes that we made.
11  Q   Okay.
12  A   Yeah, that was part of that change.
13  Q   And again, I am not asking for any substantive
14      policy differences that may be included here.
15  A   Okay.
16  Q   In fact, my question is geared towards showing the
17      opposite to be true, if it is.
18  A   Yeah.
19  Q   Did you notice anything aside from pronoun changes
20      or other grammatic changes that are apparent from
21      the print in front of you?
22  A   No.
23  Q   The same question related to the other POMS
24      section from Exhibit 76, POMS section 00803.050,
25      Developing Medical Requirement for Entitlement to

Page 104

1   EHH Medicare.
2       Do you see any changes in the new version
3   that jump out at you other than pronoun changes?
4       MR. KAKUK:  The same objection.
5   A   No.
6   Q   Okay.
7       MR. BECHTOLD:  Foundation.
8   BY MR. DUERK:
9   Q   All right.  There were some questions about this
10      timeframe from March 21st, 2023 and then the
11      e-mails that we examined from the April 2023
12      timeframe.
13          What can you tell us about the difference
14      between the March dates and the April dates and
15      why is there a disconnect in that timeframe?
16  A   The timeframe between the e-mails?
17  Q   Not necessarily the timeframe between the e-mails,
18      but the timeframe, the period of time between
19      March 21st and those e-mails.
20  A   Well, I mean, I believe that's when the
21      correspondence started, but based on -- I might
22      have been incorrect about the date, but based on
23      these e-mails, basically this is just one string
24      of e-mails that I have been continuing to get from
25      Terra regarding her correspondence with CARD.

**Exhibit 1-27**

Page 105

1   Q   Okay.

2   A   Yeah.

3   Q   And in terms of where things left off with this

4       e-mail train, based on your last review of

5       e-mails, have we now looked at all of the e-mails

6       on this topic that you had access to to the best

7       of your recollection?

8   A   To the best of my recollection.  There might be

9       additional ones that, you know, CARD had sent from

10      this date just kind of expanding on an earlier

11      e-mail, but to my recollection I believe this is,

12      you know, the majority of the question.

13  Q   Okay.

14  A   Yeah.

15  Q   And in terms of the initiation or how this

16      question first came to light, is it your

17      understanding that it came to light because of

18      phone communication, not e-mail communication?

19  A   Correct.

20  Q   Okay.  And might that in part explain the little

21      bit of time connect between March 21st, 2023 and

22      the e-mails that we see in April?

23  A   Yes.

24  Q   Okay.  The last thing that I'd like to cover is

25      you submitted a declaration in this case, is that

Page 106

1       correct?

2   A   Yes.

3           (WHEREUPON, Deposition Exhibit 136

4       marked for identification by the reporter.)

5   BY MR. DUERK:

6   Q   And that declaration is at tab 2, and I will ask

7       that we mark this declaration as Exhibit 136.

8           Do you see Exhibit 136 in front of you?

9   A   Yes.

10  Q   Ms. Hillmann, is this your declaration?

11  A   Yes.

12  Q   And if you would take a look through it, I believe

13      we have covered the topics outlined in this

14      declaration.

15          Is that your understanding also?

16  A   Correct.

17  Q   Okay.  There is one specific section here that I'd

18      like you to focus on.  Do you see paragraph 7?

19  A   Yes.

20  Q   Okay.  Is it still true that POMS section

21      HI 00803000, et sec, meaning the entire section or

22      those that follow, those sections titled Medicare

23      entitlement for individuals exposed to

24      environmental health hazards (EHH) are based on

25      and mirror language from the Affordable Care Act?

Page 107

1           MR. KAKUK:  Objection, scope.

2   A   Yes.

3   BY MR. DUERK:

4   Q   Ms. Hillmann, it has appeared to me that during

5       your deposition where you have needed

6       clarification in some of my questions rather than

7       just guessing at my meaning you have asked for

8       that clarification in order to provide clearer

9       answers.

10          Has that been your impression as well?

11  A   Yes.

12  Q   I thank you for your time today.  I don't have any

13      more questions at this moment.  I am sure I will

14      have some follow-up questions after Mr. Bechtold

15      begins.

16  A   Okay.

17          MR. DUERK:  For just a moment though, I

18      would like to make a record.  I don't know if I

19      need to do it on video or not.  I guess we can

20      redact it in this way.

21          I'd just like to note that in terms of

22      the exhibits related to the e-mails today,

23      Exhibits 138 and 139, this is the first time

24      that I have seen these e-mails and any

25      attachments.

Page 108

1       I do appreciate their disclosure today.

2   However, I am also aware that there are

3   approximately 2,500 e-mails that counsel for the

4   CARD clinic received yesterday that I have not

5   received.  I don't know what the topic of those

6   e-mails is.

7       I don't know what they are about, who

8   authored them, what the nature of those e-mails

9   are.  In essence, I'm surprised.

10      I believe that I have had discovery

11  pending now for several years with an obligation

12  to replenish discovery related to any and all

13  communications between CARD and the Social

14  Security Administration, those discovery

15  requests having been propounded on CARD.

16      I would like to note that for the record

17  that this is a surprise.  I have done as best I

18  could, given the circumstances, and I am content

19  with the record that I have developed.  However,

20  I am not in favor of being surprised with any

21  new correspondence or any other new discovery at

22  this trial preservation deposition for

23  Ms. Hillmann.

24      And to that extent I will object to

25  non-disclosure to any exhibits or materials that

Page 109

1    I haven't seen before right now if Ms. Hillmann
2    is asked to respond to those materials.
3         I just wanted to perfect that objection
4    for the record.  With that, I think this portion
5    of the video, I would imagine, would be redacted
6    out, so I tender the witness.
7         MR. BECHTOLD:  Well, let's just take a
8    break, and we'll do a switcheroo.
9         MR. DUERK:  Sounds good.
10        THE VIDEOGRAPHER:  The time is 2:46.  We
11   are off the record.
12        (Break taken.)
13        THE VIDEOGRAPHER:  The time is 2:54.  We
14   are back on the record.
15                EXAMINATION
16   BY MR. BECHTOLD:
17   Q    Ms. Hillmann, my name is Tim Bechtold, and I
18        represent the Center for Asbestos Related Disease
19        in this lawsuit.
20            And just to follow-up, so you have been
21        designated by the Social Security Administration
22        as the person with knowledge to provide responses
23        on behalf of the SSA, is that right?
24   A    Correct.
25   Q    And so you speak on behalf of the SSA, correct?

Page 110

1    A    Correct.
2    Q    And your responses today are the official position
3         of the SSA, correct?
4    A    Correct.
5    Q    So we are getting your testimony today for your
6         convenience and capturing your testimony on video
7         to present to the jury at trial because the Social
8         Security Administration has represented that you
9         are not going to be available for trial, is that
10        right?
11   A    To my knowledge, yes.
12   Q    Earlier you testified that you had reviewed the
13        POMS HI 803.001 and 803.050, the e-mails, and
14        those are the POMS dealing with the application of
15        the section of the act, section 1881A, correct?
16   A    Correct.
17   Q    And they are the Social Security Administration's
18        internal regulations regarding the application of
19        the act?
20            MR. KAKUK:  Objection, scope.  Go for
21        it.
22   A    They are our instructions for technicians to
23        process these claims.
24   Q    All right.  And I think as you testified, both
25        Exhibit 75 and 76 have been superceded, correct?

Page 111

1    A    I need to find 75 and 76.  Okay.  These are the
2         different policies.  Yes.  Correct.
3    Q    And so as of October of 2022, Exhibit 75 and
4         Exhibit 76 are no longer valid, correct?
5             MR. KAKUK:  Objection, scope.
6    A    They have been updated.  That doesn't mean they
7         are not valid.
8    Q    Okay.  Excuse me.  They have been superceded?
9    A    Superceded with the same policy.  The only change
10        is in pronouns.
11   Q    Okay.  Ms. Hillmann, I am going to hand you
12        Exhibit 332.
13   A    Okay.
14   Q    Could you take a look at that document?
15   A    It's this document that I haven't seen.
16            MR. DUERK:  Object, non-disclosure.  Go
17        ahead.
18   BY MR. BECHTOLD:
19   Q    So as I understand it, you have never seen
20        Exhibit 332 before?
21   A    I have not.  It was a part of your attached
22        e-mail, but I was never sent this attachment.
23   Q    And as part of your preparation for your
24        deposition today did you contact any of the people
25        who work for the Social Security Administration?

Page 112

1    A    Yes, I did.  I contacted headquarters, I contacted
2         our regional commissioner, I contacted the
3         district manager in Kalispell, and I contacted my
4         former counterpart that used to be the Medicare
5         lead prior to 2018.
6    Q    Okay.  And the people who were active in Libby for
7         the Social Security Administration in 2011, you
8         contacted them as well, correct?
9    A    That is who that was.  So that would be
10        Mary Lisa Lewandowski, that would be Kathy Suarez,
11        previously Suarez, now Will.
12   Q    And I think you testified that you reviewed
13        e-mails between the Social Security Administration
14        and CARD, is that right?
15   A    The e-mails from the spring 2023.  There were no
16        prior e-mails for me to review.  The only e-mails
17        prior to that were from headquarters to our
18        regional office on just the training and the
19        policies.
20   Q    So I take it obviously the e-mail exists.  You
21        just didn't look at it, is that right?
22   A    This e-mail?  I was never given this e-mail.
23   Q    Why weren't you given that e-mail?
24   A    I was not even made aware of this e-mail.
25   Q    Did you ask Mary Lisa Lewandowski about the

**Exhibit 1-29**

Page 113

1    contact she had with CARD while she was in Libby?
2  A  I asked for all correspondence.
3  Q  Who did you ask for all correspondence from?
4  A  All the people that I previously just gave to you
5     in my last question.
6  Q  All right.  So you did ask Mary Lisa Lewandowski
7     for all correspondence she had with CARD, and she
8     did not provide it to you, is that right?
9  A  Well, I would not know if she just forgot about
10    this e-mail or didn't have this e-mail anymore
11    because our records, our e-mail records actually
12    drop off after seven years, so they are no longer
13    available, so she might not have kept it.
14 Q  Okay.  Could you take a look at Exhibit 332?
15 A  Uh-huh.
16          MR. KAKUK:  Mr. Bechtold, is this
17       somewhere in the record for me to look at as
18       well?
19          MR. BECHTOLD:  Sure.  It's Exhibit 332.
20          MR. KAKUK:  In the trial exhibits?
21       Okay.
22 Q  So your testimony is you have never seen this
23    before?
24 A  No.
25 Q  Okay.  Would you look to the second page of

Page 114

1     Exhibit 332.  Can you tell me what that is?
2  A  This is the environmental health hazards
3     checklist, the EHH checklist.
4  Q  Is this the EHH checklist that has been in use
5     since May 20th of 2010 until the present?
6  A  I would have to look at the actual policy.  There
7     has been policy changes in HI 00803.50 and the
8     most recent one was done in October.
9  Q  Sure.  Take a look at it.
10 A  Okay.
11 Q  That's at page 2 of Exhibit 141.
12 A  I got it.  What was the date on this one?
13 Q  The e-mail date is May 20th of 2010.
14 A  Okay.  It appears to be the same checklist.
15 Q  And if you look at Exhibit Number 75.
16 A  Is that in tab 4?
17 Q  Excuse me.  Exhibit 73, and look at page 4.
18 A  Exhibit 73?  Can you tell me what tab that is?
19 Q  It's tab 3.
20 A  Okay.  Do you want me to check the checklist with
21    that one too?  It appears to be the same one.
22 Q  So from the e-mail that Mary Lisa Lewandowski sent
23    to Tanis Hernandez on May 20th, 2010 with that
24    environmental health hazards checklist attached to
25    it, it's the same version of the environmental

Page 115

1     health hazards checklist as Exhibit 76 and
2     Exhibit 141, correct?
3  A  It appears to be that way.  It does look like
4     there is one change.
5  Q  What is the change?
6  A  I've just got to make sure.  The actual minimum
7     medical evidence required under malignancy of the
8     lung.  It just added the bronchoscopy report.
9  Q  Which version are you looking at?
10 A  I am looking at this version, and I am also
11    looking at this version.  So from this version to
12    this version.  In this version it's different.
13 Q  Okay.
14 A  It added on the bronchoscopy report.
15 Q  So instead of saying "this" let's identify them by
16    number.
17 A  Okay.
18 Q  The document you are referring to now is?
19 A  Exhibit 332.
20 Q  Okay.  And 332?
21 A  332.
22 Q  Then the next document that you looked at would be
23    Exhibit 76.  So 332 is different from 76?
24 A  And 332 is different than Exhibit 141.
25 Q  Okay.  Great.  So the Social Security

Page 116

1     Administration developed this EHH checklist,
2     correct?
3          MR. KAKUK:  Objection, scope.  Go for
4       it.
5  A  I believe so.  I mean, I can't -- you know, to be
6     honest, I know that CARD originally had the FLAME,
7     I believe it was the FLAME and the LAMP2 benefits,
8     and they had a questionnaire and that -- you know,
9     essentially they used that questionnaire, but then
10    we moved from the Affordable Care Act to the
11    section 1881A act.  I believe social security put
12    this together to make sure that the physicians
13    were following the guidelines of section 1881A of
14    the act.
15 Q  So as I understand your testimony, the Social
16    Security Administration put together the language
17    of this EHH checklist to make sure that the
18    physicians involved in step 2 were following the
19    provisions of section 1881A of the act?
20 A  Correct.
21          MR. KAKUK:  The same objection.
22 A  Correct.
23 Q  And your testimony is the reason they included
24    this language is to have it mirror the act,
25    correct?

**Exhibit 1-30**

1      MR. KAKUK:  The same objection.

2  A   Did I say that previously?  I guess I said that in

3      my deposition.

4  Q   Your declaration?

5  A   Declaration, yes.

6  Q   Okay.  So that's what you testified in your

7      declaration?

8  A   Yes.

9  Q   So did any Social Security Administration employee

10     provide any guidance at all to any CARD employee

11     on how to fill out an EHH checklist?

12  A  No.  That is outside the realm of our job.  We are

13     not medical experts.

14  Q   How many EHH checklists have come to the Social

15     Security Administration that were not from CARD?

16  A  I would not know that off the top of my head.  I

17     would have to -- that would take some time to

18     research, but there are outside physicians that do

19     fill these out besides the CARD clinic.

20  Q   Would you agree that the CARD clinic does the vast

21     majority of them?

22  A  To to my knowledge, they do, but again I would

23     have to research that to get the numbers, and that

24     would take some time.

25  Q   Did the Social Security Administration ever give

1      Exhibit 75 or Exhibit 76 to CARD?

2  A   To my knowledge, well, Exhibit 332 clearly shows

3      Mary Lisa must have given it to them.

4  Q   It looks like that's just the EHH checklist,

5      correct?

6  A   That's what you're referring to, not the actual

7      policy, or are you talking about the actual

8      policy?

9  Q   I am talking about the policy.

10  A  Well, I don't know why we would give them the

11     policy.  It's our instructions.  It's our internal

12     instructions.

13  Q   Okay.

14  A  Yeah.

15  Q   So those instructions are meant for the Social

16     Security Administration only, correct?

17  A  Those instructions are meant for our technicians

18     only to process claims.

19  Q   They're not meant for CARD?

20  A  No, they're not.

21  Q   They are not meant for anyone outside of Social

22     Security Administration?

23  A  They can access it on our policy -- you know,

24     policy publications on the SSA.gov website, but I

25     mean I don't know why they would.  It's our

1      technician instructions.

2  Q   Sure.  And so the SSA sent staff to Libby after

3      the Affordable Care Act was passed, right?

4  A   Correct.

5  Q   And they set up shop in Libby?

6  A   Set up shop?  They trained our technicians within

7      the Kalispell office, yes.

8  Q   And so what did they do in Libby?

9  A   They took claims and they trained our SSA

10     employees in the Kalispell office.

11  Q   When you say took claims, what does that mean?

12  A  That means they took in Medicare claims.

13  Q   What did they do?

14  A  They processed Medicare claims, so they followed

15     the instructions within the policy and processed

16     any Medicare claims that they had at the time.

17  Q   So as a practical matter, they sat down in a chair

18     and did what?

19  A  They followed these instructions, so they would

20     follow -- if you go to HI 00803.50 they are

21     following the step-by-step instructions to make

22     sure that they could process this claim correctly.

23  Q   Okay.  So did people from Libby walk into their

24     office and sit down and say, hi, my name is

25     patient one?

1  A   I'm sure they came in and I'm sure they called,

2      but additionally we were just really setting up

3      shop to teach our technicians this policy and

4      train them correctly.

5  Q   Okay.  And who were the technicians there?

6  A   The technicians at the time, I really would not

7      know that unless I reached out to Terra.  I

8      believe Sonya Hymas might have been one of those

9      technicians, but to be honest with you that is

10     back in 2010-2011.  You know, I would have to

11     check.

12  Q   Did you ask Terra about who these people were?

13  A  I just asked Terra if anything was followed

14     outside of policy.  I didn't need to get the

15     specific technician's names.  There was no reason

16     for it with the deposition.

17  Q   Isn't one of the questions that you were asked to

18     answer is whether or not CARD people have been

19     trained by any SSA staff in Libby?

20  A  Correct, and the district manager relayed to me

21     that they have not been.

22  Q   But you didn't bother to check with anyone who was

23     actually in Libby and making those communications

24     with CARD, did you?

25          MR. DUERK:  Objection, form.  Go ahead.

**Exhibit 1-31**

**Page 121**

1  A   She would have reached out to her employees,
2      because I had a number of questions for her and I
3      asked her to check with her technicians that were
4      there at the time.
5  Q   But you don't know who those technicians were?
6  A   Uh-uh.
7  Q   So it's your testimony that Mary Lisa Lewandowski
8      for example never -- who was in Libby, right?
9  A   She was in Libby.
10 Q   And it's your testimony that she never
11     communicated with CARD staff about how to fill out
12     an EHH form?
13 A   Correct.
14 Q   And she never communicated with any CARD staff
15     about who determines whether an individual
16     qualifies for Medicare benefits, correct?
17         MR. DUERK:  Objection, vague, use of the
18     term "communicated."
19 A   Can you repeat that question?  I'm sorry.
20 Q   So no one from SSA in Libby communicated in any
21     way with CARD staff about who determines who
22     qualifies for Medicare benefits?
23 A   Correct.  That's outside the realm of our
24     position.
25 Q   Does CARD determine whether an individual

**Page 122**

1      qualifies for Medicare benefits?
2  A   Whatever physician completes that form should be
3      following that section 1881A of the act, so that's
4      all I can speak to on that.
5  Q   Okay.  But is it CARD who determine whether
6      someone qualifies for Medicare benefits?
7  A   Well, CARD isn't the only physicians that complete
8      that checklist, so it's kind of like a vague
9      question to me.
10 Q   Okay.  Does the Social Security Administration
11     determine who qualifies for Medicare benefits?
12 A   The Social Security Administration --
13         MR. KAKUK:  Object to the scope.  Sorry.
14 A   -- follows HI 00803.050.  We do not make the
15     medical determinations.  We rely on the physicians
16     to complete the EHH checklist according to section
17     1881A of the act.  We have nothing to do with the
18     actual medical requirements and medical review.
19 Q   And is that physician the one who makes the final
20     call on whether someone gets Medicare benefits?
21         MR. KAKUK:  The same objection.
22 A   The physician that signs the form is basically
23     attesting to the information that he completed
24     within the form, so if he is stating that this
25     person is diagnosed, you know, and continues to

**Page 123**

1      put a date of diagnosis, he completes step 3, he
2      prints his name, he puts his signature and his
3      date, then we are assuming that he followed
4      section 1881A of the act and that he agrees that
5      this person is diagnosed with that condition.
6  Q   Right.  And I think you testified that it's
7      outside of SSA's scope?
8  A   Absolutely.  We are not medical experts.
9  Q   Right.  And you would defer to the medical experts
10     to make that call, correct?
11 A   Correct.
12 Q   I am going to draw your attention to again
13     Exhibit 76, page 4, draw your attention to where
14     it says step 2.
15         Do you see that?
16 A   Uh-huh.
17 Q   And I think your testimony is that the Social
18     Security Administration has no input on step 2,
19     correct?
20 A   That is correct.  That would be filled out by the
21     provider or the physician.
22 Q   And I think you testified too that if -- that what
23     you're assuming is that the physicians who are
24     following -- who are filling out step 2 are
25     following section 1881A of the act, correct?

**Page 124**

1  A   Correct.
2  Q   And it's not your job to second-guess them,
3      correct?
4  A   Absolutely.  We are not medical experts.
5  Q   Okay.  And part of the -- it's the medical
6      provider's job to make a determination whether the
7      minimum medical evidence required is provided,
8      correct?
9         MR. KAKUK:  Objection, scope.
10        MR. DUERK:  Objection, form.  Go ahead.
11 A   Correct.
12 BY MR. BECHTOLD:
13 Q   I think you testified that you first heard about
14     that CARD was providing -- CARD physicians were
15     providing the minimum medical evidence required
16     for step 2 as solely a B reader interpretation as
17     qualifying a person for Medicare in March of 2023,
18     is that right?
19        MR. DUERK:  Objection, form.  Go ahead.
20 A   I think what I testified to is that I was informed
21     that CARD was sending our Kalispell district
22     manager an e-mail stating that they were
23     completing this form even though they didn't agree
24     that the person was diagnosed with that condition,
25     and based on that statement I instructed the

**Exhibit 1-32**

Page 125

1     Kalispell manager to, you know, make sure those
2     claims were denied, because that's not following
3     section 1881A of the act and that is not something
4     that we can process, and I think I mentioned
5     previously that we had an emergency message
6     10042REV that instructs our field offices in that
7     same direction.
8 Q   And I think you have testified too that it is not
9     your call whether to make that determination in
10    step 2.  It's the medical provider's call, isn't
11   it?
12       MR. DUERK:  Objection, form.  Go ahead.
13 A   It is the medical provider's call to complete the
14     form, but we are assuming they are following
15     section 1881A of the act, and if they are telling
16     us that they don't find that person diagnosed with
17     that condition to me and they complete the form,
18     that looks like fraud.
19 Q   Okay.  May I ask you in step 2 where it says check
20   the box next to the diagnosed impairments and
21   print the date of the diagnosis, do you see that?
22 A   Yeah, I do.
23 Q   Now let's look at where it says "asbestosis."
24 A   Uh-huh.
25 Q   Impairment, asbestosis, diagnosis code 5010.

Page 126

1 A   Uh-huh.
2 Q   And then the minimum medical evidence required.
3       Do you see that?
4 A   Uh-huh.
5 Q   Do you see where it says, "Interpretation by a
6   B reader qualified physician of a plain chest
7   x-ray."
8       Do you see that?
9 A   Uh-huh.
10 Q   Is that what it said?
11 A   Yes.
12 Q   So would you agree that interpretation by a
13   B reader qualified physician of a plain chest
14   x-ray is the sufficient minimum medical evidence
15   required for a diagnosis for purposes of the
16   environmental health hazard checklist?
17       MR. DUERK:  Objection, foundation.
18 A   Sir, I can't speak on this form, because I am not
19     a medical expert.  All I know is if they are
20     completing this form, they should be completing it
21     following the section 1881A of the act.
22 BY MR. BECHTOLD:
23 Q   Okay.  May I continue?
24 A   Uh-huh.
25 Q   Or, underlined, "Interpretation of computed

Page 127

1     tomographic radiograph of the chest by a qualified
2     physician."
3       The same question, does this satisfy the
4     minimum medical evidence required for a diagnosis
5     for purposes of the environmental health hazards
6     checklist?
7       MR. DUERK:  Objection, form, foundation.
8     Go ahead.
9 A   Again, this is outside of my purview, and if the
10    physician is following section 1881A of the act
11    and he completes this form following that, then I
12    would assume that he has found them diagnosed with
13    this condition.
14 Q   Okay.  So if a physician determined that someone
15   had -- if a qualified physician determined
16   based upon interpretation of a computed
17   tomographic radiograph of the chest by a qualified
18   physician and a different physician disagreed with
19   that diagnosis or that interpretation is that a
20   violation of section 1881A?
21       MR. KAKUK:  Objection, scope.
22 A   Again, that is outside of my purview.
23 Q   You just told me that you thought it was
24   fraudulent.
25 A   I think it's fraudulent when they are not

Page 128

1     following section 1881A of the act and they
2     disagree with the diagnosis, but they're
3     completing this form.
4 Q   So if two physicians disagree on a diagnosis --
5 A   The signing physician is the one giving the
6     diagnosis, so if the signing physician states that
7     this person is not diagnosed with this condition,
8     we are going to deny the claim, period.
9 Q   Okay.
10 A   Yeah.
11 Q   So if the signing physician says based upon
12   section 1881A there are two ways to qualify for an
13   environmental health hazards checklist, correct?
14       MR. KAKUK:  Objection, scope.
15 A   Again, I don't get into section 1881A of the act
16     because that is outside of my purview.
17       What I have simply said here is if he
18     disagrees with the diagnosis, he or she or they,
19     and they complete this form and they're stating
20     they disagree that this person is diagnosed with
21     this condition, we are going to deny them.  And to
22     me, it does look like fraud because they are
23     stating this person is diagnosed with this
24     condition even though they signed off and they
25     don't believe that that person has that condition.

Page 129

1  Q  So you are stepping in now the interpretation
2     of -- stepping in to the determination by the
3     medical provider, is that right?
4  A  I am not stepping into the interpretation.  I am
5     stating if they are telling us that they don't
6     believe this person has been diagnosed with this
7     condition and they completed the form, we will
8     deny it.  We don't get into section 1881A.  That
9     is simply up to the physician.
10 Q  So if the physician is following section 1881A, it
11    doesn't matter what you think about his diagnosis,
12    correct?
13        MR. DUERK:  Objection, form.
14        MR. KAKUK:  And scope.
15 A  I don't believe that's what I said at all.  If
16    they brought it to our attention that they don't
17    feel this person is diagnosed with this condition
18    but they completed the form, we will deny the
19    claim, bottom line.  It's not up to social
20    security to determine this medical portion of the
21    policy.
22 Q  So you just said both things.  You said it's not
23    up to you determine the medical portion, but you
24    would determine the medical portion?
25 A  Sir, I think you are kind of misconstruing what I

Page 130

1     am saying, because what I am saying is if a
2     physician completes this form and they're stating
3     that they feel this person is diagnosed with this
4     condition, gives a diagnosis date, completes 2,
5     you know, and section 3, prints their name,
6     physician signature and date, but then they say,
7     "But I don't think they are diagnosed with that
8     condition."
9         Big red flag.  No, it's not going to go
10    through.  We are going to deny it.  Why would you
11    complete a form stating that you feel this person
12    is diagnosed, and then you are verbally telling me
13    or within an e-mail that you don't feel they are
14    diagnosed, that's contradictive and that doesn't
15    align with section 1881A of the act.
16 Q  So now that's your interpretation of section 1881A
17    of the act, correct?
18 A  It doesn't even need to be an interpretation.  If
19    somebody is telling me they clearly filled out a
20    form that they don't agree with the diagnosis but
21    they signed off on it, doesn't that look to you
22    like fraud?
23        If I am completing this form and I am
24    saying this person is diagnosed, but guess what,
25    they are not really diagnosed, that does not make

Page 131

1     sense for our technicians to process that.
2         And we have put it out in an emergency
3     message.  If it is conveyed to us that they are
4     not truly diagnosed with this condition or let's
5     say they even just marked one of these but they
6     don't put the date of diagnosis, we are going to
7     deny it based on the policy that we gave them in
8     emergency message 10042REV, and that has been
9     since the beginning in 2010.
10 Q  How many filled out EHH checklists have you seen?
11 A  I honestly can't speak to that.  I mean, I have
12    seen 15 to 20, but I mean that was just within
13    getting, you know, just example cases so we could
14    rewrite some language within different policies.
15    We had to take out a lead section of a policy.  It
16    wasn't like I was reviewing them.
17 Q  I am going to hand you what has been marked
18    Exhibit 516.
19 A  Okay.
20 Q  You've never seen that before, have you?
21 A  No.
22 Q  Take a look at the second page.
23 A  Okay.
24 Q  Do you recognize what that is?
25 A  Yes.  That's the environmental health checklist.

Page 132

1     This typically would not come with this because
2     this is all we require.
3  Q  And if you look at page 2 of Exhibit 516, do you
4     notice any handwriting in there?
5  A  It says "outside read only."  But it's also
6     missing the name, social security number and date
7     of birth of the person.
8  Q  Yeah.  They've been redacted.
9  A  Okay.  So I can't verify if this is a true,
10    completed claim.
11 Q  No, I am not asking you to verify.  I'm just
12    asking you to look at it.
13 A  Okay.
14 Q  Have you seen an EHH form that has similar
15    indications on it?
16 A  No.
17 Q  And how many EHH forms have been turned in by
18    CARD?
19 A  I would have no idea off the top of my head.  That
20    would take some time to research.  You are talking
21    about going all the way back to like 2010.
22 Q  Yeah.  A lot?
23 A  Yeah.  Well, not just CARD.  I mean, again,
24    you know, other physicians fill these forms out as
25    well.

Page 133

| | | |
|---|---|---|
| 1 | Q | Sure. |
| 2 | A | Yeah. |
| 3 | Q | Would it surprise you that there are -- since the |
| 4 | | beginning of 2011 CARD has indicated when the |
| 5 | | qualification for Medicare based upon their |
| 6 | | determination by an outside B reader only has |
| 7 | | always been demarcated on the EHH form? |
| 8 | | MR. KAKUK: Objection to relevance and |
| 9 | | scope. |
| 10 | | MR. DUERK: And foundation. Go ahead. |
| 11 | A | I am not understanding your question exactly. |
| 12 | | Are you indicating like they write |
| 13 | | different comments within there, the checklist? |
| 14 | Q | Right. |
| 15 | A | Would it surprise me to know that they have been |
| 16 | | doing that? Yes, because I haven't seen a form |
| 17 | | like that. |
| 18 | Q | Has Terra Whiteman ever seen a form like that? |
| 19 | | MR. DUERK: Objection to foundation. |
| 20 | A | Again, this is my first time hearing it, so I |
| 21 | | wouldn't know. |
| 22 | Q | And that's not something you ever inquired of her, |
| 23 | | is it? |
| 24 | A | This is the first time I am hearing about it, so |
| 25 | | no. |

Page 134

| | | |
|---|---|---|
| 1 | Q | So as far as you know CARD has never outside of |
| 2 | | this one form that you see in front of you ever |
| 3 | | indicated on those EHH forms that the basis for |
| 4 | | their qualification, their finding of |
| 5 | | qualification for Medicare benefits was based upon |
| 6 | | solely an outside B read? |
| 7 | A | As far as I know, I have never seen anyone like |
| 8 | | this, and I haven't asked Terra about this because |
| 9 | | this the first time I am seeing one. |
| 10 | Q | Okay. I am going to hand you what has been marked |
| 11 | | as Exhibit 85. Take a look at that. |
| 12 | A | Okay. Okay. |
| 13 | Q | Go ahead and look through all the pages. |
| 14 | A | Okay. So this is back and forth from |
| 15 | | Sonya Peterson who was a claims technical expert |
| 16 | | to Mary Karen Caraway which I am assuming is with |
| 17 | | CARD, but it looks like she received a letter from |
| 18 | | one of the beneficiaries or claimants that she is |
| 19 | | now eligible for Medicare benefits regardless of |
| 20 | | her age based on these findings. |
| 21 | | One of the doctors did identify a small |
| 22 | | abnormality on your chest x-ray. Nothing has |
| 23 | | significant health indications nor is it |
| 24 | | considered a diagnosis of asbestos-related |
| 25 | | disease. And she is asking if there is a |

Page 135

| | | |
|---|---|---|
| 1 | | diagnosis. |
| 2 | Q | Right. And so what's the response? |
| 3 | A | It sounds like she has a B read DX, which to me |
| 4 | | would be a diagnosis. I don't know. We are not |
| 5 | | medical experts, so I would assume that DX means |
| 6 | | diagnosis. "I will look it up and get back to you |
| 7 | | momentarily." And she just basically says, |
| 8 | | "Thanks. That one I couldn't track down." |
| 9 | Q | And after the B read DX -- |
| 10 | A | CW is a B read. It looks like I sent her EHH in |
| 11 | | 2015. I will resend today. |
| 12 | | But to be honest here, I mean, Sonya is not |
| 13 | | going to be in a position to know what a B read |
| 14 | | is. She is asking if they are being diagnosed. |
| 15 | | That's the bottom line. We don't get into the B |
| 16 | | reads. You know, CARD can go on and on about |
| 17 | | B reads. They are completing that form. We are |
| 18 | | assuming they are following that section of the |
| 19 | | act, so I mean it's not Sonya's job to, you know, |
| 20 | | ask her about B reads or anything. She is asking |
| 21 | | for a diagnosis. |
| 22 | Q | Right. And CARD is telling her it's a B read |
| 23 | | diagnosis, right? |
| 24 | A | Yeah, but for her to be knowledgeable about |
| 25 | | B reads? We don't train them on that. She's not |

Page 136

| | | |
|---|---|---|
| 1 | | a medical expert. I think bottom line she is just |
| 2 | | looking for a diagnosis. |
| 3 | Q | Right. And CARD told her it was a B read |
| 4 | | diagnosis, isn't that right? |
| 5 | A | They did tell her it's a B read diagnosis, but I |
| 6 | | am assuming that she is assuming they completed |
| 7 | | the form correctly. |
| 8 | | MR. KAKUK: Can we go off the record for |
| 9 | | a second and take a short break? |
| 10 | | THE VIDEOGRAPHER: The time is 3:31. We |
| 11 | | are off the record. |
| 12 | | (Break taken.) |
| 13 | | THE VIDEOGRAPHER: The time is 3:38. We |
| 14 | | are back on the record. |
| 15 | | BY MR. BECHTOLD: |
| 16 | Q | Ms. Hillmann, I am going to draw your attention to |
| 17 | | Exhibit 135. |
| 18 | A | Okay. |
| 19 | Q | And direct your attention to paragraph 25, and |
| 20 | | paragraph 25 deals with the award that SSA |
| 21 | | presented to CARD, and I think your testimony is |
| 22 | | you don't know why SSA presented this award to |
| 23 | | CARD, correct? |
| 24 | A | Correct. |
| 25 | Q | And did you ask Terra Whiteman why? |

**Exhibit 1-35**

**Page 137**

1  A   I did not ask Terra Whiteman.  I asked
2      Mary Lisa Lewandowski, our regional commissioner,
3      and I also asked headquarters.  I was trying to
4      locate any awards to get more additional
5      information.
6          Headquarters didn't have any awards on
7      record for monetary value or just exemplary
8      service, but Mary Lisa Lewandowski said there
9      could have been a regional-level award, but she
10     didn't have any record of it.
11 Q   Why didn't you ask Terra Whiteman?
12 A   Because she wouldn't have been the one to give out
13     the award.  It would have been the regional
14     commissioner's office.
15 Q   Do you know what Terra Whiteman looks like?
16 A   Yes, I do.  I see her on Zoom.
17 Q   I am going to hand you Exhibit 336.
18     Can you take a look at that?
19 A   Okay.
20 Q   You have never seen that before, have you?
21 A   No.
22 Q   What is that?
23 A   It says it's a Center for Asbestos Related Disease
24     (CARD) for outstanding partnership with SSA and
25     Medicare outreach to individuals with

**Page 138**

1      asbestos-related disease.
2  Q   Is it an award from SSA to CARD?
3  A   It appears to be so.
4  Q   I am going to show you a photo.
5  A   Okay.
6  Q   And I apologize.  Can you tell me who is in that
7      photo?
8          MR. DUERK:  Objection.  Can we see a
9      picture?  Is this an exhibit?
10         MR. BECHTOLD:  Not yet.  I didn't expect
11     it to be.
12         MR. DUERK:  Non-disclosure.
13 Q   Can you tell me who is in the photo?
14 A   The only person that I kind of recognize is Terra
15     over here in the black, unless she has died her
16     hair.
17 Q   And could you tell us what's going on in this
18     photo?
19 A   It appears that there is an award there, but I
20     can't see what the award is for, if it's this one
21     or what.
22 Q   So you don't know which SSA employees went to
23     Libby to present this award?
24 A   I didn't know that SSA employees went to Libby to
25     present the award, because that's Terra Whiteman

**Page 139**

1      who is the Kalispell manager.  I am saying that
2      the award would have come from the regional
3      commissioner's office.  We don't give awards out
4      locally like that.  That would be something either
5      from headquarters or regional level.
6  Q   So your testimony is that's not an SSA award?
7  A   I did not say that.  That could very well be one.
8      We just didn't find any records of it.
9  Q   Okay.
10 A   Did you want your exhibit back?
11 Q   No.
12 A   Okay.
13 Q   So not only -- you don't know why SSA gave this
14     award, correct?
15 A   Correct.  This is my first time seeing it.  But as
16     I have said previously, Mary Lisa Lewandowski did
17     say there could have potentially been a
18     regional-level award for CARD, but she had no
19     records of it.
20 Q   So as I review your testimony, it is you don't
21     know who the technicians were who went to Libby in
22     2011, correct?
23 A   The technicians from social security?
24 Q   Yeah.
25 A   From the regional office?  I did list them.

**Page 140**

1  Q   No, who were the technicians who were processing
2      the Medicare claims.
3  A   Oh, within the field office?  No, I cannot name
4      all of them offhand, but I can tell you
5      Sonya Hymas was one of them.
6  Q   Okay.  So Sonya was one?
7  A   Uh-huh.
8  Q   Did you talk to Sonya Hymas about information
9      required for this testimony today?
10 A   Sonya Hymas hasn't been employed by this agency
11     for I think maybe over a year, not even over a
12     year, less than a year.
13 Q   So the answer is no?
14 A   No.
15 Q   You didn't attempt to, did you?
16 A   I would not contact her outside of social
17     security.  We don't have any kind of personal
18     level like that.
19 Q   Okay.  What did you ask Terra Whiteman about
20     regarding this deposition?
21 A   Anything within the subpoena that I was looking
22     for, any of the documents that you were -- you
23     know, that you have listed or if there was any
24     training that I was unaware of that, you know,
25     headquarters hasn't had or the regional level

**Exhibit 1-36**

1    office hadn't had where we gave some type of

2    training to CARD, and she stated no.

3  Q  Okay.  So as I understand your testimony, you did

4    not systematically go through the items in this

5    subpoena, correct, with Terra Whiteman?

6         MR. DUERK:  Objection, form.  Go ahead.

7  A  I took pieces of each of those questions and

8    asked Terra about every single one of them.

9  Q  Except the one about the award?

10  A  No.  I wouldn't ask her about the award because

11    that would not come from her office.  That would

12    be either regional level or headquarters.

13  Q  So I think you're contradicting yourself.

14         MR. DUERK:  Objection, counsel

15      testifying.  Go ahead.

16  BY MR. BECHTOLD:

17  Q  Again, just to clarify this, you did not go

18    through each of these numbered requests in the

19    subpoena with Terra Whiteman, correct?

20  A  I did not go through the one regarding the award.

21    That was the only one I did not go through.

22  Q  Okay.  I am going to draw your attention back to

23    paragraph 19, and I believe your testimony is that

24    regarding paragraph 19 that Social Security

25    Administration plays no role in step 2, is that

1    correct?

2         MR. DUERK:  Objection, form.  Go ahead.

3  A  I said that, yes.

4  Q  And I think you testified that what's incorrect

5    about this is that it's the Social Security

6    Administration personnel who fill out step 1,

7    correct?

8  A  I said that they complete step 1, and then step 2

9    and step 3 are completed by CARD following section

10    1881A of the act.

11  Q  Who did you talk to to find out that SSA employees

12    fill out step 1?

13  A  That's in policy.  It's HI 00803.050.  It's been

14    in policy since the beginning.

15  Q  And does that mean it's what actually happens?

16  A  Yes.

17  Q  So it's your testimony that EHH checklists are

18    provided from SSA to CARD after step 1 is filled

19    out?

20  A  To the best of my knowledge, this is how we are

21    supposed to be filing these claims, and this is

22    how Terra Whiteman said that these claims are

23    being processed.  She confirmed that.

24  Q  Okay.  So it's your testimony that Terra Whiteman

25    told you that CARD employees do not fill out

1    step 1 of the EHH checklist, correct?

2  A  Correct.

3  Q  And is it Terra Whiteman's testimony that CARD's

4    employees do not fill out SSA-827, the medical

5    release forms and send that to -- and have the

6    patients sign and send that to SSA?

7  A  Correct.

8  Q  And the only basis of your knowledge is what

9    Terra Whiteman told you?

10  A  Correct.  And she was the district manager during

11    that period of time, so she would know.  She sees

12    these EHH checklists and she knows how her

13    technicians process these claims.

14  Q  Okay.  But you have no personal knowledge, right?

15  A  I have no personal knowledge because I am not

16    within that office, but I am taking the district

17    manager's word at it from what she provided me.

18  Q  Okay.  And then that's your same testimony for

19    paragraph 19, paragraph 20, paragraph 21 and

20    paragraph 22, correct, regarding step 1?

21  A  I believe so.  I believe it involved the same

22    thing where we fill out step 1.  Step 2 and step 3

23    are completed by the physician following section

24    1881A of the act.

25  Q  Right.  And it's the physician's job to follow

1    section 1881A of the act?

2  A  Correct.  Yes.

3  Q  And it's not your job to second-guess them?

4  A  Uh-huh.

5  Q  So regarding paragraph 26, so why does CARD fill

6    out the EHH checklist?

7  A  Why do they fill out section 2 and 3?  Is that

8    what you're asking?

9  Q  No.  I just said the EHH checklist.

10  A  Because that's what they have to do when they are

11    following section 1881A of the act.  We are not

12    medical experts.  We don't diagnose patients with

13    diseases.  We are not doctors.  We are not

14    certified.  We haven't gone to school for that.

15    We are simply claims technicians processing

16    claims.

17  Q  So how do Social Security Administration employees

18    look for asbestos-related disease or conditions in

19    step 2?

20  A  How do we look for them?  We look -- if you go to

21    the checklist, again, section 2, we are making

22    sure that there is a listed impairment or two and

23    there is a date of diagnosis and step 3 is

24    completed, and then there is a printed name of a

25    physician with the physician's signature and date.

**Exhibit 1-37**

**Page 145**

1   We are assuming the physician followed that
2   section of the act.
3 Q   And what's the difference between a clinical
4   diagnosis and a diagnosis for purpose of the EHH
5   checklist?
6         MR. KAKUK:  Objection, scope.
7         MR. DUERK:  Foundation.  Go ahead.
8 A   To be honest with you, that is not within policy
9   and that's outside of the realm of my expertise.
10   I couldn't answer that for you.  I think that's
11   more of a medical position, and I can't answer
12   that.
13 Q   Is it fair to say that SSA has no position?
14 A   I would say that we don't get involved with that.
15 Q   Okay.
16 A   No.
17 Q   And I think your testimony for paragraph 28 is
18   again that's something where SSA doesn't get
19   involved with, correct?
20 A   Correct.
21 Q   And I think for paragraph 29 you agreed that
22   step 2 is completed by the healthcare provider who
23   will identify the asbestos-related conditions and
24   the date of diagnosis, correct?
25 A   Correct.

**Page 146**

1 Q   That's not SSA's job?
2 A   That is not SSA's job.  We are not medical
3   experts.
4 Q   So it's not SSA's job to determine whether someone
5   could be diagnosed by an interpretation of a
6   computed tomographic radiograph of the chest by a
7   qualified physician, right?
8 A   SSA's job is to make sure this form is completed,
9   and it is stating that this person is diagnosed
10   with one of these listed conditions with the date
11   of diagnosis and has been signed off by a
12   physician that has been following section 1881A of
13   the act.
14 Q   I am going to draw your attention to Exhibit 123
15   which is tab 7 in your book.
16 A   Okay.
17 Q   Did the patient in Exhibit 123 have a diagnosis
18   under section 1881A of the act?
19         MR. KAKUK:  Objection, scope.
20 A   This is just a letter from CARD stating that -- I
21   mean, this is the first time I am seeing this
22   letter, and it's saying, "You participated in an
23   asbestos health screening on 12-11-14, and at that
24   time you were not diagnosed with an
25   asbestos-related disease."

**Page 147**

1         I don't believe they would be following
2   section 1881A of the act.  I can't speak on this
3   form and what they complete on the checklist.  We
4   are assuming they are following the guidelines of
5   section 1881A of the act.
6 Q   So is it your job to interpret section 1881A of
7   the act or is it the physician's job to interpret?
8 A   That is the physician's job.  If he completes that
9   checklist and he states that they are diagnosed
10   with that condition, we are assuming he followed
11   the guidelines, he or she or they followed the
12   guidelines of the act.
13 Q   Again, you defer to his determination, correct?
14 A   Yes, we defer to their determination, yes.
15 Q   So when were you first made aware of this lawsuit?
16 A   I think when we got the subpoena.  I can't be too
17   sure.  I don't remember.
18 Q   Was it several years ago or was it last year or
19   was it a couple months ago?
20 A   A couple months ago, this year.
21 Q   So you were never made aware of any requests from
22   any of the parties for information in this case?
23 A   They wouldn't send those directly to me.  They
24   would send those to the appropriate parties if
25   there was a disclosure request.

**Page 148**

1 Q   And you being the --
2 A   Medicare lead.
3 Q   The medicare lead would not -- you would not be an
4   important person to inform about requests for
5   information for Medicare information?
6 A   I believe they were trying to get information from
7   about 2010 to whenever.  That would not be a time
8   period I was a Medicare lead.  I wouldn't be the
9   appropriate party to obtain that information from.
10 Q   And when did you become the Medicare lead?
11 A   2018.
12 Q   And it's the Social Security Administration's
13   position that no information post 2018 was asked
14   for?
15         MR. KAKUK:  Objection, scope.
16 A   I would not know.  I was not asked to supply any
17   documentation to my knowledge.
18 Q   Has the Social Security Administration been aware
19   that CARD has filled out EHH forms for individuals
20   based only on outside reader interpretations since
21   2010?
22 A   The first knowledge that we had of them completing
23   an EHH checklist where they said that they -- they
24   stated that the person -- the physician didn't
25   feel that person was diagnosed with that condition

**Exhibit 1-38**

Page 149

1    was in spring 2023.  That is the first time that
2    we are hearing about this.
3  Q  I am going to hand you Exhibit 83.
4  A  Okay.
5  Q  Take a look at that.
6  A  Do you want me to read it?
7  Q  Do you recognize what that document is?
8  A  That is an e-mail from a Kalispell employee,
9    Sonya Peterson or Sonya Hymas who is a claims
10   technical expert to one of the CARD center
11   employees, I am assuming, and she said if the
12   claimant has been diagnosed with one of the
13   impairments on that list, they qualify, so to us
14   either they are diagnosed or they are not.
15 Q  Okay.  So let's start at the bottom where the
16   e-mail train starts.
17 A  Okay.
18 Q  And so describe what's happening in this e-mail.
19 A  She contacted them, and she said this guy called
20   and said he has not been diagnosed with an
21   asbestos-related condition, but said you told him
22   to call us.
23 Q  Okay.  And that's Sonya's e-mail to CARD, correct?
24 A  Correct.  And then CARD wrote back.
25       "Hi Sonya.  TT is not diagnosed, but has

Page 150

1    received a positive outside read making him
2    eligible for the EHH designation.  It is always
3    difficult for me explaining to a patient that they
4    are not diagnosed, but then need to call you guys
5    to receive the benefits.  In the future, should
6    patients with positive outside reads just state
7    that they have positive outside read or just state
8    they are diagnosed?  Sorry about the confusion."
9       And Sonya followed policy and stated, "If
10   the claimant has been diagnosed with one of the
11   impairments on that list, they qualify."
12      So to us, they are diagnosed or they
13   are not, and that is inside the scope of
14   HI 00803.050.  She is not going into specifics
15   about a B read or any of that, because that's not
16   her job.
17 Q  Right.
18 A  Right.
19 Q  So it's CARD's job to make that determination?
20 A  Correct.
21 Q  All right.  And it's SSA's job to defer to CARD?
22 A  It's SSA's job to make sure that whoever is
23   completing that EHH checklist is following the
24   guidelines of section 1881A of the act.  If this
25   is completed, we are assuming they are following

Page 151

1    that.
2  Q  Correct.  Does SSA have any opinion on what the
3    difference between a clinical diagnosis of
4    asbestosis, pleural thickening or pleural plaques
5    by a CARD physician?
6       MR. KAKUK:  Objection, scope.
7  Q  Compared to a positive interpretation of
8    asbestosis, pleural thickening or pleural plaques
9    on a CT by a qualified physician for purposes of
10   the EHH checklist?
11      MR. DUERK:  Sorry.  Objection, form.
12      MR. KAKUK:  And scope.
13 A  Again, that's outside of my purview, and I have to
14   say I don't have an opinion because I am not a
15   medical expert.
16 Q  Why don't we go off the record for a little bit.
17   I am going to do a quick review, and then probably
18   about five minutes.
19 A  Okay.
20      THE VIDEOGRAPHER:  The time is 4:00.  We
21   are off the record.
22      (Break taken.)
23      THE VIDEOGRAPHER:  The time is 4:07.  We
24   are back on the record.
25 BY MR. BECHTOLD:

Page 152

1  Q  Ms. Hillmann, as I understand your testimony, you
2    have no personal knowledge of communications
3    between CARD staff and SSA staff at the Kalispell
4    level, correct?
5  A  I do have knowledge of the spring 2023
6    correspondence between the CARD staff and
7    Terra Whiteman, but prior to that, no.
8  Q  Okay.  And again you have no personal knowledge of
9    how CARD staff and SSA staff in Kalispell handled
10   EHH forms, correct?
11 A  I do know that our SSA staff follows that
12   HI 00803.050 based on Terra Whiteman's response
13   who is the district manager.
14 Q  Okay.  And if it turns out that CARD staff are the
15   one who actually are filling out step 1, does that
16   make those EHH checklists invalid?
17 A  I wouldn't assume they would be invalid as long as
18   they are completing step 2 and step 3.  It's just
19   that we should be following the proper
20   instructions within the policy where we initiate
21   that on our side.
22 Q  But it doesn't invalidate those EHH checklists?
23 A  Uh-uh.
24      MR. KAKUK:  That was a no?
25 A  That was a no.

**Exhibit 1-39**

Page 153

1   BY MR. BECHTOLD:
2   Q   So I would like to draw your attention to
3       Exhibit 136 which is your declaration that you
4       submitted earlier in this case.
5   A   Okay.
6   Q   In paragraph 1 you state that you searched SSA's
7       electronic records which included archived
8       policies and information stored on the agency's
9       drive?
10  A   Correct.
11  Q   Did that include e-mail communications?
12  A   It would not necessarily mean e-mail
13      communications.  It's our T-drive where we store
14      any type of Libby correspondence that Kathy kept,
15      the previous Medicare lead.
16  Q   So did it include e-mail correspondence or not?
17  A   There was e-mail correspondence between Kathy and
18      then headquarter components about training our
19      field offices.
20  Q   But as far as you know, there was no e-mail
21      communications between SSA staff and CARD staff?
22  A   Correct.
23  Q   And then you stated you further consulted with
24      current agency personnel who may have been
25      involved in CARD's interaction during this period,

Page 154

1       and is that Mary Lisa Lewandowski and
2       Terra Whiteman?
3   A   Correct.
4   Q   Anyone else?
5   A   I also contacted a couple other technicians that
6       went out there to provide the training.  That
7       would be Kelly Hansen.  She is currently a
8       supervisor within our regional office, and also
9       Chris DiGiacomo was another technician that went
10      out there to provide training to the social
11      security technician, and he is also a manager as
12      well.
13  Q   Did you contact Nancy Berrihill at that time?
14  A   No, I did not.
15  Q   And she was in Libby at that time, correct?
16  A   She did come for one -- I believe one training.
17      It might have been two.
18  Q   And she still works for SSA, right?
19  A   Correct.
20  Q   How come you didn't talk to her?
21  A   Because I went directly through our regional
22      commissioner who would have a little bit more
23      information, and if she needed to reach out to
24      Nancy, she would.
25  Q   In paragraph three you state that in the 2010 to

Page 155

1       2011 timeframe regional office personnel
2       interacted with employees from CARD because CARD
3       prepared the EHH Medicare claims for submission to
4       SSA.
5           What was the nature of the interaction?
6   A   I believe they were just doing Medicare EHH
7       outreach, so they were outreaching to the
8       community to find individuals affected, and I
9       think that they had with them is about the
10      Medicare outreach, and if they had questions
11      about, you know, if they were missing forms or
12      what have you regarding the claims process.
13  Q   So as I understand it, Medicare eligibility based
14      on the EHH checklists is something that the SSA
15      technicians in Libby were processing at that time?
16      MR. KAKUK:  Objection, scope.
17  A   Yeah.  Can you reread that question?  I guess I
18      didn't understand it fully.
19  Q   So the Medicare technicians -- excuse me.  The SSA
20      technicians were processing Medicare claims based
21      upon the EHH checklists in Libby?
22  A   They were basing it following the instructions in
23      HI 00803.50.
24  Q   And the EHH checklist is a SSA created document,

Page 156

1       correct?
2   A   Correct.
3   Q   And SSA gave that document to CARD without any
4       directions, correct?
5   A   To my knowledge, yes.  But CARD has been
6       instructed to continue to follow the section 1881A
7       of the act.
8   Q   Okay.  Who instructed CARD to follow section 1881A
9       of the act?
10  A   I would not know.  I mean, I am assuming that that
11      was some type of correspondence at some time.  I
12      don't know they would just complete a checklist
13      without knowing they have to follow the guidelines
14      of the act.  I am sure there is correspondence in
15      there somewhere.
16  Q   Okay.  So you are sure that there is
17      correspondence from SSA to CARD telling them to
18      follow section 1881A of the act?
19  A   Well, I don't know if it's directly from SSA.  I
20      mean, I am just assuming that it's probably
21      underneath their grant guidelines for them to
22      perform, you know, those type of reviews within
23      their clinic.
24  Q   Okay.  So you don't know?
25  A   I don't know.  I do know that they do get grants

**Exhibit 1-40**

Page 157

| | |
|---|---|
| 1 | and they base them off of certain things, so I |
| 2 | can't speak to that. That's outside of my |
| 3 | purview. ___ |
| 4 Q | Okay. But as far as you know, there was never |
| 5 | anything from SSA to CARD telling them how to fill |
| 6 | out the EHH checklist? |
| 7 A | Correct. |
| 8 Q | And as far as you know, there was never any |
| 9 | informal communication of any type between CARD |
| 10 | staff and SSA staff about how to fill out these |
| 11 | EHH checklists, correct? |
| 12 A | Correct. |
| 13 Q | And you base that upon your communications with |
| 14 | Mary Lisa Lewandowski and Terra Whiteman? |
| 15 A | Correct, and the headquarters components. |
| 16 Q | What are the headquarters components again? |
| 17 A | The office of information security programs and |
| 18 | then the office of program support. I'm going to |
| 19 | mess -- It's OPSOS. It is office of program |
| 20 | support. I can't think of the last two of that |
| 21 | acronym, but those are two headquarters components |
| 22 | that have trained and actually initiated this |
| 23 | policy when it originally came out. |
| 24 Q | So once the SSA employees process an environmental |
| 25 | health hazards checklist, what happens next? |

Page 158

| | |
|---|---|
| 1 A | Once they process it? Well, again, the |
| 2 | instructions in HI 00803.50 if they follow that |
| 3 | and the EHH checklist is complete there is a |
| 4 | diagnosis checked, there is a date of diagnosis, |
| 5 | section 3 is completed, printed name of the |
| 6 | physician, physician signature and date. We are |
| 7 | assuming that physician followed section 1881A of |
| 8 | the act, and we process the claim. |
| 9 Q | So what does it mean to process the claim? |
| 10 A | We allow them for EHH Medicare. |
| 11 Q | When you say allow, what does that mean? |
| 12 A | We process an allowance to entitle them to |
| 13 | Medicare under the environmental health hazards |
| 14 | provisions. |
| 15 Q | So what do the SSA employees do to make that |
| 16 | happen? |
| 17 A | They take a claim within our system and they code |
| 18 | it appropriately and then they process it, and it |
| 19 | sets up the record and it sends a Medicare card. |
| 20 Q | Okay. So SSA processes it and inputs it into the |
| 21 | system and the system -- they have been approved |
| 22 | and the system then gives them Medicare benefits? |
| 23 A | Correct. |
| 24 Q | Okay. I have nothing further. Thank you. |
| 25 A | Uh-huh. |

Page 159

| | |
|---|---|
| 1 Q | Oh, I do have something further. I want to hand |
| 2 | you what was an attachment to Exhibit 139. |
| 3 A | Okay. |
| 4 Q | Have you seen this document before? |
| 5 A | I have not. |
| 6 Q | If you look at Exhibit 139, you see on page 1 of |
| 7 | 139 at the bottom where there is an e-mail from |
| 8 | Tracy McNew to Terra Whiteman. |
| 9 A | Uh-huh. I received this e-mail, but I did not |
| 10 | receive this attachment, so this is the first time |
| 11 | I am seeing it. |
| 12 Q | Okay. So your testimony is that Terra Whiteman |
| 13 | forwarded you the e-mail but did not forward you |
| 14 | the attachment to the e-mail? |
| 15 A | Correct. |
| 16 Q | Okay. That's all the questions. |
| 17 | EXAMINATION |
| 18 BY MR. DUERK: |
| 19 Q | I have just a few follow-ups. |
| 20 A | Okay. |
| 21 Q | Mr. Bechtold asked you whether or not CARD had |
| 22 | been informed by SSA about how to fill out EHH |
| 23 | checklists. |
| 24 | Do you remember that question? |
| 25 A | Yes. |

Page 160

| | |
|---|---|
| 1 Q | Okay. Regardless of whether you can point to any |
| 2 | communication between SSA and CARD today on that |
| 3 | topic, based on what information you have reviewed |
| 4 | in your factual inquiry, are resources readily |
| 5 | available to the public about how to fill out EHH |
| 6 | checklists in terms of the POMS, section 1881A of |
| 7 | the Affordable Care Act itself, and the emergency |
| 8 | policy 10042REV that you referenced earlier? |
| 9 A | Those are public-facing policies. That means the |
| 10 | public can obtain those, yes. |
| 11 Q | And did each of those sources of information that |
| 12 | are publicly-available provide clear direction in |
| 13 | terms of the requirements of a CARD patient or any |
| 14 | patient in order to obtain Medicare benefits? |
| 15 | MR. KAKUK: Objection, scope. |
| 16 | MR. BECHTOLD: Form. |
| 17 A | Yes, for EHH Medicare, yes. Correct. |
| 18 Q | And are you aware of that just based on your own |
| 19 | personal knowledge having seen those documents? |
| 20 A | Uh-huh. |
| 21 Q | Is that a yes? |
| 22 A | That's a yes. |
| 23 Q | Okay. Now, Ms. Hillmann, you may or may not be |
| 24 | aware of this, but are you aware that even CARD's |
| 25 | website itself says you need a diagnosis of |

**Exhibit 1-41**

1    asbestos-related disease in order to get Medicare?
2  A   No, I was not aware of that.
3  Q   All right.   In terms of questions that
4    Mr. Bechtold asked you about any type of training
5    that might have been provided or wasn't provided
6    to CARD from any of these different SSA employees,
7    I believe Mary Lisa Lewandowski is somebody that
8    you spoke to about this issue of training, is that
9    right?
10 A   Correct.
11 Q   Did you speak with Terra Whiteman or Whiteman
12   about the issue of training also?
13 A   Yes.
14 Q   There was some other names that you mentioned
15   among SSA staff related to this topic of CARD and
16   whether or not any SSA training occurred.
17       Do you remember any of the other names of
18   individuals?
19 A   The regional office employees that train the SSA
20   staff in Kalispell, that would be Kelly Hansen.
21 Q   Okay.
22 A   And then Chris DiGiacomo, and I believe I said
23   Nancy Berrihill as well.  I did speak with
24   Kelly Hansen and I did speak with Chris DiGiacomo,
25   and they also verified that they never gave CARD

1    any training as well.
2  Q   In terms of all of the interviews conducted and
3    all of the written material you received, did
4    every source of information point to the same
5    response that SSA did not train CARD how to fill
6    out these EHH forms at the CARD clinic at any
7    time?
8  A   Correct.
9  Q   Okay.  Now, I want to entertain a hypothetical
10   here.  The hypothetical that I want to entertain
11   is if somehow someone like Sonya Hymas,
12   Sonya Peterson, if an SSA field office employee
13   had provided training to CARD about how to fill
14   out an EHH form, if that had occurred, would that
15   training have been based on what those SSA field
16   agents had been instructed according to the POMS?
17 A   I can't speak to the -- I don't know what they
18   would train them on.  Honestly, they would just
19   train them on this section has to be completed,
20   this section has to be completed, because we are
21   not medical experts, so I don't believe training
22   would be beneficial for CARD, because we are not
23   medical experts and we can't speak to the section
24   1881A of the act because we're not trained on it.
25 Q   All right.

1  A   Yeah.
2  Q   And in terms of where those field employees would
3    have gotten information about how to fill out an
4    EHH form, is it fair to assume that would have
5    been from the POMS?
6  A   It would have been directly from POMS.
7  Q   Right.
8  A   Yeah.
9  Q   Nothing in the POMS mentions that patients are
10   eligible for Medicare on a B read alone, correct?
11       MR. KAKUK:  Objection, scope.
12       MR. BECHTOLD:  Form.
13 A   Correct.
14 BY MR. DUERK:
15 Q   All right.  Nothing in the POMS, none of the
16   language in the POMS that you have read states
17   that it's acceptable to submit a patient for
18   Medicare without a diagnosis of asbestos-related
19   disease, correct?
20       MR. KAKUK:  The same objection.
21       MR. BECHTOLD:  Form.
22 A   Correct.
23 BY MR. DUERK:
24 Q   And I am basing that on language you yourself have
25   read in the POMS, fair?

1  A   Yes.
2  Q   Okay.  Mr. Bechtold asked you if you had any
3    personal knowledge of the communication between
4    CARD and SSA.  I believe you said you didn't have
5    any personal knowledge of that communication, but
6    during your factual inquiry related to that topic
7    did you review a certain amount of communication
8    between CARD and the Social Security
9    Administration?
10 A   I can only speak to what I received in the spring.
11   That's the only correspondence that I have seen
12   between social security and CARD.
13 Q   Okay.
14 A   Yeah.
15 Q   And in terms of any discussions with any of the
16   members of the Social Security Administration that
17   we have mentioned today, did you ask specific
18   questions of them about whether there was any
19   communication they were aware of between CARD and
20   the SSA related to the issues of training or
21   notice or any of these other issues that we have
22   discussed today?
23 A   I did reach out to Terra Whiteman on the majority
24   of the questions except for the one about the
25   award, and then I did ask Kelly Hansen and

**Exhibit 1-42**

Page 165

1   Chris DiGiacomo if -- again, I am just going to
2   reiterate what I said in my previous statement.
3   Did we give any additional, do you know if we gave
4   any additional training to the CARD employees, and
5   they all stated that we hadn't to their knowledge.
6   Q   And Terra Whiteman was based in -- where is
7   Terra Whiteman based now?
8   A   Kalispell.
9   Q   And how long has Terra Whiteman been based in
10   Kalispell?
11   A   Oh, goodness.  I would say -- I would have to
12   actually ask her, but she has been there for quite
13   some time.
14   Q   Okay.
15   A   Yeah.  Most of her tenure has been in that office.
16   Q   Mr. Bechtold had you look at two exhibits,
17   Exhibit 85, an e-mail between Sonya and Mary Karen
18   Caraway.
19       Do you have that in front of you?
20   A   If I can find it.  Let me see.  Give me one
21   second.
22   Q   Why don't we take a five-minute break and we will
23   organize the documents and then get back on the
24   record.
25   A   Okay.

Page 166

1       THE VIDEOGRAPHER:  The time is 4:27.  We
2   are off the record.
3       (Break taken.)
4       THE VIDEOGRAPHER:  The time is 4:30.  We
5   are back on the record.
6   BY MR. DUERK:
7   Q   All right.  After a short break, Ms. Hillmann, do
8   you have Exhibit 85 in front of you?
9   A   I do.
10   Q   Mr. Bechtold referenced this e-mail during your
11   cross-examination.  This is about a patient with
12   some questions from SSA as to whether or not the
13   patient has been diagnosed.
14       Is that a fair representation?
15   A   Yes.
16   Q   Okay.  On page 2 does the e-mail from CARD
17   indicate that this patient has a B read diagnosis?
18   A   To me, I would read it that way, but I am not a
19   medical expert.  I would assume DX means
20   diagnosis.
21   Q   Okay.
22   A   Yeah.
23   Q   And so if that interpretation is correct, is CARD
24   saying this patient has a B read diagnosis, but I
25   need to check on some other information?

Page 167

1   A   Correct.
2   Q   Okay.  So if the CARD clinic represents to the
3   Social Security Administration that a patient has
4   a diagnosis, in SSA's view that patient is
5   Medicare eligible, fair?
6   A   If the CARD clinic presents us with that checklist
7   with one of the diagnoses that are listed with the
8   date of diagnosis and completes 2 and 3, then yes.
9   Q   All right.
10   A   Yeah.
11   Q   Nowhere in this e-mail train does it say that this
12   patient does not have a diagnosis, correct, except
13   in the first e-mail that kicks this all off?
14       The subsequent pages don't say anywhere
15   affirmatively this patient is not sick, fair?
16   A   To the best of my knowledge, yes.
17   Q   Okay.  Nowhere in this e-mail does CARD tell the
18   SSA that they are submitting patients for Medicare
19   benefits without a diagnosis as a routine
20   practice, correct?
21   A   Correct.
22   Q   Okay.  In terms of policy, if a patient has been
23   diagnosed by CARD with one of the impairments of
24   asbestos-related disease due to asbestos exposure,
25   they qualify for Medicare?

Page 168

1   A   Yes.  If it's one of the ones listed within the
2   checklist and they complete that checklist
3   following section 1881A of the act, yes.
4   Q   All right.  So in terms of Exhibit 83 that
5   Mr. Bechtold showed you, an e-mail from Sonya --
6   between Sonya Peterson and Stephanie Moore,
7   Ms. Peterson says, "If a claimant has been
8   diagnosed with one of the impairments on that
9   list, they qualify, so to us, either they are
10   diagnosed or they aren't."
11       Did I read that correctly?
12   A   Correct.
13   Q   And so basically, Ms. Hillmann, if a patient has
14   been diagnosed they are eligible for Medicare, and
15   if they have not been diagnosed, they aren't
16   eligible for Medicare?
17       MR. KAKUK:  Objection, scope.
18   A   Correct.
19   BY MR. DUERK:
20   Q   Okay.  Is that a fair interpretation in your mind?
21   A   Yes.
22   Q   Ms. Hillmann, I have no further questions, and I
23   appreciate your time here today.  Thank you.
24   A   Thank you.
25       MR. BECHTOLD:  I am going to do a brief

**Exhibit 1-43**

Page 169

```
 1        re-cross.
 2               MR. DUERK:  I will object, but go ahead.
 3                _____EXAMINATION
 4   BY MR. BECHTOLD:
 5   Q    If the judge kicks it, he'll kick it.
 6               So you testified that there is nothing in
 7        the POMS that qualifies an individual for Medicare
 8        eligibility based on a B reading alone, correct?
 9               Do you remember that testimony you just
10        gave?
11   A    Did I just give that testimony?
12               MR. KAKUK:  The same objection.
13               MR. DUERK:  Objection, form.  Misstates
14        the testimony.  Go ahead.
15   A    I think the testimony that I gave was what's in
16        HI 00803.50 and it's our instruction to our
17        technicians.  It states if that checklist is
18        completed, you know, section 1, section 2,
19        section 3, we are assuming that the physician
20        followed section 1881A of the act and provided an
21        appropriate diagnosis based on their
22        interpretation of that act.
23               MR. BECHTOLD:  Annie, can you scroll
24        back for me to her testimony about nothing in
25        POMS?
```

Page 170

```
 1               THE COURT REPORTER:  In this answer
 2        right now?
 3               MR. BECHTOLD:  No.
 4               THE COURT REPORTER:  Previous?
 5               MR. BECHTOLD:  Previous.
 6               THE COURT REPORTER:  How far previous
 7        and during whose examination?
 8               MR. BECHTOLD:  During the beginning of
 9        Mr. Duerk's examination.
10               MR. KAKUK:  Of his cross, right, of his
11        re-direct?
12               MR. BECHTOLD:  Of his re-direct.
13               MR. KAKUK:  Yeah.
14               THE COURT REPORTER:  Well, let me go to
15        it.  One moment.
16               (Discussion off steno record.)
17               (Testimony read back as follows:)
18               Question:  Nothing in the POMS mentions
19        that patients are eligible for Medicare on a
20        B read alone, correct?
21               Answer:  Correct.
22   A    I agree with that.
23   BY MR. BECHTOLD:
24   Q    Okay.  So nothing in POMS says that a person is
25        eligible based on a B reading alone?
```

Page 171

```
 1   A    Correct.
 2               MR. KAKUK:  Objection, scope.
 3   BY MR. BECHTOLD:
 4   Q    So would you agree that Exhibit 75, the POMS, and
 5        also Exhibit 142, right?  140?
 6               MR. DUERK:  75 and 140 are the same.
 7   BY MR. BECHTOLD:
 8   Q    Yeah.  75 and 140 both indicate that an ARD
 9        diagnosis established by a diagnostic method
10        specified in the law, so for example, if we looked
11        on Exhibit 75 and the examples 1, 2 and 3 where
12        they state Mr. Brown received an ARD diagnosis
13        established by a diagnostic method specified in
14        the law or Mr. James received an ARD diagnosis
15        established by a diagnostic method specified in
16        the law or Ms. Jackson received an ARD diagnosis
17        established by a diagnostic method specified in
18        the law, so is SSA's interpretation of section
19        1881A is that a B reading alone is not a
20        diagnostic diagnosis established by a diagnostic
21        method as specified in the law?
22               MR. KAKUK:  Objection, scope.
23               MR. DUERK:  Objection, form, compound
24        and foundation.  Go ahead.
25   A    Can you read that back to me?  I'm sorry.
```

Page 172

```
 1               (Read back.)
 2   A    I meant his question.  I'm sorry.
 3               THE COURT REPORTER:  Isn't that the
 4        question?
 5   A    Was it the same question?
 6               THE COURT REPORTER:  That's the
 7        question.
 8   A    Because that doesn't sound the same because you
 9        asked me --
10   Q    Go ahead.  Finish the question.
11   A    I'm sorry.
12               THE COURT REPORTER:  That's okay.
13               (Read back.)
14               MR. DUERK:  The same objections.
15   A    Again, I can't speak to that.  That's outside of
16        my purview.  I am not a medical expert that
17        interprets section 1881A of the act.
18               I was asked if that language was within
19        this policy section that's given to our
20        technicians and I said -- he asked me you would
21        say that this language was not within this policy,
22        and I agreed and I said correct.
23   Q    Okay.  So your testimony is that the specific
24        words "B reading alone" is not found in POMS?
25   A    It's not found in policy, within this policy that
```

**Exhibit 1-44**

Page 173

1    he asked me about.

2  Q   And your testimony isn't meant to have any

3      implication about Medicare eligibility based upon

4      section 1881A?

5          MR. DUERK:  Objection, form.

6  A   I would have to agree with that because, again,

7      that's outside of my purview and I can't speak to

8      section 1881A of the act.

9  Q   Okay.  Those are all the questions I have.

10         MR. DUERK:  Thank you for your time.

11     Thanks for being here.

12         THE WITNESS:  Yeah.  Thanks.

13         THE VIDEOGRAPHER:  Okay.  That concludes

14     today's proceedings.  The time is 4:41 and we

15     are off the record.

16         THE COURT REPORTER:  Thank you.

17     Mr. Duerk, would you like to purchase the

18     transcript?

19         MR. DUERK:  Yes, please.

20         THE COURT REPORTER:  And Mr. Bechtold,

21     would you like to purchase?

22         MR. BECHTOLD:  Yes.

23         THE COURT REPORTER:  Okay.

24         MR. KAKUK:  We would like one as well.

25         (Deposition concluded at 4:41 PM.)

Page 174

1          I, HEATHER HILLMANN, do hereby certify

2      that I have read the foregoing transcript and

3      that the same and accompanying amendment sheets,

4      if any, constitute a true and complete record of

5      my testimony.

6

7

8

                     _____

9                    Signature of Deponent

10                   (  ) No amendments

                     (  ) Amendments attached

11

12         Acknowledged before me this _____ day of

13     _____ 2023.

14

15     Notary Public: _____

16     My Commission Expires _____

17     Seal:

18

19

20

21

22

23

24

25

Page 175

1  STATE OF COLORADO)

2                   ) ss.      REPORTER'S CERTIFICATE

3  COUNTY OF DENVER )

4

5          I, Annie Sager, certify that I am a

6      Court Reporter and Notary Public within the

7      State of Colorado; that previous to the

8      commencement of the examination, the deponent

9      was duly sworn to testify to the truth.

10         I further certify that this deposition

11     was taken in shorthand by me at the time and

12     place herein set forth and was thereafter

13     reduced to typewritten form, and that the

14     foregoing constitutes a true and correct

15     transcript.

16         I further certify that I am not related

17     to, employed by, nor of counsel for any of the

18     parties or attorneys herein, nor otherwise

19     interested in the result of the within action.

20         In witness whereof, I have affixed my

21     signature this 30th day of May, 2023.

22     My commission expires June 25, 2023.

23

24     *A Sager*

       Annie Sager

25     216 Sixteenth Street, Suite 600

       Denver, Colorado 80202

Page 176

1  AB LITIGATION SERVICES

2  216 Sixteenth Street, Suite 600

   Denver, Colorado 80202

3

   May 30, 2023

4

5  Michael Kakuk, Assistant U.S. Attorney

   U.S. Department of Justice

6  United States Attorney's Office

   901 Front Street, Suite 1100

7  Helena, Montana 59626

8  Re:  Deposition of Heather Hillmann

9       BNSF vs. CARD

        Case No. CV-19-40-M-DLC

10

   The aforementioned deposition is ready for reading and

11 signing.  Please attend to this matter by following BOTH of

   the items indicated below:

12

_____ Call 303-296-0017 and arrange with

13        us to read and sign the deposition in our

          office

14

_XXX_ Have the deponent read your copy and sign the

15        signature page and amendment sheets, if

          applicable; the signature page is attached

16

_____ Read the enclosed copy of the deposition and

17        sign the signature page and amendment sheets,

          if applicable; the signature page is attached

18

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

19

_____ By _____ due to a trial date of _____

20

21 Please be sure the original signature page and amendment

   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and

22 returned to AB Litigation Services for filing with the

   original deposition.  A copy of these changes should also be

23 forwarded to counsel of record.  Thank you.

24 AB LITIGATION SERVICES

25 cc:  All Counsel

**Exhibit 1-45**

**Max Baucus**

**Vol. 1**

**07/19/2022**

**Fisher Court Reporting**

**Exhibit 2-1**

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF MONTANA
 3
 4   BNSF RAILWAY COMPANY, on behalf of
 5   THE UNITED STATES OF AMERICA,
 6
 7            Plaintiff,
 8
 9   vs.                  Cause No. CV-19-40-M-DLC
10
11   THE CENTER FOR ASBESTOS RELATED
12   DISEASE, INC.,
13
14            Defendant.
15   _____
16       VIDEO DEPOSITION UPON ORAL EXAMINATION OF
17                 SENATOR MAX BAUCUS
18   _____
19       BE IT REMEMBERED, that the video-taped deposition
20   upon oral examination of SENATOR MAX BAUCUS, appearing at
21   the instance of the Defendant, was taken at the offices of
22   Fisher Court Reporting, 442 E. Mendenhall, Bozeman,
23   Montana, on July 19, 2022, beginning at 10:00 a.m.,
24   pursuant to Montana Rules of Civil Procedure, before Robyn
25   Ori English, Court Reporter - Notary Public.
```

Page 2

```
 1            APPEARANCES OF COUNSEL
 2
 3       ATTORNEY APPEARING ON BEHALF OF THE
 4       PLAINTIFF:
 5
 6            W. ADAM DUERK
 7            Knight Nicastro Mackay, LLC
 8            283 West Front Street, Suite 203
 9            Missoula, MT  59802
10            duerk@knightnicastro.com
11
12       ATTORNEY APPEARING ON BEHALF OF THE
13       DEFENDANT:
14
15            TIMOTHY BECHTOLD
16            Bechtold Law Firm, PLLC
17            P.O. Box 7051
18            Missoula, MT  59807
19            tim@bechtoldlaw.net
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2
 3
 4   EXAMINATION OF SENATOR MAX BAUCUS BY:         PAGE:
 5
 6       Mr. Adam Duerk, Esq......................... 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                    E X H I B I T S
 2
 3   DEPOSITION EXHIBITS:                          PAGE:
 4
 5   Previously marked as Exhibits 1 through 5.  Re-marked as
 6   follows:
 7
 8   Exhibit 108  Declaration of Senator Max .... 7
 9                Baucus
10   Exhibit 109  CARD's Statement of Disputed .. 15
11                Facts
12   Exhibit 110  Congressional Record - ........ 29
13                Senate Proceedings and
14                Debates of the 111th
15                Congress, First Session,
16                Saturday, December 19, 2009
17   Exhibit 111  CARD's Expert Witness ......... 30
18                Disclosure
19   Exhibit 112  Congressional Record - ........ 32
20                Senate Proceedings and
21                Debates of the 111th
22                Congress, First Session -
23                Monday, December 21, 2009
24
25
```

**Exhibit 2-2**

Page 5

1    VIDEO OPERATOR:  This is the video-recorded and
2    video-conferenced deposition of Max Baucus, taken in the
3    United States District Court for the District of Montana,
4    Cause No. CV-19-40-M-DLC, BNSF Railway Company versus The
5    Center for Asbestos Related Disease, Inc.
6         Today is July 19th, 2022.  The time is
7    10:15 a.m.  We are present with the witness at the offices
8    of Fisher Court Reporting, at 442 East Mendenhall Street
9    in Bozeman, Montana.  The Court Reporter is Robyn Ori
10   English, and the Video Operator is Nicole Tomac of Fisher
11   Court Reporting.  The deposition is being taken pursuant
12   to Notice.
13        I would now ask the attorneys to identify
14   themselves, who they represent and whoever else is
15   present.
16        MR. DUERK:  Adam Duerk for Relator, BNSF.
17        MR. BECHTOLD:  And Tim Bechtold for The Center for
18   Asbestos Related Diseases and with the deponent, Max
19   Baucus.
20        VIDEO OPERATOR:  The Court Reporter will now
21   administer the oath.
22
23
24
25

Page 6

1         WHEREUPON, the following proceedings were had and
2    testimony taken, to wit.
3
4              . . . . . . . . . .
5                   MAX BAUCUS,
6    called as a witness herein, having been first duly sworn,
7    was examined and testified as follows:
8
9                   EXAMINATION
10
11   BY MR. DUERK:
12        Q.   Good morning.
13        A.   Hi.
14        Q.   Would you please state your full legal
15   name for the record?
16        A.   Max Sieben Baucus.
17        Q.   I'll be referring to you as Senator
18   Baucus throughout the course of this deposition.
19        Senator Baucus, where do you currently
20   reside?
21        A.   257 Blue Roan Lane, Belgrade, Montana.
22        Q.   Sir, you've been named as a hybrid expert
23   witness in this case.  What did you review in
24   preparation for your deposition today?
25        A.   My -- my memory.

Page 7

1         Q.   Fair enough.  And Senator Baucus, there
2    was a Notice of Deposition in this matter that asked
3    for you to appear and also bring any materials in
4    your file related to this case.  And, sir, it's
5    perfectly understandable and acceptable if there is
6    no such file, but I have to cover that.
7         A.   Yeah, no, I don't have any file.
8         Q.   Okay.  In terms of the materials that you
9    reviewed in forming your expert opinions, what
10   materials in this matter did you review?
11        A.   Not much, frankly.  I went back and just
12   thought about it all and gave it a lot of thought,
13   but that's all I did.
14        Q.   All right.  Sir, I'll be going through
15   several different documents and pieces of paper
16   during the deposition today.  Before I get into any
17   of those deposition exhibits, one of those exhibits
18   will be your signed declaration in this case.  I'll
19   put in front of you what we'll mark as Exhibit 1 for
20   purposes of this deposition.
21
22        (Deposition Exhibit No. 1 was marked
23              for identification)
24
25        Q.   (By Mr. Duerk)  Do you see your

Page 8

1    declaration in front of you?
2         A.   I do.
3         Q.   If we could cover a few particulars about
4    it, in terms of that declaration, when was the first
5    time -- first of all, the signature on this
6    declaration is dated -- it appears to be
7    February 11th, 2022; is that correct?
8         A.   Yeah.
9         Q.   Sir, when did you first have any
10   communication with anyone else about this
11   declaration to the best of your memory?
12        A.   Oh, gosh, essentially when I first --
13   when the -- I saw this just a few days ago, it was
14   mailed to me, but also, frankly, the substance of it
15   was something I asked to be -- to be true in the
16   first place.  I mean, I don't -- I didn't get down
17   in the weeds in the details.
18        I knew that -- I worked very hard to
19   get -- to help generally the people of Libby,
20   Montana, because they are just put upon by the Great
21   Basin by the railroad.  And among many things that I
22   did to help the people was to assure that they could
23   get screened to determine whether they have
24   asbestos-related diseases.
25        And so I made it very clear to my office

**Exhibit 2-3**

Page 9

1   that I wanted the Affordable Care Act to include the
2   material that's in this declaration; that is, that
3   the -- under the act, the CARD clinic is qualified
4   to screen.  And it was very, very important to me
5   that that be the case.
6       Q.   And, sir, my question goes specifically
7   to the time frame involved in when you first saw
8   this declaration.  So I'd like to focus my questions
9   on that topic.
10      A.   Yeah, well, I first saw the -- the actual
11  declaration recently.
12      Q.   Okay.
13      A.   But that's not the point.  The point is
14  that it's -- it reflects what I believe.
15      Q.   Okay.  I understand that.
16           So in terms of when you first saw the
17  declaration, I'm assuming, based on your signature
18  of February 11th, 2022, you saw this at some point
19  before you signed it, correct?
20      A.   Not before.
21      Q.   Okay.  Did you, yourself, have any role
22  in generating this declaration?
23      A.   That's my intent.  That's what I
24  believed.
25      Q.   And here I'm talking about just the nuts

Page 10

1   and bolts of the document itself.
2           Sir, did you draft this declaration?
3       A.   Oh, personally, no.
4       Q.   Okay.
5       A.   But I had people working for me draft it.
6       Q.   Okay.
7       A.   Because I wanted them to convey my
8   wishes.
9       Q.   All right.  And who was involved in
10  drafting this declaration?
11      A.   I could not tell you specifically.
12      Q.   Okay.
13      A.   It's -- it's -- all I know -- I know
14  specifically is that when the ACA was before us, I
15  made it clear to my office that I wanted this -- the
16  substance of this to be included in the ACA.
17      Q.   Understood.
18           Prior to signing the declaration, do you
19  recall speaking with anyone in particular about the
20  substance?
21      A.   No, I don't.  Someone gave it to me and
22  said, "Is this accurate?"
23           And I said, "Yes, it's accurate."
24      Q.   Okay.  Do you recall who that someone
25  was?

Page 11

1       A.   I do not.
2       Q.   Okay.  Do you recall any conversations
3   with anybody about the possibility of signing this
4   declaration?
5       A.   No, I don't.  Well, I don't recall, but
6   there's no reason why I should because it's -- it's
7   accurate.  It is what I believe.  So I didn't give
8   it much thought.
9       Q.   Based on other deposition testimony, it's
10  my understanding that there was some communication
11  between the CARD clinic or those affiliated with the
12  CARD clinic and your office to ask if you would sign
13  this declaration and serve as a witness in this
14  case.
15      A.   That could be, yeah.
16      Q.   Okay.  Do you recall when those
17  conversations --
18      A.   I don't know.
19      Q.   -- occurred?  Okay.
20           When was the last time, to the best of
21  your recollection, that you had a conversation with
22  Dr. Charles Brad Black?
23      A.   He asked if I would be willing to be
24  deposed.
25      Q.   Okay.

Page 12

1       A.   And that was -- that was a month ago, two
2   months ago, something like that.
3       Q.   All right.  Prior to that discussion with
4   Dr. Black two months ago about today's deposition,
5   when was the next conversation that you had with
6   Dr. Black?
7       A.   I don't know.
8       Q.   Okay.  How long has it been -- I'm
9   assuming that you had a conversation with Dr. Black
10  earlier in time about matters unrelated to this
11  deposition?
12      A.   I've had an infinite number of
13  conversations with Dr. Black with many people in
14  Libby with many government officials.  Nothing has
15  been more important -- nothing has been more
16  important to me during my 36 years in the United
17  States Senate than finding justice for the people of
18  Libby.
19           Therefore, I've had an infinite number --
20  I've had -- I brought secretaries, cabinet
21  secretaries to Libby.  Dr. Black was probably part
22  of all of that.  That's just an example, frankly.
23  The point is that -- that -- to answer your
24  question, yes, many times Dr. Black -- I have total
25  confidence and faith in Dr. Black.  He's an

**Exhibit 2-4**

Page 13

1   excellent physician.
2       Q.   And the point of my questions and what
3   I'm trying to get at is in terms of the
4   conversations that you had with Dr. Black or anyone
5   else at CARD, what conversations, if any, about this
6   lawsuit did you have with Dr. Black?
7       A.   None.
8       Q.   Okay.
9       A.   Other -- other than being sued.
10      Q.   Okay.
11      A.   "Hey, do you mind being" -- basically he
12  said, "You don't have to do this."  You know, "I'm
13  not asking you to do this.  This is happening.  If
14  you want to be deposed, that's up to you."
15           And I said, "I absolutely want to because
16  I want to do anything I possibly can to bring
17  justice to the people of Libby, Montana."
18      Q.   Understood.
19           How long was that conversation with
20  Dr. Black where he asked if you would be deposed?
21      A.   About 15 minutes.
22      Q.   Do you recall Dr. Black sending you any
23  written materials either before or after that the
24  conversation?
25      A.   No.  Not only do I not recall, he did

Page 14

1   not.
2       Q.   Okay.  I want to broaden the question a
3   little bit further.  Do you recall anyone sending
4   you any written materials in anticipation of your
5   deposition testimony?
6       A.   No, no, no.
7       Q.   Okay.  Broadening the question further
8   still, do you recall anyone from CARD or anywhere
9   else sending you any materials for you to consider
10  prior to signing your declaration?
11      A.   No.
12      Q.   Okay.  And I think we've covered it, and
13  I'm sorry to belabor the point, but in terms of
14  written materials, have you reviewed the Third
15  Amended Complaint in this matter?
16      A.   No.
17      Q.   Okay.  Have you reviewed the Statement of
18  Undisputed Facts in this matter?
19      A.   I have not.
20      Q.   Have you reviewed any of the discovery
21  requests including the Requests for Production?
22      A.   No.
23      Q.   Okay.  Have you reviewed any of the
24  pleadings in this matter?
25      A.   No.

Page 15

1       Q.   Have you reviewed any deposition
2   testimony in this case?
3       A.   I have not.
4       Q.   Okay.  And have you reviewed any exhibits
5   to deposition testimony?
6       A.   No.
7       Q.   Have you reviewed any EHH Medicare claim
8   forms?
9       A.   No.
10      Q.   So fair to say, and I think we've covered
11  it now, but, Senator, in preparation for your
12  declaration and your hybrid expert disclosure in
13  this matter, you have reviewed no written documents
14  of any kind?
15      A.   Correct.
16      Q.   Okay.  Senator Baucus, I'd like to cover
17  just a few basic foundational principles here.
18  There have been some facts that are considered
19  undisputed in this case, and I'm marking it as
20  Deposition Exhibit 2.
21
22           (Deposition Exhibit No. 2 was marked
23              for identification)
24
25      Q.   (By Mr. Duerk)  Sir, although the title

Page 16

1   of this document, this pleading states that it is
2   CARD Statement of Disputed Facts, there are
3   individual facts listed here with a response from
4   CARD in bold face as to whether the fact mentioned
5   is disputed or undisputed.
6           Do you see Exhibit 2 in front of you?
7       A.   I do.
8       Q.   Okay.  I'd like to read just a few of
9   these undisputed facts and see whether based on your
10  experience and personal knowledge you would agree,
11  okay?
12      A.   All right.
13      Q.   Statement of Fact 1:  "The Environmental
14  Health Hazards provisions of the Affordable Care Act
15  found at Section 1881A address Medicare coverage for
16  individuals exposed to environmental health
17  hazards."
18           This states, "Undisputed."
19           Would you agree that the Affordable Care
20  Act in the Environmental Health Hazards provision
21  relates to individuals exposed to environmental
22  health hazards?
23      A.   To the best of my knowledge.
24      Q.   "According to language found in this
25  section of the Affordable Care Act, for purposes of

**Exhibit 2-5**

**Page 17**

```
1    eligibility for benefits under this title an
2    individual must be determined to be an environmental
3    exposure affected individual."
4            "Undisputed."
5            Would you agree?
6        A.   Yep.  If that's in the -- if that's in
7    the statute.
8        Q.   All right.
9        A.   Is it in there?
10       Q.   It is in there, and it is considered
11   undisputed.
12       A.   Okay, if it's in there.
13       Q.   All right.
14       A.   No reason to dispute it.
15       Q.   Okay.  3, "An environmental exposure
16   affected individual means any individual who is
17   diagnosed with one or more conditions."
18           "Undisputed."
19           Would you agree?
20       A.   Yep.
21       Q.   Okay.  "Those conditions are:
22   Asbestosis, pleural thickening or pleural plaques as
23   established by interpretation by a 'B Reader'
24   qualified physician of a plain chest x-ray or
25   interpretation of a computed tomographic radiograph
```

**Page 19**

```
1    Section 1881 of the Affordable Care Act that creates
2    an exception for a patient to be eligible for
3    Medicare benefits without a diagnosis."
4            "Undisputed."
5            Would you agree?
6        A.   Yep.
7        Q.   "Black's Law defines 'diagnosis' as:  'A
8    medical term, meaning the discovery of the source of
9    a patient's illness or the determination of the
10   nature of his disease from a study of its
11   symptoms.'"
12           "Undisputed."
13           Do you agree?
14       A.   I've never -- I haven't looked at my
15   Black's Law dictionary in 40 years.  I have no idea.
16       Q.   Fair enough.  Are there any facts that
17   you're aware of as you sit here today that would
18   lead you to dispute fact No. 7?
19       A.   No.
20       Q.   Okay.  This next one references CARD's
21   website.  And, sir, I'll probably ask you some
22   predicate questions here.  But have you ever seen
23   CARD's website that you can recall?
24       A.   No, no.
25       Q.   Okay.  I'll phrase it this way:  "In
```

**Page 18**

```
1    of the chest by a qualified physician, as determined
2    by the Secretary; or, two, such other diagnostic
3    standards as the Secretary specifies, except that
4    this clause shall not apply to pleural thickening or
5    pleural plaques unless there are symptoms or
6    conditions requiring medical treatment as a result
7    of these diagnoses.  Mesothelioma, or malignancies
8    of the lung, colon, rectum, larynx, stomach,
9    esophagus, pharynx, or ovary; any other diagnosis
10   which the Secretary, in consultation with the
11   Commissioner of Social Security, determines is an
12   asbestos-related medical condition, as established
13   by such diagnostic standards as the Secretary
14   specifies."
15           That fact is "Undisputed."
16           Would you agree?
17       A.   As far as I can tell.
18       Q.   "The language in the EHH provisions of
19   the Affordable Care Act uses the terms 'diagnosis,'
20   'established by,' and 'interpretation' when
21   describing environmental exposed individuals."
22           "Undisputed."
23           Would you agree?
24       A.   To the best of my knowledge.
25       Q.   Okay.  "There is no provision stated in
```

**Page 20**

```
1    order to be eligible for Medicare benefits under the
2    Affordable Care Act, an individual must have a
3    diagnosis of an asbestos-related disease."
4            Would you agree?
5        MR. BECHTOLD:  Foundation.
6        THE WITNESS:  Would I agree?
7        Q.  (By Mr. Duerk)  Yes.
8        A.   I mean, it's -- "According to CARD's" --
9    I don't know.  I haven't seen it.
10       Q.   Okay.
11       A.   So how -- I can't respond.  I haven't
12   seen it.
13       Q.   And that's why I'm phrasing it just this
14   way.  Regardless of whether or not CARD's website
15   says that an individual must have a diagnosis of an
16   asbestos-related disease in order to be eligible for
17   Medicare, would you agree that in order to be
18   eligible for Medicare benefits under the Affordable
19   Care Act an individual must have a diagnosis of an
20   asbestos-related disease?
21       A.   To the best of my knowledge, yes.
22       Q.   Okay.  Now, again, the next question
23   starts with the language, "According to CARD."  So
24   I'm going to change this question just to see if
25   you'd agree.
```

**Exhibit 2-6**

**Page 21**

1      Senator Baucus, would you agree that the
2  purpose of the Environmental Health Hazard
3  provisions in the Affordable Care Act was to provide
4  Medicare benefits for people who were exposed to
5  Libby asbestos; not to provide Medicare benefits to
6  people who are not sick?
7      A.   Yes.
8      Q.   All right.  Sir, you're welcome to review
9  these if you would like.  However, I'll turn away
10  from this document as a basic line of questioning.
11  But based on your understanding of the Affordable
12  Care Act and your involvement in the Affordable Care
13  Act, is it your understanding that CARD's purpose
14  was to diagnosis individuals with asbestos-related
15  disease and where those patients were diagnosed to
16  submit them for Medicare benefits if they were
17  eligible?
18      A.   Generally correct, yeah.
19      Q.   Okay.  And consistent with what we've
20  been discussing here, it was not the purpose of the
21  Affordable Care Act, based on your understanding, to
22  allow people who were not sick to claim Medicare
23  eligibility --
24      A.   Correct.
25      Q.   -- for life, correct?

**Page 22**

1      A.   Correct.
2      Q.   Thank you.
3          I'd like to talk about your involvement,
4  Senator Baucus, in two pieces of legislation; not
5  only the Affordable Care Act and the EHH provisions
6  in the act, but also the Fair Act or the Fairness In
7  Asbestos Injury Resolution Act of 2005.
8          I recognize that you've signed the
9  declaration about provisions, the EHH provisions in
10  the Affordable Care Act.
11          In terms of The Fairness in Asbestos
12  Injury Resolution Act, do you recall having
13  involvement in that particular piece of legislation?
14      A.   I don't at this moment, but, my gosh,
15  that was what?  This is, what, 2022?  It was 18
16  years ago.  I'd have to talk to my staff.
17      Q.   And I'm happy to --
18      A.   I have no -- it sounds like something I'd
19  do, but I would have to stop and talk to my staff.
20      Q.   Okay.  Just as you sit here today, what
21  can you recall about The Fairness in Asbestos Injury
22  Resolution Act?
23      A.   Well, if you give the provisions to me, I
24  can look at it and be able to --
25      Q.   Sure.

**Page 23**

1      A.   -- come up with something.
2      Q.   Yep, you bet.
3      A.   Just out of the blue, this is the first
4  time anybody's referenced it in a long time.  So
5  this is the judiciary committee.  This is a huge,
6  big document.
7      Q.   It is.  And rather than having you -- or
8  asking you to try to refresh your recollection over
9  a very large document, I'll say at the outset that
10  this piece of legislation had what I'll label fairly
11  extensive history in Congress.  It appears that this
12  bill was discussed and went up for hearing multiple
13  times between September 25th, 2002 and June of 2005.
14  I'm seeing half a dozen committee meetings and
15  hearings about this bill.  So I don't want to ambush
16  you with what amounts to an Encyclopedia Britannica
17  full of information.
18      A.   It's pretty extensive here.
19      Q.   It is very -- it is very extensive.  If I
20  describe it generally in a way that sounds accurate
21  to you, maybe that might help speed things along.
22      A.   This is in the judiciary committee.
23      Q.   Okay.
24      A.   I can just tell by looking at it that's
25  what it says.

**Page 24**

1      Q.   Yep, yep.  In terms of the general goal
2  of The Fairness in Asbestos Injury Resolution Act or
3  the Fair Act, Senator, is it fair to say that in the
4  Senate, you and your colleagues were trying to
5  address a system or a method of addressing the
6  asbestos litigation difficulties in the United
7  States by coming up with some sort of fund to ensure
8  that people who were sickened by asbestos had a
9  remedy that would help them with their personal and
10  medical difficulties caused by asbestos exposure?
11      A.   I --
12  MR. BECHTOLD:  Foundation.
13  THE WITNESS:  What do you mean "foundation"?
14      Q.   (By Mr. Duerk)  I think, not to speak for
15  Mr. Bechtold, but he is preserving the record with
16  some objections.  By "foundation," I think he is
17  suggesting that maybe you don't know what I'm
18  talking about?
19      A.   Because you're right.
20      Q.   And that's what I'm trying to get at.
21      A.   Basically, that's right.  I mean, I
22  was -- I was part of anything to help people in
23  Libby.
24      Q.   Yes.
25      A.   I was not on this committee.

**Exhibit 2-7**

Page 25

```
1      Q.   Okay.
2      A.   Just by looking at it.  And so I was
3  generally part of efforts to help people in Libby,
4  but I cannot speak with -- I cannot speak with any
5  specificity about this.
6      Q.   All right.  Senator Baucus, do you recall
7  whether you were co-sponsor of the Fair Act or
8  any --
9      A.   I don't.
10     Q.   -- of the provisions of the Fair Act?
11     A.   No.
12     Q.   And that's okay.
13     A.   I don't know.
14     Q.   Sir, I'll represent to you that as part
15 of the Fair Act, there is some mention in the record
16 of your name and some observations that you had
17 about it.  Does that sound accurate to you?
18     A.   I'd have to go back and look at the
19 record.
20     Q.   Understood.
21     A.   I'd have to, but it could be.
22     Q.   And to be clear, it's not my intent to
23 try to summarize a 30-plus year career and ambush
24 you with facts that you may not remember here.  That
25 said, there are some provisions in the Fair Act that
```

Page 27

```
1  asbestos trust?
2      A.   I don't.
3      Q.   Okay.
4      A.   I was -- I'm not on this committee.  I
5  was focused much more on -- much more on Libby.  As
6  I look -- as I page through this, this is more
7  general.
8      Q.   All right.
9      A.   Asbestos generally, it's not -- this is
10 not just Libby.
11     Q.   That's correct.
12     A.   And my focus was Libby.
13     Q.   Yep.  Understood.
14          Is it fair to say that the Affordable
15 Care Act also was very, very general, and the
16 Affordable Care Act also had a special section on
17 Libby, Montana?
18     A.   Yes.
19     Q.   Okay.
20     A.   It's general, but there's a special
21 section on Libby.  That's correct.
22     Q.   And, sir, I'll represent to you that
23 similar to the Affordable Care Act, the Fair --
24 Fairness in Asbestos Injury Resolution Act of 2005
25 also has special Libby provisions that I believe you
```

Page 26

```
1  I would like to cover with you.
2      A.   It's going to be hard because I don't
3  remember the Act.
4      Q.   Okay.
5      A.   Good luck.
6      Q.   All right.  I'll represent to you the
7  Fair Act attempted to come up with some medical
8  criterion and exposure criterion for
9  asbestos-related disease to determine whether or not
10 individuals would be eligible for the trust funds
11 set aside for people exposed to asbestos, who
12 contracted asbestos-related disease.  Does any of
13 this sound familiar?
14          MR. BECHTOLD:  Foundation and form of the question.
15          THE WITNESS:  I was going to say, not really.
16     Q.   (By Mr. Duerk)  All right.  Sir, do you
17 recall any of these committee hearings where you
18 made statements in support of certain provisions
19 under the Fair Act that would have established a
20 fund for people affected by asbestos?
21     A.   I do not.
22     Q.   Okay.  Sir, do you recall any statements
23 you made during the discussions about the Fair Act
24 that would have provided antifraud provisions to
25 ensure that people didn't take advantage of the
```

Page 28

```
1  advocated for because of asbestos exposure in
2  Northwest Montana.
3      A.   It could be.  It could be.
4      Q.   Okay.
5      A.   It was a general act.
6      Q.   Yes, understood.  All right.  Thank you,
7  sir.
8          Turning from the Fair Act to the
9  Affordable Care Act, your purpose in advocating for
10 EHH provisions in the Affordable Care Act was to
11 make sure that people who were sick from Libby
12 asbestos got a shot at Medicare eligibility,
13 correct?
14     A.   Correct.
15     Q.   All right.  And I think as we've
16 discussed, was it your intent to make sure that
17 anyone diagnosed with asbestos-related disease in
18 Libby would be eligible for Medicare benefits?
19     A.   Uh-huh.
20     Q.   I'll represent to you that the Fair Act
21 has some antifraud provisions or mention of
22 antifraud provisions in it.  Was it your intent to
23 ensure that the Affordable Care Act also had some
24 antifraud provisions in it?
25     A.   Not to my recollection.
```

**Exhibit 2-8**

Page 29

```
 1      Q.   Okay.
 2      A.   Didn't focus on that.  It may have.  It's
 3  a huge Act.  I had 10 staffers writing it.  So it's
 4  a big document.
 5
 6              (Deposition Exhibit No. 3 was marked
 7               for identification)
 8
 9      Q.   (By Mr. Duerk)  Senator Baucus, I'm
10  marking Deposition Exhibit 3 in this case.  Sir, do
11  you recall that certain excerpts from the
12  congressional record were referenced in your expert
13  disclosure in this case?
14      A.   What is the question?
15      Q.   Sure.  Were you aware that certain
16  records -- certain excerpts from the congressional
17  record were referenced in relation to your expert
18  disclosure in this case?
19      MR. BECHTOLD:  Form of the question.  Mr. Baucus did
20  not do an expert disclosure.
21      THE WITNESS:  Again, this is all -- it's interesting
22  that I have to go back and review it.  It's the first I've
23  seen this.
24      Q.   (By Mr. Duerk)  All right.  Sir, were
25  you --
```

Page 30

```
 1      A.   It's not like I can't relate to this.  I
 2  would have to study it.
 3      Q.   All right.
 4      A.   Probably bring back some memories.  I
 5  haven't seen it yet, so I can't respond.
 6
 7              (Deposition Exhibit No. 4 was marked
 8               for identification)
 9
10      Q.   (By Mr. Duerk)  If we can mark Exhibit 4
11  in this case.  Do you see CARD's Expert Witness
12  Disclosure in front of you?
13      A.   Yes, I do.
14      Q.   If you would turn to the third page of
15  CARD's Expert Witness Disclosure.  Do you see your
16  name there?
17      A.   I do.
18      Q.   In terms of this disclosure, in the last
19  sentence on page 3, it says," Ambassador Baucus'
20  Declaration and excerpts from the Congressional
21  Record" --
22      A.   Page 3?
23      Q.   Yes.  Page 3 under your name.
24      A.   Well, first of all, these aren't
25  numbered.
```

Page 31

```
 1      Q.   All right.  I'm sorry.  That's why I just
 2  said please turn to the third page.
 3      A.   Third page?
 4      Q.   Do you see your name here?
 5      A.   I do.
 6      Q.   Okay.  It says, "CARD also discloses the
 7  following hybrid expert witnesses."
 8      A.   Right, yep.
 9      Q.   Okay.  No. 1 there is the Honorable Max
10  Baucus.  The final sentence here reads, "Ambassador
11  Baucus' Declaration and excerpts from the
12  Congressional Record, attached here, contain his
13  expected testimony."
14          Did I read that sentence correctly?
15      A.   You've read it correctly.
16      Q.   Okay.  Prior to your deposition today and
17  prior to filling out your declaration in this
18  matter, did you review any excerpts from the
19  Congressional Record?
20      A.   No, I did not.
21      Q.   All right.  Now I understand why there's
22  the disconnect.  So I apologize, sir.  I am
23  referencing a few excerpts of the Congressional
24  Record that are referenced by CARD's Expert
25  Disclosure.
```

Page 32

```
 1          It was my understanding -- or my
 2  assumption, rather, that you had seen these before,
 3  so I apologize.
 4      A.   No, I have not.
 5      Q.   If we could look at what's been marked as
 6  Exhibit 3.  Do you see an excerpt from the
 7  Congressional Record dated Saturday, December 19th,
 8  2009?
 9      A.   On page 1?
10      Q.   Yes.
11      A.   It says, "Sunday, December 19" at the
12  top.
13      Q.   Okay.  All right.  And you had not
14  reviewed this prior to your deposition today?
15      A.   That is correct.
16      Q.   Okay.
17      A.   First I've seen it.
18      Q.   All right.
19      MR. DUERK:  If you could mark Exhibit 5.
20
21              (Deposition Exhibit No. 5 was marked
22               for identification)
23
24      THE WITNESS:  It's awfully complicated.  When Donald
25  Trump was trying to review the Affordable Care Act, you
```

Page 33

1    probably saw that he complained how complicated it is.
2    And it is true, I've seen -- I don't know anything I've
3    experienced that is more complicated than the wording of
4    the Affordable Care Act.  So I'd have to go back and look
5    at all the different parts if you want me -- if you want
6    me to try to refresh my recollection, but this is the
7    first I've seen of this.
8        Q.   Okay.  Turning to Exhibit 5 in front of
9    you, do you see another excerpt from the
10   Congressional Record --
11       A.   I do.
12       Q.   -- dated Monday, December 21st, 2009?
13       A.   Yep.
14       Q.   Okay.  And prior to your deposition
15   today, had you seen or reviewed this excerpt of the
16   Congressional Record?
17       A.   Nope.  First time I've seen it.
18       Q.   Okay.  What I'd like to do is turn to
19   certain sections of Exhibit 5.  Do you see the first
20   highlighted section in this exhibit?
21       A.   How many pages in would that be?
22       A.   I think just a few.
23       A.   There we are.
24       Q.   All right.  What is the first sentence in
25   Exhibit 5 on this page?

Page 34

1        A.   What -- what does it say?
2        Q.   Yes.
3        A.   The top or what do I say?  What's your
4    question?
5        Q.   First of all, do you see your name
6    indicated here?
7        A.   I do.
8        Q.   All right.  Does this excerpt from the
9    Congressional Record show what you were saying on
10   the -- in Congress on this day December 19th, 2009?
11       A.   I cannot tell you.
12       Q.   Okay.
13       A.   I don't know for sure.
14       Q.   All right.
15       A.   I would have to put all of this back into
16   context again.  Just -- just to pull something out
17   way back then -- it's a long -- and it's been years
18   ago -- without my reviewing it, it's hard for me to
19   respond to it.
20       Q.   Understood.  And in terms of your
21   preparation for your declaration and your expert
22   hybrid opinions in this case, you do not recall
23   reviewing this particular testimony?
24       A.   That's correct.
25       Q.   Okay.  Thank you.

Page 35

1        A.   I did not.  It says stuff which I agree
2    with.
3        Q.   Okay.
4        A.   W.R. Grace belched lots of stuff up,
5    belched 5,000 pounds of asbestos in the air around
6    Libby.  That's not a good thing.
7        Q.   I understand that.  In terms of --
8        A.   I want to make sure you do.  That's where
9    I'm coming from.  You know, I don't know if you
10   really understand.  There is nothing --
11       Q.   Sir -- sorry, I have not yet asked a
12   question.
13       A.   I can't talk?
14       Q.   Not until the question has been posed.
15       A.   Okay.
16       Q.   That's what a deposition is.
17       A.   I'm sorry.
18       Q.   That's okay.  That's okay.
19            Sir, following up on whether or not I
20   understand what's going on in Libby, we can both
21   agree that before an expert or a witness shares
22   their opinions about a matter, they need to be armed
23   with all of the facts; is that fair?
24       A.   Well, I'm not -- I'm not here as an
25   expert witness, am I?

Page 36

1        Q.   Sir, that's how you've been disclosed.
2        Q.   You just used the word "hybrid."  I don't
3    know what that means.
4        Q.   Okay.
5        A.   What does "hybrid" mean?
6        Q.   I can't testify or answer questions here
7    today, so I want to be mindful of the rules.
8        A.   Okay.  So why don't you ask the question
9    again.
10       Q.   Okay.  Sir, in order to have meaningful
11   testimony --
12       A.   Right.
13       Q.   -- a witness must be armed with facts,
14   fair?
15       A.   Generally.
16       Q.   Okay.  Is there a situation that you can
17   imagine where it wouldn't be important for a witness
18   to know the facts of a case?
19       A.   No.
20       Q.   Okay.  So would you agree that in order
21   to offer any opinions about any matter, it's
22   important for a witness to be equipped with the
23   facts, fair?
24       A.   Yeah.
25       Q.   And, sir, I am not meaning to suggest in

Page 37

1    any way that you are not equipped with the facts of
2    what happened with legislation related to Libby,
3    Montana.  You have a very clear record of your
4    involvement there.
5          What I am addressing is that in terms of
6    this particular legal case, you have not reviewed
7    any of the complaints that have been drafted by
8    Relator about the CARD clinic here, correct?
9          MR. BECHTOLD:  Asked and answered.
10         THE WITNESS:  The complaints?
11         Q.   (By Mr. Duerk)  Correct.
12         A.   I've -- I've -- I have what which is in
13    front of me; the declaration, that's what I have.
14         Q.   All right.  Outside of that declaration,
15    you have not reviewed the Third Amended Complaint?
16         A.   I have not.
17         MR. BECHTOLD:  Asked and answered.
18         THE WITNESS:  Yeah, it has been answered.
19         Q.   (By Mr. Duerk)  All right.  Sir, in terms
20    of claims for Medicare coverage in Libby, based on
21    the EHH provisions in the Affordable Care Act, I
22    think we've covered most of this, but you would
23    agree that your intent in the Senate was to provide
24    eligibility for Medicare benefits for people who had
25    a diagnosis of asbestos-related disease, correct?

Page 38

1          A.   That's correct.  I worked hard on that.
2    It was very hard for me to get that.  I mean, for
3    many years I tried to get the U.S. government to
4    declare a -- a health emergency for Libby, and they
5    would not even though EPA Administrator Christie
6    Whitman was very much in favor of it several years
7    ago.  I talked with her about it extensively.  And
8    she agreed, as an administrator -- administrator
9    should have the power to declare an emergency which
10    would trigger Medicare benefits to eligible folks in
11    Libby.
12         But that was turned down by Andy Card at
13    the White House.  It was only when Obama was elected
14    President, I went to Secretary Sebelius and EPA
15    Administrator Lisa Jackson, and she agreed that
16    there should be a declaration in this matter for
17    Libby, and I was so relieved.
18         And so as part of that, I want to make
19    sure that the people actually received the benefits
20    even though the declaration was given.  And in this
21    case, we're talking here about the provisions in the
22    Affordable Care Act with respect to screening.
23    Because I was very concerned that there would be
24    bureaucratic delays, maybe skullduggery, the company
25    would -- people just don't like to do what -- often

Page 39

1    what they should be doing.
2          And we're talking about people in Libby.
3    People in Libby, Montana, are way out in the corner
4    of Montana.  They're not in -- in the big city.  And
5    they were taken advantage of.  No question.  And
6    looking for remedies, looking for help.
7          Let me just tell you that I'm just --
8    I'll just finish answering your question about the
9    need for Medicare benefits.  Because I'll be
10    damned -- when I met Les Skramstad in the living
11    room of Gayla Benefield in Libby -- in Libby,
12    Montana, he -- I was clear how they needed benefits.
13    They weren't getting them.  They weren't getting
14    them.
15         And I said to Les, 'There's nothing more
16    important to me to make sure that justice is brought
17    to the people of Libby, Montana.'
18         And he said, 'Senator, many people have
19    said that to us, and nobody's come through, and I'm
20    going to be watching you.'
21         And he didn't have to watch me because I
22    knew I was going to do it anyway.
23         So to answer your question, absolutely.
24    It's very important that they get Medicare benefits
25    because the company was not giving the benefits.

Page 40

1          Q.   And in turn --
2          A.   Since the company is not giving benefits,
3    someone had to give them benefits.
4          Q.   And in terms of that company, Les
5    Skramstad worked for W.R. Grace?
6          A.   That's correct.
7          Q.   Sir, in terms of Les Skramstad, you met
8    with Mr. Skramstad multiple times?
9          A.   Correct.
10         Q.   And over the course of several years, you
11    saw Mr. Skramstad's medical decline due to
12    asbestos-related disease?
13         A.   Correct.
14         Q.   Mr. Skramstad had asbestosis; is that
15    correct?
16         A.   I don't know what it was, but he was
17    sick.
18         Q.   Mr. Skramstad -- and I believe your
19    statements on the Senate floor bear this out -- but
20    Mr. Skramstad worked for W.R. Grace and would come
21    home with what was called take-home dust on his
22    overall?
23         A.   That's correct.
24         Q.   And that take-home dust sickened
25    Mr. Skramstad, correct?

**Exhibit 2-11**

Page 41

1    A.   That's my understanding.

2    Q.   All right.  Is there any question in your

3  mind that Mr. Skramstad suffered from an

4  asbestos-related disease?

5    A.   No.

6    Q.   Your intent in terms of putting these EHH

7  provisions into the Affordable Care Act was to

8  protect individuals like Mr. Skramstad who had been

9  exposed to Libby amphibole and doctors determined to

10  have an asbestos-related disease, correct?

11    A.   That's correct.

12    Q.   Okay.  And one of the provisions drafted

13  into the Affordable Care Act is to enshrine those

14  protections for people like Les Skramstad by making

15  it clear that if someone has a diagnosis of an

16  asbestos-related disease, that they're sick from

17  exposure to Libby asbestos, they are Medicare

18  eligible?

19    A.   Whoever they are.  Anybody that fits that

20  description --

21    Q.   All right.

22    A.   -- including Les and anybody else.

23         Les died, as you know, because of this,

24  and his wife died and his kids died.  And it's

25  just -- so it's not just Les.  It's other people in

Page 42

1  the community.

2    Q.   Understood.  I know that this is --

3    A.   And even across the country it had --

4  exposed to asbestos.

5    Q.   I understand that this bill was not only

6  for Mr. Skramstad.

7    A.   Correct.

8    Q.   I understand that this bill --

9    A.   It's for the people of Libby primarily.

10    Q.   Yep, who were exposed to Libby --

11    A.   And I represented the state of Montana,

12  and I can do all I can for the people in the state

13  of Montana, including people who have suffered so

14  much and have no other remedy, frankly, but for me.

15    Q.   Understood.

16    A.   If it were not for me, those people would

17  still be suffering.

18    Q.   Understood.

19         In terms of Christine Todd Whitman,

20  Kathleen Sebelius, and the others that you mentioned

21  earlier in your testimony, is it your understanding

22  that they, like you, wanted to make sure that they

23  were providing protection from people who are

24  suffering from asbestos-related disease due to

25  exposure to Libby amphibole?

Page 43

1    A.   Yes.

2    Q.   Is it also true that Christine Todd

3  Whitman, Kathleen Sebelius, the others that you

4  mentioned, to the best of your understanding, like

5  you, were not trying to just give everyone in Libby

6  a free pass.  You weren't drafting legislation that

7  would just make everybody in Libby, Montana,

8  Medicare eligible?

9    A.   Correct.

10    Q.   So if somebody lived in Libby but they

11  weren't sick, it wasn't your intent to draft a law

12  that would give them a Medicare free card for life

13  even though they didn't have asbestos-related

14  disease?

15    A.   Correct.

16    Q.   Okay.  Earlier, when I was talking about

17  the Fair Act and some of its similarities to the EHH

18  provisions in the Affordable Care Act, I was

19  talking -- I was asking you some questions about

20  antifraud provisions.

21         Sir, it was never your intent to make it

22  easier for anyone to defraud the Medicare program

23  based on provisions that you had a hand in passing?

24    A.   Correct.

25    Q.   Okay.

Page 44

1    A.   Don't want fraud.

2    Q.   Yep.

3    A.   Fraud's not a good thing.

4    Q.   I think we can all agree --

5    A.   We don't like fraud.

6    Q.   -- fraud's not a good thing.

7    A.   Okay.

8    Q.   Okay.  In terms of this case, you have

9  not seen any documents outlining the allegations of

10  fraud against the CARD clinic?

11    A.   No, I have not.

12    Q.   Okay.  Regardless of who is behind a

13  scheme to defraud the federal government, you would

14  be concerned about the potential of that fraudulent

15  activity, fair?

16    A.   Well, I don't -- I'd be concerned about

17  fraud.  It would have to be proven.

18    Q.   Right.  And in terms of any of the

19  evidence in this case related to fraudulent

20  activity, you have not reviewed that evidence?

21    A.   I am unaware of any fraud.  I don't think

22  I'd find any either with respect to the CARD clinic.

23  I don't think I'd find any either knowing what I do

24  about that clinic and Dr. Black and the people

25  involved.

**Exhibit 2-12**

Page 45

```
1      Q.   And, sir, you say that even though you
2   have not seen any evidence yet in this case.
3      A.   That's correct.
4      Q.   All right.  In terms of the opinions and
5   the testimony that you plan to offer at trial, do
6   you plan to offer any opinions or testimony about
7   CARD's character or Dr. Black's character?
8      A.   Not at this point, but I'll reserve on
9   that.
10     Q.   All right.
11     A.   Not -- not to this point.  If it gets to
12  be more serious, I might look at it.
13     Q.   Okay.
14     A.   Because I feel so strongly about helping
15  the people in Libby and about this -- about the
16  outcome of this case.
17     Q.   Senator Baucus, at one point, in terms of
18  this congressional testimony, you made a statement
19  about --
20     A.   Is it in 5?  This is 5 right here.
21     Q.   Yep.  I'll let you know in just a sec,
22  sir.
23          You made a statement about doctors across
24  the country who didn't know about asbestos-related
25  disease.
```

Page 46

```
1      A.   Where is that?
2      Q.   That would be --
3      A.   Do you want No. 5?
4      Q.   I'm trying to see if I have Exhibit 5 in
5   front of me.
6      A.   I have 5 here.  Do you want 5?
7      Q.   Do you see page 9 on the lower right-hand
8   corner here?
9      A.   I do.
10     Q.   All right.  Do you see the sentence that
11  begins with "Let me refine that point"?
12     A.   Yeah, I do.
13     Q.   All right.  And, sir, just for the
14  record, I believe this is part of your statement in
15  front of the Senate.  I'd like to read this
16  paragraph.  Please follow along with me and tell me
17  if I've read it accurately, okay?
18     A.   Okay.
19     Q.   "Let me refine that point.  For a long
20  time, we have been talking to lung specialists
21  across the country about the Libby tremolite
22  asbestos, and we got just so-so responses about how
23  dangerous it was.  Why?  Because virtually none of
24  those doctors had experience dealing with the
25  pernicious kind of asbestos we have seen in Libby,
```

Page 47

```
1   Montana.  It took a long time to get their
2   attention.  We finally got some doctors to say this
3   stuff in Libby is wicked stuff.  That is why,
4   frankly, EPA has started to understand how bad this
5   really is."
6              Did I read that correctly?
7      A.   You did.
8      Q.   Okay.
9   MR. BECHTOLD:  Almost.  Almost.
10  MR. DUERK:  Did I miss something?  Oh, "this really
11  is."  Is that what you're referring to?
12  THE WITNESS:  "How bad this really is."
13     Q.   (By Mr. Duerk)  Yeah, sorry, I did say
14  "that."
15          Sir, in terms of this part of what you
16  said in front of the Senate, I'd like to focus on
17  the doctors that you spoke to nationally about
18  asbestos-related disease as a result of Libby
19  tremolite asbestos.  Do you recall any of the
20  pulmonologists or radiologists that you spoke with
21  nationally?
22     A.   Well, I do recall this phenomenon.
23     Q.   Okay.
24     A.   And it is -- to my recollection, it's
25  true that the disease of Libby tremolite is sort of
```

Page 48

```
1   special and more wicked and more difficult and more
2   pernicious than other forms of asbestos --
3   asbestos-related diseases in other parts of the
4   country.
5              And I also recall that it took some time
6   educating doctors on all this.  But it's also
7   important to know that I had great staff.  My staff
8   talked to those doctors.
9      Q.   Oh, okay.
10     A.   I haven't -- I did not personally.
11     Q.   All right.
12     A.   But, you know, when you run a Senate
13  office, you can't do everything.
14     Q.   Understood.
15     A.   You've got to delegate some stuff.  What
16  you do, you hire the very best people you can get.
17  And I had the best people.  I'll tell you, you talk
18  to people in Washington, D.C., they'll tell you I
19  had the best staff there, and I think I did.  We all
20  worked hard.  We cared.  We wanted to work primarily
21  with the state on the issues.
22          But the head of my health care team is a
23  lady named Liz Fowler.  I'm sure she and her
24  people -- I know how hard they worked -- talked to
25  lots of people including doctors, including relevant
```

**Exhibit 2-13**

Page 49

1    doctors.  I did not personally.  I'm quite confident
2    they did.
3         Q.   Okay.  But in terms of personal
4    conversations that you had with any doctors about
5    Libby amphibole and asbestos-related disease
6    resulting from Libby, fair to say that the only
7    doctor that you can recall conversations with, that
8    you had personally, were conversations with
9    Dr. Charles Brad Black, correct?
10        A.   No, there's Black and there's -- who's
11   the guy in Spokane?
12        Q.   Dr. Whitehouse.
13        A.   Whitehouse.
14        Q.   Okay.
15        A.   He's another one.  There's another doctor
16   I talked to down in Texas.  I called him up to
17   recruit him to come to Montana.  Holden or
18   something, I've forgotten his name.
19        Q.   Okay.
20        A.   And he came up, and he actually spent
21   some time in Libby, but some time in Missoula.  So
22   there -- those are three.
23        Q.   Let me see if you've spoken with any of
24   the following doctors.  Have you ever spoken with
25   any of the local radiologists or local

Page 50

1    pulmonologists in the Libby area who diagnosed and
2    treated asbestos-related disease in Northwestern
3    Montana?
4         A.   I talked -- I talked to somebody in
5    Kalispell.  I forgot who it was.
6         Q.   Do you recall ever speaking with
7    Dr. Steven Becker?
8         A.   Is he in Kalispell?
9         Q.   He is not.
10        A.   Steven Becker, I don't -- not to the best
11   of my recollection.
12        Q.   Do you recall ever speaking with
13   Dr. dal Nogare?
14        A.   You're pulling all these names out, and,
15   I mean, it's a long time ago.
16        Q.   All right.  Sir --
17        A.   I might just -- I mean, if someone could
18   remind me of that person's name, I might associate
19   the name with the conversation --
20        Q.   Sure.
21        A.   -- but right now, I don't.
22        Q.   That's okay.
23             Do you recall speaking with pulmonologist
24   Tim Obermiller?
25        A.   Not to my recollection.

Page 51

1         Q.   Did you ever speak with Dr. Steven Haber?
2         A.   Not to my recollection.
3         Q.   Do you recall --
4         A.   I could have, though.
5         Q.   That's okay.
6         A.   It's very possible.
7         Q.   That's okay.
8              Do you recall ever speaking with a
9    Dr. Heppe?
10        A.   Nope.
11        Q.   Do you recall speaking with any of the
12   local radiologists based either in Libby or
13   Kalispell, Montana about what they were and weren't
14   seeing with patients alleged to have
15   asbestos-related disease in Libby?
16        A.   I've already covered that.
17        Q.   Okay.
18        A.   But my staff -- don't forget -- my staff
19   worked day and night talking to all the relevant
20   people, and I know they talked to a lot of doctors.
21        Q.   And from conversations with your staff
22   and the conversations that you had with Dr. Black,
23   is that primarily the source of your understanding
24   that's consistent with your words in front of the
25   Senate, "We've been talking to lung specialists

Page 52

1    across the country about the Libby tremolite
2    asbestos, and we got just so-so responses about how
3    dangerous it was"?
4         A.   Yep, that's fair.
5         Q.   Okay.  And --
6         A.   Again, I want to emphasize, I cannot
7    personally talk to everybody.
8         Q.   Understood.  And, sir, my point --
9         A.   That's why I hire good people.
10        Q.   Understood.  During your deposition
11   today, I'm trying to figure out the basis of your
12   opinions.
13        A.   I'm telling you that they're good staff.
14        Q.   And I -- I hear you that you were relying
15   on your staff, but without identifying the source of
16   this information that Dr. Black and CARD were
17   correct in their determinations about whether Libby
18   amphibole disease existed, without knowing who the
19   other doctors were, it's just difficult for me to
20   form a complete picture.  Is that -- do you
21   understand?
22        A.   Maybe difficult for you, not for me.
23        Q.   All right.  Sir, in terms of the doctors
24   that you spoke with or your staff spoke with about
25   Libby asbestos, do you recall speaking with any of

Page 53

1    the doctors from Mount Sinai?
2         A.   I don't, but let me say this:  Nobody
3    that I or we talked to disputed the general
4    statement that we just read.
5         Q.   All right.
6         A.   Nobody's disputed it.
7         Q.   Okay.
8         A.   It's accurate.  There's no question that
9    statement is accurate.
10        Q.   All right.  In terms of Dr. Black's
11   credentials, are you aware of whether Dr. Black is
12   board-certified in any particular field of medicine?
13        A.   Well, he sure became the nation's expert
14   on asbestos with all the time that he spent on it.
15        Q.   All right.  Are you aware of his
16   credential?
17        A.   Well, he's a pediatrician, wasn't he?
18   But, my god, he spent a -- his whole life on this,
19   the problem in Libby.  Yeah, he's a -- he's good.
20   He's a doctor.
21        Q.   In terms of Dr. Black's diagnosis rate,
22   are you aware of any facts about Dr. Black's
23   diagnosis rate compared to radiologists and
24   pulmonologists looking at the same patient?
25        A.   I have no knowledge of any of that.

Page 54

1         Q.   All right.  In terms of Dr. Black's
2    methodology, are you aware of any facts related to
3    the way in which Dr. Black diagnoses patients?
4         A.   I have full faith in him.
5         Q.   I understand that.  My question is, do
6    you know what he does to get at a diagnosis?
7         A.   I don't -- I don't sit in his lap, and I
8    don't stand next to him.  I don't go -- it's
9    impossible for me to know that question.  I just
10   don't know.
11        Q.   All right.  You don't know his
12   methodology in terms of diagnosing patients; is that
13   fair?
14        A.   That's fair.  I just -- I just trust him
15   because I have heard no evidence to the contrary.
16        Q.   I'm aware of that fact in particular.
17   So --
18        A.   Which happened to be true.  It's
19   something that you should be aware of.
20        Q.   Senator Baucus, are you aware of the --
21   the data related to fraud in asbestos litigation
22   nationally?
23        A.   Nope.
24        Q.   Okay.  Are you aware that that has been a
25   topic of discussion in front of the Senate in the

Page 55

1    past?
2         A.   What's -- what -- again, what data?
3         Q.   Data related to the incidence of fraud in
4    asbestos litigation.
5         A.   Oh, fraud, no, no.
6         Q.   Okay.  Have you sat through any Senate
7    hearings or any committee hearings or any committee
8    discussions about the topic of fraud in asbestos
9    litigation?
10        A.   No.  Fraud in Medicare and other areas,
11   but not in asbestos.
12        Q.   Have you sat through any meetings as part
13   of your professional responsibilities related to
14   fraud in asbestos litigation that's focused on the
15   topic of a high-diagnostic differential?
16        A.   I don't know.  Nope.
17        Q.   Have you sat through any meetings or read
18   any materials in terms of your professional
19   responsibilities related to the involvement of
20   plaintiffs' lawyers hiring doctors to inflate
21   diagnosis rates?
22        A.   Nope, never.  It may happen.  I'm unaware
23   of it.
24        Q.   Have you sat through any testimony or
25   read any materials in your professional duties

Page 56

1    related to a solitary doctor or a small group of
2    doctors vastly overdiagnosing asbestos-related
3    disease when outside objective reads show no
4    evidence of disease?
5         A.   Nope.
6         Q.   During any part of your professional
7    responsibilities or duties, have you heard testimony
8    or read any reports about either millions or
9    billions of taxpayer dollars wasted as a result of
10   false claims for patients who are not sick?
11        A.   No, I'm not.  It could be down in
12   Florida, but not in Montana.
13        MR. DUERK:  Sir, if we could take a five-minute
14   break, I'll gather some of my notes and try and speed this
15   along.
16        VIDEO OPERATOR:  We are going off the record.  The
17   time is 11:18 a.m.
18
19             (Whereupon, a recess was taken)
20
21        VIDEO OPERATOR:  We are back on the record.  The time
22   is 11:25 a.m.
23        Q.   (By Mr. Duerk)  Senator, we just took a
24   short break.  I just want to cover a couple of just
25   general topics.

**Exhibit 2-15**

Page 57

1  A.  Sure.

2  Q.  In -- in terms of Medicare eligibility, I

3  want to go through a hypothetical with you and get

4  your thoughts, okay?

5  The hypothetical is this:  Let's say an

6  individual who lives in Libby, Montana, goes to a

7  doctor and gets screened for asbestos-related

8  disease and that patient has an abnormality because

9  of a rib fracture that would appear on a chest

10  x-ray.

11  As part of the screening program, that

12  patient's chest x-ray and CT scan is sent out to a

13  panel of experts, and they identify that there's a

14  rib fracture there.

15  Those x-rays and CT's come back to the

16  diagnosing physician who reviews the CT scan and the

17  chest x-ray, and they sit down with the patient

18  after conducting an exposure history and a physical

19  exam, and they look at the CT scan and they say,

20  "You have a fractured rib, but you do not have a

21  diagnosis of asbestos-related disease."

22  Does that all make sense so far in terms

23  of the hypothetical?  We've got a patient with no

24  diagnosis of asbestos-related disease.

25  In your mind, would it be proper for that

Page 58

1  patient to be submitted for Medicare eligibility

2  under the EHH provisions of the Affordable Care Act?

3  A.  I'd want a second opinion.

4  Q.  All right.

5  A.  I think, my gosh, I've gone to a lot of

6  the doctors in my life, and sometimes it's better to

7  go see another one.

8  Q.  All right.  Well, within the context of

9  this hypothetical, let's say that the doctor with

10  the most information, the diagnosing physician, the

11  doctor who has the CT scan and the chest x-ray, the

12  doctor who's completed an inpatient assessment, the

13  doctor who's reviewed the exposure history of the

14  patient, the diagnosing physician in this instance

15  says, "You're not sick.  You don't have

16  asbestos-related disease."

17  Based on your understanding of the

18  Affordable Care Act, would it be proper for that

19  patient to be submitted for Medicare benefits?

20  A.  If the patient does not have disease, the

21  answer is no.

22  Q.  Right.  And so consistent with the

23  original purpose of the EHH provisions in the

24  Affordable Care Act, without a diagnosis, that

25  patient shouldn't be deemed Medicare eligible?

Page 59

1  A.  Without a diagnosis, that's correct.

2  Q.  Okay.  Doctor, in terms of your

3  background training and experience, and I think

4  these questions are all going to be real basic, but

5  you don't hold yourself out as a physician, correct?

6  A.  No, I don't.

7  Q.  Didn't go to medical school?

8  A.  I did not.

9  Q.  All right.  Don't claim to know or

10  understand the intricacies of what's required for a

11  diagnosis of asbestos-related disease under the

12  American Thoracic Society standard?

13  A.  That's correct.  It's not my deal.

14  Q.  All right.  So if CARD physicians have

15  admitted under oath that B Readers, just

16  radiologists who only look at a film, do not

17  diagnose, you wouldn't have a reason to disagree

18  with that?

19  A.  Again, if there's no diagnosis, that

20  person should not get -- should not be covered.

21  Q.  Okay.  And on the very narrow and

22  specific question, I think I might anchor this to

23  undisputed facts if we need to, but would you

24  dispute that radiologists, those doctors who just

25  look at films, are not responsible for diagnosing a

Page 60

1  patient?

2  MR. BECHTOLD:  Foundation.

3  THE WITNESS:  I was going to say I have no -- I

4  cannot -- I cannot answer that question.

5  Q.  (By Mr. Duerk)  Fair enough.

6  A.  I have no basis to answer that question.

7  Q.  Okay.  And if we could look at Exhibit 2

8  in front of you.  I'm looking at page 13 of 41.

9  A.  Okay.

10  Q.  Sir, if I told you that CARD does not

11  dispute the fact that B Readers do not diagnose,

12  would you have any reason to disagree with that?

13  A.  I -- I'm --

14  MR. BECHTOLD:  Foundation.

15  THE WITNESS:  I'm not qualified to answer that

16  question.

17  Q.  (By Mr. Duerk)  All right.  Back to the

18  hypothetical of the patient with the rib fracture,

19  if a doctor had submitted Medicare claims for over

20  100 patients knowing that those patients did not

21  have a diagnosis of asbestos-related disease, would

22  you find that problematic?

23  A.  Yes.

24  Q.  Why?

25  A.  Because it would be fraud.

**Exhibit 2-16**

Page 61

1      Q.   In your mind, would that scenario
2   suggest fraud to you?
3      A.   It's inaccurate.  Benefits based on false
4   evidence.
5      Q.   Right.  Continuing on with this
6   hypothetical, if the doctor in that hypothetical
7   where the patient had the a rib fracture signed a
8   Medicare claim form stating that that patient had
9   asbestosis and the date of diagnosis for that
10  asbestosis in support of the claim for Medicare
11  eligibility, would you find that fact problematic?
12     A.   Yeah.  I don't quite understand the
13  question.  Did the doctor find that there is
14  asbestos-related disease or not?
15     Q.   No.  In this hypothetical, the doctor
16  determined there was no diagnosis of
17  asbestos-related --
18     A.   What did the doctor do?
19     Q.   The doctor in this hypothetical submitted
20  a Medicare claim form that stated the patient had
21  asbestosis.  Would you find that problematic?
22     A.   Yes, I would.
23     Q.   Would you -- in your words, would you
24  describe that as fraud?
25     A.   I'd have to look at the statute.  It --

Page 62

1   it certainly is wrong.  I'd have to look at the
2   statute legally.  All I know is it's -- it raises --
3   as I said problematic.  It raises questions and
4   seems wrong, and I'd have to dig into it a lot more
5   to find out what's going on here.
6      Q.   Understood.
7           Let's go into a separate hypothetical.
8   Assume there's the same doctor who sees a patient
9   and that patient had some experience in Libby,
10  Montana, so that they were in Libby for the
11  requisite period of time, and the doctor sent that
12  patient's x-rays and CT scans out for a read from
13  either a B Reader or a thoracic radiologist, a
14  pulmonologist, someone with experience reading
15  films, and all of those films, all of those chest
16  x-rays came back as negative for asbestos-related
17  disease, not just once but multiple times year after
18  year, assuming there was no outside evidence
19  according to radiologists and outside experts
20  showing any signs consistent with asbestos-related
21  disease, would you find it problematic if that
22  doctor submitted that patient for Medicare benefits?
23     A.   Yeah.  If there's no basis for finding
24  disease, yeah.
25     Q.   Same hypothetical:  Would you find it

Page 63

1   problematic if, in addition to all those negative
2   outside readings, that patient went to a local
3   pulmonologist who, similar to the hypothetical
4   doctor, had been treating patients for Libby
5   amphibole disease for years and said to the patient,
6   "You are not sick.  You do not have asbestos-related
7   disease," and that patient returned to the
8   hypothetical doctor, and the hypothetical doctor
9   told the patient, "Ignore that pulmonologist's
10  second opinion," would you find that problematic?
11     A.   No.
12     Q.   Why not?
13     A.   A lot of doctors are quacks, and I
14  just -- I just don't know what -- who that
15  pulmonologist is.  I have no idea who he is, so I --
16  based on what you said, I -- I do not have that
17  information.
18     Q.   But your statement is a lot of doctors
19  are quacks.
20     A.   Some are.  That's an overstatement.  Some
21  are.
22     Q.   All right.  Senator Baucus, in your
23  opinion are doctors from the Mayo Clinic in
24  Rochester, Minnesota, doctors that fall into that
25  quack category?

Page 64

1      A.   No.
2      Q.   Generally no, fair?
3      A.   Fair.
4      Q.   Okay.  Same hypothetical:  Let's assume
5   that patient, frustrated with the different opinions
6   he's hearing about his disease --
7      A.   Right.
8      Q.   -- takes a trip to Rochester.
9      A.   Right.
10     Q.   And he remains there for several days,
11  and he has his films over-read by radiologists, and
12  he has an in-person physical examination, and he
13  goes through a battery of tests.
14     A.   Right.
15     Q.   Let's assume that that patient is told by
16  the doctors at Mayo, "You have no signs of
17  asbestos-related disease.  In fact, we over-read all
18  of your scans going back for years, and none of them
19  show any signs consistent with asbestos-related
20  disease."  Would it concern you if the hypothetical
21  doctor still maintained and told that patient, "You
22  have asbestos-related disease despite what all of
23  these other doctors are saying"?
24     A.   I'd be concerned.
25     Q.   I would like to expand the hypothetical

Page 65

```
 1   just one step further.  Let's think about this
 2   hypothetical doctor.  And let's assume that this
 3   doctor has the same experience with this
 4   hypothetical patient who has gotten second opinions
 5   and has had his radiographic scans over-read year to
 6   year to year to year.  Let's assume that this doctor
 7   is aware that the Mayo Clinic and other
 8   pulmonologists, expert B Readers who look at all of
 9   these films are consistently over-reading the
10   hypothetical doctor's interpretations and telling
11   this doctor, "These patients do not have any sign of
12   disease.  These patients are not sick."  Assume this
13   has been going on for a decade.
14           Would it concern you if, after time, the
15   hypothetical doctor who is submitting these people
16   for Medicare decides not to even look at the scans
17   that the expert outside thoracic radiologists are
18   returning to him telling him these patients aren't
19   sick.  Would that concern you?
20       A.  That's awfully complicated.  I'm having a
21   hard time.  There's so many hypotheticals there.
22   It's just -- I like to deal with real facts, not
23   with hypotheticals.
24       Q.  All right.  There are a lot of variables,
25   but assume that this hypothetical doctor for over a
```

Page 66

```
 1   decade was told hundreds and hundreds and hundreds
 2   of times --
 3       A.  By?
 4       Q.  By thoracic radiologists, by outside
 5   physicians that his patients weren't sick and he
 6   wasn't listening, would that concern you?
 7       A.  Yes.
 8       MR. BECHTOLD:  So we're no longer dealing with just
 9   the guy who went to Rochester?
10       MR. DUERK:  We're dealing with hundreds of patients.
11       MR. BECHTOLD:  Okay.
12       Q.  (By Mr. Duerk)  Doc -- I almost called
13   you doctor.  Senator --
14       A.  You did earlier already.
15       Q.  If I have -- there have been so many
16   doctors in this case, I apologize.
17           Senator, when it comes to any Medicare
18   claim forms, any EHH forms -- I'm not trying to
19   ambush you or issue you a trick question, but do you
20   know what an EHH form is?
21       A.  No.
22       Q.  In terms of any witnesses or potential
23   witness in this case outside of Dr. Black, have you
24   spoken with any of the employees, managers, or
25   directors at the CARD clinic?
```

Page 67

```
 1       A.  No.
 2       Q.  In terms of the diagnosis criteria that's
 3   used at the CARD clinic, do you have any knowledge
 4   of what criteria the CARD clinic uses in diagnosing
 5   patients?
 6       A.  No.  I generally trust doctors until they
 7   raise -- until questions are raised that cause
 8   concern.  That's not happened in the case of
 9   Dr. Black.
10       Q.  All right.  It hasn't happened to date,
11   correct?
12       A.  What's today?  The 19th?
13       Q.  Yes.
14       A.  Correct.
15       Q.  As of the 19th of July, you have still
16   not read the complaint in this chase?
17       A.  No, I have not.
18       MR. BECHTOLD:  Asked and answered, third time.
19       Q.  (By Mr. Duerk)  Doctor, the last time
20   that you had any interaction with Dr. Black --
21       A.  Is it better to be a doctor or a Senator?
22       Q.  I apologize.  Senator Baucus.
23       A.  I don't care.
24       Q.  I apologize.  Senator Baucus, the last
25   time that you had any communication with Dr. Black,
```

Page 68

```
 1   was that in person or over the phone?
 2       A.  Over the phone.  Let me see, over the
 3   phone.
 4       Q.  Over the phone.
 5           Can you recall, just ballpark the last
 6   time that you saw Dr. Black in person?
 7       A.  I guess when -- the dedication of the
 8   clinic.  There was a big ceremony up in Libby when
 9   an extension of the building was completed.
10       Q.  And it's often difficult for me to put
11   events like that on a timeline, but was that three
12   years ago, five years ago?
13       A.  More than that.  I'd say six, seven --
14   maybe -- three, five, I'd say eight.  More than
15   that.  More than that.
16       Q.  So fair to say somewhere in the
17   seven-to-10-year range?
18       A.  I'd say 10.
19       Q.  10 years?
20       A.  Roughly.
21       Q.  Aside from that visit, have you been to
22   the CARD clinic since?
23       A.  No.
24       Q.  When you saw Dr. Black, the last time
25   that you saw him in person, how did he appear to
```

**Exhibit 2-18**

Page 69

```
1    you?
2         A.   Great.
3         Q.   Great.  What -- what do you recall?
4         A.   Dr. Black, upbeat, positive, smart,
5    engaging.
6         Q.   Energetic?
7         A.   Energetic, yeah.
8         Q.   Did he appear to be in good physical
9    health to you?
10        A.   Yes, he did.
11        Q.   Have you had any discussions with any of
12   the expert witnesses in this case who have been
13   disclosed by CARD?
14        A.   No.
15        Q.   Do you know who the other experts are?
16        A.   I do not.
17        Q.   Okay.  In terms of the testimony that you
18   would offer at trial in this matter, would that
19   testimony be limited to your personal experience
20   with CARD and its members?
21        A.   I don't know.  Depends what I'm asked.
22        Q.   All right.  In terms of your expert
23   witness disclosure, do you recall reviewing this
24   before it went out?
25        A.   What's that?
```

Page 70

```
1         Q.   Exhibit 4, third page.
2         A.   No.
3         Q.   All right.  Do you recall reviewing
4    anything like that or discussing the contents of
5    what would be included in your expert disclosure?
6         A.   No.  I just -- I put that provision in
7    the statute because I believed in it, and I'm more
8    than happy to testify that -- as to the reasons why
9    I put that in.
10        Q.   Okay.  And in terms of any inquiry about
11   CARD's diagnostic methodology or practices related
12   to submitting claims for Medicare benefits, that is
13   not any type of inquiry you have made.
14        A.   Inquiry where?
15        Q.   About CARD's diagnostic methodology or
16   CARD's practices --
17        A.   No, no, no.
18        Q.   -- of submitting Medicare forms?
19        A.   No, no.
20        Q.   All right.  Can we agree that on both of
21   those topics you do not have any information?
22        A.   Correct.
23        Q.   Sir, in terms of testifying about the
24   Affordable Care Act, would you agree with me that
25   information about legislative history comes from the
```

Page 71

```
1    Congressional Record itself?
2         A.   A lot does.
3         Q.   And just so I'm clear here, sometimes
4    lawyers make arguments about what's included in
5    legislative history.  In terms of legislative
6    history itself, would you agree that when you were
7    in the Senate you were one member of a deliberative
8    body that included many points of view?
9         A.   Correct.
10        Q.   In terms of the legislative history of a
11   bill, would you agree that that legislative history
12   is captured in the written record, in this instance
13   the Congressional Record related to passage of the
14   Affordable Care Act?
15        A.   That's relevant, but there probably are
16   other revisions to it that can be in the category of
17   legislative history.  That's part of it.
18        Q.   And what other parts or what other
19   information would you --
20        A.   It would be committee hearings.
21        Q.   Right.
22        A.   Committees.
23        Q.   So the committee hearings and the records
24   of the committee hearings would also be relevant in
25   your mind for --
```

Page 72

```
1         A.   Oh, there could be letters.  There could
2    be lots of stuff.
3         Q.   All right.
4         A.   Not just the record.  The record is very
5    important.
6         Q.   Right.  Understood.
7              I think what I'm trying to get to is,
8    I've seen the -- what I'll represent to you is the
9    legislative history in this case in terms of the
10   hearings, the committee hearings, and the material
11   submitted at those hearings.
12             Is that the type of information that
13   you're talking about that would be considered
14   relevant for purposes of determining legislative
15   history?
16        A.   Relevant, but not determinative.
17        Q.   Understood.  And what would be
18   determinative?
19        A.   Well, certainly more relevance as to what
20   the senators from those states think.  We're talking
21   about Libby here.  Senator, you know, of Louisiana
22   doesn't care that much, but the Senators of the
23   state of Montana do.
24        Q.   Understood.
25        A.   So...
```

Page 73

1    Q.   But in terms of what's passed into law,
2    the law is what's determinative of how this
3    legislation is enforced?
4    A.   Senators vote for all kinds of reasons.
5    It's hard to tell.
6    Q.   All right.   When we enforce the criminal
7    code, for example, or when we enforce the Affordable
8    Care Act and determine how the Affordable Care Act
9    should govern all of us, the first place we look is
10   the law itself?
11   A.   Right.
12   Q.   Not necessarily legislative history?
13   A.   Correct.
14   Q.   Okay.   And when we look to legislative
15   history, is it fair to say we look at the printed
16   record of your deliberations?
17   A.   Yeah.
18   Q.   Okay.   In terms of your declaration in
19   Exhibit 1, I think we've probably covered this at
20   length, but in terms of the opinions that you intend
21   to share at trial in this matter, is it your opinion
22   that in order to be Medicare eligible a patient must
23   have a diagnosis of asbestos-related disease?
24   A.   It helps.
25   Q.   It helps?

Page 74

1    A.   It helps.
2    Q.   All right.   Is a diagnosis required under
3    the Affordable Care Act?
4    A.   Under the law, yes.
5    Q.   Okay.
6    A.   But CMS may reject a claim.   I mean, CMS
7    may reject, and there are all kinds of steps here.
8    Q.   All right.   And then --
9    A.   But for the purposes of this discussion,
10   though, it's my intention that -- and I think it's
11   the intention of the statute -- that if you got a
12   diagnosis, you're covered; if there's no diagnosis,
13   you're not covered.
14   Q.   Right.
15   A.   It's very simple.
16   Q.   And in terms of the law itself, as we've
17   covered earlier, there's no provision stated in the
18   Affordable Care Act, the EHH provisions, that
19   creates an exception for a patient to be eligible
20   for Medicare benefits without a diagnosis.
21   A.   There must be a diagnosis.
22   Q.   And if a patient does not have a
23   diagnosis of asbestos-related disease, if a patient
24   is not sick from Libby amphibole, they should not be
25   submitted for Medicare benefits?

Page 75

1    A.   Generally that's correct.
2    Q.   Okay.   And again, is there any exception
3    that you can think of here?
4    A.   No.
5    Q.   All right.   So --
6    A.   But things are generally not black and
7    white.   I mean, someone may say, "That person is not
8    qualified.   That person" -- some other doctor may
9    say, "Yes, he is qualified."
10   Q.   Sure.
11   A.   So I mean, it's -- there are shades of
12   gray here.
13   Q.   Understood.   But in terms of --
14   A.   The principle, we're talking about the
15   principle.
16   Q.   And in terms of the language of the law.
17   A.   The language of the law, that's correct.
18   Q.   If a patient doesn't have a diagnosis --
19   A.   Correct.
20   Q.   -- of asbestos-related disease from Libby
21   amphibole, they should not be Medicare eligible?
22   A.   Correct.
23   MR. DUERK:   Sir, I would like to take a few minutes
24   to review my notes once more to make sure I'm not missing
25   anything, and then I anticipate we may be through with my

Page 76

1    part.   Thank you.
2    VIDEO OPERATOR:   We are going off the record.   The
3    time is 11:52 a.m.
4
5    (Whereupon, a recess was taken)
6
7    VIDEO OPERATOR:   We are back on the record.   The time
8    is 12:04 p.m.
9    Q.   (By Mr. Duerk)   Senator Baucus, during
10   your deposition today, it's appeared to me that
11   you've understood my questions.   When you've needed
12   clarification, you've asked for that clarification.
13   Has that been your impression also?
14   A.   Yes.
15   Q.   Sir, I thank you for your time.
16   Do you anticipate serving as a witness at
17   trial in this matter?
18   A.   Yes.
19   MR. DUERK:   Okay.   I have nothing further.   Thank
20   you, sir.
21   MR. BECHTOLD:   And I'll reserve --
22   THE WITNESS:   Sorry?
23   MR. BECHTOLD:   I'll reserve any questions for trial.
24   THE WITNESS:   Okay.
25   VIDEO OPERATOR:   That concludes the deposition.   The

**Exhibit 2-20**

Page 77

```
1    time is 12:04 p.m.
2
3                (Whereupon, the deposition concluded at
4            12:04 p.m. for the day)
5
6                (Signature reserved)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 79

```
1                    C E R T I F I C A T E
2
3    STATE OF MONTANA      )
4                          :ss
5    COUNTY OF BEAVERHEAD )
6         I, Robyn Ori English, Freelance Court Reporter and
7    Notary Public for the State of Montana, residing in
     Dillon, do hereby certify:
8         That I was duly authorized to and did swear in the
     witness and report the deposition of Senator Max Baucus,
9    in the above-entitled cause; that the foregoing pages of
     this deposition constitute a true and accurate
10   transcription of my stenotype notes of the testimony of
     said witness, all done to the best of my skill and
11   ability; that the reading and signing of the deposition by
     the witness has been expressly reserved.
12
13        I further certify that I am not an attorney nor
     counsel of any of the parties, nor a relative or employee
14   of any attorney or counsel connected with the action, nor
     financially interested in the action.
15        IN WITNESS WHEREOF, I have hereunto set my hand and
16   affixed by notarial seal on this, the 26th day of July,
     2022.
17
18
19
20
21
22
23
24
25
```

Page 78

```
1                DEPONENT'S CERTIFICATE
2
3         I, Senator Max Baucus, Deponent in the foregoing
4    deposition, DO HEREBY CERTIFY, that I have read the
5    foregoing pages of typewritten material and that the same
6    is, with any changes thereon made in ink on the correction
7    sheet and signed by me, a full, true and correct
8    transcript of my oral deposition given at the time and
9    place hereinbefore mentioned.
10
11
12                Senator Max Baucus, Witness
13
14
15
16        SUBSCRIBED AND SWORN to before me this
17   day        of            , 20___.
18
19
20                NOTARY PUBLIC
                  Residing at
21                My Commission Expires
22
23
24   ROE - BNSF v. CARD
25
```

**Exhibit 2-21**

Rough Draft

*BNSF Railway Company v*
*The Center For Asbestos Related Disease, Inc.*

---

*Senator Max Baucus*
*May 25, 2023*

---

*Charles Fisher Court Reporting*

*442 East Mendenhall*

*Bozeman, MT  59715*

*(406) 587-9016*

*maindesk@fishercourtreporting.com*

Min-U-Script® with Word Index

**Exhibit 3-1**

Senator Max Baucus

---

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF MONTANA

 3

 4   BNSF RAILWAY COMPANY, on behalf of

 5   THE UNITED STATES OF AMERICA,

 6

 7                  Plaintiff,

 8

 9       vs.                      Cause No. CV-19-40-M-DLC

10

11   THE CENTER FOR ASBESTOS RELATED

12   DISEASE, INC.,

13

14                  Defendant.

15

16       VIDEO DEPOSITION UPON ORAL EXAMINATION OF

17             SENATOR MAX BAUCUS

18

19       BE IT REMEMBERED, that the video-taped deposition

20   upon oral examination of SENATOR MAX BAUCUS, appearing at

21   the instance of the Defendant, was taken at 224 E. Main,

22   Bozeman, Montana, on May 25, 2023, beginning at 10:00

23   a.m., pursuant to Montana Rules of Civil Procedure, before

24   Robyn Ori English, Court Reporter - Notary Public.

25
```

---

Page 2

```
 1                APPEARANCES OF COUNSEL

 2

 3   ATTORNEY APPEARING ON BEHALF OF THE

 4   PLAINTIFF:

 5

 6           W. ADAM DUERK

 7           Knight Nicastro Mackay, LLC

 8           283 West Front Street, Suite 203

 9           Missoula, MT  59802

10           duerk@knightnicastro.com

11

12   ATTORNEY APPEARING ON BEHALF OF THE

13   DEFENDANT:

14

15           TIMOTHY BECHTOLD

16           Bechtold Law Firm, PLLC

17           P.O. Box 7051

18           Missoula, MT  59807

19           tim@bechtoldlaw.net

20

21

22

23

24

25
```

---

Page 3

1   **VIDEO OPERATOR:** This is the video-recorded subpoena
2   of Max Baucus, taken in the United States District Court
3   for the District of Montana, Civil Action No. 19-40-M-DLC,
4   BNSF versus CARD.
5       Today is May 25th, 2023.  The time is 10:09 a.m.
6   We are present with the witness at 224 East Main Street,
7   in Bozeman, Montana.  The Court Reporter is Robyn Ori
8   English, and the video operator is Nate Trejo with Fisher
9   Court Reporting.
10       The deposition is being taken pursuant to
11   Notice.  I would now ask the attorneys to identified
12   themselves, who they represent, and whoever else is
13   present.
14       **MR. DUERK:** Adam Duerk for Relator BNSF.
15       **MR. BECHTOLD:** And I'm Tim Bechtold representing the
16   CARD Clinic.
17       **VIDEO OPERATOR:** The Court Reporter will now
18   administer the oath.
19       WHEREUPON, the following proceedings were had and
20   testimony taken, to wit.
21
22               ..........
23               MAX BAUCUS,
24   called as a witness herein, having been first duly sworn,
25   was examined and testified as follows:

---

Page 4

1               **DIRECT EXAMINATION**
2
3   **BY MR. BECHTOLD:**
4       **Q.  Could you spell your name -- say your**
5   **name and spell your last name for the Court**
6   **Reporter?**
7       A.  Sure.  Max Baucus, B-A-U-C-U-S.
8       **Q.  And how would you prefer to be called**
9   **today; Mr. Baucus, Senator Baucus, Ambassador**
10   **Baucus, Max?**
11       A.  Max.
12       **Q.  All right.  I'll call you Max.**
13       A.  Okay.
14       **Q.  Max, what is your current occupation?**
15       A.  Well, I'm a -- self-employed.  I
16   represent several companies.  I consult with several
17   companies.  I'm self-employed.
18       **Q.  Okay.  Could you outline your work**
19   **history for the jury?**
20       A.  Well, I've been in public service most of
21   my life.  I was in the State Legislature a couple
22   years in the early '70s.  I represented Western
23   Montana.  That's when we had two congressional
24   districts.  Now I'm back in two terms, '74 and 78.
25   And I represented Montana in the U.S. Senate from

---

**Exhibit 3-2**

Senator Max Baucus

Page 5

1 '78 -- '79 -- I mean, '78 to 2014. And I
2 represented the United States of America in China as
3 U.S. Ambassador to China in 2013 to '17. And then
4 -- since then, I've been self-employed.
5 **Q. And, Max, during your time in Congress,**
6 **how many laws were you involved in drafting and**
7 **passing?**
8 A. It seemed like an infinite number. Many.
9 No question, many.
10 **Q. Is it fair to say that you're familiar**
11 **with the drafting and passage of laws in Congress?**
12 A. With a good number of them, yes. Those
13 that are most important to me and to Montana, yes.
14 **Q. Could you please tell the jury about your**
15 **involvement with the drafting of the language of the**
16 **Libby provision of the Affordable Care Act?**
17 A. Yeah. Generally, I spent a lot of time
18 working on the Affordable Care Act. Actually, a
19 couple years, because at that time, the United
20 States really did not have much of a healthcare
21 system. It was very rewarding to help try to put
22 something together.
23    Two main purposes, one of which was
24 accomplished, was to give greater coverage to
25 Americans. A lot of Americans didn't have any

Page 6

1 health insurance, about 40 million at that time, as
2 I recall.
3    The other was to -- goal was to cut
4 costs, because the healthcare cost was so expensive.
5    But, at the same time, I was very
6 involved specifically with the problems that people
7 in Libby were having with asbestos-related diseases.
8 I spent a lot of time in Libby, visited Libby many,
9 many times on that issue; my staff maybe over ten
10 times on that issue. It's what you do to help Libby
11 receive justice because of all the asbestos-related
12 illnesses and diseases in Libby.
13    And so I thought I wanted to do something
14 to help Libby. Libby was not, in my judgment,
15 getting sufficient help in a lot of areas; one was
16 Superfund and asbestos on the playgrounds. It's
17 just -- in the town of Libby and annex. It was --
18 the mine, it was just stunning to see these guys
19 come off the mine just caked with vermiculite. It
20 was just awful.
21    And at the same time, I met a lot of
22 people in Libby who were dying because of
23 asbestos-related diseases. One in particular, a
24 fella named Les Skramstad, and I spent some time
25 with Les. And Gayla Benefield is another lady there

Page 7

1 who is very, very adamant and active in making sure
2 that people of Libby got justice.
3    And I remember sitting in Gayla's living
4 room talking to a group there, and Les Skramstad --
5 he explained the problems. And I said to Les, "Les,
6 I will do whatever it takes to bring justice to the
7 people of Libby, Montana." And he looked me
8 straight in the eye and pointed his finger at me and
9 said, "Well, Senator, many people have said they're
10 going to be helping and I'll be watching."
11    And I thought to myself immediately, he
12 didn't have to watch because I'm going to do
13 whatever it took to bring justice to the people of
14 Libby.
15    And so a major action was to include in
16 the Affordable Care Act a provision which would give
17 Medicare coverage to the people who were diagnosed
18 with the asbestos-related disease if Libby was
19 declared a national healthcare emergency. So I put
20 that provision in the bill to make sure that Libby
21 people that have asbestos get coverage so long as
22 the designation is made and actually a national
23 healthcare emergency designation.
24    And, frankly, I tried two or three times
25 to get different administrations to invoke that

Page 8

1 declaration, and finally we were able in the Obama
2 administration to get that designation through then
3 Secretary Sebelius who was secretary of HHS.
4    And so I got familiar with that part of
5 the Affordable Care Act, and, frankly, many parts of
6 the Affordable Care Act because I spent two or three
7 years on that act to try to get it passed.
8 **Q. Max, I'd like to draw your attention to**
9 **tab 3, Exhibit 112, and then to page 9 of that**
10 **exhibit. So if you look at the bottom right hand**
11 **corner, there's numbers.**
12 A. Okay. Yeah.
13 **Q. I guess it starts -- let's start at -- it**
14 **actually starts at page 6.**
15 A. Okay, yeah.
16 **Q. Could you tell the jury what you're**
17 **looking at?**
18 A. Yeah, this looks like a portion of the
19 Congressional Record. I was speaking about this
20 provision about the people of Libby. If you want, I
21 can read parts, but that's what this is.
22 **Q. Okay. And why did you make that**
23 **statement in the Congressional Record?**
24 A. Because I wanted the law to pass and I
25 wanted members of Congress, in this case USA, to

**Exhibit 3-3**

Senator Max Baucus

Page 9

1  understand the reasons to putting this provision in
2  the bill.  And it outlined -- this portion here
3  outlines the basic provisions of the bill that are
4  relevant to Libby.
5      Q.  And, Max, I'd like you now to go to tab 7
6  in the exhibits, Exhibit 305.
7      A.  All right.
8      Q.  And I would like you to turn to the fifth
9  page of that exhibit.  Could you tell the jury what
10  that exhibit is?
11      A.  Well, this is basically an outline of the
12  Affordable Care Act.  Well, there are various
13  outlines, provisions, sections of the bill, and the
14  whole bill is not here, but the bill is over 800
15  pages.
16      Q.  Right.  So what I'd like you to look at
17  is Section 1881A.
18      A.  1881A.
19      Q.  And then if you go to Section 81A, sub e.
20      A.  Yeah, I see that.
21      Q.  Okay.  And could you tell the jury what
22  -- who environmental exposure affected individuals
23  is defined as?
24      A.  Well, the statute says, In general, a
25  person's covered who is diagnosed with one or more

Page 10

1  conditions described in subparagraph b.
2  Subparagraph b is conditions described in the
3  statute.  For purposes of subparagraph A, the
4  following conditions are described in this
5  subparagraph.  One, asbestosis, pleural thickening,
6  or pleural plaques as established by interpretation
7  of s B reader, qualified physician of a plain chest
8  x-ray or interpretation of the computed tomographic
9  radiograph, that's a CT, of the chest by a qualified
10  physician as determined by the secretary.  And other
11  -- or such other diagnostic standards as the
12  secretary specifies.
13      Q.  Okay.  So to summarize, a person
14  qualifies if they have a diagnosis of one of those
15  conditions described in -- is diagnosed with one or
16  more conditions described in that subparagraph b
17  which you just read?
18      A.  Yeah, that's what the statute says, and
19  that's what we -- the statute is written that way
20  because we wanted people in Libby to be covered.
21      Q.  Now, Max, I would like you to now draw
22  your attention to the first tab, Exhibit 108.
23      A.  Yeah, here it is.
24      Q.  And what is this exhibit?
25      A.  This is a declaration by me, Max Baucus.

Page 11

1      Q.  And when did you provide that
2  declaration?
3      A.  Well, it's dated February 2002 -- 2022, a
4  while ago.  Last year.
5      Q.  And I understand that this declaration
6  was prepared by your staff working with other
7  people?
8      A.  Yeah, right.  Yeah, this is my
9  declaration.
10      Q.  And why did you give this declaration?
11      A.  First of all, because it's part of this
12  procedure, and second, I wanted to declare why I put
13  these provisions in the Affordable Care Act and what
14  they basically provide.
15      Q.  Okay.
16      A.  The purpose was to make sure the people
17  in Libby, Montana with asbestos-related disease are
18  covered under the Medicare so long as if the
19  declaration is approved by the secretary, and that
20  is the case here.
21      Q.  So if you look at paragraph No. 4 of your
22  declaration, what does that read?
23      A.  "I worked closely with Kathleen Sebelius,
24  then Secretary of the Department of Health and Human
25  Services, and her staff, to draft language in the

Page 12

1  Affordable Care Act to ensure that physicians at the
2  Center for Asbestos Related Disease, that is CARD,
3  in Libby, Montana, would be qualified under the
4  language of the Act to diagnose asbestosis, pleural
5  thickening and pleural plaques.
6      Q.  And so did the language that you just
7  read under Section 1881A provide that language?
8      A.  Yes, it does, yes.
9      Q.  And then in paragraph 6, you state?
10      A.  Do you want me to read that?
11      Q.  Yes.
12      A.  Okay.  After passage of the Affordable
13  Care Act, Secretary Sebelius' department determined
14  that physicians at the Center for Asbestos Related
15  Disease are qualified under the language of the Act
16  to diagnose asbestosis -- I don't know that word --
17  asbestosis, pleural thickening, or pleural plaques
18  by interpretation of a computed tomographic
19  radiograph of the chest.
20      Q.  Is that still your testimony?
21      A.  Yes.
22      Q.  And paragraph 7.
23      A.  7 reads, Thus physicians at CARD are
24  qualified under the Act to diagnose asbestosis,
25  pleural thickening, pleural plaques by

**Exhibit 3-4**

**Senator Max Baucus**

Page 13

1  interpretation of a computed tomographic radiograph
2  of the chest.
3  **Q.  And that's still your testimony?**
4  A.  It is.
5  **Q.  And paragraph 8?**
6  A.  8.  Moreover, individuals diagnosed by
7  CARD physicians to have asbestosis, pleural
8  thickening, or pleural plaques are eligible for
9  Medicare benefits under the amendments to the Social
10  Security Act enacted by the Affordable Care Act.
11  **Q.  Is that still your testimony?**
12  A.  It is.
13  **Q.  And that was the intention of passing the**
14  **Act?**
15  A.  Absolutely.
16  **Q.  And paragraph 9?**
17  A.  This is longer.  It was my express
18  intention and the express intention of Secretary
19  Sebelius to have the language of the Affordable Care
20  Act enable physicians at CARD be determined
21  qualified to diagnose asbestosis, plural thickening
22  and pleural plaques by interpretation of a computed
23  tomographic radiograph of the chest.  It was also my
24  express intention and the express intention of
25  Secretary Sebelius that individuals diagnosed by

Page 14

1  CARD physicians to have asbestosis, pleural
2  thickening, or pleural plaques would be eligible for
3  Medicare benefits under the amendments to the Social
4  Security Act enacted by the Affordable Care Act.
5  **Q.  And that's still your testimony?**
6  A.  It is.
7  **Q.  Doctor -- I mean, Senator, I would like**
8  **you to take a look at tab 6, Exhibit 301.**
9  A.  All right.  Okay.
10  **Q.  And do you recognize what that is?**
11  A.  This an Overview Information Department
12  of HHS, and it's -- I guess it's -- it relates to
13  agency funding.
14  **MR. DUERK:** Object on foundation grounds.  Go ahead.
15  **Q.  (By Mr. Bechtold)  Have you seen this**
16  **document before, Max?**
17  A.  I don't think so.  Nope, I haven't seen
18  this.
19  **Q.  All right.  I will carry on.**
20  A.  Okay.
21  **Q.  Let's look -- go back to your**
22  **declaration, and now to paragraph 10.**
23  A.  10.  After passage of the Affordable Care
24  Act, B Reader qualified physicians may diagnosis
25  asbestosis, pleural thickening, and pleural plaques

Page 15

1  based on review of plain chest x-rays of individuals
2  and individuals so diagnosed by B Reader physicians
3  are eligible for Medicare benefits under the
4  amendments to the Social Security Act enacted by
5  Affordable Care Act.
6  **Q.  Is that still your testimony?**
7  A.  It is, yep.
8  **Q.  And so your testimony is that B Readers**
9  **can diagnose individuals and make them eligible for**
10  **Medicare benefits?**
11  A.  Yeah, B Readers finds a positive reading,
12  yeah, it qualifies.
13  **Q.  Okay.  And how about paragraph 11?**
14  A.  It was my express intention and express
15  intention of Secretary to have the language of the
16  Affordable Care Act ensure that if B Reader
17  qualified physicians diagnosed asbestosis, pleural
18  thickening, and pleural plaques based on review of
19  plain chest x-rays of individuals, these individuals
20  would be eligible for Medicare benefits under the
21  amendments to the Social Security Act enacted by the
22  Affordable Care Act.
23  **Q.  And is that still your testimony?**
24  A.  Yep, yes.
25  **Q.  Now, Max, I would like to draw your**

Page 16

1  **attention to tab 10.**
2  A.  Okay.
3  **Q.  You're not a medical doctor, are you?**
4  A.  I am not.
5  **Q.  But B Readers are doctors, are they not?**
6  A.  That's correct, they are.
7  **Q.  But you're aware that B Readers do not**
8  **make clinical diagnoses, correct?**
9  A.  Yes.
10  **Q.  And B Readers just interpret x-rays,**
11  **correct?**
12  A.  That's correct.
13  **Q.  So why does the Affordable Care Act state**
14  **that a qualifying diagnosis is established by**
15  **interpretation by a B Reader qualified physician of**
16  **a plain chest x-ray or interpretation of a computed**
17  **tomographic radiograph of the chest as a qualified**
18  **physician as determined by the Secretary when B**
19  **Readers don't make clinical diagnoses?**
20  **MR. DUERK:** Objection, foundation, no prior
21  disclosure for his opinion.  Go ahead.
22  **THE WITNESS:** Well, the intent here is to make sure
23  that any person in Libby related to Libby's asbestos who
24  has asbestos-related disease is covered.  That's the
25  purpose.  And as I was talking to people in Libby when

**Exhibit 3-5**

Senator Max Baucus

---

Page 17

1  doing all this, it became apparent to me that it's
2  difficult to read a lot of these chest x-rays because the
3  disease is so varied and different individuals have
4  different variations of the disease.  So while I'm sure
5  that everybody is covered, one doctor may miss a person
6  who should be covered, and another doctor will find it.
7  It's conclusive and responsible.  So the point of all this
8  is to assure that even B Readers do not make, quote,
9  diagnoses, but if a B Reader finds a positive reading with
10  the CT scan or x-ray, that that's sufficient to allow the
11  patient to be qualified.
12      So the main point being here that there are
13  various ways for a positive determination to be made.  One
14  is a diagnoses as CARD and another is a positive reading
15  by a B Reader, even though the B Reader does not
16  technically diagnosis.  The B Reader finds a positive
17  result, then that's sufficient to qualify for Medicare
18  coverage.
19      **MR. DUERK:** The same objections, move to strike.  Go
20  ahead.
21      **Q.  (By Mr. Bechtold)  And so in your
22  declaration, when you testify that -- that in
23  paragraph 10 that B Reader qualified physicians may
24  diagnosis asbestosis, pleural thickening and pleural
25  plaques, that's with the recognition that these are**

---

Page 18

1  **not clinical diagnoses?**
2      **MR. DUERK:** The same objections, foundation, no prior
3  disclosure, relevance, move to strike.  Go ahead.
4      **THE WITNESS:** Yes.
5      **Q.  (By Mr. Bechtold)  So why did Congress
6  include that in the Affordable Care Act?**
7      A.  Because I put it in.  Pretty simple.  I
8  put it in for good reason.  People in Libby needed
9  justice, and the members of Congress agreed to put
10  it in.  So that was passed.
11      **Q.  And I would like to draw your attention
12  to Exhibit 112 again, which is --**
13      A.  Which tab?
14      **Q.  It is tab 3, sorry.  And then go to page
15  9.  And again, this is your testimony from the
16  Congressional Record?**
17      A.  Right, that's right.
18      **Q.  Could you take a look at the paragraph
19  that starts with, "Medical Care in Libby" about five
20  paragraphs from the bottom?**
21      A.  Page 9?
22      **Q.  Yeah.**
23      A.  Okay.  "Medical care in Libby has
24  historically been limited due to Libby's isolated
25  location and economic situation, thus reducing the

---

Page 19

1  chance of early detection and treatment of
2  asbestos-related disease."
3      Boy that's true.  That's my reading.
4  This piece bears repeating.
5      "Let me refine that point.  For a long
6  time, we've been talking to lung specialists across
7  the country about the Libby tremolite asbestos, and
8  we got just so-so responses about how dangerous it
9  is.  Why?  Because virtually none of these doctors
10  experienced dealing with the pernicious kind of
11  asbestos we have in Libby.  It took a long time to
12  get their attention.  We finally got some doctors to
13  say this stuff in Libby is wicked stuff.  That's
14  why, frankly, EPA has started to understand how bad
15  this really is."
16      "Essentially, the lack of access to
17  health care services in Libby-I will say it
18  again-has actually worsened the effects of this
19  contamination.  It is worked to their disadvantage."
20      "The language before us today helps to
21  solve this.  It allows us to fulfill the commitment
22  we made to the people of Libby when we passed the
23  Affordable Care Act 30 years ago.  Heaven forbid, if
24  in the future another Superfund site like Libby
25  emerges, the bill before us today will allow the

---

Page 20

1  Secretary to use the authorities in this provision
2  to fulfill our commitment to provide health care
3  services for those residents as well.
4      **Q.  So, Max, when you stated earlier that
5  doctors didn't seem to recognize --**
6      A.  Correct.
7      **Q.  -- is this the sentiment you were --**
8      A.  Yes, that is a sentiment.  That's
9  basically the point, that's correct.
10      **Q.  So why did you include the provision
11  about allowing B Readers and other readers to have
12  interpretations qualify as diagnoses?**
13      **MR. DUERK:** Objection, foundation, relevance, no
14  prior disclosure.
15      **THE WITNESS:** Because we wanted to make sure that
16  everybody who had the disease was covered.  That meant the
17  statute to be read in an inclusive way.  And the inclusion
18  would mean not only diagnosis determined by the CARD
19  Clinic, but also if a B Reader were to find a positive
20  indication of asbestos-related disease, that that would be
21  enough to allow that person to be covered under Medicare.
22      So I wanted to make sure that if a case was
23  missed at CARD, by the CARD Clinic, that it would be
24  picked up by someone else, by another doctor, we're
25  talking about doctors here, radiologists who would look at

---

**Exhibit 3-6**

Senator Max Baucus

Page 21

1 CT scans of the patient. And if that doctor finds a
2 positive indication of asbestos-related disease, that that
3 would be sufficient. I wanted to make sure that the
4 statute was sufficiently was inclusive and people would
5 not be missed because of a misdiagnosis.
6     Q. (By Mr. Bechtold) So for purposes of the
7 statute, does the word diagnosis include
8 interpretation by B Readers?
9     MR. DUERK: Objection, foundation, no prior
10 disclosure, relevance.
11     THE WITNESS: Yes, absolutely. That's the whole
12 point of this.
13     Q. (By Mr. Bechtold) And it sounds like
14 from your testimony before Congress, that you were
15 aware that other doctors didn't always agree with
16 CARD doctors?
17     A. No question, no question. Well, for a
18 lot of reasons. I mean, there's a different kinds
19 of asbestos that is more pernicious than asbestos
20 found in other parts of the country. The only time
21 that you get doctors is it's really bad. It's the
22 bad asbestos and it has to be picked up early.
23     Q. Max, I'm going to direct your attention
24 to tab 5, which is Exhibit 76, and I'd like you to
25 go to page 4 of that.

Page 22

1     A. Okay.
2     Q. Do you recognize what this document is?
3     A. Yeah, I think that's a submission for
4 coverage.
5     MR. DUERK: Objection, no prior disclosure,
6 foundation.
7     Q. (By Mr. Bechtold) You didn't create this
8 form, did you?
9     A. No.
10     Q. Do you know who did?
11     A. I think HHS did, or maybe an agency of
12 HHS.
13     Q. That's not something that was created by
14 statute, was it?
15     A. That's correct. That's a -- this is
16 after the statute passed. HHS, pursuant to its
17 authority, designed -- or set up this procedure and
18 created this checklist.
19     Q. If there's some confusion between this
20 checklist and the statute, which should govern had?
21     MR. DUERK: Objection, foundation, no prior
22 disclosure.
23     THE WITNESS: The statute, clearly the statute.
24     Q. (By Mr. Bechtold) And that was the
25 purpose of passing the statute, correct?

Page 23

1     A. What was?
2     Q. The purpose, again, of passing the
3 statute was to afford as much possible care as
4 possible.
5     A. Oh, you asked me about the purpose, yeah,
6 exactly. I mean, people in Libby --
7     MR. DUERK: Objection, nonresponsive.
8     Q. (By Mr. Bechtold) Go ahead.
9     A. People -- I mean, it's a far corner part
10 of Montana. They just need help. I just wanted to
11 do all I could to help. And I wanted the statute
12 to be broad and I wanted the coverage to be broad.
13     Q. Okay. Max, I'm going to draw your
14 attention now to tab 4, which is Exhibit 137.
15     A. Okay.
16     Q. And I would like to start at the last
17 page, page 3. And this is a document you've seen
18 before, correct?
19     A. Yes.
20     MR. DUERK: Objection, non-disclosure. Go ahead.
21     Q. (By Mr. Bechtold) Now, were you aware,
22 if we look that Docket No. 97, SDF 292 at the very
23 bottom, were you aware that CARD has been signing
24 these environmental health hazard forms for patients
25 without a clinical diagnosis since they've begun

Page 24

1 going through the EHH guideline?
2     A. Well, this says it's an undisputed fact.
3 The answer is, I'm not personally aware, but it's
4 certainly possible.
5     Q. And you're aware that CARD has been
6 diagnosing individuals with asbestos-related
7 diseases even as qualified physicians under the Act,
8 correct?
9     A. Yes.
10     Q. And you're aware that B Readers have been
11 identifying people with asbestos-related disease
12 even though CARD doesn't find those same individuals
13 -- doesn't diagnose those same individuals with an
14 asbestos-related disease, correct?
15     MR. DUERK: Objection, form, leading, non-disclosure.
16 Go ahead.
17     THE WITNESS: Yes.
18     Q. (By Mr. Bechtold) And your testimony
19 from your declaration is that either CARD physicians
20 or B Readers with this diagnoses may qualify for
21 Medicare, correct?
22     A. Yes.
23     Q. So have you been aware that CARD has been
24 submitting these individuals for environmental
25 health hazard checklist benefits through Medicare

Exhibit 3-7

**Senator Max Baucus**

Page 25

1  when B readers alone find an asbestos-related
2  disease?
3      MR. DUERK: Objection.
4      THE WITNESS: No.  I just don't know.
5      Q.  (By Mr. Bechtold)  Max, I'm going to draw
6  your attention now to your -- tab 8, Exhibit 348.
7      MR. DUERK: Has this been admitted into evidence?
8      MR. BECHTOLD: Nothing has been admitted yet.
9      Q.  (By Mr. Bechtold)  I'm going to draw your
10 attention to Exhibit 348.  Do you know what this is?
11     A.  This is my deposition earlier.
12     Q.  Do you recall giving a deposition in July
13 of 2022?
14     A.  I do.
15     Q.  Do you recall being asked some questions
16 about your declaration in July of 2022?
17     A.  I do.
18     Q.  I'll draw your attention to page 9 and 10
19 of the deposition.  So on page 9.
20     A.  Page 9.  I see it.
21     Q.  So let's start on line 21.  Just review
22 that to yourself, please.
23     A.  Okay.  Okay.
24     Q.  Does that refresh your memory a little
25 bit about the declaration?

Page 27

1      Q.  And based upon your understanding of your
2  drafting of the Affordable Care Act, how does an
3  individual get diagnosed with an asbestos-related
4  disease?
5      A.  Either by the CARD Clinic and getting
6  diagnosed as having the disease, or when a B Reader
7  finds a positive indication.  Either case, that
8  qualifies.
9      MR. BECHTOLD: Well, Max, thank you for your time.  I
10 have no more questions right now.  Mr. Duerk may have some
11 cross-examination questions, at which time I can follow-up
12 afterward.
13     THE WITNESS: Sure.  All right.
14     MR. DUERK: Let's go ahead and take a short break.
15     VIDEO OPERATOR: We're going off the record.  The
16 time is 10:46 a.m.
17
18          (Whereupon a recess was taken)
19
20     VIDEO OPERATOR: We are back on the record.  The time
21 is 10:56 a.m.
22
23
24
25

Page 26

1      A.  Yeah.
2      Q.  So is it still your testimony that this
3  declaration was drafted with the help of your staff?
4      A.  It is.
5      Q.  And you signed it because you believed it
6  to be true?
7      A.  Yes.  That's true.
8      Q.  Okay.  I would like to now move on to
9  page 20.
10     A.  All right.  All right, 20.
11     Q.  And I'll draw your attention to line 13.
12 Just read through that to yourself and refresh your
13 memory.
14     A.  All right.
15     Q.  And then on to page 21.
16     A.  Yeah.  Yeah.
17     Q.  So is your testimony still that the idea
18 behind the Affordable Care Act was to provide
19 Medicare incentives for people who were exposed to
20 Libby asbestos, correct?
21     A.  Yes.
22     Q.  And to provide Medicare coverage for
23 those who were diagnosed with asbestos-related
24 diseases, correct?
25     A.  Yes.

Page 28

1          CROSS-EXAMINATION
2
3  BY MR. DUERK:
4      Q.  Senator Baucus, I'm Adam Duerk.  We've
5  taken your deposition once before today; is that
6  correct?
7      A.  That's correct.
8      Q.  That was July of 2022, last year?
9      A.  Sounds about right.
10     Q.  Sir, to begin with, I would just like to
11 review with you what you did in anticipation of your
12 deposition today.  Who, if anyone, did you speak to
13 about your deposition prior to today?
14     A.  I spoke to Mr. Bechtold.
15     Q.  Okay.  And when did that conversation
16 occur?
17     A.  Yesterday.
18     Q.  How long was that conversation?
19     A.  Fifteen minutes, twenty minutes.
20     Q.  Did you speak with anyone else before
21 today's deposition?
22     A.  No.
23     Q.  Okay.  So one conversation with Tim
24 Bechtold?
25     A.  Uh-huh.

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

**Exhibit 3-8**

Senator Max Baucus

Page 29

1    Q.  We've reviewed some material together
2  during your deposition?
3    A.  Yeah.
4    Q.  In that fifteen-minute conversation, did
5  you review those materials with Mr. Bechtold?
6    A.  Yes.
7    Q.  Between the time of your deposition last
8  July and this morning, have you spoken with anyone
9  else about your deposition?
10   A.  No.
11   Q.  And, sir, the reason that I ask is, at
12  your last deposition, we spoke about the declaration
13  that you signed; is that right?
14   A.  Yes.
15   Q.  That deposition lasted several hours, do
16  you recall that?
17   A.  Yes, I do.
18   Q.  Okay.
19   A.  It was a long time.
20   Q.  It was a long time.  And during that
21  deposition, I asked you about any of the materials
22  that you reviewed in anticipation of that July 20,
23  2022 deposition, and do you recall at the last
24  deposition, you told me that you didn't recall
25  speaking with anyone prior to that deposition about

Page 30

1  the basis of your testimony?
2    A.  Yes.
3    Q.  Okay.  I also asked in July of 2022,
4  whether you recalled reviewing any written records,
5  and during the last deposition, you indicated that
6  you had not reviewed anything in writing, do you
7  recall that?
8    A.  Yeah, I do.  Yes, that's right.
9    Q.  During that last deposition, likewise,
10  you testified that you had had a 15-minute
11  conversation with Dr. Black before the deposition,
12  but other than that 15-minute conversation, you
13  didn't recall any other conversations?
14   A.  That's correct.
15   Q.  Okay.  You didn't remember any written
16  information being sent to you other than a draft of
17  the declaration before your last deposition,
18  correct?
19   A.  Correct.
20   Q.  So CARD sent you no written materials
21  prior to that last deposition, right?
22   A.  Correct.
23   Q.  And so I didn't have an opportunity to
24  ask you any questions about any written materials
25  because you said you hadn't seen any, does that

Page 31

1  sound accurate?
2    A.  Yeah, except I think at some point I saw
3  the declaration and knew what was in the declaration
4  because I signed it.
5    Q.  Sure.  But aside from that declaration,
6  last time we were together, you had seen no written
7  pleadings, no copies of the complaint, no
8  depositions, no EHH forms, no written documents of
9  any kind, correct?
10   A.  Correct.
11   Q.  At the last deposition, you essentially
12  testified that your testimony was based on your
13  memory alone; is that right?
14   A.  Yes.
15   Q.  In terms of any file in this case, you
16  don't have a file related to this current lawsuit
17  related to the opinions that you have been offered?
18   A.  That's correct.
19   Q.  Okay.  You haven't talked to any
20  witnesses in this case, right?
21   A.  Correct.
22   Q.  Last time before you were deposed, you
23  were not aware that you had been declared an expert
24  witness in this case, correct?
25   A.  All I know is Dr. Black asked me if I

Page 32

1  wanted to testify, and I said yes.
2    Q.  But during the last deposition when I
3  asked you, it appeared you weren't aware that you'd
4  been declared an expert in this case.
5    A.  That's correct.
6    Q.  Okay.  Sir, when we visited together in
7  July, you agreed with me that expert witnesses must
8  be armed with facts, does that sound right?
9    A.  Anybody speaks should be armed with
10  facts.
11   Q.  Right.  And if someone is offered as an
12  expert witness in a federal trial, it would be
13  especially important for them?
14   A.  Well, I don't know that's a legal
15  determination.  I'm not qualified to answer that.
16   Q.  Okay.  Sir, if you would look at tab 20,
17  please, I'm looking at page 36.
18   A.  This is the deposition?
19   Q.  Yes.  And, sir, this is your deposition
20  from July 19th, 2022.  I was there, you were there,
21  Mr. Bechtold was there and the Court Reporter was
22  there, correct?
23   A.  Just a second.  This is falling apart.
24  Okay, say again.
25   Q.  Sure.  I was there, you were there?

Exhibit 3-9

Senator Max Baucus

---

Page 33

1    A.  What page are you on?
2    Q.  We're at page 36, line 10.  We were
3  talking about the requirement for understanding
4  facts of the case.  So I'll read this part of your
5  deposition and please tell me if I'm right.
6    A.  Page 36?
7    Q.  Page 36, and I'm starting at line 10 and
8  I'll continue to line 24.
9    A.  I'm trying to find a page number.
10    Q.  Top left-hand corner of each of the
11  individual pages are marked.
12    A.  Mine only goes to 35.
13    Q.  If you can hand it to me, I can help you.
14  You were on tab 19.  Here's tab 20.
15    A.  Okay.  Thanks for helping me find this.
16    Q.  Do you see a copy of a transcript of your
17  deposition taken July 19th, 2022?
18    A.  Yes.
19    Q.  If you would go to page 36.
20    A.  Page 36, okay.
21    Q.  I'll read lines 10 through 24.  Please
22  tell me if I've read them correctly.
23        "Q. Okay.  Sir, in order to have
24  meaningful testimony --
25    A. Right.

Page 34

1        Q  -- a witness must be armed with facts,
2  fair?
3    A.  Generally.
4    Q. Okay.  Is there a situation that you
5  can imagine where it wouldn't be important for a
6  witness to know the facts of a case?
7    A.  No.
8    Q.  Okay.  So would you agree that in
9  order to offer any opinions about any matter, it's
10  important for a witness to be equipped with the
11  facts, fair?
12    A.  Yeah."
13        Did I read that correctly?
14    A.  Yep.
15    Q.  Okay.  So in terms of the facts of the
16  case that were before us last time, you had not
17  reviewed any of the pleadings in this case, any of
18  the deposition testimony, you had not reviewed the
19  statement of undisputed facts or any of the other
20  documents that Mr. Bechtold put in front of you
21  today, is that fair?
22    A.  Yes.
23    Q.  And, sir, in terms of the disclosure in
24  this case --
25        (Pause)

Page 35

1    Q.  (By Mr. Duerk)  Sir, in terms of the
2  information in writing that I had from you about the
3  opinions you intended to express last time, the only
4  information that I had from you was your declaration
5  to the best of your knowledge, fair?
6    A.  I guess.  You tell me if that's all you
7  had.  I don't know what you had.
8    Q.  Yeah, right.  I'll represent to you that
9  that's all I had.
10    A.  Okay.  If that's case, that's the case.
11  It must be a fact.
12    Q.  I was not aware of any documents that you
13  had been testifying about.
14        In terms of the testimony that you
15  provided related to your expert opinions last time,
16  I asked you about the Congressional Record and
17  legislative history.  Do you recall --
18    A.  I do.
19    Q.  Okay.  And last time we were together at
20  the deposition, you had not reviewed the
21  Congressional Record or the legislative history of
22  this section of the Affordable Care Act, correct?
23    A.  I have not read the record, that's
24  correct, because I was part of it at all.  I spoke
25  on the floor of the Senate.  Part of the record was

Page 36

1  a recording of what I said.
2    Q.  Sir, in terms of any communication that
3  you've had with the Social Security administration
4  about the EHH provisions of the Affordable Care Act,
5  we reviewed some communication between you and the
6  Social Security Administration at your deposition
7  today or prior, fair?
8    A.  Correct.
9    Q.  Okay.  And in terms of any communication
10  that you've had with the Social Security
11  Administration, have you had any communication with
12  the Social Security Administration in the last 10
13  years?
14    A.  No -- well, 10 years.  No.
15    Q.  Okay.  In terms of any communication with
16  the CARD Clinic or any individual who has ever
17  worked at the CARD Clinic, have you had any
18  communication with anybody at the CARD Clinic in the
19  last 10 years?
20    A.  Yes.
21    Q.  Okay.  Who?
22    A.  Dr. Black.
23    Q.  Okay.  Aside from Dr. Black, have you
24  communicated with anybody else at the CARD Clinic?
25    A.  No.

Charles Fisher Court Reporting    (9) Pages 33 - 36
442 East Mendenhall, Bozeman MT  59715, (406) 587-9016

**Exhibit 3-10**

Senator Max Baucus

Page 37

1  Q. And when was the last time you recall
2  talking to Dr. Black?
3  A. Oh, months ago, a year ago. He asked me
4  if I would be a witness in this case, and I said
5  yes.
6  Q. Okay. Outside of Dr. Black asking you
7  that question, do you recall any specifics of the
8  communication?
9  A. No. I said that I would I would love to.
10  Q. Prior to that conversation with
11  Dr. Black, when was the last time you recall having
12  any conversations with him?
13  A. Oh, I went up to the Clinic dedication up
14  there.
15  Q. And, sir, that was in about 2009 or 2010?
16  A. It could be. It was several years ago.
17  Q. I believe when we visited at your last
18  deposition, you said it was approximately 10 years
19  ago, maybe more, does that sound about right?
20  A. It could be more.
21  Q. Okay. So that would put us at 2013,
22  perhaps earlier?
23  A. Probably earlier.
24  Q. Earlier than --
25  A. Because I went to Beijing in 2013.

Page 39

1  responsibility at that point, fair?
2  A. Certainly.
3  Q. Sir, I'd like to talk specifically about
4  whether or not anyone at CARD has alerted you to
5  conversations that CARD has had with the Social
6  Security Administration about these provisions in
7  the Affordable Care Act related to a diagnosis of
8  asbestos-related disease.
9  A. No.
10  Q. No? Okay. Are you aware of the sworn
11  testimony from SSA employee Heather Hilman in this
12  case?
13  A. No.
14  Q. Have you seen or been alerted to any
15  e-mails from the Social Security office sent to CARD
16  that indicate to CARD that they are not to submit
17  patients who have not been diagnosed with an
18  asbestos-related disease for Medicare benefits?
19  A. No.
20  Q. And so, in your mind, both during your
21  deposition testimony today and last July, it appears
22  that you would be concerned if there were patients
23  who were submitted for Medicare benefits who did not
24  have a diagnosis of asbestos-related disease, fair?
25  A. No, that's not fair. Because it could be

Page 38

1  Q. Okay.
2  A. So it had to have been earlier.
3  Q. In terms of that dedication ceremony,
4  what conversations, if any, do you remember having
5  with Dr. Black or any other CARD staff members?
6  A. Just how this went along.
7  Q. In terms of any communication with
8  anybody from the SSA during that time frame, do you
9  remember speaking with anybody at the Social
10  Security Administration?
11  A. Nope.
12  Q. Okay. In terms of your involvement in
13  passing legislation, the law is set forth in the
14  published statute itself, correct?
15  A. Correct.
16  Q. Okay. And in terms of how that law is
17  interpreted or enforced, once legislation is passed
18  into law, it's no longer necessarily within your
19  purview to enforce that law, correct?
20  A. Well, no. I mean, if I have something to
21  do with passing the law, I make sure that the law is
22  upheld. So I do have that interest.
23  Q. Right. But in terms of ensuring that the
24  law is adhered to, abided by, read, recognized and
25  understood, that's not your task or your

Page 40

1  a B Reader to find a positive determination. And
2  then that would indicate that that person has an
3  asbestos-related disease.
4  Q. I understand what you're saying today.
5  I've not heard this testimony from you before. So
6  I'll go about it this way.
7  MR. BECHTOLD: Misstates his testimony.
8  Q. (By Mr. Duerk) I'll go about it this
9  way. In order to be Medicare eligible, it is
10  important for a person to be sick with
11  asbestos-related disease, correct?
12  A. Yep.
13  Q. Okay. And your intent was to make sure
14  that individuals in Libby would receive Medicare
15  benefits if they were sick due to asbestos exposure,
16  correct?
17  A. Correct.
18  Q. Okay. It was your intent and the intent
19  of other United States Senators to make sure that in
20  order for a patient to be Medicare eligible, they
21  had to have been exposed to Libby asbestos and be
22  suffering from that exposure to Libby asbestos?
23  A. Right.
24  Q. It was not your intent to allow patients
25  to be submitted for lifetime Medicare benefits if

**Exhibit 3-11**

Page 41

1  they were not sick due to an exposure to Libby
2  amphibole, correct?
3     A.  Correct.
4     Q.  And so if you had a patient who CARD knew
5  not to be sick due to an exposure to Libby asbestos,
6  it was not your intent that that patient submitted
7  for lifetime Medicare benefits?
8     A.  That's a difficult question to answer
9  because that's a loaded question.
10    Q.  In the past --
11    A.  Because basically -- I'll tell you why
12 it's loaded.  Because you're making -- you're
13 assuming that the diagnosis was made knowing there's
14 no -- with intent to deceive, and I'm saying a
15 diagnosis could be missed.
16    Q.  I understand that diagnoses can be
17 missed, but if a clinician submits a patient for
18 lifetime Medicare benefits, you would expect that
19 that patient would be sick due to their exposure to
20 Libby amphibole, correct?
21    A.  Yeah.
22    Q.  Is that a yes?
23    A.  Yes.
24    Q.  And, sir, that's the very intent of the
25 Affordable Care Act Libby provisions related to

Page 42

1  environmental health hazards in your mind, correct?
2     A.  Well, in my mind, is it -- I don't know
3  words you used, I don't know what exact words you
4  used, but my point is, and I've said this many
5  times, if a person's got the disease and the disease
6  has been diagnosed, diagnosed either by CARD or by a
7  B Reader, that's sufficient for coverage.
8     Q.  Sir, in order to be eligible for Medicare
9  benefits under the Affordable Care Act, an
10 individual must have a diagnosis of an
11 asbestos-related disease, correct?
12    A.  Depending what you mean by diagnosis.
13    Q.  All right.  That wasn't my question at
14 last summer's deposition.  So what I'd like to do is
15 show you that -- your response to that answer, and I
16 would like to determine if it's still correct, okay?
17    A.  Sure.
18    Q.  All right.
19
20      (Whereupon, Clip No. 1 was played
21      for the jury)
22
23    VIDEO OPERATOR:  We are going off the record.  The
24 time is 11:17 a.m.
25

Page 43

1       (Off the record discussion)
2
3     VIDEO OPERATOR:  We are back on the record.  The time
4  is 11:18 a.m.
5     Q.  (By Mr. Duerk)  Sir, did the three video
6  clips played during the July 19th, 2022 deposition
7  reflect your testimony under oath at that time?
8     A.  At that time.
9     Q.  Okay.  Sir, your intention and the
10 intention of the environmental health hazard
11 statutory provisions in the Affordable Care Act is
12 that if you've got a diagnosis, you're covered.  If
13 there's no diagnosis, you're not covered.  It's very
14 simple.  Correct?
15    A.  That's what I said back then.
16    Q.  Okay.  And you also testified that the
17 purpose of the environmental health hazard
18 provisions in the Affordable Care Act was to provide
19 Medicare benefits for people who were exposed to
20 Libby asbestos, not to provide Medicare benefits for
21 people who are not sick?
22    A.  Right.
23    Q.  Okay.  And so, sir, at your -- at your
24 deposition, you had a couple of different
25 hypotheticals posed to you.

Page 44

1     A.  They were sure long and complicated.
2  They were very long and complicated.  I don't know
3  how relevant they were, because they were just
4  hypotheticals.
5     Q.  I understand what you're saying here, but
6  I'll see if I can make those --
7     A.  Okay.
8     Q.  -- hypotheticals a little bit easier.  So
9  say we've got a patient with no diagnosis.  We've
10 got a patient with no diagnosis of asbestos-related
11 disease, and we've got a patient with a B Read that
12 the B Reader says doesn't have a diagnosis of
13 asbestos-related disease, okay?
14    A.  So what's the question?
15    Q.  The question is, should that person get
16 Medicare benefits?
17    A.  Again, who is this person and describe
18 that person again?
19    Q.  Sure.  The CARD patient is the subject
20 here.  Imagine a CARD patient with no diagnosis of
21 asbestos-related disease from anybody, from a B
22 Reader, from a pulmonologist, from the provider,
23 from CARD, imagine a patient who has no diagnosis of
24 asbestos-related disease, that patient should not
25 get Medicare?

Senator Max Baucus

Page 45

1    A.  Correct.
2    Q.  Okay.  During your deposition last time,
3  I asked you about B Readers and the diagnostic
4  standards for physicians at CARD.  And last time we
5  were together, you said you were not qualified to
6  answer any of these questions.  Do you recall that?
7    A.  No, I do not.
8    Q.  Okay.  If you could turn to page 59 of
9  your deposition.  I'm looking at line 2.
10    A.  Okay.
11    Q.  You don't hold yourself out nor have you
12  ever held yourself out as a physician, correct?
13    A.  Correct.
14    Q.  You didn't go to medical school?
15    A.  Correct.
16    Q.  You don't claim to know or understand the
17  intricacies of what's required for a diagnosis of
18  asbestos-related disease under the American Thoracic
19  Society standards, correct?
20    A.  Right.
21    Q.  Now, I'll put the question to you this
22  way.  So if CARD physicians have admitted under oath
23  that B Readers, just radiologists, who only look at
24  a film did not diagnose, you would have no reason to
25  disagree with me, correct?

Page 46

1    A.  Based on what you just told me.  Based on
2  only what you just said, yes.  There may be more to
3  it, but based upon what you just said.
4    Q.  Okay.  And then I'll read what I asked
5  you precisely and what your answer is on page 59.
6    A.  Okay.
7    Q.  I'm looking at page 59, line 14.
8    Q.  So if CARD physicians have admitted
9  under oaths that B Readers, just radiologists, who
10  only look at a film do not diagnose, you wouldn't
11  have a reason to disagree with that.
12    A.  Again, if there's no diagnosis, that
13  person should not get -- should not be covered."
14    Did I read that correctly?
15    A.  You read that correctly.
16    Q.  And then I asked you about a narrower and
17  specific question that I wanted to anchor your
18  testimony to.  And that question was, "Would you
19  dispute that radiologists --
20    A.  Are you reading or is this something new?
21    Q.  Something new.
22    A.  Go ahead.
23    Q.  "Radiologists do not diagnosis
24  asbestos-related disease and are not responsible for
25  diagnosing asbestos-related disease?

Page 47

1    A.  Correct.
2    Q.  You say correct today, but during your
3  testimony in July, you said, you couldn't answer
4  that question.  You had no basis to answer that
5  question, correct?
6    A.  Yes, but also I want to do something else
7  here.  Earlier you said that a witness, an expert
8  witness, should have the facts.  So I went back and
9  I reviewed so that I would have the facts.  I
10  reviewed the statute to get the facts.  So now I
11  have more facts and now I can answer that more
12  accurately.
13    Q.  And, sir, I appreciate that, but when I
14  deposed you in July of 2022, my intent was to get
15  all of the information from you that we could
16  anticipate here at trial so that I had a clear idea
17  of what your testimony was.
18    A.  And I have a better idea because I have
19  more facts.
20    Q.  I have a better idea of what you're
21  saying here today.
22    A.  Correct.
23    Q.  But it's also fair to say that you didn't
24  say anything about what B Readers did or what a
25  radiologist's role was in the diagnostic process at

Page 48

1  your July 22 deposition, correct?
2    MR. BECHTOLD:  Misstates --
3    THE WITNESS:  Before I refreshed my recollection and
4  going back and getting the facts.
5    MR. BECHTOLD:  Misstates the testimony.
6    Q.  (By Mr. Duerk)  Sir, in terms of your
7  declaration itself, I'm looking at tab 17, what's
8  been marked as Exhibit 108 here.  I'm looking at
9  paragraph 10.  Do you see that?
10    A.  Yeah.
11    Q.  Okay.  Paragraph 10 says, "After passage
12  of the Affordable Care Act, B Reader qualified
13  physicians may diagnose asbestosis, pleural
14  thickening and pleural plaques based on review of
15  plain chest x-rays of individuals, and individuals
16  so diagnosed by B Reader physicians are eligible for
17  Medicare benefits under the amendments to the Social
18  Security Act enacted by the Affordable Care Act."
19    Did I read that correctly?
20    A.  Yep.
21    Q.  Okay.  So your declaration says that B
22  Readers may diagnosis; not that a B Read equals a
23  diagnosis, correct?
24    A.  That's what -- I'm sorry, ask the
25  question again.

Exhibit 3-13

Page 49

1  Q. You said that B Readers may diagnosis.
2  A. Here?
3  Q. In your declaration.
4  A. Yeah, right.
5  Q. Right. B Readers may diagnosis; not that
6  a B Read equals a diagnosis, correct?
7  A. Correct.
8  Q. Okay. And in the language of the
9  Affordable Care Act itself, Section 1881A, and I'm
10  handing you a copy here, I'm looking at page 2. I'm
11  looking at individuals described under the
12  Affordable Care Act. So right in the middle of the
13  page do you see the section Individual Described. I
14  believe we read this into the record earlier.
15  A. Yes, we did.
16  Q. Individual described. In general, an
17  individual described in this paragraph is any
18  individual who is diagnosed with one or more
19  conditions described in subparagraph B.
20  Did I read that correctly?
21  A. Yep.
22  Q. Okay. So at least in terms of the law,
23  the law says that an individual must have a
24  diagnosis of asbestos-related disease, correct?
25  A. That's one condition. That's not the --

Page 50

1  exclusive.
2  Q. Let's go directly to the conditions. The
3  conditions described are asbestosis, pleural
4  thickening or pleural plaques, correct?
5  A. Yep.
6  Q. Okay. And so here in the law, in order
7  to receive Medicare benefits, a patient must have a
8  diagnosis. And this is a -- this is a proposition
9  that you agreed with during your prior deposition,
10  correct?
11  A. Well, it all comes out with what the
12  definition and diagnosis is. That's what it's all
13  about. And under the statute, the diagnosis at
14  large is a diagnosis by the CARD clinic or an
15  affirmative determination by the B Reader. That is,
16  at large, a diagnosis.
17  Q. That is what you are saying, correct?
18  But the law --
19  A. And that's what the law says, too.
20  Q. Sir, the law says an individual must have
21  a diagnosis.
22  A. I'm sorry. Now you're quibbling.
23  Q. No, I'm not quibbling.
24  MR. BECHTOLD: Argumentative.
25  Q. (By Mr. Duerk) I'm going to offer it

Page 51

1  this way. Sir, in terms of the enforcement of this
2  law and its provisions, enforcement of the law comes
3  from the Social Security Administration, correct?
4  A. Medicare.
5  Q. Medicare?
6  A. And CMS.
7  Q. And CMS and the Social Security
8  Administration have a field office in Kalispell,
9  Montana to the best of your knowledge?
10  A. Right.
11  Q. Okay. And the Medicare claim forms, the
12  EHH forms, are filled out and signed by Dr. Black
13  and providers at the CARD Clinic to the best of your
14  knowledge, correct?
15  A. Correct.
16  Q. And those Medicare claim forms, to the
17  best of your knowledge, are then submitted to the
18  Social Security Administration field office in
19  Kalispell, Montana?
20  A. I don't know.
21  Q. Okay. Have you ever spoken with any of
22  the field office personnel?
23  A. No, no.
24  Q. Okay. You're not aware of the policies
25  and procedures they have for handling CARD Medicare

Page 52

1  claim forms?
2  A. No.
3  Q. You've never seen the program operations
4  manual system?
5  A. No.
6  Q. Okay. You've never seen any e-mails back
7  and forth?
8  A. No.
9  Q. Let me ask the question.
10  A. I'm answering it anyways, no. Go ahead
11  and ask the question.
12  Q. I'm sure you've seen some e-mails before,
13  but here's the question. You've never seen any
14  e-mails between the CARD Clinic and the Social
15  Security Administration field office personnel,
16  correct?
17  A. Correct.
18  Q. Okay. And you've not seen any e-mails
19  recently between the CARD Clinic and Social Security
20  Administration as recently as two weeks ago,
21  correct?
22  A. Correct.
23  Q. So if I told you that the Social Security
24  Administration insisted that CARD patients have a
25  diagnosis of asbestos-related disease in order to be

Exhibit 3-14

Senator Max Baucus

Page 53

1    eligible for Medicare benefits, you've not seen that
2    communication?
3        A.  Correct.
4        Q.  And you would have no reason to disagree
5    with me, correct?
6        A.  I have not seen it.
7        Q.  Okay.  In terms of how the Social
8    Security Administration treats these EHH Medicare
9    claim forms, that's not a job that you ever had,
10   correct?
11       A.  Correct.
12       Q.  And no one at CARD, prior to your
13   deposition, has shown you any communications
14   recently from SSA to CARD telling them that in order
15   to be Medicare eligible, a patient must have a
16   diagnosis, correct?
17       A.  I have not seen any, no.  And I've not
18   seen what you're describing.
19       Q.  Sir, it was not your intent, Kathleen
20   Sebelius' intent or Christine Todd Whitman's intent,
21   to the best of your knowledge, to draft legislation
22   that would just make everyone in Libby Medicare
23   eligible if they did not have an asbestos-related
24   disease, correct?
25       A.  That would not be my intent either.

Page 54

1        Q.  Okay.  It was also never your intent to
2    make it easier to defraud the Medicare program based
3    on any provisions that you put in the Affordable
4    Care Act?
5        A.  Correct.
6        Q.  There is no provisions stated in Section
7    1881 of the Affordable Care Act that creates an
8    exception for a patient to be eligible for Medicare
9    benefits without a diagnosis, correct?
10       A.  Well, I don't want to quibble with
11   myself.  It gets around to a diagnosis.
12       Q.  Let's do it this way.  During your
13   deposition last July in 2022, there was some
14   testimony to that point, correct?
15       A.  I guess.
16       Q.  Well, I'll play you what you said at that
17   time, okay?
18       MR. DUERK: This is Clip 6.
19
20           (Whereupon, Clip No. 6 was played
21            for the jury)
22
23       Q.  (By Mr. Duerk)  Did that accurately refer
24   to your testimony from last July?
25       A.  It did.

Page 55

1        Q.  So if a patient does not have a diagnosis
2    of an asbestos-related disease, if a patient is not
3    sick from Libby amphibole, they should not be
4    submitting for Medicare benefits, no exceptions,
5    correct?
6        A.  Unless a B Reader finds a positive
7    designation.
8        Q.  Okay.  Let's look at Clip 8.
9
10           (Whereupon, Clip No. 8 was played
11            for the jury)
12
13       Q.  (By Mr. Duerk)  Does that accurately
14   reflect your sworn testimony from last July?
15       A.  Yes.
16       Q.  Okay.  Sir, last July, during your
17   testimony, there wasn't any testimony from you about
18   this provision that a B Read constituted a
19   diagnosis, correct?
20       A.  Correct.  To the best of my recollection,
21   correct.
22       Q.  All right.  And then in terms of your
23   foundation about CARD's methodology for diagnosing,
24   that's not something that you ever made an inquiry
25   about, correct?

Page 56

1        A.  Correct.
2        Q.  In terms of the specifics about the
3    intricacies of a diagnosis of asbestos-related
4    disease, you don't claim to understand what's
5    required for a diagnosis of ARD, correct?
6        A.  Correct.
7        Q.  In terms of the American Thoracic Society
8    standards, are you aware that Dr. Black and other
9    CARD employees have testified that in order to
10   establish a diagnosis of asbestos-related disease,
11   that requires more than just a B Read?
12       A.  I'm not aware of that.
13       Q.  Okay.  Are you aware that according to
14   the sworn testimony of Dr. Black, in order to have a
15   valid diagnosis of asbestos-related disease, a
16   patient needs either a chest x-ray or a CT scan
17   interpreted showing an asbestos-related disease,
18   they need exposure history showing that the
19   individual was exposed to asbestos at some point,
20   and the patient needs a differential diagnosis
21   ruling out all other possible causes of those
22   radiographic findings?
23       A.  That's a long question.  Can you shorten
24   that up, please?
25       Q.  I can.  I'll represent to you that under

Exhibit 3-15

Page 57

1  the American Thoracic Society guidelines, a
2  diagnosis requires exposure history, a CT or chest
3  x-ray showing disease and a differential diagnosis
4  ruling out other potential causes.  Were you aware
5  of that?
6      A.  No.
7      Q.  And would you defer to Dr. Black and
8  other medical professionals about what is required
9  for a diagnosis of an asbestos-related disease?
10     A.  Dr. Black's a physician.  I trust
11  Dr. Black.
12     Q.  All right.  Would you also trust the
13  NIOSH certified B Readers, the radiologists, M.D.
14  physicians that over-read all of that?
15     A.  I have no idea because I don't know of
16  them.  I know Dr. Black.
17     Q.  Sir, were you aware that the CARD B
18  Readers, in this case, NIOSH certified B Readers,
19  when they learned of CARD's practice of saying that
20  their B Reads served as the basis of diagnosis left
21  their contracts and will not be reading for CARD
22  anymore?
23     A.  I'm not aware of that.
24     MR. BECHTOLD:  Objection, misstates the evidence.
25     Q.  (By Mr. Duerk)  Sir, have you heard any

Page 58

1  information about B Readers, Dr. Kanne, Dr. Meyer
2  Dr. Lynch in this case who have served on CARD's
3  panel of expert outside NIOSH B Readers?
4      A.  No.
5      Q.  Would it cause you any concern if CARD's
6  thoracic radiologist B Readers, when they learned
7  about this B Rad diagnosis practice at CARD,
8  terminated their contracts with the Center for
9  Asbestos-elated Disease?
10     A.  I would have to know the facts.  I can't
11  answer that without more facts.
12     Q.  All right.  If those facts were true and
13  those B Readers have all testified under oath that
14  their reads do not constitute a diagnosis nor could
15  they constitute a diagnosis of asbestos-related
16  disease, would that concern you?
17     A.  You're assuming an answer and I would
18  need more facts.  I cannot answer that question.
19     Q.  Okay.  I can provide more facts.  Are you
20  aware of what --
21     A.  You're not giving me enough.  I'm would
22  have to know of independent examination,
23  investigation and inquiry before I was able to
24  answer that question.
25     Q.  Right.  And do you understand that that

Page 59

1  is the jury's job in this current action to look at
2  all of the facts, look at what the B Readers have
3  said, what the B Readers have done, to look at all
4  the --
5      A.  Of course, that's a different issue.
6  You've asked me a different question.
7      Q.  All right.
8      A.  Those are two different points.
9      Q.  So, sir, do you know what a B Reader is?
10     A.  I have an idea.
11     Q.  Okay.  What is your idea?
12     A.  It's a pulmonologist or somebody who's
13  qualified to determine whether or not there's a
14  positive or negative reading of an x-ray or a CT
15  scan.
16     Q.  All right.
17     A.  With respect to asbestos.
18     Q.  And sir --
19     A.  A doctor.
20     Q.  A doctor.  Yep, an MD doctor?
21     A.  An MD doctor, anesthesiologist who is an
22  MD doctor.  It could be an anesthesiologist or and
23  MD doctor.
24     Q.  Are you aware of what a B Reading
25  physician is indicating when they find signs of an

Page 60

1  abnormality or a positive B Read when they look at
2  CARD patient films?
3      A.  No, I don't know.
4      Q.  Okay.  So --
5      A.  I'm not a doctor.
6      Q.  Understood.  And Senator Baucus, if it
7  turned out that when B Reading physicians were
8  looking for abnormalities, they would note all
9  abnormalities, not just asbestos-related
10  abnormalities in their reports?
11     A.  What's the question?
12     Q.  Were you aware of that?
13     A.  No.
14     Q.  Okay.  Sir, were you aware that a
15  positive B Read may indicate abnormalities like
16  emphysema or COPD or a history of smoking
17  cigarettes?
18     A.  I have no idea.  All I know is if there's
19  a -- a doctor found a positive indication of
20  asbestos, irrespective of emphysema or the others,
21  asbestos, that's sufficient.
22     Q.  All right.  Sir, are you aware that when
23  B Readers send their B Read reports back to CARD,
24  there isn't any indication on that form that says
25  whether or not that B Reader believes the patient

**Exhibit 3-16**

**Senator Max Baucus**

Page 61

1  has an asbestos-related disease?
2      A.  I think that's accurate.  I think that's
3  accurate.
4      Q.  All right.  So a doctor, a B Reading
5  physician, may send a report back to CARD that
6  merely says there's an abnormality of emphysema.
7  Are you aware of that possibility?
8      MR. BECHTOLD: Foundation.
9      THE WITNESS: I'm also aware of the statute that says
10  if a B Read -- if The B Reader determines a positive
11  indication, the statute stays that, in effect, that it
12  sufficient for coverage.
13      Q.  (By Mr. Duerk)  All right.  And, sir, I
14  understand that that's what your testimony is here
15  today.  And it's not your intent to have a B Reader
16  find that a patient has no asbestos-related disease
17  and still be submitted for Medicare coverage,
18  correct?
19      A.  Correct.
20      Q.  Okay.  During your deposition last time,
21  we talked about a hypothetical involving a patient
22  with a fractured rib.  Sir, I'll represent to you
23  that a fractured rib shows up as an abnormality on a
24  B Read.  Do you have any reason to disagree with
25  that?

Page 62

1      A.  I have no reason to agree or disagree.  I
2  just have no -- I'm not competent to answer that
3  question.
4      Q.  In your mind, if a patient suffered from
5  a fractured rib, but no signs of asbestos-related
6  disease, would it be proper to submit that patient
7  for lifetime Medicare benefits when they are not
8  sick with asbestos-related disease?
9      A.  It would not be proper.
10      Q.  Right.  Sir, in terms of that fractured
11  rib patient, we discussed that hypothetical during
12  your deposition in July of last year, right?
13      A.  I vaguely remember all of us talked about
14  fractured ribs, yes.
15      Q.  Okay.  So, in your mind, in patients with
16  a rib fracture, if a doctor had submitted Medicare
17  claims for patients knowing that those individual
18  patients did not have a diagnosis of
19  asbestos-related disease, you would find that
20  problematic?
21      A.  Right.
22      Q.  In fact, if a doctor submitted patients
23  with a rib fracture or other non-related asbestos --
24  or problems not related to asbestos for lifetime
25  Medicare benefits, you would find that to be

Page 63

1  fraudulent, correct?
2      A.  Well, fraud is intent.  So there may not
3  be intent to defraud.  It could be a mistake.  It
4  could be oversight.  So I don't know if that's fraud
5  or not.  That's a legal determination.
6      Q.  Sir, I'll go ahead and go about it this
7  way.  I'm going to play for you video clip 11.
8  Please tell me if this is an accurate reflection of
9  your testimony.
10      A.  I suppose it's in here in the deposition.
11
12          (Whereupon, Clip No. 11 was
13           played for the jury)
14
15      Q.  (By Mr. Duerk)  Did that accurately
16  reflect your sworn testimony?
17      A.  Yes.
18      Q.  All right.  And, sir, have you ever seen
19  any correspondence from the CARD Clinic where the
20  CARD Clinic indicated to its own patients that the
21  patient did not have a diagnosis of asbestos-related
22  disease and yet they were submitting that patient
23  for Medicare benefits for life anyway?
24      A.  I'm unaware.
25      Q.  Did you ever see any correspondence from

Page 64

1  the CARD Clinic where CARD indicated to the patient
2  that a B Reader found an abnormality but this had no
3  indication of any health condition that should cause
4  the patient any concern but the patient was still
5  being submitted for Medicare benefits?
6      A.  I'm not aware of any.
7      Q.  Were you aware, sir, that in over 100
8  individual patient cases, CARD told the patient that
9  they didn't have a diagnosis of asbestos-related
10  disease from CARD or anywhere else, that the patient
11  did have an abnormality that was identified by an
12  outside Reader, but that that abnormality was
13  nothing that had significant health implications nor
14  is it considered a diagnosis of asbestos-related
15  disease?
16      MR. BECHTOLD: Misstates the testimony.
17      THE WITNESS: I'm unaware of anything.
18      Q.  (By Mr. Duerk)  Okay.  And would that
19  cause concern in your mind?
20      A.  I would have to have more information.
21
22          (Pause)
23
24      Q.  Doctor, we also talked about a different
25  kind of hypothetical in your July 2022 deposition

**Exhibit 3-17**

Page 65

1  that I'd like to cover that today, okay?  Last
2  summer, we talked about a hypothetical patient who
3  went to the -- goes to a clinic to determine whether
4  or not there's a diagnosis of asbestos-related
5  disease.  And during that time frame, the patient is
6  never found to have signs of an abnormality on
7  either a chest x-ray or a CT scan by any
8  radiologist.
9        In this hypothetical, the patient returns
10  to the clinic year after year after year, and his CT
11  scans and his chest x-rays are read by radiologists,
12  thoracic radiologists, pulmonologists, and every
13  single time, over a multi-year period, that patient
14  is always negative for asbestos-related disease.
15        If that patient were submitted for
16  Medicare benefits, would that concern you?
17  A.  Yes.
18  Q.  Why?
19  A.  Because the statute is not intended --
20  the statute is not intended to cover a person in
21  that situation.  Although I will say, that often, as
22  I understand it, even though I'm not a doctor, that
23  the disease often is not detected in the early
24  stages but can be detected at later stages in
25  subsequent years.

Page 66

1  Q.  Understood.  With this hypothetical
2  patient, I'd like for you to assume that they were
3  scanned starting in 2013 -- I'm sorry, starting in
4  2015, and they were scanned in 2016 and 2017.
5  Ultimately, that patient was sent to the Mayo
6  Clinic, and not only was the patient scanned again
7  at the Mayo Clinic, but the radiologists at Mayo
8  went back and reviewed all prior scans.
9        In this hypothetical, the Mayo Clinic
10  found no signs of asbestos-related disease during
11  the current scan, the most recent scan, but also no
12  signs of asbestos-related disease going all the way
13  back to the patient's earliest scan.
14        If that patient were submitted for
15  Medicare benefits, would it concern you?
16  MR. BECHTOLD: Foundation.
17  THE WITNESS: Well, that's not this case.  That's a
18  hypothetical.  And I just -- it's hard to deal with
19  hypotheticals.
20  Q.  (By Mr. Duerk) I understand.  I would
21  like for you to assume that that hypothetical is true.
22  A.  Of course you would.  For your purposes,
23  yes.  I can't -- I just don't know.  It's a
24  hypothetical.  I can't -- it's hard for me to answer
25  a hypothetical.

Page 67

1  Q.  All right.  Now, I'd like you to look at
2  page 62 of your deposition.
3  A.  What tab is that again?
4  Q.  Sorry, it's tab 20.  It's behind tab 20.
5  There we go.  I'm looking at page 62.  I'm looking
6  at line 7.
7  A.  Okay.
8  Q.  I'm starting at line 7.
9        Let's go into a separate hypothetical.
10  Assume there's the same doctor who sees a patient
11  and that patient had some experience in Libby,
12  Montana, so that they were in Libby for the
13  requisite period of time, and the doctor sent that
14  patient's x-rays and CT scans out for a read from
15  either a B Reader or a thoracic radiologist, a
16  pulmonologist, someone with experience reading
17  films, and all of those films, all of those chest
18  x-rays came back as negative for asbestos-related
19  disease; not just once, but multiple times, year
20  after year.
21        Assuming there was no outside evidence
22  according to radiologists and outside experts
23  showing any signs consistent with asbestos-related
24  disease, would you find it problematic if that
25  doctor submitted that patient for Medicare benefits?

Page 68

1  Answer, yeah, if there's no basis for finding a
2  disease, yeah.
3        Did I read that correctly?
4  A.  Yes.
5  Q.  Now, we talked about -- or Mr. Bechtold
6  talked about outside pulmonologists and outside
7  radiologists and outside doctors not necessarily
8  understanding Libby asbestos and asbestos-related
9  disease from Libby's asbestos, do you remember your
10  testimony there?
11  A.  Yeah.
12  Q.  And I believe we looked at some
13  congressional testimony about doctors outside of
14  Libby really not understanding the problem; is that
15  right?
16        I believe that testimony on the
17  Congressional Record was given in support of the
18  changes in the Affordable Care Act, correct?
19  A.  I don't know about changes.  They
20  supported the provision that was put in there.
21  Q.  Correct.  I'm sorry, the provision that
22  was to be put in the act.  And I think we could
23  probably determine when that -- when you gave that
24  testimony or when --
25  A.  Oh, yeah it would be in there.

**Exhibit 3-18**

Senator Max Baucus

Page 69

1  **Q.** Do you mind referring to the record just
2  to see what year that testimony was provided?
3  **A.** It would have been prior to the passage
4  of the Act, so in 2000 -- after 2010. What tab is
5  that? Where do I find it?
6  **MR. BECHTOLD:** Tab 3.
7  **THE WITNESS:** Okay. Oh, this is in '09.
8  **Q.** (By Mr. Duerk) So the remarks that you
9  made on the record about other physicians outside of
10 Libby not necessarily understanding the disease,
11 those remarks were made in 2009; is that correct?
12 **A.** It looks like it.
13 **Q.** Okay. And in terms of any conversations
14 you've had with outside physicians or radiologists,
15 you didn't communicate with outside doctors about
16 their understanding of Libby disease?
17 **A.** Oh, I did.
18 **Q.** In terms of any conversations with
19 outside doctors, aside from Dr. Whitehouse --
20 **A.** Other than Whitehouse, Holm, I think his
21 name is, in Texas.
22 **Q.** Holm in Texas?
23 **A.** I think so.
24 **Q.** But aside from Dr. Whitehouse who worked
25 for the CARD Clinic, who did work with the CARD

Page 70

1  Clinic, and this doctor in Texas, Dr. Holm, did you
2  speak with any other outside physician?
3  **A.** I did not but my staff could well have,
4  and I have very good staff, and I put a lot on my
5  staff to get the facts.
6  **Q.** All right. But in terms of --
7  **A.** Personally, no.
8  **Q.** Personally? Right. And so in terms of
9  this understanding that there were outside
10 physicians in Libby and the surrounding area in 2009
11 at the time you gave this testimony that didn't
12 understand Libby disease, aside from Dr. Whitehouse,
13 a CARD physician and perhaps Dr. Holm, you,
14 yourself, didn't speak with other outside
15 physicians?
16 **A.** No, but it's common knowledge. It was
17 common knowledge. I mean, lots of people knew.
18 Nobody disputed that.
19 **Q.** Back in 2009 is when you made those
20 statements on the record. Since 2009, have you
21 spoken with any other outside radiologists,
22 pulmonologists, thoracic radiologists or any other
23 doctors who have looked at, examined, scanned and
24 interpreted images of CARD patients?
25 **A.** No.

Page 71

1  **Q.** Is that --
2  **MR. DUERK:** I'm seeing a note that we should take a
3  break so we will take a break.
4  **VIDEO OPERATOR:** We're going off the record. The
5  time is 12:00 p.m.
6
7  (Whereupon a recess was taken)
8
9  **VIDEO OPERATOR:** We are back on the record. The time
10 is 12:02 p.m.
11 **Q.** (By Mr. Duerk) You said just in terms of
12 your experience with physicians from the Mayo
13 Clinic, physicians from the Mayo Clinic aren't whack
14 doctors, correct?
15 **A.** Correct. Better not. I go there.
16 **Q.** Doctor, in terms of the way in which
17 patients that are enrolled for Medicare, there are a
18 couple of different definitions and concepts within
19 the Social Security Act procedures, And I just want
20 to see if they square with your understanding of how
21 a disease is diagnosed, okay?
22 In the Medicare provisions, in the POMS,
23 there's reference to a physician as a provider. And
24 the provider, the diagnosing physician, is one who
25 takes into account all of the information about that

Page 72

1  patient before rendering a diagnosis. Does that
2  concept make sense to you?
3  **A.** Yeah.
4  **MR. BECHTOLD:** Foundation, relevance.
5  **Q.** (By Mr. Duerk) In terms of the types of
6  information that the provider needs to take into
7  account, they take into account, the scans, or the
8  CT scans, or the chest x-rays, the provider also
9  performs an in-person assessment and looks at
10 medical history.
11 Are those concepts, do they square with
12 your understanding of what a provider does?
13 **A.** Yes.
14 **Q.** Okay. In the Social Security
15 Administration Program Operation Manual Systems,
16 that's what I'll call the POMS, it's the provider,
17 it's the doctor who has the most information about
18 the patient who makes that diagnosis.
19 Does that square with your understanding
20 of how things work?
21 **A.** Yeah.
22 **MR. BECHTOLD:** Foundation, relevance.
23 **Q.** (By Mr. Duerk) All right. If the
24 physician, if the doctor with the most information
25 about a patient, the diagnosing physician, the

**Exhibit 3-19**

Senator Max Baucus

Page 73

1  doctor who has read the CT scan and the chest x-ray,
2  the doctor who completed the patient assessment, the
3  doctor who reviewed the exposure history of the
4  patient, the diagnosing physician, if that doctor
5  says to the patient, you're not sick, you don't have
6  asbestos-related disease, based on your
7  understanding of the Affordable Care Act, would it
8  be proper for that patient to be submitted for
9  Medicare benefits?
10     A.  Are we talking about generally?  Are we
11  talking about this Libby, the Libby cases?  What are
12  we talking about?
13     Q.  Libby Cases.
14     A.  No, that's -- the question is way too
15  long.  I couldn't remember it all.  Can you ask a
16  simpler question?
17     Q.  Sure.  If we've got the doctor with the
18  most --
19     A.  Now, we're talking about Libby?
20     Q.  We're talking about Libby.
21     A.  Okay.
22     Q.  If the doctor with the most information,
23  who's seen the CT scans, he's read and interpreted
24  them, if the doctor who has taken the exposure
25  history, who's done the inpatient assessment, if

Page 74

1  that doctor seeing all of the information tells the
2  patient, you're not sick, you don't have
3  asbestos-related disease, should that patient be
4  submitted for Medicare?
5     A.  Might.  Yes, possibly.
6     Q.  Might?  Why?
7     A.  Because it was a different doctor.  A
8  different doctor is involved here.  The statute says
9  you're either diagnosed by CARD or by a B Reader.
10  Technically, the term diagnosis is not usable in a B
11  Reader, so it depends.  The point here in the
12  statute is not to narrow the determination down to
13  one doctor and one doctor's decision only.
14     Q.  Okay.  Let's look at page --
15     A.  So that's why I asked the question the
16  way I did.
17     Q.  Sure.  Let's look at page 58, lines 8.
18     A.  58.
19     Q.  Line 8.
20     A.  Yeah.
21     Q.  "Within the context of this hypothetical,
22  let's say that the doctor with the most information,
23  the diagnosing physician, the doctor who has the CT
24  scan and the chest x-ray, the doctor who's completed
25  an inpatient assessment, the doctor who's reviewed

Page 75

1  the exposure history of the patient, the diagnosing
2  physician in this instance says, quote, you are not
3  sick, you don't have asbestos-related disease."
4  Based on your understanding of the Affordable Care
5  Act, would it be proper for that patient to be
6  submitted for Medicare benefits?
7     A.  That's what I said there, but since then
8  I've gone back --
9     Q.  Sorry, I'm not done.
10     A.  Okay, go ahead.
11     Q.  Answer, if the patient does not have
12  disease, the answer is no.
13         Did I read that correctly?
14     A.  You did, but I'm going to say that that
15  we have more facts now.  And as an expert witness,
16  I'm supposed to have more facts, and I have more
17  facts.  And when I went back and read the statute
18  and refreshed my recollection for the statute, so
19  that's why my answer is not -- will be different now
20  than what I said then.
21     Q.  The question that I asked you back then
22  starting on line 22, page 58, and so consistent with
23  the original purpose of the --
24     A.  I'm sorry, where are you?
25     Q.  Page 58, line 22.

Page 76

1     A.  Okay.
2     Q.  And so consistent with the original
3  purpose of the EHH provisions and the Affordable
4  Care Act, without a diagnosis, that patient
5  shouldn't be deemed Medicare eligible.  Your answer,
6  without a diagnosis, that's correct.
7         That's what you said last year under
8  oath, correct?
9     A.  That's what I said back then.
10     Q.  All right.
11     A.  But I'm -- it's more complicated than
12  you're implying there.
13     Q.  Senator Baucus, in your mind, would it
14  ever be proper to knowingly submit a patient for
15  Medicare benefits when the physician knew that
16  patient wasn't sick with an asbestos-related
17  disease?
18     A.  It would problematic.  Again, I would
19  want more facts.
20     Q.  Right.  And you've described that
21  scenario in the past as fraud, correct?
22     A.  I've used the word in the prior
23  deposition, and it would be fraudulent with all
24  things considered if both the B Reader and, in my
25  hypothetical, both the B Reader and the CARD

Exhibit 3-20

Page 77

1  physician intentionally knew there was no disease,
2  that would be fraud.
3     Q.  Right.  Right.  So if the B Reader saw
4  that the patient didn't have an asbestos-related
5  disease, but instead chronic obstructive pulmonary
6  disease and CARD knew that, and they submitted a
7  Medicare claim form for lifetime health care
8  benefits anyway, that would be fraud, right?
9     A.  I don't know.  I'd have to have the
10  facts.  I can't answer that question.  That's way
11  too complicated; too many subsections to that
12  question.
13     Q.  In terms of the facts in this case, did
14  you ask for more facts before you rendered your
15  expert witness opinions in this matter?
16     A.  Did I ask for more facts?
17     Q.  Yes.
18     A.  I asked myself and went back and I
19  refreshed my recollection of the statutes and my
20  recollection.
21     Q.  Did CARD provide you with more facts?
22     A.  No.
23     Q.  Did CARD provide you with any medical
24  records related --
25     A.  No.

Page 78

1     Q.  Did they provide you with any medical
2  records related to any of the individual CARD
3  patients that are the subject of the false claims
4  act case here?
5     A.  No.
6     Q.  Okay.  In terms of the Complaint itself,
7  the Amended Complaint, have you seen what the
8  precise allegations are against the CARD claim?
9     A.  No.  I just want to help people in Libby.
10  That's my concern.
11     Q.  I understand.  And you understand, sir,
12  that this case is not about the people in Libby who
13  are sick with an asbestos-related disease.  This
14  fraud case is a case about the people in Libby who
15  are not sick.  Do you understand that?
16     A.  No.
17     Q.  Okay.  Okay.  That's helpful.  So if I
18  were to tell you that there is deposition testimony
19  from CARD patients who have said under oath that
20  they are aware, one patient in particular I'm
21  thinking of, has stated she's aware that she doesn't
22  have an asbestos-related disease because CARD told
23  her she doesn't have an asbestos-related disease,
24  and, yet, nevertheless, she's still getting gym
25  membership benefits under the Medicare program.  Is

Page 79

1  that testimony that you've heard about before?
2     A.  I have not heard about anything about
3  that.
4     Q.  All right.  And if there was a patient
5  who did actually fall into that category who has
6  been told by CARD repeatedly, you are not sick, you
7  don't have asbestos-related disease, and, yet, CARD
8  submitted her for Medicare benefits for life so that
9  she could get gym membership paid for by the people
10  of the United States, would you find that
11  problematic?
12     A.  I find it concerning, but I need more
13  facts before making a decision.
14     Q.  Right.  And in terms of the facts related
15  to this case, aside from your declaration and the
16  exhibits that I learned you were going to be talking
17  about today, you haven't seen any other written
18  information about those CARD patients, fair?
19     A.  That's true.
20     Q.  Okay.  Sir, I apologize if any of my
21  questions seem disrespectful here, but what I'm
22  trying to get at is, I do appreciate the work that
23  you've done for the people of Libby.  I do.  But is
24  it benefitting the people of Libby if there's fraud
25  in the system being perpetrated by CARD to let that

Page 80

1  fraud continue?
2     A.  I'm unaware of any fraud.
3     Q.  I'm well aware of that.  However, my
4  question stands, does it benefit anybody in Libby if
5  there's fraud in the way that CARD submits people
6  for Medicare benefits to let that practice continue?
7     A.  I'm against fraud.
8     Q.  Understood.  And you have not seen any of
9  the evidence of fraud in this case?
10     A.  Correct.
11     Q.  Okay.  So is it fair to say that without
12  seeing any evidence of the alleged fraudulent
13  conduct in this case, you wouldn't be able to make
14  up your mind one way or another whether fraud had
15  occurred?
16     A.  Correct.
17     Q.  Okay.  And CARD has not provided you with
18  any evidence other than what we've looked at on the
19  record today, is that fair?
20     A.  Right.
21     Q.  Okay.
22        MR. DUERK: If we could talk a short break, I might
23  be able to figure out how to shorten this up.
24        VIDEO OPERATOR: We're going off the record.  The
25  time is 12:14 p.m.

**Exhibit 3-21**

Senator Max Baucus

Page 81

1
2          (Whereupon a recess was taken)
3
4     VIDEO OPERATOR: We are back on the record.  The time
5  is 12:28 p.m.
6     Q.  (By Mr. Duerk)  Senator Baucus, I would
7  like you to look at what I'll mark as Exhibit 160 in
8  this case.  It's at tab 24 in your binder.
9
10          (Deposition Exhibit No. 160 was marked
11           for identification)
12
13     Q.  (By Mr. Duerk)  Sir, if you would look at
14  page 2 of Exhibit 160.
15     A.  Yep.
16     Q.  Do you see an e-mail from Tanis Hernandez
17  at the top and a number of other individuals?
18     A.  I do, down at the bottom.
19     Q.  Yep.  The subject is Baucus mailing?
20     A.  Yep.
21     Q.  Sir, I can't imagine that you have seen
22  this e-mail before, but what I'm hoping to do is
23  show you this e-mail to try to refresh your
24  recollection about the subject here, it says Baucus
25  mailing.

Page 82

1     Sir, in about 2010, do you recall sending
2  out a community-wide mailer about the new provisions
3  in the Affordable Care Act to the residents of
4  Libby, Montana?
5     A.  It is something I would do, but I do not
6  specifically remember this one.
7     Q.  All right.  If we could look at the first
8  page of Exhibit 160.  It appears that there's a back
9  and forth about the subject here, Baucus mailing.
10  I'm looking at what I think is the very last e-mail
11  in this train from Tanis Hernandez to several other
12  people.
13     A.  Are you at the top of the page?
14     Q.  I am.  It indicates that there are some
15  handwritten notes on the bottom of this mailing.
16  Sir, do you recall either the mailing itself or any
17  handwritten notes on the bottom of the mailing?
18     A.  No.
19     Q.  Okay.  Let's do this.  If we could turn
20  to the next tab.  Find tab 25.  What I'll do is mark
21  this -- oops, I think you might be one back --
22  behind tab 25.
23     A.  There it is.
24     Q.  I'll mark this as Exhibit 161.
25          (Deposition Exhibit No. 161 was marked

Page 83

1           for identification)
2
3     Q.  (By Mr. Duerk)  Do you see what appears
4  to be the mailing referenced in the prior e-mails
5  with your signature on it?
6     A.  Yes.
7     Q.  Okay.  Does the website at the bottom of
8  the page, www.baucus.senate.gov, is that your -- was
9  that one of your e-mails?
10     A.  I presume.
11     Q.  Okay.  And does this appear to be a true
12  and accurate copy of a mailing entitled, Dear
13  Friends that was sent out --
14     A.  As near as I can tell, yes.
15     Q.  Okay.
16     MR. DUERK: So I would move to admit this exhibit.
17     Q.  (By Mr. Duerk)  If you would please start
18  from the beginning and just read this mailing, that
19  would be helpful, Senator.
20     A.  "I'm so pleased to be writing you after
21  the passage of the health care reform bill that
22  would lower costs and provide quality affordable
23  health coverage to all Montanans.  In addition, the
24  Patient Protection and Affordable Care Act sets up a
25  new system for screenings and medical care for

Page 84

1  people affected by asbestos-related disease.  In
2  June 2009, the joint EPA Administrator Jackson with
3  the announcement that a 'public health emergency'
4  was declared at the Libby/Troy Superfund site, I
5  have been pushing for this since it was first
6  considered by the EPA in 2001.  The public health
7  emergency triggers screening and medical care for
8  affected people.
9          Before Libby, this process had never been
10  used, so there's no system set up.  But the
11  healthcare reform bill does just that.  I wrote the
12  section of the bill that provides funding for
13  screening services.  If a person is determined to
14  have an asbestos-related disease that requires
15  treatment, it allows that person to enroll in
16  Medicare.  This program is permanent.  In addition,
17  allots funds for a pilot program to provide
18  specialized medical services that are not covered by
19  Medicare.  It will ensure that people affected by
20  asbestos-related disease from the W.R. Grace
21  operation in Libby, Montana will receive the
22  healthcare they need.
23          Now that healthcare reform bill is law,
24  we're working to get the system up and running
25  quickly.  In the meantime, people who need screening

**Exhibit 3-22**

Page 85

1  or medical care for asbestos-related disease can
2  enroll in the FLASH program, the Federal Libby
3  Asbestos Special Healthcare program, funded with the
4  $6 million grant from the Department of Health and
5  Human Services that I secured in '09.  This program
6  will provide coverage for services that are not
7  covered by other insurance or asbestos-related
8  disease programs.  For details on how to enroll,
9  contact my office toll free at (800) 332-6106, or in
10  Kalispell at (406) 756-1150."
11      Q.  And, sir, is that your signature on this
12  mailer?
13      A.  It is.  Well, it looks like it.
14      Q.  Looks like it.  I would like to look at
15  the bottom of the page in Exhibit 161 and see if you
16  know the source of it.  First, I'll read it to you
17  and tell me if I've read it correctly.
18      "If you:
19          1) Have an asbestos-related disease
20  diagnosed by a medical provider;
21          2) Are NOT on Medicare;
22          3) Call 1-888-482-3128 and say.
23      'I want to sign up for Medicare coverage
24  due to my asbestos-related disease that resulted
25  from the Libby, Montana asbestos exposure.'"

Page 86

1          First, did I read that correctly?
2      A.  Yes, you did.
3      Q.  Okay.  And, sir, in terms of this
4  mailing, was this consistent with the messaging that
5  was being sent out to the people of Libby about the
6  passage of the Affordable Care Act?
7      A.  It's consistent, yeah.
8      Q.  Okay.  And, sir, in terms of the
9  handwritten language there, is this also consistent
10  with what your understanding is about the way the
11  patients would report their condition to the Social
12  Security Administration to get Medicare coverage?
13      A.  It's a good start.
14      Q.  Okay.  And to the best of your knowledge,
15  what else is required to submit to the Social
16  Security Administration to get Medicare coverage?
17      A.  Well, I don't know.  I never brought it.
18      Q.  Do you have any understanding of what
19  CARD would submit in support of Medicare benefits
20  for its patients?
21      A.  No, I just trust them to do the right
22  thing.
23      Q.  And, at least, according to the e-mail
24  that we see and your mailing, it says that CARD
25  patients should report to Social Security if they

Page 87

1  have an asbestos-related disease diagnosed by a
2  medical provider, correct?
3      A.  Right.
4      Q.  All right.  And in terms of the
5  conversation we've had back and forth, the provider
6  is the doctor or the healthcare facility --
7      A.  Right.
8      Q.  -- itself, correct?
9          Nowhere on your mailing or this
10  handwritten note does it indicate that individuals
11  are eligible for Medicare based on a radiographic
12  report alone, correct?
13      A.  No, but that's the reason for the
14  telephone number, to get the facts.
15      Q.  Right.  And when the Social Security
16  Administration is called about those facts, the
17  first fact that needs to be established is that the
18  patient has an asbestos-related disease diagnosed by
19  a medical provider, correct?
20      A.  Generally.  I mean, it's -- the main
21  point is, the statute is there to help people.  The
22  mailing's sent out to give notice, and here's a
23  telephone number to see if you qualify.
24      Q.  Right.  Based on all of the material that
25  I've seen about Medicare benefits from your office,

Page 88

1  all of that material indicates that in order to get
2  Medicare, the person has to be sick due to
3  asbestos-related disease, is that your
4  understanding?
5      A.  Basically, yeah.
6      Q.  Yeah.  And I've never seen, sir, a
7  mailing from your office that indicates that
8  patients who aren't sick due to an exposure to Libby
9  asbestos are eligible for Medicare, is that your --
10      A.  You've said you've never seen it, and I
11  trust you.
12      Q.  I haven't.  But let me ask it this way.
13  Are you aware of any communication --
14      A.  No.
15      Q.  Sorry.  Just for the record, I've got to
16  ask my question.  But are you aware of any
17  communications sent by your office that told
18  individuals in Libby that they were eligible for
19  Medicare without being sick due to an exposure to
20  Libby asbestos?
21      A.  No.
22      Q.  Okay.  And in terms of the communication
23  that you've received from CARD that you're aware of,
24  have you ever received any communication from CARD
25  that indicated to you that CARD was submitting

**Exhibit 3-23**

Page 89

1 patients for Medicare benefits who CARD knew were
2 not sick due to an exposure to asbestos-related
3 disease?
4    A. I'm not aware of anybody. Nothing
5 provided.
6    Q. In terms of any communications from
7 Medicare or the Social Security administration --
8 I'm know you know where I'm going, but I'll ask the
9 question -- have you ever seen any communication
10 from the Social Security Administration that
11 indicated that Social Security was okay giving
12 Medicare benefits to people that CARD and everyone
13 else knew were not sick with asbestos-related
14 disease?
15    A. No, I've never seen anything like that.
16    Q. And it is not your testimony here today
17 that it is okay for somebody without an
18 asbestos-related disease to get lifetime Medicare
19 benefits unless they've been exposed to Libby
20 asbestos and are actually sick with asbestos-related
21 disease due to that exposure, correct?
22    A. Correct.
23    MR. DUERK: Sir, thank you for your time today. I
24 have no further questions at this point.
25    MR. BECHTOLD: I just have a couple follow-ups.

Page 90

2        REDIRECT EXAMINATION
4 BY MR. BECHTOLD:
5    Q. I'd like to take a look at Exhibit 161.
6    A. Which book?
7    Q. Right in front of you.
8    A. Where is 161?
9    Q. It's the one that you have right in front
10 of you now. It's your letter to the people from
11 Libby.
12    A. Okay.
13    Q. In the second paragraph, the third
14 sentence, it says, "I wrote a section of the bill
15 that provides funding for screening services."
16      Do you see that?
17    A. Second paragraph? Yeah, I do.
18    Q. So you wrote a section of the Act that we
19 looked at before, right, section --
20    A. Right.
21    Q. -- 1881A, correct?
22    A. Uh-huh.
23    Q. And under Section 1881A, is it your
24 interpretation of asbestosis, pleural thickening or
25 pleural plaques is established by a B Reader? Is

Page 91

1 that a diagnosis under the Act?
2    MR. DUERK: Objection, foundation, form,
3 nondisclosure, also calls for a legal interpretation. Go
4 ahead.
5    THE WITNESS: It's not -- it's technically not a
6 diagnosis, but it's sufficient for coverage.
7    Q. (By Mr. Bechtold) And you wrote the Act,
8 right?
9    A. Yes.
10    Q. And that was your intention?
11    A. Yes. B Readers positive -- a different
12 name -- a positive determination and it's
13 sufficient.
14    MR. BECHTOLD: Nothing further. Thank you.
15    VIDEO OPERATOR: That concludes this deposition. The
16 time is 12:42 p.m.
18      (Whereupon, the deposition concluded at
19       12:42 p.m. for the day)
21      (Signature waived)

Page 92

1        C E R T I F I C A T E
3 STATE OF MONTANA    )
4               :ss
5 COUNTY OF BEAVERHEAD )
6    I, Robyn Ori English, Freelance Court Reporter and
   Notary Public for the State of Montana, residing in
7    Dillon, do hereby certify:
8    That I was duly authorized to and did swear in the
   witness and report the deposition of Max Baucus,
9    in the above-entitled cause; that the foregoing pages of
   this deposition constitute a true and accurate
10    transcription of my stenotype notes of the testimony of
   said witness, all done to the best of my skill and
11    ability; that the reading and signing of the deposition by
   the witness has been expressly waived.
12
   I further certify that I am not an attorney nor
13    counsel of any of the parties, nor a relative or employee
   of any attorney or counsel connected with the action, nor
14    financially interested in the action.
15    IN WITNESS WHEREOF, I have hereunto set my hand and
   affixed by notarial seal on this, the _____day of _____,
16    2023.

**Exhibit 3-24**

Timothy Bechtold
Bechtold Law Firm, PLLC
P.O. Box 7051
Missoula, MT 59807
406-721-1435
tim@bechtoldlaw.net

Attorneys for CARD

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BNSF, <br><br> Plaintiff <br><br> vs. <br><br> CARD, <br><br> Defendant. | CV-19-40-M-DLC <br><br> **CARD'S INITIAL DISCLOSURE SECOND SUPPLEMENT** |

I. **INDIVIDUALS WITH DISCOVERABLE INFORMATION WHOM CARD MAY USE TO SUPPORT ITS CLAIMS AND DEFENSES**

1. Brad Black, CARD

2. Tracy McNew, CARD

3. Jim Lockey, Professor Emeritus, University of Cincinnati

4. Albert Miller, Professor of Clinical Medicine, Mt Sinai School of Medicine

5. Tanis Hernandez, former administrative director at CARD

6. Henry Falk, former HHS

**Exhibit 4-1**

7. Cheryl Everhart, HHS

8. Theodore Larson, HHS

9. Max Baucus, former US Senator

10. Sonia Hymas, former SSA

11. Mary Lewandowski, SSA

12. Terra Whiteman, SSA

13. Art Frank, Drexel University

14. Jaime Szeinuk, Northwell

15. Jimmie Sevre, Kalispell, 406-314-0659, CARD patient

16. Gayla Benefield, Libby, 406-291-0376, CARD patient

17. Judy Woller, Ft. Mojave, AZ, 928-788-1755, CARD patient

18. Stephanie Shaw, CARD

19. Chris Ekstedt, CARD

20. Lee Morrissette, MD, CARD

## II.   DESCRIPTION OF DOCUMENTS AND TANGIBLE THINGS IN CARD'S POSSESSION THAT IT MAY USE TO SUPPORT ITS CLAIMS

1. Documents CARD produced to DHHS OGC

## III.   COMPUTATION OF DAMAGES

CARD does not believe that an award of damages is appropriate in this matter.

CARD Initial Disclosure Second Supplement
Page 2

**Exhibit 4-2**

## IV.   INSURANCE AGREEMENTS

CARD has no insurance coverage for this action.

DATED May 8, 2023.

/s/ Timothy M. Bechtold
BECHTOLD LAW FIRM, PLLC

**Exhibit 4-3**

**CERTIFICATE OF SERVICE**

I certify that I served a true and correct copy of the foregoing via email attachment

on May 8, 2023, upon the following:

Adam Duerk
 283 W. Front Street, Suite 203
Missoula, Montana 59802
duerk@knightnicastro.com


/s/Timothy M. Bechtold

**Exhibit 4-4**

# EXHIBIT 5

Relator will supplement the record with a certified copy
of the Excerpts of Transcript.

UNCERTIFIED DRAFT REALTIME TRANSCRIPT
NOT TO BE USED FOR VERBATIM CITATION

1    BNSF v. CARD, CV 19-40-M-DLC
     HEARING ON MOTIONS - MONDAY, SEPTEMBER 12, 2022

2

3                         REALTIME TEXT NOTICE

4              We, the party working with the court reporter's
     realtime feed, understand that if we choose to use the

5    realtime text we are doing so with the understanding that it
     is uncertified and contains no appearance page, contents page,

6    or certificate page.

7              We agree not to share, give, copy, scan, fax, email,
     or in any way distribute this realtime text in any form,

8    written or computerized, to the press or any party.  However,
     our own experts, cocounsel, and staff may have internal use.

9
               We further understand that the realtime text will

10   include discrepancies regarding page and line numbers when
     comparing the realtime text to the certified transcript.

11
               We further understand that the realtime text may

12   contain untranslated steno, reporter's notes in parentheses,
     misspelled proper names, incorrect or missing Q/A symbols or

13   punctuation, and/or nonsensical English word combinations.
     All such entries will be corrected on the certified

14   transcript.

15             The certified transcript is the only official
     transcript which may be relied upon for the purposes of

16   verbatim citation and is the only transcript which will be
     efiled in the case docket.

17

18

19

20

21

22

23

24

25

UNCERTIFIED DRAFT REALTIME TRANSCRIPT
NOT TO BE USED FOR VERBATIM CITATION

1    purposes of this form, they don't consider a diagnosis a

2    clinical diagnosis.  They just consider it the minimal medical

3    evidence required to have someone qualify for Medicaid --

4    Medicare.  Excuse me.

5              So, again, I'm not sure why SSA didn't do a separate

6    form for B-read-only, but this is what they did.

7              THE COURT:  Okay.

8              MR. BECHTOLD:  And so -- and furthermore, I mean,

9    they directed CARD to fill it out this way.

10             So I think when we're talking about the elements of

11   the False Claims Act, you know, one of the most important

12   things for materiality is how the government responds to what

13   CARD has been doing.

14             CARD has been doing these environmental health

15   hazard checklists 12 years the way SSA told them to, and

16   obviously there's been many instances where the CARD staff

17   have been informed, you know, the SSA staff, that this was a

18   B-read-only.  And so it's not a surprise to CARD -- I mean, to

19   SSA staff that there are B-read onlys, qualifications under

20   the HH checklist.

21             So, you know, a couple documents.  Docket No. 80-40,

22   80-41, 80-42 are several emails back and forth between SSA and

23   CARD staff where they show that it's B-read-only.  So the SSA

24   staff are fully aware that these EHH forms are occasionally,

25   or pretty often based only on outside positive read and not by

UNCERTIFIED DRAFT REALTIME TRANSCRIPT
NOT TO BE USED FOR VERBATIM CITATION

1   staff would certainly say:  Well, that's not right.  You know,

2   having been aware of, through these two separate

3   investigations, that this is what CARD was doing, it was no

4   surprise to them because CARD had been doing it all along.

5            THE COURT:  So, Mr. Bechtold, back to the question I

6   asked about *scienter*.  That all may be true, but how do I make

7   that determination as a matter of law?  Isn't that a factual

8   issue for the jury to resolve?

9            MR. BECHTOLD:  The actual behavior of the SSA?

10           THE COURT:  And what, what they knew.  Now you said

11  they conducted investigations and they may know a lot.  But

12  you're asking me to decide, as a matter of law, that they knew

13  enough to get over the materiality hurdle.

14           MR. BECHTOLD:  Well, I think that's the actual

15  behavior hurdle from *Escobar*.

16           THE COURT:  Right.

17           MR. BECHTOLD:  So what did they actually do?  What

18  did they actually do is keep accepting those B-read-only HH

19  forms and processing people for Medicare.  So what's what

20  their actual behavior is.

21           So they know.  And, believe me, CARD staff has been

22  in contact with the SSA virtually, you know, every week for

23  years.  SSA staff know that this, that this is part of the

24  lawsuit.  They know these issues, and they still keep

25  accepting it.

UNCERTIFIED DRAFT REALTIME TRANSCRIPT
NOT TO BE USED FOR VERBATIM CITATION

1      So, Your Honor, just because CARD relied on all

2  those B-readers for all those forms, all they were doing is

3  following the law.  And that's what SSA told them to do, and

4  that's what they've done ever since 2010, and every part of

5  the government is aware of that, and every part of the

6  government sustains it.  It can't be a false claim when

7  everything that the CARD is doing is approved by the

8  government.  It doesn't make sense.

9      Thanks.

10      THE COURT:  All right.  The matter is fully

11  submitted.

12      I came into this hearing this afternoon, after

13  having read a tremendous amount in this case, with the

14  impression that probably summary judgment was not going to be

15  granted, as you both requested, on the part of either party

16  and that we're going to have a trial in this case.

17      I will carefully consider all of the arguments that

18  have been made.  I will be provided with a rough draft of the

19  transcript.  We'll reread it.  But I remain of the opinion

20  that most likely we're going to have a trial in this case.

21  Now what we try is yet to be determined.

22      I have, before me, two other cases that are set to

23  go to trial in October and early December that have a pile of

24  motions in them that I need to get to before I get to this, so

25  don't hold your breath, expecting you're going to get a ruling

**From:** Stephanie Shaw <sshaw@libbyasbestos.org>
**Sent:** Tuesday, April 11, 2023 8:56 AM
**To:** Tracy Mcnew <tracy@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>
**Subject:** FW: EHH Medicare

Good Morning Ladies,

Please see below information on B_read EHH's. I will let you know once I have established a meeting with Medicare to ensure you can attend as well.

Stephanie

**From:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Sent:** Thursday, April 6, 2023 1:15 PM
**To:** Stephanie Shaw <sshaw@libbyasbestos.org>
**Subject:** EHH Medicare

Good Afternoon Stephanie.

I appreciate you taking the time to discuss your processes earlier today. I relayed the information to my regional office and because you are telling me that CARD does not consider the individual diagnosed based on an interpretation by a B reader, we are unable to approve EHH Medicare claims involving the B reader at this time. Someone from our agency or Medicare will be reaching out directly in the next couple of weeks.

Thank you.

**Terra Whiteman, District Manager**
Social Security Administration
Kalispell, MT FO 872



*With you through life's journey. Securing today and tomorrow.*
*Open a **my Social Security** account today at www.socialsecurity.gov/myaccount.*



**Exhibit 138-1**

**From:** Stephanie Shaw <sshaw@libbyasbestos.org>
**Sent:** Thursday, April 06, 2023 9:21 AM
**To:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Subject:** [EXTERNAL] RE: EHH Medicare

I got caught on a phone call with Pilot, will call as soon as I am done.

Stephanie

**From:** Stephanie Shaw
**Sent:** Thursday, April 6, 2023 8:20 AM
**To:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Subject:** RE: EHH Medicare

Good Morning ☺

I am in, but can only be transferred to the VM because it is after hours. I will call right at 9AM ☺

Stephanie

**From:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Sent:** Wednesday, April 5, 2023 5:10 PM
**To:** Stephanie Shaw <sshaw@libbyasbestos.org>
**Cc:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Subject:** EHH Medicare

Good Afternoon.

I would like to try to connect with you if possible tomorrow sometime.  I will be in the office from 7:00 – 3:30.  If you can call on the EHH line when it is convenient for you that would be great.  Thank you.

**Terra Whiteman, District Manager**
Social Security Administration
Kalispell, MT FO 872

 Securing today
and tomorrow

*With you through life's journey. Securing today and tomorrow.*
*Open a **my Social Security** account today at www.socialsecurity.gov/myaccount.*

**Exhibit 138-2**

**From:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Sent:** Friday, April 28, 2023 8:53 AM
**To:** Tracy Mcnew <tracy@libbyasbestos.org>
**Cc:** Stephanie Shaw <sshaw@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>; Pam Martens <pmartens@libbyasbestos.org>
**Subject:** FW: EHH Medicare and CARD

Good Morning.

I have forwarded this information on to our Center for Program Support.

Thank you.

**Terra Whiteman, District Manager**
Social Security Administration
Kalispell, MT FO 872



*With you through life's journey. Securing today and tomorrow.*
*Open a my Social Security account today at www.socialsecurity.gov/myaccount.*

**From:** Tracy Mcnew <tracy@libbyasbestos.org>
**Sent:** Thursday, April 27, 2023 3:30 PM
**To:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Cc:** Stephanie Shaw <sshaw@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>; Pam Martens <pmartens@libbyasbestos.org>
**Subject:** RE: [EXTERNAL] EHH Medicare and CARD

Terra,
If SSA has not changed any of its rules, CARD will continue to submit EHH checklists for patients based solely on positive B reads and outside CT reads as it has in the past. I've attached a document that explains CARD's diagnostic methods and how there are two versions - clinical (CARD provider diagnoses) and non-clinical (B-read or outside CT read only). Please let me know if you have any questions or if you don't want us to submit the non-clinical diagnosis EHH forms.
Tracy

Tracy McNew, LPN, MPA



**Exhibit 139-1**

Executive Director
Center for Asbestos Related Disease
214 East 3rd Street
Libby, MT 59923
(406) 293-9274 ext. 126
www.libbyasbestos.org

**From:** Tracy Mcnew
**Sent:** Wednesday, April 26, 2023 4:59 PM
**To:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Cc:** Stephanie Shaw <sshaw@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>;
Pam Martens <pmartens@libbyasbestos.org>
**Subject:** RE: [EXTERNAL] EHH Medicare and CARD

Thank you, Terra.
Tracy

Tracy McNew, LPN, MPA
Executive Director
Center for Asbestos Related Disease
214 East 3rd Street
Libby, MT 59923
(406) 293-9274 ext. 126
www.libbyasbestos.org

**From:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Sent:** Wednesday, April 26, 2023 2:47 PM
**To:** Tracy Mcnew <tracy@libbyasbestos.org>
**Cc:** Stephanie Shaw <sshaw@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>;
Pam Martens <pmartens@libbyasbestos.org>
**Subject:** RE: [EXTERNAL] EHH Medicare and CARD

Good Afternoon Tracy

I wanted to get you an interim answer to this email. I think there may be confusion. Stephanie
reached out to SSA and made us aware that CARD does not considering the patients as diagnosed
despite signing off on the checklist when a B reader is involved. SSA has not changed any of its
rules.

I am forwarding your information to our Center for Program Support so they can address any of your
concerns. I will have them reach out to you directly. Thank you.

**Terra Whiteman, District Manager**
Social Security Administration

**Exhibit 139-2**

Kalispell, MT FO 872



*With you through life's journey. Securing today and tomorrow.*
*Open a* **my Social Security** *account today at* www.socialsecurity.gov/myaccount.

**From:** Tracy Mcnew <tracy@libbyasbestos.org>
**Sent:** Wednesday, April 12, 2023 8:33 AM
**To:** Whiteman, Terra <Terra.Whiteman@ssa.gov>
**Cc:** Stephanie Shaw <sshaw@libbyasbestos.org>; Karen Lee Morrissette <lee@libbyasbestos.org>;
Pam Martens <pmartens@libbyasbestos.org>
**Subject:** [EXTERNAL] EHH Medicare and CARD

Hi Terra,
My name is Tracy McNew, I am the Executive Director of the CARD Clinic. Thanks for your email to
Stephanie Shaw about EHH checklists indicating that SSA will no longer be approving Medicare based
on positive reads by B readers. Stephanie forwarded your email to her supervisor and me so that we
can implement this change at an organizational level at CARD. Since this is an organizational issue, I
request that you please direct communication on this topic to me moving forward.
We're happy to do whatever the Social Security Administration asks us to do, so we will plan to
implement a change in our processes immediately. Just to be clear, SSA has now changed its position
regarding Medicare eligibility based on positive B reads, and CARD should no longer fill out EHH
forms for patients with no CARD diagnosis, even if they have a positive outside B-read or CT read. Is
that correct? Please send us formal documentation of this change. Since the program began, we
have been filling EHH forms out if requested, for either CARD-diagnosed patients or for patients with
a positive outside read only. This was based on direction from, and working closely with, SSA staff
members who were present in Libby and remained very involved in the early stages of this process
following the Affordable Care Act's passage.

Do you know what will happen to patients who have been given Medicare in the past based on a
positive outside read only? This is a question that I'm sure will come up when we begin to educate
our patients and staff about the change.
Tracy

Tracy McNew, MPA
Executive Director
Center for Asbestos Related Disease, Inc. (CARD Clinic)
214 East 3rd Street
Libby, MT 59923
(406) 293-9274 Ext. 126

**Exhibit 139-3**