Chad M. Knight
James E. Roberts
W. Adam Duerk
Seamus Molloy
KNIGHT NICASTRO MACKAY, LLC
283 W. Front Street, Suite 203
Missoula, Montana 59802
Telephone:  (406) 206-7052
Facsimile: (816) 396-6233
knight@knightnicastro.com
roberts@knightnicastro.com
duerk@knightnicastro.com
molloy@knightnicastro.com
        *Attorneys for BNSF Railway Company*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## MISSOULA DIVISION

| | |
|---|---|
| BNSF RAILWAY COMPANY, on behalf of THE UNITED STATES OF AMERICA | Civil Action No.: CV-19-40-M-DLC |
| Plaintiff, | |
| vs. | **NOTICE OF FILING DEPOSITION TRANSCRIPTS** |
| THE CENTER FOR ASBESTOS RELATED DISEASE, INC., | |
| Defendant. | |

Pursuant to the Final Pretrial Conference held in this matter on June 8, 2023,

Relator, BNSF Railway Company ("BNSF"), by and through its attorneys of record,

Knight Nicastro MacKay, LLC, file the following deposition:

**Exhibit A**     Videotaped 30(b)(6) Deposition of the Agency for Toxic Substances and Disease Registry through Theodore Larson , May 9, 2023

**Exhibit B**     Videotaped 30(b)(6) Deposition of the Social Security Administration, by and through its designated representative of Heather Hillman, May 16, 2023

**Exhibit C**     Videotaped 30(b)(6) Deposition of the Social Security Administration, by and through its designated representative Monica Nolan, June 8, 2023

DATED this 13th day of June, 2023.

KNIGHT NICASTRO MACKAY, LLC


By:   */s/ W. Adam Duerk*
          W. Adam Duerk
          *Attorneys for BNSF Railway Company*

2

<u>**CERTIFICATE OF SERVICE**</u>

I certify on this 13th day of June, 2023, a copy of the foregoing document

was served upon the following persons by the following means:


| | |
|---|---|
| _1-3_ | CM/ECF |
| _____ | Mail |
| _____ | Hand Delivery |
| _____ | Overnight Delivery Service |
| _____ | Fax |
| _____ | Email |


1. Clerk, U.S. District Court

2. Michael Kakuk
   Assistant U.S. Attorney
   U.S. Attorney's Office
   901 Front Street, Suite 1100
   Helena, MT 59626
   michael.kakuk@usdoj.gov

3. Timothy Bechtold
   Bechtold Law Firm, PLLC
   PO Box 7051
   Missoula, MT 59807
   Facsimile: 406-830-3085
   tim@bechtoldlaw.net



KNIGHT NICASTRO MACKAY, LLC


By:   _/s/ W. Adam Duerk_____
          W. Adam Duerk
          *Attorneys for BNSF Railway Company*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

BNSF,

    Plaintiff,              CV-19-40-M-DLC

v.

CARD,

    Defendant.

------------------------------

VIDEOTAPED 30(b)(6) DEPOSITION OF THE AGENCY FOR TOXIC

SUBSTANCES AND DISEASE REGISTRY

THROUGH THEODORE LARSON

May 9, 2023

8:35 a.m.

2900 Chamblee Tucker Road

Building 13

Atlanta, Georgia

Lori Johnston, CCR

Certified Court Reporter #5682-4498-7599-2576

---

**Page 2**

1                 APPEARANCES OF COUNSEL

2

3    On behalf of the Plaintiff:

4

5    W. ADAM DUERK, Esquire

6        Knight Nicastro Mackay, LLC

7        283 W. Front Street

8        Suite 203

9        Missoula, Montana 59802

10       (406) 206-1535

11       duerk@knightnicastro.com

12

13   On behalf of the Defendant:

14

15   TIMOTHY BECHTOLD, Esquire

16      Bechtold Law Firm, PLL

17      East Spruce Street

18      Missoula, Montana 59802

19      (406) 721-1435

20      (406) 830-3085 (facsimile)

21      tim@bechtoldlaw.net

22

23

24

25  (Continued on the next page.)

www.GeorgiaReporting.com/Schedule
404.389.1155

---

**Page 3**

1    On behalf of the CDC and ATSDR:

2

3    MARK S. KASHDAN, Esquire

4      OGC, DHHS, MS D-53

5      Centers for Disease Control

6      1600 Clifton Road

7      Atlanta, Georgia 30329

8      (404) 639-7448

9      (404) 639-7361 (facsimile)

10     mrk6@cdc.gov

11

12   On behalf of the United States:

13

14   MICHAEL A. KAKUK, Esquire

15     Assistant U.S. Attorney

16     U.S. Department of Justice

17     901 Front Street

18     Suite 1100

19     Helena, Montana 59626

20     (406) 457-5262

21     (406) 457-5130 (facsimile)

22     michael.kakuk@usdoj.gov

23

24

25  (Continued on the next page.)

---

**Page 4**

1   Also present:

2

3   Ms. Tracy McNew, Executive Director of CARD

4   Mr. Brian Stephens, Videographer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---



Page 5

INDEX TO EXAMINATION

WITNESS: THEODORE LARSON

| EXAMINATION | Page |
| --- | --- |
| Examination by Mr. Bechtold | 11 |
| Examination by Mr. Duerk | 93 |
| Further Examination by Mr. Bechtold | 147 |
| Further Examination by Mr. Duerk | 158 |

Page 6

INDEX TO EXHIBITS

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 50 | Final Grant Report Excerpt Re Outside Reader Panel | 123 |
| Exhibit 301 | 2011 Notice of Funding Opportunity | 16 |
| Exhibit 302 | CDC Notice of Funding Opportunity Second Funding Cycle | 36 |
| Exhibit 303 | 2019 Notice of Funding Opportunity | 69 |
| Exhibit 305 | Affordable Care Act Statute | 17 |
| Exhibit 307 | 2011 Notice of Award | 27 |
| Exhibit 309 | 2019 Notice of Award | 70 |
| Exhibit 310 | 2012-2013 CARD Interim Progress Report | 28 |
| Exhibit 311 | 2011 CARD Financial Progress Report | 31 |
| Exhibit 312 | 2013-2014 CARD Interim Progress Report | 33 |
| Exhibit 313 | 2012 CARD Financial Progress Report | 34 |
| Exhibit 314 | 2014-2015 CARD Interim Progress Report | 35 |
| Exhibit 315 | 2014 CARD Financial Progress Report | 35 |
| Exhibit 316 | CARD Work Plan | 43 |
| Exhibit 317 | 2015 CARD Financial Progress Report | 45 |
| Exhibit 318 | Annual Progress Report Second Funding Cycle | 45 |

(Continued on the next page.)

Page 7

INDEX TO EXHIBITS (continued)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 319 | CARD Financial Progress Report Year 2, Second Funding Cycle | 45 |
| Exhibit 320 | Annual Progress Report Second Funding Cycle | 46 |
| Exhibit 321 | 2017 CARD Financial Progress Report | 47 |
| Exhibit 322 | 2018 CARD Financial Progress Report | 47 |
| Exhibit 323 | CARD Financial Progress Report Year 4, Second Funding Cycle | 48 |
| Exhibit 324 | 2019 CARD Work Plan | 71 |
| Exhibit 325 | CARD Financial Progress Report Third Funding Cycle | 72 |
| Exhibit 326 | CARD Annual Report Third Funding Cycle | 72 |
| Exhibit 327 | 2019-2020 CARD Financial Plan | 73 |
| Exhibit 328 | 9/2020-2/2021 CARD Progress Report | 73 |
| Exhibit 329 | CARD Financial Progress Report Third Year, Current Funding Cycle | 74 |
| Exhibit 330 | 9/2021-2/2022 CARD Progress Report | 74 |
| Exhibit 331 | CARD Financial Plan | 75 |

(Continued on the next page.)

Page 8

INDEX TO EXHIBITS (continued)

| Exhibit | Description | Page |
| --- | --- | --- |
| Exhibit 337 | 12/10/15 Emails Re Over Diagnose Complaints | 79 |
| Exhibit 338 | 2011, 2015 Emails Re OIG Investigation | 80 |
| Exhibit 341 | CDC Supplemental Notice of Award 9/2021-8/2022 | 75 |
| Exhibit 344 | CARD Final Grant Report Second Funding Cycle | 48 |
| Exhibit 347 | CARD Work Plan for Supplemental Funding | 76 |
| Exhibit 350 | Declaration of Theodore Larson | 11 |
| Exhibit 505 | Reader Panel Results with Kappa | 62 |
| Exhibit 506 | 2011 Outside Reader Panel Results | 59 |
| Exhibit 507 | 2012 Outside Reader Panel Results | 60 |
| Exhibit 508 | 2012 Outside Reader Panel Results | 64 |
| Exhibit 509 | 2013 Outside Reader Panel Results | 64 |
| Exhibit 510 | 2013 Outside Reader Panel Results | 64 |
| Exhibit 511 | 2014 Outside Reader Panel Results | 64 |
| Exhibit 512 | 2015 Outside Reader Panel Results | 64 |
| Exhibit 514 | 2019 Outside Reader Panel Results | 64 |
| Exhibit 517 | 8/2010 Emails Re CARD Clinic Call | 25 |
| Exhibit 518* | 8/2011 Emails Re Outside B-readers | 57 |

(Continued on the next page.)



**Exhibit A-2**

Page 9

```
 1                INDEX TO EXHIBITS (continued)
 2
 3  Exhibit         Description                    Page
 4
 5  Exhibit 521   8/22/14 Emails Re ACA Data Request      78
 6  Exhibit 522   5/8/15 Emails Re Year 4 2nd Peer Review  56
 7  Exhibit 523   2016 Peer Review Analysis by C. Noonan   63
 8  Exhibit 524   12/1/16 Emails Re PALS Manuscript        78
 9  Exhibit 525*  Emails Re Doctors Leaving Panel         147
10  Exhibit 526   2022 CARD Quarterly Report              149
11
12
13     (Original exhibits attached to original transcript.
14  Exhibits denoted with an asterisk were retained by Attorney
15  Bechtold and may be attached a later date.)
16     (Copy of Plaintiff's Exhibit 50 and Major Findings 12/1/22 -
17  2/28/2023 Document have been attached but not marked in the
18  original transcript.)
19
20
21
22
23
24
25  (End of Index.)
```

Page 10

```
 1  Videotaped 30(b)(6) Deposition of the Agency for Toxic
 2  Substances and Disease Registry through Theodore Larson
 3                      May 9, 2023
 4                       *****
 5         THE VIDEOGRAPHER:   We are on the record.  Today's
 6  date is May 9, 2023 and the time is approximately 8:35
 7  a.m.  This will be the videotaped deposition of 30(b)(6)
 8  representative Theodore Larson in the matter of BNSF v.
 9  CARD.
10         Will the attorneys present please state your names
11  and whom you represent?
12      MR. DUERK:   Adam Duerk for Relator BNSF.
13      MR. BECHTOLD:   I'm Tim Bechtel for The Center for
14  Asbestos Related Disease.
15      MR. KAKUK:   Michael Kakuk for the United States.
16      MR. KASHDAN:   Mark Kashdan for the Office of General
17  Counsel for the Centers for Disease Control and Prevention
18  Agency for Toxic Substances and Disease Registry.
19         THE VIDEOGRAPHER:   Thank you.  Will the court
20  reporter please swear in the witness?
21         THE COURT REPORTER: Certainly.  Mr. Larson, if you'd
22  raise your right hand for me, please?  Thank you.
23  (The witness is sworn in by the court reporter.)
24  Whereupon,
25               THEODORE LARSON,
```

Page 11

```
 1  having been first duly sworn, was examined and testified as
 2  follows:
 3                    EXAMINATION
 4  BY MR. BECHTOLD:
 5      Q    Mr. Larson, my name is Tim Bechtel and I represent
 6  the CARD Clinic.  And you understand that today you have been
 7  designated as a person of knowledge by the United States on
 8  behalf of The Agency for Toxic Substances and Disease Registry
 9  as to represent the government in this deposition?
10      A    Yes.
11      (Exhibit No. 350 is introduced and identified for the
12  record.)
13      Q    I'm going to hand you Exhibit 350.  Tell me if you
14  recognize what that is.
15      (Witness reviews Exhibit No. 350.)
16      A    I do recognize this.
17      Q    And what is it?
18      A    It is my declaration from last September regarding
19  this case.
20      Q    All right.  Very good.  So Mr. Larson, where do you
21  work?
22      A    I work for the Agency for Toxic Substances and
23  Disease Registry.
24      Q    How long have you worked for the -- if I may call it
25  the ATSDR?
```

Page 12

```
 1      A    23 years.
 2      Q    And what is your current position?
 3      A    I am an epidemiologist.
 4      Q    And what are your job responsibilities?
 5      A    So I run human health studies, I oversee non-research
 6  grants, and do other duties as assigned.
 7      Q    And what would have been your various jobs at ATSDR
 8  since you started there?
 9      A    I've been an epidemiologist the whole time I've been
10  with ATSDR.
11      Q    What is your educational training?
12      A    I have a master's degree from Colorado State and a
13  bachelor's degree from the University of Colorado.
14      Q    And when did you start at ATSDR?
15      A    In 2000.
16      Q    What's ATSDR's mission?
17      A    To protect the public from toxic substances at
18  hazardous waste sites and other sites.
19      Q    So how does the grant funding that ATSDR provides the
20  CARD Clinic advance ATSDR's mission?
21      A    The CARD grant is a public service that allows the
22  public to find out if they've been exposed to asbestos in
23  Libby, Montana.
24      Q    And how does that benefit ATSDR?
25      A    It's a community service.  It does not -- you know,
```

Page 13

1  it's part of ATSDR's mission.  It doesn't really benefit ATSDR.
2      Q    Does it benefit the people of the United States?
3      A    Yes.
4      Q    In which way?
5      A    It -- it improves the public health of -- of
6  taxpayers.  You know, they -- they understand better what their
7  health is after exposure to toxic substances in the
8  environment.
9      Q    When did you first become aware of asbestos
10  contamination in Libby, Montana?
11      A    About the same time I started at ATSDR, so that would
12  have been April of 2000.
13      Q    And what was that exposure that you became aware of?
14      A    So I had many peers working in Libby at the time that
15  I started and just word-of-mouth at the breakroom.  You know,
16  in the breakroom, over the water cooler, people were talking
17  about what they were doing in Libby.
18      Q    And when did you first become aware of the CARD
19  Clinic?
20      A    So I believe the CARD opened its doors long after I
21  started at ATSDR.  It might have been in the early aughts.
22  When I say "aughts," maybe 2003 or -- or so.  So there was some
23  time, I think, before CARD officially the -- opened its doors
24  after I started working in Libby.
25      Q    So you were working in Libby prior to CARD's

Page 14

1  existence?
2      A    I believe so.
3      Q    And what was your involvement with the CARD Clinic
4  when it first started?
5      A    So I had -- I had met the director of CARD, Dr. Brad
6  Black.  At the time he was the -- he was in charge of the
7  county health department and he was greatly aiding ATSDR with
8  its mission there in Libby.  And so I got to know him and, you
9  know, I'm sure we crossed paths.  We collaborated on some
10  studies early on, as early as 2003 probably.  And also, I'll go
11  back to your question.  Did I answer your question?
12      Q    Close enough.  And so the Affordable Care Act got
13  passed in 2010, correct?
14      A    Yes.
15      Q    And so what was your involvement with the CARD Clinic
16  from its inception, as you've testified, about 2003 until 2010,
17  prior to the passage of the Affordable Care Act?
18          MR. DUERK:    Objection:  Relevance.
19          Go ahead.
20      A    For my personal involvement, or?
21  BY MR. BECHTOLD:
22      Q    No, ATSDR's.
23      A    ATSDR's?
24      Q    Yeah.
25      A    So -- so immediately preceding the -- the Affordable

Page 15

1  Care Act grants, there was another grant that ATSDR was
2  involved with -- involved with and it was through
3  the -- through HRSA.  And prior to that we also had
4  collaborated with CARD on several other smaller studies and
5  ATSDR had paid for some data from CARD.  I forget the exact
6  years, but we would run a couple of studies where we relied on
7  CARD to provide just X-rays and CT scans for studies.
8      Q    And had ATSDR made grants to -- to screening programs
9  in Libby prior to the passage of the Affordable Care Act?
10      A    So there was an additional screening grant that ATSDR
11  oversaw prior to the HRSA grants and that was to the state
12  health department to do screening in Libby.
13      Q    And how did passage of the Affordable Care Act affect
14  ATSDR's relationship with CARD?
15      A    So to stand up a grant of that size required
16  coordination with CARD back in the day and so, you know, it
17  always has been a very professional relationship with CARD and
18  a great working relationship so I don't think that changed.  It
19  was about the same relationship.
20      Q    Okay.  So had ATSDR funded CARD prior to the passage
21  of the ACA?
22      A    So I wasn't directly involved with the HRSA grant.
23  I'm not sure where those funds came from.  And when you say,
24  "funded," I mean, you know, it's federal dollars and sometimes
25  it flows to different agencies.  I don't recall the exact flow

Page 16

1  for the dollars for the HRSA grant, for example.  But that
2  would have been the first grant that I can recall to CARD from
3  ATSDR.
4          (Exhibit No. 301 is introduced and identified for the
5  record.)
6      Q    Okay.  I'm going to hand you Exhibit 301.  Could you
7  tell me what that is?
8          (Witness reviews Exhibit No. 301.)
9      A    This is a Notice of Funding Opportunity.  And looking
10  at the key dates or the key date fields, it appears this was
11  the first NOFO to the CARD back in 2011.
12      Q    I'd like you to turn to page 3 of Exhibit 301.
13          (Witness complies.)
14      Q    And tell me, what is the -- what was the purpose of
15  that grant?
16      A    So reading from the NOFO's text, under "Purpose:"
17      "The purpose of the program is to (1) provide medical
18  screening to persons with possible exposures to amphiboles that
19  occurred in Libby and Troy, Montana; (2) conduct nationwide
20  outreach to raise awareness of the screening program among
21  persons eligible to participate and of the availability of
22  certain Medicare benefits; and (3) provide health education to
23  detect, prevent, and treat environmental health conditions.
24  The three components of this project, screening, outreach, and
25  education, will be conducted in an integrated manner.  In order



**Exhibit A-4**

Page 17

1  to maintain continuity with the current Libby area screening
2  program, screening under this FOA should be implemented in two
3  phases:  Phase 1 in the Libby area and Phase 2 at other
4  locations in the U.S. that include screening candidates no
5  longer residing in Libby.  The grantee should prioritize
6  implementing a program for Phase 1, such that no gap in service
7  occurs for Libby area residents.  This program addresses the
8  "Healthy People 2020" focus of environmental health."
9      Q    And how did the -- this funding opportunity come
10  about?
11     A    So, under ACA statute, HHS had to stand up a grant
12  program to fulfill that purpose that I just read.  And it came
13  down to the group that I was working in at ATSDR because we had
14  managed prior screening programs.
15     Q    So as I understand your testimony, the -- the
16  Affordable Care Act required Health and Human Services to
17  create these funding opportunities?
18     A    Yes.
19     (Exhibit No. 305 is introduced and identified for the
20  record.)
21     Q    I'm going to hand you Exhibit 305.  Could you tell me
22  what that is, please?
23     (Witness reviews Exhibit No. 305.)
24     A    This is the actual Affordable Care Act statute.
25     Q    And I'd like you to turn to the Section 2009, which

Page 18

1  is the second last page.
2      (Witness complies.)
3      Q    Under "Program Establishment" -- and the purpose you
4  just read for your Notice of Funding Opportunity, does that
5  match with Section 2009's purposes?
6          MR. DUERK:    Objection to form.
7          Go ahead.
8  BY MR. BECHTOLD:
9      Q    Just -- just before you answer --
10     A    Sure.
11     Q    -- what -- what is the purpose as -- as stated in
12  Section 2009?
13     A    You'd like me to read it?
14     Q    Just tell me.
15     A    Oh.
16     Q    You can read it or tell me.
17     A    I -- actually I believe it's the same purposes in the
18  NOFO.  The NOFO mirrors the statute so it's to do outreach,
19  education, and screening.
20     Q    So basically as I understand it then, the -- the
21  purpose as designed in -- in the Notice of Funding Opportunity
22  mirrors the Act?
23     A    Yes.
24     Q    And that is delivered?
25     A    I'm sorry?

Page 19

1      Q    Was that delivered?
2          MR. DUERK:    Objection: Foundation.
3          Go ahead.
4      A    Yes.
5  BY MR. BECHTOLD:
6      Q    And who created the Notice of Funding Opportunity?
7      A    So it was -- many people worked on it.  I may have
8  come up with an early draft but it was reviewed and edited by
9  many people around me too.  And we had many high-end physicians
10  at CDC that reviewed it and -- and commented on it.  And so it
11  was a team effort at ATSDR.
12     Q    But you were part of that team?
13     A    I was part of the team.
14     Q    And -- and you were integral in -- in the creation of
15  the -- of the funding opportunity request?
16     A    So I wouldn't say I was integral.  I could have been
17  replaced by somebody else pretty easily I think but I --
18     Q    Just --
19     A    -- I -- I did participate.
20     Q    Just a cog in a wheel?
21     A    I'm just a cog in a wheel.
22     Q    All right.  I'd like you now to return to Exhibit
23  301.
24     (Witness complies.)
25     Q    And on page 5 of Exhibit 301, in Section E,

Page 20

1  the -- the positive screening result definition, could you
2  describe what the positive screening result definition was for
3  this funding opportunity?
4      A    So it -- it's the presence of -- reading directly out
5  of the -- the NOFO, presence of asbestosis, pleural thickening
6  or pleural plaques as established by one of two ways.
7  Interpretation of a single B-reader qualified physician of a
8  plain chest X-ray or interpretation of a computer tomography of
9  the chest by a qualified physician.
10     Q    And what is a qualified physician?
11     A    Again, reading directly from the text of the NOFO,
12  that would be "a physician with board certification in
13  radiology or pulmonary medicine or an interpretation provided
14  by the Center for Asbestos-Related Disease Clinic for patients
15  in the Libby area."
16     Q    What is a B-reader?
17     A    A B-reader is a physician with special training to
18  look at chest radiographs, chest X-rays, and pick out
19  structures that are consistent with asbestosis, pleural
20  thickening, or pleural plaques.
21     Q    So if a -- a positive screening result could be a
22  single B-reader interpreting a chest X-ray?
23     A    Yes.
24     Q    And it could also be a qualified physician
25  interpreting a CT scan?



**Exhibit A-5**

Page 21

1    A    Yes.
2    Q    And does a -- this positive screening definition
3    result is -- I'd like you to -- refer you again to Exhibit 305.
4         (Witness complies.)
5    Q    And does this positive screening result from Section
6    1E of the Notice of Funding Opportunity, does it also mirror or
7    where is that based -- rather, what is the basis of the -- the
8    positive screening definition from the Notice of -- of Funding
9    Opportunity?
10   A    So that's also based on statute and I just happen to
11   have it open, I think, to the -- it's the next to the
12   last -- it's the last sheet but the next to the last page under
13   the section that starts "Environmental Health Condition" and it
14   has some terms there; asbestos is pleural thickening or pleural
15   plaques.  So to your point, the -- the -- that passage from the
16   NOFO mirrors the -- this -- this section in the statute also.
17   Q    So in the conditions described in Section
18   (e)(2)(B)(i)?
19   A    Is that a question?
20   Q    Yeah.
21        MR. DUERK:    Objection:  Form.
22        What is the question?
23        MR. BECHTOLD:  Sorry.
24   BY MR. BECHTOLD:
25   Q    Are you talking about Section (e)(2)(B)(i)?

Page 22

1    A    Yes.
2         MR. DUERK:    Objection:  Vague.
3    BY MR. BECHTOLD:
4    Q    All right.  I'd like you -- to direct you to the
5    second last page of Exhibit 305.
6         (Witness complies.)
7    A    Uh-huh (affirmative).  Yes, sir.
8    Q    And I'd like to draw your attention to the definition
9    section.  What is the definition of environmental health
10   condition?
11        MR. DUERK:    Objection:  Foundation.
12        Go ahead.
13   A    So if we're talking about the same section and it can
14   be -- one can easily get lost in the sea of words in the
15   statute.  But I'm looking at Paragraph (B), "Conditions
16   Described."  Are we in the same place?
17   BY MR. BECHTOLD:
18   Q    Yes.
19   A    Okay.  And your question is what -- what are
20   the -- what are the environmental health conditions described
21   in statute?
22   Q    Right.
23   A    Okay.  So reading directly from statute, "The
24   following conditions are described in this subparagraph:
25   asbestosis, pleural thickening, or pleural plaques established

Page 23

1    by (I), interpretation by a B-reader qualified physician or a
2    plain chest X-ray or interpretation of a computed tomographic
3    radiograph of the chest by a qualified physician as determined
4    by the Secretary."
5         There's another clause; clause II:  "Such other diagnostic
6    standards as the Secretary specifies except that this clause
7    shall not be -- shall not apply to pleural thickening or
8    pleural plaques unless there are symptoms or conditions
9    requiring medical treatment as a result of these diagnoses."
10        And then finally, there's a section for specific tumors
11   that constitute environmental health condition also:
12   "Mesothelioma, or malignancies of the lung, colon, rectum,
13   larynx, stomach, esophagus, pharynx, or ovary as established by
14   pathologic examination of biopsy tissue, cytology from
15   bronchioalveolar lavage, or such other diagnostic standards as
16   the Secretary specifies."
17   Q    So I -- I think you testified that the -- that the
18   positive results screening definition was drawn from the
19   statute, correct?
20   A    Yes.
21   Q    So if I can redirect your attention to Exhibit 301,
22   where the positive screening result definition resides?
23        (Witness complies.)
24   Q    The language in Section (e)(i)(2) differs from that
25   of the statute, doesn't it?

Page 24

1    A    It does differ.  You know, the -- the words are not
2    exactly the same.
3    Q    And what is the difference or -- in the Exhibit 301?
4         (Witness reviews a portion of Exhibit No. 301.)
5    A    So I think the language is little bit clearer in the
6    NOFO but the -- the first point is just referring to B-readers
7    of chest radiographs, chest X-rays.
8    Q    Okay.
9    A    And -- and then the second point from the NOFO is
10   about CT scans.  And so it -- it kind of builds a little bit on
11   what's in statute and it specifies that the qualified physician
12   is defined as being a physician from the Centers for Asbestos
13   Related Disease for patients in the Libby area.
14   Q    Okay.  And who made the determination to include the
15   language so that physicians from the Center for Asbestos
16   Related Disease would be a -- qualified physicians for purposes
17   of Exhibit 301?
18   A    So that would have been the greater ATSDR team.  As I
19   mentioned earlier, there were many people on the team, very,
20   you know, high-end -- I say high-end.  You know, very
21   experienced physicians and people in upper management that
22   evidently thought it -- it needed to be spelled out like that
23   for the NOFO.
24   Q    So for purposes of the -- of the NOFO, physicians at
25   CARD are deemed to be qualified physicians?


Exhibit A-6

Page 25

1    A   Yes.
2    (Exhibit No. 517 is introduced and identified for the
3  record.)
4    Q   I'm going to hand you Exhibit 517.  Do you recognize
5  what that is?
6    (Witness reviews Exhibit No. 517.)
7    A   So I do.
8    Q   What is it?
9    A   These are emails between two of our senior physicians
10 at ATSDR that were working on preparation of the NOFO
11 back -- back in the day, circa 2010, 2011 and Brad Black.
12   Q   And you are included on these emails, correct?
13   A   I am.  I was cc'd on at least one of these emails.
14   Q   And what is the -- the second -- the attachment to
15 that email?  Could you describe what that document is?
16   A   So just giving it a quick scan, it appears to be
17 minutes from a meeting between, again, Dr. Falk, Dr. Antao,
18 Caroline McDonald, and Dr. Brad Black.
19   Q   And what was the purposes of those meetings?
20   A   So I -- I don't recall this meeting and evidently, I
21 didn't attend it but just reading the top of the meeting
22 minutes it says, "This call was held to follow up on previous
23 discussions from July of 2010 related to definitions of a
24 qualified physician for reading CT scans and the number of
25 B-readers as stated in the Affordable Care Act."

Page 26

1    Q   So what was the conclusion that ATSDR arrived at for
2  defining a qualified physician?
3    (Witness reviews a portion of Exhibit No. 517.)
4    A   So reading -- reading directly from the minutes,
5  under "CT scans," it says, "For the purposes of screening for
6  ARD, asbestos-related disease, CT readings from a qualified
7  physician will mean CT readings from physicians who are board
8  certified in pulmonary medicine or radiology or CT readings
9  from the CARD Clinic."
10   Q   What's your understanding of Senator Max Baucus's
11 involvement in the language of the Affordable Care Act?
12   A   Could you specify what language in the Affordable
13 Care Act you're asking about?
14   Q   The language regarding the -- the Libby section of
15 the Act.
16   A   So my recollection is Senator Baucus had a very deep
17 interest in the well-being and public health of people living
18 in Libby and had a direct hand in crafting that section of the
19 Affordable Care Act.
20   Q   So I -- if I could direct your attention to page 20
21 of Exhibit 301?
22   (Witness complies.)
23   Q   And who has ATSDR designated as the -- the agency
24 contact for this grant?
25   A   That's me, Theodore Larson.

Page 27

1    Q   So when you're the agency contact for the grant, what
2  does that mean your responsibilities are?
3    A   So for technical assistance that would mean if anyone
4  with the program -- you know, the grantee -- had questions
5  about implementing the grant or if there were questions from
6  the community, say, or -- or anyone else regarding the grant, I
7  would be the -- the point of contact and would triage questions
8  as they came in and route them to -- you know, either I would
9  take them on myself or -- or route them back in the day, would
10 have maybe consulted with Dr. Antao, for example.
11       MR. KAKUK:     Mr. Bechtold, this might be a time to
12    go off the record real quick.
13       MR. BECHTOLD:  Sure.
14       MR. KAKUK:     Can we go off the record?
15       THE VIDEOGRAPHER:  Going off the record.  The time
16    is 9:04.
17    (Off the record from 9:04 a.m. until 9:14 a.m.)
18    (On the record.)
19       THE VIDEOGRAPHER:  We are back on the record.  The
20    time is 9:14.
21    (Exhibit No. 307 is introduced and identified for the
22 record.)
23 BY MR. BECHTOLD:
24   Q   Mr. Larson, I'm handing you what's -- Exhibit 307.
25 Could you identify what that is, please?

Page 28

1    (Witness reviews Exhibit No. 307.)
2    A   So let's see.  Page 1 is a letter to Tanis Hernandez
3  at the Center for Asbestos Related Disease and it has to do
4  with financials.  That is, you know, the -- providing the
5  financial resources to fund the grant at CARD.
6    Q   And does it say, "Notice of Award" on -- up there?
7    A   Let's see.  You are correct.  This is an award letter
8  actually.
9    Q   Okay.  And what does that indicate?
10   A   So the -- the letter is dated on August 15, 2011.  So
11 this must have been the initial award of the grant to CARD back
12 when the grant was first set up.
13   Q   So that applies to Exhibit 301, the -- the Notice of
14 a Funding Opportunity?
15   A   Yes.
16   Q   So ATSDR -- this exhibit indicates what?
17   A   That the award was made so the CARD must have
18 submitted an application for the grant indicated in the NOFO,
19 and then the -- the application was accepted and the award was
20 made and this letter is notification of that award to CARD,
21 that -- that CARD had been -- would have been the recipient of
22 the grant.
23   Q   And did the ATSDR deliver the funds as promised?
24   A   Yes.
25   (Exhibit No. 310 is introduced and identified for the



Exhibit A-7

Page 29

```
 1  record.)
 2       Q   I have -- I'm going to hand you Exhibit 310.  What is
 3  Exhibit 310?
 4       (Witness reviews Exhibit No. 310.)
 5       A   This is a progress report from CARD.  And this -- it
 6  appears to be from roughly 2012, 2013 and it may have been the
 7  initial progress report.  So the report begins "Brief Report of
 8  Year 1 Activities to Date."  So it -- so it is just a progress
 9  report of what they had accomplished in Year 1 of the first
10  funding period for the grant.
11       Q   How many progress reports does CARD provide to ATSDR
12  for each year for the terms of its grant?
13       A   A total of five.
14       Q   How are they spaced?
15       A   Quarterly and one annual report.
16       MR. BECHTOLD:  Let's -- let's go off the record.
17       THE VIDEOGRAPHER:  Going off the record.  The time
18  is 9:17.
19       (Off the record from 9:17 a.m. until 9:21 a.m.)
20       (On the record.)
21       THE VIDEOGRAPHER:  We are back on at 9:21.
22  BY MR. BECHTOLD:
23       Q   Mr. Larson, how many progress reports does CARD
24  provide to ATSDR each year?
25       A   Five.
```

Page 30

```
 1       Q   And how are they spaced?  Is there different
 2  purposes?
 3       A   There's four quarterly reports and one annual report.
 4       Q   What's the differences between the reports?
 5       A   They're -- they're pretty similar actually.  Just
 6  the -- the numbers of screening participants changes obviously
 7  every quarter and then the annual report might present some
 8  more global issues or success stories for the -- you know, for
 9  that year.
10       Q   And what do you expect that CARD will provide you
11  in -- in the report?
12       A   So again, I expect accounts of patient throughput.
13  You know, number of patients seen and their disposition.
14  Hopefully, you know, the number of people that ended up with
15  pleural plaque, for example, as identified by -- by B-reader on
16  CT by a qualified physician; their disposition.
17       CARD has kind of a unique low dose lung cancer
18  screening program and so we monitor that pretty carefully and
19  we look for success stories like incidental findings.  You
20  know, sometimes you don't see a plaque but you do see an early
21  lung cancer, for example, on a radiograph.  So that's a
22  tremendous public health success story when you can catch
23  cancers early as a side impact of the screening program.
24       Q   And so as -- as you review Exhibit 310, which you
25  indicated was a report from the -- from the first year of the
```

Page 31

```
 1  grant?
 2       A   It appears to be.
 3       Q   So how was CARD's performance in carrying out the
 4  purpose of the grant in that year?
 5       MR. DUERK:  Objection:  Form.
 6       Go ahead.
 7       A   So I don't specifically remember any issues from that
 8  year.  I do recall generally after 12 years there were some
 9  startup, you know, hiccups trying to get the program stood up.
10  But nothing that sticks in my mind as a particular obstacle to
11  getting the mission accomplished under the grant.  I don't
12  recall much from that year at all.  I don't recall any major
13  pitfalls or issues that popped up that year.
14       (Exhibit No. 311 is introduced and identified for the
15  record.)
16  BY MR. BECHTOLD:
17       Q   Okay.  I'm handing you Exhibit 311.  Could
18  you -- what is that document?
19       (Witness reviews Exhibit No. 311.)
20       A   So this is a -- it's a pretty heavy -- you know, it's
21  a long document but it appears to be a financial progress
22  report from CARD from -- I don't see any date on it.  But I'm
23  pretty sure it's from the Affordable Care Act era of -- of
24  CARD.  But I am not seeing a date.
25       Q   Is it -- I'll represent it's from the first year of
```

Page 32

```
 1  the grant.
 2       A   Okay.
 3       Q   And what was CARD's obligation for accounting for the
 4  funds that ATSDR provided?
 5       A   So they provide a, you know, an estimate of how the
 6  money is spent by category.  For example, the first category in
 7  this report is personnel costs.  So it has to do with salaries
 8  of individual staff members.  And it goes on to subcontracts
 9  that have to be accounted for.  CARD subcontracts out, for
10  example, a lot of the reading.  They have, you know, costs
11  associated with running a medical clinic and that sort of
12  thing.
13       Q   How does CARD have to justify its accounting for the
14  money from the ATSDR grant?
15       A   So they -- they have a plan when they first applied
16  for the grants and usually, they stick to that plan throughout
17  the funding cycle.  You know, it's -- this was a four-year
18  funding cycle for example, so year to year, if there were major
19  changes, they would have to account for in this report.  If
20  they needed a special piece of equipment or had to reallocate
21  funds from one category to another, that -- it would be
22  documented in -- in this report.
23       Q   Okay.  And that's a report that goes to you as the
24  contact person?
25       A   I would see it but there's -- but there's actually a
```


Exhibit A-8

Page 33

1  separate group at CDC that handles the financial side of
2  research -- of non-research grants.
3      Q    Okay.  I'd like to direct your attention to page 22.
4      (Witness complies.)
5      Q    What is the requirement for an outside audit for
6  these grants?
7      A    So I believe I -- I don't know if it's a CDC rule or
8  a federal regulation but I believe they have to have an
9  independent audit done every year of their -- of their
10 financials.
11     Q    So is part of this grant that CARD Clinic has an
12 independent audit done every year?
13     A    I believe so.  But again, that's really not in my
14 direct wheelhouse.
15     Q    Okay.  So the -- the financial report would go
16 somewhere else but you would get the report of the activity
17 under the grant?
18     A    Right.
19     (Exhibit No. 312 is introduced and identified for the
20 record.)
21     Q    So I'm going to hand you now Exhibit 312.  What is
22 that document?
23     (Witness reviews Exhibit No. 312.)
24     A    This is another progress report from CARD regarding
25 the Affordable Care Act grant.

Page 34

1      Q    Okay.  And this is a report that would come to you,
2  correct?
3      A    Yes.
4      Q    And as you review this report, how was CARD's
5  performance in carrying out the purpose of the grant in that
6  year?
7      A    I don't -- so once again, I don't recall anything
8  specific from that year.  So there was no bad event that
9  occurred obviously if I don't recall it.  It was just another
10 year of CARD providing day-to-day screening.
11     Q    Were they doing what the funding proposal required?
12     A    Yes.
13     (Exhibit No. 313 is introduced and identified for the
14 record.)
15     Q    Now I'm going to hand you Exhibit 313.  What is that
16 document?
17     (Witness reviews Exhibit No. 313.)
18     A    This is another financial report from CARD.  And it
19 looks like it's from 2013.
20     Q    So the secondary grant?
21     A    Yes, sir.
22     Q    And again, this is standard reporting for the
23 financials?
24     (Witness reviews Exhibit No. 313.)
25     A    So just scanning through the report, I would say yes,

Page 35

1  this is -- it looks pretty typical for this type of report.
2      Q    It was what ATSDR expected from CARD?
3      A    So again, there was no -- I don't recall any issues
4  regarding this particular financial report.  So I would have to
5  say no.
6      Q    Okay.  Is it -- it was not what ATSDR expected from
7  CARD or what ATR [sic] did expect from CARD?
8      A    It was what ATSDR expected from CARD regarding this
9  grant.
10     Q    Okay.  Thank you.
11     (Exhibit No. 314 is introduced and identified for the
12 record.)
13     Q    Now I'm going to hand you Exhibit 314.  What is that
14 document?
15     (Witness reviews Exhibit No. 314.)
16     A    This is another progress report from CARD regarding
17 the grant.  It looks like it's from the 2014 to 2015 period.
18     Q    And as you review that report, how was CARD's
19 performance in carrying out the purpose of the grant in that
20 year?
21     A    Once again, I don't recall anything that was aberrant
22 from that year and so I -- I would -- I would say once again,
23 CARD did its job under the terms and purposes of the grant.
24     (Exhibit No. 315 is introduced and identified for the
25 record.)

Page 36

1      Q    And similar for Exhibit 315, what is that document?
2      (Witness reviews Exhibit No. 315.)
3      A    This is another financial report from CARD.  This is
4  from Year 4.  I'm not -- I -- you know, it would have to be one
5  of the first two grant periods.  I'm -- probably the first one.
6      Q    Yes, the first grant period.
7      A    Okay.
8      Q    So was CARD spending the federal funds the way the
9  ATSDR intended?
10     A    Yes.
11     Q    When did the first grant period end?
12     A    So it was a four-year funding period.  It would have
13 ended in -- since I'm shooting from the hip and the -- the
14 funding periods don't sync with calendar years, I think it
15 probably ended in 2014.
16     (Exhibit No. 302 is introduced and identified for the
17 record.)
18     Q    Now I'm handing you Exhibit 302.  Could you take a
19 look at that and tell me what the document is?
20     (Witness reviews Exhibit No. 302.)
21     A    This is a CDC NOFO for the second funding period of
22 the Affordable Care Act screening grant.
23     Q    When the Affordable Care Act screening grant program
24 set up, what did it envision ATSDR doing?
25     A    I -- I'm not sure if I understand the question.



**Exhibit A-9**

Page 37

1  Could you rephrase?

2      Q    So how much money did the Affordable Care Act set

3  aside for this screening program?

4      A    2.5 million per year.  So for a four-year funding

5  cycle that would be 10 million.

6      Q    Okay.  So for the -- the -- for the first funding

7  opportunity, how much did ATSDR provide CARD?

8      A    2.5 million per year.  Summed over four years, that

9  would be 10 million.

10      Q    And for this second funding opportunity notice, what

11  were the terms of -- of that funding opportunity notice?

12      A    So it's a four-year award again, just like the first

13  funding period.  Again, average one year amount according to

14  the NOFO, 2.5 million per year.  Total project period funding,

15  10 million.

16      Q    And if you look on page 3 of that funding

17  opportunity, there's -- what is that table?

18      A    So that's called a logic model and that -- that's an

19  innovation CDC mandated for -- for grants I think starting -- I

20  think we were one of the first grants that had a logic model.

21  And basically, it's a roadmap for activities and outcomes, that

22  kind of guide.  They guide the grantee and also kind of guide

23  the crafting of the whole NOFO for CDC also.

24      Q    So the -- what is a -- what is, like, when you

25  created this logic table for the funding opportunity, what was

Page 38

1  it based on?

2      A    So I -- I had never created a logic model before and

3  no one at -- at ATSDR had done one either so we brought in an

4  independent consultant to develop it.  And so basically the

5  consultant met with Dr. Antao and me at the time and we talked

6  about the -- the activities that we envisioned for the grant

7  and I believe -- my memory is a little shaky after this many

8  years but I believe the consultant actually went to Libby and

9  met with CARD personnel also to talk about the logic model.

10      Q    And so the -- they worked with CARD to develop the

11  logic model?  Is that fair to say?

12      A    I don't recall actually.

13      Q    So in the logic table -- so for example, it looks

14  like there's a -- something called a disease management

15  program.  What is that?

16      (Witness reviews a portion of Exhibit No. 302.)

17      A    Okay.  So it's the term.  It's under "Intermediate

18  Outcomes" in the logic model.

19      Q    Yeah.

20      A    And that would refer to making sure that participants

21  in -- in the screening program would get the appropriate

22  follow-up care.  So if they needed, for example, supplemental

23  oxygen, that would be -- you know, they would have the links to

24  where they could get that resource.  Presumably they would be

25  enrolled in Medicare and that would not be a problem for them

Page 39

1  to get those types of services.

2      Q    So follow-up care?

3      A    Follow-up care.  Thank you.

4      Q    And in your short-term outcome in the logic thing, in

5  the logic -- now I've forgotten what --

6      A    Model?

7      Q    Logic model, thank you.  It -- the -- it says one of

8  the things is that target audience aware of Medicaid

9  eligibility.  What's that all about?

10      A    So the NOFO specifies that the recipient of the grant

11  has to make -- make candidates for the program aware they may

12  be eligible for Medicare benefits.  So that's one of the

13  education and outreach items mandated under the NOFO.  And it

14  may -- it may -- I wouldn't be surprised if it -- it also maps

15  to the -- the Affordable Care Act language also.

16      Q    So again, if you look on page 31 of Exhibit 302?

17      (Witness complies.)

18      Q    Who is the -- who is the program officer for ATSDR?

19      A    Once again that's me, Theodore Larson.

20      Q    Okay.  And again, is -- is your role different for

21  this funding opportunity than it was for the first one?

22      A    I would say overall the same.  I'm the main point of

23  contact if there were questions from the grantee or from the

24  community or from -- it could be any -- any interested party, I

25  guess, in the United States could -- could come to me for

Page 40

1  information about the grant.

2      Q    Okay.  And so I -- I think you said for the logic

3  table there was something to mirror the language in the

4  Affordable Care Act?

5      A    I believe so.  I don't know if I can find it now but

6  I -- I believe that's right.  I -- I think there's a clause in

7  there that says make -- make the community aware of potential

8  eligibility for Medicare.

9      Q    And for the -- again, for the logic table on there on

10  page 2, what is a qualifying diagnosis?  Where it says,

11  "Individuals with qualifying diagnosis enrolled in Medicare,"

12  was one of your short-term outcomes.

13      MR. DUERK:    Objection: Foundation.

14      Go ahead.

15      (Witness reviews a portion of Exhibit 302.)

16      A    So you're asking about the -- the phrase "Individuals

17  with qualifying diagnosis enrolled in Medicare?"

18  BY MR. BECHTOLD:

19      Q    Correct.

20      A    Can you restate the question?

21      Q    So what is a -- what is a qualifying diagnosis?

22      A    So --

23      MR. DUERK:    Objection: Form, foundation.

24      Go ahead.

25      A    -- it's the items that make up the definition for



Page 41

1 environmental exposure in the NOFO.
2 BY MR. BECHTOLD:
3   Q   So if you look at page 7 of the NOFO of Exhibit 302?
4   A   Oh.  Thank you.
5   (Witness complies.)
6   Q   So for ATSDR's purposes, what is a positive screening
7 result?
8   A   So it's asbestosis, pleural thickening or pleural
9 plaques established by the criteria that we talked about
10 earlier.  I don't believe the language changed for this NOFO.
11 I believe it's identical to the prior NOFO or the -- the same
12 tumors that were listed earlier.  I think a difference maybe
13 for this NOFO was that we did -- we may have added positive
14 result from a fecal occult blood test.  So that's -- that's a
15 screening method for colon cancer.
16   Q   So as you say, it's the -- the positive screening
17 result is -- is the same as it was in the first one in Exhibit
18 301?
19   A   Yes.
20   Q   And -- and again, a qualifying -- qualified physician
21 was defined as a physician at CARD, correct?
22   A   Yes.
23   Q   So throughout the -- the terms of these grants like
24 you're -- you're the -- the contact for ATSDR for the first
25 grant.  It looks like you're the contact for ATSDR for the

Page 42

1 second grant.  And how long were each of these grant periods?
2   A   They were four years for the first two.
3   Q   So in -- in the periods of these grants, what was
4 your communication with CARD like?
5   A   So I would say it was regular telephone
6 communication.  I mean, not really a -- I don't think we had a
7 set meeting schedule but I would say regular or as issues
8 cropped up.  Tanis Hernandez was the director, I think, for the
9 first two -- entirely for the first two grants.  And she and I
10 had a great relationship.  If she had an issue, she would call
11 me or vice versa.  I mean, we just reached out and called each
12 other.
13   Q   And how often have you made site visits to Libby?
14   A   So my goal is to do one every year but there's been
15 some years where they -- where a site visit didn't get done for
16 whatever reason.  My, you know, personal life got in the way of
17 getting out there on key dates.  Or during COVID, we suspended
18 entirely for a couple of years and couldn't go out.
19   Q   So why did you make site visits?
20   A   So it's just a standard procedure at CDC to visit
21 with grantees and, you know, sometimes you just get a different
22 view of the lay of the land when you're visiting with people
23 face to face.  This would never happen at CARD, I'm sure, but
24 you want to make sure that the -- they have all the staff that
25 they say they've hired, they have the facilities that they say

Page 43

1 they have; that sort of thing.  And it's just a way of kicking
2 the tires and make sure that everything appears in order.
3   Q   And what did you do on your site visits in -- at
4 CARD?
5   A   So you meet -- usually CARD will give a presentation
6 where they summarize the annual report, most recent annual
7 report.  And again, we usually get a facility walk through,
8 meet with key staff, and have the opportunity to talk to key
9 staff about their role in the program.  And it can be hard to
10 get people to open up.  We find success stories out of people.
11 You know, things that have really worked out well within the
12 program, that sort of thing.
13   Q   What conclusions did you draw from your site visits
14 at CARD?
15   A   So I -- I don't recall any morale issues.  It seemed
16 like people were generally happy to be working at CARD.  I
17 don't recall any -- any issues from any particular site visit.
18   Q   So when you say you didn't recall any issues, that
19 means things were going as -- the way they were supposed to?
20   A   So yeah, I -- I think that we humans -- it's when
21 things go south that really sticks in your mind.  And no, I
22 don't recall any issues on any -- on any site visit to CARD.
23   Q   Okay.
24   (Exhibit No. 316 is introduced and identified for the
25 record.)

Page 44

1   Q   And now I'm going to hand you more of those reports
2 and budgets.  This is Exhibit 316.  Could you tell me what that
3 is?
4   (Witness reviews Exhibit No. 316.)
5   A   It's not clearly labeled but I think this is a work
6 plan.  So this was CARD's written plan for -- I'm -- I'm
7 speculating -- over the next four-year funding cycle.
8   Q   For the -- for the funding cycle for Exhibit 302?
9   A   (Nods head affirmatively.)
10   Q   You have to say yes.
11   A   Yes.
12   Q   And what was the plan for the second funding cycle?
13   A   So where possible we try to add innovations to the
14 screening grant.  Like I had mentioned earlier, CARD had
15 started a lung cancer screening program that was pretty
16 innovative.  We added the fecal occult blood test.  There might
17 have been some other -- a smattering of other innovations that
18 we added.  I say we.  CARD.  CARD is the one that mostly came
19 up with those ideas and put them -- and put them to use.  But
20 what was your question?
21   Q   Here's another question.  Was -- was CARD doing what
22 the ATSDR wanted them to do?
23   A   Yes.
24   Q   Was CARD spending the money the way ATSDR wanted them
25 to them to spend the money?



**Exhibit A-11**

Page 45

1    A    Yes.
2    (Exhibit No. 317 is introduced and identified for the
3 record.)
4    Q    I'm now handing you Exhibit 317.  Would you explain
5 what that is?
6    (Witness reviews Exhibit No. 317.)
7    A    This is another financial report and it appears to be
8 from Year 1, sometime in Year 1, of the second funding cycle.
9    Q    Were there any aberrations in the financials for that
10 year?
11    A    I don't recall any aberrations.
12    (Exhibit No. 318 is introduced and identified for the
13 record.)
14    Q    Mr. Larson, I'm now handing you Exhibit 318.  Could
15 you explain what that document is?
16    (Witness reviews Exhibit No. 318.)
17    A    This is the annual progress report from the
18 second -- from a year in the second funding cycle.
19    Q    And based on your understanding of that report
20 was -- how was CARD's performance in carrying out the purposes
21 of the ATSDR grant in Year 1 of the second grant cycle?
22    A    So again, I have no recollection of anything aberrant
23 and CARD was meeting the terms and purposes of the grant still.
24    Q    All right.
25    (Exhibit No. 319 is introduced and identified for the

Page 46

1 record.)
2    Q    Now I'm handing you Exhibit 319.  Could you explain
3 what that is?
4    (Witness reviews Exhibit No. 319.)
5    A    It's another financial report.  It appears to be from
6 Year 2 of the second funding cycle.
7    Q    And was CARD spending those federal funds the way
8 that ATSDR intended?
9    A    Yes.
10    (Exhibit No. 320 is introduced and identified for the
11 record.)
12    Q    I'm now providing you Exhibit 320.  Could you explain
13 what that is?
14    (Witness reviews Exhibit No. 320.)
15    A    This is an annual progress report.  Again, from the
16 second funding cycle.
17    Q    And when you get these reports from CARD, what do
18 you -- what do you do?
19    A    I read through them, I mark them up for anything that
20 looks atypical and then I usually call CARD to talk to
21 any -- anything that I notice or -- over the years, we've
22 tweaked the format of the reports some too.  And so that's
23 common feedback that I give to CARD is, you know, could we add
24 this or make this more succinct or something, some change to
25 the report.

Page 47

1    Q    And those are things that you would discuss over the
2 telephone?
3    A    Yes.
4    (Exhibit No. 321 is introduced and identified for the
5 record.)
6    Q    Now I'm handing you Exhibit 321.  Could you explain
7 what that is?
8    (Witness reviews Exhibit No. 321.)
9    A    This is a financial report from 2017.  So it's
10 probably for Year 3 of the second funding cycle.
11    Q    And again, and this -- this report was -- and this
12 grant year, rather, was CARD spending the funds, the federal
13 funds, the way the ATSDR intended?
14    A    Yes.
15    Q    Were the reports to the ATSDR's -- satisfactory to
16 ATSDR?
17    A    Yes, although I don't recall anything specific that
18 we changed for this report that was -- you know, even today we
19 have ongoing conversations about ways to improve the reporting
20 quarterly and annually.
21    (Exhibit No. 322 is introduced and identified for the
22 record.)
23    Q    I'm now handing you Exhibit 322.  What is that
24 document?
25    (Witness reviews Exhibit No. 322.)

Page 48

1    A    This is an annual performance report from 2018.
2    Q    So Year 3 of the second grant?
3    A    I believe so.
4    Q    And was CARD spending the money the way ATSD
5 intended?
6    A    This is a --
7    Q    Oh, excuse me.  Was CARD performing the work that
8 ATSDR intended --
9    A    Yes.
10    Q    -- for the grant?
11    A    Yes.
12    (Exhibit No. 323 is introduced and identified for the
13 record.)
14    Q    Now I'm handing you Exhibit 323.  Can you explain
15 what that is?
16    (Witness reviews Exhibit No. 323.)
17    A    This is a financial report for -- you know, from CARD
18 for the grant.  Year 4 of the second funding cycle.
19    Q    So was CARD spending federal funds the way ATSDR
20 intended in that year?
21    A    Yes.
22    (Exhibit No. 344 is introduced and identified for the
23 record.)
24    Q    Mr. Larson, now I'm handing you Exhibit 344.  Could
25 you explain what that is?

Elizabeth Gallo
COURT REPORTING, LLC

Exhibit A-12

Page 49

1    (Witness reviews Exhibit No. 344.)

2    A    This is the final report from CARD for the second

3    funding cycle.

4    Q    And I'd like you to note on -- on page 3 of Table 4.

5    (Witness complies.)

6    Q    So this is now four years into the granting, correct?

7    A    Yes.

8    Q    How many screenings have they done under the grant?

9    A    So from Table 4 on page 3, 3,449.

10    Q    And of those, how many abnormal CTs did CARD find for

11   pleural thickening or pleural -- pleural issues?

12    A    45 percent was the percentage.

13    Q    And if -- and if we look at Table 7?

14    (Witness complies.)

15    Q    What does Table 7 represent?

16    A    These are the outside -- or the results from outside

17   readers, B-readers and radiologists outside of CARD.

18    Q    And why would CARD have outside readers?

19    A    That's a requirement or, you know, a requirement.

20   It's a grant so it's a suggestion in the NOFO to have outside

21   readers.  And in fact, to be consistent with the Affordable

22   Care Act language, the grantee -- let me clarify.  I believe

23   the -- NOFO actually specifies that they -- they have to do

24   outside -- they have to employ outside readers.

25    Q    So, for example, if you look at Exhibit 302 again.

Page 50

1    (Witness complies.)

2    A    302?  I -- I have it right here, sir.  They're out of

3    order.  Got it.

4    Q    On page 8, under Section G, "Quality control," what's

5    the purpose of having a panel of B-readers?

6    (Witness reviews a portion of Exhibit No. 302.)

7    A    So I don't believe it's specified in the NOFO but I

8    believe the intention was to have a panel of B-readers to

9    improve consistency so they're -- if a new reader was

10   introduced to the program, maybe not familiar with such a high

11   prevalence of pleural plaque as -- as is seen in Libby, that

12   person could be brought up to speed potentially by -- by

13   working on this panel.  As a panel, they look at the same image

14   and they -- the readers will debate, I guess, about what a

15   structure on a radiograph or CT scan is.

16    Q    So I'm going to bring your attention back to Exhibit

17   517.  It's a -- let's look at the -- it's at the very bottom.

18    (Witness searches through the exhibits.)

19    A    Further down?

20    Q    At the very bottom.  The very bottom.

21    A    Is it this one (indicating) that's unlabeled?

22    Q    It says 517 at the bottom.

23    A    Ah.  I was looking for a cover sheet.

24    (Witness complies.)

25    Q    So if we look at the exhibit -- I mean, the

Page 51

1    attachments to the email on 517, prior to the formation of

2    these funding opportunities, what was the discussion for the

3    purpose of having outside readers?

4    (Witness reviews a portion of Exhibit No. 517.)

5    A    So reading from this memo, these meeting minutes: "A

6    quality program that will consist of having the entire panel of

7    B-readers periodically review a random sample of radiographs

8    will be instituted in collaboration with ATSDR.  This review

9    will have no influence on already established status of patient

10   benefits but will serve solely to bring consistency to the

11   screening program."

12    Q    Okay.  What's that mean to have no effect on already

13   established benefits?

14    A    So regardless of what the readers deem an individual

15   patient to have in this review panel, if they had already been

16   dispositioned as having an abnormality, the -- the panel

17   results would not change that disposition.  That person would

18   still be eligible potentially for Medicare benefits.

19    Q    So I'm going to draw your attention back again to

20   Exhibit 344, the -- the Table 7.

21    (Witness complies.)

22    Q    Where it said -- these are these outside readers,

23   right?

24    A    Yes.

25    Q    So I asked you earlier about the previous table where

Page 52

1    CARD was making -- finding abnormal reads from CTs.  And how

2    many CT reads did these outside readers do?

3    (Witness reviews a portion of Exhibit No. 344.)

4    A    Let's see.  Outside readings done were 2,544.

5    Q    How many -- how many did the outside readers actually

6    read?

7    A    Ah.  Thank you.  2,481.

8    Q    And how many did they find abnormal?

9    A    1,009.

10    Q    And I think you -- you gave a percentage for

11   the -- for the CARD reads.  And how -- what is the percentage

12   for the outside abnormal rate?

13    A    41 percent.

14    Q    And then I'll draw your attention back again to Table

15   4.

16    (Witness complies.)

17    Q    Did -- did CARD read the same number of CTs as the

18   outside readers?

19    (Witness reviews a portion of Exhibit No. 344.)

20    A    Comparing the number of completed CTs from Table 4,

21   2,544.  That's the same number as the number of CTs in Table 7,

22   2,544.

23    Q    Okay.  And so CARD -- it looks like CARD read 2,544

24   CTs?

25    A    Yes.


**Exhibit A-13**

Page 53

1    Q    And the -- and I think you said that the -- in Table
2    7, the outsiders read 2,481, correct?
3    A    I stand corrected.  You are correct.  The -- so the
4    number of readings is slightly lower for outside readers.
5    Q    Why would that be?
6    A    So the -- I do know there's a processing lag for
7    outside readings.  It takes time.  I -- I believe at one point
8    at least the radiographs were being sent by courier and
9    maybe -- I believe that it was the same thing for the CT scans.
10   That's all digital but I think they had to burn it to CD and
11   ship it by courier.  The B-readers are doing this under
12   contract but they have a -- a clinical day job also so it takes
13   them some time, in some cases, to get -- to get to the readings
14   for the program.  And so there could be a lag in getting the
15   results back.  And that might be what you're seeing here.
16   Q    So it basically looks like there's -- 98 percent of
17   them get read but for one reason or another, time lag or
18   whatever --
19   A    Right.
20   Q    -- they don't all get read?
21   A    Yes.
22   Q    I understand.  All right.  I'm going to draw your
23   attention to page 19 of Exhibit 344.
24   (Witness complies.)
25   Q    Near the middle of the page there's a heading that

Page 54

1    says, "Dissension Between CARD Diagnosis Rate and Outside
2    Reader Diagnosis Rate."
3    This is, I think you testified, a report for the first
4    four years of the grant funding, correct?
5    A    Uh-huh (affirmative).
6    Q    What's your understanding of this dissension rate?
7    A    So I'm reading to see how the term is used in this
8    report.
9    (Witness reviews a portion of Exhibit No. 344.)
10   A    So it -- it looks like they're maybe explaining the
11   disconnect, the apparent disconnect, why some people are not
12   clinically diagnosed at CARD but are eligible to receive
13   Medicare benefits.  And the reasons for that appear to be based
14   on an outside reader result for -- for a CT -- for a chest
15   X-ray or a CT scan.  Or perhaps they had another eligible
16   asbestos-related cancer diagnosis from that list that I read
17   earlier from the NOFO.
18   Q    And what's ATSDR's understanding of eligibility for
19   Medicare benefits through this screening grant?
20   MR. DUERK:    Objection: Foundation, form.
21   Go ahead.
22   A    So as specified in the NOFO, a person could get a
23   positive diagnosis several ways.  One is to have a qualified
24   physician at CARD detect something on a CT scan.  Another way
25   would be to have an outside B-reader or an outside radiologist

Page 55

1    find one of the structures that we talked about earlier;
2    asbestosis or pleural plaque.  One would not necessarily need
3    both concurrence or the same result from both the qualified
4    physician at CARD and the outside reader.  So one -- I think
5    what this is implying is that some -- some people are getting
6    an outside reading, a positive result on an outside reading
7    that was not detected by the qualified physician but they still
8    qualified for Medicare benefits.
9    Q    Because of that outside read?
10   A    Yes.
11   Q    Is it a concern to -- or was it a concern to ATSDR
12   that the -- that there were discordant findings on these CT
13   reads from CARD physicians and outside physicians?
14   A    So it was -- I would say it was notable but
15   not -- not surprising.
16   Q    And why is that?
17   A    ATSDR knew from previous rounds of screening that
18   pleural plaques are hard -- they can be very difficult to
19   diagnose and it's not unusual even among -- you know, in
20   the -- in the initial round of screening that we did, we had
21   two or three B-readers look at each test radiograph.  And it
22   was not unusual to have them disagree.  And we've done other
23   studies on CT scans in Libby and the same thing.  It's
24   not -- it's not unusual to have radiologists disagree about
25   what's on a patient's CT scan.

Page 56

1    (Exhibit No. 522 is introduced and identified for the
2    record.)
3    Q    I'm going to hand you Exhibit 522.  What is that
4    document, Mr. Larson?
5    (Witness reviews Exhibit No. 522.)
6    A    This is an email from Tracy McNew at CARD to -- the
7    to line is to -- I believe these are the expert outside
8    radiologists that the program used -- used or uses.
9    MR. DUERK:    Can I see a copy?
10   MR. BECHTOLD:  Can we go off the record for a second,
11   please?  Thanks.
12   THE VIDEOGRAPHER:    We're going off the record.  The
13   time is 10:10.
14   (Off the record from 10:10 a.m. until 10:22 a.m.)
15   (On the record.)
16   THE VIDEOGRAPHER:    We are back on the record at
17   10:22.
18   BY MR. BECHTOLD:
19   Q    So Mr. Lawson, what is Exhibit 522?
20   A    This is an email from Tracy McNew at CARD to the -- I
21   believe the -- the outside CT readers that were used at the
22   time of the email in 2015.
23   Q    And you're copied on this email, correct?
24   A    Yes.
25   Q    Why were you copied?

Exhibit A-14

Page 57

1    A    Because I'm the -- probably because I'm the project
2  officer for the grant.
3    Q    Okay.  In the -- in the email Ms. McNew indicates
4  that there's a peer review call scheduled.  What is a peer
5  review call?
6    A    That's the -- the panel of readers noted in the NOFO.
7    Q    So you're referring to, for example, Exhibit 302 at
8  page 8?
9    A    Yes.
10   Q    And what is -- what is that -- that panel for?
11   A    Again, it's for trying to improve, I think, the
12 consistency of the readers.  Correction.  The consistency of
13 the readings done by the readers.
14   Q    Okay.  So the consistency of the readings done by the
15 readers.  So how -- how do -- what's the -- what's the process?
16 How does that happen?
17   A    So they -- they look at the same image and they have
18 extended conversation about whether or not they would classify
19 a particular structure on a chest X-ray or CT scan as, for
20 example, pleural plaque.
21       (Exhibit No. 518 is introduced and identified for the
22 record.)
23   Q    I'm going to hand you Exhibit 518.  Could you tell me
24 what that is?
25       (Witness reviews Exhibit No. 518.)

Page 58

1    A    This is email from my former supervisor, Vinicius
2  Antao, to me and Tanis Hernandez at CARD.
3    Q    Okay.  Could you look through the body of that
4  exhibit?
5        (Witness complies.)
6    Q    So this is an email from August of 2011, correct?
7    A    Yes.
8    Q    So what's going on here?
9    A    So I don't recall this email chain but it's
10 not -- it's nothing surprising.  It looks like Tanis at
11 CARD -- if you go back to the -- the bottom of the email chain,
12 it looks like she -- it looks like she was reaching out to
13 ATSDR to -- to identify potential outside readers for their
14 program and to -- there's a lot of text on page 1 of this
15 chain.  It looks like we were getting down into the details of
16 power calculations and that kind of thing.
17   Q    Okay.  So what was your role in selection of the
18 people on the -- on the -- the panel?
19   A    So I -- I had done some studies as an investigator
20 and had -- I had worked with different readers.  And so I have
21 a list on page 2 of names I thought would be good candidates.
22 And these are all folks that work in academia.  They're
23 physicians at the medical school, at their respective medical
24 schools, and I was proposing them as candidates that CARD might
25 consider for their program.

Page 59

1    Q    Okay.  And then on page 1 of 518, in the -- an email
2  authored by you in this chain, what are you talking about
3  there?
4        (Witness reviews a portion of Exhibit No. 518.)
5    A    So it appears I'm proposing a sampling -- a sampling
6  strategy to get chest radiographs and CT scans for the -- for
7  the outside reader panel.  And it looks like I'm proposing
8  just, like, a random sample; go in and grab random people for
9  that -- for that panel.
10   Q    And do you know how -- how did CARD eventually select
11 these -- the -- the scans for the panel?
12   A    I don't recall exactly.  I -- I believe they may have
13 started off with a random sample but I think at some point they
14 may have intentionally tried to identify chest X-rays and CT
15 scans that were difficult to interpret and to -- to make more
16 of a challenge for the readers.
17   Q    Or identify it.
18       (Exhibit No. 506 is introduced and identified for the
19 record.)
20   Q    I'm now going to hand you what's been marked as
21 Exhibit 506.  What is that document?
22       (Witness reviews Exhibit No. 506.)
23   A    So it's not labeled but it -- to me it looks like
24 it's the results from said outside reader panel.  I believe
25 these are CT readers and it shows -- I believe -- again, it's

Page 60

1  not really labeled clearly but it appears to be how each reader
2  made their respective calls for parenchymal and plural
3  abnormalities on a given CT scan.
4    Q    And this is something that -- that you received
5  regularly from CARD, correct?
6    A    I -- I have received these.  I don't know that I've
7  seen one recently but -- but I have received these in the past.
8    Q    And as you look at Exhibit 506, do you note that
9  there's -- what -- what do you note about the agreements
10 between these three CT readers and these various scans?
11       (Witness reviews Exhibit 506.)
12   A    The one dated -- to take -- I think you'd want to
13 compare, for example, the pleural columns, the three different
14 readers looking at the same image, I'm thinking.  And then see
15 how the results agree or not.  I think the reason why I don't
16 typically see the data in this format anymore is that there's
17 a -- a new summary statistic that we -- summary statistics that
18 we use in the -- in the monthly and annual reports that are
19 more concise and easier to interpret.
20   Q    Okay.
21   A    I -- it looks like these are mostly noes and there's
22 a -- I -- I do see a few places where the readers disagree.
23       (Exhibit No. 507 is introduced and identified for the
24 record.)
25   Q    And I'm going to hand you Exhibit 507.  Again, what



**Exhibit A-15**

Page 61

1 is this document?

2     (Witness reviews Exhibit No. 507.)

3     A    So this is -- this appears to be the results from

4 another CT reader panel.  And there's a little more information

5 on it.  I think the emph, E-P -- or E-M-P-H in parentheses is

6 emphysema.  And again, I think you can see places where there

7 was agreement and disagreement in this table.

8     Q    Would you agree that these -- that Dr. Kanne, Dr.

9 Lynch, and Dr. Meyer are all highly expected -- experienced

10 radiologists?

11     A    They are.

12     Q    And you agree that they -- as you testified, both

13 agree and disagree on reading these CTs, correct?

14     A    Yes.

15     Q    Would -- would you expect a discordance in agreement

16 to change over time?

17     A    So, you know, we're -- we're dealing with humans

18 looking at chest radiograph or CT on a screen.  There's shades

19 of gray and it's not surprising that on -- on the day -- on the

20 day that this panel was looking at it, some -- you know, some

21 of the readers agreed, some disagreed.  And we've done studies

22 where we looked at within reader agreements of this.  You take

23 the same reader, they look at the same image after some amount

24 of time, a washout period, sometimes you get a different

25 result.  It's just a -- a way of illustrating how difficult it

Page 62

1 is to classify a lot of these types of abnormalities.

2     Q    So it's no surprise then that, for example, Dr. Brad

3 Black's readings of CTs would be different from a different

4 doctor who -- who would use these CTs?

5         MR. DUERK:    Objection: Foundation.

6         Are we talking about Exhibit 507?  I don't see

7     Black's reads here.

8 BY MR. BECHTOLD:

9     Q    Go -- go ahead and answer.

10     A    So Dr. Black is another reader in a way.  And no, it

11 would not be surprising to see his results agree and disagree

12 with these two readers within this table.

13     Q    Okay.

14     (Exhibit No. 505 is introduced and identified for the

15 record.)

16     Q    I'm -- Mr. Larson, I'm handing you what's been marked

17 as Exhibit 505.  Please take a look at that document, and.

18     (Witness reviews Exhibit No. 505.)

19     A    So these -- again, this appears to be results from a

20 reader panel like we were talking about in the NOFO.  And this

21 is a little more sophisticated way to present the data.  And

22 they have some measures of reader agreement, including a kappa

23 statistic.

24     Q    What's a kappa statistic?

25     A    So I get out of my -- out of my knowledge of

Page 63

1 statistics pretty quickly but it's a -- it's a way of

2 measuring, like, agreement succinctly.  And so the first kappa

3 result is .619.  It's not a percentage or a proportion.

4 It's -- it's just a way of ranking agreement.  And there's

5 different interpretations for kappas.  Shooting -- I'm shooting

6 from the hip, but I would say that's -- that's not bad.  That's

7 better than average probably.

8     (Exhibit No. 523 is introduced and identified for the

9 record.)

10     Q    Okay.  I'm handing you what's -- Exhibit 523.  What

11 is that document?

12     (Witness reviews Exhibit No. 523.)

13     A    These are the results from another -- what CARD calls

14 a peer review.  It's the -- it's the panel of outside readers

15 for radiographs and HRCT scans.

16     Q    So who is -- who conducted this analysis?

17     A    This is Dr. Curtis Noonan, who is on contract with

18 CARD.

19     Q    Why does CARD have Dr. Noonan do this analysis?

20     A    So he's a subject matter expert as it relates to

21 doing kappa statistics.  And I'm speculating but I think CARD

22 just realized, you know, the -- the -- where their knowledge

23 ends and wanted to bring in an expert.

24     Q    And these are statistics that -- that CARD provides

25 to you, correct?

Page 64

1     A    Yes.

2     Q    So this is something that CARD provides to you

3 regularly?

4     A    Yes.

5     Q    And something that ATSDR has been aware of?

6     A    Yes.

7     Q    So what was ATSDR's role in involving Dr. Noonan in

8 these statistical analysis?

9     A    So ATSDR is a consumer of Dr. Noonan's output, like

10 in this table -- in these tables.  And so he's an expert.  We

11 did not advise him on the approach, the statistical approach,

12 to be used.  I think he came -- he reached that conclusion on

13 his own and I'm not sure if I'm -- if I'm getting at your

14 question.

15     Q    So what's the purpose of having this statistical

16 analysis done?

17     A    So recall earlier exhibits, the -- you're looking at

18 a table with was there agreement, yes or no.  It can be hard to

19 take in a lot of records, a lot of patients in a single table.

20 This is a much more succinct way to look at reader agreement.

21     (Exhibit Nos. 508, 509, 510, 511, 512, and 514 are

22 introduced and identified for the record.)

23     Q    Okay.  So I'm going to hand you what has been marked

24 as Exhibits 508, 509, 510, 511, 512, and 514.  Will you take a

25 look at those, please?



**Exhibit A-16**

Page 65

1    (Witness complies and reviews Exhibit Nos. 508 through 512
2  and Exhibit No. 514.)
3    Q    And what are those documents?
4    A    These are tables of outside reader panel results.
5    Q    Okay.  And from what years?
6    A    So the dates that the CTs were taken range from 2013
7  to 2019.
8    Q    And as you look at the -- the discordant rates
9  between those ones taken from 2013 compared to the ones from
10  2019, is there a difference in the discordance rate for those
11  various readers?
12    A    Can you ask the question one more time, please?
13    Q    What's the discordance rate in the various readings
14  compared from the 2013 -- the early ones, 2013, compared to the
15  last one from 2019?
16    A    So these tables are not summarized by
17  discordant -- discordancy rate.  I do see discordancy, I see
18  agreement but there's not, like, a summary statistic that
19  would -- I mean, that would take some time, I think, to
20  calculate that.
21    Q    Okay.  And if you look at Exhibit 505 --
22    (Witness complies.)
23    Q    -- does that help you in that analysis?
24    A    Yes, so that's where you would see -- let's see.  So
25  the -- yeah, these do present kind of summary -- summaries of

Page 66

1  the individual readings for -- for a given patient.  These are
2  much more succinct and easier to digest.
3    Q    And what does the -- what does the table on page 1 of
4  505 indicate to you about the -- the rate of discordance from
5  beginning -- at the beginning of the grant in 2011 to the -- it
6  looks like the eleventh year of the grant?
7    A    So with regard to kappa, I'm not seeing a clear
8  trend.
9    Q    Would it be fair to say that the -- the readings go
10  all over the place?
11    MR. DUERK:    Objection:  Form.
12    Go ahead.
13    A    So there's a statistical test for trends that could
14  be attempted here, but to my -- just giving it the eyeball
15  check, I'm not seeing a clear improvement or worsening of
16  kappa.
17  BY MR. BECHTOLD:
18    Q    So when there's -- when there's no improvement or
19  worsening of kappa, what does that mean?
20    A    So there's no trend.  I mean, the -- the numbers
21  appear to be trending down and then they're going up again.  So
22  there's no -- there's no clear trend.  They do differ from
23  reading panel to reading panel but there's not a -- there's no
24  trend.  If I look at the other statistics, they're hard to
25  interpret but kind of the same thing; not a clear -- a clear

Page 67

1  trend in the statistics.
2    Q    So what does that mean in your life?
3    A    It means there's remaining inconsistency in the
4  readers.  I mean, there's not perfect agreement in the readers
5  and there does not appear to be giving it the eyeball check.
6  I'm not seeing an improvement in time.
7    Q    Does this reinforce your earlier testimony
8  that -- that the CT readers have a great degree of
9  inconsistency?
10    MR. DUERK:    Objection:  Form.
11    Go ahead.
12    A    It may -- it may indicate inconsistency of the CT
13  readers.
14  BY MR. BECHTOLD:
15    Q    What do you think it indicates?
16    A    So I'd want to know what the makeup of the CT scans
17  for each panel were.  I mean, were they -- were they random
18  samples or were they -- again, I believe at one point CARD was
19  intentionally selecting kind of difficult scans and radiographs
20  to read and so that -- that would -- you know, one would expect
21  that with CT scan, for example, that's not straightforward to
22  classify, that would result in greater inconsistency between
23  the readers.
24    Q    Okay.  So it's -- it's your understanding
25  that -- that some are random and -- and some of the -- of the

Page 68

1  scans chosen for the peer review are random and some are not?
2    A    I really don't remember.  From that earlier email
3  I -- that I couldn't remember either, I had -- I had
4  recommended a random sample and I think that's a reasonable
5  approach still.  Even with a random sample there might be some
6  panel meetings where the -- where the images were just tougher
7  by -- by chance, so.
8    Q    Okay.  And is the idea behind the quality control
9  provision of the funding opportunities, is it to -- is it to
10  eliminate discordant reads?
11    A    I don't think it's possible to eliminate discordancy
12  but I've heard the readers that attend these panels found them
13  very beneficial and they didn't always agree at the end of the
14  meeting, but they felt that they were working towards better
15  consistency in the readings.
16    Q    What's the discordancy read rates between CARD
17  doctors and B-readers?
18    A    It's summarized in the quarterly and annual reports.
19    Q    So it's something that ATSDR is familiar with?
20    A    Yes.
21    Q    Is it something ATSDR is concerned about?
22    A    So I think it's notable but again, it's not
23  surprising.  So I wouldn't say I'm -- you know, my personal
24  opinion is I'm not worried about it but it is something to keep
25  an eye on.



Page 69

1    Q    Why are you not worried about it?
2    A    So again, from my experience, expert readers reading
3 images from Libby, that is chest X-rays and CT scans, tend to
4 disagree a lot especially about pleural plaque.
5    Q    All right.  I'm going to clean up your paper mess.
6    A    Okay.
7    (Exhibit 303 is introduced and identified for the
8 record.)
9    Q    And I'm handing you Exhibit 303.  What is Exhibit
10 303?
11   (Witness reviews Exhibit No. 303.)
12   A    This is the NOFO for the current funding cycle from
13 2019.
14   Q    Is there anything different about the -- current
15 funding cycle as opposed to the prior two?
16   A    The NOFO is essentially the same.  There may have
17 been edits requested by reviewers as it went through the
18 process of getting stood up.  But in essence, it's the same as
19 the prior two NOFOs.
20   Q    So it has that same logic table?
21   A    Yes.
22   Q    It has that same -- you're identified as the program
23 officer again on page 39?
24   (Witness reviews a portion of Exhibit No. 303.)
25   A    Yes.

Page 70

1    Q    It has that same positive screening definition on
2 page 11?
3    A    Yes.
4    Q    And it has that same -- it has that same disease
5 management provision in the logic table as before?
6    (Witness reviews a portion of Exhibit No. 303.)
7    A    Yes.
8    Q    It has that same notion of the -- of -- of how people
9 qualify for Medicare in the logic table?
10   MR. DUERK:    Objection: Foundation, form.
11   Go ahead.
12   A    Yes.
13 BY MR. BECHTOLD:
14   Q    So would you characterize this essentially as a
15 continuation of the first two grants?
16   A    Yes.
17   Q    Why was it extended for five years instead of four?
18   A    That was a recommendation from a CDC reviewer.  It's
19 just less burdensome on the bureaucracy at CDC.  It reduces
20 their load by 25 percent by going to five years.
21   (Exhibit No. 309 is introduced and identified for the
22 record.)
23   Q    And I'm handing you what's been marked as Exhibit
24 309.  What is that?
25   (Witness reviews Exhibit No. 309.)

Page 71

1    A    This is a Notice of Award from CDC to CARD for the
2 2019 NOFO.
3    Q    So that's -- that's the -- how the ATSDR notified
4 CARD that they had been awarded the grant?
5    A    That's how CDC notifies.
6    Q    Oh, CDC.  Excuse me.
7    (Exhibit No. 324 is introduced and identified for the
8 record.)
9    Q    I'm going to hand you what's been marked as Exhibit
10 324.  If you could explain what that is?
11   (Witness reviews Exhibit No. 324.)
12   A    This appears to be CARD's work plan submitted as part
13 of the application process for the 2019 funding cycle.
14   Q    And just in -- to summarize, what -- what was CARD's
15 work plan?
16   A    So at its core it's the same as the two prior work
17 plans.  Again, there are some innovations as he mentioned on
18 page 2.  For example, their lung -- lung cancer screening
19 program.  And -- but again, at its core it's -- it's
20 essentially the same work plan as -- as for the two prior
21 funding periods.
22   Q    So why did ATSDR grant CARD this third group of
23 funds?
24   A    ATSDR felt there was still public health work to be
25 done in Libby regarding -- regarding screening for asbestos

Page 72

1 related disease there.  And stood up this third funding period.
2    Q    And was ATSDR satisfied with CARD's performance under
3 the two prior grants?
4    A    Yes.
5    Q    Was ATSDR satisfied with the way CARD had spent the
6 federal funds granted to them?
7    A    Yes.
8    (Exhibit No. 325 is introduced and identified for the
9 record.)
10   Q    I'm handing you what's marked as Exhibit 325.  Could
11 you explain what that is?
12   (Witness reviews Exhibit No. 325.)
13   A    This is the financial plan for the third funding
14 cycle of the ACA grant.
15   Q    And is ATSDR satisfied with the financial plan?
16   A    Yes.
17   (Exhibit No. 326 is introduced and identified for the
18 record.)
19   Q    I'm handing you what's been marked -- I'm handing you
20 Exhibit 326.  Can you explain what that is?
21   (Witness reviews Exhibit No. 326.)
22   A    This is an annual report from CARD for -- it looks
23 like it's the first quarterly -- quarterly report under the
24 third funding cycle.
25   Q    Okay.  And is -- based on that report is -- is CARD



**Exhibit A-18**

Page 73

1  performing under the grant satisfactorily?

2      A   Yes.

3      Q   Spending the money as intended by the ATSDR?

4      Yes.

5      Q   Fulfilling the purposes of the statute?

6      A   Yes.

7      (Exhibit No. 327 is introduced and identified for the

8  record.)

9      Q   I'm now handing you Exhibit 327.  What is that

10 document?

11     (Witness reviews Exhibit No. 327.)

12     A   This is CARD's financial plan for the grant.  It's

13 not well labeled.  I'm not sure what era it's from.

14     (Witness continues review of Exhibit No. 327.)

15     A   It's from -- it looks like the period 2019 to 2020.

16     Q   So Year -- Year 2 -- Year 2 of the grant?

17     A   Yes.

18     Q   Was the budget approved by ATSDR?

19     A   Yes.

20     (Exhibit No. 328 is introduced and identified for the

21 record.)

22     Q   I'm now handing you what's been -- Exhibit 328.

23 Could you explain what that is?

24     (Witness reviews Exhibit No. 328.)

25     A   This is a progress report from CARD.  Appears to be a

---

Page 74

1  quarterly report from September 2020 to February 2021.

2      Q   Again, is CARD performing as expected under the

3  grant?

4      A   Yes.

5      Q   Is CARD performing as ATSDR determined satisfactory?

6      A   Yes.

7      (Exhibit No. 329 is introduced and identified for the

8  record.)

9      Q   I'm handing you Exhibit 329.  Could you tell us what

10 that document is?

11     (Witness reviews Exhibit No. 329.)

12     A   This is the financial plan from CARD to CDC.  It

13 appears to be the third year for the current funding cycle.

14     Q   Okay.  And has CARD been spending the money

15 appropriately?

16     A   Yes.

17     Q   As intended by ATSDR?

18     A   Yes.

19     (Exhibit No. 330 is introduced and identified for the

20 record.)

21     Q   I'm handing you Exhibit 330.  What is that?

22     (Witness reviews Exhibit No. 330.)

23     A   This is another progress report from CARD for the

24 period September 2021 to February 2022.

25     Q   And has CARD been performing under the grant as

---

Page 75

1  expected?

2      A   Yes.

3      Q   Has it been performing as intended?

4      A   Yes.

5      Q   Is ATSDR satisfied with the performance of CARD under

6  the grant?

7      A   Yes.

8      (Exhibit No. 331 is introduced and identified for the

9  record.)

10     Q   I'm now handing you Exhibit 331.  Could you explain

11 what that document is?

12     (Witness reviews Exhibit No. 331.)

13     A   This is CARD's financial plan.  It looks like it was

14 the plan from the outset of the, you know, the whole funding

15 cycle.

16     Q   So has CARD been spending the money as intended under

17 this funding cycle?

18     A   Yes.

19     Q   As ATSDR intended?

20     A   Yes.

21     (Exhibit No. 341 is introduced and identified for the

22 record.)

23     Q   Now I'm handing you Exhibit 341.  What is that?

24     (Witness reviews Exhibit No. 341.)

25     A   This is a CDC Notice of Award to CARD for the period

---

Page 76

1  September 2021 to August 2022.

2      Q   So is this a supplemental award?

3      (Witness continues review of Exhibit No. 341.)

4      A   This does include a supplemental -- this does include

5  supplemental funding.

6      Q   So what were the circumstances that would provide

7  that ATSDR would give CARD supplemental funding?

8      A   So this was at the height of the COVID-19 pandemic

9  and CARD's patient population already has compromised pulmonary

10 systems and CARD did not have the facilities to protect its

11 patients from contracting COVID-19 while anticipating its

12 screening activities.  And so one part of the supplemental

13 funding was to bring CARD up to speed with regard to having

14 engineering controls in their facility to protect patients.

15     (Exhibit No. 347 is introduced and identified for the

16 record.)

17     Q   Okay.  I'm handing you Exhibit 347.  Can you tell us

18 what that is?

19     (Witness reviews Exhibit No. 347.)

20     A   This is CARD's work plan for the supplemental

21 funding.

22     Q   Okay.  Was ATSDR aware of Burlington Northern Santa

23 Fe's lawsuit when ATSDR gave CARD a supplemental $1 million?

24     MR. DUERK:     Objection:  Form.

25     Go ahead.

---



**Exhibit A-19**

Page 77

1    A   I don't recall.  It was -- I think I may have vaguely
2 been aware of it but really, the supplemental funding had
3 nothing to do with any pending litigation with CARD.  It was
4 more to get it -- I was concerned that CARD's program would be
5 knocked out by COVID essentially.  They had no patients turning
6 out to be screened and I had concerns also that staff would be
7 leaving and that institutional knowledge would be gone forever.
8 You know, those -- those sorts of things.  I -- I guess I had
9 been aware in years leading up to the COVID-19 pandemic that
10 there was litigation or a threat of litigation in the
11 background but it -- it was not prominent on my radar.
12 BY MR. BECHTOLD:
13    Q   In other words, that wasn't a concern of ATSDR
14 regarding funding?
15    A   That's correct.
16    Q   Was that because you were confident in CARD's
17 performance under the grant?
18    A   Yes.
19    Q   At any point in these three grant periods, what
20 concerns did you have, if any, about how CARD was spending the
21 federal money?
22    A   So I may have had a minor concern in the first
23 funding period regarding CARD's inability to spend the full
24 amount and sometimes that can make it hard to justify funding
25 at the same level in subsequent years.  And so I would say that

Page 78

1 was my only -- the only concern that comes to mind over the
2 history of the grant.
3    Q   How would you rate CARD's compliance with the
4 requirements of the grant?
5    A   Very good.
6    Q   So have the purposes of the -- of the federal grants
7 been served?
8    A   Yes.
9    (Exhibit No. 521 is introduced and identified for the
10 record.)
11    Q   I'm handing you Exhibit 521.  What is Exhibit 521?
12    (Witness reviews Exhibit No. 521.)
13    A   This is an email from me to Dr. Black from 2014.  And
14 in it, it appears I'm requesting data from CARD's patient
15 population for an analysis that I was working on.  I don't
16 recall this analysis specifically but it looks like I was
17 trying to put together an abstract for a scientific conference.
18    (Exhibit No. 524 is introduced and identified for the
19 record.)
20    Q   I'm also going to hand you what's been -- Exhibit
21 524.  Could you explain what that is?
22    (Witness reviews Exhibit No. 524.)
23    A   So this is an email chain started by Dr. Jaime
24 Szeinuk to me notifying me of his success in publishing a
25 manuscript that he had collaborated with Dr. Black and others

Page 79

1 on.
2    Q   Okay.  So is research any part of these grants?
3    A   These are non-research grants but it's possible that
4 the data could be repurposed and used in research.
5    Q   And did that happen?
6    A   So you could see in the previous email that I was
7 working towards using some of CARD's data for an analysis.
8 The -- the email in my hands from Dr. Szeinuk I believe was
9 also using the -- the CARD's patient population under a
10 different -- this is a -- under a research grant not under the
11 Affordable Care Act, I believe.
12    Q   What's the benefit of -- of using the data generated
13 through these grants in research?
14    A   So a research question may indirectly or directly
15 benefit an individual CARD patient.  Maybe we can answer some
16 scientific question about how they're getting sick or maybe
17 identifying a disease earlier than were identified previously.
18 Those sorts of basic research questions may be answered by
19 looking at the CARD's patient population data.
20    Q   Is that something that ATSDR encourages?
21    A   So in the past I have been encouraged to work on
22 research questions that have the potential to benefit a public
23 health situation like in Libby.
24    (Exhibit No. 337 is introduced and identified for the
25 record.)

Page 80

1    Q   I'm now handing you Exhibit 337.  Mr. Larson, could
2 you tell us what that document is?
3    (Witness reviews Exhibit No. 337.)
4    A   So this -- it's -- it's an email chain starting with
5 me sending an email to my supervisor, Kevin Horton.  So I was
6 noting to him in 2015 -- I didn't realize it been that long ago
7 but -- evidently HHS Office of the Inspector General was
8 scrutinizing CARD's work back then.  So I was notifying my
9 supervisor about that conversation and then the email chain
10 goes on -- let's see.  And there are a lot of people copied on
11 it at the time, I guess.
12    (Exhibit No. 338 is introduced and identified for the
13 record.)
14    Q   Okay.  I'm handing you 338, Exhibit 338.  What is
15 that?
16    (Witness reviews Exhibit No. 338.)
17    A   So this is an email from me to Ashley Collins.  I
18 don't remember this person specifically but it appears she's an
19 HHS OIG investigator and I had furnished the names of the
20 outside readers being used by CARD for their program.
21    Q   Okay.  What is HHS OIG?  What's that stand for?
22    A   So HHS is the Department of Health and Human
23 Services, under which CDC and ATSDR fall.  And then OIG is
24 their Office of the Inspector General that does internal
25 investigations regarding grants and that sort of thing.


**Exhibit A-20**

Page 81

1    Q    So what triggered the 2015 Office of Inspector
2  General investigation?
3    A    So I didn't -- I did not specify it in this email
4  and --
5    (Witness reviews Exhibit 337.)
6    A    -- looking at the previous email chain, it was
7  regarding a complaint that OIG had received that physicians in
8  Libby may be over diagnosing asbestos related disease.
9    Q    So physicians in Libby, that means the CARD
10  physicians?
11    (Witness continues review of Exhibit 337.)
12    A    So my -- my direct words were "complaints from
13  physicians in Libby," so I'm assuming I meant physicians
14  physically located in Libby, Montana.
15    Q    Had made complaints about --
16    A    About CARD.
17    Q    Over diagnosing?
18    A    (Nods head affirmatively.)
19    Q    Okay.  So what was the outcome of this 2015 Office of
20  Inspector General investigation?
21    MR. DUERK:    Objection:  Foundation.
22    MR. KAKUK:    I'm going to object here as well.
23    I''s a good opportunity to put on the record the issue
24    that we might have if this goes outside -- I believe this
25    whole line of questioning is outside the scope of the

Page 82

1    deposition.
2    You can go ahead and answer, Mr. Larson.
3    A    So my memory of what happened, I think, kind of
4  trails off.  I believe it was not pursued to the end.  You
5  know, CARD was never -- that -- that was the outcome.
6  CARD was never -- never accused or had to face charges,
7  I guess, of over diagnosing.
8  BY MR. BECHTOLD:
9    Q    What's your understanding of CARD's diagnostic
10  methodologies for asbestos related diseases?
11    A    So they -- CARD, just like as specified in the NOFO,
12  they use chest CT scans as part of their diagnostic procedures.
13  They also do spirometry and pulmonary function testing, which
14  are well recognized in -- in treating and diagnosing patients
15  exposed to asbestos.  And in addition they administer a
16  standardized survey to get the patient's potential exposure
17  history.
18    Q    Do -- do CARD physicians apply American Thoracic
19  Society guidelines in clinically diagnosing asbestos related
20  disease?
21    A    So I have read those guidelines.  I'm not intimately
22  familiar with them.  I -- I do believe there are many elements
23  in the ATS guidelines that CARD employs but they are not
24  specified in the NOFO or the Affordable Care Act statute.
25    Q    So is -- so is it -- what is ATSDR's understanding of

Page 83

1  individuals who are diagnosed by CARD with an asbestos related
2  disease eligibility for Medicare?
3    A    So if -- again, a patient meets those criteria
4  specified in the NOFO they would be eligible for Medicare.
5  That is, if -- if they're a qualified physician at CARD, sees
6  asbestosis, pleural thickening or plural plaque, a person would
7  be deemed eligible for Medicare.
8    Q    Similarly, what's ATR's -- ATSDR's position regarding
9  the eligibility for Medicare benefits of those individuals
10  identified by an outside reader to have an abnormality
11  associated with an asbestos-related disease?
12    MR. DUERK:    Objection:  Form, foundation, and
13    relevance.
14    A    Similar response.  It's specified the NOFO.  Outside
15  readers may -- a B-reader may identify a structure on a chest
16  X-ray as asbestos related or on a CT scan.
17  BY MR. BECHTOLD:
18    Q    So what's the -- what's the purpose of -- of
19  these -- of the ACA provisions as -- as transferred -- as --
20  rather, as designated in these three funding request proposals?
21    MR. DUERK:    Objection:  Form, foundation,
22    relevance.
23    Go ahead.
24    A    Can you restate the question, please?
25  BY MR. BECHTOLD:

Page 84

1    Q    What's the -- what's the purpose of this -- what is
2  ATR's -- ATSDR's position on why -- why this provision in the
3  Affordable Care Act?  Why does it exist?
4    MR. DUERK:    Same objections.  Form, foundation,
5    relevance.  Calls for a legal conclusion.
6    Go ahead.
7    A    So the -- you're talking about the definition for
8  asbestos related disease in the statute and then the NOFO,
9  why -- why are they there?
10  BY MR. BECHTOLD:
11    Q    Yeah, why are they there?
12    MR. DUERK:    Same objections.
13    Go ahead.
14    A    So it's to -- it's to make people -- allow people in
15  Libby that may have been exposed to asbestos, if they have
16  those diseases, then -- then they qualify for Medicare.  So
17  it's the way of getting people on -- providing a government
18  service for those people.
19  BY MR. BECHTOLD:
20    Q    Why would ATSDR want to do that?
21    A    So I believe ATSDR was directed by the HHS secretary
22  to do it under statute.
23    Q    What's the public health benefit of providing these
24  funds to CARD?
25    A    People with asbestos related disease get a positive

Elizabeth Gallo
COURT REPORTING, LLC

**Exhibit A-21**

Page 85

1 screening result potentially and then they end up on Medicare,
2 where they can get their -- get the services to treat their
3 disease.
4     Q    So what benefit does it serve to have a CARD patient
5 get this ongoing disease management from CARD after they've
6 been diagnosed?
7         MR. DUERK:    Objection: Foundation and form.
8         Go ahead.
9     A    It's just like any -- any human with disease, there's
10 a benefit to society to make sure people get the appropriate
11 diagnosis and treatment.
12 BY MR. BECHTOLD:
13     Q    So is ATSDR's funding of CARD predicated upon CARD
14 following American Thoracic -- American Thoracic Society
15 guidelines in diagnosing patients?
16     A    No.
17     Q    What's the benefit of early detection of -- of
18 disease, of asbestos related disease?
19     A    So for cancer, it's -- should be obvious that, you
20 know, the sooner you get diagnosed typically, the better the
21 prognosis.  For some of these chronic noncancer conditions,
22 like pleural plaque, there's a benefit to having the patient
23 know what's potentially causing them to be short of breath, for
24 example, and getting them on the appropriate treatment.
25     Q    I'd like to draw your attention back to Exhibit 350,

Page 86

1 which is one of the first exhibits I handed you.  So it's going
2 to be on the bottom of this pile (indicating).
3     A    Thanks.
4     (Witness complies.)
5     Q    Three piles here.
6         MR. DUERK:    Which exhibit is that?
7         MR. BECHTOLD:    350.
8         MR. DUERK:    Thanks.
9 BY MR. BECHTOLD:
10     Q    I'm just going to address some of the -- again,
11 this -- this is your declaration dated September of 2022,
12 correct?
13     A    Yes.
14     Q    I'm just going to address some of the statements in
15 your declaration.  So as you testified, you got degrees from
16 the University of Colorado and Colorado State, correct?
17     A    Yes.
18     Q    And as you testified, you've been an epidemiologist
19 at ATSDR since 2000?
20     A    Yes.
21     Q    And -- and you testified that you were the -- the
22 contact or the managing person at ATSDR for at least three CARD
23 funding opportunities, correct?
24     A    Yes.
25     Q    And you testified that the Affordable -- or this

Page 87

1 provision in the Affordable Care Act includes a diagnosis for
2 asbestosis, pleural thickening, or pleural plaques?
3     A    Yes.
4     Q    Established that the diagnosis is established by a
5 B-reader qualified physician of a plain chest X-ray, correct?
6         MR. DUERK:    Objection: --
7     A    Yeah.
8         MR. DUERK:    -- Form, foundation, misstates the
9     Affordable Care Act itself.
10 BY MR. BECHTOLD:
11     Q    And you testified that for the purposes of the ATSDR
12 the physicians at CARD are qualified physicians for the
13 purposes of Notice of Funding Opportunities, correct?
14     A    Yes.
15     Q    And you testified that that's ATR's -- ATSDR's
16 interpretation of -- of the Act, correct?
17     A    Yes.
18     Q    And you testified the purposes of the screening
19 grants were threefold, correct?
20     A    Yes.
21     Q    To provide screening, correct?
22     A    Yes.
23     Q    To provide outreach?
24     A    Yes.
25     Q    And education?

Page 88

1     A    Yes.
2     Q    Then you testified that the -- that the grants
3 amended a panel of B-readers, correct?
4     A    Yes.
5     Q    And you testified that these B-readers also have a
6 peer review session, correct?
7     A    Yes.
8     Q    And the peer review session indicates that these
9 highly trained radiologists don't always agree in their CT
10 reading, correct?
11     A    Correct.
12     Q    And these discordance rates continued over time,
13 correct?
14     A    Yes.
15     Q    You testified that -- that ATSDR is aware
16 that -- that these B-readings don't effect the CARD diagnoses,
17 correct?
18         MR. DUERK:    Objection: Vague.
19     A    Can you restate the question, please?
20 BY MR. BECHTOLD:
21     Q    No, let me -- I'll just draw your attention back to
22 Exhibit 517, which is the 2011 document.  So here it is.
23     A    Sorry.  Sorry.  I'm not -- I'm looking for the cover
24 sheet.
25     Q    So again, I draw your attention to Exhibit 517 and

Exhibit A-22

Page 89

1  the attachment to that email.
2      (Witness complies.)
3      A    Yes.
4      Q    Do you -- so you testified that the -- that the
5  B-read panels do not affect an individual's eligibility for
6  Medicare benefits if CARD has diagnosed them otherwise,
7  correct?
8      A    Yes.
9          MR. DUERK:    Objection: Form, foundation.
10          Go ahead.
11      A    Yes.
12  BY MR. BECHTOLD:
13      Q    Is it -- was it -- ATSDR's intention was to have
14  individuals diagnosed by CARD qualify for Medicare eligibility
15  regardless of any B-reader result, correct?
16          MR. DUERK:    Objection: Form, foundation.
17      A    Yes.
18  BY MR. BECHTOLD:
19      Q    How do you know that?
20      A    The -- the criteria was spelled out in the NOFO and
21  it's -- or operator between the two.  It could be deposited by
22  a qualified physician at CARD or by an outside reader
23  potentially.
24      Q    So it's disjunctive; one or the other?
25      A    To clarify, I think, you know, the qualified

Page 90

1  physician at CARD and the outside reader could -- could be in
2  complete agreement (indiscernible).
3      Q    Okay.  But it could -- but also one or the other?
4      A    Correct.
5      Q    So if -- if either a diagnosis by CARD or a
6  B-reader's positive interpretation would qualify an individual
7  for Medicare benefits?
8          MR. DUERK:    Objection: Form, foundation.
9      A    Yes.
10  BY MR. BECHTOLD:
11      Q    And how do you know that?
12      A    Again, it's -- it's specified in the NOFO and in the
13  statute.
14      Q    And -- or you testified that you're aware of
15  discordance in CT interpretation, positive CT interpretations
16  by CARD physicians as opposed to outside readers, correct?
17      A    Yes.
18      Q    Does that concern the ATSDR?
19      A    Again, I think it's notable but given ATSDR's past
20  work in Libby, it's not surprising.
21      Q    And you testified that CARD has reported its -- its
22  positivity rates to the ATSDR quarterly as required, correct?
23      A    Yes.
24      Q    And I think you testified that ATSDR was satisfied
25  with CARD's performance under the grant, correct?

Page 91

1      A    Yes.
2      Q    What's the advantage of being as inclusive as
3  possible in identifying persons with positive screening
4  results?
5      A    So I think the -- I think the intent of the original
6  NOFO was to make sure that we weren't excluding people
7  unnecessarily and we had multiple ways people can get on
8  Medicare.  Again, giving them the ability to get on Medicare by
9  an outside reader or using the qualified physician at CARD.
10  And there's a benefit to getting as many people that qualify on
11  Medicare as possible so they're getting the appropriate
12  diagnosis and treatment for their conditions.
13      Q    What's your understanding of after CARD
14  physicians -- the qualified physicians at CARD diagnose an
15  individual with an asbestos related disease, what's your
16  understanding of what they do next?
17      A    So there's a form, the EHH form, Environmental Health
18  Hazard form, that SSA developed.  And my understanding is it's
19  the handshake where we hand off patients that have been -- have
20  a positive screening result to SSA so they can start getting
21  their Medicare benefits.
22      Q    And what's your understanding of once the -- a
23  B-reader makes a positive determination of a -- of a scan
24  for -- from somebody who's been screened at CARD?  What happens
25  next?

Page 92

1          MR. DUERK:    Objection to form.
2          Go ahead.
3      A    Can you restate the question, please?
4  BY MR. BECHTOLD:
5      Q    What's your understanding of -- of what happens after
6  a -- one of CARD's B-readers identifies -- makes a positive
7  finding on a -- on a scan for a patient for whom CARD has not
8  diagnosed as asbestos related disease?
9          MR. DUERK:    Same objection.
10      A    It's my -- my understanding is the CARD collates all
11  the data and that hypothetical patient that has, I believe, a
12  positive result from an outside reader but not from CARD would
13  still get dispositioned as having asbestos related disease and
14  move further down the process.
15  BY MR. BECHTOLD:
16      Q    And what does that further process entail?
17      A    So I believe the next step would be the -- the CARD
18  physician would fill out the EHH form and denote which
19  abnormality the patient has, sign it, and hand it off to SSA.
20      Q    Is there any part of the -- of these three
21  grants -- of -- of these three grant notices and funding
22  opportunities that CARD is out of compliance with?
23          MR. DUERK:    Objection: Foundation.
24          Go ahead.
25      A    No.

Elizabeth Gallo
COURT REPORTING, LLC

**Exhibit A-23**

Page 93

1    MR. BECHTOLD:  All right.  I'm going to take a brief
2  break, probably about five minutes, and confer with Ms.
3  McNew and then probably finish.
4    THE VIDEOGRAPHER:  Going off the record.  The time
5  is 11:33.
6  (In recess from 11:33 a.m. until 12:30 p.m.)
7  (On the record.)
8    THE VIDEOGRAPHER:  We're back on the record at
9  12:35.
10    MR. BECHTOLD:  So Mr. Larson, that's all the
11  questions I have.  Thank you very much for your time.
12    THE WITNESS:  Thank you.
13                EXAMINATION
14  BY MR. DUERK:
15    Q    Just because of the way this has all playing out, if
16  you would please state your full legal name for the record,
17  spelling your last name, that'll be helpful.
18    A    Sure.  Theodore Larson L-A-R-S-O-N.
19    Q    And Mr. Larson, what is your role with the ATSDR?
20    A    I'm an epidemiologist.
21    Q    Okay.  And do you prefer Dr. Larson?
22    A    I just have a master's degree so you can address me
23  as master.
24    Q    Okay.  All right.  Mr. Larson, you were the grant
25  administrator for the ATSDR related to CARD's federal grant.

Page 94

1  Is that correct?
2    A    I was the project officer.
3    Q    All right.  And how long did you serve -- or how long
4  have you served in that role?
5    A    Just since the start of the ACA grant so 13 years, 12
6  years.
7    Q    Okay.  Mr. Larson, in terms of your background,
8  experience, and training, I'd like to go through some of your
9  qualifications.  And in no way am I intending any slight or
10  anything about qualifications or certifications that you may
11  not have.  Mr. Larson, you are not a radiologist, correct?
12    A    That is correct.
13    Q    You are not a pulmonologist, correct?
14    A    That's correct.
15    Q    You're not a B-reader, correct?
16    A    Correct.
17    Q    In terms of any medical degrees, you're not a medical
18  doctor, correct?
19    A    Correct.
20    Q    It is not your role to diagnose and treat individual
21  patients in any capacity, correct?
22    A    Correct.
23    Q    In terms of your profession today, you work for the
24  American Toxic Substances Disease Registry.  Is that right?
25    A    I work for the Agency for Toxic Substances and

Page 95

1  Disease Registry.
2    Q    Thank you.  And that is under the aegis of the
3  Centers for Disease Control?
4    A    Technically ATSDR is a sister agency of CDC but we're
5  so small we actually just function as another center at CDC.
6    Q    Prior to working for ATSDR, if you could go through
7  some of your professional background with me that would be
8  helpful.
9    A    Sure.
10    Q    Where did you go to undergrad?
11    A    University of Colorado Boulder.
12    Q    And after you received your undergrad degree?
13    A    I went to graduate school at Colorado State
14  University.
15    Q    And what year did you complete your academic degree
16  at Colorado State?
17    A    1999.
18    Q    What did you do after that time?
19    A    I was employed as a chemist for the pharmaceutical
20  industry at the end of the 1990s until I took this job at ATSDR
21  in 2000.
22    Q    Okay.  So in the private sector between Colorado
23  State University and working for ATSDR, you were in the private
24  sector for approximately how long?
25    A    So I actually worked my way through graduate school

Page 96

1  and I was working full-time and then going to school on the
2  side.  But you're right.  So after graduation in 1999 I
3  continued to work as a chemist in the private sector for less
4  than 12 months, I guess.
5    Q    Sir, in terms of any work that you've done for any
6  other government agency or subdivision or department, aside
7  from ATSDR, have you ever worked for the Social Security
8  Administration?
9    A    No.
10    Q    Have you ever worked for the Centers for Medicare
11  Medicaid Services?
12    A    No.
13    Q    Have you ever worked for the Department of Public
14  Health and Human Services in any state outside of the federal
15  government?
16    A    No.
17    Q    And today you're testifying on behalf of the ATSDR as
18  what's called a 30(b)(6) deponent.  Is that --
19    A    Yes.
20    Q    -- correct?
21    A    Yes.
22    Q    You are not testifying on behalf of the Social
23  Security Administration, correct?
24    A    That's correct.
25    Q    You are not testifying on behalf of CMS or Medicare,

**Exhibit A-24**

BNSF vs CARD
30(b)(6) Theodore Larson

Case 9:19-cv-00040-DLC    Document 177    Filed 06/13/23    Page 28 of 122

30(b)(6)
30(b)(6)
May 09, 2023

Page 97

1  correct?

2      A   Correct.

3      Q   In terms of the materials that you reviewed prior to

4  today's deposition, did you review any of the depositions that

5  have been taken in this case?

6      A   No.

7      Q   Okay.  Did you review any deposition summaries for

8  Dr. Black, Dr. Morrisette, or Tanis Hernandez?

9      A   No.

10     Q   Did you review any depositions or deposition

11  summaries for former CARD employees or former physicians who

12  worked at CARD, specifically Dr. Heppe or Dr. Koval?

13     A   No.

14     Q   Did you read any deposition testimony or any

15  deposition summaries for any current or former B-readers on

16  CARD's expert B-reader panel?

17     A   No.

18     Q   So particularly did you read the deposition or

19  deposition summary for Dr. Kanne?

20     A   No.

21     Q   Did you read the deposition or deposition summary for

22  Dr. Meyer?

23     A   No.

24     Q   In terms of any pleadings related to this case -- by

25  pleadings I mean documents filed with the Federal Court in

Page 98

1  Montana -- have you read any of the pleadings in this matter?

2      A   No.

3      Q   Okay.  And just so I'm very clear for the record, you

4  didn't read -- read the third amended complaint in this matter.

5  Fair?

6      A   No.

7      Q   Okay.  You haven't read any of the statement of

8  undisputed facts in this case, correct?

9      A   No.

10     Q   Okay.  In terms of any of the discovery in this case,

11  have you reviewed any of the discovery materials that have

12  passed between the parties other than what's been referenced in

13  the record today?

14     A   No.

15     Q   Okay.  Sir, just a few other questions and I hope

16  these are as easy for you as the ones in the past.

17     Q   Have you ever had any communication with anyone at the

18  Kalispell Social Security Administration field office to the

19  best of your knowledge?

20     A   No.

21     Q   Have you communicated with anyone at the Social

22  Security Administration prior to your deposition in this case

23  in preparation for your testimony?

24     A   No.

25     Q   Have you communicated with anybody at CMS in

Page 99

1  preparation for your testimony today?

2      A   No.

3      Q   Sir, in terms of other records, I'll represent to you

4  that there is something called a POMS, or the Program Operation

5  Manuals System, that's been published by the Social Security

6  Administration and made available online.  Is that a document

7  that you had any role in creating or producing or publishing in

8  any way?

9      A   No.

10     Q   Have you ever read the Program Operations Manual

11  System for the Social Security Administration related to the

12  assignment of EHH Medicare benefits?

13     A   No.

14     Q   In terms of other qualifications, sir, I'm assuming

15  that you've never served as a United States Congressional

16  representative from any state?

17     A   That's correct.

18     Q   You've never been a United States senator.  Fair?

19     A   That's fair.

20     Q   Okay.

21     A   Correct.

22     Q   In terms of meetings or conversations with individual

23  members of the United States Senate, have you ever met with

24  Senator -- now former ambassador -- Max Baucus about any

25  matters that were up for a -- a floor vote?

Page 100

1      A   No.

2      Q   Did you ever participate in any committee hearings or

3  meet with any of Senator Baucus's staff members prior to the

4  signing of the Affordable Care Act, particularly the EHH

5  provisions into law?

6      A   No.

7      Q   In terms of any opinions about the specific

8  provisions in the environmental health hazard section of the

9  Affordable Care Act, did anyone ask you for any legal opinions

10  prior to passage of that law into its final form?

11     A   No.

12     Q   Do you have a law degree, aside from what we've

13  mentioned here?

14     A   No.

15     Q   Okay.  In terms of the -- EHH forms, are you

16  aware of what an EHH form is generally?

17     A   Yes.

18     Q   And in terms of those EHH forms, was it part of your

19  role at ATSDR to ever review any of those EHH forms?

20     A   No.

21     Q   Did you provide any guidance to CARD or anyone else

22  as to how EHH forms should be filled out by the clinic?

23     A   No.

24     Q   In terms of the EHH form language itself, when was

25  the last time that you can recall seeing an EHH form to the



**Exhibit A-25**

Page 101

1  best of your recollection?

2      A    In preparation for this subpoena, I -- I reviewed the

3  document.

4      Q    Okay.  Prior to preparing for today's deposition in

5  May of 2023, do you recall the last time that you had seen an

6  EH [sic] form?

7      A    So I had -- I had asked for examples of an EHH form

8  in, I believe it was, 2022 from CARD and they had shared some

9  redacted versions of forms that had been filled out.

10     Q    And aside from reviewing those redacted versions of

11  EHH forms, do you recall any time that you had asked for or

12  reviewed EHH forms prior to 2022?

13     A    I don't recall.

14     Q    Okay.  In terms of individual patient medical

15  records, have you, to the best of your knowledge, ever seen any

16  individual patient medical records from the CARD Clinic?

17     A    No.

18     Q    And just to be clear, I -- I include in individual

19  patient medical records not only their chart notes but also

20  their CT scans, their chest X-ray interpretive reports, and any

21  B-reader reports for individual patients.

22     A    So the answer is no, although this morning we

23  reviewed an email chain where I had requested some data from

24  Dr. Black for an analysis that would have been data stripped of

25  any identifiers.  I wouldn't have known anything about the

Page 102

1  patient.  I was -- I was looking at correlating, I think,

2  spirometry to findings on CT.

3      Q    Yes.  I -- I recall that email and it sounds like you

4  were looking for a -- a greater subset of radiographic studies

5  than you had seen prior to that time.  Does that -- that jog

6  your memory?

7      A    I'd have to look at that email again.  I -- I didn't

8  even recall that email prior to this morning.

9      Q    Sir, do you see what's been marked as Exhibit 521 in

10  front of you?

11     A    Yes.

12     Q    Is that date August 22, 2014?

13     A    It is.

14     Q    Okay.  And is this an email sent by you to Brad

15  Black, Tanis -- and Tanis Hernandez at the CARD Clinic?

16     A    Yes.

17     Q    And is this the email that you were referencing

18  where you asked for a larger set of radiographic scans?

19         (Witness reviews Exhibit No. 521.)

20     A    Yes.

21     Q    And Mr. Larson, do you recall if you received that

22  requested larger set of radiographic scans after sending this

23  email?

24     A    I -- I don't recall.  I do recall collaborating with

25  Dr. Black on some abstracts that were published in -- you know,

Page 103

1  for scientific meetings.  And I don't recall if this -- if this

2  is one that we finished or not.

3      Q    Mr. Larson, in terms of gross record sets, have you

4  seen all of the results of radiographic scans, be they chest

5  X-rays or CT scans, for every patient from the CARD Clinic in

6  any form that you can recall?

7      A    Do you mean have I seen a data set with all, you

8  know, one -- for example, one record per patient so it'd be,

9  you know, some -- many thousands of CARD patients?  No, I have

10  not seen that.

11     Q    Okay.

12     A    (Indiscernible.)

13     Q    And sir, what I'll -- what I'll reference on the

14  record is the master data set or a document called the Libby

15  Screening Dataset.  Have you heard of a record with any title

16  similar to that?

17     A    No.

18     Q    Okay.  And sir, what I'll also represent to you is

19  that the master dataset, or the Libby Screening Dataset, at

20  least in the form that I've seen it, appears to be an Excel

21  spreadsheet that documents the name, date of birth, visit date,

22  the outcomes of the CT scans, the outcomes of the chest X-rays,

23  the outcomes of the B-reads for both chest X-rays and CT scans.

24  For most, if not all, of the thousands of patients that have

25  been through CARD's doors, have you seen any document like that

Page 104

1  during the years that you've been working at ATSDR?

2      A    No.

3          MR. BECHTOLD:  Foundation.

4  BY MR. DUERK:

5      Q    Sir, your deposition today is intended to capture

6  your testimony as an ATSDR employee, not an employee from any

7  other government agency.  Is that fair?

8      A    Yes.

9      Q    Okay.  And in terms of legal interpretations of the

10  Affordable Care Act itself, likewise, it is not your mission

11  here today to provide legal interpretations of what the

12  Affordable Care Act says in terms of legal determinations.

13  Fair?

14     A    Yes.

15     Q    Okay.  Doctor, I'd like to -- I'm sorry.  I often

16  call people Doctor.  Mr. Larson, I'd like to go through the

17  screening process versus the diagnosing process at -- at CARD.

18  So my understanding this morning, we were talking about CARD's

19  screening grant, correct?

20     A    Uh-huh (affirmative).

21     Q    It's -- I'm sorry.  Is --

22     A    Yes.

23     Q    -- that a yes?

24     A    Yes.  Yes.

25     Q    Okay.  And the purposes of that screening grant,

**Exhibit A-26**

Page 105

1  again, were threefold.  What were those three purposes?

2      A    Screening itself, outreach, and education.

3      Q    All right.  In terms of a screening program, CARD has

4  had various different screening grants during its existence.

5  Is that right?

6      A    Yes.

7      Q    Okay.  And one of those screening grants and one of

8  those screening programs was under HRSA.  Is that right?

9      A    Yes.

10     Q    And what is HRSA?

11     A    So that's part of the Federal Department of Health

12 and Human Services and it's essentially what HRSA -- they call

13 it HRSA -- stands for at the moment.  But it is another

14 health-related agency.

15     Q    And you were involved in some of the discussions

16 about the HRSA grant with CARD early on.  Is that fair?

17     A    I believe so.  I was largely not involved with that

18 grant but I -- I did see some emails in the last couple of days

19 where I -- I was cc'd on them or engaged others at ATSDR about

20 them.

21     Q    Is it fair to say that the screening protocols under

22 the HRSA grant were -- were somewhat different from the

23 screening protocols under the current CARD grant?

24         MR. BECHTOLD:    Foundation.

25         MR. KAKUK:    Mr. Duerk, I'd just like to step in

Page 106

1  and say I think the HRSA grant is outside the scope of

2  the -- of the deposition.

3         But feel free to answer --

4         MR. DUERK:    All right.

5         MR. KAKUK:    -- to the extent you can.

6      A    So again I don't recall too many details but I will

7  say I think I saw on an email earlier today or when I was

8  preparing over the last few days where ATSDR staff were making

9  comments on using more than one B-reader, for example.

10 BY MR. DUERK:

11     Q    And that's exactly what I want to reference or get

12 into.

13         Is it your understanding that at one point there were

14 three B-readers who would review each CARD scan and that in

15 order to qualify under HRSA, those reads had to either be

16 corroborated by two readers or it had to be unanimous?

17         MR. BECHTOLD:    Foundation, relevance.

18     A    So again, I was not -- to my recollection, I was not

19 that that involved in the oversight of the HRSA grant.  And in

20 fact, it was a HRSA-led operation, I think.  And we

21 just -- ATSDR may have advised on standing it up.  And I don't

22 recall many of the details.  I just recall seeing an email

23 either today or in preparation for this meeting today with you

24 all where the idea of using more than one reader was

25 entertained at least.

Page 107

1  BY MR. DUERK:

2      Q    Do you recall whether or not Dr. Black was in support

3  of using more than one reader to determine eligibility under

4  those earlier versions of the grant?

5         MR. BECHTOLD:    Foundation, relevance.

6      A    Are you referring to the HRSA grant?

7  BY MR. DUERK:

8      Q    I am.

9      A    So I -- I don't -- I don't recall or was not involved

10 in those conversations.  I had no knowledge perhaps.

11 BY MR. DUERK:

12     Q    Okay.  Pardon me if I'm mispronouncing this name.

13 Dr. Antao Vinicius?

14     A    Vinicius Antao, Dr. Antao.

15     Q    Dr. Antao?  Who is he?

16     A    So he's my former supervisor at ATSDR.  Also a

17 pulmonologist and is now in the private sector.

18     Q    Do you recall working with Dr. Antao on any CARD

19 related matters prior to the current grant?

20     A    So I -- I mentioned earlier today that we had

21 collaborated with Dr. Black and CARD on other studies or had

22 engaged CARD as -- in the role of perhaps a contractor or took,

23 like, images for various studies.  So to get back to your

24 question, yes, Dr. Antao and I had had internal discussions

25 about CARD and also met with Dr. Black and other CARD staff.

Page 108

1      Q    Do you recall any discussions with Dr. Antao about

2  the topics of conflicts of interest or whether or not Dr. Black

3  should be deemed a qualified physician?

4      A    I do not.

5      Q    Okay.  If we could look at Exhibit 303 together?  I'm

6  looking at what's been marked as page 12 in the header of this

7  document.  In terms of the page number at the bottom of the

8  page, I'm looking at page 9.

9      (Witness complies.)

10     Q    First of all, Mr. Larson, what is this document?

11     (Witness reviews Exhibit No. 303.)

12     A    This is the NOFO from 2019.

13     Q    All right.  And in terms of the Notice of Funding

14 Opportunity from 2019, does this appear to be a true and

15 accurate copy of the NOFO from that year?

16     A    Yes.

17     Q    Turning to page 12 on the top of the header, do you

18 see at the -- the beginning of this page, Section H labeled

19 "Screening flow?"

20     A    Uh-huh (affirmative).

21     Q    I'd like to talk a little bit about the differences

22 between screening and diagnosis in the context of this

23 document.  Okay?

24     A    (Nods head affirmatively.)

25     Q    And I'll read the first section of the top of this


Exhibit A-27

BNSF vs CARD                    30(b)(6)
Case 9:19-cv-00040-DLC   Document 177   Filed 06/13/23   Page 31 of 122
30(b)(6) Theodore Larson                           May 09, 2023

Page 109

1 page.  Please tell me if I've read it correctly.

2      "Screening flow.  The recipient should coordinate the flow

3 of screening participants through the system.  Steps in

4 screening flow may include" and then there's a colon.

5      My question is this, Mr. Larson.  Is the recipient

6 referenced in this docket; the CARD Clinic?

7      (Witness reviews a portion of Exhibit No. 303.)

8      Q    That being the grant recipient.

9      A    No.

10     Q    Okay.  Who is the recipient here?

11     A    The recipient would be -- would be CARD.  I mean,

12 that's -- that's the grantee.

13     Q    All right.  Okay.  So the recipient here would be the

14 CARD Clinic?

15     A    Yes.

16     Q    All right.  So then the steps in -- in the screening

17 flow.   Step 1, "Pre-screening to confirm eligibility for

18 screening according to ACA language as described above in

19 Section B, Eligibility for Screening."

20     Did I read that correctly?

21     A    Yes.

22     Q    Here the ACA, does that stand for the Affordable Care

23 Act language?

24     A    Yes.

25     Q    All right.  And there is language in the Affordable

Page 110

1 Care Act about the screening program itself, which is

2 distinguishable from language in the Affordable Care Act

3 related to Medicare eligibility.  Fair?

4      A    Yes.

5      Q    All right.  So I -- I'm focusing now on ATSDR's

6 screening program in reference to this document.  Does that

7 make sense?

8      A    Yes.

9      Q    All right.  Thank you.  The next step, 2, "Initial

10 enrollment and obtaining participant's consent (prior to

11 screening the recipient will obtain consent from each

12 screening participant)."

13     Did I read that correctly?

14     A    Yes.

15     Q    So here, prior to the screening taking place, the

16 recipient -- that would be CARD -- would obtain consent from

17 each participant.  Is that right?

18     A    Yes.

19     Q    Okay.  Moving to step 3.  "Prior to screening,

20 mailing information to each screening participant about the

21 screening program (including an overall program description,

22 listed affiliate providers in the area, letter to personal

23 physician or affiliated provider explaining screening

24 requirements and instructions for how to send radiographic

25 exams to the recipient)."

Page 111

1      Did I read that correctly?

2      A    Yes.

3      Q    Okay.  Step 4 here in the steps in the screening flow

4 reads --

5           MR. KAKUK:    Is there a question?

6           MR. DUERK:    Not yet.

7 BY MR. DUERK:

8      Q    Step 4 in the screening flow reads "Appointment

9 scheduling," correct?

10     A    Yes.

11     Q    Okay.  Step 5 reads "Administration of screening

12 components (radiography (radiograph and HRCT) and FOBT as

13 appropriate)."

14     Did I read that correctly?

15     A    Yes.

16          MR. BECHTOLD:  Form.

17 BY MR. DUERK:

18     Q    Here, HRTC, does that stand for high resolution

19 computer tomography?

20     A    Yes.

21     Q    Or high-resolution CT scan.  Is that fair?

22     A    Correct.

23     Q    And what does FOBT stand for?

24     A    Fecal occult blood test.

25     Q    All right.  The next step, Step 6, reads "On-site

Page 112

1 radiology reading."

2      Did I read that correctly?

3      A    Yes.

4      Q    Okay.

5           MR. BECHTOLD: Form.

6 BY MR. DUERK:

7      Q    Step 7, "Dissemination of urgent results from on-site

8 radiology reading if necessary."

9      Did I read that right?

10     A    Yes.

11          MR. BECHTOLD:  Form.

12          MR. DUERK:    I -- I don't understand your

13 objection.  Could you explain it to me?

14          MR. BECHTOLD:  You're just reading.  You're not

15 asking questions.

16          MR. DUERK:    I'm asking if I'm reading it correctly

17 but thank you.  I understand your objection now.

18 BY MR. DUERK:

19     Q    Step 8, would you please read that next step for me?

20     A    "Routing radiographs to B-readers and HRCT stands to

21 radiologists."

22     Q    And what is your understanding of that step in the

23 screening flow?

24     A    So from studies that I had worked on I know it can be

25 complex trying to manage all the images and so I think that's

Elizabeth Gallo
COURT REPORTING, LLC

**Exhibit A-28**

Page 113

1 referring to just the -- the logistics of getting the right
2 radiograph or CT scan to the right physician.
3    Q    And is this the recipient's responsibility,
4 that -- that being CARD?
5    A    Yes.
6    Q    Okay.  Step 9, what is Step 9 on this form?
7    A    "Collecting B-reader/radiologist interpretations and
8 disseminating to the screening physician, along with a blank
9 final diagnosis letter to be completed by the screening
10 physician.  One copy of the final diagnosis letter will be
11 returned to the recipient and one will be sent to the screening
12 participant."
13    Q    Okay.  In terms of Step 9 here, when it comes to
14 collecting the B-reader radiologist interpretations and
15 disseminating the screening physician, who is the screening
16 physician in -- in this case?
17    A    So I believe that would be the CARD physician
18 coordinating the results of moving radiographs and CT scans
19 around and collecting the results.
20    Q    Okay.  Here it says that the -- that there's a blank
21 final diagnosis letter that's to be completed by the screening
22 physician.  Did I read that fairly?
23    A    You did.
24    Q    Okay.  And so in terms of the final diagnosis for
25 each of these CARD patients in the screening program, who is to

Page 114

1 complete the final diagnosis letter?
2    A    I think it's suggested that it would be the CARD
3 physician that fills out that letter.
4    Q    Okay.  Under Section 9, "One copy of the final
5 diagnosis letter will be returned to the recipient and one will
6 be sent to the screening participant."
7    In terms of that letter, is that letter something that
8 you've seen or reviewed in the past?
9    A    No.
10    Q    Okay.  Doctor, in terms of CARD's responses to
11 discovery requests and deposition testimony, have you reviewed
12 any materials that shows whether Dr. Black considers a
13 radiologist able to offer a diagnosis of a patient?
14    A    Can you restate the question, please?
15    Q    Sure.  Have you read anything that says whether
16 radiologists diagnose according to Dr. Black?
17    A    Are -- you mean does Dr. Black consider the
18 radiologist capable of diagnosing a patient?
19    Q    Almost.
20    A    Okay.
21    Q    Have you seen any of Dr. Black's testimony wherein he
22 says --
23    A    No.
24    Q    -- that radiologists do not diagnose?
25    A    I have not seen said testimony.

Page 115

1    Q    Okay.  In terms of the B-readers in this case, I
2 think we've already covered the -- B-reader depositions.
3 But just to be clear, have you read either Dr. Kanne, Dr.
4 Lynch, or Dr. Meyer's sworn testimony?
5    A    No.
6    Q    Okay.  In terms of any conversations that you've had
7 with Dr. Kanne, Dr. Meyer, or Dr. Lynch, have you spoken with
8 any of those doctors in the last year?
9    A    No.
10    Q    In terms of reading any declarations from Dr. Kanne
11 or Dr. Meyer, have you seen any declarations from those
12 individuals?
13    A    No.
14    Q    Dr. Kanne, Dr. Meyer, and Dr. Lynch are the three
15 thoracic radiologists on CARD's panel of five B-readers,
16 correct?
17    A    Yes.
18    Q    Okay.  Are you aware that Dr. Kanne and Dr. Meyer
19 have indicated that they are terminating their agreement as
20 B-readers with CARD?
21    A    Yes.
22    Q    After learning that information, did you have any
23 follow-up conversations as to the reasons why with either of
24 those B-readers?
25    A    No.

Page 116

1    Q    In terms of the other parts of Exhibit 303, page 12,
2 if you would please read Step 10 in the screening flow, that
3 would be helpful.
4    A    "Creating a disposition for each screening
5 participant, i.e., ARD positive or negative."
6    Q    All right.  Sir, I'll represent to you that CARD's
7 master dataset has what's called -- what I'll label an ARD
8 positive or negative column in it that shows the disposition of
9 every patient who's been through CARD's screening program.
10 Have you seen CARD's indications of whether those patients are
11 ARD positive or negative based on the master dataset?
12    MR. BECHTOLD:  Foundation.
13    A    So I -- I don't know.  I suspect the -- the results
14 that appear in the quarterly and annual reports from CARD are
15 based on the dataset that you're describing.  So the answer is
16 no, but I've seen the results likely based on that --
17 BY MR. DUERK:
18    Q    All right.
19    A    -- dataset.
20    Q    And that brings up an important point.  During your
21 deposition testimony today, we've seen exhibits that all
22 categorizes excerpts from CARD's master dataset.  For example,
23 the -- in the Exhibit 300 series, we saw several charts that
24 seem to be, you know, excerpts or datapoints for different
25 information related to CARD's screening program.  Do you recall



**Exhibit A-29**

Page 117

1 seeing those same datapoints as well?
2      A   I -- I think I recall what you're talking about.
3      Q   Okay.  But in terms of the gross data or the overall
4 data that's been included in CARD's master dataset, whether in
5 printed form or in an Excel spreadsheet, to the best of your
6 knowledge, you've never seen the total collection of that
7 master dataset?
8      A   Correct.
9      Q   Okay.
10         MR. BECHTOLD:   Asked and answered.
11 BY MR. DUERK:
12     Q   Sir, in terms of what we have here on Exhibit 303
13 then, in terms of the -- what I'll call the ARD positive or
14 negative column, you've not seen that column on CARD's master
15 dataset?
16     A   Correct.
17     Q   Okay.  Now, in terms of the exhibits that we had on
18 the screen today, there were a number of exhibits shown related
19 to the expert panel of B-readers and their findings.  What I'd
20 like to do to get us oriented is show you some of those
21 exhibits and what I'll call the 500 series.
22         MR. DUERK:   May I have Exhibits 507 to 512,
23     please?
24     (Mr. Duerk is provided requested exhibits by Mr.
25 Bechtold.)

Page 118

1         MR. DUERK:      Thank you.
2 BY MR. DUERK:
3      Q   Doctor, I'm putting exhibits in the 500 series in
4 front of you.  Do you see Exhibit 508 at the top?
5      A   I see it at the bottom.
6      Q   Okay.  Sorry.  In terms of the 500 series exhibits,
7 are we essentially looking at the read results of the different
8 B-readers on CARD's panel and whether or not they determined
9 that there was a positive or negative outside CT read for the
10 parenchymal area of the lungs?
11     A   I believe that's correct but the, you know, the
12 tables are not documented that well so I -- I believe that's
13 correct.
14     Q   Okay.  And -- and what do you mean the tables aren't
15 documented that well?
16     A   So there's no table caption to clarify what the table
17 contains so, you know, I have to interpret what some of these columns
18 are.  PTID sounds like patient ID.
19     Q   So --
20     A   CT date is self-explanatory most likely although
21 there may be some nuance in the date run.  I don't know what PR
22 set would be or CARD set would be and -- but you're right.
23 The -- the three aggregations of columns are -- seem to
24 correspond to the three outside CT readers.
25     Q   All right.  So at least in terms of Exhibits 508

Page 119

1 and 509 in front of us, is it fair to say that these tables
2 include comparisons between the individual outside B-readers
3 related to the CT scans but they do not include a column for
4 what Dr. Black's read or CARD's read was for those same films?
5      A   So these are for CT scans not for chest X-rays.
6      Q   I'm -- I'm sorry.  For --
7      A   For --
8      Q   -- for CT scans, not films.  I apologize.
9      A   But you're right.  Yeah.  I -- I just see columns
10 representing those three outside readers and not the -- the
11 CARD reader.
12     Q   In terms of these three collections in Exhibits 508
13 and 509, is it fair to say that these CT positive or negative
14 results represent a -- smaller subset than the entire balance
15 of all CARD patients that have been through the screening
16 program?
17     A   So by design these panels just collect a, you know, a
18 sample of patients for, you know, for that panel.  So -- so
19 yeah.  Short answer, yes.
20     Q   Okay.  And in terms of the number of individual
21 samples here, I -- I think I've seen it in the grant reporting
22 material that for peer review sessions there might be a smaller
23 subset of 54 individual reads per session.  Does that square
24 with your memory or is there a different number?
25     A   I don't recall.  That does seem like a lot of images

Page 120

1 to look at for one meeting of . . .
2      Q   In terms of those peer review calls, did you ever
3 participate in any of those peer review calls with B-readers
4 yourself?
5      A   I have attended but I wouldn't say I participate.
6 I'm not a clinician and really can't contribute to the
7 conversation.
8      Q   Okay.  And if you could estimate for me how many of
9 those peer review calls you've participated in, that would be
10 helpful.
11     A   So in the early years of the grant I went to several
12 but I don't -- I have not gone in several years actually.
13 I -- I wasn't contributing much and it was more an internal
14 discussion for the physicians I thought.
15     Q   All right.  There was some discussion when Mr.
16 Bechtold was showing you these exhibits about the readers not
17 necessarily agreeing on every single scan, correct?
18     A   Yes.
19     Q   Okay.  I think during that part of your deposition,
20 you were asking whether or not these CTs were randomly sampled
21 by CARD.  Did I hear that right?
22     A   So my -- again, my recollection -- so I have a weak
23 memory, I guess, of what -- I saw the email where I had
24 proposed doing a random sample but I also seem to recall that
25 there might have been some over-selection of hard to read



**Exhibit A-30**

Page 121

1   images.  You know, the patient's hard to classify.

2       Q    All right.  So given that possibility, if these

3   samples were not random but indeed samples selected by CARD

4   that were more difficult for -- for an interpretation, is it

5   fair to say that these exhibits, if they weren't based on

6   random samples but more difficult reads, wouldn't necessarily

7   be representative of dissension among the readers on CARD's

8   expert panel?

9       A    No, but that gives the opportunity -- you know, if

10  you had easy to diagnose patients, it would be kind of a boring

11  reading, I guess.  I mean --

12      Q    Sure.

13      A    -- you want to stimulate conversation between the

14  readers so you -- I would think that's perfectly acceptable to

15  have -- you know, for learning purposes and teaching purposes

16  to have tougher images to review.

17      Q    Okay.  In terms of the data that you've reviewed,

18  have you ever seen any of these peer review session reports

19  with a column on it to include the CARD interpretations?

20      A    I don't recall seeing a report with that column in

21  it.

22      Q    In terms of the kappa agreement, if you could give me

23  a -- just a layperson's term of what kappa agreement means or

24  signifies related to reader variability that would be helpful.

25      A    So it's a statistical approach and it's measuring,

Page 122

1   you know, where -- where two or more readers are agreeing on

2   the outcome and the higher the number, the better the

3   agreement.

4       Q    Okay.  In terms of the individual responsible for

5   coming up with those kappa agreements at CARD, who was that

6   individual?

7       A    Curtis Noonan.

8       Q    In terms of some of the exhibits that I've seen

9   related to Curtis Noonan's work, I've seen what appeared to be

10  some graphs that chart kappa agreement.  Have you seen those

11  charts as well?

12      A    Yes.

13      Q    Okay.  I'll try to put one in front of you so that

14  we're literally on the same page.

15      A    Okay.

16      Q    Do you see Exhibit 505 in front of you, what appears

17  to be page 6?

18      A    I do see it.

19      Q    All right.  And what is the title of that graph?

20      A    "Overall Kappa for parenchymal and pleural reads

21  combined."

22      Q    In terms of the data that Curtis Noonan used or

23  synthesized to form these tables, charts, and graphs, are you

24  aware of whether or not Dr. Noonan included Dr. Black's read

25  rate or any of CARD's CT read rates to come up with that kappa

Page 123

1   calculation?

2       A    I believe this is just for the outside readers.

3       Q    All right.  So in terms of the data that we have

4   about read dissension rates between the individuals who are

5   reading CT scans, Dr. Black is left out of the data that we've

6   reviewed in all these exhibits so far.  Is that right?

7       A    I believe so.

8       Q    And the only data that you and the ATSDR had to

9   consider about Dr. Black's read rate were the -- just the

10  printout numbers that were included in CARD's federal grant

11  reporting forms --

12      A    Yes.

13      Q    -- to ATSDR?

14      A    That's correct.

15      Q    Okay.  In terms of any follow-up by you, aside from

16  the email that you pointed out earlier, where you were asking

17  for a larger set of CARD's reads, do you recall any other time

18  where you followed up to obtain the gross dataset that would

19  show what CARD's read rates were in terms of variability or

20  dissension from the other readers?

21      A    No.

22      (Exhibit No. 50 is introduced and identified for the

23  record.)

24      Q    Okay.  In terms of that dissension rate, there are

25  two exhibits.  There are Exhibit 50 and 344.  I'll put Exhibit

Page 124

1   50 in front of you and I'll represent to you that this is an

2   excerpt of the final report that Mr. Bechtold showed you

3   earlier.  Do you have Exhibit 50 in front of you?

4       A    Yes.

5       Q    Now, sir, if you would please turn to what's marked

6   as page 19 in the bottom right-hand corner of Exhibit 50?

7       (Witness complies.)

8       A    It's also Bates stamped as page, I believe, 6623 and

9   also has another page indicator; FCA008750.

10      Do you have that in front of you?

11      A    Yes.

12      Q    Do you see the report that CARD forwarded to you and

13  the language here that begins "Dissension between CARD

14  diagnosis rate and outside reader diagnosis rate?"

15      A    Yes.

16      Q    Now, in terms of the -- second paragraph, do you

17  see that CARD has stated "CARD's diagnosis rate is 47 percent

18  versus a 41 percent diagnosis rate by outside readers."

19      Did I read that part of the sentence correctly?

20      A    Yes.

21      Q    Okay.  The sentence continues "So about 206 people

22  fall into this category."

23      Did I read that correctly?

24      A    Yes.

25      Q    In terms of the figures on Exhibit 50, if you could


**Exhibit A-31**

Page 125

1  look at page 1 or the first page of Exhibit 50?
2       (Witness complies.)
3       Q    Do you see Table 1?
4       A    Yes.
5       Q    Do you see here that CARD has stated "Number ARD
6  diagnosed, grant cumulative total is 1,620 or 47 percent?"
7       A    Yes.
8       Q    All right.  And in terms of the indication of 41
9  percent, could you please turn to page 4, what's Bates stamped
10 6608 on Table 7?
11      (Witness complies.)
12      Q    Do you see Table 7 reads "Single outside read results
13 by B-reader CXR or radiologist CT?"
14      A    Yes.
15      Q    And do you see a -- a row and column here that
16 indicates a 41 percent percentage?
17      A    Yes.
18      Q    And what does that correspond to?
19      A    Outside CT reads abnormal.
20      Q    All right.  So in terms of the data that you've seen
21 related to diagnostic dissension, was there a -- a greater
22 diagnostic dissension between outside readers and CARD than 6
23 percent?
24      A    In later reports was -- was the difference bigger
25 than 6 percent?

Page 126

1       Q    Was the difference bigger than 6 percent in any of
2  the data that you saw?
3       A    I don't recall.  I'd have to recheck later reports.
4  I -- I believe that it may have gone up actually over -- over
5  time.
6       Q    Was that diagnostic dissension ever as great as 70
7  percent in any information that you saw from CARD?
8       A    A 70 percent difference between CARD and the outside
9  readers?  I don't recall a figure like that.
10      Q    Okay.  Would a figure like that be significant in
11 your mind?
12      A    So 70 -- I believe I -- I see today there was 70
13 percent prevalence of abnormalities as detected by the CARD
14 reader so that is -- you know, that's quite notable.  That's
15 running about double what the outside B-readers have found over
16 time.
17      Q    Okay.  And in terms of that diagnostic dissension,
18 whether it's 70 percent, 50 percent, or 100 percent in some
19 cases for some subsets, have you ever looked at the individual
20 datapoints on CARD's master dataset that would back up those
21 figures?
22      A    No.
23      MR. BECHTOLD:  Asked and answered.
24 BY MR. DUERK:
25      Q    Mr. Larson, in terms of the individual patients in

Page 127

1  Relator's false claim act case, have you seen any of the
2  individual counts that have been set forth in Relator's
3  complaint?
4       A    I don't know what Relator's complaint refers to.
5       Q    Okay.  And the relator in this case would be BNSF
6  standing in the shoes of the United States bringing this case
7  forward.  So that is what I mean by relator.
8       Have you seen the relator's third amended complaint and
9  the individual patients that constitute the false claim
10 allegations in --
11      MR. BECHTOLD:  Asked and answered.
12 BY MR. DUERK:
13      Q    -- this matter?
14      Go ahead.
15      A    No.
16      Q    Okay.  And so I take it from your response that you
17 have not performed any kind of data analysis for the several
18 hundred individual patients that form the basis for Relator's
19 complaint?
20      A    That's correct.
21      Q    Okay.  And likewise, because there's been no data
22 analysis, is it fair to say -- and I'll lump a few different
23 pieces of information here but stop me if I'm wrong.  Is it
24 fair to say that for those hundreds of patients you have not
25 seen CARD's master dataset, you have not seen those patients'

Page 128

1  medical records, you have not seen EHH forms, you have not seen
2  any of the CT or chest X-ray or B-read interpretive reports
3  saying that those individual patients do not have any sign of
4  asbestos-related disease?
5       A    That's correct.
6       Q    Would it trouble you if hundreds of patients had been
7  submitted for Medicare coverage when CARD knows that those
8  patients do not have a diagnosis of asbestos related disease?
9       A    So if -- if true, that would be troubling.  I don't
10 believe CARD intentionally misdiagnoses.
11      Q    And I understand that you don't believe that.  But my
12 question is if you haven't seen any of the underlying data that
13 shows that, as a scientist, why would you be willing to offer
14 that opinion?  You would agree with me, sir, that opinions
15 about whether fraud have been -- whether fraud has been
16 committed should be based on facts and data.  Fair?
17      A    Yes.
18      Q    Okay.  And you have not seen the data upon which
19 those fraud allegations are based in this case, correct?
20      A    Correct.
21      Q    Sir, in terms of your involvement with CARD, you have
22 known the -- the individuals who -- who work and serve at CARD
23 for many years.  Is that fair?
24      A    That's fair.
25      Q    And your declaration, I believe, says that you've



**Exhibit A-32**

Page 129

1 worked closely with CARD for over a decade.

2    A    Yes.

3    Q    You've been to Libby, correct?

4    A    Yes.

5    Q    You've worked with Dr. Black on the ATSDR grant for

6 years, correct?

7    A    The present ACA grant, yes.

8    Q    And in terms of research at CARD, you yourself

9 have -- have published studies based on some of the -- the data

10 that's been generated by CARD.  Is that fair?

11    A    I've managed and published under data collected prior

12 to the ACA grant.

13    Q    Okay.  Sir, if some of that data is later found to be

14 incorrect, what effect, if any, would that have on any of the

15 various studies that have been published about disease rates in

16 Libby, Montana?

17    A    So in contrast to a clinical activity like doing a

18 screening, the -- the studies I did were epidemiologic, were

19 population-based, and so in that case, CARD -- I can name a

20 couple of studies where CARD collected the images.  But I did

21 my own analysis and, you know, I -- I ran my own readers, for

22 example, and -- and had a study protocol.  So it's a little bit

23 different.

24    Q    Okay.

25    A    Understand that -- and epidemiologic definition of

Page 130

1 disease is different than what would be used in a clinical

2 setting.

3    A    Right.  And that's exactly what I'm trying to get to,

4 Doctor -- or I'm sorry -- Mr. Larson.  In terms of data in

5 a -- a screening setting, that data is -- is different from

6 data used to diagnose.  Fair?

7    A    I -- I'm saying there's a distinction between data

8 used -- used for an epidemiologic study versus putting a

9 disposition on a patient.  It's -- it's very different and --

10    Q    Right.

11    A    -- a lot of times in epidemiology you use a more

12 conservative definition than you would in a -- in a clinical

13 setting.

14    Q    Okay.  And in terms of the clinical setting, that's

15 not a setting in which you've ever practiced.  Fair?

16    A    That's correct.

17    Q    In terms of any of the -- the individual subjects in

18 any of your screening studies, those were never your patients

19 per se, correct?

20    A    So I never did a screening study per se.  I mean, I

21 was -- I -- I may have got -- I think the studies I did all

22 collected during -- you know, I got images collected

23 specifically for my -- for my study.

24    Q    Okay.  In terms of any of the studies that you've

25 worked on, as part of that study you never diagnosed any of

Page 131

1 those patients with any disease though, correct?

2    A    That's correct.  I'm not a -- I'm not a clinician.

3    Q    In terms of the -- the NOFO, so the Notice of Funding

4 Opportunities, we've been through a couple of the Notice of

5 Funding Opportunities.  Aside from CARD, were there any other

6 facilities, clinics, or medical entities that applied for that

7 grant?

8    A    So the NOFO is largely tailored for CARD actually and

9 I think -- I think the answer is no.  Maybe -- there may have

10 been others that applied for the first NOFO but after that it

11 was -- CARD was the only applicant.

12    Q    In terms of CARD's reporting responsibilities, it's

13 the responsibility of a grant applicant to be truthful and

14 accurate in the reporting that it provides to the federal

15 agency, correct?

16    A    Correct.

17    Q    Okay.  In terms of any type of verification process

18 to ensure that the information that you are getting

19 from -- that you are getting from CARD was accurate, aside from

20 the periodic visits what did ATSDR do to ensure that the

21 information that CARD submitted in -- in its grant application

22 and follow-up reports was accurate?

23    A    There was no other -- no other checks done of their

24 data.

25    Q    You relied on CARD to provide true and accurate

Page 132

1 information --

2    A    Yes.

3    Q    -- in all their reporting.  Is that fair?

4    A    Yes.

5    Q    Okay.  We went through some of the reporting.  I -- I

6 think -- I'll try to orient you to a document here in a minute

7 but when Mr. Bechtold was asking questions, you alluded to some

8 success stories that CARD would report on to ATSDR.  Do you

9 recall that?

10    A    Yes.

11    Q    And can you think of some examples of success stories

12 that might have been reported?

13    A    I believe there's an ongoing table in the report.  I

14 don't remember what year we started including it but I think it

15 tells the incidental findings.  For example, one patient might

16 have breast cancer.  That's an incidental finding when getting

17 a radiograph collected for the screening program.  And that's

18 a -- that's a huge public -- public health win, when you can

19 detect something as -- a collateral finding in screening.

20    Q    Did CARD ever report on the losses so to speak or

21 the -- the problematic stories?

22    A    There's an ongoing section on challenges in the

23 report.

24    Q    Okay.  And what kinds of topics do you recall coming

25 up in those sections of your report?



Page 133

1    A    So I don't think it's been a problem in recent years,
2 but there was at one -- one point the backlog of outside
3 readings was quite pronounced and that was a -- a challenge in
4 at least one report.
5    Q    Okay.  Are there any other problems other than the
6 backlogs of the readings that you can recall that come to mind?
7    A    So there's, like, a -- staffing has been an issue.  I
8 know CARD has sought, at times, a second physician and has had
9 difficulty recruiting.
10    Q    Okay.  In terms of those reports, and I'll orient you
11 to Exhibit 311 --
12    (Witness complies.)
13    Q    -- do you recall any of those reports referencing not
14 just physician shortages but do you recall any sections of the
15 CARD report related to physicians who had left or why they had
16 left?
17    A    So this has been a long grant.  It's over 12 years.
18 And my memory is shaky but I think there have been other, you
19 know, physicians that were employed for short amounts of time
20 at CARD.
21    Q    Do you recall speaking with any of those physicians
22 after they left?  For example, do you recall speaking, you
23 know, to Dr. Koval or Dr. Heppe about why they left?
24    A    No.
25    Q    Okay.  Do you recall reading anything in the CARD

Page 134

1 reports about Dr. Heppe -- or I'm sorry -- Dr. Koval, in
2 particular, leaving?
3    A    I don't recall.
4    Q    Do you recall seeing anything in any of CARD's
5 reports about their B-readers terminating the contracts?
6    A    Yes.
7    Q    Okay.  And what do you recall reading about the
8 B-readers terminating their contracts?
9    A    So I may be imparting information from a phone
10 conversation.  It may also be in the report.  But I think
11 readers had terminated out of, you know, as a consequence of
12 litigation.  You know, it was -- they were having to turn up
13 for depositions and that sort of thing.
14    Q    And this is information that CARD provided to you,
15 not the B-readers themselves, correct?
16    A    Correct.
17    Q    Okay.  And so the reason for the B-readers leaving
18 disclosed by CARD was that the B-readers were feeling put upon
19 by litigation.  Is that what you recall?
20    A    Yes.
21    Q    And do you recall any other reason that CARD told you
22 the B-readers left?
23    A    No.
24    Q    I'd like to show you page -- oh, I'm sorry -- Exhibit
25 310, page 4 of 17.  Do you see page 4 in front of you, Section

Page 135

1 3, "Provider availability?"
2    A    Yes.
3    Q    Do you see Dr. Alisa Koval referenced in Section 3
4 labeled "Provider availability?"
5    A    Yes.
6    Q    I'll read the middle part of this page just to orient
7 us and then tell me if I've read it correctly.
8    "Dr. Black also consistently provides ongoing oversight
9 and over-reads while also completing his other
10 responsibilities.  He is the primary provider to conduct
11 outreach and education activities but more availability is
12 still needed."
13    Did I read that correctly?
14    A    I'm having difficulty getting eyes on what
15 you're -- what you're reading.
16    Q    It's starting here (indicating) with Dr. Black.
17    A    I see.
18    (Witness reviews a portion of Exhibit No. 310.)
19    A    Yes, you read that correctly.
20    Q    All right.  And with this document, am I -- am
21 I -- does this report seem to address the concern you raised
22 about provider availability that you identified as a -- a CARD
23 area of concern?
24    A    So again, this is early in the grant and my memory is
25 kind of shaky on this but this could be what I'm thinking of.

Page 136

1    Q    Okay.  Following up, it says "Strategy to address:
2 CARD has a two-pronged approach to address this challenge.  They
3 are reflected in the Year 02 goals and objectives listed below.
4 Dr. Alisa Koval, a physician trained in occupational medicine,
5 will assist in implementation of the screening program goals
6 and objectives two days a month.  The second strategy to
7 address this challenge is to begin a dedicated recruitment
8 strategy to retain another permanent physician at CARD,
9 preferably an occupational medicine physician or
10 pulmonologist."
11    Did I read that right?
12    A    Yes.
13    Q    Okay.  In terms of your understanding of Dr. Koval's
14 role at CARD, aside from what's contained here in the grant
15 reporting, what -- what was your understanding of Koval's role
16 at CARD, if any?
17    A    So I don't -- I don't even remember Dr. Koval at all
18 so I'm relying totally on the report.  It sounds like she was
19 an OccMed physician and must have been part-time.  I -- I
20 honestly don't recall anything about Dr. Koval.  It could be
21 that she was an area -- you know, maybe someone who was living
22 in Libby for a shorter period of time and was looking for
23 part-time work.  I'm speculating.  I'm just going off what's in
24 this report.
25    Q    Okay.  If we could turn to page 8 of 17 of that



Elizabeth Gallo
COURT REPORTING, LLC

**Exhibit A-34**

Page 137

1 report?
2     (Witness complies.)
3     Q    I'm looking at the top of the page.  It says, "Goal
4 1: provide medical screening in the Libby area and across the
5 nation."
6     Are you on page 8 of 17?
7     A    Yes.
8     Q    Okay.  I'm looking under Section 2 and it appears to
9 contain more information about Dr. Alisa Koval.  Do you see
10 that?
11     A    Yes.
12     Q    Okay.  It says here, beginning in the second
13 sentence, "Dr. Koval has experience in reading Libby amphibole
14 asbestos radiography and will complete screening evaluations in
15 the same fashion as all other CARD screening medical
16 providers."
17     Did I read that correctly?
18     A    Yes.
19     Q    "She will follow all existing procedures and
20 protocols and will work under the supervision of Dr. Black.
21 Dr. Black will provide oversight of all CARD screening
22 providers and will over-read radiographic images and review
23 physical health evaluation findings, including determination of
24 diagnostic status as necessary."
25     Did I read that correctly?

Page 138

1     A    Yes.
2     Q    "Once fully trained and oriented to CARD screening
3 protocols and procedures, Dr. Koval will provide oversight to
4 the primary screening medical provider, Michelle Boltz, Nurse
5 Practitioner-C, in Dr. Black's absence."
6     Did I read that correctly?
7     A    Yes.
8     Q    Okay.  Were you aware that Dr. Koval, according to
9 her testimony, did not feel comfortable performing radiographic
10 reads to diagnose patients with ARD at CARD?
11     A    No.
12     Q    Did you ever hear any information from CARD that Dr.
13 Koval felt uncomfortable performing radiographic reads at CARD?
14     A    No.
15     Q    Did you ever hear anything about Dr. Heppe at any
16 time being uncomfortable not just performing radiographic reads
17 himself but discomfort with how the radiographic reads were
18 being performed at CARD while he was employed there?
19     A    No.
20     Q    In terms of the local physicians, did you ever speak
21 to radiologist Dr. Becker about the CARD program and his
22 discomfort with CARD's practices?
23     A    No.
24     Q    Did you ever speak with Dr. Timothy Obermiller, a
25 pulmonologist in Kalispell, about his discomfort with CARD's

Page 139

1 reading methodology?
2     A    No.
3     Q    Did you ever speak with Dr. Anthony Dal Nogare,
4 another pulmonologist in Kalispell, about his discomfort with
5 CARD's radiographic reads and CT reading practices?
6     A    No.
7     Q    Mr. Larson, during Dr. Black's deposition he was
8 asked about the topic of an error rate related to radiographic
9 reads.  Is that a concept that's generally familiar to you?
10     A    I don't think I've heard the term error rate in
11 reference to radiographic reads but, you know, there are other
12 statistics reader agreement.  You know, that sort of thing.
13     Q    Okay.  Are you aware of any software that
14 radiologists use to try to keep track of their error rate?
15     A    No.
16     Q    In terms of any error rate, is that a topic that CARD
17 has ever addressed with you vis-à-vis its CT reads or chest
18 X-ray reads?
19     A    No.
20     Q    In terms of information in CARD's grant reporting,
21 has CARD ever included data showing that they submit patients
22 to Medicare who they know do not have a diagnosis of
23 asbestos-related disease?
24     A    No.
25     Q    In terms of your understanding of whether or not that

Page 140

1 conduct would be proper from the ATSDR's perspective, in your
2 view, would it be proper to submit patients for benefits who do
3 not have a diagnosis of asbestos-related disease?
4     A    No.
5     Q    In terms of submitting patients for any kind of
6 Medicare or Meridian benefits for housekeeping or gym
7 membership, in your mind would it be proper to knowingly submit
8 patients for those benefits --
9     A    No.
10     Q    -- in the absence of an asbestos related disease
11 diagnosis?
12     A    No.
13     Q    And based on the reporting that you've seen from
14 CARD, has CARD reported to you the numbers of individual
15 patients that they have submitted to any government agency for
16 federal benefits in the absence of asbestos related disease?
17     A    No.
18     Q    If there were hundreds of patients who had been
19 submitted for federal benefits without a diagnosis of
20 asbestos related disease, would that concern you?
21     A    Yes.
22     Q    In your mind, based on your position with ATSDR, it
23 is not the purpose of any of the work you do, based on the
24 Affordable Care Act, to submit patients for medical benefits
25 who are not sick from asbestos related disease who have no

**Elizabeth Gallo**
COURT REPORTING, LLC

**Exhibit A-35**

Page 141

1  diagnosis of asbestos related disease, correct?
2      A   Can you restate the question?
3      Q   Sure.
4      A   I may need a break soon.
5      Q   Sure.  I'll -- I'll just put it this way.
6      A   Sure.
7      Q   Based on your involvement with the ACA from ATSDR's
8  perspective, is it your view that the ACA, the grant that
9  you're a part of, was set up to provide Medicare benefits or
10  federal benefits to people who are not sick from asbestos
11  related disease?
12     A   No.
13         MR. DUERK:    Let's go ahead and take a break.
14         THE WITNESS:   Thank you.
15         THE VIDEOGRAPHER:   Going off the record.  The time
16  is 1:52.
17     (In recess from 1:52 p.m. until 2:01 p.m.)
18         THE VIDEOGRAPHER:   We're back on the record at 2:01.
19  BY MR. DUERK:
20     Q   Mr. Larson, I'm looking at your affidavit here,
21  specifically focusing on Paragraphs 12 and 13.  Do you have
22  your affidavit in front of you?
23     A   I do.
24     (Witness reviews Exhibit No. 350.)
25     Q   Okay.  So in terms of Paragraph 12, I'm just reading

Page 142

1  from it.  Please tell me if I'd read it correctly.
2      "As of a recent quarterly report CARD submitted to ATSDR
3  in March 2022, CARD has read 4,819 CT scans of which CARD's
4  physician interpreted 2,767 as abnormal, 57 percent."
5      Did I read that correctly?
6      A   Yes.
7      Q   In terms of the numbers of EHH forms submitted, I'll
8  represent to you in Paragraph 38 of -- of CARD's -- I believe
9  it's their initial answer, CARD has represented in discovery
10  that 3,414 EHH forms were submitted or completed as of April 4,
11  2022.  Do you have any knowledge of the number of EHH forms
12  that were submitted?
13     A   There is a table in the quarterly and annual report
14  on EHH forms completed and I don't recall the exact counts from
15  that table but that's where you would find that information.
16     Q   Okay.  And not to pin you to a number here but if
17  CARD has reported that figure in their grant reporting or in
18  discovery responses in the -- in the sworn pleadings in this
19  case, would you have any reason to disagree with those numbers
20  yourself?
21     A   No.
22     Q   Okay.  Sir, in terms of the -- the EHH form process,
23  that's -- that's not really something that you're involved in
24  in terms of reviewing EHH forms before they go out or reviewing
25  information that's submitted with the EHH forms that -- that

Page 143

1  went to SSA.  Is that right?
2      A   That's correct.
3      Q   The -- the issue that I'd like to bring up here is
4  that apparently CARD has interpreted 2,767 CT scans as abnormal
5  but the number of EHH forms completed appears to be quite a bit
6  higher than that figure.  Does it appear that way to you as
7  well?
8      A   So the number you cited before was above 3,000 and
9  the number in my statement is less than 3,000 so that appears
10  to be correct.
11     Q   Okay.  The other thing that I'd like to address here
12  is that in Paragraph 13 of your -- your statement, you say that
13  "As of a recently quarterly -- quarterly report, CARD submitted
14  to ATSDR in March 2022, radiologists have read 4,689 CT scans,
15  of which radiologists interpreted 1,537 as abnormal, or 33
16  percent."
17     Did I read that correctly?
18     A   Yes.
19     Q   Okay.  Sir, just in terms of abnormalities on a CT
20  scan, is it your understanding that there are certain
21  conditions that might appear on a CT scan that don't
22  necessarily have anything to do with asbestos related disease?
23     A   I'm not a clinician and I'm not a reader so I -- I
24  would say I don't know.
25     Q   Okay.  Just as a general matter -- and it's okay if

Page 144

1  you don't know -- but just as a general matter, have you heard
2  that there are abnormalities that appear on a CT scan read by a
3  radiologist that have nothing to do with asbestos related
4  disease?
5      A   I'm certain there are structures that can be read or
6  misread as -- as pleural plaque.  That's -- that's
7  the -- that's the crux.  I mean, that's what makes pleural
8  plaque so difficult to identify.
9      Q   In terms of one of those abnormalities that may
10  appear on a CT scan but has little or nothing to do with
11  asbestos related disease, there's been testimony from
12  radiologists in this case, pulmonologists, and even Dr. Black
13  that one such abnormality that may have nothing to do with
14  asbestos related disease may be a fractured rib.  And I'll be
15  just referring to that as a touchstone.  Are you aware that a
16  fractured rib would present as an abnormality on a CT?
17     A   I -- yeah, I have no knowledge of that but I believe
18  there is -- in the B-reader classification, I think there is a
19  field on there for fractured rib.
20     Q   Okay.  But in terms of completing those B-reader
21  forms or performing any sort of interpretation of a chest X-ray
22  or a CT scan, that is not a job you've ever had, right?
23     A   Correct.
24     Q   Okay.  Dr. Morrissette is now the -- is she the
25  clinical director of CARD?

**Exhibit A-36**

Page 145

1    A    Yes.
2    Q    Okay. And it's my understanding that she has taken
3  over quite a few of Dr. Black's responsibilities at the clinic.
4  Is that your understanding also?
5    A    Yes.
6    Q    In terms of this fractured rib, hypothetically, in
7  cases where there is a CT abnormality detected on a scan
8  related to a fractured rib but that abnormality is known by the
9  clinician not to be related in any way to asbestos-related
10  disease, would it be proper in your mind for the doctor to
11  submit that patient for federal benefits, claiming they have a
12  diagnosis of asbestos related disease?
13    A    No.
14    Q    Based on any reporting forwarded to you by CARD, were
15  you aware that that precise practice is one that Dr.
16  Morrissette believes is valid?
17         MR. BECHTOLD: Misstates the evidence.
18    A    I have -- I have no knowledge of Dr. Morrissette's
19  comments on rib fractures.
20  BY MR. DUERK:
21    Q    Would you agree with the general statement that a rib
22  fracture does not equal asbestosis?
23    A    Yes.
24    Q    If a physician, seeing a rib fracture on a CT scan,
25  knowing that that CT scan showed a rib fracture, not

Page 146

1  asbestosis, certified a diagnosis of asbestos related disease,
2  that being asbestosis to the federal government, in support of
3  Medicare benefits, would you find that problematic?
4    A    Yes.
5    Q    Have you heard from anyone that CARD has been
6  employing that practice of submitting patients without a
7  diagnosis of asbestos related disease to the Social Security
8  Administration for Medicare benefits since the Affordable Care
9  Act went into existence?
10    A    No.
11    Q    And if you learn that the Center for Asbestos Related
12  Disease had been knowingly submitting patients for Medicare
13  benefits, knowing that those patients did not have a diagnosis
14  of asbestos related disease since the ACA grant and since the
15  Affordable Care Act was put into place, would you likewise find
16  that problematic as well?
17    A    Yes.
18         MR. DUERK:    Mr. Larson, I appreciate your time
19  here today. I have no further questions at this time.
20         THE WITNESS:   Thank you.
21         MR. BECHTOLD:  All right. Let's take a little break
22  and we'll switch our situations.
23         THE VIDEOGRAPHER:  Going off the record. The time
24  is 2:12.
25         (Off the record from 2:12 p.m. until 2:18 p.m.)

Page 147

1         (On the record.)
2         THE VIDEOGRAPHER:  We're back on the record at 2:18.
3                FURTHER EXAMINATION
4  BY MR. BECHTOLD:
5    Q    Mr. Larson, I have some follow-up questions. And the
6  first comment I want to make on the record is we are collecting
7  your trial -- or testimony today because you will be
8  unavailable for trial. Is that correct?
9    A    Yes.
10    Q    And thank you for making yourself available outside
11  of the trial dates. Just a couple of follow-ups on what Mr.
12  Duerk asked you. Mr. Duerk asked you if CARD had ever informed
13  you that the B-readers -- why the B-readers have decided to
14  leave the panel, specifically Dr. Kanne and Dr. Meyer. And you
15  mentioned that you thought if -- CARD had told you it had
16  something to do with the litigation.
17         (Exhibit No. 525 is introduced and identified for the
18  record.)
19    Q    I have presented to you Exhibit 525. Could you tell
20  us what that is?
21         (Witness reviews Exhibit No. 525.)
22    A    This is an email from Tracy McNew to David Lynch,
23  Jaime Szeinuk, cc'ing Rhonda LaBelle and me.
24    Q    Okay. And in the body of the email did Tracy McNew
25  explain why the doctors had decided to leave the B-reader

Page 148

1  panel?
2    A    Yes.
3    Q    Does this refresh your memory of what CARD may have
4  informed you?
5    A    Yes.
6    Q    Could you tell the jury now what the CARD informed
7  you about the doctors' decision to leave the B-reader panel?
8         MR. DUERK:    I'll object. No CARD disclosure.
9         Go ahead.
10    A    So I'm skipping down about halfway through the email.
11    "Despite positive" -- let's see. I'm sorry. There's one
12  thing -- I want to see the text. "This has been discussed in
13  our calls in the past but I wanted to make sure that it is
14  clear to you. Despite these discussions on our calls, Dr.
15  Meyer and Dr. Kanne stated they were unaware that under the
16  Affordable Care Act, positive outside reads established the
17  minimum medical evidence required for CARD to fill out EHH
18  forms for patients."
19  BY MR. BECHTOLD:
20    Q    So do you recall receiving this email from Ms. McNew?
21    A    I -- I did not recall it until this moment.
22    Q    Okay. But she did, in fact, send it to you, correct?
23    A    Yes.
24    Q    And it -- you did, in fact, discuss these issues on
25  the telephone with her?



**Exhibit A-37**

Page 149

```
1    A   Yes.
2    Q   I'd like to bring your attention now to Exhibit 350.
3    (Witness complies.)
4    A   Okay.
5    Q   In Exhibit 350 you mention a recent quarterly report
6  to provide some statistics in your declaration.  Do you recall
7  that?
8    A   Yes.
9    Q   Do you recall Mr. Duerk asked you about
10 those -- those figures?
11   A   Yes.
12   (Exhibit No. 526 is introduced and identified for the
13 record.)
14   Q   I'm handing you Exhibit 526.  Could you tell us what
15 that is?
16   (Witness reviews Exhibit No. 526.)
17   A   This is a CARD report from -- it's probably the most
18 recent one published in March of this year.  Or correction.
19 This is from 2022.  This is from last year.
20   Q   Okay.  Is that the document that -- is that the
21 document that -- to which you're referring to in your
22 declaration?
23   A   Yes.
24   Q   And how do you know that?
25   A   In -- in my statement I say, quote, as of a recent
```

Page 150

```
1  quarterly report CARD submitted to ATSDR in March 2022, which
2  corresponds to the dates on the report.
3    Q   And as you look at that report, are the numbers in
4  your declaration accurate based upon that report?
5    (Witness reviews Exhibit Nos. 350 and 526.)
6    A   So the -- yes.  Yes.  Sorry.
7    Q   And which tables are you referring to in Exhibit 526?
8    A   I'm looking at Tables 4 and -- Tables 4 and 7.
9    Q   And could you explain the meaning of the
10 document -- I mean, the numbers that you're citing?
11   A   So I'm looking at the cumulative -- the cumulative
12 totals in both tables.  I'm looking specifically at CTs and I
13 am presenting a proportion of abnormal CTs, overall CTs
14 completed.
15   Q   And what are those?
16   A   Drawing from the table, Table 4 specifically, it's
17 2,769 abnormal CTs detected at CARD, over 4,819
18 CTs completed.  And then in Table 7, I'm looking at 1,537
19 abnormal outside CT reads over 4,689 total outside reads.
20   Q   Okay.  Thanks.  Would it be fraudulent for CARD to
21 present the -- an EHH form to the Social Security
22 Administration based on a B-reader's positive interpretation of
23 an asbestos related disease?
24   MR. DUERK:    Objection: Foundation, form, calls
25   for a legal conclusion, ultimate issue.
```

Page 151

```
1    A   Can you restate the question?
2  BY MR. BECHTOLD:
3    Q   Would it be fraud for CARD to present the EHH form to
4  SSA based upon a B-reader's positive interpretation of asbestos
5  related disease?
6    A   No.
7    MR. DUERK:    Object -- same objections.  And --
8  BY MR. BECHTOLD:
9    Q   If --
10   MR. BECHTOLD:  Do you have more?
11   MR. DUERK:    -- and move to strike.
12 BY MR. BECHTOLD:
13   Q   If you have -- or rather if CARD presents an EHH form
14 to the Social Security -- or to the SSA based upon a positive
15 B-reader's interpretation of asbestos related disease, is that
16 in compliance with the terms of the -- the grants from ATSDR?
17   A   Yes.
18   MR. DUERK:    Objection.  Same objections.
19   Go ahead.
20 BY MR. BECHTOLD:
21   Q   If CARD reviewed the -- a patient -- or if
22 CARD -- I'll start over.
23   If CARD reviews a patient's CT scan and makes a -- no
24 finding of a clinical diagnosis of asbestos related disease but
25 a B-reader makes a positive finding of an asbestos related
```

Page 152

```
1  disease, based upon the ATSDR funding grant, is it proper for
2  CARD to present that EHH form to the Social Security
3  Administration?
4    MR. DUERK:    Objection: Form, foundation, calls for
5    a legal conclusion, foundation.
6    Go ahead.
7    A   Slight correction.  I think you meant compared CT to
8  CT, not CT to a -- a B-reader only reads chest -- chest X-rays
9  not --
10 BY MR. BECHTOLD:
11   Q   Excuse me.  An --
12   A   -- but --
13   Q   -- an outside reader.
14   MR. DUERK:    Same objections.
15   A   All right.
16 BY MR. BECHTOLD:
17   Q   Let's -- let's just strike that whole thing and start
18 over and get it straight.
19   Okay.  If CARD reviews a patient and finds that the
20 patient has no -- no asbestos related disease and an outside
21 reader views a CT and finds a positive interpretation of
22 asbestos related disease and CARD presents that EHH form based
23 upon that outside read to the Social Security Administration,
24 is that in conformance with the ATSDR funding grant?
25   MR. DUERK:    Objection: Calls for a legal -- to
```

**Exhibit A-38**

Page 153

1    the extent it calls for a legal conclusion.

2    A    Yes.

3 BY MR. BECHTOLD:

4    Q    Mr. Duerk asked you about a series of incidents where

5 the -- the CARD Clinic presented EHH forms to the Social

6 Security Administration based upon -- for individuals that they

7 had not diagnosed with asbestos related disease but they

8 presented the EHH forms to the Social Security Administration

9 because those same individuals had a positive outside read.  Is

10 that in conformance with the ATSDR grant?

11        MR. DUERK:    Objection: Foundation, calls for a

12    legal conclusion.

13        Go ahead.

14    A    Yes.

15 BY MR. BECHTOLD:

16    Q    You testified that -- that it would be fraud for CARD

17 to present the EH form [sic] to Social Security -- Social

18 Security Administration based on a B-reader's positive

19 interpretation when CARD did not diagnose that individual with

20 ARD.  Do you recall that testimony?

21    A    I don't believe I said -- I may -- I may have said

22 that and may have to correct that.  That doesn't -- I don't

23 think that's correct.  That's not -- that's an analogous

24 situation to your previous line of questions.  Outside reader

25 sees something, CARD reader does not, correct?  And -- and so

Page 154

1 that's not -- that's not fraud if that person had an EHH form

2 turned in -- turned in to SSA.

3    Q    I'd like to draw your attention back to Exhibit 526,

4 on page 1, in the paragraph that begins with Table 1.

5    (Witness complies.)

6    Q    Do you see that paragraph?

7    A    Yes.

8    Q    Could you tell us what that paragraph says?

9    A    So this is describing the ways that a patient could

10 have an EHH form completed and -- but still not have -- have a

11 diagnosis from CARD.

12    Q    Okay.  And this is a situation that ATSDR's familiar

13 with, correct?

14    A    Yes.

15    Q    What are the ways that an individual can be eligible

16 for Medicare through the EHH designation criteria but not be

17 clinically diagnosed with an ARD By CARD?

18        MR. DUERK:    Objection: Form, foundation, no prior

19    disclosure, calls for a legal conclusion.

20    A    Three ways.  One, a positive chest X-ray B-read.

21 Two, a positive CT read by an outside radiologist.  And three,

22 a documented diagnosis of an asbestos related cancer listed out

23 on page 1.

24 BY MR. BECHTOLD:

25    Q    Mr. Duerk asked you about a patient with a rib

Page 155

1 fracture.  If that patient with a rib fracture had been -- an

2 EHH form forwarded to the Social Security Administration based

3 upon a positive B-read, would your opinions still be the same?

4        MR. DUERK:    Objection: Form, foundation, calls

5    for a legal conclusion.

6    A    A patient with a chest -- I'm just confirming the

7 scenario, hypothetical scenario.  The -- there's a patient with

8 a rib fracture detected by an outside reader on CT, correct?

9 BY MR. BECHTOLD:

10    Q    So I think the -- well, we'll set the scenario.  A

11 patient who CARD has not diagnosed with an asbestos related

12 disease, a patient who does have a rib fracture noted by an

13 outside reader but -- and a patient who has a positive outside

14 read from asbestos related disease.

15        MR. DUERK:    Objection: Inaccurate hypothetical

16    based on the question that I posed.

17 BY MR. BECHTOLD:

18    Q    Go ahead.

19    A    So as long as there is no asbestos related finding by

20 an outside reader, I would say yeah, that still qualifies for

21 an EHH.

22    Q    So -- so if an individual has a positive outside

23 finding by -- by an outside reader, it qualifies for an EHH?

24        MR. DUERK:    Inaccurate hypothetical.  Objection.

25    A    If it's asbestosis, pleural plaque, or pleural

Page 156

1 thickening, yes.

2 BY MR. BECHTOLD:

3    Q    Okay.  So what are the conditions under which CARD

4 may present an EHH form to the Social Security Administration

5 based upon an outside read?

6        MR. DUERK:    Asked and answered.

7    A    An asbestos related finding as described in

8 the -- the Affordable Care Act and a NOFO and it's asbestosis,

9 pleural plaque, or pleural thickening.

10 BY MR. BECHTOLD:

11    Q    Even though CARD may not have diagnosed that patient

12 with an asbestos related disease?

13        MR. DUERK:    Objection: Incomplete facts,

14    foundation.

15        Go ahead.

16    A    Yes.

17 BY MR. BECHTOLD:

18    Q    So when CARD knowingly submits an EHH form for a

19 patient for whom it didn't -- specifically did not have a

20 determination of an asbestos related disease, knowingly submits

21 that EHH form to the SSA based upon a B-reader's positive

22 interpretation, is that contrary to the wishes of the ATSDR?

23        MR. DUERK:    Objection: Foundation, form.

24    A    No.

25 BY MR. BECHTOLD:

**Exhibit A-39**

Page 157

1    Q    What does the ATSDR want the CARD Clinic to do?

2    A    As stated in the NOFO, if the outside reader detects

3  one of those three conditions but the CARD physician does not,

4  then that patient still qualifies for -- to have an EHH

5  submitted. And conversely, if both the outside readers and the

6  CARD reader agree, great. An EHH gets submitted. If the CARD

7  reader detects one of those three conditions and the outside

8  reader does not, it -- it still becomes an EHH for that

9  patient.

10    Q    Does it matter to -- rather, is it relevant to the

11  ATSDR what the -- some radiologist in Kalispell and Libby felt

12  about the CARD's diagnostic rate?

13         MR. DUERK:    Objection: Vague.

14         Go ahead.

15    A    So I'm not aware of what those radiologists are

16  saying. I suppose ATSDR would take it into account but at the

17  same time, I mean, it's -- it could be hearsay, I guess. I

18  mean, I -- that's kind of a -- that's a hypothetical, I guess.

19  BY MR. BECHTOLD:

20    Q    Do you recall in the -- in your -- when I was talking

21  with you before about an investigation by the OIG, the Office of

22  Inspector General, in 2015 based upon local doctors complaining

23  about the CARD's diagnostic rate? Do you recall that

24  testimony?

25    A    Yes.

Page 158

1    Q    And there was an investigation, correct?

2    A    Yes.

3    Q    And what was the result of the investigation?

4    A    The investigation was dropped.

5    Q    And do you know why?

6         MR. DUERK:    Objection: Beyond the scope of my

7  examination. This is not rebuttal or redirect.

8         MR. BECHTOLD:  Go ahead.

9    A    OIG dropped it. They didn't find enough evidence to

10  pursue it was my understanding.

11         MR. DUERK:    Objection: Hearsay.

12  BY MR. BECHTOLD:

13    Q    How long have you known that CARD submits EHH forms

14  to the Social Security Administration based solely upon a

15  positive outside read?

16    A    So I would say since the grant was initially stood

17  up. The eligibility criteria that are in the -- the

18  original NOFO.

19    Q    So that is something that the ATSDR intended CARD to

20  do from the beginning?

21    A    Yes.

22         MR. BECHTOLD:  I have nothing further.

23         MR. DUERK:    I have a few follow-ups.

24              FURTHER EXAMINATION

25  BY MR. DUERK:

Page 159

1    Q    In terms of --

2         MR. DUERK:    And we don't need to move.

3  BY MR. DUERK:

4    Q    -- but in terms of the hypothetical I posed, the

5  hypothetical is this. I'd like you to assume that there is a

6  patient with a fractured rib. That is her only finding on a CT

7  scan. There is no finding of an asbestos related condition

8  according to the B-readings also. CARD has not diagnosed that

9  patient with asbestos related disease. In fact, CARD has

10  determined that patient does not have a diagnosis of an

11  asbestos related disease. So to be blunt and to summarize, no

12  physician at any level from any institution anywhere has

13  diagnosed this person with an asbestos related condition at

14  all.

15        Are you saying that it's proper to submit that patient for

16  Medicare?

17    A    So I -- I may have misunderstood.

18         MR. BECHTOLD:  First, I'd like to object. I don't

19  think we did recross. And object to the form of the

20  question.

21    A    So the answer would be to me that sounds like -- that

22  sounds like an error coming out of EHH for that particular

23  hypothetical patient.

24  BY MR. DUERK:

25    Q    Right. And in terms of the agency, the government

Page 160

1  entity, the individuals that would look at that EHH form, an

2  EHH form that you don't regularly see. Fair?

3    A    Yes.

4    Q    In terms of the individuals responsible for

5  determining whether that person is eligible for Medicare

6  benefits, that is the Social Security Administration field

7  office in Kalispell to the best of your knowledge, correct?

8    A    Yes.

9    Q    And in terms of their say on whether or not that

10  would be proper under the Affordable Care Act, EHH Medicare

11  provisions, that is a decision left to SSA, correct, not you?

12    A    Yes.

13         MR. DUERK:    Nothing further.

14         MR. BECHTOLD:  That concludes.

15         THE VIDEOGRAPHER:   This concludes the deposition.

16  The time is 2:41.

17

18  (Deposition concluded at approximately 2:41 p.m.)

19

20  (Pursuant to Rule 30(e) of the Federal Rules of Civil

21  Procedure and/or O.C.G.A. 9-11-30(e), signature of the witness

22  was waived.)

23

24

25

**Elizabeth Gallo**
COURT REPORTING, LLC

**Exhibit A-40**

Page 161

```
 1   STATE OF GEORGIA     )
 2   COUNTY OF DEKALB      )
 3
 4       I hereby certify that the foregoing transcript was
 5   reported, as stated in the caption, and the questions and
 6   answers thereto were reduced to typewriting under my direction;
 7   that the foregoing pages represent a true, complete and correct
 8   transcript of the evidence given upon said hearing, and I
 9   further certify that I am not of kin or counsel to the parties
10   in the case; am not in the employ of counsel for any of said
11   parties; nor am I in any way interested in the result of said
12   case.
13
14
15       _____/s/_____
16           Lori Johnston
17           CCR 5682-4498-7599-2576
18
19
20
21
22
23
24
25
```

Page 162

```
 1               DISCLOSURE OF NO CONTRACT
 2
 3       I, Lori Johnston, do hereby disclose pursuant to Article
 4   10.B of the Rules and Regulations of the Board of Court
 5   Reporting of the Judicial Council of Georgia that Elizabeth
 6   Gallo Court Reporting, LLC was contacted by the party taking
 7   the deposition to provide court reporting services for this
 8   deposition and there is no contract that is prohibited by
 9   O.C.G.A. Section 15-14-37(a) and (b) or Article 7.C of the
10   Rules and Regulations of the Board for the taking of this
11   deposition.
12
13       There is no contract to provide court reporting services
14   between Elizabeth Gallo Court Reporting, LLC or any person with
15   whom Elizabeth Gallo Court Reporting, LLC has a principal and
16   agency relationship nor any attorney at law in this action,
17   party to this action, nor any party having a financial interest in
18   this action.  Any and all financial arrangements beyond our
19   usual and customary rates have been disclosed and offered to
20   all parties.
21
22       This 30th day of May 2023.
23       _____/s/_____
24           Lori Johnston
25           CCR 5682-4498-7599-2576
```



www.GeorgiaReporting.com/Schedule
404.389.1155

**Exhibit A-41**

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

------------------------------------------------------

VIDEO DEPOSITION OF HEATHER HILLMANN

May 16, 2023

------------------------------------------------------

BNSF,                              Case No.

                                  CV-19-40-M-DLC

    Plaintiff,

vs.

CARD,

    Defendant.

------------------------------------------------------

**Page 2**

1   APPEARANCES:
2
3   KNIGHT NICASTRO MACKAY, LLC
        By W. Adam Duerk, Esquire
4          283 W. Front Street, Suite 203
           Missoula, Montana 59802
5          duerk@knightnicastro.com
             On behalf of BNSF.
6
7   U.S Department of Justice
    United States Attorney's Office
8       By Michael Kakuk, Assistant U.S. Attorney
           901 Front Street, Suite 1100
9          Helena, Montana 59626
           michael.kakuk@usdoj.gov
             On behalf of the SSA.
10
11  BECHTOLD LAW FIRM, PLLC
        By Timothy Bechtold, Esquire
12         PO Box 7051
           Missoula, Montana 59807
13         tim@bechtoldlaw.net
             On behalf of CARD.
14
15  ALSO PRESENT:  Sarah Berry
                   Social Security Administration
16
                   Dwayne Beuthel
17                 Videographer
18
19
20
21
22
23
24
25

**Page 3**

1   Pursuant to Notice, the Video Deposition of HEATHER
2   HILLMANN, called by the Plaintiff, taken on May 16,
3   2023, commencing at 10:32 AM Mountain Time before
4   Annie Sager, Court Reporter and Notary Public within
5   and for the State of Colorado.
6
7   EXAMINATION                                    PAGE
8   Mr. Duerk:                                6, 159
9   Mr. Bechtold:                           109, 169
10
11  EXHIBIT        DESCRIPTION                    PAGE
12  Exhibit 135    Subpoena                          5
13  Exhibit 136    Declaration                     106
14  Exhibit 137    Statement of Disputed Facts      95
15  Exhibit 138    E-mail                           66
16  Exhibit 139    E-mail                           76
17  Exhibit 140    HI 00803.001                    102
18  Exhibit 141    HI 00803.050                    102
19
20
21
22
23
24
25

**Page 4**

1        P R O C E E D I N G S
2        THE VIDEOGRAPHER:  The time is 10:32.
3   Today is May 16th, 2023.  This begins the
4   video-recorded deposition of Heather Hillmann
5   taken in the matter of BNSF versus CARD.
6        This deposition is being taken at
7   1961 Stout Street, Denver, Colorado, 80202.  The
8   court reporter today is Annie Sager.  The
9   videographer is Dwayne Beuthel.
10       Counsel will introduce themselves and
11  the parties they represent beginning with the
12  plaintiff's counsel first.
13       MR. DUERK:  Adam Duerk for Relator BNSF.
14       MR. BECHTOLD:  This is Tim Bechtold on
15  behalf of the Center for Asbestos Related
16  Disease.
17       MR. KAKUK:  Michael Kakuk, U.S.
18  Department of Justice.
19       MS. BERRY:  Sarah Berry for the
20  Social Security Administration.
21       THE VIDEOGRAPHER:  Will our
22  court reporter please swear in the deponent.
23       (WHEREUPON, the oath was administered by
24  the court reporter.)
25       WITNESS RESPONSE:  Yes, I do.

**Exhibit B-1**

Page 5

1    THE COURT REPORTER:  Thank you.  Go
2  ahead.
3    THE VIDEOGRAPHER:  You may begin.
4    HEATHER HILLMANN,
5  a witness in the above-entitled proceedings,
6  after having been first duly sworn,
7  testified under oath as follows:
8    MR. KAKUK:  Gentlemen, at the outset of
9  this I just want to point out that per our
10  e-mail yesterday, Ms. Hillmann is here on behalf
11  of SSA specifically for requests 17 through 22,
12  25 through 29, and 36 through 39.
13    We believe these are essentially the
14  factual requests that were in the 30(b)(6)
15  deposition notice.  The social security agency
16  has designated somebody else for the policy
17  questions.
18    MR. DUERK:  And in terms of the notice
19  of deposition, I am assuming we are taking about
20  the same paragraphs that align with what we will
21  mark as Exhibit 135, the subpoena to SSA for
22  30(b)(6) testimony.
23    (WHEREUPON, Deposition Exhibit 135
24  marked for identification by the reporter.)
25    MR. KAKUK:  That's correct.  Thank you.

Page 6

1    MR. DUERK:  Thank you.
2    MR. KAKUK:  I understand that factual
3  issues can bleed into policy questions.  I am
4  assuming that I will have to object if something
5  is outside the scope of the requests if we get
6  into any policy issues.
7    I just want us all to be clear from the
8  get-go that what that means on behalf of the
9  agency is that the agency was not required to
10  prepare Ms. Hillmann for that request, and any
11  answer that Ms. Hillmann chooses to give is not
12  on behalf of the agency.
13    So if I just say objection, scope, we
14  all understand moving forward what that means,
15  and then you can continue on with the questions
16  and answers.
17    Does that make sense?
18    MR. DUERK:  It does to relator.
19    MR. BECHTOLD:  Yes.
20    MR. KAKUK:  Thank you.
21    EXAMINATION
22  BY MR. DUERK:
23  Q   Would you please state your full legal name
24    spelling your last name.
25  A   Heather Marie Hillmann, H-I-L-L-M-A-N-N.

Page 7

1  Q   Ms. Hillmann, have you had your deposition taken
2    in the past?
3  A   No.
4  Q   Okay.  I will go over a few ground rules today.
5    The most important is if any of my
6    questions are unclear or you need a break for any
7    reason, including speaking with counsel in the
8    room, will you just indicate that to me so that we
9    can take a break?
10  A   Yes.
11  Q   All right.  Ms. Hillmann, what is your
12    professional title?
13  A   My professional title is subject matter expert
14    Medicare lead, and I am also a data exchange
15    coordinator.
16  Q   And who do you work for?
17  A   Social Security Administration.
18  Q   How long have you been employed with the
19    Social Security Administration?
20  A   21 years in September.
21  Q   Where have you primarily been based?
22  A   Denver.
23  Q   Okay.  And what are some of your job
24    responsibilities related to your position at SSA?
25  A   Training the field offices on different policy,

Page 8

1    providing additional support in regards to data
2    exchange and Medicare.
3  Q   Ms. Hillmann, it is my understanding that you've
4    been offered by the Social Security Administration
5    as the 30(b)(6) deponent pursuant to a subpoena
6    issued to the SSA?
7  A   Yes.
8  Q   All right.  Have you seen that subpoena and the
9    topics referenced?
10  A   I have.
11  Q   Okay.  And I have marked the subpoena itself as
12    Exhibit 135.
13    Do you have a copy of that in front of you?
14  A   I do.
15  Q   I think I can shoot through this pretty quickly,
16    but it's my understanding that you were prepared
17    to address paragraphs 17 to 22?
18  A   Correct.
19  Q   Paragraphs 25 to 29?
20  A   Yes.
21  Q   And paragraphs 36 to 39 as referenced in this
22    subpoena, is that your understanding also?
23  A   Yes.
24  Q   Ms. Hillmann, what did you do in order to prepare
25    to address these topics today?

**Page 9**

1   A     I reached out to a number of components in
2         headquarters, the office of information systems
3         and policy, and then the office of program support
4         as well and then the local Kalispell office in
5         addition to reaching out to my former Medicare
6         counterpart that mentored me and had a lot to do
7         with EHH cases, and she is now retired.  Her name
8         is Kathy Will, formerly Kathy Suarez.
9   Q     In terms of any other SSA employees, do you recall
10        the names of any individual SSA employees that
11        have worked at the Kalispell field office in
12        Montana?
13  A     Terra Whiteman, Sonya Hymas, and there is a number
14        of other field office technicians, but I don't
15        have them all memorized.  I do about six different
16        states.
17  Q     Ms. Hillmann, was it your intent and understanding
18        in preparing for this 30(b)(6) deposition that you
19        were to seek and gather information and facts
20        related to the topics that you intend to address
21        today from a variety of different sources, both
22        human sources as well as paper sources?
23  A     Correct.
24  Q     And were you able to successfully accomplish that
25        task in your view?

**Page 10**

1   A     I was.
2   Q     All right.  In terms of the materials that you
3         reviewed, the paper records, if you could give me
4         a survey or a basic understanding of what kind of
5         paper records you reviewed that would be helpful.
6   A     Okay.  I reviewed different policies that have
7         been in effect since roughly around 2010, and that
8         was HI 00803.50, HI 00803.001, emergency message
9         10042REV, and then a variety of e-mail contacts
10        back and forth regarding training for
11        social security employees.
12  Q     All right.  And did these written materials help
13        inform the facts that you are going to establish
14        for the record today?
15  A     Absolutely.
16  Q     I would like to look first at what has been marked
17        previously as Exhibit 76.  You have a notebook in
18        front of you.  Behind tab 3 I believe you should
19        find Exhibit 76.
20              Do you recognize this?
21  A     Yes, I do.
22  Q     And what is it?
23  A     This is HI 00803.050.  That is our policy
24        instructions for our social security technicians
25        for processing EHH claims.

**Page 11**

1   Q     Ms. Hillmann, I will be referencing Exhibit 76 as
2         well as another exhibit under the program
3         operations manual system as the POMS today.
4   A     Okay.
5   Q     Does that make sense to you?
6   A     Yes.
7   Q     What generally is the POMS, if you can describe it
8         for me?
9   A     It's basically our policy instructions and our
10        technicians instructions on how to process claims.
11  Q     Okay.  In terms of Exhibit 76, is this
12        HI 00803.050 titled developing medical requirement
13        for entitlement to EHH Medicare?
14  A     Yes.
15  Q     Is this one of the POMS sections that you reviewed
16        in preparation for your testimony?
17  A     Correct.
18  Q     If you would look through Exhibit 76 related to
19        the enumerated POMS section at the top of page 1,
20        does this appear to be a true and accurate copy of
21        the POMS for the medical requirement for
22        entitlement to EHH Medicare?
23  A     Yes.
24  Q     I will move to admit if Exhibit 76 hasn't already
25        been admitted.

**Page 12**

1               In terms of the POMS, what is the
2         significance of this particular section?
3   A     The significance of this particular section is
4         just these are instructions for the technicians
5         that are processing the EHH claims to follow.
6   Q     Okay.
7   A     It's the required documentation they have to
8         follow.
9   Q     And in terms of those technicians, are we talking
10        about the SSA employees who may be working at the
11        Kalispell field office in Montana?
12  A     Yes.
13  Q     All right.  Is this essentially the set of working
14        instructions or their policy for how to look at
15        EHH forms?
16  A     This is their instructions on how to process the
17        claim.
18  Q     The claim itself?
19  A     Uh-huh.
20  Q     Okay.  If you would please read section A under
21        medical requirement for entitlement to EHH
22        Medicare that would be helpful.
23  A     "An individual exposed to environmental health
24        hazards (EHH) in Lincoln County, Montana, must
25        meet a medical requirement for entitlement to EHH

1  Medicare.  He or she must have been diagnosed with
2  an asbestos-related disease (ARD) established by
3  certain diagnostic methods."
4  Q  Ms. Hillmann, is it your understanding that this
5     policy is the same policy that has been in place
6     for at least the last decade related to Medicare
7     claims under the EHH program?
8  A  Yes.
9  Q  Okay.  What is the next section titled?
10 A  Developing and documenting medical requirement.
11 Q  Just generally, Ms. Hillmann, what does this
12    section address?
13 A  This section addresses how the technician would
14    address getting the required forms to process the
15    claim.
16 Q  All right.  And what are those required forms?
17 A  Depending on the type of claim that we are taking,
18    if it's EHH Medicare, we are obtaining one 827,
19    SSA-827 medical release form, and we are sending
20    that out with the EHH checklist to the medical
21    provider.
22        If it involves disability, we obtain two
23    signed SSA-827s which is the medical release form,
24    and then we also additionally send that out with
25    the EHH checklist to the medical provider.

1  Q  All right.  And just so that we are on the same
2     page with the jury here, in terms of the medical
3     provider, is it fair to say that in EHH Medicare
4     claims or social security claims involving the
5     CARD clinic, the medical provider would be CARD?
6  A  For CARD claims, yes.  They're not the only ones
7     that take in this claim.  There's other
8     physicians.
9  Q  Right.
10 A  Yes.
11 Q  Understood.  And during the course of this
12    litigation, I will represent to you that we will
13    only be focusing on EHH claims related to CARD.
14 A  Okay.
15 Q  Okay?
16 A  Uh-huh.
17 Q  So if you could describe who is responsible for
18    sending out those SSA-827 forms to CARD that would
19    be helpful.
20 A  Those are field office technicians that take
21    claims, so those are claims specialists or claim
22    technicians or technical experts within the
23    Kalispell field office.
24 Q  All right.  Ms. Hillmann, I will represent to you
25    that the jury will have seen or heard several

1  different names related to technicians in the
2  Kalispell field office by the time your testimony
3  airs.
4      One of those names is Sonya Hymas or
5  Sonya Peterson.  I believe she had several
6  different last names during that period.
7      To the best of your knowledge, was
8  Sonya Hymas an EHH technician in the Kalispell
9  field office?
10 A  I can probably speak on that in the last couple of
11    years that I have gotten to know her and know that
12    she takes Medicare claims.  I can't specifically
13    tell you if she has taken EHH claims, but I'm
14    assuming that she has within that field office.
15 Q  Fair enough.
16     So is it fair to say that it's the EHH
17  field office's responsibility for sending these
18  release forms to the CARD clinic to make sure that
19  the patients have authorized a release of their
20  medical information back to the
21  Social Security Administration related to EHH
22  claims or how does that work?
23 A  Okay.  So the medical release form goes with the
24    EHH checklist to give us authorization for the
25    medical provider to actually complete the form and

1  send that back to social security.
2  Q  Got it.
3  A  Yeah.
4  Q  Okay.  So once these SSA-827 forms are sent to the
5     medical provider, what happens next?
6  A  Could you repeat that question?  I'm sorry.
7  Q  Sure.  I am just trying to give the jury an idea
8     of step-by-step what happens in the process of
9     obtaining EHH forms.
10 A  Okay.
11 Q  And processing these Medicare claims.
12 A  Okay.  So once, you know, we actually have the
13    claimant within the office or on the phone let's
14    say, for instance, we are going to complete step 1
15    which is their identifying information, their
16    social security number, and then their name and
17    their date of birth which is at the top of the EHH
18    checklist.  In addition, we complete the 827 and
19    leave, you know, the bottom for the claimant to
20    sign.
21        Once we obtain that, we send that medical
22    release form and the EHH checklist to the CARD
23    clinic or whatever physician that they have, and
24    then once that information is obtained from the
25    CARD clinic or whatever physician sends that back,

1      that is when we are able to start the claims

2      processing.

3  Q    All right.  Just so that I'm as clear as I can be

4      in front of a jury, I am looking at page 4 of

5      Exhibit 76.

6          Is this a copy of a blank EHH form in terms

7      of an exemplar?

8  A    Yes.

9  Q    Okay.  And is this the form that the EHH field

10     technician would fill out in terms of step 1, the

11     top box, with the CARD patient's name,

12     social security number and date of birth?

13  A    Yes.  That is the only box that they complete.

14  Q    Okay.  Is there any other information or any other

15     box on this form that the patient would complete

16     with SSA?

17  A    No.

18  Q    Okay.

19  A    That would go to the physician.

20  Q    In terms of the box under step 2 on page 4, is

21     there any information here that would be completed

22     by the SSA?

23  A    No.  We are not expertised in that area.

24  Q    Okay.  So after step 1 is complete, box 1 is

25     complete, the EHH form then goes to CARD in this

1      case, is that fair?

2  A    Correct.

3  Q    All right.  What happens at CARD with this EHH

4     checklist to the extent that you know?

5  A    They complete it to the best of their ability

6     following section 1881A of the act.  We don't get

7     involved past that point.  We are not medical

8     experts, and that's outside the scope of our jobs.

9  Q    All right.  And in fact, is that reflected in this

10     section of the POMS related to what is supposed to

11     happen with the EHH checklist?

12         MR. KAKUK:  Objection, scope.

13  A    Sorry.

14         MR. KAKUK:  Go ahead and answer.

15  Q    Go ahead.

16  A    I think it's just pretty laid out and it's pretty

17     clear in there what our job roles are within the

18     policy.

19  Q    All right.  Let's go about it this way.

20         Does section 2 titled EHH checklist set out

21     your understanding of the goals and job

22     responsibilities for what is going to happen with

23     this EHH checklist at SSA?

24         MR. KAKUK:  The same objection.

25  Q    Okay.

1  A    I can honestly just say that, you know, once we

2     have a completed checklist that shows that there

3     is a diagnosis underneath section 1881A of the act

4     which is with a completed form, then we would be

5     able to process this claim once step 2 and step 3

6     are completed.  We are not medical experts like

7     I've previously mentioned.  We don't get into the

8     diagnosis or the diagnosis codes.

9  Q    All right.

10  A    Yeah.

11         MR. KAKUK:  Mr. Duerk, I'm sorry.  I

12     might have misunderstood.  Were you talking

13     about section 2 of the form or section 2 of the

14     policy?

15         MR. DUERK:  I was talking about

16     section 2 of the form.

17         MR. KAKUK:  Okay.

18         MR. DUERK:  And I was about to go into

19     section 2 of the policy.

20         MR. KAKUK:  Apologize for anticipating.

21         MR. DUERK:  Okay.  No problem.

22  Q    Ms. Hillmann, let's go about it this way.  I'll

23     reference section 2 of the policy.

24  A    Okay.

25  Q    Which I believe corresponds to section 2 of the

1      form, but to be clear, if we could look at the

2      policy itself, do you see the section titled EHH

3      checklist?

4  A    Yes.

5  Q    Would you please read that, the purpose of the EHH

6     checklist.

7  A    "The purpose of the EHH Checklist is to obtain

8     information from the claimant's medical source

9     regarding the claimant's diagnosis and presence in

10     Lincoln County, Montana.  The claims

11     representative (CR) will use the completed EHH

12     Checklist to determine if the claimant's condition

13     meets the medical requirement.  The EHH Checklist

14     may also provide evidence of presence in Lincoln

15     County, Montana.  (For policy on using the EHH

16     Checklist as proof of presence in Lincoln County,

17     Montana, see HI 00803.040B and HI 00803.040C.)

18     See images of the EHH Checklist and cover notice

19     in HI 00803.050B.3 in this section."

20  Q    All right.  So a couple of general questions here

21     about the EHH forms and the facts that you are

22     aware of related to how these forms are processed.

23         Is it your understanding based on the facts

24     related to you by EHH technicians and field

25     personnel that any information about a medical

**Exhibit B-5**

Page 21

1     diagnosis related to these EHH forms for CARD
2     patients is to be placed on section 2 of the EHH
3     form by the CARD physicians or the CARD medical
4     provider?
5  A  Correct.
6  Q  Okay.  And in terms of any direction, training,
7     instruction, teaching, on-site supervision, any
8     interaction with CARD employees at the CARD
9     facility, does the SSA provide any training or any
10    teaching or any instruction by any name to CARD
11    about how to complete an EHH checklist other than
12    what is shown here in these POMS sections?
13 A  No.  And I have actually checked with other
14    components including the Kalispell office, and
15    that has never been a former practice.
16 Q  Okay.  So to the best of your knowledge as the
17    30(b)(6) deponent, based on your review of
18    information in both printed form and interviews
19    with SSA field staff and other SSA employees, is
20    it your understanding that SSA has ever taught
21    CARD how to fill out an EHH form in any regard
22    outside of what is included in these POMS?
23 A  No.
24 Q  Okay.  In terms of the form itself, and I'm
25    looking at page 4 on Exhibit 76, what if, based on

Page 22

1     the facts that you're aware of, an EHH form would
2     be returned to the Social Security Administration
3     field office in Kalispell and there was a section
4     left blank, for example, if a form failed to
5     identify an asbestos-related condition or
6     conditions and its date of diagnosis, if a form
7     was lacking any information about the diagnosis or
8     diagnoses of asbestos-related conditions, would
9     the SSA be able to process that claim and approve
10    Medicare benefits for that CARD patient?
11 A  No.
12 Q  Why not?
13 A  Because they have to meet the listing and they
14    have to have a date of diagnosis, they have to
15    have the printed name of the physician, the
16    physician's signature, and the date listed as
17    well, as well as step 3, the information within
18    step 3 and step 2.
19       And we have actually put this out in policy
20    in an emergency message, it was 10042REV that gave
21    those specific instructions, and I believe it came
22    out in 2010, archived in 2011, the latter part of
23    2011, and it was a public-facing policy, so the
24    public did have access as well as CARD to that
25    policy online.

Page 23

1  Q  Okay.  If you could just generally share with me
2     the information that was covered in that emergency
3     policy that would be helpful.
4  A  It basically laid out the guidelines of
5     HI 00803.50 and that if the environmental health
6     hazard checklist was not completed correctly
7     meaning that there was no diagnosis, no diagnosis
8     date, and it doesn't have to necessarily -- like
9     if they marked a diagnosis, but then there is not
10    a diagnosis date, we still have to deny the claim.
11 Q  All right.
12 A  Yeah.
13 Q  So without a diagnosis of an asbestos-related
14    condition, a CARD patient simply would not receive
15    Medicare eligibility or Medicare benefits
16    according to the SSA?
17 A  Correct.
18 Q  Okay.  Now, in terms of the SSA's reliance on
19    these forms, does the SSA do any fact-checking or
20    independent investigation or ask for any other
21    records to support a claim for Medicare benefits
22    other than this EHH checklist?
23 A  Not to my knowledge.  There is no additional
24    Medicare benefits quite like this, but our claims
25    technicians, I do want to state, you know, we

Page 24

1     don't -- we don't check -- we are not medical
2     experts, so just like with our disability claims,
3     our claims technicians are not going to be the
4     ones checking medical references, checking,
5     you know, the medical evidence.  That is not their
6     job and that is outside of the scope of their job.
7  Q  All right.  And to the best of the information
8     you've been able to gather, the boundaries of
9     SSA's job and the procedure for what SSA will do
10    and will not do vis-a-vis these checklists is
11    communicated to CARD?
12 A  I don't know if it's communicated to CARD, but
13    it's communicated to our employees, and that's who
14    we are responsible for.
15 Q  All right.
16 A  Yeah.
17 Q  In terms of these program operation manual systems
18    or the POMS, are these available to the public
19    online?
20 A  They are.
21 Q  Okay.  And in terms of the emergency policy that
22    you just referenced, I'm assuming that that was
23    made available to any member of the public online
24    as well?
25 A  Absolutely.

Page 25

1  Q    Okay.  So page back to page 4 of Exhibit 76 with
2       this EHH form, if the EHH form doesn't include a
3       diagnosis related to asbestos exposure, what
4       happens at that stage in the process when the SSA
5       field office gets the form based on the
6       information you've reviewed?
7  A    If the SSA field office gets this form and we do
8       not have a diagnosis that's listed within the
9       checklist, then it's a deny.
10 Q    All right.  And what would be some examples of
11      denials that might occur for diagnoses that don't
12      show up in the checklist if you could give me a
13      for instance.
14 A    Well, they don't meet the medical requirements of
15      the policy, so then it would be a denial based off
16      of that.  We have a special code for it.
17 Q    Okay.
18 A    Uh-huh.
19 Q    And so diagnoses that don't meet the medical
20      requirement, I'm assuming these would be diagnoses
21      of conditions that don't have anything to do with
22      asbestos exposure, for example, is that fair?
23 A    Well, I mean, I can't speak on that.  If we don't
24      have a completed form with, you know, the
25      impairments that are listed here and they haven't

Page 26

1       marked that or they haven't even marked the date
2       of diagnosis, I mean, that would be a denial.
3  Q    Okay.
4  A    Yeah.  Because the physicians are required to be
5       following section 1881A of the act.
6  Q    In terms of any medical training that you're aware
7       of possessed by any of these field technicians,
8       are any of the field technicians at the Kalispell
9       office medical doctors?
10 A    No.
11 Q    Are any of the field technicians in the Kalispell
12      office pulmonologists?
13 A    No.
14 Q    Are any of them radiologists?
15 A    No.
16 Q    Are any of them medical professionals of any
17      designation as far as you're aware?
18 A    No.
19 Q    Okay.  Is it fair to say that the Kalispell field
20      office personnel are relying on CARD providers,
21      CARD doctors, to provide all of the accurate, all
22      the true and accurate information related to an
23      asbestos-related diagnosis in this EHH form?
24            MR. KAKUK:  Objection, scope.  Go ahead.
25 A    Yes.

Page 27

1  BY MR. DUERK:
2  Q    Okay.  Now, in terms of the rest of this POMS
3       policy, I think we have read the EHH checklist
4       heading.  If you could go through each of the
5       steps that -- is it FO 872?
6            What does FO 872 stand for?
7  A    That's the field office for Kalispell, Montana.
8  Q    Okay.  If you could go through the steps that the
9       field office in Kalispell takes to obtain a
10      completed EHH checklist that would be helpful.
11 A    And you are wanting me to start on page 2?
12 Q    I am.
13 A    Okay.  "FO 872 takes the following actions to
14      complete an EHH Checklist:  Complete step 1
15      (identify the individual) on the EHH Checklist;
16      fill in the FO's fax number on the cover notice;
17      and forward the EHH Checklist with the cover
18      notice to the claimant's medical source with a
19      signed SSA-827.  The name of source will appear in
20      'Remarks' in the MCS claims path or the paper
21      application."
22 Q    In terms of that note, just so the jury isn't left
23      scratching their heads, what does that mean, what
24      does that indicate, the name of source will appear
25      in the "remarks" in the MCS claims path or the

Page 28

1       paper application?
2  A    The name of the medical provider or the name of
3       the medical source.
4  Q    Okay.  Gotcha.
5            And so in terms of remarks here, would an
6       example of the provider just be CARD Clinic,
7       Libby, Montana, or something to that effect?
8  A    With their address.
9  Q    Understood.
10 A    Uh-huh.
11 Q    Okay.  Anything else that I failed to ask about
12      this first part, section A of the POMS?
13 A    No.
14 Q    Okay.  So what happens when the claimant's medical
15      source gets the EHH form?
16 A    So the claimant's medical source will take the
17      following actions to complete and return the EHH
18      checklist.  Complete step 2, identify the
19      asbestos-related condition and its date of
20      diagnosis, and step 3, identify presence in
21      Lincoln County, Montana, fill in the printed name,
22      physician's signature and date, and return it by
23      fax to the number provided on the cover notice or
24      mail it to the Kalispell field office located at
25      275 Corporate Drive, Ashley Square Mall, Suite D,

1    Kalispell, Montana, 59901.
2  Q  All right.  Thank you.
3  A  Uh-huh.
4  Q  There is another note here that I think touches on
5     the issue of whether any supporting medical
6     evidence needs to be provided by CARD.  If you
7     could first read it, then I have a few questions.
8  A  Okay.  "The medical source does not need to
9     provide the supporting medical evidence."
10 Q  Okay.  In terms of any other medical evidence that
11    is submitted along with the EHH form, based on
12    your review of the facts, your interviews in the
13    case, your review of the paperwork, to the best of
14    your understanding, is there anything other than
15    the EHH form that is submitted to the field
16    office, for example, any CT interpretive reports,
17    any medical records, any notes from the doctor so
18    to speak, or is it just the EHH form to the best
19    of your understanding based on the factual
20    information you've reviewed?
21 A  It's just the EHH checklist.
22 Q  Understood.  Okay.  All right.
23        If we could turn to page 3 of Exhibit 76.
24    It appears there is a section here about what the
25    Kalispell field office will do to store the

1     completed EHH checklist.
2         Is that a fair representation?
3  A  Yes.
4  Q  Okay.  Would you please read this section.
5  A  Field office 872, which is the Kalispell field
6     office, "will take the following actions to store
7     the completed EHH Checklist: Obtain a bar code fax
8     coversheet via the Electronic Disability Collect
9     System," which is EDCS.
10        "And fax the completed EHH Checklist into
11    the Electronic Folder (EF) if the claimant is also
12    applying for disability benefits or has a pending
13    disability claim; and retain the completed EHH
14    Checklist until the MBR is established.  Once the
15    MBR is established, fax the EHH Checklist into the
16    EF using NDRed.  Use a Document Type of 'Other.'
17    The document description should show 'EHH
18    Checklist' and confirm that the EHH Checklist is
19    in the EF or electronic folder and legible, then
20    shred the original."
21 Q  All right.  To the best of your understanding and
22    based on your review of the factual information
23    and documents in this case, does this section of
24    the POMS describe what actually occurs with those
25    EHH forms?

1  A  Yes.
2  Q  Okay.  Just a couple of questions.  There is a
3     reference to the MBR here on page 3.
4         What is the MBR?
5  A  That is the master beneficiary record, so that's
6     going to be a record that is established for
7     Medicare beneficiaries, retirement beneficiaries,
8     disability beneficiaries and survivor
9     beneficiaries.
10 Q  Okay.  The other acronym NDRed, what is that
11    reference?
12 A  That's an electronic file, and that actually
13    stands for -- there is a lot of acronyms.  Just
14    give me one second.
15 Q  It's the government.  It's okay.
16 A  Honestly, I can't remember off the top of my head.
17    I wish they had spelled it out like they did with
18    the Disability Collection System.
19 Q  That's okay.
20 A  But it's essentially what that electronic file
21    is for is for most of our Medicare retirement
22    survivors insurance beneficiaries.  For our
23    disability claimants we collect that information
24    in EDCS which is the Electronic Disability
25    Collection System.

1  Q  All right.
2  A  Uh-huh.
3  Q  So turning to page 4 of the POMS again, we see
4     this EHH checklist, and so in terms of the EHH
5     checklist then based on your review of the facts
6     in this case, if an EHH checklist does not
7     indicate that the patient has a diagnosis of an
8     asbestos-related condition, does that patient
9     become eligible for Medicare?
10 A  Again, no, they would not.  If we don't have a
11    diagnosis that is listed within the checklist or a
12    date of diagnosis and step 2, step 3, printed
13    name, physician signature and date is not
14    complete, we will deny the claim.
15 Q  All right.  In terms of the next program operation
16    manuals system or POMS, I would like you to turn
17    to what's marked as Exhibit 75.  This is behind
18    tab 4 of your notebook.
19 A  Okay.
20 Q  Ms. Hillmann, do you have Exhibit 75 in front of
21    you?
22 A  I do.
23 Q  What is this?
24 A  This is the background for EHH Medicare, so the
25    hospital insurance HI entitlement for individuals

1    exposed to environmental health hazards, EHH.
2  Q  Is this a document that you've seen before?
3  A  Yes.
4  Q  And in fact, is this a document that you reviewed
5    in preparation for your deposition today?
6  A  Yes.
7  Q  If you would leaf through it.
8  A  Okay.
9  Q  And tell me if this appears to be a true and
10   accurate copy of the POMS section for
11   HI 00803.001, hospital insurance entitlement for
12   individuals exposed to environmental health
13   hazards.
14  A  Yes.
15  Q  Okay.  If we could just focus on Exhibit 75
16   generally, what is this and what is its
17   significance?
18  A  This is just the background information on EHH
19   Medicare in general, just how it came about
20   underneath the Affordable Care Act, how we added
21   the section into the Social Security Act, and it
22   just goes over the basic requirements for
23   entitlement.  It's not actually processing
24   instructions, but it's giving our technicians a
25   background on it.

1  Q  If we could focus on section A and the citations
2    above it, if you would read the citations.
3  A  Okay.  Section 1881A of the Social Security Act.
4  Q  And to the best of your knowledge, Ms. Hillmann,
5    is section 1881A of the Social Security Act
6    commonly referred to as the EHH provisions of the
7    Affordable Care Act?
8  A  Yes.
9  Q  Okay.  If you could read section A, that would be
10   helpful.
11  A  Okay.  "Background for EHH Medicare.
12   Section 10323 of the Affordable Care Act added
13   section 1881A of the Social Security Act effective
14   March 23rd, 2010.  This section extends
15   entitlement and medical hospital insurance (HI)
16   and eligibility to enroll in Supplemental Medical
17   Insurance or SMI to certain individuals exposed to
18   environmental health hazards (EHH) and diagnosed
19   with a medical condition caused by such exposure."
20  Q  All right.  I'll stop you right there.
21  A  Okay.
22  Q  In terms of providing background for EHH Medicare,
23   in terms of the information that you reviewed,
24   both in the POMS, in your interviews with other
25   SSA employees, in terms of all of the information

1    whether it was printed or through interviews of
2    living humans at SSA, does this section on the
3    background for EHH Medicare appear to be true and
4    accurate and to the best of your understanding
5    from what you learned from others during your
6    inquiry?
7         MR. KAKUK:  Objection, scope.
8  A  Yes.
9  Q  Okay.
10  A  To my knowledge.
11  Q  All right.  And does it appear to you that this
12   section, section 00803.001 states that in order to
13   receive EHH Medicare there must be certain
14   individuals exposed to environmental health
15   hazards and diagnosed with a medical condition
16   caused by such exposure?
17         MR. KAKUK:  The same objection.
18  A  Yes.
19  BY MR. DUERK:
20  Q  Okay.  Based on the language that we see here, is
21   there another section that we haven't read yet for
22   background for EHH Medicare?
23  A  No.
24  Q  Okay.  I am looking at the next paragraph that
25   starts with "currently." Could you read that part

1    as well, please.
2  A  "Currently, the only individuals eligible for
3    Medicare under this provision are those who were
4    present in Lincoln County, Montana and have an
5    asbestos-related disease diagnosis.  April 2010 is
6    the earliest possible effective date of
7    entitlement based on a March 2010 filing date."
8  Q  All right.  Now, in terms of these two POMS
9    sections, aside from these POMS sections are you
10   aware of any source of any other material that may
11   have been used to train, teach or instruct
12   individuals at the CARD clinic related to filling
13   out EHH forms?
14  A  No.
15  Q  Okay.  And I want to make sure that I'm as
16   exhaustive as I can be here, and I don't mean to
17   beat a dead horse.
18        Did you look for any evidence that SSA had
19   provided training or instruction, direction or
20   supervision to the CARD clinic in terms of the
21   proper way to submit or fill out EHH forms other
22   than what we see here in the POMS?
23  A  I did.  I reached out to headquarters, I reached
24   out to the Kalispell manager and I reached out to
25   my former counterpart that used to head Medicare

1     in my same position, she is now retired,
2     Kathy Suarez or Kathy Will, and I could not find
3     anything to that extent.
4  Q   In terms of the way that you tried to turn up any
5     information along those lines, did you ask
6     questions about any type of training or any type
7     of education or any type of instruction that may
8     have occurred at any time in the history of SSA
9     working with CARD on the EHH program?
10  A   I did.
11  Q   Okay.  And according to your search, is it fair to
12     say that the information you uncovered revealed no
13     training of CARD employees along these lines ever
14     existed?
15  A   SSA employees have never trained CARD.
16  Q   All right.
17  A   Uh-huh.
18  Q   So would it be fair to say that if there was any
19     claim that a training or an instruction by SSA in
20     Libby, Montana of CARD officials or CARD employees
21     in terms of filling out an EHH form, is it fair to
22     say that if anyone suggested that it had ever
23     occurred, you found no evidence or facts in your
24     search to support that?
25  A   Correct.

1  Q   Okay.  Did you find any information about any SSA
2     individuals or employees ever visiting Libby,
3     Montana or the CARD clinic?
4  A   No.
5  Q   Okay.  Did you find any information or any written
6     materials related to anybody from the
7     Social Security Administration ever providing CARD
8     with any awards?
9  A   I did reach out to our headquarters components and
10     they tried to track down monetary funds as well as
11     the exemplary awards, and we couldn't find any
12     records of that, but our regional commissioner
13     did -- she did mention the possibility that there
14     was a regional-level award, but she has no record
15     of it.
16  Q   Okay.  Ms. Hillmann, I will represent to you that
17     I have seen a photograph of what appears to be
18     some sort of a plaque or a trophy of some kind
19     giving CARD some recognition for something.
20         Perhaps Mr. Bechtold may ask you some
21     questions about that, but have you seen any
22     correspondence, any information about any type of
23     award outside of this photograph of a trophy?
24  A   No.
25  Q   Okay.  And in terms of any correspondence on file,

1     did you look for any correspondence from the CARD
2     clinic requesting training or asking about having
3     Social Security Administration field
4     representatives or staff from the Kalispell office
5     coming out to CARD and providing instruction or
6     training or guidance about any matter related to
7     EHH Medicare?
8  A   I did not find any correspondence.
9  Q   All right.  In terms of these POMS sections, both
10     Exhibit 75 and Exhibit 76, do you see any language
11     in either of these program operational manual
12     system publications that say anything about a
13     B read only being a sufficient basis for EHH
14     Medicare?
15  A   No.
16  Q   In terms of any communication outside of these
17     POMS in terms of other POMS sections, the
18     emergency policy that you mentioned earlier or any
19     of the other information that you've referenced
20     here today that you accessed during your
21     preparation for this 30(b)(6) deposition, did you
22     see any other materials from the
23     Social Security Administration advising CARD that
24     a B read only would itself qualify an individual
25     for EHH Medicare benefits?

1  A   No.
2  Q   In terms of the appropriate route for obtaining
3     Medicare benefits, outside of the EHH form, is
4     there any other avenue for a CARD patient or
5     anyone else to obtain EHH Medicare other than an
6     EHH form being submitted to the
7     Social Security Administration?
8  A   No.
9         MR. KAKUK:  Objection, scope.
10  A   Sorry.  No.
11  BY MR. DUERK:
12  Q   Okay.  Based on all of the facts that you
13     reviewed, based on all of your interviews in this
14     case, based on your review of information and
15     factual materials, did you see any correspondence
16     or any writings, e-mails of any kind from the SSA
17     saying that a B read by itself was sufficient to
18     trigger Medicare eligibility for a CARD patient?
19  A   No.
20  Q   In terms of the EHH form itself then, is the
21     submission of an EHH form that includes a
22     diagnosis of an asbestos-related disease or
23     condition the only avenue, route or mechanism that
24     you found through your factual inquiry of assuring
25     that a patient would be Medicare eligible under

1      the EHH Medicare program?

2 A    Yes.

3 Q    So for example, are you familiar with what a

4      B read is?

5 A    Absolutely not.  That is outside the scope of my

6      job.

7 Q    All right.  Understood.  Let me just describe it

8      for you this way generally.

9 A    Okay.

10 Q    I will represent to you that a B read is -- it can

11      be a report from a specialist radiologist who has

12      been certified by NIOSH to read either a chest

13      x-ray or in some circumstances a CT scan.

14          First of all, is that information that

15      you've ever heard before about B readers?

16 A    Uh-uh.  It's not within our listed policies, so I

17      wouldn't know and neither would our technicians.

18 Q    All right.

19 A    It's outside the scope of our job.

20 Q    And in terms of whether or not it's relevant to

21      you within the scope of your job, do you

22      necessarily, not to put too fine a point on it,

23      but do you necessarily even care what a B reader

24      is?

25 A    No.

1 Q    Okay.  So my question is this.  Based on your

2      review of all of the factual information, did you

3      see any mechanism within the EHH Medicare program

4      for a CARD patient to receive Medicare benefits if

5      only a B reader's checklist or interpretive report

6      for a chest x-ray or CT were submitted to the

7      Kalispell field office?

8          MR. BECHTOLD:  Foundation.

9          THE COURT REPORTER:  Pardon?

10          MR. BECHTOLD:  Foundation.

11 BY MR. DUERK:

12 Q    I asked her if she ever saw any example of that

13      occurring in her factual investigation.  Did you?

14 A    No.

15 Q    Okay.  So Ms. Hillmann, I am asking basically a

16      logical question.

17          Based on your review of the facts in this

18      case, did you see any evidence that if a B read,

19      an interpretive form was sent to the Kalispell

20      field office, did you see any evidence of any CARD

21      patients that would receive Medicare eligibility

22      or Medicare benefits based on that B read alone?

23 A    Okay.  I guess I need you to repeat the question.

24 Q    Sure.

25 A    Because I think to be honest with you, our

1      technicians don't get into B reads.  We don't get

2      into all the medical issues with that.  We follow

3      the checklist, and if everything is in the

4      checklist, we process our claims that way

5      following policy.

6          It's just like any other type of Medicare.

7      You have to have -- for international volunteers

8      or for a disability SUP, you have to have required

9      forms for each type of Medicare, and if you don't

10      have those required forms, then you are going to

11      be disallowed.

12 Q    Understood.

13 A    Yeah.

14 Q    So in terms of the EHH checklist form, is it fair

15      to say that the technicians at SSA when it comes

16      to box number 2 about the diagnosis and how it was

17      arrived at, is it fair to say that SSA technicians

18      are relying on CARD to provide true and accurate

19      information on those forms based on the materials

20      you've reviewed?

21 A    Correct.

22 Q    Okay.  And aside from the EHH form itself and,

23      again, I am sorry to be beating this to death, but

24      I just want to be really clear.

25          Aside from getting an EHH form from the

1      CARD clinic related to CARD patient Medicare

2      claims, is there any additional avenue, any

3      separate piece of paper, any work around, any

4      exceptional route to getting Medicare benefits for

5      a CARD patient that you came across during your

6      review of facts in this case other than an EHH

7      checklist?

8 A    No.

9 Q    Okay.  It's 11:30.  I would ask that we take a

10      short rest break.

11          THE VIDEOGRAPHER:  The time is 11:26.

12      We are off the record.

13          (Break taken.)

14          THE VIDEOGRAPHER:  The time is 11:34.

15      We are back on the record.

16          MR. KAKUK:  Mr. Duerk, during the break

17      I believe Ms. Hillmann had something that she

18      wanted to clarify about people traveling to

19      Montana to conduct training.  I believe the

20      question was limited to Libby, but in case it

21      wasn't, Ms. Hillmann, was there more information

22      you wanted to provide?

23          MR. DUERK:  Why don't I ask a question

24      about that directly.

25          MR. KAKUK:  Fair.

**Page 45**

```
1   BY MR. DUERK:
2   Q   Ms. Hillmann, I was asking questions about
3       training in Libby.  I may have failed to ask if
4       there was training generally in Montana.
5           Based on what Mr. Kakuk is presenting on
6       the record, is there anything that comes to mind
7       for you related to that topic?
8   A   There was training for social security employees
9       from our regional office employees. Mary Lisa
10      Lewandowski, our regional commissioner.  Our
11      current regional commissioner was there.
12      Nancy Berrihill, Kathy Will or Kathy Suarez,
13      Kelly Hansen and Chris DiGiacomo.
14  Q   All right.  And in terms of each of the
15      individuals that you just named, is it fair to say
16      that they are governments employees, not CARD
17      employees?
18  A   Correct.
19  Q   Okay.  And so in terms of the trainings in Montana
20      likewise is it fair to say that the trainings
21      provided were trainings from government employees
22      to other government employees related to the EHH
23      Medicare program?
24  A   Correct.
25  Q   Okay.  In terms of the documents that you've
```

**Page 46**

```
1       reviewed and the interviews that you have
2       conducted, were there any aspects or elements of
3       those trainings that were inconsistent with what
4       we have already reviewed in terms of the POMS
5       sections?
6   A   No.
7   Q   Okay.  And during those trainings, based on the
8       information that you reviewed related to the
9       facts, was there any information that indicated
10      that that training of government employees
11      included any training that would allow for a CARD
12      patient to receive Medicare benefits without a
13      diagnosis of asbestos-related disease?
14  A   Can you repeat the question?
15  Q   Sure.  I am trying to focus just on this training
16      among government employees in Montana.
17  A   Okay.
18  Q   Based on the factual inquiry that you made, did
19      you see any information that indicated to you that
20      those trainings included anything about allowing
21      patients from CARD who did not have a diagnosis of
22      asbestos-related disease to become Medicare
23      eligible?
24  A   No.
25  Q   Okay.  And specifically did you see anything in
```

**Page 47**

```
1       the information that you reviewed that would have
2       allowed CARD patients to receive Medicare
3       eligibility for life with only a B read?
4   A   No.
5   Q   Ms. Hillmann, I would like to cover the individual
6       topics that you were asked to address in the
7       subpoena which has been marked as Exhibit 135 for
8       purposes of this deposition.  I will start with
9       paragraph 17 which is on page 11 of that subpoena.
10          Do you see that in front of you?
11  A   Yes.
12  Q   Okay.  I will read the topic for you.  Please tell
13      me if I have read it correctly.
14          "The Social Security Administration's
15      designated deponent must identify the SSA
16      employees who trained CARD staff to fill out the
17      environmental health hazards checklist in 2011."
18          Did I read paragraph 17 correctly?
19  A   Yes.
20  Q   Aside from the information that you have already
21      provided, is there any other information on
22      paragraph 17 that we haven't covered?
23  A   No, just that we have never trained CARD staff on
24      the EHH checklist.
25  Q   All right.  Paragraph 18, I will read it.  Please
```

**Page 48**

```
1       tell me if I have read it correctly, and then I
2       will have a few follow-ups.  Okay?
3   A   Okay.
4   Q   Paragraph 18.  "The
5       Social Security Administration's designated
6       deponent must testify whether CARD staff have
7       filled out the environmental health hazards
8       checklists according to the training SSA provided
9       CARD staff in 2011 from 2011 until the present
10      day."
11          Did I read that correctly?
12  A   Yes.
13  Q   Aside from the testimony that you have already
14      provided, do you have any additional information
15      to share on that topic?
16  A   No, just that we never provided CARD staff
17      any type of training.
18  Q   All right.  Paragraph 19.
19          "When a physician at CARD determines a
20      patient has asbestosis by interpretation of a
21      computed tomographic radiograph of the chest, CARD
22      staff enter the patient's name, social security
23      number and date of birth in the step 1 section of
24      the environmental health hazards checklist.  Check
25      the asbestosis box in the impairment section of
```

Page 49

```
 1      step 2 of the environmental health hazards
 2      checklist, enter the date the CARD physician made
 3      the interpretation and the date of diagnosis
 4      section of step 2, enter the dates the patient was
 5      present in Lincoln County, Montana in step 3, and
 6      the CARD physician prints and signs the
 7      physician's name and dates the environmental
 8      health hazards checklist."
 9              "The Social Security Administration's
10      designated deponent must testify whether this is
11      the SSA approved method of filling out the
12      environmental health hazards checklist."
13              Aside from the testimony that you have
14      already provided, do you have anything additional
15      to add in response to paragraph 19?
16   A  I do.  A step 1 is completed by social security.
17      We fill in the identifying information, and that's
18      in HI 00803.50.
19   Q  All right.  And in terms of section 1, just for
20      the jury's edification and reference, I am looking
21      at Exhibit 76, page 4, at the EHH exemplar.
22              Step 1 is basically the first box on the
23      EHH form on page 4, is that right?
24   A  Correct.
25   Q  Okay.  Anything else to add in response to
```

Page 50

```
 1      paragraph 19?
 2   A  No.
 3   Q  Okay.  Paragraph 20.
 4              "When a B reader qualified physician
 5      determines a patient has asbestosis by
 6      interpretation of plain chest x-ray or a computed
 7      tomographic radiograph of the chest, CARD staff
 8      enter the patient's name, social security number
 9      and date of birth in the step 1 section of the
10      environmental health hazards checklist, check the
11      asbestosis box in the impairment section of step 2
12      of the environmental health hazards checklist,
13      enter the date the B reader physician made the
14      interpretation in the date of diagnosis section of
15      step 2, enter the dates the patient was present in
16      Lincoln County, Montana in step 3, and the CARD
17      physician prints and signs the CARD physician's
18      name and dates the environmental health hazards
19      checklist."
20              "The Social Security Administration's
21      designated deponent must testify whether this is
22      the SSA approved method of filling out the
23      environmental health hazards checklist."
24              First, did I read that accurately?
25   A  You did read it accurately, excuse me, but for
```

Page 51

```
 1      step 1, social security completes step 1 in that
 2      section of policy or on the EHH checklist.
 3              And as far as step 2 and step 3, you know,
 4      our technicians are not going to know the
 5      background of a B reader.  We are just assuming
 6      that the physician that completed section 2 and
 7      section 3 followed section 1881A of the act and we
 8      don't get into the medical interpretations or
 9      background of this checklist.
10   Q  All right.  Is it fair to say that you rely on
11      CARD physicians to fill out boxes 2 and 3,
12      sections 2 and 3 of the EHH form truly and
13      accurately?
14              MR. KAKUK:  Objection, scope.
15   A  Yes.
16   BY MR. DUERK:
17   Q  Okay.  Paragraph 21.
18              "When a physician at CARD determines a
19      patient has pleural thickening or pleural plaques
20      by interpretation of a computed tomographic
21      radiograph of the chest, CARD staff enter the
22      patient's name, social security number and date of
23      birth in the step 1 section of the environmental
24      health hazards checklist, check the pleural
25      thickening and pleural plaques box in the
```

Page 52

```
 1      impairment section of step 2 of the environmental
 2      health hazards checklist, enter the date the CARD
 3      physician made the interpretation in the date of
 4      diagnosis section of step 2, enter the dates the
 5      patient was present in Lincoln County, Montana in
 6      step 3, and the CARD physician prints and signs
 7      the physician's name and dates the environmental
 8      health hazards checklist."
 9              "The Social Security Administration's
10      designated deponent must testify whether this is
11      the SSA approved method of filling out the
12      environmental health hazard checklist."
13              Aside from the testimony that you have
14      already provided, anything else that you feel is
15      necessary to add in response to paragraph 21?
16   A  Yes.  Step 1 is completed by social security
17      again.  Anything within step 2 and step 3, the
18      physician should be following section 1881A of the
19      act.  We do not step into that realm of pleural
20      thickening or pleural plaques.  That's outside the
21      realm of our job.
22   Q  Whose job is that?
23   A  That is the physician.
24   Q  All right.  Not SSA's?
25   A  Correct.
```

Page 53

1  Q   Okay.

2  A   We are not qualified to make those determinations.

3  Q   All right.  And in fact, when it comes to any

4      information on section 2 or section 3 of the EHH

5      form in Exhibit 76, page 4, does SSA based on your

6      review of all the facts in this case wade into any

7      of these boxes to double-check, second-guess or

8      overread what the physicians have placed here from

9      the CARD clinic related to their patients?

10 A   No.

11 Q   Let's see.  I believe I was on paragraph 22.  I

12     will read it, and please tell me if I have read it

13     correctly.

14         "When a B reader qualified physician

15     determines a patient has pleural thickening or

16     pleural plaques by interpretation of plain chest

17     x-ray or a computed tomographic radiograph of the

18     chest, CARD staff enter the patient's name,

19     social security number and date of birth in the

20     step 1 section."

21         I am going to try to speed this up, because

22     I think the beginning of all of these is

23     essentially the same.

24 A   Okay.

25 Q   Okay.  At the bottom it says again, "The Social

Page 54

1      Security Administration's designated deponent must

2      testify whether this is the SSA approved method of

3      filling out the environmental health hazards

4      checklist."

5          Based on your view of paragraph 22 and in

6      light of the testimony you have provided already

7      today, is there any other response that you need

8      to give?

9  A   Again, step 1 is completed by social security.

10     Step 2 and step 3 should be followed by the

11     physician following section 1881A of the act.

12     Social security employees do not get involved with

13     step 2 and step 3.

14 Q   All right.  So looking at the EHH form itself

15     then, Exhibit 76, page 4, when it comes to making

16     any notes or any observations or any distinctions

17     in section 2 of the EHH form under the heading of

18     the column minimum medical evidence required, what

19     do SSA field staff do when looking at this form

20     based on the factual information you reviewed,

21     anything?

22 A   They just check to make sure that the individual

23     has a diagnosis that is listed within the EHH

24     checklist, that there is a date of diagnosis,

25     step 3 is completed, there is the printed name of

Page 55

1      the physician, the physician's signature and the

2      date.  Outside of that, that's outside of the

3      scope of our job.

4  Q   All right.  And I don't want to summarize

5      everything inaccurately, but I am going to attempt

6      to, and then tell me if I have done it unfairly.

7          It sounds to me like in terms of this EHH

8      form, what the SSA field techs are looking for is

9      whether there is a diagnosis of an

10     asbestos-related condition, is that fair?

11 A   Correct.

12 Q   Okay.  And if there is not an asbestos-related

13     condition or an asbestos-related disease, is it

14     also fair to say based on your review of the facts

15     that that patient isn't eligible for Medicare?

16 A   Correct.

17 Q   Okay.  But if the CARD physician has indicated in

18     section 2 of this form that there is a diagnosis

19     of an asbestos-related condition caused by

20     exposure to Libby asbestos, then the patient is

21     eligible for Medicare based on the information

22     you've reviewed, is that fair?

23 A   Correct.

24 Q   Okay.  What if the information that's included in

25     section 2 is false?

Page 56

1          For example, what if a patient's EHH form

2      was filled out completely perfectly and

3      completely, there was a first name, a middle

4      initial, a last name, a social security number and

5      a date of birth filled out by SSA, and then step 2

6      was also completed by the provider with

7      information indicating that a patient had an

8      asbestos-related disease diagnosis.

9          Are you with me so far?

10 A   Uh-huh.

11 Q   All right.  Let's also in this hypothetical look

12     at step 3, and is step 3 a section that is also

13     filled out by CARD?

14 A   Correct.

15 Q   Okay.  And then the bottom of section 3 below

16     whether the individual is present in Lincoln

17     County, Montana during the relevant time period,

18     there is the section for both the printed name of

19     the physician and the CARD physician's signature

20     and a date for that signature, right?

21 A   Uh-huh.

22 Q   Okay.  Is that a yes?

23 A   Yes.

24 Q   All right.  So in this hypothetical, all of the

25     information appears to indicate a diagnosis of an

1    asbestos-related condition with a date of
2    diagnosis, the presence in Lincoln County, Montana
3    section appears to have been met based on the
4    information that is there, and there's a doctor's
5    printed name from CARD, a physician's signature
6    and a date.
7        Are you with me?
8  A  Yes.
9  Q  Okay.  Let's say in this hypothetical the
10    impairment, the box that's checked next to the
11    diagnosed impairment is asbestosis.
12 A  Okay.
13 Q  Okay.  Let's also say that asbestosis has a
14    diagnosis code of 5010, is that right?
15 A  Uh-huh.
16 Q  Is that a yes?
17 A  Yes, that is correct.
18 Q  And that the date of diagnosis is filled out with
19    a handwritten or typed date section.
20 A  Uh-huh.
21 Q  In terms of that information, if SSA through any
22    means became aware that in fact there was not a
23    diagnosis of asbestos-related disease or that
24    there was not a date of diagnosis of
25    asbestos-related disease or that the impairment

1    that had been marked was in fact untrue or
2    incorrect, would that patient be Medicare eligible
3    based on all of the information, the facts and the
4    conversations that you had in preparation for your
5    deposition today?
6        MR. KAKUK:  Objection, scope.  Go ahead.
7  A  No.
8  BY MR. DUERK:
9  Q  Okay.
10 A  And I do want to expand on this a little bit.
11 Q  Sure.
12 A  I just recently received some e-mails from CARD
13    March 21st, 2023 where I believe it was --
14 Q  Wait.  I'm sorry.  When?
15 A  March 21st, 2023.
16 Q  So this would have been -- today's date is
17    May 16th, so you received these less than a month
18    ago?
19 A  That they had filled out two checklists for two
20    beneficiaries that they didn't feel were
21    diagnosed, and I instructed the Kalispell office
22    to follow the EM 10042REV and deny the claims.
23 Q  Wait.  I'm sorry.  So you learned from CARD --
24 A  Just recently in March.
25 Q  That two patients --

1  A  I didn't directly.  This e-mail was sent to
2    Terra Whiteman, the Kalispell manager.
3  Q  Okay.  And so the e-mail, I think it --
4  A  And this was our first time hearing of it, because
5    I have searched all the records all the way back
6    to 2010, so this is the first time ever seeing
7    anything like this come from CARD.
8  Q  All right.  There's a good starting place.  I'm
9    going to have some more questions about this
10    e-mail in a minute, but let's stick with the
11    hypothetical.
12 A  Okay.
13 Q  So it sounds like this hypothetical has happened.
14    You have learned information that an EHH form
15    completed by CARD was completed inaccurately in
16    some way, is that fair?
17 A  Uh-huh.
18 Q  Is that a yes?
19 A  That's a yes.
20 Q  Okay.  And once you learned that that EHH form was
21    filled out inaccurately, what did you do?
22        What did the Social Security Administration
23    do based on your review of the facts?
24 A  They contacted me, and I instructed them to deny
25    the claim.

1  Q  All right.  In those two cases did those
2    individuals have a diagnosis of an
3    asbestos-related disease?
4  A  I wouldn't be able -- they stated that they didn't
5    find that these were diagnosed with an
6    asbestos-related disease, but they had completed
7    the form.
8  Q  CARD said these cases --
9  A  Correct.
10 Q  And this happened just recently in March?
11 A  21st, 2023.
12 Q  And SSA's response was to deny the claim?
13 A  Absolutely.
14 Q  You seem confident about that.  Why was it
15    absolutely SSA's response to deny the claim?
16 A  Because you can't complete an EHH checklist and
17    state that somebody -- marking a person diagnosed
18    with one of these diseases, but stating that you
19    don't feel they are diagnosed with that disease.
20        As a qualified physician, you are signing
21    off stating that you feel that they have this
22    certain diagnosis, and you put the date of
23    diagnosis and you completed this form following
24    section 1881A of the act.
25 Q  And SSA is relying on CARD to be true and accurate

Page 61

1     in these EHH forms?

2  A  Correct.

3  Q  And so in this particular instance, somebody at

4     CARD indicated that the EHH form was for patients

5     that didn't have a diagnosis?

6  A  Correct.

7  Q  And SSA's concern or your concern was that the EHH

8     form that had been submitted was not accurate?

9  A  Correct.

10  Q  And so as a result what was the conclusion, what

11     happened?

12  A  We denied the claims.

13  Q  All right.  Is that action consistent with what

14     should occur with EHH Medicare claims that are

15     submitted when the information on them turns out

16     not to be true about a diagnosis?

17          MR. KAKUK:  Objection, scope.

18  A  Correct.

19  BY MR. DUERK:

20  Q  Okay.  And why do you say that?

21  A  Because that would be fraudulently filling out one

22     of these forms.  If you bring it to our attention

23     that you filled out a form like this, this EHH

24     checklist, and that you are marking that this

25     person is diagnosed with this impairment, with

Page 62

1     this date of diagnosis that you're signing off on

2     it and you're stating that you don't feel that

3     they're diagnosed with this condition, that to us

4     is fraud.

5  Q  In terms of this March 21st, 2023 e-mail, aside

6     from this e-mail, based on your review of the

7     facts, your interviews, your factual inquiry in

8     this case, have you seen any other correspondence

9     from CARD that alerted SSA that it was adopting

10     this same practice with EHH Medicare claim forms?

11  A  No.  This is the first e-mail that I have seen.

12     And as I mentioned, I went all the way back

13     looking through lots of documents and talking to

14     the Kalispell manager, talking to headquarter

15     components, looking through the Medicare lead's

16     previous information on EHH claims.

17  Q  And do you recall who at CARD sent this

18     March 21st, 2023 e-mail?

19  A  It was a technician under the director.

20  Q  A technician under the director?  And do you

21     recall from -- do you know who the director at

22     CARD was?  Were they listed on this e-mail?

23  A  No, they were not listed on that e-mail.

24  Q  Do you have a copy of this e-mail?

25  A  I'm sure I do.

Page 63

1  Q  I'd like to take a short break and obtain a copy

2     of that e-mail.

3  A  Okay.

4          THE VIDEOGRAPHER:  The time is 11:58 and

5     we are off the record.

6          (Break taken.)

7          THE VIDEOGRAPHER:  The time is 12:00.

8     We are back on the record.

9  BY MR. DUERK:

10  Q  All right.  Ms. Hillmann, I have a few more

11     questions for you about this e-mail from the

12     March 21st, 2023 timeframe.

13          In terms of any communication around this

14     issue, and by "issue" I mean CARD submitting EHH

15     records with information that was not true on it

16     related to a diagnosis of asbestos-related

17     disease, are there any communications about this

18     topic around this timeframe that you saw from the

19     CARD clinic in your search for information?

20  A  No.  The only -- this is the first piece of

21     communication from CARD that covered that piece of

22     material that you were just talking about.

23  Q  Okay.

24  A  Uh-huh.

25  Q  In terms of communication from CARD, is the e-mail

Page 64

1     from March 21st, 2023, did it include

2     communication directly from CARD?

3  A  Yes.

4  Q  Okay.  All right.  So here's the situation that

5     I'm in, and perhaps you can answer some of these

6     questions and help out.

7          I will represent to you that I have

8     requested any correspondence about any

9     communication related to a B read only program or

10     CARD patients who haven't been diagnosed with

11     asbestos-related disease, but submitted for

12     Medicare, and I have been asking for that kind of

13     communication for years from CARD or its

14     individual members or any other sources, and I

15     have not received anything along those lines, and

16     I understand that we are talking about March 21st,

17     less than a month ago here.

18          In terms of this topic, was it your intent

19     to try to look for any type of correspondence or

20     communication about this topic that came to SSA

21     from the CARD clinic?

22  A  I looked for everything within the subpoena

23     document.

24  Q  All right.

25  A  Yeah.

Page 65

1  Q   And this one e-mail from March 21st, 2023 was the
2      only document you received?
3  A   Correct.  And this solely just covered the
4      diagnosis.
5  Q   All right.  Were there any other pieces of
6      correspondence from the CARD clinic that have been
7      forwarded to the SSA recently that you reviewed in
8      preparation for your deposition today?
9  A   I believe this correspondence was the only
10     continuing correspondence that I had with
11     Kalispell Montana's district manager.
12 Q   Okay.
13 A   To my recollection.
14 Q   Okay.
15         MR. KAKUK:  Can we go off the record for
16     a second?
17         MR. DUERK:  Yes.
18         THE VIDEOGRAPHER:  The time is 12:03.
19     We are off the record.
20         (Break taken.)
21         THE VIDEOGRAPHER:  The time is 1:25.  We
22     are back on the record.
23 BY MR. DUERK:
24 Q   Ms. Hillmann, we have come back from a little bit
25     of a break, and during that break I will represent

Page 66

1      that we now have in front of us a handful of
2      e-mails that I will represent to you I have not
3      seen before today.
4         Do you have two e-mail strings in front of
5      you with the lead pages sent Tuesday, April 11th,
6      2023 and Friday, April 28th, 2023?  I tell you
7      what, why don't I give you the stapled copies.
8  A   Yeah.
9  Q   All right.
10 A   Yes.
11 Q   And what are these?
12 A   These are e-mail correspondence between
13     Stephanie Shaw and Terra Whiteman.  Terra Whiteman
14     is the district manager of Kalispell, and then
15     Stephanie Shaw appears to be from CARD.
16 Q   Okay.  And I will represent to you that the way
17     that we came into possession of these e-mails is
18     that after you provided some testimony about
19     e-mails from March 21st, 2023 timeframe, CARD's
20     attorney produced these e-mails for us.
21         In terms of these e-mails, I am going to
22     start with the April 11th e-mail which I would ask
23     the court reporter to mark as Exhibit 138.
24         (WHEREUPON, Deposition Exhibit 138
25         marked for identification by the reporter.)

Page 67

1  BY MR. DUERK:
2  Q   All right.  Let's begin with Exhibit 138, and I
3      apologize if I'm a little slow with this.  I am
4      just getting used to this e-mail myself.  It
5      appears that the e-mail train begins on page 2 of
6      Exhibit 138.
7         Do you see that in front of you?
8  A   Yes.
9  Q   If you could describe generally what this e-mail
10     string is about to the best of your knowledge.
11 A   To the best of my knowledge, what it's conveying
12     is that Stephanie Shaw had some questions for our
13     district manager, Terra Whiteman.  Stephanie is
14     from CARD, and Terra was trying to set up a
15     possible time to speak.
16 Q   And what was the nature of the topic that CARD
17     wanted to discuss with Terra Whiteman from SSA?
18 A   It sounded like they wanted to discuss the EHH
19     checklist in general and, you know, one of Terra's
20     comments was that she relayed the information that
21     Stephanie had conveyed to her to the regional
22     office and "because you are telling me that CARD
23     does not consider the individual diagnosed based
24     on an interpretation by a B reader, we are unable
25     to approve an EHH Medicare claim involving the

Page 68

1      B reader at this time.  Someone from our agency or
2      Medicare will be reaching out directly in the next
3      couple of weeks."
4  Q   So Ms. Hillmann, does this e-mail address the
5      topic that we were discussing prior to the break
6      about a revelation that certain EHH forms
7      submitted to SSA had untrue or incorrect
8      information on them?
9  A   Yes.
10 Q   Okay.  And according to this general timeframe,
11     April 6th, 2023, based on your review of written
12     materials and interviews that you took, based on
13     your factual inquiry, is this roughly the very
14     first time that SSA is learning that some of the
15     EHH forms submitted to its field office have
16     untrue information on them?
17 A   Correct.
18 Q   Okay.  And what was SSA's response, if you can
19     recall?
20 A   Well, when Terra actually reached out to me, she
21     explained this to me in a way that they were
22     completing the EHH checklist with a diagnosis as
23     defined under section 1881A, but they truly didn't
24     feel that that individual was diagnosed, that
25     physician that signed the form.  And I explained

1     to her if they're stating that about a specific
2     beneficiary, then we have to deny the claim based
3     on policy.
4  Q   Okay.  And this is information related to a
5     conversation between you and Terra or you and
6     CARD?  I'm sorry, if you could clarify.
7  A   So Stephanie Shaw who reached out to Terra and
8     they eventually talked by phone had this
9     conversation, so Stephanie Shaw is from CARD, and
10    she was explaining this to Terra who is our
11    district manager in Kalispell, Montana.
12         And then Terra told her that she needed to
13    talk to the regional office Medicare expert, which
14    I am, and then I explained how the policy reads
15    and how we would have to deny the claims, and that
16    was our official response.
17  Q   Had this type of issue from CARD ever been
18    elevated to you before?
19  A   No.  This is the first time I'm seeing anything
20    like this.
21  Q   In 2023?
22  A   Exactly.
23  Q   Did it cause any surprise?
24  A   It did, but, you know, by that time I think we
25    were aware of the subpoena, so it was just kind

1     of, you know, I just assumed maybe this was tied
2     up with whatever was going on with the subpoena.
3  Q   Okay.  And in terms of the subpoena, are we
4     talking about the subpoena for your deposition
5     testimony?
6  A   Absolutely.
7  Q   Today?
8  A   Yes.
9  Q   Okay.  So prior to this timeframe, and I am
10    including today in this timeframe because,
11    frankly, we are at May 16th and these e-mails are
12    dated in April, this is the first you've heard
13    about EHH forms that have incorrect information?
14  A   Absolutely.
15  Q   Okay.
16  A   And in my position I have been doing this since
17    2018, and prior to that I looked through all of
18    Kathy's stuff, and I haven't seen any kind of
19    correspondence like this.
20  Q   So no correspondence that you're aware of --
21  A   Correct.
22  Q   -- through your inquiry had elevated this issue to
23    your awareness related to EHH forms submitted to
24    the Social Security Administration field office
25    with untrue information on it?

1  A   Correct.
2  Q   In terms of you spoke a moment ago about I think a
3    conversation between or among CARD staff and SSA
4    in which there was some claim that the CARD
5    employees felt that a patient wasn't diagnosed.
6         Did I hear that correctly?
7  A   Correct.
8  Q   Okay.  And if you could share with me any factual
9    information you're aware of on that basis, what
10    was CARD essentially sharing with SSA about this
11    category of patients?
12  A   Well, as I was previously mentioning, they just
13    basically said that they completed the checklist,
14    but they didn't feel that person was diagnosed
15    with that actual EHH diagnosis, the physician that
16    signed the form, and with that statement I told
17    and I instructed the Kalispell manager that we
18    cannot approve that claim.
19  Q   Okay.  I want to be very clear about what specific
20    information may have been shared with SSA during
21    that timeframe outside of a feeling that perhaps
22    this patient didn't have a diagnosis according to
23    CARD employees.  Okay?
24  A   Uh-huh.
25  Q   Ms. Hillmann, at any time did CARD disclose to you

1     or anyone else at SSA as far as you were aware
2     that CARD was knowingly submitting EHH forms in
3     support of Medicare beneficiary status for
4     patients who did not have a diagnosis of
5     asbestos-related disease prior to April of 2023?
6  A   No.
7  Q   Did CARD ever submit any correspondence authored
8    by CARD to the effect that CARD was knowingly
9    submitting patients for Medicare benefits who CARD
10    knew did not have a diagnosis of asbestos-related
11    disease?
12  A   Prior to that date?
13  Q   Prior to this timeframe in 2023.
14  A   No.
15  Q   For example, I would like you to turn to
16    Exhibit 7, I'm sorry, tab 7 in your book.
17  A   Okay.
18  Q   Do you see Exhibit 123 in front of you?
19  A   Yes.
20  Q   Now, what is the date at the top of this page?
21  A   May 18, 2015.
22  Q   Okay.  And do you see CARD's letterhead?
23  A   I do.
24  Q   Now, I would like to ask some questions about
25    this.  I believe this will already have been

Page 73

1   admitted into evidence.  Ms. Hillmann, if you
2   would read the first paragraph here.
3   A   Okay.  "You participated in an asbestos health
4       screening on 12-11-2014, and at that time you were
5       not diagnosed with an asbestos-related disease
6       (ARD).  You received a letter at the conclusion of
7       your appointment that informed you that your chest
8       x-ray and CT would be sent out for a second read
9       by other doctors specially trained in reading
10      radiographic images for dust diseases like
11      asbestos."
12  Q   Okay.  If you would continue reading the second
13      paragraph.
14  A   Okay.  "One of these doctors did identify a small
15      abnormality on the CT image.  It is nothing that
16      has significant health implications, nor is it
17      considered a diagnosis of an asbestos-related
18      disease."
19  Q   All right.  If you'd read the next paragraph.
20  A   "A diagnosis of asbestos-related disease is based
21      on exposure histories, time since exposure,
22      medical provider assessment and radiographic
23      images.  The reader who identified the abnormality
24      did not have the rest of this information."
25  Q   The next paragraph, please.

Page 74

1   A   "We are notifying you of the finding because any
2       type of abnormality identified by the outside
3       reader, even if it not a diagnosis of an
4       asbestos-related disease, qualifies you for
5       certain medical benefits."
6           "You are now eligible for Medicare benefits
7       regardless of your age based on these findings.
8       If you choose to enroll in Medicare, you would
9       also be eligible for the Medicare Pilot Program
10      for ARD that covers medically necessary services
11      not covered by usual medical insurance programs.
12      An example would be mileage, fitness club
13      memberships, assistance with daily living.
14      Information about these programs is enclosed."
15  Q   The next paragraph.
16  A   "In addition, you can continue to be eligible for
17      free ongoing screenings for asbestos-related
18      disease through the CARD screening program."
19  Q   Ms. Hillmann, have you ever seen a letter like
20      this?
21  A   No.
22  Q   From CARD in any respect?
23  A   No.
24  Q   Has CARD ever sent to you any correspondence
25      remotely similar to this about any of their

Page 75

1       patients?
2   A   No.
3   Q   What does this letter indicate to you about the
4       individual patient here in terms of whether or not
5       they have a diagnosis of asbestos-related disease?
6           MR. KAKUK:  Objection, scope.
7           MR. BECHTOLD:  Foundation.
8   BY MR. DUERK:
9   Q   Let me put it this way.
10          If you were to see correspondence from CARD
11      indicating that they were telling patients that
12      that patient was eligible for social security EHH
13      Medicare benefits even though that patient did not
14      have a diagnosis of asbestos-related disease,
15      would you find that troublesome?
16  A   Yes.
17  Q   Why?
18  A   Because that would be a denial.  We shouldn't be
19      putting individuals on EHH Medicare that don't
20      have the proper diagnosis under section 1881A of
21      the act.
22  Q   Based on all of the information that you uncovered
23      during the course of your inquiry, did you ever
24      see any correspondence from CARD or any e-mails,
25      any other documentation prior to this timeframe

Page 76

1       disclosing that CARD was telling patients that
2       they were eligible for Medicare without a
3       diagnosis of asbestos-related disease?
4   A   No.
5   Q   Would you or anyone else at the
6       Social Security Administration based on your
7       factual inquiry have ever written a letter like
8       this to CARD teaching them, training them,
9       instructing them that this practice of submitting
10      patients for Medicare benefits without a diagnosis
11      of ARD was appropriate, proper or authorized by
12      the Social Security Administration?
13  A   No.
14  Q   Why not?
15  A   Because that's outside of the scope of our job.
16  Q   If we could turn to what I would like to mark as
17      Exhibit 139, the e-mail dated at the top Friday,
18      April 28th, 2023, that would be helpful.
19          (WHEREUPON, Deposition Exhibit 139
20      marked for identification by the reporter.)
21  BY MR. DUERK:
22  Q   Ms. Hillmann, is Exhibit 139 an e-mail train that
23      you have seen before today?
24  A   Yes.
25  Q   And is Exhibit 139 and the e-mail train here from

Page 77

1  approximately the end of April 2023 and earlier
2  part of the same conversation that is related to
3  this March 21st, 2023 timeframe?
4  A  Correct.
5  Q  Okay. And that timeframe, I will just represent
6  to you, is it fair to say this timeframe is the
7  first information you had heard of from CARD that
8  they were submitting people to Medicare or SSA for
9  Medicare benefits under the EHH program without a
10  diagnosis?
11  A  Yes.
12  Q  I would like to focus on the e-mail in the
13  beginning of this train, so page 3 of Exhibit 139,
14  an e-mail from Tracy McNew dated April 12th, 2023.
15  First off, who is Tracy McNew?
16  A  She is the executive director of the CARD clinic.
17  Q  And who is Terra Whiteman again?
18  A  Terra Whiteman is the Kalispell district manager.
19  Q  Okay. And what is your understanding of how this
20  e-mail originated, if you know?
21  A  I believe this particular e-mail actually
22  originated from this Exhibit 138.
23  Q  Okay. So the two Exhibits 138 and 139 are tied
24  together, is that fair?
25  A  Yeah.

Page 78

1  Q  Okay. If you would please read this e-mail from
2  Tracy McNew to Terra Whiteman on April 12th that
3  would be helpful.
4  A  Okay. "Hi Terra. My name is Tracy McNew. I am
5  the executive director of the CARD clinic. Thanks
6  for your e-mail to Stephanie Shaw about EHH
7  checklists indicating that SSA will no longer be
8  approving Medicare based on positive reads by
9  B readers."
10  Q  If I could stop you right there, first of all, is
11  it true that SSA would no longer be approving
12  Medicare based on positive reads by B readers,
13  that is to say are you aware that prior to this
14  time or are you aware of whether or not SSA ever
15  had a practice of approving Medicare benefits
16  based only on positive B reads?
17  MR. KAKUK: Objection, scope. Go ahead.
18  A  Again, that's outside of the scope of the realm of
19  my job. Honestly, I think this e-mail transpired
20  from a misinterpretation of what Terra was trying
21  to convey to Tracy's employee at CARD.
22  Q  If you could explain, that would be helpful.
23  A  Yeah. So Terra came back, and I believe it was in
24  this e-mail, and she just explained to them that
25  she conferred with the regional office, and

Page 79

1  because you're telling me that CARD does not
2  consider the individual diagnosed based on
3  interpretation by a B reader, we are unable to
4  approve EHH Medicare claims involving a B reader
5  at this time, but this was a phone conversation
6  where they basically laid out that the physician
7  was completing the EHH checklist, but did not feel
8  that that person was diagnosed, and I think there
9  was some misinterpretation here from the
10  phone call with Terra to Stephanie to what was
11  relayed to Tracy.
12  Q  All right. So in any event, in terms of this
13  e-mail on Exhibit 139, page 3, is this the first
14  that SSA is learning based on your factual
15  investigation of the matter that CARD is
16  apparently submitting EHH checklists based on
17  positive B reads alone?
18  A  This is the first time that I'm hearing about it
19  from the original time that Terra contacted me.
20  Q  And the original time that Terra contacted you
21  again was April of 2023?
22  A  Correct.
23  Q  And prior to that time were you aware of any
24  correspondence, any communication of any kind from
25  CARD in any way in which CARD had disclosed to the

Page 80

1  SSA that they were engaging in this practice of
2  submitting CARD patients for Medicare benefits on
3  a B read alone prior to this period?
4  A  No.
5  Q  Okay. It sounds to me from the second sentence of
6  this e-mail, April 12th, 2023, Exhibit 139, that
7  Tracy McNew is saying that SSA will no longer be
8  approving Medicare based on positive reads by
9  B reads.
10  Do you see that sentence?
11  A  I do see that sentence, yes.
12  Q  Okay. And just so that we are clear, have you
13  seen any materials anywhere ever from CARD that
14  indicate that this was an approved practice by the
15  Social Security Administration?
16  A  No.
17  Q  And you seem certain of that. Why?
18  A  Just because I -- I mean, we don't, again, we
19  don't go outside the realm of that EHH checklist.
20  We don't get into the B reader part of this or
21  anything that has to do with the medical
22  interpretations or anything to do with that. We
23  are not medical experts.
24  So the conversation between Terra and
25  Stephanie seems to be misconstrued here within

1  this e-mail.  Terra was trying to convey that this
2  employee said that this physician completed the
3  EHH checklist even though they did not agree with
4  the diagnosis, and that to us is a denial for EHH
5  Medicare.
6  Q  And is that because that individual patient does
7     not have a diagnosis of asbestos-related disease?
8  A  Correct.
9  Q  Okay.  Further down in this e-mail of April 12th,
10    2023 there is another sentence that I would just
11    like to read to you, and please tell me if I have
12    read it correctly.  Okay?
13 A  Uh-huh.
14 Q  That sentence begins about midway down this
15    e-mail.
16       It says, "Just to be clear, SSA has now
17    changed its position regarding Medicare
18    eligibility based on positive B reads, and CARD
19    should no longer fill out EHH forms for patients
20    with no CARD diagnosis even if they have a
21    positive outside B read or CT read."
22       Is that correct?  Did I read that
23    accurately?
24 A  You did.
25 Q  Okay.  So now I just want to be clear.

1  Q  Was there any change in SSA's position
2     regarding Medicare eligibility based on positive B
3     reads that you could find in any of your factual
4     inquiry?
5        MR. KAKUK:  Objection, scope.  Go for
6        it.
7  A  No, and I think Terra cleared that up in her
8     e-mail that's dated April 26th, 2023.
9  Q  Let's turn to that e-mail.
10 A  Okay.
11 Q  Are you looking at page 1 of Exhibit 139?
12 A  I believe it's page 2, correct?  Yeah, page 2.
13 Q  Page 2?  Okay.  I am looking at an e-mail sent
14    Wednesday, April 26th, 2023 at 2:47 PM.
15       Am I looking at the right one?
16 A  Correct.
17 Q  Okay.  If you would please read it.
18 A  "Good afternoon, Tracy.  I wanted to get you an
19    interim answer to this e-mail.  I think there may
20    be confusion.  Stephanie reached out to SSA and
21    made us aware that CARD does not consider the
22    patients as diagnosed despite signing off on the
23    checklist when a B reader is involved.  SSA has
24    not changed any of its rules.  I am forwarding
25    your information to our center for program support

1  so they can address any of your concerns.  I will
2  have them reach out to you directly.  Thank you."
3  Q  So is this the e-mail that clarifies that there
4     has been no change in SSA policy?
5  A  Yes.
6  Q  Okay.  When were you asked to look at these
7     e-mails?
8  A  I believe sometime in April.  I think that was
9     whenever Terra connected with Stephanie and
10    Stephanie had that question.
11 Q  And at any time prior to you looking at these
12    e-mails had anyone from CARD to the best of your
13    knowledge approached anyone at the
14    Social Security Administration outside of what we
15    are seeing here to ask questions about a practice
16    of submitting B read only patients for Medicare
17    benefits to SSA?
18 A  I mean, I can't really speak on that.  I know
19    there was continuing correspondence with Terra and
20    then I believe the executive director and
21    Stephanie, but I don't know if it was directly
22    related to that.
23 Q  At any point, and I think we have covered this,
24    but at any point to the best of your knowledge
25    according to your factual inquiry did the

1  Social Security Administration ever train or teach
2  or authorize this practice with CARD from 2010 at
3  any time?
4  A  No.
5  Q  The way that we got into this line of questioning
6     initially during your deposition today, I want to
7     try to return to that point.  If I remember
8     correctly, we were walking through the different
9     paragraphs that you were asked to respond to in
10    the subpoena.
11       Do you recall that part of your testimony?
12 A  Yes.
13 Q  Okay.  I would like to return to that part of the
14    inquiry, but before we leave off here, when this
15    topic first came up, you used the word "fraud."
16       Do you recall that?
17 A  Yes.
18 Q  What was your meaning?
19       What were you describing when you used that
20    word?
21 A  Fraud means you are completing a form like to me
22    it would be illegally, and you're signing off on a
23    diagnosis that you don't believe this person is
24    diagnosed so they can get onto Medicare benefits,
25    so that to me is a clear indication of fraud.

1  Q   And when you reviewed this e-mail train in
2      Exhibits 138 and 139 about CARD's practices of
3      submitting patients without a diagnosis for
4      Medicare benefits, did you have concerns that this
5      was fraudulent?
6              MR. KAKUK:  Objection, scope.
7  A   I did have concerns, but now that it was on our
8      radar, we did make it clear to them that if they
9      were completing any checklists that they didn't
10     agree that person had a diagnosis that we would be
11     denying them and that they need to make us aware
12     of that.
13 Q   And when you asked for CARD to make you aware of
14     any of those cases, did CARD disclose to you how
15     many cases they have done this in, for how many
16     individual CARD patients?
17 A   I didn't directly talk to CARD, but Terra relayed
18     that information, and to my knowledge there was no
19     such reply.
20 Q   Okay.  So to the best of your knowledge based on
21     your factual inquiry as you sit here today as far
22     as you are aware there are two patients whose EHH
23     forms were submitted when CARD knew that patient
24     did not have an ARD diagnosis?
25 A   Correct.

1  Q   Okay.  And you are aware of no more than just
2      those two patients from the spring of 2023?
3  A   Correct.
4  Q   At any time has CARD disclosed to you how many
5      patients actually fell into this category or fall
6      into this category?
7  A   I've had no direct correspondence with CARD and I
8      don't believe that to my knowledge, and I have
9      asked Terra, that they have reported anybody
10     outside of those two beneficiaries.
11 Q   Those two beneficiaries from the spring of 2023?
12 A   Correct.
13 Q   Okay.  Back to the subpoena, again, I am looking
14     at what has been marked as Exhibit 135.  I think
15     we made it to paragraph 22.
16 A   Okay.
17 Q   And just so that I'm clear, once you've had a
18     chance to review paragraph 22, is there anything
19     else that comes to mind that you have to offer in
20     response to paragraph 22 that we haven't talked
21     about today?
22 A   So on paragraph 22, again, step 1 is completed by
23     social security, and then CARD is to complete
24     step 2 and step 3 following section 1881A of the
25     act.  As far as the specifics, social security

1      employees or technicians do not get into the
2      specifics of the medical condition listed on the
3      EHH checklist.
4  Q   In terms of paragraph 22, when a B reader
5      qualified physician determines a patient has
6      pleural thickening or pleural plaques by
7      interpretation of plain chest x-ray or computed
8      tomographic radiograph of the chest, SSA staff
9      doesn't wade into those facts to determine whether
10     or not what SSA is being told by CARD qualifies as
11     a diagnosis or not.
12             That's left up to the CARD physician to
13     state on the EHH form, is that fair?
14 A   Correct.
15 Q   Okay.  Turning to paragraph 25, I will read it and
16     please tell me if I have read it correctly.
17             "The Social Security Administration's
18     designated deponent must testify why the
19     Social Security Administration gave an award to
20     CARD for CARD's exemplary cooperation with the
21     Social Security Administration in implementing the
22     amendments enacted by the Affordable Care Act."
23             I think we have heard some of your
24     testimony here.  Do you have anything more to
25     offer on that topic?

1  A   I do not.
2  Q   Okay.  So to the best of your knowledge based on
3      your factual inquiry, did you see evidence that
4      the Social Security Administration gave an award
5      to CARD for CARD's exemplary cooperation with the
6      SSA in implementing the amendments enacted by the
7      Affordable Care Act?
8  A   I did not, but as I previously mentioned, there
9      could have been a regional award.  Our Regional
10     Commissioner Mary Lisa Lewandowski did mention
11     that there was a potential that a regional
12     commissioner award was given out.
13 Q   Okay.
14 A   But she had no record of it.
15 Q   All right.  And you communicated with
16     Mary Lewandowski about that?
17 A   Correct.
18 Q   Okay.  Paragraph 26.
19             "The Social Security Administration's
20     designated deponent must testify why the
21     Social Security Administration has designated to
22     CARD the task of filling out environmental health
23     hazards checklists."
24             What response do you have?
25 A   Well, I think that, you know, again, this aligns

1      with section 1881A of the act.  The physicians are
2      completing these checklists and, you know,
3      following the guidelines of that act in order for
4      these beneficiaries to be put on EHH Medicare.  If
5      they're not diagnosed with one of those
6      conditions, then they will not be put on EHH
7      Medicare.
8 Q   And in terms of a physician's determination,
9      again, with the diagnosis, it's the physician at
10     CARD who fills out the EHH form, is that right?
11 A   Correct.
12 Q   And is SSA relying on the provider or the CARD
13     physician to communicate whether there is a
14     diagnosis of asbestos-related disease or not to
15     SSA?
16 A   Correct.
17          MR. KAKUK:  Objection, scope.
18 A   Sorry.  Correct.
19 Q   Anything else to offer on paragraph 26 aside from
20     what's already been covered?
21 A   No.
22 Q   Okay.  Paragraph 27.
23       "Because CARD physicians actually see
24     patients in a clinical setting, CARD physicians
25     make clinical diagnoses of the patients prior to

1      filling out environmental health hazards
2      checklists for them.  Meanwhile, B readers who
3      interpret chest x-rays and outside readers who
4      interpret CT scans do not make clinical diagnoses
5      because they never see the patients in a clinical
6      setting, but rather make interpretations of x-rays
7      and CT scans."
8       First, did I read that correctly?
9 A   Yes.
10 Q   Okay.  In terms of your factual review of all the
11     information and material that was available to you
12     from SSA, do you have any comment on the first
13     part of paragraph 27 or is this something that
14     only a physician would know?
15 A   I believe only a physician would know.
16 Q   All right.  The second part of paragraph 27.
17       "Do the positive interpretations of these
18     non-CARD physicians qualify as diagnoses for
19     purposes of the environmental health hazards
20     checklists even though they are not clinical
21     diagnosis."
22       The same questions.  Is this information
23     information that you are able to obtain through
24     your factual review of the file, interviews with
25     SSA employees or any other sources?

1 A   Again, this would be outside the expertise of our
2     position as technicians and as a Medicare lead.
3 Q   All right.  In your mind based on your review of
4     the facts is the answer to this question better
5     left to the CARD clinicians?
6 A   Correct.
7 Q   Okay.  Paragraph 28.
8       "Many patients whom CARD physicians have
9     not clinically diagnosed with asbestos-related
10    disease are found to have positive interpretations
11    of chest x-rays for asbestosis or pleural plaques,
12    pleural thickening by B reader qualified
13    physicians or positive interpretation of CT scans
14    for asbestosis or pleural plaques or pleural
15    thickening by other qualified physicians."
16       "Based on these outside interpretations,
17    CARD fills out environmental health hazard
18    checklists for these patients, a CARD physician
19    signs the checklist, and CARD submits the
20    checklist to SSA."
21       Did I read that correctly?
22 A   Yes.
23 Q   The question, is this the proper course of action
24    for CARD for these patients, did I read that
25    correctly?

1 A   You did.
2 Q   In terms of the first part of response for
3     paragraph 28, is information about CARD physicians
4     clinically diagnosing patients compared to
5     B readers interpreting CTs and x-rays, is that
6     anything that is within your purview as an SSA
7     employee?
8 A   No.
9 Q   Do you have any response to paragraph 28 other
10    than what you just said or what we've been
11    discussing today?
12 A   No.
13 Q   Okay.  Paragraph 29.
14       "Does the EHH checklist form referenced in
15    SSA POMS section HI 00803.001 and .050 indicate
16    that step 2 of the form is to be completed by a
17    healthcare provider who will identify the
18    asbestos-related conditions and its date of
19    diagnosis."
20       Other than shortening those policy
21    sections, did I read this correctly?
22 A   Yes.
23 Q   Have you addressed this topic already in your
24    testimony?
25 A   I believe so.

Page 93

1  Q   Is there anything else that needs to be covered
2      here in your view?
3  A   No.
4  Q   Turning to paragraph 36 of the subpoena.
5          "Has anyone at CARD informed the SSA field
6      office in Kalispell that CARD patients do not need
7      to have a diagnosis of asbestos-related disease in
8      order to qualify for federal benefits."
9          Did I read that correctly?
10 A   Yes.
11 Q   Aside from these e-mails from the timeframe of
12     March and April of 2023 which we have covered, has
13     anyone at CARD informed the SSA field office in
14     Kalispell that CARD patients do not need to have a
15     diagnosis of asbestos-related disease in order to
16     qualify for federal benefits?
17 A   No.
18 Q   Anything else on that topic?
19 A   No.
20 Q   Response 37. "Has any employee at the SSA field
21     office in Kalispell instructed CARD that patients
22     do not need to have a diagnosis of
23     asbestos-related disease in order to qualify for
24     federal benefits."
25         Did I read that correctly?

Page 94

1  A   You did.
2  Q   And what is the answer?
3  A   With my correspondence with manager
4      Terra Whiteman, we have never instructed CARD on
5      how to complete an EHH checklist or go over the
6      medical factors that are involved.  It's outside
7      of our purview.
8  Q   All right.  And based on what you've learned from
9      Terra Whiteman about her response to this B read
10     only program, have you ever seen anything from
11     Terra Whiteman that would indicate to you that she
12     would have instructed CARD that patients do not
13     need to have a diagnosis of asbestos-related
14     disease in order to qualify for federal benefits?
15 A   No.
16 Q   And why not?
17         MR. KAKUK:  Objection, scope.
18 A   There is no record of that, and that's not within
19     policy.  There would be no reason for her to
20     instruct her technicians on what a qualified
21     physician does by following section 1881A of the
22     act as it's outside the purview of our positions.
23 Q   All right.  Paragraph 28, and I will just ask the
24     question.  Has any employee at the SSA field
25     office in Kalispell instructed anyone that CARD

Page 95

1      patients qualify for Medicare benefits on a B read
2      chest x-ray interpretation of a lung abnormality
3      unrelated to asbestos exposure and without a
4      diagnosis of asbestos-related disease?
5  A   No.
6  Q   Paragraph 39.  Has anyone at CARD informed the SSA
7      that it has submitted in excess of 100 EHH forms
8      signed by Dr. Black to the
9      Social Security Administration field office in
10     Kalispell on behalf of CARD patients when CARD had
11     actual knowledge that those patients had not been
12     diagnosed with asbestos-related disease?
13 A   This my first time seeing this, I think, besides
14     reading the subpoena.  Hold on.  To my knowledge,
15     no.
16 Q   Earlier I asked about whether or not CARD had
17     disclosed certain facts to the
18     Social Security Administration about the B read
19     only program or about the topic of submitting
20     undiagnosed patients to the SSA field office for
21     Medicare benefits without asbestos-related disease
22     diagnoses.
23         Do you recall that line of questions?
24 A   Yes.
25         (WHEREUPON, Deposition Exhibit 137

Page 96

1          marked for identification by the reporter.)
2  BY MR. DUERK:
3  Q   Okay.  I would like to show you now what I am
4      marking as Exhibit 137, tab 8 in your book.
5          Do you see Exhibit 137 in front of you?
6  A   Yes.
7  Q   I will represent to you that this document,
8      document 110, has been filed in federal court in
9      front of the trial judge in this matter.
10 A   Okay.
11 Q   I will also represent to you that there are
12     several statements of fact here that are
13     undisputed by the CARD clinic.
14 A   Okay.
15 Q   I would like to read these to you, and my question
16     is this.
17         During your factual investigation and
18     inquiry did you see any documents or obtain any
19     statements from any witnesses or learn any
20     information that indicated that CARD had submitted
21     these statements to the SSA at any time from 2010
22     until the spring of 2023?
23 A   No.
24 Q   Okay.  So what I want to do is go through them
25     statement by statement.

Page 97

1  A    Okay.
2  Q    So the first one, I will read it, and please tell
3       me if I have read it correctly.
4            "CARD has submitted EHH forms to the
5       Social Security Administration when CARD providers
6       were aware that the individual patient did not
7       have a clinical diagnosis of asbestos-related
8       disease.  Undisputed."
9            Ms. Hillmann, to the best of your knowledge
10      based on your factual inquiry, did you see any
11      evidence that CARD prior to March and April of
12      2023 had ever submitted any kind of statement like
13      this to the social security administration?
14 A    No.
15 Q    The next statement.  "Dr. Black, Tanis Hernandez
16      and Tracy McNew knew about CARD's practice of
17      submitting patient EHH forms for Medicare benefits
18      to social security for patients who did not have a
19      diagnosis of asbestos-related disease.  Undisputed
20      that this is Ms. Hernandez's testimony."
21           Prior to the spring of 2023 or at any time,
22      frankly, based on your factual inquiry did you
23      come across information that CARD had submitted a
24      statement like this for SSA to consider?
25 A    Prior to the spring of 2023, no.

Page 98

1  Q    The next statement.
2            "CARD continues its practice of submitting
3       patients EHH forms to Social Security
4       Administration who do not have a diagnosis of
5       asbestos-related disease.  Undisputed."
6            Prior to the spring of 2023 based on your
7       factual inquiry did you ever see that CARD
8       submitted this statement to the SSA?
9  A    No.
10 Q    The next statement.
11           "CARD has submitted patients without a
12      diagnosis of asbestos-related disease to the
13      Social Security Administration for Medicare
14      benefits since at least 2013 and presumably since
15      the Affordable Care Act was passed in 2010.
16      Undisputed."
17           The same question.  Ms. Hillmann, at any
18      time prior to the spring of 2023 did you see that
19      CARD had submitted any statements like this to the
20      Social Security Administration for any purpose,
21      for guidance, for response, for training, for any
22      reason?
23 A    No.
24 Q    The next statement.
25           "CARD submitted an EHH form on multiple

Page 99

1       patients' cases based on a B read alone when
2       CARD's current medical director knew those
3       patients did not have an asbestos-related disease
4       diagnosis."  Response, undisputed.
5            Did I read that correctly?
6  A    Yeah.
7  Q    The same question, Ms. Hillmann.
8            At any point to your knowledge did CARD
9       submit this statement to the Social Security
10      Administration?
11 A    No.
12 Q    The next statement.
13           "CARD's medical director testified multiple
14      patients' EHH forms were submitted to the Social
15      Security Administration for Medicare benefits even
16      though they did not have a CARD diagnosis of
17      asbestos-related disease."  Response, undisputed.
18           Ms. Hillmann, the same question.
19           At any time prior to the spring of 2023 did
20      you come across any information indicating that
21      CARD had come forward with this statement to the
22      Social Security Administration?
23 A    No.
24 Q    The next statement.
25           "CARD knowingly submitted EHH forms to the

Page 100

1       Social Security Administration in support of
2       Medicare benefits for patients who had no clinical
3       diagnosis of asbestos-related disease."
4       Undisputed."
5            Did I read that correctly with the changes
6       indicated here?
7  A    Yes.
8  Q    Prior to the spring of 2023, did CARD ever come
9       forward to the Social Security Administration
10      telling the Social Security Administration that
11      they planned to do something like this?
12 A    No.
13 Q    "CARD has been signing EHH forms for patients
14      without a clinical diagnosis since the federal
15      grant started."
16           Did I read that correctly?
17 A    Yes.
18 Q    The response, undisputed.
19           Did I read that correctly?
20 A    Yeah.
21 Q    During your factual investigation into this matter
22      did you come across any evidence that CARD had
23      ever shared anything remotely like any of these
24      statements, including the one I just read, to the
25      Social Security Administration?

Page 101

```
1   A    Prior to April of 2023, no.
2   Q    I'd like to take a short break.
3             THE VIDEOGRAPHER:  The time is 2:13.  We
4        are off the record.
5             (Break taken.)
6             THE VIDEOGRAPHER:  The time is 2:34.  We
7        are back on the record.
8   BY MR. DUERK:
9   Q    All right.  After a short break, I am looking at
10       the subpoena for trial testimony and all of the
11       topics and paragraphs that we have attempted to
12       cover today from paragraphs 17 to 22, paragraphs
13       25 to 29 and paragraphs 36 to 39.
14            Ms. Hillmann, have we now covered your
15       responses to each of the paragraphs as set forth
16       in the subpoena to the SSA?
17  A    Yes.
18  Q    Okay.  I've got a few clarifications, but in terms
19       of any substantive response in terms of the topics
20       covered in the subpoena to the SSA, have we now
21       essentially covered any response that you might
22       have based on your factual review of the evidence
23       and the underlying records that you examined in
24       your inquiry?
25  A    Yes.
```

Page 102

```
1             (WHEREUPON, Deposition Exhibit 140
2        marked for identification by the reporter.)
3             (WHEREUPON, Deposition Exhibit 141
4        marked for identification by the reporter.)
5   BY MR. DUERK:
6   Q    Okay.  So just a couple of clarifications.  I want
7        to put in front of you what I have marked or what
8        the court reporter has marked as Exhibit 140 and
9        141.
10            I will represent to you that each of these
11       exhibits represent the updated POMS for the
12       sections that we have been covering during your
13       testimony today.
14            Is that an accurate characterization in
15       your mind?
16  A    Yes.
17  Q    Okay.  Let's start with Exhibit 140.  This is
18       essentially the same POMS as Exhibit 75, POMS
19       008031.001, Hospital Insurance Entitlement for
20       Individuals Exposed to Environmental Health
21       Hazards.
22            Is that fair?
23  A    Yes.
24  Q    Okay.  Based on your review of the earlier POMS
25       published in Exhibit 75, is the same POMS section
```

Page 103

```
1        in Exhibit 140 different in any material way that
2        you see?
3             MR. KAKUK:  Objection, scope.  Go ahead.
4             MR. BECHTOLD:  Objection, foundation.
5   BY MR. DUERK:
6   Q    First of all, have you had a chance to look at
7        each of these?
8   A    I looked at 141, but I haven't fully looked at
9        140, but I am assuming that it was due to the
10       pronoun changes that we made.
11  Q    Okay.
12  A    Yeah, that was part of that change.
13  Q    And again, I am not asking for any substantive
14       policy differences that may be included here.
15  A    Okay.
16  Q    In fact, my question is geared towards showing the
17       opposite to be true, if it is.
18  A    Yeah.
19  Q    Did you notice anything aside from pronoun changes
20       or other grammatic changes that are apparent from
21       the print in front of you?
22  A    No.
23  Q    The same question related to the other POMS
24       section from Exhibit 76, POMS section 00803.050,
25       Developing Medical Requirement for Entitlement to
```

Page 104

```
1        EHH Medicare.
2             Do you see any changes in the new version
3        that jump out at you other than pronoun changes?
4             MR. KAKUK:  The same objection.
5   A    No.
6   Q    Okay.
7             MR. BECHTOLD:  Foundation.
8   BY MR. DUERK:
9   Q    All right.  There were some questions about this
10       timeframe from March 21st, 2023 and then the
11       e-mails that we examined from the April 2023
12       timeframe.
13            What can you tell us about the difference
14       between the March dates and the April dates and
15       why is there a disconnect in that timeframe?
16  A    The timeframe between the e-mails.
17  Q    Not necessarily the timeframe between the e-mails,
18       but the timeframe, the period of time between
19       March 21st and those e-mails.
20  A    Well, I mean, I believe that's when the
21       correspondence started, but based on -- I might
22       have been incorrect about the date, but based on
23       these e-mails, basically this is just one string
24       of e-mails that I have been continuing to get from
25       Terra regarding her correspondence with CARD.
```

**Exhibit B-26**

| | | |
|---|---|---|
| 1 | Q | Okay. |
| 2 | A | Yeah. |
| 3 | Q | And in terms of where things left off with this |
| 4 | | e-mail train, based on your last review of |
| 5 | | e-mails, have we now looked at all of the e-mails |
| 6 | | on this topic that you had access to to the best |
| 7 | | of your recollection? |
| 8 | A | To the best of my recollection. There might be |
| 9 | | additional ones that, you know, CARD had sent from |
| 10 | | this date just kind of expanding on an earlier |
| 11 | | e-mail, but to my recollection I believe this is, |
| 12 | | you know, the majority of the question. |
| 13 | Q | Okay. |
| 14 | A | Yeah. |
| 15 | Q | And in terms of the initiation or how this |
| 16 | | question first came to light, is it your |
| 17 | | understanding that it came to light because of |
| 18 | | phone communication, not e-mail communication? |
| 19 | A | Correct. |
| 20 | Q | Okay. And might that in part explain the little |
| 21 | | bit of time connect between March 21st, 2023 and |
| 22 | | the e-mails that we see in April? |
| 23 | A | Yes. |
| 24 | Q | Okay. The last thing that I'd like to cover is |
| 25 | | you submitted a declaration in this case, is that |

| | | |
|---|---|---|
| 1 | | correct? |
| 2 | A | Yes. |
| 3 | | (WHEREUPON, Deposition Exhibit 136 |
| 4 | | marked for identification by the reporter.) |
| 5 | BY MR. DUERK: | |
| 6 | Q | And that declaration is at tab 2, and I will ask |
| 7 | | that we mark this declaration as Exhibit 136. |
| 8 | | Do you see Exhibit 136 in front of you? |
| 9 | A | Yes. |
| 10 | Q | Ms. Hillmann, is this your declaration? |
| 11 | A | Yes. |
| 12 | Q | And if you would take a look through it, I believe |
| 13 | | we have covered the topics outlined in this |
| 14 | | declaration. |
| 15 | | Is that your understanding also? |
| 16 | A | Correct. |
| 17 | Q | Okay. There is one specific section here that I'd |
| 18 | | like you to focus on. Do you see paragraph 7? |
| 19 | A | Yes. |
| 20 | Q | Okay. Is it still true that POMS section |
| 21 | | HI 00803000, et sec, meaning the entire section or |
| 22 | | those that follow, those sections titled Medicare |
| 23 | | entitlement for individuals exposed to |
| 24 | | environmental health hazards (EHH) are based on |
| 25 | | and mirror language from the Affordable Care Act? |

| | | |
|---|---|---|
| 1 | | MR. KAKUK: Objection, scope. |
| 2 | A | Yes. |
| 3 | BY MR. DUERK: | |
| 4 | Q | Ms. Hillmann, it has appeared to me that during |
| 5 | | your deposition where you have needed |
| 6 | | clarification in some of my questions rather than |
| 7 | | just guessing at my meaning you have asked for |
| 8 | | that clarification in order to provide clearer |
| 9 | | answers. |
| 10 | | Has that been your impression as well? |
| 11 | A | Yes. |
| 12 | Q | I thank you for your time today. I don't have any |
| 13 | | more questions at this moment. I am sure I will |
| 14 | | have some follow-up questions after Mr. Bechtold |
| 15 | | begins. |
| 16 | A | Okay. |
| 17 | | MR. DUERK: For just a moment though, I |
| 18 | | would like to make a record. I don't know if I |
| 19 | | need to do it on video or not. I guess we can |
| 20 | | redact it in this way. |
| 21 | | I'd just like to note that in terms of |
| 22 | | the exhibits related to the e-mails today, |
| 23 | | Exhibits 138 and 139, this is the first time |
| 24 | | that I have seen these e-mails and any |
| 25 | | attachments. |

| | |
|---|---|
| 1 | I do appreciate their disclosure today. |
| 2 | However, I am also aware that there are |
| 3 | approximately 2,500 e-mails that counsel for the |
| 4 | CARD clinic received yesterday that I have not |
| 5 | received. I don't know what the topic of those |
| 6 | e-mails is. |
| 7 | I don't know what they are about, who |
| 8 | authored them, what the nature of those e-mails |
| 9 | are. In essence, I'm surprised. |
| 10 | I believe that I have had discovery |
| 11 | pending now for several years with an obligation |
| 12 | to replenish discovery related to any and all |
| 13 | communications between CARD and the Social |
| 14 | Security Administration, those discovery |
| 15 | requests having been propounded on CARD. |
| 16 | I would like to note that for the record |
| 17 | that this is a surprise. I have done as best I |
| 18 | could, given the circumstances, and I am content |
| 19 | with the record that I have developed. However, |
| 20 | I am not in favor of being surprised with any |
| 21 | new correspondence or any other new discovery at |
| 22 | this trial preservation deposition for |
| 23 | Ms. Hillmann. |
| 24 | And to that extent I will object to |
| 25 | non-disclosure to any exhibits or materials that |

1  I haven't seen before right now if Ms. Hillmann
2  is asked to respond to those materials.
3      I just wanted to perfect that objection
4  for the record.  With that, I think this portion
5  of the video, I would imagine, would be redacted
6  out, so I tender the witness.
7      MR. BECHTOLD:  Well, let's just take a
8  break, and we'll do a switcheroo.
9      MR. DUERK:  Sounds good.
10      THE VIDEOGRAPHER:  The time is 2:46.  We
11  are off the record.
12      (Break taken.)
13      THE VIDEOGRAPHER:  The time is 2:54.  We
14  are back on the record.
15      EXAMINATION
16  BY MR. BECHTOLD:
17  Q  Ms. Hillmann, my name is Tim Bechtold, and I
18  represent the Center for Asbestos Related Disease
19  in this lawsuit.
20      And just to follow-up, so you have been
21  designated by the Social Security Administration
22  as the person with knowledge to provide responses
23  on behalf of the SSA, is that right?
24  A  Correct.
25  Q  And so you speak on behalf of the SSA, correct?

1  A  Correct.
2  Q  And your responses today are the official position
3  of the SSA, correct?
4  A  Correct.
5  Q  So we are getting your testimony today for your
6  convenience and capturing your testimony on video
7  to present to the jury at trial because the Social
8  Security Administration has represented that you
9  are not going to be available for trial, is that
10  right?
11  A  To my knowledge, yes.
12  Q  Earlier you testified that you had reviewed the
13  POMS HI 803.001 and 803.050, the e-mails, and
14  those are the POMS dealing with the application of
15  the section of the act, section 1881A, correct?
16  A  Correct.
17  Q  And they are the Social Security Administration's
18  internal regulations regarding the application of
19  the act?
20      MR. KAKUK:  Objection, scope.  Go for
21   it.
22  A  They are our instructions for technicians to
23  process these claims.
24  Q  All right.  And I think as you testified, both
25  Exhibit 75 and 76 have been superceded, correct?

1  A  I need to find 75 and 76.  Okay.  These are the
2  different policies.  Yes.  Correct.
3  Q  And so as of October of 2022, Exhibit 75 and
4  Exhibit 76 are no longer valid, correct?
5      MR. KAKUK:  Objection, scope.
6  A  They have been updated.  That doesn't mean they
7  are not valid.
8  Q  Okay.  Excuse me.  They have been superceded?
9  A  Superceded with the same policy.  The only change
10  is in pronouns.
11  Q  Okay.  Ms. Hillmann, I am going to hand you
12  Exhibit 332.
13  A  Okay.
14  Q  Could you take a look at that document?
15  A  It's this document that I haven't seen.
16      MR. DUERK:  Object, non-disclosure.  Go
17   ahead.
18  BY MR. BECHTOLD:
19  Q  So as I understand it, you have never seen
20  Exhibit 332 before?
21  A  I have not.  It was a part of your attached
22  e-mail, but I was never sent this attachment.
23  Q  And as part of your preparation for your
24  deposition today did you contact any of the people
25  who work for the Social Security Administration?

1  A  Yes, I did.  I contacted headquarters, I contacted
2  our regional commissioner, I contacted the
3  district manager in Kalispell, and I contacted my
4  former counterpart that used to be the Medicare
5  lead prior to 2018.
6  Q  Okay.  And the people who were active in Libby for
7  the Social Security Administration in 2011, you
8  contacted them as well, correct?
9  A  That is who that was.  So that would be
10  Mary Lisa Lewandowski, that would be Kathy Suarez,
11  previously Suarez, now Will.
12  Q  And I think you testified that you reviewed
13  e-mails between the Social Security Administration
14  and CARD, is that right?
15  A  The e-mails from the spring 2023.  There were no
16  prior e-mails for me to review.  The only e-mails
17  prior to that were from headquarters to our
18  regional office on just the training and the
19  policies.
20  Q  So I take it obviously the e-mail exists.  You
21  just didn't look at it, is that right?
22  A  This e-mail?  I was never given this e-mail.
23  Q  Why weren't you given that e-mail?
24  A  I was not even made aware of this e-mail.
25  Q  Did you ask Mary Lisa Lewandowski about the

Page 113

1    contact she had with CARD while she was in Libby?
2  A  I asked for all correspondence.
3  Q  Who did you ask for all correspondence from?
4  A  All the people that I previously just gave to you
5     in my last question.
6  Q  All right.  So you did ask Mary Lisa Lewandowski
7     for all correspondence she had with CARD, and she
8     did not provide it to you, is that right?
9  A  Well, I would not know if she just forgot about
10    this e-mail or didn't have this e-mail anymore
11    because our records, our e-mail records actually
12    drop off after seven years, so they are no longer
13    available, so she might not have kept it.
14 Q  Okay.  Could you take a look at Exhibit 332?
15 A  Uh-huh.
16         MR. KAKUK:  Mr. Bechtold, is this
17    somewhere in the record for me to look at as
18    well?
19         MR. BECHTOLD:  Sure.  It's Exhibit 332.
20         MR. KAKUK:  In the trial exhibits?
21    Okay.
22 Q  So your testimony is you have never seen this
23    before?
24 A  No.
25 Q  Okay.  Would you look to the second page of

Page 114

1     Exhibit 332.  Can you tell me what that is?
2  A  This is the environmental health hazards
3     checklist, the EHH checklist.
4  Q  Is this the EHH checklist that has been in use
5     since May 20th of 2010 until the present?
6  A  I would have to look at the actual policy.  There
7     has been policy changes in HI 00803.50 and the
8     most recent one was done in October.
9  Q  Sure.  Take a look at it.
10 A  Okay.
11 Q  That's at page 2 of Exhibit 141.
12 A  I got it.  What was the date on this one?
13 Q  The e-mail date is May 20th of 2010.
14 A  Okay.  It appears to be the same checklist.
15 Q  And if you look at Exhibit Number 75.
16 A  Is that in tab 4?
17 Q  Excuse me.  Exhibit 73, and look at page 4.
18 A  Exhibit 73?  Can you tell me what tab that is?
19 Q  It's tab 3.
20 A  Okay.  Do you want me to check the checklist with
21    that one too?  It appears to be the same one.
22 Q  So from the e-mail that Mary Lisa Lewandowski sent
23    to Tanis Hernandez on May 20th, 2010 with that
24    environmental health hazards checklist attached to
25    it, it's the same version of the environmental

Page 115

1     health hazards checklist as Exhibit 76 and
2     Exhibit 141, correct?
3  A  It appears to be that way.  It does look like
4     there is one change.
5  Q  What is the change?
6  A  I've just got to make sure.  The actual minimum
7     medical evidence required under malignancy of the
8     lung.  It just added the bronchoscopy report.
9  Q  Which version are you looking at?
10 A  I am looking at this version, and I am also
11    looking at this version.  So from this version to
12    this version.  In this version it's different.
13 Q  Okay.
14 A  It added on the bronchoscopy report.
15 Q  So instead of saying "this" let's identify them by
16    number.
17 A  Okay.
18 Q  The document you are referring to now is?
19 A  Exhibit 332.
20 Q  Okay.  And 332?
21 A  332.
22 Q  Then the next document that you looked at would be
23    Exhibit 76.  So 332 is different from 76?
24 A  And 332 is different than Exhibit 141.
25 Q  Okay.  Great.  So the Social Security

Page 116

1     Administration developed this EHH checklist,
2     correct?
3         MR. KAKUK:  Objection, scope.  Go for
4     it.
5  A  I believe so.  I mean, I can't -- you know, to be
6     honest, I know that CARD originally had the FLAME,
7     I believe it was the FLAME and the LAMP2 benefits,
8     and they had a questionnaire and that -- you know,
9     essentially they used that questionnaire, but then
10    we moved from the Affordable Care Act to the
11    section 1881A act.  I believe social security put
12    this together to make sure that the physicians
13    were following the guidelines of section 1881A of
14    the act.
15 Q  So as I understand your testimony, the Social
16    Security Administration put together the language
17    of this EHH checklist to make sure that the
18    physicians involved in step 2 were following the
19    provisions of section 1881A of the act?
20 A  Correct.
21         MR. KAKUK:  The same objection.
22 A  Correct.
23 Q  And your testimony is the reason they included
24    this language is to have it mirror the act,
25    correct?

1              MR. KAKUK: The same objection.

2 A   Did I say that previously? I guess I said that in

3     my deposition.

4 Q   Your declaration?

5 A   Declaration, yes.

6 Q   Okay. So that's what you testified in your

7     declaration?

8 A   Yes.

9 Q   So did any Social Security Administration employee

10    provide any guidance at all to any CARD employee

11    on how to fill out an EHH checklist?

12 A   No. That is outside the realm of our job. We are

13     not medical experts.

14 Q   How many EHH checklists have come to the Social

15    Security Administration that were not from CARD?

16 A   I would not know that off the top of my head. I

17     would have to -- that would take some time to

18     research, but there are outside physicians that do

19     fill these out besides the CARD clinic.

20 Q   Would you agree that the CARD clinic does the vast

21    majority of them?

22 A   To my knowledge, they do, but again I would

23     have to research that to get the numbers, and that

24     would take some time.

25 Q   Did the Social Security Administration ever give

1     Exhibit 75 or Exhibit 76 to CARD?

2 A   To my knowledge, well, Exhibit 332 clearly shows

3     Mary Lisa must have given it to them.

4 Q   It looks like that's just the EHH checklist,

5    correct?

6 A   That's what you're referring to, not the actual

7     policy, or are you talking about the actual

8     policy?

9 Q   I am talking about the policy.

10 A   Well, I don't know why we would give them the

11     policy. It's our instructions. It's our internal

12     instructions.

13 Q   Okay.

14 A   Yeah.

15 Q   So those instructions are meant for the Social

16    Security Administration only, correct?

17 A   Those instructions are meant for our technicians

18     only to process claims.

19 Q   They're not meant for CARD?

20 A   No, they're not.

21 Q   They are not meant for anyone outside of Social

22    Security Administration?

23 A   They can access it on our policy -- you know,

24     policy publications on the SSA.gov website, but I

25     mean I don't know why they would. It's our

1     technician instructions.

2 Q   Sure. And so the SSA sent staff to Libby after

3    the Affordable Care Act was passed, right?

4 A   Correct.

5 Q   And they set up shop in Libby?

6 A   Set up shop? They trained our technicians within

7     the Kalispell office, yes.

8 Q   And so what did they do in Libby?

9 A   They took claims and they trained our SSA

10     employees in the Kalispell office.

11 Q   When you say took claims, what does that mean?

12 A   That means they took in Medicare claims.

13 Q   What did they do?

14 A   They processed Medicare claims, so they followed

15     the instructions within the policy and processed

16     any Medicare claims that they had at the time.

17 Q   So as a practical matter, they sat down in a chair

18    and did what?

19 A   They followed these instructions, so they would

20     follow -- if you go to HI 00803.50 they are

21     following the step-by-step instructions to make

22     sure that they could process this claim correctly.

23 Q   Okay. So did people from Libby walk into their

24    office and sit down and say, hi, my name is

25    patient one?

1 A   I'm sure they came in and I'm sure they called,

2     but additionally we were just really setting up

3     shop to teach our technicians this policy and

4     train them correctly.

5 Q   Okay. And who were the technicians there?

6 A   The technicians at the time, I really would not

7     know that unless I reached out to Terra. I

8     believe Sonya Hymas might have been one of those

9     technicians, but to be honest with you that is

10     back in 2010-2011. You know, I would have to

11     check.

12 Q   Did you ask Terra about who these people were?

13 A   I just asked Terra if anything was followed

14     outside of policy. I didn't need to get the

15     specific technician's names. There was no reason

16     for it with the deposition.

17 Q   Isn't one of the questions that you were asked to

18    answer is whether or not CARD people have been

19    trained by any SSA staff in Libby?

20 A   Correct, and the district manager relayed to me

21     that they have not been.

22 Q   But you didn't bother to check with anyone who was

23    actually in Libby and making those communications

24    with CARD, did you?

25            MR. DUERK: Objection, form. Go ahead.

Page 121

1  A   She would have reached out to her employees,
2      because I had a number of questions for her and I
3      asked her to check with her technicians that were
4      there at the time.
5  Q   But you don't know who those technicians were?
6  A   Uh-uh.
7  Q   So it's your testimony that Mary Lisa Lewandowski
8      for example never -- who was in Libby, right?
9  A   She was in Libby.
10 Q   And it's your testimony that she never
11     communicated with CARD staff about how to fill out
12     an EHH form?
13 A   Correct.
14 Q   And she never communicated with any CARD staff
15     about who determines whether an individual
16     qualifies for Medicare benefits, correct?
17         MR. DUERK:  Objection, vague, use of the
18     term "communicated."
19 A   Can you repeat that question?  I'm sorry.
20 Q   So no one from SSA in Libby communicated in any
21     way with CARD staff about who determines who
22     qualifies for Medicare benefits?
23 A   Correct.  That's outside the realm of our
24     position.
25 Q   Does CARD determine whether an individual

Page 122

1      qualifies for Medicare benefits?
2  A   Whatever physician completes that form should be
3      following that section 1881A of the act, so that's
4      all I can speak to on that.
5  Q   Okay.  But is it CARD who determine whether
6      someone qualifies for Medicare benefits?
7  A   Well, CARD isn't the only physicians that complete
8      that checklist, so it's kind of like a vague
9      question to me.
10 Q   Okay.  Does the Social Security Administration
11     determine who qualifies for Medicare benefits?
12 A   The Social Security Administration --
13         MR. KAKUK:  Object to the scope.  Sorry.
14 A   -- follows HI 00803.050.  We do not make the
15     medical determinations.  We rely on the physicians
16     to complete the EHH checklist according to section
17     1881A of the act.  We have nothing to do with the
18     actual medical requirements and medical review.
19 Q   And is that physician the one who makes the final
20     call on whether someone gets Medicare benefits?
21         MR. KAKUK:  The same objection.
22 A   The physician that signs the form is basically
23     attesting to the information that he completed
24     within the form, so if he is stating that this
25     person is diagnosed, you know, and continues to

Page 123

1      put a date of diagnosis, he completes step 3, he
2      prints his name, he puts his signature and his
3      date, then we are assuming that he followed
4      section 1881A of the act and he agrees that
5      this person is diagnosed with that condition.
6  Q   Right.  And I think you testified that it's
7      outside of SSA's scope?
8  A   Absolutely.  We are not medical experts.
9  Q   Right.  And you would defer to the medical experts
10     to make that call, correct?
11 A   Correct.
12 Q   I am going to draw your attention to again
13     Exhibit 76, page 4, draw your attention to where
14     it says step 2.
15         Do you see that?
16 A   Uh-huh.
17 Q   And I think your testimony is that the Social
18     Security Administration has no input on step 2,
19     correct?
20 A   That is correct.  That would be filled out by the
21     provider or the physician.
22 Q   And I think you testified too that if -- that what
23     you're assuming is that the physicians who are
24     following -- who are filling out step 2 are
25     following section 1881A of the act, correct?

Page 124

1  A   Correct.
2  Q   And it's not your job to second-guess them,
3      correct?
4  A   Absolutely.  We are not medical experts.
5  Q   Okay.  And part of the -- it's the medical
6      provider's job to make a determination whether the
7      minimum medical evidence required is provided,
8      correct?
9          MR. KAKUK:  Objection, scope.
10         MR. DUERK:  Objection, form.  Go ahead.
11 A   Correct.
12 BY MR. BECHTOLD:
13 Q   I think you testified that you first heard about
14     that CARD was providing -- CARD physicians were
15     providing the minimum medical evidence required
16     for step 2 as solely a B reader interpretation as
17     qualifying a person for Medicare in March of 2023,
18     is that right?
19         MR. DUERK:  Objection, form.  Go ahead.
20 A   I think what I testified to is that I was informed
21     that CARD was sending our Kalispell district
22     manager an e-mail stating that they were
23     completing this form even though they didn't agree
24     that the person was diagnosed with that condition,
25     and based on that statement I instructed the

Page 125

1   Kalispell manager to, you know, make sure those
2   claims were denied, because that's not following
3   section 1881A of the act and that is not something
4   that we can process, and I think I mentioned
5   previously that we had an emergency message
6   10042REV that instructs our field offices in that
7   same direction.
8   Q   And I think you have testified too that it is not
9       your call whether to make that determination in
10      step 2.  It's the medical provider's call, isn't
11      it?
12          MR. DUERK:  Objection, form.  Go ahead.
13  A   It is the medical provider's call to complete the
14      form, but we are assuming they are following
15      section 1881A of the act, and if they are telling
16      us that they don't find that person diagnosed with
17      that condition to me and they complete the form,
18      that looks like fraud.
19  Q   Okay.  May I ask you in step 2 where it says check
20      the box next to the diagnosed impairments and
21      print the date of the diagnosis, do you see that?
22  A   Yeah, I do.
23  Q   Now let's look at where it says "asbestosis."
24  A   Uh-huh.
25  Q   Impairment, asbestosis, diagnosis code 5010.

Page 126

1   A   Uh-huh.
2   Q   And then the minimum medical evidence required.
3       Do you see that?
4   A   Uh-huh.
5   Q   Do you see where it says, "Interpretation by a
6       B reader qualified physician of a plain chest
7       x-ray."
8       Do you see that?
9   A   Uh-huh.
10  Q   Is that what it said?
11  A   Yes.
12  Q   So would you agree that interpretation by a
13      B reader qualified physician of a plain chest
14      x-ray is the sufficient minimum medical evidence
15      required for a diagnosis for purposes of the
16      environmental health hazard checklist?
17          MR. DUERK:  Objection, foundation.
18  A   Sir, I can't speak on this form, because I am not
19      a medical expert.  All I know is if they are
20      completing this form, they should be completing it
21      following the section 1881A of the act.
22  BY MR. BECHTOLD:
23  Q   Okay.  May I continue?
24  A   Uh-huh.
25  Q   Or, underlined, "Interpretation of computed

Page 127

1   tomographic radiograph of the chest by a qualified
2   physician."
3       The same question, does this satisfy the
4   minimum medical evidence required for a diagnosis
5   for purposes of the environmental health hazards
6   checklist?
7          MR. DUERK:  Objection, form, foundation.
8     Go ahead.
9   A   Again, this is outside of my purview, and if the
10      physician is following section 1881A of the act
11      and he completes this form following that, then I
12      would assume that he has found them diagnosed with
13      this condition.
14  Q   Okay.  So if a physician determined that someone
15      had -- if a qualified physician determined
16      based upon interpretation of a computed
17      tomographic radiograph of the chest by a qualified
18      physician and a different physician disagreed with
19      that diagnosis or that interpretation is that a
20      violation of section 1881A?
21          MR. KAKUK:  Objection, scope.
22  A   Again, that is outside of my purview.
23  Q   You just told me that you thought it was
24      fraudulent.
25  A   I think it's fraudulent when they are not

Page 128

1   following section 1881A of the act and they
2   disagree with the diagnosis, but they're
3   completing this form.
4   Q   So if two physicians disagree on a diagnosis --
5   A   The signing physician is the one giving the
6       diagnosis, so if the signing physician states that
7       this person is not diagnosed with this condition,
8       we are going to deny the claim, period.
9   Q   Okay.
10  A   Yeah.
11  Q   So if the signing physician says based upon
12      section 1881A there are two ways to qualify for an
13      environmental health hazards checklist, correct?
14          MR. KAKUK:  Objection, scope.
15  A   Again, I don't get into section 1881A of the act
16      because that is outside of my purview.
17      What I have simply said here is if he
18      disagrees with the diagnosis, he or she or they,
19      and they complete this form and they're stating
20      they disagree that this person is diagnosed with
21      this condition, we are going to deny them.  And to
22      me, it does look like fraud because they are
23      stating this person is diagnosed with this
24      condition even though they signed off and they
25      don't believe that that person has that condition.

1  Q  So you are stepping in now the interpretation
2     of -- stepping in to the determination by the
3     medical provider, is that right?
4  A  I am not stepping into the interpretation.  I am
5     stating if they are telling us that they don't
6     believe this person has been diagnosed with this
7     condition and they completed the form, we will
8     deny it.  We don't get into section 1881A.  That
9     is simply up to the physician.
10 Q  So if the physician is following section 1881A, it
11    doesn't matter what you think about his diagnosis,
12    correct?
13           MR. DUERK:  Objection, form.
14           MR. KAKUK:  And scope.
15 A  I don't believe that's what I said at all.  If
16    they brought it to our attention that they don't
17    feel this person is diagnosed with this condition
18    but they completed the form, we will deny the
19    claim, bottom line.  It's not up to social
20    security to determine this medical portion of the
21    policy.
22 Q  So you just said both things.  You said it's not
23    up to you determine the medical portion, but you
24    would determine the medical portion?
25 A  Sir, I think you are kind of misconstruing what I

1     am saying, because what I am saying is if a
2     physician completes this form and they're stating
3     that they feel this person is diagnosed with this
4     condition, gives a diagnosis date, completes 2,
5     you know, and section 3, prints their name,
6     physician signature and date, but then they say,
7     "But I don't think they are diagnosed with that
8     condition."
9           Big red flag.  No, it's not going to go
10    through.  We are going to deny it.  Why would you
11    complete a form stating that you feel this person
12    is diagnosed, and then you are verbally telling me
13    or within an e-mail that you don't feel they are
14    diagnosed, that's contradictive and that doesn't
15    align with section 1881A of the act.
16 Q  So now that's your interpretation of section 1881A
17    of the act, correct?
18 A  It doesn't even need to be an interpretation.  If
19    somebody is telling me they clearly filled out a
20    form that they don't agree with the diagnosis but
21    they signed off on it, doesn't that look to you
22    like fraud?
23           If I am completing this form and I am
24    saying this person is diagnosed, but guess what,
25    they are not really diagnosed, that does not make

1     sense for our technicians to process that.
2           And we have put it out in an emergency
3     message.  If it is conveyed to us that they are
4     not truly diagnosed with this condition or let's
5     say they even just marked one of these but they
6     don't put the date of diagnosis, we are going to
7     deny it based on the policy that we gave them in
8     emergency message 10042REV, and that has been
9     since the beginning in 2010.
10 Q  How many filled out EHH checklists have you seen?
11 A  I honestly can't speak to that.  I mean, I have
12    seen 15 to 20, but I mean that was just within
13    getting, you know, just example cases so we could
14    rewrite some language within different policies.
15    We had to take out a lead section of a policy.  It
16    wasn't like I was reviewing them.
17 Q  I am going to hand you what has been marked
18    Exhibit 516.
19 A  Okay.
20 Q  You've never seen that before, have you?
21 A  No.
22 Q  Take a look at the second page.
23 A  Okay.
24 Q  Do you recognize what that is?
25 A  Yes.  That's the environmental health checklist.

1     This typically would not come with this because
2     this is all we require.
3  Q  And if you look at page 2 of Exhibit 516, do you
4     notice any handwriting in there?
5  A  It says "outside read only."  But it's also
6     missing the name, social security number and date
7     of birth of the person.
8  Q  Yeah.  They've been redacted.
9  A  Okay.  So I can't verify if this is a true,
10    completed claim.
11 Q  No, I am not asking you to verify.  I'm just
12    asking you to look at it.
13 A  Okay.
14 Q  Have you seen an EHH form that has similar
15    indications on it?
16 A  No.
17 Q  And how many EHH forms have been turned in by
18    CARD?
19 A  I would have no idea off the top of my head.  That
20    would take some time to research.  You are talking
21    about going all the way back to like 2010.
22 Q  Yeah.  A lot?
23 A  Yeah.  Well, not just CARD.  I mean, again,
24    you know, other physicians fill these forms out as
25    well.

Page 133

1    Q    Sure.
2    A    Yeah.
3    Q    Would it surprise you that there are -- since the
4         beginning of 2011 CARD has indicated when the
5         qualification for Medicare based upon their
6         determination by an outside B reader only has
7         always been demarcated on the EHH form?
8              MR. KAKUK:  Objection to relevance and
9         scope.
10             MR. DUERK:  And foundation.  Go ahead.
11   A    I am not understanding your question exactly.
12             Are you indicating like they write
13        different comments within there, the checklist?
14   Q    Right.
15   A    Would it surprise me to know that they have been
16        doing that?  Yes, because I haven't seen a form
17        like that.
18   Q    Has Terra Whiteman ever seen a form like that?
19             MR. DUERK:  Objection to foundation.
20   A    Again, this is my first time hearing it, so I
21        wouldn't know.
22   Q    And that's not something you ever inquired of her,
23        is it?
24   A    This is the first time I am hearing about it, so
25        no.

Page 134

1    Q    So as far as you know CARD has never outside of
2         this one form that you see in front of you ever
3         indicated on those EHH forms that the basis for
4         their qualification, their finding of
5         qualification for Medicare benefits was based upon
6         solely an outside B read?
7    A    As far as I know, I have never seen anyone like
8         this, and I haven't asked Terra about this because
9         this the first time I am seeing one.
10   Q    Okay.  I am going to hand you what has been marked
11        as Exhibit 85.  Take a look at that.
12   A    Okay.  Okay.
13   Q    Go ahead and look through all the pages.
14   A    Okay.  So this is back and forth from
15        Sonya Peterson who was a claims technical expert
16        to Mary Karen Caraway which I am assuming is with
17        CARD, but it looks like she received a letter from
18        one of the beneficiaries or claimants that she is
19        now eligible for Medicare benefits regardless of
20        her age based on these findings.
21             One of the doctors did identify a small
22        abnormality on your chest x-ray.  Nothing has
23        significant health indications nor is it
24        considered a diagnosis of asbestos-related
25        disease.  And she is asking if there is a

Page 135

1         diagnosis.
2    Q    Right.  And so what's the response?
3    A    It sounds like she has a B read DX, which to me
4         would be a diagnosis.  I don't know.  We are not
5         medical experts, so I would assume that DX means
6         diagnosis.  "I will look it up and get back to you
7         momentarily."  And she just basically says,
8         "Thanks.  That one I couldn't track down."
9    Q    And after the B read DX --
10   A    CW is a B read.  It looks like I sent her EHH in
11        2015.  I will resend today.
12             But to be honest here, I mean, Sonya is not
13        going to be in a position to know what a B read
14        is.  She is asking if they are being diagnosed.
15        That's the bottom line.  We don't get into the B
16        reads.  You know, CARD can go on and on about
17        B reads.  They are completing that form.  We are
18        assuming they are following that section of the
19        act, so I mean it's not Sonya's job to, you know,
20        ask her about B reads or anything.  She is asking
21        for a diagnosis.
22   Q    Right.  And CARD is telling her it's a B read
23        diagnosis, right?
24   A    Yeah, but for her to be knowledgeable about
25        B reads?  We don't train them on that.  She's not

Page 136

1         a medical expert.  I think bottom line she is just
2         looking for a diagnosis.
3    Q    Right.  And CARD told her it was a B read
4         diagnosis, isn't that right?
5    A    They did tell her it's a B read diagnosis, but I
6         am assuming that she is assuming they completed
7         the form correctly.
8              MR. KAKUK:  Can we go off the record for
9         a second and take a short break?
10             THE VIDEOGRAPHER:  The time is 3:31.  We
11        are off the record.
12             (Break taken.)
13             THE VIDEOGRAPHER:  The time is 3:38.  We
14        are back on the record.
15   BY MR. BECHTOLD:
16   Q    Ms. Hillmann, I am going to draw your attention to
17        Exhibit 135.
18   A    Okay.
19   Q    And direct your attention to paragraph 25, and
20        paragraph 25 deals with the award that SSA
21        presented to CARD, and I think your testimony is
22        you don't know why SSA presented this award to
23        CARD, correct?
24   A    Correct.
25   Q    And did you ask Terra Whiteman why?

Page 137

```
 1   A   I did not ask Terra Whiteman.  I asked
 2       Mary Lisa Lewandowski, our regional commissioner,
 3       and I also asked headquarters.  I was trying to
 4       locate any awards to get more additional
 5       information.
 6           Headquarters didn't have any awards on
 7       record for monetary value or just exemplary
 8       service, but Mary Lisa Lewandowski said there
 9       could have been a regional-level award, but she
10       didn't have any record of it.
11   Q   Why didn't you ask Terra Whiteman?
12   A   Because she wouldn't have been the one to give out
13       the award.  It would have been the regional
14       commissioner's office.
15   Q   Do you know what Terra Whiteman looks like?
16   A   Yes, I do.  I see her on Zoom.
17   Q   I am going to hand you Exhibit 336.
18           Can you take a look at that?
19   A   Okay.
20   Q   You have never seen that before, have you?
21   A   No.
22   Q   What is that?
23   A   It says it's a Center for Asbestos Related Disease
24       (CARD) for outstanding partnership with SSA and
25       Medicare outreach to individuals with
```

Page 138

```
 1       asbestos-related disease.
 2   Q   Is it an award from SSA to CARD?
 3   A   It appears to be so.
 4   Q   I am going to show you a photo.
 5   A   Okay.
 6   Q   And I apologize.  Can you tell me who is in that
 7       photo?
 8           MR. DUERK:  Objection.  Can we see a
 9       picture?  Is this an exhibit?
10           MR. BECHTOLD:  Not yet.  I didn't expect
11       it to be.
12           MR. DUERK:  Non-disclosure.
13   Q   Can you tell me who is in the photo?
14   A   The only person that I kind of recognize is Terra
15       over here in the black, unless she has died her
16       hair.
17   Q   And could you tell us what's going on in this
18       photo?
19   A   It appears that there is an award there, but I
20       can't see what the award is for, if it's this one
21       or what.
22   Q   So you don't know which SSA employees went to
23       Libby to present this award?
24   A   I didn't know that SSA employees went to Libby to
25       present the award, because that's Terra Whiteman
```

Page 139

```
 1       who is the Kalispell manager.  I am saying that
 2       the award would have come from the regional
 3       commissioner's office.  We don't give awards out
 4       locally like that.  That would be something either
 5       from headquarters or regional level.
 6   Q   So your testimony is that's not an SSA award?
 7   A   I did not say that.  That could very well be one.
 8       We just didn't find any records of it.
 9   Q   Okay.
10   A   Did you want your exhibit back?
11   Q   No.
12   A   Okay.
13   Q   So not only -- you don't know why SSA gave this
14       award, correct?
15   A   Correct.  This is my first time seeing it.  But as
16       I have said previously, Mary Lisa Lewandowski did
17       say there could have potentially been a
18       regional-level award for CARD, but she had no
19       records of it.
20   Q   So as I review your testimony, it is you don't
21       know who the technicians were who went to Libby in
22       2011, correct?
23   A   The technicians from social security?
24   Q   Yeah.
25   A   From the regional office?  I did list them.
```

Page 140

```
 1   Q   No, who were the technicians who were processing
 2       the Medicare claims.
 3   A   Oh, within the field office?  No, I cannot name
 4       all of them offhand, but I can tell you
 5       Sonya Hymas was one of them.
 6   Q   Okay.  So Sonya was one?
 7   A   Uh-huh.
 8   Q   Did you talk to Sonya Hymas about information
 9       required for this testimony today?
10   A   Sonya Hymas hasn't been employed by this agency
11       for I think maybe over a year, not even over a
12       year, less than a year.
13   Q   So the answer is no?
14   A   No.
15   Q   You didn't attempt to, did you?
16   A   I would not contact her outside of social
17       security.  We don't have any kind of personal
18       level like that.
19   Q   Okay.  What did you ask Terra Whiteman about
20       regarding this deposition?
21   A   Anything within the subpoena that I was looking
22       for, any of the documents that you were -- you
23       know, that you have listed or if there was any
24       training that I was unaware of that, you know,
25       headquarters hasn't had or the regional level
```

Page 141

1     office hadn't had where we gave some type of

2     training to CARD, and she stated no.

3  Q  Okay.  So as I understand your testimony, you did

4     not systematically go through the items in this

5     subpoena, correct, with Terra Whiteman?

6           MR. DUERK:  Objection, form.  Go ahead.

7  A  I took pieces out of each of those questions and

8     asked Terra about every single one of them.

9  Q  Except the one about the award?

10  A  No.  I wouldn't ask her about the award because

11     that would not come from her office.  That would

12     be either regional level or headquarters.

13  Q  So I think you're contradicting yourself.

14           MR. DUERK:  Objection, counsel

15        testifying.  Go ahead.

16  BY MR. BECHTOLD:

17  Q  Again, just to clarify this, you did not go

18     through each of these numbered requests in the

19     subpoena with Terra Whiteman, correct?

20  A  I did not go through the one regarding the award.

21     That was the only one I did not go through.

22  Q  Okay.  I am going to draw your attention back to

23     paragraph 19, and I believe your testimony is that

24     regarding paragraph 19 that Social Security

25     Administration plays no role in step 2, is that

Page 142

1     correct?

2           MR. DUERK:  Objection, form.  Go ahead.

3  A  I said that, yes.

4  Q  And I think you testified that what's incorrect

5     about this is that it's the Social Security

6     Administration personnel who fill out step 1,

7     correct?

8  A  I said that they complete step 1, and then step 2

9     and step 3 are completed by CARD following section

10     1881A of the act.

11  Q  Who did you talk to to find out that SSA employees

12     fill out step 1?

13  A  That's in policy.  It's HI 00803.050.  It's been

14     in policy since the beginning.

15  Q  And does that mean it's what actually happens?

16  A  Yes.

17  Q  So it's your testimony that EHH checklists are

18     provided from SSA to CARD after step 1 is filled

19     out?

20  A  To the best of my knowledge, this is how we are

21     supposed to be filing these claims, and this is

22     how Terra Whiteman said that these claims are

23     being processed.  She confirmed that.

24  Q  Okay.  So it's your testimony that Terra Whiteman

25     told you that CARD employees do not fill out

Page 143

1     step 1 of the EHH checklist, correct?

2  A  Correct.

3  Q  And is it Terra Whiteman's testimony that CARD's

4     employees do not fill out SSA-827, the medical

5     release forms and send that to -- and have the

6     patients sign and send that to SSA?

7  A  Correct.

8  Q  And the only basis of your knowledge is what

9     Terra Whiteman told you?

10  A  Correct.  And she was the district manager during

11     that period of time, so she would know.  She sees

12     these EHH checklists and she knows how her

13     technicians process these claims.

14  Q  Okay.  But you have no personal knowledge, right?

15  A  I have no personal knowledge because I am not

16     within that office, but I am taking the district

17     manager's word at it from what she provided me.

18  Q  Okay.  And then that's your same testimony for

19     paragraph 19, paragraph 20, paragraph 21 and

20     paragraph 22, correct, regarding step 1?

21  A  I believe so.  I believe it involved the same

22     thing where we fill out step 1.  Step 2 and step 3

23     are completed by the physician following section

24     1881A of the act.

25  Q  Right.  And it's the physician's job to follow

Page 144

1     section 1881A of the act?

2  A  Correct.  Yes.

3  Q  And it's not your job to second-guess them?

4  A  Uh-huh.

5  Q  So regarding paragraph 26, so why does CARD fill

6     out the EHH checklist?

7  A  Why do they fill out section 2 and 3?  Is that

8     what you're asking?

9  Q  No.  I just said the EHH checklist.

10  A  Because that's what they have to do when they are

11     following section 1881A of the act.  We are not

12     medical experts.  We don't diagnose patients with

13     diseases.  We are not doctors.  We are not

14     certified.  We haven't gone to school for that.

15     We are simply claims technicians processing

16     claims.

17  Q  So how do Social Security Administration employees

18     look for asbestos-related disease or conditions in

19     step 2?

20  A  How do we look for them?  We look -- if you go to

21     the checklist, again, section 2, we are making

22     sure that there is a listed impairment or two and

23     there is a date of diagnosis and step 3 is

24     completed, and then there is a printed name of a

25     physician with the physician's signature and date.

Page 145

1    We are assuming the physician followed that
2    section of the act.
3  Q   And what's the difference between a clinical
4    diagnosis and a diagnosis for purpose of the EHH
5    checklist?
6         MR. KAKUK:  Objection, scope.
7         MR. DUERK:  Foundation.  Go ahead.
8  A   To be honest with you, that is not within policy
9    and that's outside of the realm of my expertise.
10   I couldn't answer that for you.  I think that's
11   more of a medical position, and I can't answer
12   that.
13 Q   Is it fair to say that SSA has no position?
14 A   I would say that we don't get involved with that.
15 Q   Okay.
16 A   No.
17 Q   And I think your testimony for paragraph 28 is
18   again that's something where SSA doesn't get
19   involved with, correct?
20 A   Correct.
21 Q   And I think for paragraph 29 you agreed that
22   step 2 is completed by the healthcare provider who
23   will identify the asbestos-related conditions and
24   the date of diagnosis, correct?
25 A   Correct.

Page 146

1  Q   That's not SSA's job?
2  A   That is not SSA's job.  We are not medical
3    experts.
4  Q   So it's not SSA's job to determine whether someone
5    could be diagnosed by an interpretation of a
6    computed tomographic radiograph of the chest by a
7    qualified physician, right?
8  A   SSA's job is to make sure this form is completed,
9    and it is stating that this person is diagnosed
10   with one of these listed conditions with the date
11   of diagnosis and has been signed off by a
12   physician that has been following section 1881A of
13   the act.
14 Q   I am going to draw your attention to Exhibit 123
15   which is tab 7 in your book.
16 A   Okay.
17 Q   Did the patient in Exhibit 123 have a diagnosis
18   under section 1881A of the act?
19        MR. KAKUK:  Objection, scope.
20 A   This is just a letter from CARD stating that -- I
21   mean, this is the first time I am seeing this
22   letter, and it's saying, "You participated in an
23   asbestos health screening on 12-11-14, and at that
24   time you were not diagnosed with an
25   asbestos-related disease."

Page 147

1         I don't believe they would be following
2    section 1881A of the act.  I can't speak on this
3    form and what they complete on the checklist.  We
4    are assuming they are following the guidelines of
5    section 1881A of the act.
6  Q   So is it your job to interpret section 1881A of
7    the act or is it the physician's job to interpret?
8  A   That is the physician's job.  If he completes that
9    checklist and he states that they are diagnosed
10   with that condition, we are assuming he followed
11   the guidelines, he or she or they followed the
12   guidelines of the act.
13 Q   Again, you defer to his determination, correct?
14 A   Yes, we defer to their determination, yes.
15 Q   So when were you first made aware of this lawsuit?
16 A   I think when we got the subpoena.  I can't be too
17   sure.  I don't remember.
18 Q   Was it several years ago or was it last year or
19   was it a couple months ago?
20 A   A couple months ago, this year.
21 Q   So you were never made aware of any requests from
22   any of the parties for information in this case?
23 A   They wouldn't send those directly to me.  They
24   would send those to the appropriate parties if
25   there was a disclosure request.

Page 148

1  Q   And you being the --
2  A   Medicare lead.
3  Q   The medicare lead would not -- you would not be an
4    important person to inform about requests for
5    information for Medicare information?
6  A   I believe they were trying to get information from
7    about 2010 to whenever.  That would not be a time
8    period I was a Medicare lead.  I wouldn't be the
9    appropriate party to obtain that information from.
10 Q   And when did you become the Medicare lead?
11 A   2018.
12 Q   And it's the Social Security Administration's
13   position that no information post 2018 was asked
14   for?
15        MR. KAKUK:  Objection, scope.
16 A   I would not know.  I was not asked to supply any
17   documentation to my knowledge.
18 Q   Has the Social Security Administration been aware
19   that CARD has filled out EHH forms for individuals
20   based only on outside reader interpretations since
21   2010?
22 A   The first knowledge that we had of them completing
23   an EHH checklist where they said that they -- they
24   stated that the person -- the physician didn't
25   feel that person was diagnosed with that condition

Page 149

```
 1      was in spring 2023.  That is the first time that
 2      we are hearing about this.
 3  Q   I am going to hand you Exhibit 83.
 4  A   Okay.
 5  Q   Take a look at that.
 6  A   Do you want me to read it?
 7  Q   Do you recognize what that document is?
 8  A   That is an e-mail from a Kalispell employee,
 9      Sonya Peterson or Sonya Hymas who is a claims
10      technical expert to one of the CARD center
11      employees, I am assuming, and she said if the
12      claimant has been diagnosed with one of the
13      impairments on that list, they qualify, so to us
14      either they are diagnosed or they are not.
15  Q   Okay.  So let's start at the bottom where the
16      e-mail train starts.
17  A   Okay.
18  Q   And so describe what's happening in this e-mail.
19  A   She contacted them, and she said this guy called
20      and said he has not been diagnosed with an
21      asbestos-related condition, but said you told him
22      to call us.
23  Q   Okay.  And that's Sonya's e-mail to CARD, correct?
24  A   Correct.  And then CARD wrote back.
25          "Hi Sonya.  TT is not diagnosed, but has
```

Page 150

```
 1      received a positive outside read making him
 2      eligible for the EHH designation.  It is always
 3      difficult for me explaining to a patient that they
 4      are not diagnosed, but then need to call you guys
 5      to receive the benefits.  In the future, should
 6      patients with positive outside reads just state
 7      that they have positive outside read or just state
 8      they are diagnosed?  Sorry about the confusion."
 9          And Sonya followed policy and stated, "If
10      the claimant has been diagnosed with one of the
11      impairments on that list, they qualify."
12          So to us, either they are diagnosed or they
13      are not, and that is inside the scope of
14      HI 00803.050.  She is not going into specifics
15      about a B read or any of that, because that's not
16      her job.
17  Q   Right.
18  A   Right.
19  Q   So it's CARD's job to make that determination?
20  A   Correct.
21  Q   All right.  And it's SSA's job to defer to CARD?
22  A   It's SSA's job to make sure that whoever is
23      completing that EHH checklist is following the
24      guidelines of section 1881A of the act.  If this
25      is completed, we are assuming they are following
```

Page 151

```
 1      that.
 2  Q   Correct.  Does SSA have any opinion on what the
 3      difference between a clinical diagnosis of
 4      asbestosis, pleural thickening or pleural plaques
 5      by a CARD physician?
 6          MR. KAKUK:  Objection, scope.
 7  Q   Compared to a positive interpretation of
 8      asbestosis, pleural thickening or pleural plaques
 9      on a CT by a qualified physician for purposes of
10      the EHH checklist?
11          MR. DUERK:  Sorry.  Objection, form.
12          MR. KAKUK:  And scope.
13  A   Again, that's outside of my purview, and I have to
14      say I don't have an opinion because I am not a
15      medical expert.
16  Q   Why don't we go off the record for a little bit.
17      I am going to do a quick review, and then probably
18      about five minutes.
19  A   Okay.
20          THE VIDEOGRAPHER:  The time is 4:00.  We
21      are off the record.
22          (Break taken.)
23          THE VIDEOGRAPHER:  The time is 4:07.  We
24      are back on the record.
25  BY MR. BECHTOLD:
```

Page 152

```
 1  Q   Ms. Hillmann, as I understand your testimony, you
 2      have no personal knowledge of communications
 3      between CARD staff and SSA staff at the Kalispell
 4      level, correct?
 5  A   I do have knowledge of the spring 2023
 6      correspondence between the CARD staff and
 7      Terra Whiteman, but prior to that, no.
 8  Q   Okay.  And again you have no personal knowledge of
 9      how CARD staff and SSA staff in Kalispell handled
10      EHH forms, correct?
11  A   I do know that our SSA staff follows that
12      HI 00803.050 based on Terra Whiteman's response
13      who is the district manager.
14  Q   Okay.  And if it turns out that CARD staff are the
15      one who actually are filling out step 1, does that
16      make those EHH checklists invalid?
17  A   I wouldn't assume they would be invalid as long as
18      they are completing step 2 and step 3.  It's just
19      that we should be following the proper
20      instructions within the policy where we initiate
21      that on our side.
22  Q   But it doesn't invalidate those EHH checklists?
23  A   Uh-uh.
24          MR. KAKUK:  That was a no?
25  A   That was a no.
```

Page 153

BY MR. BECHTOLD:

Q  So I would like to draw your attention to Exhibit 136 which is your declaration that you submitted earlier in this case.

A  Okay.

Q  In paragraph 1 you state that you searched SSA's electronic records which included archived policies and information stored on the agency's drive?

A  Correct.

Q  Did that include e-mail communications?

A  It would not necessarily mean e-mail communications. It's our T-drive where we store any type of Libby correspondence that Kathy kept, the previous Medicare lead.

Q  So did it include e-mail correspondence or not?

A  There was e-mail correspondence between Kathy and then headquarter components about training our field offices.

Q  But as far as you know, there was no e-mail communications between SSA staff and CARD staff?

A  Correct.

Q  And then you stated you further consulted with current agency personnel who may have been involved in CARD's interaction during this period,

Page 154

and is that Mary Lisa Lewandowski and Terra Whiteman?

A  Correct.

Q  Anyone else?

A  I also contacted a couple other technicians that went out there to provide the training. That would be Kelly Hansen. She is currently a supervisor within our regional office, and also Chris DiGiacomo was another technician that went out there to provide training to the social security technician, and he is also a manager as well.

Q  Did you contact Nancy Berrihill at that time?

A  No, I did not.

Q  And she was in Libby at that time, correct?

A  She did come for one -- I believe one training. It might have been two.

Q  And she still works for SSA, right?

A  Correct.

Q  How come you didn't talk to her?

A  Because I went directly through our regional commissioner who would have a little bit more information, and if she needed to reach out to Nancy, she would.

Q  In paragraph three you state that in the 2010 to

Page 155

2011 timeframe regional office personnel interacted with employees from CARD because CARD prepared the EHH Medicare claims for submission to SSA.

What was the nature of the interaction?

A  I believe they were just doing Medicare EHH outreach, so they were outreaching to the community to find individuals affected, and I think that they might have like -- potentially the only contact that they had with them is about the Medicare outreach, and if they had questions about, you know, if they were missing forms or what have you regarding the claims process.

Q  So as I understand it, Medicare eligibility based on the EHH checklists is something that the SSA technicians in Libby were processing at that time?

MR. KAKUK: Objection, scope.

A  Yeah. Can you reread that question? I guess I didn't understand it fully.

Q  So the Medicare technicians -- excuse me. The SSA technicians were processing Medicare claims based upon the EHH checklists in Libby?

A  They were basing it following the instructions in HI 00803.50.

Q  And the EHH checklist is a SSA created document,

Page 156

correct?

A  Correct.

Q  And SSA gave that document to CARD without any directions, correct?

A  To my knowledge, yes. But CARD has been instructed to continue to follow the section 1881A of the act.

Q  Okay. Who instructed CARD to follow section 1881A of the act?

A  I would not know. I mean, I am assuming that that was some type of correspondence at some time. I don't know they would just complete a checklist without knowing they have to follow the guidelines of the act. I am sure there is correspondence in there somewhere.

Q  Okay. So you are sure that there is correspondence from SSA to CARD telling them to follow section 1881A of the act?

A  Well, I don't know if it's directly from SSA. I mean, I am just assuming that it's probably underneath their grant guidelines for them to perform, you know, those type of reviews within their clinic.

Q  Okay. So you don't know?

A  I don't know. I do know that they do get grants

Page 157

1  and they base them off of certain things, so I
2  can't speak to that.  That's outside of my
3  purview.
4  Q  Okay.  But as far as you know, there was never
5     anything from SSA to CARD telling them how to fill
6     out the EHH checklist?
7  A  Correct.
8  Q  And as far as you know, there was never any
9     informal communication of any type between CARD
10    staff and SSA staff about how to fill out these
11    EHH checklists, correct?
12 A  Correct.
13 Q  And you base that upon your communications with
14    Mary Lisa Lewandowski and Terra Whiteman?
15 A  Correct, and the headquarters components.
16 Q  What are the headquarters components again?
17 A  The office of information security programs and
18    then the office of program support.  I'm going to
19    mess -- It's OPSOS.  It is office of program
20    support.  I can't think of the last two of that
21    acronym, but those are two headquarters components
22    that have trained and actually initiated this
23    policy when it originally came out.
24 Q  So once the SSA employees process an environmental
25    health hazards checklist, what happens next?

Page 158

1  A  Once they process it?  Well, again, the
2     instructions in HI 00803.50 if they follow that
3     and the EHH checklist is complete there is a
4     diagnosis checked, there is a date of diagnosis,
5     section 3 is completed, printed name of the
6     physician, physician signature and date.  We are
7     assuming that physician followed section 1881A of
8     the act, and we process the claim.
9  Q  So what does it mean to process the claim?
10 A  We allow them for EHH Medicare.
11 Q  When you say allow, what does that mean?
12 A  We process an allowance to entitle them to
13    Medicare under the environmental health hazards
14    provisions.
15 Q  So what do the SSA employees do to make that
16    happen?
17 A  They take a claim within our system and they code
18    it appropriately and then they process it, and it
19    sets up the record and it sends a Medicare card.
20 Q  Okay.  So SSA processes it and inputs it into the
21    system and the system -- they have been approved
22    and the system then gives them Medicare benefits?
23 A  Correct.
24 Q  Okay.  I have nothing further.  Thank you.
25 A  Uh-huh.

Page 159

1  Q  Oh, I do have something further.  I want to hand
2     you what was an attachment to Exhibit 139.
3  A  Okay.
4  Q  Have you seen this document before?
5  A  I have not.
6  Q  If you look at Exhibit 139, you see on page 1 of
7     139 at the bottom where there is an e-mail from
8     Tracy McNew to Terra Whiteman.
9  A  Uh-huh.  I received this e-mail, but I did not
10    receive this attachment, so this is the first time
11    I am seeing it.
12 Q  Okay.  So your testimony is that Terra Whiteman
13    forwarded you the e-mail but did not forward you
14    the attachment to the e-mail?
15 A  Correct.
16 Q  Okay.  That's all the questions.
17              EXAMINATION
18 BY MR. DUERK:
19 Q  I have just a few follow-ups.
20 A  Okay.
21 Q  Mr. Bechtold asked you whether or not CARD had
22    been informed by SSA about how to fill out EHH
23    checklists.
24       Do you remember that question?
25 A  Yes.

Page 160

1  Q  Okay.  Regardless of whether you can point to any
2     communication between SSA and CARD today on that
3     topic, based on what information you have reviewed
4     in your factual inquiry, are resources readily
5     available to the public about how to fill out EHH
6     checklists in terms of the POMS, section 1881A of
7     the Affordable Care Act itself, and the emergency
8     policy 10042REV that you referenced earlier?
9  A  Those are public-facing policies.  That means the
10    public can obtain those, yes.
11 Q  And did each of those sources of information that
12    are publicly-available provide clear direction in
13    terms of the requirements of a CARD patient or any
14    patient in order to obtain Medicare benefits?
15       MR. KAKUK:  Objection, scope.
16       MR. BECHTOLD:  Form.
17 A  Yes, for EHH Medicare, yes.  Correct.
18 Q  And are you aware of that just based on your own
19    personal knowledge having seen those documents?
20 A  Uh-huh.
21 Q  Is that a yes?
22 A  That's a yes.
23 Q  Okay.  Now, Ms. Hillmann, you may or may not be
24    aware of this, but are you aware that even CARD's
25    website itself says you need a diagnosis of

1   asbestos-related disease in order to get Medicare?
2  A   No, I was not aware of that.
3  Q   All right.  In terms of questions that
4   Mr. Bechtold asked you about any type of training
5   that might have been provided or wasn't provided
6   to CARD from any of these different SSA employees,
7   I believe Mary Lisa Lewandowski is somebody that
8   you spoke to about this issue of training, is that
9   right?
10 A   Correct.
11 Q   Did you speak with Terra Whiteman or Whiteman
12   about the issue of training also?
13 A   Yes.
14 Q   There was some other names that you mentioned
15   among SSA staff related to this topic of CARD and
16   whether or not any SSA training occurred.
17        Do you remember any of the other names of
18   individuals?
19 A   The regional office employees that train the SSA
20   staff in Kalispell, that would be Kelly Hansen.
21 Q   Okay.
22 A   And then Chris DiGiacomo, and I believe I said
23   Nancy Berrihill as well.  I did speak with
24   Kelly Hansen and I did speak with Chris DiGiacomo,
25   and they also verified that they never gave CARD

1  A   Yeah.
2  Q   And in terms of where those field employees would
3   have gotten information about how to fill out an
4   EHH form, is it fair to assume that would have
5   been from the POMS?
6  A   It would have been directly from POMS.
7  Q   Right.
8  A   Yeah.
9  Q   Nothing in the POMS mentions that patients are
10   eligible for Medicare on a B read alone, correct?
11        MR. KAKUK:  Objection, scope.
12        MR. BECHTOLD:  Form.
13 A   Correct.
14 BY MR. DUERK:
15 Q   All right.  Nothing in the POMS, none of the
16   language in the POMS that you have read states
17   that it's acceptable to submit a patient for
18   Medicare without a diagnosis of asbestos-related
19   disease, correct?
20        MR. KAKUK:  The same objection.
21        MR. BECHTOLD:  Form.
22 A   Correct.
23 BY MR. DUERK:
24 Q   And I am basing that on language you yourself have
25   read in the POMS, fair?

1   any training as well.
2  Q   In terms of all of the interviews conducted and
3   all of the written material you received, did
4   every source of information point to the same
5   response that SSA did not train CARD how to fill
6   out these EHH forms at the CARD clinic at any
7   time?
8  A   Correct.
9  Q   Okay.  Now, I want to entertain a hypothetical
10   here.  The hypothetical that I want to entertain
11   is if somehow someone like Sonya Hymas,
12   Sonya Peterson, if an SSA field office employee
13   had provided training to CARD about how to fill
14   out an EHH form, if that had occurred, would that
15   training have been based on what those SSA field
16   agents had been instructed according to the POMS?
17 A   I can't speak to the -- I don't know what they
18   would train them on.  Honestly, they would just
19   train them on this section has to be completed,
20   this section has to be completed, because we are
21   not medical experts, so I don't believe training
22   would be beneficial for CARD, because we are not
23   medical experts and we can't speak to the section
24   1881A of the act because we're not trained on it.
25 Q   All right.

1  A   Yes.
2  Q   Okay.  Mr. Bechtold asked you if you had any
3   personal knowledge of the communication between
4   CARD and SSA.  I believe you said you didn't have
5   any personal knowledge of that communication, but
6   during your factual inquiry related to that topic
7   did you review a certain amount of communication
8   between CARD and the Social Security
9   Administration?
10 A   I can only speak to what I received in the spring.
11   That's the only correspondence that I have seen
12   between social security and CARD.
13 Q   Okay.
14 A   Yeah.
15 Q   And in terms of any discussions with any of the
16   members of the Social Security Administration that
17   we have mentioned today, did you ask specific
18   questions of them about whether there was any
19   communication they were aware of between CARD and
20   the SSA related to the issues of training or
21   notice or any of these other issues that we have
22   discussed today?
23 A   I did reach out to Terra Whiteman on the majority
24   of the questions except for the one about the
25   award, and then I did ask Kelly Hansen and

Page 165

```
1    Chris DiGiacomo if -- again, I am just going to
2    reiterate what I said in my previous statement.
3    Did we give any additional, do you know if we gave
4    any additional training to the CARD employees, and
5    they all stated that we hadn't to their knowledge.
6  Q  And Terra Whiteman was based in -- where is
7    Terra Whiteman based now?
8  A  Kalispell.
9  Q  And how long has Terra Whiteman been based in
10   Kalispell?
11 A  Oh, goodness.  I would say -- I would have to
12   actually ask her, but she has been there for quite
13   some time.
14 Q  Okay.
15 A  Yeah.  Most of her tenure has been in that office.
16 Q  Mr. Bechtold had you look at two exhibits,
17   Exhibit 85, an e-mail between Sonya and Mary Karen
18   Caraway.
19       Do you have that in front of you?
20 A  If I can find it.  Let me see.  Give me one
21   second.
22 Q  Why don't we take a five-minute break and we will
23   organize the documents and then get back on the
24   record.
25 A  Okay.
```

Page 166

```
1        THE VIDEOGRAPHER:  The time is 4:27.  We
2    are off the record.
3        (Break taken.)
4        THE VIDEOGRAPHER:  The time is 4:30.  We
5    are back on the record.
6  BY MR. DUERK:
7  Q  All right.  After a short break, Ms. Hillmann, do
8    you have Exhibit 85 in front of you?
9  A  I do.
10 Q  Mr. Bechtold referenced this e-mail during your
11   cross-examination.  This is about a patient with
12   some questions from SSA as to whether or not the
13   patient has been diagnosed.
14       Is that a fair representation?
15 A  Yes.
16 Q  Okay.  On page 2 does the e-mail from CARD
17   indicate that this patient has a B read diagnosis?
18 A  To me, I would read it that way, but I am not a
19   medical expert.  I would assume DX means
20   diagnosis.
21 Q  Okay.
22 A  Yeah.
23 Q  And so if that interpretation is correct, is CARD
24   saying this patient has a B read diagnosis, but I
25   need to check on some other information?
```

Page 167

```
1  A  Correct.
2  Q  Okay.  So if the CARD clinic represents to the
3    Social Security Administration that a patient has
4    a diagnosis, in SSA's view that patient is
5    Medicare eligible, fair?
6  A  If the CARD clinic presents us with that checklist
7    with one of the diagnoses that are listed with the
8    date of diagnosis and completes 2 and 3, then yes.
9  Q  All right.
10 A  Yeah.
11 Q  Nowhere in this e-mail train does it say that this
12   patient does not have a diagnosis, correct, except
13   in the first e-mail that kicks this all off?
14       The subsequent pages don't say anywhere
15   affirmatively this patient is not sick, fair?
16 A  To the best of my knowledge, yes.
17 Q  Okay.  Nowhere in this e-mail does CARD tell the
18   SSA that they are submitting patients for Medicare
19   benefits without a diagnosis as a routine
20   practice, correct?
21 A  Correct.
22 Q  Okay.  In terms of policy, if a patient has been
23   diagnosed by CARD with one of the impairments of
24   asbestos-related disease due to asbestos exposure,
25   they qualify for Medicare?
```

Page 168

```
1  A  Yes.  If it's one of the ones listed within the
2    checklist and they complete that checklist
3    following section 1881A of the act, yes.
4  Q  All right.  So in terms of Exhibit 83 that
5    Mr. Bechtold showed you, an e-mail from Sonya --
6    between Sonya Peterson and Stephanie Moore,
7    Ms. Peterson says, "If a claimant has been
8    diagnosed with one of the impairments on that
9    list, they qualify, so to us, either they are
10   diagnosed or they aren't."
11       Did I read that correctly?
12 A  Correct.
13 Q  And so basically, Ms. Hillmann, if a patient has
14   been diagnosed they are eligible for Medicare, and
15   if they have not been diagnosed, they aren't
16   eligible for Medicare?
17       MR. KAKUK:  Objection, scope.
18 A  Correct.
19 BY MR. DUERK:
20 Q  Okay.  Is that a fair interpretation in your mind?
21 A  Yes.
22 Q  Ms. Hillmann, I have no further questions, and I
23   appreciate your time here today.  Thank you.
24 A  Thank you.
25       MR. BECHTOLD:  I am going to do a brief
```

Page 169

```
 1        re-cross.
 2                MR. DUERK:  I will object, but go ahead.
 3                EXAMINATION
 4  BY MR. BECHTOLD:
 5  Q    If the judge kicks it, he'll kick it.
 6            So you testified that there is nothing in
 7      the POMS that qualifies an individual for Medicare
 8      eligibility based on a B reading alone, correct?
 9            Do you remember that testimony you just
10      gave?
11  A    Did I just give that testimony?
12                MR. KAKUK:  The same objection.
13                MR. DUERK:  Objection, form.  Misstates
14      the testimony.  Go ahead.
15  A    I think the testimony that I gave was what's in
16      HI 00803.50 and it's our instruction to our
17      technicians.  It states if that checklist is
18      completed, you know, section 1, section 2,
19      section 3, we are assuming that the physician
20      followed section 1881A of the act and provided an
21      appropriate diagnosis based on their
22      interpretation of that act.
23                MR. BECHTOLD:  Annie, can you scroll
24      back for me to her testimony about nothing in
25      POMS?
```

Page 170

```
 1                THE COURT REPORTER:  In this answer
 2      right now?
 3                MR. BECHTOLD:  No.
 4                THE COURT REPORTER:  Previous?
 5                MR. BECHTOLD:  Previous.
 6                THE COURT REPORTER:  How far previous
 7      and during whose examination?
 8                MR. BECHTOLD:  During the beginning of
 9      Mr. Duerk's examination.
10                MR. KAKUK:  Of his cross, right, of his
11      re-direct?
12                MR. BECHTOLD:  Of his re-direct.
13                MR. KAKUK:  Yeah.
14                THE COURT REPORTER:  Well, let me go to
15      it.  One moment.
16                (Discussion off steno record.)
17                (Testimony read back as follows:)
18                Question:  Nothing in the POMS mentions
19      that patients are eligible for Medicare on a
20      B read alone, correct?
21                Answer:  Correct.
22  A    I agree with that.
23  BY MR. BECHTOLD:
24  Q    Okay.  So nothing in POMS says that a person is
25      eligible based on a B reading alone?
```

Page 171

```
 1  A    Correct.
 2                MR. KAKUK:  Objection, scope.
 3  BY MR. BECHTOLD:
 4  Q    So would you agree that Exhibit 75, the POMS, and
 5      also Exhibit 142, right?  140?
 6                MR. DUERK:  75 and 140 are the same.
 7  BY MR. BECHTOLD:
 8  Q    Yeah.  75 and 140 both indicate that an ARD
 9      diagnosis established by a diagnostic method
10      specified in the law, so for example, if we looked
11      on Exhibit 75 and the examples 1, 2 and 3 where
12      they state Mr. Brown received an ARD diagnosis
13      established by a diagnostic method specified in
14      the law or Mr. James received an ARD diagnosis
15      established by a diagnostic method specified in
16      the law or Ms. Jackson received an ARD diagnosis
17      established by a diagnostic method specified in
18      the law, so as SSA's interpretation of section
19      1881A is that a B reading alone is not a
20      diagnostic diagnosis established by a diagnostic
21      method as specified in the law?
22                MR. KAKUK:  Objection, scope.
23                MR. DUERK:  Objection, form, compound
24      and foundation.  Go ahead.
25  A    Can you read that back to me?  I'm sorry.
```

Page 172

```
 1                (Read back.)
 2  A    I meant his question.  I'm sorry.
 3                THE COURT REPORTER:  Isn't that the
 4      question?
 5  A    Was it the same question?
 6                THE COURT REPORTER:  That's the
 7      question.
 8  A    Because that doesn't sound the same because you
 9      asked me --
10  Q    Go ahead.  Finish the question.
11  A    I'm sorry.
12                THE COURT REPORTER:  That's okay.
13                (Read back.)
14                MR. DUERK:  The same objections.
15  A    Again, I can't speak to that.  That's outside of
16      my purview.  I am not a medical expert that
17      interprets section 1881A of the act.
18            I was asked if that language was within
19      this policy section that's given to our
20      technicians and I said -- he asked me you would
21      say that this language was not within this policy,
22      and I agreed and I said correct.
23  Q    Okay.  So your testimony is that the specific
24      words "B reading alone" is not found in POMS?
25  A    It's not found in policy, within this policy that
```

Page 173

1    he asked me about.

2  Q   And your testimony isn't meant to have any

3      implication about Medicare eligibility based upon

4      section 1881A?

5          MR. DUERK:  Objection, form.

6  A   I would have to agree with that because, again,

7      that's outside of my purview and I can't speak to

8      section 1881A of the act.

9  Q   Okay.  Those are all the questions I have.

10         MR. DUERK:  Thank you for your time.

11     Thanks for being here.

12         THE WITNESS:  Yeah.  Thanks.

13         THE VIDEOGRAPHER:  Okay.  That concludes

14     today's proceedings.  The time is 4:41 and we

15     are off the record.

16         THE COURT REPORTER:  Thank you.

17     Mr. Duerk, would you like to purchase the

18     transcript?

19         MR. DUERK:  Yes, please.

20         THE COURT REPORTER:  And Mr. Bechtold,

21     would you like to purchase?

22         MR. BECHTOLD:  Yes.

23         THE COURT REPORTER:  Okay.

24         MR. KAKUK:  We would like one as well.

25         (Deposition concluded at 4:41 PM.)

Page 174

1          I, HEATHER HILLMANN, do hereby certify

2      that I have read the foregoing transcript and

3      that the same and accompanying amendment sheets,

4      if any, constitute a true and complete record of

5      my testimony.

6

7

8

9                    _____
                     Signature of Deponent

10                   ( ) No amendments

                     ( ) Amendments attached

11

12         Acknowledged before me this _____ day of

13     _____ 2023.

14

15         Notary Public: _____

16         My Commission Expires _____

17         Seal:

18

19

20

21

22

23

24

25

Page 175

1  STATE OF COLORADO )

2                    ) ss.      REPORTER'S CERTIFICATE

3  COUNTY OF DENVER )

4

5          I, Annie Sager, certify that I am a

6      Court Reporter and Notary Public within the

7      State of Colorado; that previous to the

8      commencement of the examination, the deponent

9      was duly sworn to testify to the truth.

10         I further certify that this deposition

11     was taken in shorthand by me at the time and

12     place herein set forth and was thereafter

13     reduced to typewritten form, and that the

14     foregoing constitutes a true and correct

15     transcript.

16         I further certify that I am not related

17     to, employed by, nor of counsel for any of the

18     parties or attorneys herein, nor otherwise

19     interested in the result of the within action.

20         In witness whereof, I have affixed my

21     signature this 30th day of May, 2023.

22         My commission expires June 25, 2023.

23

24         _____
           Annie Sager

25         216 Sixteenth Street, Suite 600

           Denver, Colorado 80202

Page 176

1  AB LITIGATION SERVICES

   216 Sixteenth Street, Suite 600

2  Denver, Colorado 80202

3

   May 30, 2023

4

5  Michael Kakuk, Assistant U.S. Attorney

   U.S. Department of Justice

6  United States Attorney's Office

   901 Front Street, Suite 1100

7  Helena, Montana 59626

8

   Re:  Deposition of Heather Hillmann

9        BNSF vs. CARD

         Case No. CV-19-40-M-DLC

10

   The aforementioned deposition is ready for reading and

11 signing.  Please attend to this matter by following BOTH of

   the items indicated below:

12

   _____ Call 303-296-0017 and arrange with

13        us to read and sign the deposition in our

          office

14

   _XXX_ Have the deponent read your copy and sign the

15        signature page and amendment sheets, if

          applicable; the signature page is attached

16

   _____ Read the enclosed copy of the deposition and

17        sign the signature page and amendment sheets,

          if applicable; the signature page is attached

18

19 _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

   _____ By _____ due to a trial date of _____

20

21 Please be sure the original signature page and amendment

   sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and

22 returned to AB Litigation Services for filing with the

   original deposition.  A copy of these changes should also be

23 forwarded to counsel of record.  Thank you.

24 AB LITIGATION SERVICES

25 cc:  All Counsel

Page 177

```
 1   AB LITIGATION SERVICES
     216 Sixteenth Street, Suite 600
 2   Denver, Colorado 80202
 3
 4
              HEATHER HILLMANN
 5             May 16, 2023
              BNSF vs. CARD
 6          Case No. CV-19-40-M-DLC
 7
     The original deposition was filed with
 8
     W. Adam Duerk, Esquire, on approximately the
 9
     30th day of May, 2023.
10
     _____ Signature waived
11
     _____ Signature not requested
12
     _____ Unsigned; signed signature page and amendment
13        sheets, if any, to be filed at trial
14   _XXX_ Unsigned; original amendment sheets and/or
          signature pages should be forwarded to
15        AB Litigation Services to be filed in the envelope
          attached to the sealed original
16
     Thank you.
17
     AB LITIGATION SERVICES
18
     cc:  All Counsel
19
20
21
22
23
24
25
```

Page 178

```
          - AMENDMENT SHEET -

     Deposition of HEATHER HILLMANN

             May 16, 2023

            BNSF vs. CARD

       Case No. CV-19-40-M-DLC

The deponent wishes to make the following changes in the

testimony as originally given:

Page  Line            Should Read              Reason
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____
____  ____  _____     _____

Signature of Deponent: _____

Acknowledged before me this _____ day of

_____, 2023.

(seal)    Notary's signature _____

          My commission expires _____
```

Transcript of Monica Nolan, Designated Representative

1 (1 to 4)

Conducted on June 8, 2023

---

**1**

```
1          IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF MONTANA
3    - - - - - - - - - - - - - - - x
4    BNSF RAILWAY COMPANY,          :
5    On behalf of THE UNITED        :
6    STATES OF AMERICA              :    Civil Action No.
7            Plaintiff,             :    CV-19-40-M-DLC
8        v.                         :
9    THE CENTER FOR ASBESTOS        :
10   RELATED DISEASE, INC.,         :
11           Defendant.             :
12   - - - - - - - - - - - - - - - x
13
14           Videotaped Deposition of the
15    SOCIAL SECURITY ADMINSTRATION, BY AND THROUGH
16        ITS DESIGNATED REPRESENTATIVE,
17              MONICA NOLAN
18                REMOTE
19          Thursday, June 8, 2023
20             10:04 a.m. EST
21
22
23   Job No.: 496083
24   Pages: 1 - 129
25   Transcribed By: Janice Willier
```

**2**

```
1    Videotaped deposition of MONICA NOLAN, held
2    remotely:
3
4
5
6
7
8
9
10   Pursuant to notice, before Shawn Cavaliere,
11   Notary Public in and for the State of Maryland.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              A P P E A R A N C E S
2    ON BEHALF OF THE PLAINTIFF:
3        ADAM DUERK, ESQUIRE
4        KNIGHT NICASTRO MACKAY
5        283 W Front Street
6        Suite 20
7        Missoula, Montana 59802
8        406-206-7052
9
10   ON BEHALF OF THE DEFENDANT:
11       TIMOTHY BECHTOLD, ESQUIRE
12       BECHTOLD LAW FIRM, PLLC
13       317 East Spruce Street
14       Missoula, Montana 59802
15       406-721-1435
16
17
18
19
20
21
22
23
24
25
```

**4**

```
1       A P P E A R A N C E S   C O N T I N U E D
2    ON BEHALF OF THE U.S. ATTORNEY'S OFFICE:
3        MICHAEL KAKUK, ESQUIRE
4        SARAH BERRY, ESQUIRE
5        ASSISTANT U.S. ATTORNEY
6        U.S. ATTORNEY'S OFFICE
7        P.O. Box 8329
8        105 E. Pine Street, 2nd Floor
9        Missoula, Montana  59802
10       406-457-5262
11
12
13
14
15   ALSO PRESENT:
16       Andrew Stromberg, Remote Tech
17       Tracy Mcnew, CEO for CARD
18       Brendon Skipper, Videographer
19
20
21
22
23
24
25
```

**Exhibit C-1**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

2 (5 to 8)

---

**5**

C O N T E N T S

EXAMINATION OF MONICA NOLAN                    PAGE

    By Mr. Duerk                    8
    By Mr. Bechtold                79
    By Mr. Duerk                  112


E X H I B I T S

EXAMINATION EXHIBIT                            PAGE

75  POMS Document                    30
76  EHH Document                     15
135 Public Law Document             113
305 Public Law Document              82

---

**6**

PROCEEDINGS

1 THE VIDEOGRAPHER: Here begins the remote
2 video deposition of Monica Nolan, in the matter of
3 BNSF Railway Company v. The Center of Asbestos
4 Related Disease, Inc., in the United States
5 District Court for the District of Montana, case
6 number CV-19-40-M-DLC.
7     Today's date is June 8, 2023. The time on
8 the video monitor is 10:05 a.m., Eastern Standard
9 Time. The remote videographer today is Brendon
10 Skipper, representing Planet Depos. All parties
11 of this video deposition are attending remotely.
12     Would counsel please voice identify
13 themselves and state whom they represent.
14     MR. DUERK: Adam Duerk, for Realtor BNSF.
15     MR. BECHTOLD: Tim Bechtold, on behalf of
16 the CARD Clinic.
17     MR. KAKUK: And Michael Kakuk, on behalf
18 of the United States and the Social Security
19 Administration.
20     MS. BERRY: Sarah Berry, on behalf of the
21 Social Security Administration.
22     THE VIDEOGRAPHER: The court reporter
23 today is Shawn Cavaliere, representing Planet
24 Depos. The witness will now be sworn.

---

**7**

1 Whereupon,
2         MONICA LEE NOLAN,
3 Having been first duly sworn, was examined and
4 testified as follows:
5     MR. DUERK: Thank you. Mr. Kakuk, I
6 understand that you have a brief statement to put
7 on the record before we get underway.
8     MR. KAKUK: Yes, thank you, Adam. As
9 before with Ms. Hillman's deposition, I'd just
10 like to note that the Social Security
11 Administration has designated Ms. Nolan today
12 specifically for specific requests in the subpoena
13 sent to Social Security. And those requests are 1
14 through 16, 23 and 24, 30 through 35, and 40 to
15 44. Which are essentially the remaining requests
16 after the deposition of Ms. Hillman.
17     And so any questions outside of the scope
18 of those requests, Social Security would like to
19 make sure that everybody is aware that that means
20 essentially two things. One, that the Social
21 Security Administration was not required to
22 prepare Ms. Nolan for that question, if it's
23 beyond the scope. And secondly, any answer that
24 Ms. Nolan gives would not be, therefore, on behalf
25 of the Social Security Administration.

---

**8**

1     MR. DUERK: Thank you, Michael.
2     EXAMINATION BY COUNSEL FOR THE PLAINTIFF
3 BY MR. DUERK:
4     Q Ms. Nolan, good morning. I'm Adam Duerk.
5 Would you please state your full legal name for
6 the record, spelling your last name?
7     A Sure. Monica Lee Nolan, N-O-L-A-N.
8     Q Ms. Nolan, thank you for being here today.
9 I'll just call you Ms. Nolan, pursuant to our
10 local rules and practices here in Montana, if
11 that's okay with you?
12     A Certainly.
13     Q Thank you. Ms. Nolan, have had your
14 deposition taken in the past?
15     A No.
16     Q All right. I'll cover some basic ground
17 rules with you. If you have any questions for me
18 or the other counsel present, that's just fine.
19 If you need to take break for any reason to
20 consult with counsel, that's okay too. Does that
21 make sense to you?
22     A Yes.
23     Q All right. A few other basic ground rules
24 -- and I'll try to get through these as quickly as
25 I can. But we're making an official transcript

---

**Exhibit C-2**

9

1  today in anticipation of an official proceeding,
2  that being trial.  And we anticipate that your
3  testimony will be played in full.  However,
4  although your testimony is trial testimony, it's
5  okay if we need to take breaks.  The jury and the
6  judge won't be inconvenienced here.  Does that
7  make sense to you?
8      **A  Yes.**
9      Q  Also it's important that we try to shoot
10  for a clear record.  So if I start to speak over
11  you or you are speaking any of the questioning
12  attorneys, that doesn't necessarily make for a
13  very clear record.  So I'll try to indicate that
14  we need to put a stop to that somehow.  Does that
15  make sense?
16     **A  Yes.**
17     Q  All right.  Ms. Nolan, I'll represent to
18  you that it's not my intent to confuse you or ask
19  questions in a confusing manner.  If that happens
20  with anyone today, rather than guessing at our
21  meaning and convoluted questions, if you would
22  just raise your hand and stop and ask me or others
23  to rephrase.  I think that would be helpful.  Does
24  that make sense to you, also?
25     **A  Yes.**

10

1      Q  All right.  Thank you, Ms. Nolan, I
2  appreciate it.
3          Ms. Nolan, what is your occupation?
4      **A  I'm a supervisor for the Office of**
5  **Earnings, Enumeration, and Medicare Policy at the**
6  **Social Security Administration.**
7      Q  And where are you based?
8      **A  In Baltimore, Maryland headquarters.**
9      Q  How long have you been so employed with
10  the Social Security Administration, or SSA?
11     **A  For 27 years.  27 years.**
12     Q  What are some of your primary job
13  responsibilities in that occupation?
14     **A  In my current position I oversee a couple**
15  **of policy areas including Medicare.  That includes**
16  **reviewing, revising, creating policy based on**
17  **legislation or a change in legislation.  We are**
18  **also are involved with certain other entities,**
19  **agencies, for enumeration related policy as well**
20  **as earnings related policy in addition to**
21  **Medicare.**
22     Q  Ms. Nolan, it's my understanding that
23  you've been designated as the 30(b)(6) deponent
24  for SSA.  Is it your understanding that you have
25  been designated address the topics related to the

11

1  subpoena for trial testimony issued to the Social
2  Security Administration?
3      **A  Yes.**
4      Q  And what have you done in order to look at
5  the different topics issued in that subpoena?
6      **A  I reviewed the POMS.  I reviewed the**
7  **legislation, the Affordable Care Act, 1881A, I**
8  **believe.  And that's really about it, those basic**
9  **resources.  Check my e-mails, like, historical**
10  **e-mails.  But I didn't have much information**
11  **specific to EHH.**
12     Q  All right.  It's my understanding that an
13  SSA employee has already been deposed in this
14  matter.  Her name is Heather Hillman.  Have you
15  had any conversations with Heather Hillman about
16  her testimony?
17     **A  No.**
18     Q  In terms of any conversations with any
19  other individuals, outside of legal counsel for
20  SSA, did you have any substantive conversations
21  with anyone else in preparing your testimony
22  today?
23     **A  No.**
24     Q  Okay.  In terms of any other written
25  materials, e-mails, handbooks, documents of any

12

1  kind, other than the POMS sections that you
2  mentioned and the Social Security Act, have you
3  reviewed any other e-mails that we haven't
4  discussed yet?
5      **A  No.**
6      Q  All right.  What I'd like to do is focus
7  on some of the POMS.  Do you have printed copies
8  in front of you?
9      **A  I do not.**
10     Q  All right.  Are you familiar with the
11  different sections of POMS 00803.001 and
12  00803.050?
13     **A  Yes.**
14     Q  Okay.  If you could just generally
15  describe for me what -- what the POMS are, that
16  would be helpful.
17     **A  Okay.  The POMS are instructions that are**
18  **written for our technicians to carry out**
19  **programatic claims, taking claims, or programatic**
20  **policies.**
21     Q  And how were the POMS distributed within
22  the Social Security Administration?
23     **A  Can you clarify when you say distributed,**
24  **how do the technicians review them or how do we --**
25     Q  How do you make them?

**Exhibit C-3**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

13

1    A Okay. So there is an a pretty
2 comprehensive process for getting POMS to the
3 publication state. That includes the writing, the
4 crafting, and then sharing across the agency. So
5 OGC, operations systems, legislative operations,
6 there are many opponents that actually review the
7 POMS, provide input, guidance. Those comments are
8 reconciled in the policy component more often than
9 not and then sent back out for an executive level
10 review. And once that is approved at the
11 executive level, they're published.
12    Q And in terms of the way that those POMS
13 sections are published, are those POMS made
14 available, not just to employees at the Social
15 Security Administration, but to members of the
16 general public as well, through SSA's website?
17    A There are some that are published
18 publicly, yes.
19    Q All right. Ms. Nolan, I'll represent to
20 you that I have copies of the POMS that I believe
21 I was able to access on SSA's website. To your
22 knowledge, are you aware of whether or not the SSA
23 POMS sections that I just referenced are available
24 to the public generally?
25    A Yes, those two sections are.

15

1 interpretations of the law or how it's written
2 instead of following the POMS?
3    A The expectation is that the technicians
4 follow the POMS.
5    Q Ms. Nolan, what I'd like to do is focus on
6 Exhibit 76.
7       MR. DUERK: Is there a way that we could
8 publish the exhibit for Ms. Nolan's benefit?
9       THE VIDEOGRAPHER: Sure. Please stand by.
10       MR. DUERK: Thank you.
11       THE COURT REPORTER: And would you like
12 those just marked as, like, Nolan 1 or --
13       MR. DUERK: No, the exhibits forward
14 should have their own exhibit stickers.
15       THE COURT REPORTER: Yeah, I do see that.
16 Okay, cool. Stand by. One second.
17       MR. DUERK: Thank you.
18       THE COURT REPORTER: Exhibit 76 is now up.
19       MR. DUERK: Great, thank you.
20 BY MR. DUERK:
21    Q Ms. Nolan, do you see what's been marked
22 as Exhibit 76 in front of you?
23       (Thereupon, Exhibit 76 was marked for
24 identification.)
25    A Yes.

14

1    Q Okay. In terms of how the POMS are
2 implemented, do you have any knowledge of how the
3 POMS that we'll be referencing today may have been
4 implemented by the Kalispell field office in
5 Kalispell, Montana with the Social Security
6 Administration?
7       MR. BECHTOLD: Objection, scope.
8    Q Okay. Ms. Nolan, let me rephrase. It's
9 my understanding that you are here to speak about
10 policy issues but not necessarily factual issues
11 raised in the subpoena. Is that your
12 understanding also?
13    A Yes.
14    Q Okay. I'll try to stick to policy issues
15 exclusively. Let me ask it this way, from the
16 policy level do you have any information about how
17 the POMS are distributed to field office staff
18 with the Social Security Administration?
19    A The POMS are located on our internal
20 website and individuals actually select the
21 section based on whatever they are working on and
22 they follow those instructions verbatim.
23    Q Okay. All right. To the best of your
24 knowledge, are Social Security Administration
25 field staff at liberty to come up with their own

16

1    Q Does this appear to be a true and accurate
2 copy of the Program Operations Manual System, or
3 system -- the POMS, for section HI 00803.050,
4 Developing Medical Requirement for Entitlement to
5 EHH Medicare?
6    A Yes, I know there are a couple. There
7 should be another section. But this appears
8 accurate.
9    Q All right. I'd like to read the first
10 section under part A.
11       MR. DUERK: I'm sorry, I just heard some
12 speaking in the background. Are we okay? All
13 right.
14 BY MR. DUERK:
15    Q I'd just like to read section A for you.
16 Please tell me if I've read it correctly, okay?
17    A Yes.
18    Q Section A, Medical Requirement for
19 Entitlement to EHH Medicare. An individual
20 exposed to environmental health hazards, EHH, in
21 Lincoln County, Montana, must meet the medical
22 requirement for entitlement to EHH Medicare. He
23 or she must have been diagnosed with an
24 asbestos-related disease, ARD, established by
25 certain diagnostic methods.

**Exhibit C-4**

17

1    Did I read that correctly?
2    **A  Yes.**
3    Q  Okay.  In terms of this section, based on
4  the Program Operations Manual and the other
5  materials that you have reviewed, in order to
6  receive Medicare benefits is it true that an
7  individual must have been diagnosed with an
8  asbestos-related disease?
9    **A  Yes.**
10    Q  All right.  In terms of the EHH checklist,
11  is that a document that you've reviewed yourself?
12    **A  Yes.**
13    Q  All right.  I'd like to review that EHH
14  checklist which, I believe, is set forth on page 4
15  of Exhibit 76.
16      MR. DUERK:  If we could please publish
17  that for the witness.
18  BY MR. DUERK:
19    Q  Ms. Nolan, do you see the Environmental
20  Health Hazards Checklist, subtitled Medicare
21  Coverage for Individuals Exposed to Environmental
22  Health Hazards in front of you?
23    **A  Yes.**
24    Q  Ms. Nolan, does this appear to be a true
25  and accurate copy of an EHH checklist that is part

18

1  of the POMS policy that we've been discussing so
2  far?
3    **A  Yes.**
4    Q  All right.  I'd like to read a few
5  sections of this form, just to orient us and then
6  I'll ask you some questions, okay?
7    **A  Yes.**
8    Q  Step 1 here says, identify the individual.
9  In parenthesis the section says completed by the
10  field office.  Did I read that right?
11    **A  Yes.**
12    Q  Ms. Nolan, in terms of the field office,
13  are you aware of what the field office is as
14  indicated on this form?
15    **A  Do I know what the term field office**
16  **means?**
17    Q  Yes.
18    **A  Yes.**
19    Q  Okay.  And in terms of your understanding
20  of the term, field office, would this term apply
21  to, say, the Kalispell field office for the Social
22  Security Administration?
23    **A  Yes.**
24    Q  All right.  Step 2 of the EHH form reads,
25  identify the asbestos-related condition or

19

1  conditions and its date of diagnosis.  In
2  parenthesis it says here, completed by the
3  provider.  Did I read that correctly?
4    **A  Yes.**
5    Q  In terms of the term in parenthesis here,
6  the provider, what is your understanding of who
7  that individual would be?
8    **A  The medical provider.**
9    Q  Okay.  So Ms. Nolan, just generally in
10  terms of all of the information filled out on Step
11  2 of this form, would it be your understanding and
12  expectation, according to the POMS, that these
13  boxes would be filled out by the health care
14  provider, who in this case involving CARD, would
15  be the physician or health care provider who
16  diagnosed the CARD patient who has been submitted
17  for potential Medicare eligibility?
18    **A  Yes.**
19    Q  All right.  So in terms of the columns
20  here below Step 2, do you see a column titled
21  impairment, with a number of different diagnosed
22  impairments listed?
23    **A  Yes.**
24    Q  Okay.  I'll be focusing on just two of
25  those impairments today, asbestosis and pleural

20

1  thickening, or pleural plaques.  Do you see those
2  diagnose impairments listed?
3    **A  Yes.**
4    Q  All right.  Do you see a diagnosis code
5  for each of those impairments listed as 5010?
6    **A  Yes.**
7    Q  Do you see the minimum medical evidence
8  required column?
9    **A  Yes.**
10    Q  For both asbestosis and pleural
11  thickening, pleural plaques I'd like to read the
12  language there.  Please tell me if I've read it
13  correctly, okay?
14    **A  Yes.**
15    Q  This column is titled Minimum Medical
16  Evidence Required; interpretation by a B reader
17  qualified physician of a plain chest x-ray or
18  interpretation of computed tomographic radiograph
19  of the chest by a qualified physician.
20      Did I read that correctly?
21    **A  Yes.**
22    Q  And that language appears for both the
23  asbestosis, pleural thickening, and pleural
24  plaques column; is that right?
25    **A  Correct.**

**Exhibit C-5**

21

1    Q  Okay.  I'll have more questions about that
2  in a moment but first I'd like to address the rest
3  of the form.
4        If we could please scroll down to the next
5  set of boxes.  Please stop there.  Thank you.
6        Ms. Nolan, in the far left column of the
7  EHH form do you see a check box for a description
8  saying, individual does not have an impairment
9  listed above?
10   A  Yes.
11   Q  Ms. Nolan, is it your understanding that
12 if an individual does not have one of the
13 diagnosed impairments listed, the physician or the
14 health care provider is supposed to check this box
15 indicating there is not any of the impairments
16 listed on the EHH form?
17   A  Yes.
18   Q  All right.  Do you see the box directly
19 below, a box labeled date of diagnosis?
20   A  Yes.
21   Q  Now, Ms. Nolan, I'll represent to you that
22 the evidence in this case deals with hundreds of
23 these EHH forms and in many of those EHH forms
24 there is a handwritten date of the diagnosis of an
25 asbestos-related disease or impairment.  Is it

22

1  your understanding that it is the provider or the
2  physician who gives care to, in this instance,
3  CARD patients that is to fill out the date of
4  diagnosis on this EHH form?
5    A  Yes.
6    Q  Okay.  And in terms of your review of any
7  information about the POMS sections, or anything
8  else, did you come across any information that
9  said whether it would be appropriate for someone,
10 other than a provider or physician, to fill out
11 this date of diagnosis box on the form?
12   A  No.
13   Q  Okay.  Then at the bottom of page, do you
14 see the indications under Step 3 about identifying
15 the presence in Lincoln County, Montana?
16   A  Yes.
17   Q  Is this section of the EHH form also
18 supposed to be competed by the health care
19 provider?
20   A  Yes.
21   Q  That section at the very bottom has a box
22 with the printed name and the physician signature,
23 along with the date.  Do you see that section as
24 well?
25   A  Yes.

23

1    Q  And is it your understanding that the
2  physician is supposed to sign this EHH form in the
3  bottom boxes and also the date when they sign that
4  form?
5    A  Yes.
6    Q  Ms. Nolan, in any of the materials that
7  you reviewed did you see other copies of EHH forms
8  or to the best of your knowledge is this a true
9  and accurate copy of the EHH form that is to be
10 used as a Medicare claim form for patients in
11 Libby, Montana related to environmental health
12 hazards?
13   A  This is the only form that is in our POMS.
14 So this is what we would expect to be used.
15   Q  Okay.  If we could go back to page 1 of
16 Exhibit 76.
17       Ms. Nolan, I'll be looking at the bottom
18 of this form first, related to the EHH checklist
19 and I'll read the section.  Please tell me if I've
20 read it correctly.  And I understand that I'm
21 going very slowly and deliberately and I apologize
22 for that.  As soon as we get through this section
23 I'll have some more conversations -- I'll have
24 some other questions that aren't as literal, okay?
25   A  Sure.

24

1    Q  Okay.  So under section 2, the EHH
2  checklist, the purpose of the EHH checklist is to
3  obtain information from the claimant's medical
4  source, regarding the claimant's diagnosis and
5  presence in Lincoln County, Montana.
6        Did I read that sentence correctly?
7    A  Yes.
8    Q  I'll read the rest of the section in a
9  moment.  But first, does this section of the POMS
10 manual identify the purpose of the EHH form in
11 your mind?
12   A  Yes.
13   Q  Okay.  And in terms of obtaining
14 information from the claimant's medical source, is
15 it SSA's expectation and understanding that the
16 claimant's medical source or the provider or the
17 physician will provide true, accurate, and
18 complete information when filling out these EHH
19 checklists and submitting them to the Social
20 Security Administration?
21   A  Yes.
22   Q  All right.  Continuing on, I'll read this
23 part of the next sentence and then we'll go over
24 to the next page.
25       The claims representative, or CR, will use

**Exhibit C-6**

25

1 the completed EHH checklist to determine if the --
2 if we could go to the next page? I'm sorry, if we
3 could scroll down to the next page, that would be
4 helpful. Great. Continuing.
5     If the claimant's condition meets the
6 medical requirement. The EHH checklist may also
7 provide evidence of presence in Lincoln County,
8 Montana, parenthesis, for policy on using the EHH
9 checklist is proof of presence in Lincoln County,
10 Montana, see the following POMS sections. Also
11 see images of the EHH checklist and cover notice
12 in HI 00803.050 v.3 in this section.
13     With the expectation of omitting some of
14 those policy sections did I read this part of the
15 EHH topic in the POMS correctly?
16   **A  Yes.**
17   Q  Okay. Now, couple of background questions
18 here. The POMS talk about the claims
19 representative, or CR. Are you aware of who the
20 CR or claims representative would be in this
21 instance?
22   **A  Yes.**
23   Q  And who is that?
24   **A  The individual we call a technician in the**
25 **field office who would actually take an**

26

1 **application or claim.**
2   Q  If you're aware, how does the claims
3 representative determine if the claimant's
4 condition meets the medical requirement?
5   **A  According to the POMS they would use the**
6 **checklist to make that determination.**
7   Q  All right. And then, to the best of your
8 knowledge, outside of reviewing the POMS, does the
9 claims representative access or review any other
10 information? For example, does the claims
11 representative look at any medical records or look
12 at any other sources of information not
13 specifically referenced in the POMS?
14   **A  Not to my knowledge.**
15   Q  Okay. I'll continue to read on this form
16 and we'll see if that helps clarify some things.
17 The form under section A reads, FO-872 takes the
18 following actions to obtain a completing EHH
19 checklist.
20     Ms. Nolan, what is FO-872?
21   **A  That is a field office number.**
22   Q  Okay. And to the best of your
23 understanding is FO-872 the field office number
24 for the field office in Kalispell, Montana?
25   **A  Yes, that's identified in POMS.**

27

1   Q  Okay. In terms of the steps that the
2 Kalispell field office would take to obtain a
3 completed checklist, are those steps included here
4 directly in the POMS?
5   **A  Yes.**
6   Q  Okay. I think those are going to be
7 obvious to the jury. They can read them. What
8 I'd like to do now is just go down to section B,
9 about the claimant's medical source. Do you see
10 that in front of you?
11   **A  Yes.**
12   Q  All right. If we could scroll down a
13 little bit? Thank you. Section B, the claimant's
14 medical source will take the following actions to
15 complete and return the EHH checklist.
16     Did I read that correctly?
17   **A  Yes.**
18   Q  Okay. It says complete Step 2,
19 identifying the asbestos-related conditions and
20 its date of diagnosis. And Step 3, identify
21 presence in Lincoln County, Montana.
22     Did I read that correctly?
23   **A  Yes.**
24   Q  Okay. And to go through these other
25 provisions; fill in the printed name, the

28

1 physician's signature, and date.
2     Did I read that correctly?
3   **A  Yes.**
4   Q  Okay. Return it by fax to the number
5 provided on the cover notice or mail it to the
6 Kalispell field office, located at 275 Corporate
7 Drive, Ashley Square Mall, Suite D, Kalispell,
8 Montana 59901.
9     Did I read that part correctly?
10   **A  Yes.**
11   Q  Okay. Note, the medical source does not
12 need to provide the supporting medical evidence.
13     Did I read that right?
14   **A  Yes.**
15   Q  Couple questions here, just so that we're
16 on the same page. Is the claimant's medical
17 source the health care provider who saw the CARD
18 patient in this instance and provided the
19 diagnosis and date of diagnosis?
20   **A  The Medicare -- I'm sorry, the medical**
21 **provider should be the individual that makes the**
22 **diagnosis, yes.**
23   Q  All right. And here the note saying that
24 the medical source or the care provider does not
25 need to provide the supporting medical evidence.

**Exhibit C-7**

---

29

1    So is it -- is it your understanding, from
2  the POMS, that the medical source, in this
3  instance the CARD physician, doesn't need to fax
4  or mail any of the patient's medical records,
5  including CT scans or B reader checklists, or
6  anything like that to the field office?
7    **A  Correct.**
8    Q  Okay.  If we can go to the next page of
9  Exhibit 76, that would be helpful.  Thanks.
10    So next page here starts off, field office
11  872 will take the following actions to store the
12  completed EHH checklists.
13    Ms. Nolan, just generally, what is your
14  understanding of how the Social Security
15  Administration office in Kalispell would store EHH
16  checklists?
17    **A  It would -- it should be according to**
18  **what's in the POMS.  They've taken the information**
19  **and reviewing it, making sure that it is stored in**
20  **what's called an electronic folder.**
21    Q  And in terms of those EHH checklists, just
22  generally, Ms. Nolan, is it your understanding and
23  is it the policy of the Social Security
24  Administration that if a patient does not have a
25  diagnosis of an asbestos-related condition caused

---

30

1  by exposure to Libby asbestos they are not
2  eligible for Medicare?
3    **A  Correct.**
4    Q  Okay.  Now if we could turn to Exhibit 75,
5  please, that would be helpful.
6    As we're are getting Exhibit 75 on the
7  screen, Ms. Nolan, is section HI 00803.001,
8  Hospital Insurance Entitlement for Individuals
9  Exposed to Environmental Health Hazards, EHH, also
10  a section of policies that you reviewed in
11  preparation for your testimony today?
12    (Thereupon, Exhibit 75 was marked for
13  identification.)
14    **A  Yes.**
15    Q  Okay.  This section begins with a
16  bold-faced heading, citations.  Do you see that?
17    **A  Under section A or --**
18    Q  Yes.
19    **A  -- on the top?**
20    Q  Yes, at the very top and in section.
21    **A  The citation, yes.**
22    Q  Okay.  And what is the citation after the
23  bold-faced heading here?
24    **A  Section 1881A, the Social Security Act.**
25    Q  Ms. Nolan, is Section 1881A of the SSA the

---

31

1  provision of the Affordable Care Act that
2  addresses environmental health hazard eligibility
3  for Medicare?
4    **A  Yes.**
5    Q  And is that the section of law that you
6  reviewed in preparation for your 30(b)(6)
7  deposition today?
8    **A  Yes.**
9    Q  Okay.  I'd like to read Section A,
10  background for EHH Medicare.  Just please tell me
11  if I've read it correctly, okay?
12    **A  Yes.**
13    Q  Section 10323 of the Affordable Care Act
14  added Section 1881A of the SSA Act, effective
15  March 23, 2010.  This section extends entitlement
16  to Medicare hospital insurance, HI, and
17  eligibility to enroll in supplementary medical
18  insurance, SMI, to certain individuals exposed to
19  environmental health hazards, EHH, and diagnosed
20  with a medical condition caused by such exposure.
21    Did I read that correctly?
22    **A  Yes.**
23    Q  Okay.  I'll read the next section.
24  Currently, the only individuals eligible for
25  Medicare under this provision are those who were

---

32

1  present in Lincoln County, Montana and have an
2  asbestos-related disease diagnosis.
3    Did I read that section correctly?
4    **A  Yes.**
5    Q  April 2010 is the earliest possible
6  effective date of entitlement based on a March
7  2010 filing date.
8    Did I read that correctly?
9    **A  Yes.**
10    Q  Okay.  Ms. Nolan, just generally, is it
11  your understanding that this section of the POMS
12  took into account Section 1881A of the SSA Act, or
13  the EHH provisions of the Affordable Care Act, and
14  put them into a policy to be implemented by Social
15  Security Administration staff?
16    **A  May I rephrase your question to make sure**
17  **I understand?**
18    Q  Please.
19    **A  Did -- was the SSA Act -- 1881A of the SSA**
20  **Act, used in order to make or create the POMS?**
21    Q  Yes.
22    **A  Yes.**
23    Q  All right.  And thank you for that
24  clarification.
25    In terms of this section of the POMS, does

---

**Exhibit C-8**

33

1  this section of the POMS also set forth that in
2  order to receive Medicare benefits.  In order to
3  be eligible for Medicare benefits, a patient or an
4  individual must be diagnosed with an
5  asbestos-related disease?
6  **A Yes.**
7  Q Okay.  And I think the exact word in the
8  first clause is certain individuals must --
9  exposed to environmental health hazards and
10  diagnosed with a medical condition caused by such
11  exposure.
12  Is that your understanding as well as that
13  just mentioned for the requirements for
14  eligibility for Medicare benefits?
15  **A Correct.**
16  Q All right.  So Ms. Nolan, in terms of the
17  information that you reviewed about the Affordable
18  Care Act or the Program Operations Manual or the
19  EHH forms themselves, based on your review of
20  evidence and material, is there any exception that
21  you're aware of that would allow a patient to
22  receive Medicare benefits, if only a B-read
23  checklist form was submitted to the Kalispell
24  field office, not a signed and dated EHH form with
25  the certification that the patient had been

34

1  diagnosed with an asbestos-related disease?
2  MR. BECHTOLD:  Leading.
3  Q I'll go ahead and just rephrase.  I'll
4  concede that that was, at least, a very long
5  question.
6  Ms. Nolan, can a patient be deemed
7  eligible for Medicare unless an EHH form is filled
8  out and submitted by the provider?
9  **A No, the rules are EHH form signed by the**
10  **provider, file an application, and live in Libby,**
11  **Montana for at least six months.**
12  Q All right.  So if a provider were to
13  submit or send into the Social Security field
14  office in Kalispell any other pieces of paper,
15  short of a signed certified and dated EHH form,
16  could that patient get Medicare eligibility?
17  **A They should not, based on EHH, according**
18  **to the POMS.**
19  Q All right.  Are you aware of any exception
20  to that rule that would allow a patient to become
21  Medicare eligible under the EHH program, aside
22  from having an EHH form submitted to the Kalispell
23  field office?
24  **A Not to my knowledge.**
25  Q Okay.  Ms. Nolan, I'm going to ask a

35

1  series of questions here and you may or may not
2  know the factual basis for them.  And that's just
3  fine.  I'll try to be as clear as I can.
4  Ms. Nolan, are you aware of what a
5  radiologist, known as a B reader, is?
6  **A I have a surface level understanding of a**
7  **B reader.**
8  Q Okay.  And it's not my objective nor my
9  intent to ask you test questions, so to speak, or
10  quiz you in front of a jury in a way that is
11  embarrassing at all.  But if you could share with
12  me what your surface understanding of what a B
13  reader is, that will be helpful.
14  **A Sure.  A B reader, to my understanding, is**
15  **a physician who reads chest x-rays of individuals.**
16  **That's probably the extent of my knowledge.**
17  Q Okay.  And Ms. Nolan, my question is this,
18  is there a pathway to Medicare eligibility if
19  physicians or a provider were just to send in a B
20  reader checklist form without an EHH checklist?
21  **A Not to my knowledge.  The POMS state to**
22  **send in a checklist and all the other criteria**
23  **that I mentioned earlier, so --**
24  Q Okay.  Yeah.  And what I'm trying to get
25  at here is it sounds like, to your knowledge,

36

1  there isn't another route to EHH Medicare
2  eligibility, other than the doctor who diagnosed
3  the patient, sending in a signed, dated EHH form
4  with a diagnosed impairment listed on that EHH
5  form.
6  Is that your understanding also?
7  **A Yes.**
8  Q Okay.  In terms of the Social Security
9  Administration office's expectations for that EHH
10  form, is the Social Security Administration
11  relying on the provider to determine whether
12  there's a diagnosis of a asbestos-related
13  condition or not?
14  **A Yes.**
15  Q And so if the provider, in this case the
16  CARD physician, asserts on the EHH form that there
17  is a diagnosis and they submit that signed, dated
18  EHH certification, does the Social Security
19  Administration have any follow-up questions or do
20  any other additional inquiry at the Kalispell
21  field office, to the best of your knowledge?
22  **A It's possible that they could --**
23  Q Okay.
24  **A -- do follow up.  I wouldn't be able to go**
25  **into details as to why, if there was a question**

**Exhibit C-9**

37

1  about, you know, the date or something like that.
2  So it's possible that they could do follow up.
3      Q  Sure.  And I think we have some e-mails
4  like that in this case.  My understanding is
5  you're not a factual witness so I won't be asking
6  you to address that topic.
7      But is the general practice between the
8  Social Security Administration field office and
9  the CARD clinic, as a provider, is it generally
10  the practice of SSA just to look for just the EHH
11  form itself to determine whether or not the CARD
12  patient has a diagnosis for asbestos -- related
13  disease?
14      A  According to the POMS, that's what they
15  should be looking for.
16      Q  All right.  On this issue of B readers, if
17  we could go back to Exhibit 76, page 4, please?
18      Ms. Nolan, I'll represent to you that
19  Exhibit 76, page 4 shows the EHH form that's in
20  the POMS manual that we were looking at earlier,
21  okay?
22      A  Yes.
23      Q  All right.  So in terms of the boxes here,
24  under minimum medical evidence required -- I think
25  we've already covered the interpretation by a B

38

1  reader qualified physician of plain chest x-ray or
2  interpretation of computed tomographic radiograph
3  of the chest-ray by a qualified physician.
4      Do you recall this section of the form?
5      A  Yes.
6      Q  Okay.  In terms of any inquiry by the
7  Social Security Administration about whether there
8  was a B reader that indicated a finding of an
9  abnormality or a CT scan read by a qualified
10  physician, are you aware of whether or not the
11  Social Security Administration field office
12  conducts any further inquiry with the CARD
13  provider on this topic, other than just looking to
14  see if the form has been filled out correctly with
15  all the required fields addressed?
16      A  I'm not aware.
17      Q  Okay.  In terms of whether a B-read,
18  alone, would qualify a patient for Medicare
19  eligibility in the absence of a physician or a
20  provider certifying that patient had a diagnosis
21  of an asbestos-related disease, is it your
22  understanding that a B-read, alone, would qualify
23  a patient for Medicare benefits without the
24  physician's certification of a diagnosis?
25      A  A certification of the diagnosis would be

39

1  necessary.
2      Q  All right.  So without that CARD provider
3  saying that there was a diagnosis, in any case,
4  regardless of whether it was apparently based on a
5  B-read or a CT scan or a chest x-ray from a normal
6  radiologist, is it true that without the
7  physician's certification that an asbestos-related
8  disease diagnosis exists, the patient wouldn't be
9  able to get Medicare?
10      A  Correct.  They would need to have the
11  document that EHH signed, certified stated they
12  had an asbestos-related disease to qualify for EHH
13  Medicare.
14      Q  Okay.  So without a diagnosis from a CARD
15  provider signed, dated, and submitted by the CARD
16  clinic to the Social Security Administration, a
17  patient could not be and would not be deemed
18  eligible for Medicare?
19      MR. BECHTOLD:  Leading.
20      Q  Let me rephrase.  What's your
21  understanding of whether a CARD physician's
22  certification of a diagnosis is required in order
23  to get Medicare eligibility?
24      A  To get Medicare eligibility for EHH, a
25  signed -- a signed checklist acknowledging the

40

1  diagnosis would need to be sent forward.
2      Q  Okay.  And that certification, that EHH
3  form, would be sent forward to the Social Security
4  Administration field office by the CARD clinic in
5  this case?
6      A  Correct.
7      Q  Okay.  Ms. Nolan, what I'd like to do --
8  we've been going for about an hour -- is take a
9  short break.  Would ten minutes be acceptable to
10  everybody?
11      A  That's fine.
12      Q  All right.  Thank you, ma'am.  We'll be
13  back on the record in ten minutes.
14      THE VIDEOGRAPHER:  We're going off the
15  record.  The time is 10:54.
16      (Thereupon, a recess was had.)
17      THE VIDEOGRAPHER:  We're back on record.
18  The time is 11:03.
19  BY MR. DUERK:
20      Q  All right.  Ms. Nolan, thanks for that
21  short break.  I'll see if I can trim this up as
22  much as possible here.
23      Before we went on the break we were
24  talking about B readers and your knowledge about B
25  readers.  Again, I don't mean to quiz you or give

**Exhibit C-10**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

---

41

1  you a high school examination in front of a jury
2  here, but in terms of B readers, I'd like to
3  question whether you were aware of a couple of
4  different issues that have come up related to B
5  readers in this case.
6        First, ma'am, were you aware that
7  according to the radiologist B readers themselves,
8  B readers do not diagnose patients?
9        MR. BECHTOLD:  Foundation, leading.
10  **A I was not clear.**
11  Q Okay.  In terms of any communications you
12  reviewed or any information at all from CARD, did
13  you review any information that indicated that
14  CARD itself does not consider radiologists or B
15  readers as diagnosing physicians?
16        MR. BECHTOLD:  Foundation, leading.
17  Q And you were unaware of it, that's okay,
18  Ms. Nolan.  I'm just trying to check if you
19  reviewed any information that indicated that even
20  CARD considers B reading radiologists as not
21  diagnosing physicians?
22        MR. BECHTOLD:  Foundation, leading.
23  **A You want me to answer --**
24  Q Yes.
25  **A -- still?  I'm not aware.**

---

42

1  Q Okay.  That makes sense.  In terms of any
2  of these POMS policies, based on your review of
3  the evidence and information in this case, have
4  any of these POMS policies changed since the time
5  they were implemented until today's date?
6  **A There's been a recent change to change**
7  **gender specific language to gender neutral**
8  **language. It's been the only change since**
9  **inception.**
10  Q All right.  And in terms of how the POMS
11  has been administered from inception until today's
12  date, is it still a requirement of the Social
13  Security Administration field office in Kalispell,
14  according to these POMS sections, that for
15  Medicare eligibility a patient must have a
16  diagnosis of an asbestos-related disease?
17  **A Yes.**
18  Q All right.  And in terms of that specific
19  requirement, at any time based on your review of
20  the information available, has the Social Security
21  Administration ever made any changes in that
22  particular provision of the POMS?
23  **A No.**
24  Q So Ms. Nolan, according to the information
25  that you reviewed from the very beginning, in 2010

---

43

1  to the present day, if an EHH form were submitted
2  for a patient who did not have a diagnosis of
3  asbestos-related disease and the Social Security
4  Administration somehow became aware of that, would
5  that patient be Medicare eligible?
6  **A Can you repeat the question, please?**
7  Q Sure.  And maybe I'll try rephrase it and
8  make it a little simpler.  If a -- if an EHH form
9  was submitted by a provider and whether it was
10  information on the EHH form itself or
11  communication from the provider over the phone,
12  regardless of the form of that communication, if
13  the Social Security Administration learned that
14  that patient did not actually have a diagnosis of
15  asbestos-related disease, would that patient be
16  eligible for Medicare?
17  **A I'm sorry.  Are you saying the EHH form**
18  **was signed stating that the patient had an**
19  **asbestos-related disease --**
20  Q I am saying -- no, go ahead, ask your
21  question, sorry.
22  **A No, no.  And then later learned that the**
23  **individual did not have asbestos-related disease?**
24  Q Yes.
25  **A What -- okay.**

---

44

1  Q What would happen there?
2  **A The case may be reviewed if the field**
3  **office had questions about the Medicare coverage,**
4  **whether Medicare entitlement should be provided or**
5  **not. So the case could be reviewed.**
6  Q Okay.  And -- and if that review -- if the
7  final analysis revealed that the patient did not
8  have a diagnosis of an asbestos-related disease,
9  would that patient be eligible for Medicare?
10  **A The individual should not be eligible for**
11  **Medicare.  I'm unaware -- what you're explaining,**
12  **that example, I'm not aware that that has**
13  **happened.**
14  Q Right.
15  **A But that individual would not be eligible**
16  **for Medicare.**
17  Q All right.  And is it fair to say that
18  that was the initial policy of Social Security
19  Administration, that has been the policy of the
20  Social Security Administration, and that is still
21  the policy of the Social Security Administration
22  today?  That if you don't have a diagnosis of an
23  asbestos-related disease, you do not get Medicare?
24  **A Correct.**
25  Q Okay.  Ms. Nolan, the subpoena in this --

---

**Exhibit C-11**

45

1  in this case had a number of different paragraphs
2  related to, I think -- what I'll represent are
3  related issues. Just so that we're clear though,
4  I'd like to go through each of the paragraphs in
5  subpoena that you reviewed to make sure that there
6  aren't any remaining unanswered questions, okay?
7      A Yes.
8      Q All right. So it's my understanding that
9  paragraph 1 of the subpoena deals with the POMS
10 section HI 00803.050, Developing Medical
11 Requirements for Entitlement to EHH Medicare.
12     The Social Security Administration's
13 designated deponent must define and explain what
14 the certain diagnostic methods are that are
15 accepted by the Social Security Administration in
16 that section of the POMS to qualify a person for
17 EHH Medicare and delineate and explain how a
18 person can be diagnosed with an asbestos-related
19 disease, ARD, that is accepted by the Social
20 Security Administration to qualify that person for
21 EHH Medicare.
22     Ms. Nolan, what would your response be to
23 paragraph 1 of the subpoena, if we haven't covered
24 it already?
25     **A We would actually -- based on what the**

46

1  **Affordable Care Act states, 1881A, the Affordable**
2  **Care Act, we would use those definitions to**
3  **determine what a qualified -- and I'm sorry. I**
4  **lost your terms.**
5      Q Sure. Certain diagnostic methods.
6      **A So, we would list what that is from the**
7  **Affordable Care Act.**
8      Q Okay. And then, in terms of those certain
9  diagnostic methods lifted from the Affordable Care
10 Act, what are the accepted diagnostic methods in
11 the Social Security Administration's view?
12     **A It would be those items that are listed on**
13 **the EHH checklist.**
14     Q Okay. And so in terms of the EHH
15 checklist -- again, if we could go to Exhibit 76,
16 page 4? Okay. Are the certain diagnostic methods
17 included on this EHH checklist?
18     **A I believe they are, yes.**
19     Q Okay. And what are those diagnostic
20 methods?
21     **A Interpretation by B reader, qualified**
22 **physician of a plain chest x-ray, or**
23 **interpretation of a computed tomographic**
24 **radiograph of a chest by a qualified physician**
25 **would be one.**

47

1      Q Okay. And what are some of the other
2  diagnostic methods that are recognized --
3      **A If you go -- sorry.**
4      Q That would be recognized by the SSA?
5      **A Apologies. Yes, if you would go further**
6  **down, established -- this is the third column for**
7  **mesothelioma established by pathology examination**
8  **or biopsy tissue or cytology from -- and I'm going**
9  **to botch that word.**
10     Q Bronchoalveolar, is that -- sure. Lavage.
11 Okay. Are there any other diagnostic methods that
12 are recognized by the Social Security
13 Administration?
14     **A I don't know that there are any others**
15 **listed here.**
16     Q Okay. And again, for purposes of today's
17 examination, I'm just primarily focusing on the
18 minimum medical evidence required for asbestosis
19 and pleural thickening or pleural plaques, okay?
20     So Ms. Nolan, if you could share with me
21 any information that you found in your review of
22 the policies, or any other source of information,
23 about this issue of certain diagnostic methods.
24 In terms of the diagnostic methodology or the
25 diagnostic methods, we talked earlier about

48

1  whether a B-read form alone could be submitted to
2  the Social Security Administration, do you recall
3  that part of your testimony?
4      **A Yes.**
5      Q Okay. So regardless of what diagnostic
6  method is used or forms the basis for a diagnosis,
7  is it your understanding that the CARD provider or
8  the CARD physician is still the physician that
9  determines whether there is a diagnosis for that
10 individual CARD patient?
11     **A It should be the individual signing the**
12 **form at the bottom of the EHH checklist.**
13     Q Okay. And regardless of what diagnostic
14 method is used, is it still the individual who
15 signs the EHH form who is responsible for
16 certifying that a diagnosis exists?
17     **A Yes.**
18     Q Okay. So in this case, unless the CARD
19 physician or the CARD provider signed the EHH form
20 certifying that there is a diagnosis for that
21 patient, the SSA doesn't conduct any inquiry about
22 the diagnostic methodology outside of the four
23 corners in this EHH form; is that fair?
24     **A To my knowledge, that's correct.**
25     Q Okay. And in terms of your review of any

**Exhibit C-12**

49

1 information about the certain diagnostic methods
2 referenced in the subpoena, did you find any other
3 information, any other facts, any other policy
4 considerations about the certain diagnostic
5 methods listed in the POMS here that was relevant
6 in your inquiry?
7   A. No.
8   Q. Okay. Is there anything more to discuss
9 about paragraph 1 of the subpoena when it comes to
10 certain diagnostic methods?
11   A. No.
12   Q. Okay. If -- we'll -- we'll go on to
13 paragraph 2 of the subpoena. This also is about
14 the POMS section HI 00803.050. That section
15 includes an Environmental Health Hazards
16 Checklist. The Social Security Administration's
17 designated deponent must define the minimum
18 medical evidence required accepted by the Social
19 Security Administration to qualify a person for
20 EHH Medicare.
21       Ms. Nolan, is there anything further to
22 discuss on that topic?
23   A. No.
24   Q. Okay. Paragraph 3, the Social Security
25 Administration's POMS section 00803.050,

50

1 Developing Medical Requirement for Entitlement to
2 EHH Medicare includes an Environmental Health
3 Hazards Checklist. The Social Security
4 Administration's designated deponent must provide
5 the Social Security Administration's definition of
6 a B reader qualified physician for interpretations
7 of plain chest x-rays as stated on the
8 Environmental Health Hazards Checklist.
9       Aside from the definition that you shared
10 of a B reader earlier, do you have any other
11 definition from the Social Security Administration
12 of a B reader qualified physician?
13   A. No.
14   Q. Is there anything further discuss on
15 paragraph 2 of the subpoena?
16   A. No.
17   Q. Okay. Next paragraph. The Social
18 Security Administration's Operation Manual System
19 for the same section related to the Environmental
20 Health Hazards Checklist. It continues. The
21 Social Security Administration's designated
22 deponent must provide the Social Security
23 Administration's definition of a qualified
24 physician for interpretations of computed
25 tomographic radiographs of the chest, as stated on

51

1 the EHH checklist.
2       What is the SSA's definition of a
3 qualified physician related to the EHH form?
4   **A Again, we would have taken that**
5 **information from the Affordable Care Act, 1881A.**
6   Q. Okay. And so what would the SSA's
7 definition of a qualified physician be, just
8 generally?
9   **A I don't know that SSA has defined it in**
10 **this term.**
11   Q. Okay. Is there anything else to add in
12 response to paragraph 4 of the subpoena?
13   A. No.
14   Q. Okay. Paragraph 5 talks about the other
15 section of the POMS, HI 00803.001, Hospital
16 Insurance Entitlement for Individuals Exposed to
17 Environmental Health Hazards. I think we've
18 covered this but if we could please go to Exhibit
19 75, page 1?
20       All right. Do you see Exhibit 75, page 1
21 in front of you with the citation Section 1881A of
22 the Social Security Act in front of you?
23   A. Yes.
24   Q. All right. Okay. I'm looking for the
25 questions here. Here we go. The Social Security

52

1   Administration's designated deponent must define
2   and explain the eligibility requirements for HI,
3   or Hospital Insurance, and SMI for certain
4   individual exposed to environmental health
5   hazards, EHH, and diagnosed with a medical
6   condition caused by such exposure stated in this
7   POMS section.
8       Ms. Nolan, have you defined and explained
9   the eligibility requirements under this section of
10   the POMS?
11   **A Yes.**
12   Q. Okay. Do you have anything else to add on
13 that topic?
14   **A No.**
15   Q. Okay. It also asks the Social Security
16 Administration's designated deponent must define
17 and explain how individuals obtain an
18 asbestos-related disease diagnosis stated in POMS
19 section 803.001.
20       Have we covered that topic to the best of
21 your knowledge?
22   **A Yes.**
23   Q. Okay. The next question. The Social
24 Security Administration's designated deponent must
25 define and explain what the certain diagnostic

**Exhibit C-13**

53

1  methods are that are accepted by the Social
2  Security Administration in section HI 00803.001.
3        Have we covered what the certain
4  diagnostic methods are in -- to the best of your
5  knowledge?
6     A Yes.
7     Q Okay. In order to qualify a person for
8  EHH Medicare -- the deponent must delineate and
9  explain how a person can be diagnosed with a
10 asbestos-related disease that is accepted by the
11 Social Security Administration to qualify that
12 person for EHH Medicare.
13       Ms. Nolan, have we addressed that topic to
14 the best of your knowledge?
15    A Yes.
16    Q Okay. The next section here -- or the
17 next question, POMS 803.001, so we're still on
18 this same section. This section provides three
19 examples. So if we could go to the next page
20 here? If we could continue down, great. So if --
21 if we could go just a little bit higher to get to
22 the heading. I'll read it and we'll cover the
23 waterfront here. Do you see the section 3,
24 effective date of HI coverage?
25    A Yes.

54

1     Q I'll read this. Please tell me if I've
2  read it correctly.
3        If the claimant meets both the presence
4  and medical requirements as of the date of filing,
5  DOF, or by the end of the month of filing. HI, or
6  Hospital Insurance, will be effective the first
7  day of the month following the month of filing.
8  If a physician has not diagnosed the claimant with
9  a qualifying asbestos-related disease as of the
10 date of filing or by the end of the month of
11 filing, the effective date of HI, Hospital
12 Insurance, will be the first day of the month
13 after the month the claimant is diagnosed with a
14 qualifying asbestos-related disease if the
15 claimant also meets the presence requirements in
16 HI 00803.001. B1, second bullet in this section.
17       Did I read that correctly?
18    A Yes.
19    Q Okay. Ms. Nolan, does it appear to you
20 that the three examples below here relate to the
21 effective date of hospital insurance coverage?
22    A Yes.
23    Q Okay. The -- the specific question in
24 this subpoena says that the Social Security
25 Administration's designated deponent must define

55

1  and explain what the diagnostic methods specified
2  in the law are that are accepted by the Social
3  Security Administration in the POMS to qualify a
4  person for EHH Medicare.
5        The Social Security Administration's
6  designated deponent must define the law to which
7  HI 00803 refers and explain the procedures the SSA
8  has followed to implement this law.
9        Ms. Nolan, what would your response be to
10 those specific questions, if you haven't addressed
11 them already?
12    A So I apologize, I'll get these out of
13 order likely. But this section refers to the
14 Affordable Care Act.
15    Q Okay.
16    A That's the law that -- I think we covered,
17 the asbestos-related diagnosis when we went over
18 the check sheet, the checklist.
19    Q Okay.
20    A And I apologize, the first question was?
21    Q What is your response to these questions
22 in the subpoena, if you haven't already addressed
23 them?
24    A I believe I addressed them.
25    Q Okay. And in terms of these three

56

1  examples, if you just scan over the first two and
2  I'll show you the third one. But is there
3  anything else that's relevant in your analysis of
4  these examples to the main question about the law
5  or the diagnostic method specified in the law that
6  we haven't already covered?
7     A I don't believe so, no.
8     Q Okay. Let me make sure that you've seen
9  example 3, okay? If we could scroll down, please,
10 to the next page.
11    A I think we've addressed them.
12    Q Okay. Paragraph 9 of the subpoena asks
13 the Social Security Administration's designated
14 deponent must define and explain what the certain
15 diagnostic methods are that are accepted by the
16 Social Security Administration in HI 00803.050 to
17 qualify a person for EHH Medicare and delineate
18 and explain how a person can be diagnosed with an
19 asbestos-related disease that is accepted to the
20 Social Security Administration to qualify that
21 person for EHH Medicare.
22       Ms. Nolan, do you have any response to
23 paragraph 9 of the subpoena that we haven't
24 already covered?
25    A No.

**Exhibit C-14**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

15 (57 to 60)

57

1  Q All right. I'll -- I'll keep going
2  through these to make sure that we've buttoned
3  everything up. But paragraph 10 asks that the
4  Social Security Administration's designated
5  deponent must define the minimum medical evidence
6  required accepted by the Social Security
7  Administration to qualify a person for EHH
8  Medicare.
9      Have we covered that topic to the best of
10 your knowledge?
11 A Yes.
12 Q Okay. Paragraph 11 references POMS
13 section 00803.050. The Social Security
14 Administration's designated deponent must provide
15 the Social Security Administration's definition of
16 a B reader qualified physician for interpretations
17 of plain chest x-rays, as stated on the
18 Environmental Health Hazards Checklist.
19     Ms. Nolan, have we covered that topic to
20 completion as far as you're concerned?
21 A Yes.
22 Q Okay. Paragraph 12 also references POMS
23 section 00803.050. It says the Social Security
24 Administration's designated deponent must provide
25 the Social Security Administration's definition of

58

1  a qualified physician for interpretations of
2  computed tomographic radiographs of the chest as
3  stated on the Environmental Health Hazards
4  Checklist.
5      Ms. Nolan, have we covered that topic?
6  A Yes.
7  Q Anything to add to that topic in your
8  view?
9  A No.
10 Q Okay. Paragraph 13, also referencing POMS
11 00803.050. The Social Security Administration's
12 designated deponent must provide the SSA's
13 definition of the date of diagnosis when the
14 minimum medical evidence required is a
15 interpretation by a B reader qualified physician
16 of a plain x-ray, as stated on the Environmental
17 Health Hazards Checklist.
18     Is there anything else that you feel you
19 have to offer on that topic?
20 A No.
21 Q Okay. And just so we're clear, if we
22 could go back to Exhibit 76, page 4, we'll look at
23 the EHH checklist itself. And Ms. Nolan, I
24 apologize for, kind of, the exhaustive nature of
25 going through paragraph by paragraph here, I just

59

1  want to make sure no stone is unturned, okay?
2  A Yes.
3  Q All right. So here we're looking at the
4  minimum medical evidence required column, the
5  interpretation by a B reader. And then, down at
6  the bottom of the form, the date of diagnosis. So
7  in terms of what's on this EHH form, is the Social
8  Security Administration concerned with when the
9  B-read, chest x-ray, or any of CT scans were
10 interpreted by the radiologist or -- if we can go
11 to the bottom of this form -- is the SSA more
12 concerned with the date that the provider, the
13 physician -- in this case, the CARD doctor --
14 actually diagnosed the patient?
15     MR. BECHTOLD: Leading.
16 Q Let me rephrase. Ms. Nolan, in terms of
17 the date of diagnosis that's filled out here by
18 the CARD provider, in -- in the SSA's view, is
19 that supposed to be the date that the provider
20 considered the patient or diagnosed the patient
21 with an asbestos-related disease?
22 A Yes.
23 Q Okay. And in terms of the information
24 that the SSA has or that the SSA considers
25 important, does the SSA make any kind of inquiry

60

1  into when the radiographic scan was taken, the
2  radiographic study, the chest x-ray, or CT scan?
3  A I'm sorry, are you asking, do we --
4  Q I'll try -- I'll try to make this as clear
5  as I can. Is it the CARD provider's date of
6  diagnosis that is important to the SSA?
7  A Yes, the date of diagnosis is important.
8  Q Okay. And in terms of the date that a
9  radiologist took the exam, is that information
10 that is important to the SSA?
11 A May I ask a question?
12 Q Sure.
13 A In your question, are you saying there's a
14 distinction between the radiologist and whoever's
15 certifying -- signing off on the checklist?
16 Q Yes, I am saying that radiologists in this
17 set of CARD cases --
18     MR. BECHTOLD: Counsel, questions please.
19     MR. DUERK: Sure.
20 BY MR. DUERK:
21 Q Ms. Nolan, are you aware of anyone but the
22 CARD provider signing EHH forms to certify
23 patients for Medicare benefits?
24     MR. KAKUK: Scope.
25     MR. DUERK: I can see that. All right.

**Exhibit C-15**

61

1 Let me try and clarify.
2 BY MR. DUERK:
3     Q Ms. Nolan, I apologize. When it comes to
4 EHH forms, is it the diagnosing physician who
5 signs the EHH form in terms of the POMS policy?
6     **A It should be the medical provider that**
7 **signs the EHH checklist.**
8     Q All right. In your view would it be
9 appropriate, based on the POMS policy, for anyone,
10 other than the medical provider, the physician, to
11 sign the EHH checklist and the date of diagnosis
12 here?
13     **A The POMS outlines the medical provider,**
14 **the medical source to sign the EHH checklist.**
15     Q All right. Thank you. And this one might
16 -- this one might require a little bit of
17 background and it involves a hypothetical. But
18 I'd like you to assume that the radiologist, in a
19 -- in a patient's case, is not the one who
20 diagnosis the patient.
21         If a physician doesn't diagnose the
22 patient and doesn't believe that there is a
23 diagnosis of asbestos-related disease, should that
24 physician, in your view, sign an EHH form for a
25 patient when the physician knows there is no

62

1 diagnosis?
2         MR. BECHTOLD: Leading.
3     Q Go ahead.
4     **A In my opinion if the medical source does**
5 **not diagnose an asbestos-related disease, the box**
6 **on the checklist that says the individual does not**
7 **have an impairment listed above should be checked.**
8     Q Okay. So if the physician submitting the
9 form does not believe the patient has a diagnosis,
10 this box that we see on the EHH form titled
11 individual does not have an impairment listed
12 above should be filled in by the provider?
13     **A Yes.**
14     Q Okay. All right. Paragraph 15, the
15 Social Security Administration's designated
16 deponent must define the meaning of diagnosis for
17 purposes of the Environmental Health Hazards
18 Checklist. What response do you have to that
19 question, Ms. Nolan?
20     **A A diagnosis would be a medical**
21 **determination on an individual's disease.**
22     Q And then, in terms of the individual
23 responsible for certifying that the patient has a
24 diagnosis on an EHH form, who would that
25 individual be?

63

1     **A That should be the physician as noted on**
2 **the form where it says physician signature.**
3     Q All right. Skipping to paragraph 23, the
4 Social Security Administration's designated
5 deponent must testify whether the Social Security
6 Administration considers CARD physicians qualified
7 physicians for purposes of the Environmental
8 Health Hazards Checklist minimum medical evidence
9 required section of Step 2.
10         Ms. Nolan, do you have any additional
11 information, other than what you've already
12 provided on this topic?
13     **A No.**
14     Q Okay. Paragraph 24, the Social Security
15 Administration's designated deponent must testify
16 whether the Social Security Administration
17 considers CARD's physicians to be qualified
18 physicians for purposes of 42 USC Section
19 1881A(e)(2)(B)(i)(I).
20         Do you have any other information or any
21 other response to this question, other than what
22 you've already offered?
23     **A No.**
24     Q Okay. Going to the next provision,
25 paragraph 30. Does the POMS state that a

64

1 diagnosis of asbestos-related disease is required
2 for Medicare eligibility?
3     **A Yes.**
4     Q Paragraph 31, if a person does not have a
5 diagnosis of asbestos-related disease, is she
6 eligible for EHH Medicare?
7     **A No.**
8     Q Paragraph 32, if a person submits a B-read
9 chest x-ray interpretation to the Social Security
10 Administration that indicates a lung abnormality
11 from a radiologist related to sarcoidosis but not
12 a diagnosis of asbestos-related disease from a
13 qualified physician, is that patient eligible for
14 EHH Medicare benefits?
15     **A An asbestos-related disease needs to be**
16 **identified and diagnosed in order to receive EHH**
17 **Medicare.**
18     Q All right. Paragraph 33, if a person
19 submits a chest x-ray interpretation or a computed
20 tomography interpretation, CT scan, to the SSA
21 from a radiologist that indicates a lung
22 abnormality but not a diagnosis of
23 asbestos-related disease, is she eligible for EHH
24 Medicare benefits?
25     **A No.**

**Exhibit C-16**

65

1    Q  Paragraph 34, if a health care provider
2  submits an EHH checklist form on behalf of a
3  patient that does not include a date of diagnosis,
4  is that patient eligible for EHH Medicare
5  benefits?
6    A  No.
7    Q  Paragraph 35, if a health care provider
8  submits an EHH health care checklist form on
9  behalf of patient, when the provider has actual
10  knowledge that the patient does not have a
11  diagnosis of asbestos-related disease, is that
12  patient eligible for EHH health care benefits?
13    A  No.
14    Q  Paragraph 40, are patients with signs of a
15  fractured rib on a B-read chest x-ray but no
16  diagnosis of asbestos-related disease eligible for
17  EHH Medicare benefits?
18    A  Can you repeat that, please?
19    Q  Sure.  Are patients with signs of a
20  fractured rib on a B-read chest x-ray but no
21  diagnosis of asbestos-related disease eligible for
22  EHH Medicare benefits?
23    A  No.
24    Q  I only have one, two, three, four more
25  paragraphs.  And I'd just like to go through these

66

1  to see if you have any knowledge or information
2  about them, okay?
3    A  Yes.
4    Q  Paragraph 41, are the following
5  statements, undisputed by CARD, related to EHH
6  Medicare eligibility consistent with SSA POMS
7  sections HI 00803.001 and 050:  CARD has submitted
8  EHH forms to the Social Security Administration
9  when CARD providers were aware that the individual
10  patient did not have a clinical diagnosis of
11  asbestos-related disease.
12    Any response?
13    A  No.
14    Q  Any response?
15    A  No.
16    Q  CARD continues its practice of submitting
17  patients' EHH forms to SSA who do not have a
18  diagnosis of asbestos-related disease.
19    Is that consistent with the POMS?
20    A  Can you repeat that one more time, please?
21    Q  CARD continues its practice of submitting
22  patients' EHH forms to SSA who do not have a
23  diagnosis of asbestos-related disease.
24    Is that consistent with the POMS?
25    A  So I have a question.  Are they -- are

67

1  they checking the box that says an individual does
2  not have an impairment?
3    Q  No, they are signing and dating the EHH
4  form and checking boxes indicating a diagnosis of
5  either asbestosis, pleural thickening or pleural
6  plaques?
7    MR. BECHTOLD:  Form of the question.
8    MR. DUERK:  What's that?
9    MR. BECHTOLD:  The form of the question.
10  I'm not sure that's a question.
11    MR. DUERK:  Oh, sorry.
12  BY MR. DUERK:
13    Q  Ms. Nolan, would that practice of
14  submitting patients' EHH forms to SSA who do not
15  have a diagnosis of asbestos-related disease when
16  the EHH form itself indicates that they do have a
17  diagnosis, that there is a date of diagnosis, and
18  the CARD physician is signing and dating the EHH
19  form, would that be consistent with the POMS
20  practices in the POMS policy?
21    A  No.
22    Q  Okay.  Next statement.  CARD has submitted
23  patients without a diagnosis of asbestos-related
24  disease to the Social Security Administration for
25  Medicare benefits since at least 2013, and

68

1  presumably since the Affordable Care Act was
2  passed in 2010.
3    Would that practice be consistent with the
4  POMS?
5    A  They're submitting -- can you repeat the
6  question?
7    Q  Sure.  CARD has submitted patient without
8  a diagnosis of asbestos-related disease to the
9  Social Security Administration for Medicare
10  benefits since at least 2013, and presumably since
11  the Affordable Care Act was passed in 2010.
12    I'd like you to assume the same parts of
13  hypothetical that, in those cases, CARD signed the
14  EHH form, said there was a date of diagnosis of an
15  asbestos-related disease and checked the box for
16  the diagnosed impairments of either asbestosis or
17  pleural plaques, pleural thickening.  Would that
18  practice be consistent with the POMS?
19    A  No.
20    Q  Next statement.  CARD submitted an EHH
21  form in multiple patients' cases based on a B-read
22  alone when CARD's current medical director knew
23  those patients did not have an asbestos-related
24  disease diagnosis.
25    I'd like you to assume the same facts

**Exhibit C-17**

69

1 about the EHH form having a date of diagnosis
2 filled out, a box checked for a diagnosed
3 impartment with a physician's signature from CARD.
4 Would that practice be consistent with the Social
5 Security Administration policies listed in the
6 POMS?
7     A No.
8     Q CARD's medical director testified multiple
9 patients' EHH forms were submitted to the Social
10 Security Administration for Medicare benefits even
11 though they did not have a CARD diagnosis of
12 asbestos-related disease.
13     Let's assume the same facts, that the EHH
14 form is signed and dated by a CARD physician with
15 a date of diagnosis filled out and a box checked
16 for a diagnosed impartment. Would that practice
17 be consistent with SSA policies?
18     A No.
19     Q Last statement. CARD knowingly submitted
20 EHH forms to the Social Security Administration in
21 support of Medicare benefits for patients who had
22 no clinical diagnosis of asbestos-related disease.
23     Let's assume that we have -- let's assume
24 that we have a signed, dated EHH form from a
25 physician at CARD indicating a date of diagnosis

70

1 and a box checked for an asbestos-related disease
2 diagnosed condition. Would that practice be
3 consistent with the Social Security
4 Administration's policies?
5     A No.
6     Q Okay. Ms. Nolan, in terms of the
7 remaining paragraphs, these different provisions
8 appear to be statements from other CARD witnesses.
9 Did you review paragraphs 42, 43, and 44 in
10 consideration of your answers today?
11     A I did review.
12     Q Okay. And in terms of responses?
13     A I'm sorry. I don't know them by heart.
14     Q No, that's okay. I'll go ahead and just
15 relay to you the questions.
16     Are the following sworn statements from
17 Senator Max Baucus consistent with SSA POMS
18 sections HI 00803.001 and 803.050 related to EHH
19 Medicare eligibility?
20     Statement 1: Senator Baucus, would you
21 agree that the purpose of the Environmental Health
22 Hazard provisions in the Affordable Care Act was
23 to provide Medicare benefits for people who were
24 exposed to Libby asbestos; not to provide Medicare
25 benefits in people who are not sick? Answer, yes.

71

1     Do you have any response to Statement 1 as
2 to whether or not that statement would be
3 consistent with the POMS sections?
4     A It's consistent.
5     Q Okay. Statement 2: But for the purposes
6 of this discussion, though, my intention that
7 -- and I think it's the intention of the statute
8 -- that if you got a diagnosis, you're covered; if
9 there's no diagnosis, you're not covered.
10 Question, right. Answer, it's very simple.
11 Question, and in terms of the law itself, as we've
12 covered earlier, there's no provision stated in
13 the Affordable Care Act, the EHH provisions, that
14 creates an exception for a patient to be eligible
15 for Medicare benefits without a diagnosis.
16 Answer, there must be a diagnosis.
17     Is that statement consistent with the POMS
18 manual?
19     A Yes.
20     Q Statement 3: Question, if a patient
21 doesn't have a diagnosis, Answer, correct.
22 Question, of asbestos related disease from Libby
23 amphibole, they should not be Medicare eligible?
24 Answer, correct.
25     Is that statement consistent with the POMS

72

1 and Social Security Administration policy?
2     A Yes.
3     Q Okay. In terms of any other testimony or
4 statements from Senator Baucus, were there any
5 other statements from Senator Baucus that you were
6 asked to consider in the subpoena, to the best of
7 your knowledge?
8     A Not that I can recall.
9     Q Okay. Have you read or reviewed any
10 deposition testimony from Senator Baucus outside
11 of these three statements?
12     A No.
13     Q Okay. In terms of any conversations that
14 you've had or are aware that occurred between the
15 Social Security Administration and Senator Baucus
16 about the EHH provisions in the Affordable Care
17 Act, are you aware of the existence of any such
18 conversations?
19     A No.
20     Q Okay. And in terms of how the Social
21 Security Administration implements its policies
22 and procedures, are those policies and procedures
23 reflected in the POMS that we've covered?
24     A As they relate to EHH, yes.
25     Q All right. And in terms of who's

**Exhibit C-18**

73

1  responsibility it is to implement policies and
2  enact these procedures related to Medicare in the
3  POMS, is that the Social Security Administration's
4  responsibility or is there any other agency or
5  individual representative of government who is
6  responsible for implementing these POMS
7  procedures?
8      **A It's Social Security's responsibility.**
9      Q Okay. Is the following statement from --
10 this is paragraph 43. Is the following statement
11 from an SSA employee, Sonia Hynes, to CARD about
12 the EHH consistent with SSA POMS section HI
13 00803.001 and 050. Quote, if a claimant has been
14 diagnosed with one of the impairments on that
15 list, they qualify. So to us, either they are
16 diagnosed, or they aren't, close quote.
17     Is that consistent with the POMS in your
18 view or in SSA's view?
19     **A Yes. They need to be diagnosed and meet**
20 **the other criteria that were outlined in the POMS.**
21     Q Okay. And in terms of the other criteria
22 that are outlined in the POMS, are you talking
23 about filling an EHH form, checking a box that
24 there is a diagnosis of asbestos-related disease
25 caused by an exposure to asbestos in Libby,

74

1  Montana and otherwise following the provisions of
2  the POMS?
3      **A Including, yes, filing an application,**
4  **living in Lincoln County.**
5      Q Okay. And in terms of anything that's
6  included in the POMS, itself, and in terms of
7  express language, is there anything in the POMS,
8  anywhere that says that a diagnosis is equivalent
9  to a B-read chest x-ray or CT scan?
10     **A Can you repeat the question?**
11     Q Sure. Is there any language in any of the
12 POMS that we've reviewed here today on screen or
13 that you've reviewed, is there anything that
14 explicitly says that a B-read alone is sufficient
15 for a diagnosis of asbestos-related disease?
16     MR. BECHTOLD: Leading.
17     Or does the requirement state you need a
18 diagnosis from a physician that sends in the EHH
19 form?
20     MR. BECHTOLD: Again, leading.
21     **A Diagnose needs to --**
22     Q Go ahead?
23     **A The diagnosis needs to come from the**
24 **medical provider who signs the form.**
25     Q And Ms. Nolan, why is that, based on your

75

1  review of the policy information?
2      **A Well, those are the guidelines that are**
3  **outlined in the Affordable Care Act.**
4      Q Paragraph 44, are the following statements
5  from CARD's current clinical director consistent
6  with the POMS section 00803.001 and 00803.050:
7      Question, so a patient can come in, in the
8  hypothetical that we began today, with -- with a
9  fractured rib that appears on a B-read and get
10 Medicare benefits even though CARD knows that that
11 patient doesn't have a diagnosis of
12 asbestos-related disease, correct? Answer,
13 correct.
14     Ms. Nolan, in that scenario, based on the
15 POMS manual and the policies that we've discussed
16 today, is a patient with only a fractured rib that
17 appears on a B-read when CARD knows, or the
18 provider knows, that that patient doesn't have a
19 diagnosis of asbestos-related disease an
20 acceptable basis for Medicare eligibility?
21     **A We would need to have the asbestos-related**
22 **disease diagnosis in order for Medicaid --**
23 **Medicare to be given.**
24     Q And who would be responsible for asserting
25 that a diagnosis exists?

76

1      **A The medical provider.**
2      Q Right. Ms. Nolan, if we could take one
3  five-minute break, I think I'm about ready to wrap
4  all this up.
5      **A Okay.**
6      Q Great. Thank you.
7      THE VIDEOGRAPHER: We are going off the
8  record. The time is 11:58.
9      (Thereupon, a recess was had.)
10     THE VIDEOGRAPHER: We're back on record.
11 The time is 12:05.
12 BY MR. DUERK:
13     Q All right. Ms. Nolan, we are back on the
14 record after a short break. It's my understanding
15 that you may have some clarifications you'd like
16 to make; is that right?
17     **A Yes, thank you.**
18     Q Please go ahead.
19     **A First, I'd like to clarify that Social**
20 **Security used the Affordable Care Act's definition**
21 **of B reader and not my elementary definition of a**
22 **B reader.**
23     Q All right.
24     **A And secondly, I would like to clarify the**
25 **POMS. Social Security actually carries out what**

**Exhibit C-19**

77

1  the POMS say.  But for this particular section,
2  EHH, it is HHS CMS's POMS where they open the
3  POMS.  We work with them to implement.
4      Q  Sure.
5      A  I didn't make that distinction, that there
6  was another entity involved.
7      Q  That makes sense.  But regardless of who
8  owns the POMS or who drafted it, or -- is it the
9  SSA's field office, I think it's field office 872,
10  that is tasked with receiving these EHH forms
11  related to Medicare eligibility status?
12      A  That is correct.
13      Q  Okay.  And Ms. Nolan, thank you for your
14  time today.  I'd just like to finish up here with
15  this question.
16      Based on your review of the Social
17  Security Administration's policies, the POMS
18  sections, the law, and any other information you
19  considered, is it still the SSA's position that a
20  CARD patient must have a diagnosis of an
21  asbestos-related disease certified by an medical
22  provider on an EHH form in order to be eligible
23  for Medicare benefits?
24      A  Yes.
25      Q  Thank you.  And Ms. Nolan, in terms of the

78

1  information that you've reviewed, are there any
2  exceptions that you are aware of to this position
3  and policy from the SSA, including the B reader
4  scenarios that we have discussed, that would form
5  some sort of end run or alternative route of
6  obtaining EHH Medicare designation, outside of the
7  this EHH form submission process?
8      MR. BECHTOLD:  Foundation, form, leading.
9      Q  Let me go ahead and rephrase it, make it
10  simpler.
11      Ms. Nolan, are there any exceptions to
12  SSA's policy about an EHH form certified by a
13  provider that you're aware of?
14      A  Not to my knowledge.
15      Q  Thank you, Ms. Nolan.  I have no further
16  questions at this time.
17      MR. BECHTOLD:  Ms. Nolan, my name is Tim
18  Bechtold and I represent the CARD clinic in this
19  matter.  And I'd like to draw your attention to --
20  to some exhibits that -- that the court reporter
21  should have, Exhibit 305.  Court reporter, would
22  it be possible to put Exhibit 305 up?
23      THE COURT REPORTER:  Hang on one second.
24  I don't believe I have Exhibit 305.
25      MR. BECHTOLD:  Okay, why don't we take a

79

1  short break.  No one will go away.  Let's just go
2  off the record.
3      THE VIDEOGRAPHER:  We're going off the
4  record.  The time is 12:09.
5      (Thereupon, a recess was had.)
6      THE VIDEOGRAPHER:  We are back on the
7  record.  The time is 12:17.
8      EXAMINATION BY COUNSEL FOR THE DEFENDANT
9  BY MR. BECHTOLD:
10      Q  Hi, Ms. Nolan.  My name is a Tim Bechtold
11  and I represent the CARD clinic.  I just have a
12  series of follow-up questions.  You testified that
13  you used the Affordable Care Act, Section 1881A,
14  to define the POMS, correct?
15      A  Yes.
16      Q  And -- and you agree that Section 1881A is
17  the basis from which the POMS derive, correct?
18      A  Yes.
19      Q  And you agree, don't you, that the POMS
20  have to agree with the -- with Section 1881A?
21      MR. DUERK:  Objection, foundation.  Go
22  ahead.
23      A  The POMS follow the law, Section 1881A.
24      Q  So Ms. Nolan, you testified in order to
25  prepare for your deposition today that you

80

1  reviewed Section 1881A, correct?
2      A  Yes.
3      Q  And you reviewed POMS HI 00803.001 and
4  POMS HI 00803.050?
5      A  Yes, I have reviewed those.
6      Q  And you have been designated by the United
7  States to represent the Social Security
8  Administration's position regarding these policies
9  and statute, correct?
10      A  Yes.
11      Q  Okay.  So would you agree that -- that the
12  POMS 803.001 and 803.005 are meant to implement
13  Section 1881A?
14      A  Yes.
15      Q  And you expect the CARD physicians to
16  follow Section 1881A, correct?
17      A  The expectation is that the medical
18  providers will follow the directions that are on
19  the checklist that stem from 1881A.
20      Q  Okay.  So do you expect CARD physicians to
21  -- or rather, do you expect CARD physicians to
22  defer to the statute as opposed to deferring to
23  the POMS?
24      MR. DUERK:  Objection.  Relevance,
25  foundation.  Go ahead.

**Exhibit C-20**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

81

1    **A   The medical provider will follow the**
2    **instructions on the checklist.**
3        Q   Okay.  Does -- does CARD -- does the
4    Social Security Administration interpret section
5    81A for CARD providers?
6    **A   I'm sorry, repeat your question?**
7        Q   Does the Social Security Administration
8    interpret Section 1881A for CARD providers?
9    **A   No.**
10       Q   And, in fact, the Social Security
11   Administration expects CARD to fill out Step 2 and
12   Step 3 of the EHH form, correct?
13   **A   Yes.  According to the checklist the**
14   **medical provider will fill out Section 2 and 3.**
15       Q   Right.  Right.  And the Social Security
16   Administration doesn't -- doesn't direct the
17   provider how to fill out that section, correct?
18       MR. DUERK:  Objection, vague.  Go ahead.
19   **A   Can you restate the question, please?**
20       Q   The Social Security Administration does
21   not direct the CARD provider how to fill out Step
22   2 and Step 3 of the EHH checklist, correct?
23   **A   Other than the instructions that are on**
24   **the checklist, no.**
25       Q   You testified that -- that the accepted

82

1    diagnostic methods are listed on the EHH
2    checklist.  Do you remember that testimony?
3    **A   Yes.**
4        Q   All right.
5        MR. BECHTOLD:  Andrew, I'd like to bring
6    up Exhibit 305, if we can, so Ms. Nolan can take a
7    look at it.  And I'd like to you scroll down to
8    page 5 of this exhibit.  Now go to page 7.
9    BY MR. BECHTOLD:
10       Q   Ms. Nolan, do you recognize what Exhibit
11   305 is?
12       (Thereupon, Exhibit 305 was marked for
13   identification.)
14   **A   Yes.**
15       Q   What is it?
16   **A   It's the section 1881 where we pulled the**
17   **-- are you speaking about the highlighted section**
18   **specifically?**
19       Q   No, just what is the document?
20   **A   Oh, it's the section of the law that we**
21   **pull the EHH POMS from.**
22       Q   Okay.  I'd like you to draw your attention
23   to section E2 A.  Do you see that?
24   **A   Yes.**
25       Q   All right.  So it says, in general, for

83

1    purposes of this section, the term environmental
2    exposure affected individual means, A, an
3    individual described in paragraph 2; and B, an
4    individual described in paragraph 3.
5        Sub 2, individual described.  In general,
6    an individual described in this paragraph is any
7    individual who, I, is diagnosed with one or more
8    conditions described in subparagraph B?
9        Did I read that correctly?
10   **A   Yes.**
11       Q   Now I'm going to skip down to subparagraph
12   B.  So can you scroll down so we see all of the
13   highlighted section, please?  Okay.  So would you
14   agree that an individual who is diagnosed with
15   asbestosis, pleural thickening, or pleural plaques
16   who has established, by interpretation by a B
17   reader qualified physician of a plain chest x-ray,
18   qualifies for Medicare benefits under the act?
19       MR. DUERK:  Objection to the extent it
20   calls for a legal interpretation, foundation.  Go
21   ahead.
22   **A   Can you repeat the question?**
23       Q   Sure.  Would you agree that an individual
24   diagnosed with asbestosis, pleural thickening, or
25   pleural plaques, as established by interpretation

84

1    by a B reader qualified physician of a plain chest
2    x-ray, qualifies for Medicare benefits under the
3    act?
4    **A   Yes.**
5        Q   Would you agree that an individual
6    diagnosed with asbestosis, pleural thickening, or
7    pleural plaques, as established by interpretation
8    of a computed tomographic radiograph of the chest
9    by a qualified physician, as determined by the
10   Secretary qualifies for Medicare benefits under
11   the act?
12   **A   Yes.**
13       Q   So you testified that if individuals
14   signing the EHH checklist certifies that a
15   diagnosis exists, correct?
16   **A   Yes, the medical provider signing the EHH**
17   **checklist.**
18       Q   Certifies that a diagnosis exists; is that
19   correct?
20   **A   Yes.**
21       Q   That is your testimony?
22   **A   Yes.**
23       Q   And your testimony was that the diagnosis
24   needs -- needs to come from the provider who signs
25   the form, it says so in the Affordable Care Act.

**Exhibit C-21**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

22 (85 to 88)

85

1   Do you recall your testimony --
2       **A  Yes.**
3       Q -- when you said that?
4       **A  Yes.**
5       Q  So you just testified that a diagnosis of
6   asbestosis, pleural thickening, or pleural
7   plaques, as established by an interpretation by a
8   B reader qualified physician of a plain chest
9   x-ray, qualifies an individual for Medicare
10  benefits, correct?
11      MR. DUERK:  Objection.  Vague, misstates
12  the evidence.  Go ahead.
13      **A  It's -- can you repeat the question?**
14      Q  Sure.  You agreed just a minute ago that a
15  diagnosis of asbestosis, pleural thickening, or
16  pleural plaques, as established by interpretation
17  by a B reader qualified physician of a plain chest
18  x-ray, qualifies an individual for Medicare
19  benefits under the act, correct?
20      MR. DUERK:  Same objections.  Go ahead.
21      **A  That is certified and signed by a**
22  **physician, yes.**
23      Q  Okay.  So -- so if a physician -- so are
24  you saying that somewhere in this act it says that
25  a diagnosis has to be certified and signed by a

86

1   physician?
2       **A  The checklist requires that the form is**
3   **signed by a physician, that the diagnosis is made**
4   **and signed by the physician.**
5       Q  Okay.  So we have two issues here, Ms.
6   Nolan.  The first is that you testified that a
7   person who has a diagnosis of asbestosis, pleural
8   thickening, or pleural plaques, as established by
9   interpretation of a B reader qualified physician
10  of a plain chest x-ray, qualifies for Medicare
11  benefits, correct?
12      MR. DUERK:  Same objections.
13      **A  That -- that a physician signs off on.**
14      Q  So -- that a physician signs off on it?
15      **A  Yes, that's --**
16      Q  So if a physician -- if a physician sees
17  that a -- that an individual has asbestosis,
18  pleural thickening, or pleural plaques as
19  established by interpretation by a B reader
20  qualified physician of a plain chest x-ray, a
21  physician should certify that for qualification
22  for Medicare benefits, correct?
23      MR. DUERK:  Did you say should?  I'm
24  sorry, I didn't hear you, counsel.
25      MR. BECHTOLD:  All right.  I'll repeat my

87

1   question.
2       MR. DUERK:  Thank you.
3   BY MR. BECHTOLD:
4       Q  So if a person has a diagnosis of
5   asbestosis, pleural thickening, or pleural
6   plaques, as established by an interpretation of a
7   B reader qualified physician of a plain chest
8   x-ray, should the provider certify that as a
9   diagnosis on the EHH form.
10      MR. KAKUK:  Objection, scope.
11      MR. DUERK:  Objection, foundation.  Go
12  ahead.
13      **A  The medical provider is the one that**
14  **actually makes the diagnosis and signs the EHH**
15  **checklist.**
16      Q  Ms. Nolan, you just testified that the
17  diagnosis was made by interpretation of a B
18  reader.
19      MR. DUERK:  Objection, misstates --
20      Q  Did you not?
21      MR. DUERK:  Misstates the evidence.  Go
22  ahead.
23      **A  I'm sorry.  Can you restate your question?**
24      Q  Sure.  If a diagnosis is established by --
25  well, if a diagnosis of asbestosis, pleural

88

1   thickening, or pleural plaques is established by
2   interpretation of a computed tomographic
3   radiograph of the chest by a qualified physician,
4   you agreed that that individual qualifies for
5   Medicare benefits under the act, correct?
6       **A  Yes.**
7       Q  And so if a provider knows that -- that
8   that individual has been diagnosed -- that a
9   diagnosis of asbestosis, pleural thickening, or
10  pleural plaques is established by the
11  interpretation of a computed tomographic
12  radiography of the chest by a qualified physician
13  has been made under the act, isn't that provider
14  obligated to provide the EHH checklist for that
15  individual?
16      MR. DUERK:  Objection, foundation.  Calls
17  for --
18      MR. KAKUK:  Scope.
19      MR. DUERK:  Calls for a medical and legal
20  opinion.  Go ahead.
21      MR. KAKUK:  And scope, sorry.
22      **A  I don't know how to answer that.**
23      Q  You testified that a diagnosis -- that the
24  individual signing the form needs to certify that
25  a diagnosis exists.  Do you recall that testimony?

**Exhibit C-22**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

89

1    A  Yes.
2    Q  So if a diagnosis exists, didn't that
3  provider certify that it exists?
4        MR. DUERK:  Objection, foundation.  Go
5  ahead.
6        MR. KAKUK:  Scope.
7    **A  So the medical provider signing off on the**
8  **diagnosis is the one that treated -- saw the**
9  **patient, then yes, that's correct.**
10   Q  Okay.  So if that -- if that -- if the
11  provider knows that there's a diagnosis based upon
12  interpretation by a qualified physician, he should
13  certify that he has a diagnosis for the purpose of
14  the EHH checklist?
15       MR. KAKUK:  Objection, scope.
16       MR. DUERK:  Objection, form and
17  foundation.  Go ahead.
18   **A  If the medical provider made the**
19  **diagnosis, they can sign off on the EHH checklist.**
20   Q  Well, you agreed that -- that the -- what
21  the statute says is that the diagnosis can be
22  established by interpretations by a B reader,
23  correct?
24       MR. DUERK:  Objection.  Misstates the
25  evidence, foundation.  Go ahead.

90

1    A  Correct.
2    Q  All right.  So if the statute says that a
3  diagnosis can be established -- a diagnosis of
4  asbestosis, pleural thickening, or pleural plaques
5  as established by interpretation by a B reader
6  qualified physician of a plain chest x-ray.  So in
7  other words, under the act a B reader qualified
8  physician of a plain chest x-ray can make a
9  diagnosis of asbestosis, pleural thickening, or
10  pleural plaques, correct?
11       MR. DUERK:  Objection.  Form, foundation.
12  Go ahead.
13   **A  Can you repeat it one more time?  Repeat**
14  **the question?**
15   Q  Sure.  Under the act, can a B reader
16  qualified physician, based upon an interpretation
17  of a plain chest x-ray, establish a diagnosis of
18  asbestosis, pleural thickening or pleural plaques?
19       MR. DUERK:  Objection.  Form, foundation.
20   **A  Yes.**
21   Q  And similarly, can a qualified physician's
22  interpretation of a computed tomographic
23  radiograph of the chest establish a diagnosis of
24  asbestosis, pleural thickening, or pleural
25  plaques?

91

1    A  Yes.
2    Q  So if a certifying doctor knows that that
3  diagnosis exists, should he certify that diagnosis
4  on the EHH checklist for the Social Security
5  Administration to consider for Medicare benefits?
6        MR. DUERK:  Objection.  Form, misstates
7  the evidence.  Go ahead.
8        MR. KAKUK:  Scope.
9    **A  If the medical providers made the**
10  **diagnosis, then I don't know if -- can I see the**
11  **checklist again?**
12   Q  Sure.  Let's take a look at Exhibit 76 and
13  go to page 4.  Okay.  Now let's take a look at
14  this.  This is Exhibit 76 and this is the
15  Environmental Health Hazards Checklist.  Can you
16  scroll down just a little bit?  I mean, scroll up
17  a little bit.  Great.  Thank you.  So do you see,
18  in Step 2, where it says check the box next to
19  diagnosed impairments and print the date of
20  diagnosis?
21   **A  Yes.**
22   Q  And do you see minimum medical evidence
23  required is interpretation by a B reader qualified
24  physician of a plain chest x-ray?
25   **A  Yes.**

92

1    Q  Or interpretation of computed tomographic
2  radiograph of the chest by a qualified physician,
3  correct?
4    **A  Yes.**
5    Q  That's exactly what it says in the
6  Affordable Care Act, Section 1881A, correct?
7    **A  Yes.**
8    Q  So the minimum medical evidence required
9  for that diagnosis, as it states in the act, is
10  simply interpretation by a B reader qualified
11  physician of a plain chest x-ray or interpretation
12  of a computed tomographic radiograph of the chest
13  by a qualified physician, correct?
14   **A  Yes.**
15   Q  So if a certifying physician knows that
16  this diagnosis has been made by a B reader
17  qualified physician or a CT interpretation by a
18  qualified physician, should he certify that to the
19  Social Security Administration for --
20       MR. DUERK:  Objection, form.
21   Q  -- consideration of Medicare benefits?
22       MR. DUERK:  Objection.  Form, foundation,
23  misstates the evidence.
24       MR. KAKUK:  Scope.  Sorry, scope.
25   **A  The form states that it should be**

**Exhibit C-23**

93

1 completed by a provider.
2     Q  Okay.  And if the provider knows that a
3 diagnosis had been made, should he tell the Social
4 Security Administration that?
5     A  Do you mind scrolling down the checklist
6 to the bottom -- towards the bottom, please?
7     Q  Sure.
8     A  Okay.  And ask your question one more
9 time, the last part, please?
10     Q  So if a certifying physician knows that
11 this diagnosis has been made by a B reader
12 qualified physician or a qualified physician
13 interpretation of a CT scan, should he certify
14 that diagnosis to the Social Security
15 Administration?
16     MR. DUERK:  Objection.  Form, foundation,
17 misstates the evidence.
18     MR. KAKUK:  And scope.
19     A  I'm unsure.  I'm unsure based on my
20 interpretation of the checklist and that the
21 provider should be the one that is diagnosing and
22 signing the checklist.
23     Q  Well, doesn't it say -- scroll back up,
24 please.  It says interpretation of a computed
25 tomographic reading of radiograph of the chest by

94

1 a qualified physician or interpretation by a B
2 reader qualified physician of a plain chest x-ray,
3 correct?
4     A  Yes.
5     Q  So what you're saying is that in order for
6 the B reader qualified physician of a plain chest
7 x-ray to count it has to come from the person who
8 signs -- that B reader, has to be the publisher
9 who signs the form?
10     A  That's my understanding.
11     MR. DUERK:  Objection.
12     Q  So that's your understanding of -- that's
13 the understanding of Social Security
14 Administration?
15     MR. KAKUK:  Objection, scope.
16     Q  What's the difference -- does the Social
17 Security Administration distinguish between
18 clinical diagnoses and a diagnosis?
19     MR. KAKUK:  Objection, scope.
20     MR. DUERK:  Objection.  Form and
21 foundation.
22     Q  Do you know the difference between a
23 clinical diagnosis and a diagnosis?
24     MR. KAKUK:  Same objection.
25     MR. DUERK:  Same objection.

95

1     A  Can you repeat the question?
2     Q  Do you know the difference between a
3 clinical diagnosis and a diagnosis?
4     MR. DUERK:  Same objection.
5     MR. KAKUK:  Same objection.
6     A  I personally think I know the difference
7 between the two.
8     Q  Okay.  So does the Social Security
9 Administration distinguish between the two?
10     A  Not to my knowledge.
11     MR. KAKUK:  Objection, scope.
12     Q  So I'd like to bring you back to Exhibit
13 305, if I could, and return to page 7.  Okay.  Now
14 your testimony is, is that -- is that these --
15 these interpretations of -- as established by a B
16 reader, a qualified physician or a qualified
17 physician's interpretation of a CT, that that has
18 to be the person who signs for that -- for that
19 diagnosis.  The B reader qualified physician has
20 to be the one who signs the EHH form; is that your
21 testimony?
22     MR. DUERK:  Objection, form.
23     A  The checklist states that the medical
24 provider will make the diagnosis by checking one
25 of those boxes on checklist and then signing.

96

1     Q  Where does it say that the medical
2 provider will make that diagnosis?
3     A  It says the medical provider will fill out
4 the Section 2.
5     Q  Okay.  And if the medical provider fills
6 out Step 2 -- can we go back again to page 4 of
7 Exhibit 76?  Where does it say that the -- that a
8 medical provider has to be the one who makes the
9 diagnosis?
10     A  The form says that Step 2 is completed by
11 a provider and the provider is -- is -- checked
12 the box next to the diagnosed impairment, print
13 the date of the diagnosis.  So the assumption is
14 that the medical provider is also making the
15 diagnosis.
16     Q  Where is that assumption?
17     A  It's not on the checklist.
18     Q  It's not in the law either, is it?
19     MR. KAKUK:  Objection, scope.
20     MR. DUERK:  Objection, form.
21     Q  You've been designated by the United
22 States as the one who has the policy -- who has
23 that policy and knowledge of Section 1881A to
24 respond to these questions on behalf of the Social
25 Security Administration, correct?

Exhibit C-24

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

97

1    **A I am responsible for the POMS.**
2    Q And the POMS are based upon Section 1881A,
3    correct?
4    **A The POMS are pulled from Section 1881A,**
5    **but we have general counsel that works with us to**
6    **interpret when legislation comes in. And the --**
7    **specifically 1881A in this situation.**
8    Q All right. So you testified that there's
9    an assumption that it will be the provider who
10   make the diagnosis. Where is that assumption
11   stated?
12   **A That is my opinion. That it's an**
13   **assumption that the provider would be the one to**
14   **make the diagnosis and sign off on it.**
15   Q Okay. So you agree it doesn't say that in
16   the law, correct?
17   **A Correct.**
18   Q And you agree it doesn't say that in the
19   Environmental Health Hazards Checklist, correct?
20   **A It does not say that directly, correct.**
21   Q No. And so why wouldn't -- if a
22   physician, who's the provider, who knows that
23   there's been a diagnosis that has been made based
24   upon an interpretation by a B reader qualified
25   physician of a plain chest x-ray, doesn't it make

98

1    sense for him to certify that to the Social
2    Security Administration?
3         MR. DUERK: Objection. Foundation, form.
4    Go ahead.
5         MR. KAKUK: And scope.
6    **A I don't know that I know the answer to**
7    **that question.**
8    Q You have been directed as -- you've been
9    identified as a person who has knowledge of this
10   by the Social Security Administration. So I guess
11   either the Social Security Administration has no
12   opinion; is that correct?
13        MR. DUERK: Objection, form. Go ahead.
14        MR. KAKUK: Vague and scope.
15   Q Okay. The Social Security takes no
16   position whether or not a provider has to be the
17   one who makes the diagnosis when they certify an
18   EHH checklist. Is that your position or not?
19        MR. DUERK: Objection. Misstates prior
20   testimony and form. Go ahead.
21   Q I'm just asking.
22        MR. DUERK: Same objections.
23   **A I'm sorry. Repeat the question one more**
24   **time?**
25   Q Sure. We agree, don't we, that neither

99

1    the law nor the EHH checklist requires that the
2    diagnosis, certified by the provider, has been
3    made by the provider, correct?
4         MR. DUERK: Objection. Form, foundation,
5    misstates prior testimony. Go ahead.
6    **A There's no specific language in the POMS**
7    **that states that the provider has to diagnose --**
8    **be the one that diagnosis the asbestos-related**
9    **disease.**
10   Q Correct. Thank you. So if that provider
11   knows the diagnosis has been made based upon, for
12   example, a B reader's interpretation of a chest
13   x-ray, why isn't it appropriate for him to certify
14   that diagnosis to the Social Security
15   Administration?
16        MR. DUERK: Objection. Form, foundation,
17   misstates prior testimony. Go ahead.
18   **A Being that it's not specified in the POMS,**
19   **I don't know. I don't know now that -- that it**
20   **would not be accepted.**
21   Q So the POMS don't specifically prohibit a
22   provider from certifying an EHH checklist to the
23   Social Security Administration based upon the
24   diagnosis by -- or rather, a diagnosis established
25   by the interpretation of a B reader qualified

100

1    physician or plain chest x-ray?
2         MR. DUERK: Objection. Form, foundation,
3    and to the extent it misstates former testimony.
4    Go ahead.
5    **A The POMS, as they are written out, do not**
6    **contain a statement specifically to that**
7    **situation.**
8    Q Similarly for an interpretation of a CT
9    scan by a qualified physician?
10   **A Correct.**
11   Q So I'm just going to see if I understand
12   the testimony from the Social Security
13   Administration. First, the Social Security
14   Administration agrees that the law provides that a
15   diagnosis of asbestosis, pleural thickening, or
16   pleural plaques is established by interpretation
17   by a B reader qualified physician of a plain chest
18   x-ray or interpretation of a computed tomographic
19   radiograph of the chest by a qualified physician,
20   correct?
21        MR. DUERK: Objection. Form, foundation,
22   misstates prior testimony.
23   **A Can you repeat the question?**
24   Q Sure. And to make it easier, we can put
25   Exhibit 305 back on. Page 7. So the Social

**Exhibit C-25**

Case 9:19-cv-00040-DLC   Document 177   Filed 06/13/23   Page 115 of 122
Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

26 (101 to 104)

101

1   Security Administration agrees that a diagnosis of
2   asbestosis, pleural thickening, or pleural plaques
3   can be established -- or a diagnosis of
4   asbestosis, pleural thickening, or pleural plaques
5   is established by the interpretation by a B reader
6   qualified physician of a plain chest x-ray or
7   interpretation of a computed tomographic
8   radiograph of the chest by a qualified physician,
9   as determined by the Secretary, qualifies an
10  individual for Medicare benefits?
11      **A  Yes.**
12      Q  Okay.  And now let's go back to Exhibit
13  76.  Page 4 again.  And the Social Security
14  Administration agrees that there's nothing in the
15  statute, Section 1818A, or the POMS that prohibits
16  a provider from certifying a diagnosis of
17  asbestosis, pleural thickening, or pleural plaques
18  based upon interpretation by a B reader qualified
19  physician of a plain chest x-ray or interpretation
20  of computed tomographic radiographic or chest by a
21  qualified physician, correct?
22      **A  Yes.**
23      Q  Ms. Nolan, I'd like to take about a
24  ten-minute break.  It's now about five minutes or
25  so to the hour.  How about we reconvene five

102

1   minutes after the hour?
2       **A  Okay.**
3       Q  All right.  Thanks.  Let's go off the
4   record.
5           THE VIDEOGRAPHER:  We're going off the
6   record.  The time is 12:53.
7           (Thereupon, a recess was had.)
8           THE VIDEOGRAPHER:  We're back on record.
9   The time is 1304.
10  BY MR. BECHTOLD:
11      Q  Ms. Nolan, does Section 1881A distinguish
12  between the terms clinical diagnosis and
13  diagnosis?
14      **A  I'm unsure.**
15      Q  Did the Social Security Administration
16  POMS distinguish between the terms clinical
17  diagnosis and diagnosis?
18      **A  I don't believe so.**
19      Q  You agree that the minimum medical
20  evidence required for -- to qualify a person for
21  Medicare benefits -- to qualify a person for EHH
22  Medicare benefits is established by Section 1881A,
23  correct?
24          MR. DUERK:  Objection.  Foundation, form.
25  Go ahead.

103

1       **A  Can you repeat the question?**
2       Q  Do you agree that the minimum medical
3   evidence required to qualify an individual for EHH
4   Medicare benefits is established by 1881A?
5           MR. DUERK:  Objection.  Form, foundation.
6       **A  Yes.**
7       Q  That was your prior testimony, correct?
8           MR. DUERK:  Same objections.
9       **A  I believe so.**
10      Q  And I think your testimony was is that the
11  Social Security Administration relies on Section
12  1881A for the definition of what a qualified
13  physician is, correct?
14      **A  Correct.**
15      Q  And you testified that, for the --
16  defining the meaning of diagnosis, for purposes of
17  the Environmental Health Hazard Checklist, your
18  testimony was that it's a medical determination of
19  an individual disease, correct?
20      **A  That was my personal definition, yes.**
21      Q  That's your personal definition not the
22  definition of the Social Security Administration?
23      **A  We would have used what was in the
24  Affordable Care Act.  You will not see that -- a
25  definition for that in the POMS.**

104

1       Q  Okay.  I'm not sure I caught your answer
2   to this question but does the Social Security
3   Administration consider the physicians at the CARD
4   clinic qualified physicians for purposes of
5   Section 1881A?
6       **A  I don't know that I can answer that.  Are
7   they a provider?  It's -- in the POMS it talks
8   about the provider medical source.**
9       Q  Okay.  Paragraph 24 of the subpoena
10  specifically asks that question.  Have you been
11  prepared to answer that?
12      **A  Can you repeat the question?**
13      Q  Sure.  Does the Social Security
14  Administration consider CARD's physicians to be
15  qualified physicians for purposes of Section
16  1881A?
17      **A  If they match the definition in 1881A then
18  yes.**
19      Q  So Ms. Nolan, were you involved in the
20  development of the Environmental Health Hazard
21  Checklist back in 2010 and 2011?
22      **A  No.**
23      Q  Did you communicate with anyone -- or
24  rather, were you involved in the development of
25  the POMS section HI 00803.001 in 2010 and 2011?

105

1   A No.
2   Q Were you involved in the development of
3 the POMS HI 00803.050 in 2010 and 2011?
4   A No.
5   Q Were you involved in the amendments to
6 these both of those POMS in 2022?
7   A No. That was a systemic change from our
8 publication staff. So no.
9   Q So to summarize then, you were never
10 involved in development of the POMS or their
11 implementation, correct?
12   A I did not write the POMS or develop their
13 implementation, correct.
14   Q So have you ever been involved with the
15 implementation of either of those POMS sections at
16 any time?
17   A No.
18   Q But you're the person at the Social
19 Security Administration with the most knowledge,
20 correct?
21   A Correct. The individual that wrote the
22 POMS is deceased and the other individual is
23 retired that helped.
24   Q And did you communicate with them prior to
25 your testimony today?

106

1   A No.
2   Q Not the dead guy. Would you agree -- or
3 rather, would the Social Security Administration
4 agree that if there is a -- differences in
5 interpretation of -- of the POMS that the -- the
6 -- the guiding light should be Section 1881A?
7     MR. DUERK: Objection, foundation.
8   A If there's a disagreement with what's in
9 the POMS we would consult with HHS CMS.
10   Q Would you agree that there is an ambiguity
11 date in the POMS as they exist today?
12     MR. DUERK: Objection. Foundation, form.
13 Go ahead.
14   A If we had any concerns with the POMS we
15 would consult HHS CMS.
16   Q So the SSA has no concerns with POMS HI
17 00803.050, correct?
18   A I am not aware of any issues that we have.
19 And just to clarify, generally, when we are -- are
20 made aware of issues, there's an internal process
21 that we use to resolve those issues. And that
22 would, again, take us back to HHS CMS to resolve.
23 So I am not aware of any known issues.
24   Q Okay. You testified earlier today that --
25 about some things that you considered were not

107

1 consistent with the POMS section HI 00803.001 and
2 HI 00803.050. And I'm going to just go over that
3 testimony right now.
4     You testified that CARD -- to this
5 statement, you said this was not consistent with
6 the POMS, CARD has submitted EHH forms to the
7 Social Security Administration when CARD providers
8 were aware that the individual patient did not
9 have a clinical diagnosis of asbestos-related
10 disease. Do you recall your testimony?
11   A Yes, I believe so.
12   Q You said it was not consistent with the
13 POMS, correct?
14   A I believe so.
15   Q What is a clinical diagnosis?
16   A Did you say what is a clinical diagnosis?
17   Q Yes.
18     MR. KAKUK: Objection, scope.
19   A I don't know.
20   Q Well, you offered an opinion about this
21 statement. So you clearly must have -- SSA must
22 have an opinion of what a clinical diagnosis is.
23   A I believe I gave my opinion of what a
24 clinical diagnosis was or is.
25   Q I don't think you did.

108

1   A Okay. Can you repeat the statement?
2   Q Sure. You said this was not consistent
3 with the POMS, CARD has submitted EHH forms to
4 Social Security Administration when CARD providers
5 who were aware of individual clinical did not have
6 a clinical diagnosis of asbestos-related disease.
7 And so I ask you, what is a clinical diagnosis?
8     MR. DUERK: Same objection. Go ahead.
9   Q Or would you rather withdraw your opinion
10 about whether that's consistent with the POMS?
11     MR. DUERK: Objection, form.
12   A I'm sorry to do this to you. Can you
13 repeat the question one more time? And statement?
14   Q Sure, the statement is CARD has submitted
15 EHH forms to the Social Security Administration
16 when CARD providers were aware that the individual
17 patient did not have a clinical diagnosis of
18 asbestos-related disease.
19     MR. DUERK: Is there a question?
20   Q Would you like to withdraw your prior
21 testimony that this was not consistent with the
22 POMS?
23     MR. DUERK: Objection. Form, go ahead.
24   A I don't -- I don't want to withdraw my --
25 my testimony.

**Exhibit C-27**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

109

1 Q Okay.
2 **A Prior testimony.**
3 Q Then you have to tell me what a clinical
4 diagnosis is.
5 **A A diagnosis that is made by the provider.**
6 Q So is there anything -- rather, let's
7 start here. What is the purpose of a -- what is
8 the purpose of Section 10323 of the Affordable
9 Care Act, the Medicare Coverage for Individuals
10 Exposed to Environmental Health Hazards?
11     MR. DUERK: Objection. Foundation, vague.
12 Go ahead.
13     MR. KAKUK: Scope.
14 **A What's the --**
15 Q Yeah. Why did -- why did Congress amend
16 -- why did Congress insert this section into the
17 Affordable Care Act to provide coverage --
18 Medicare coverage for people exposed to
19 environmental health hazards?
20     MR. DUERK: Objection, foundation. Go
21 ahead.
22     MR. KAKUK: Scope.
23 **A So it's my understanding that there was a**
24 **need to provide health insurance coverage for**
25 **individuals in a certain area in Montana because a**

110

1 company that was providing that coverage before
2 had gone bankrupt. That's my understanding.
3 Q Why would the Social Security
4 Administration want to provide Medicare benefits
5 to people who have environmental health hazard
6 exposures?
7 **A Social Security is following the law.**
8 Q So you would agree that the Social
9 Security Administration should follow Section
10 1881A and implementation of the law, correct?
11     MR. DUERK: Objection, foundation. Go
12 ahead.
13 **A Social Security Administration follows the**
14 **laws that are set before us. I agree to that,**
15 **yes.**
16 Q Including Section 1881A, right?
17 **A Correct.**
18 Q And you would agree, wouldn't you, that
19 CARD providers should also follow Section 1881A,
20 correct?
21     MR. DUERK: Objection. Form, foundation.
22 Go ahead.
23 **A The medical provider should follow what's**
24 **in the POMS, which would include the EHH**
25 **checklist.**

111

1 Q Okay. And should they follow the law as
2 well?
3 **A They should follow --**
4     MR. DUERK: Asked and answered.
5 **A -- the checklist.**
6 Q So your testimony is they should not
7 follow Section 1881?
8     MR. DUERK: Objection, form. Go ahead.
9 **A The provider should follow the checklist**
10 **as established in the POMS.**
11 Q Okay. I agree with that. But would you
12 agree that the provider should also follow Section
13 1881A?
14     MR. DUERK: Asked and answered.
15 Q It's just a yes or no question.
16     MR. DUERK: Same objection. Form, asked
17 and answered.
18 **A So the providers should follow the**
19 **checklist that's outlined in the POMS.**
20 Q But that's not my question. The question
21 is should the provider follow Section 1881A?
22     MR. DUERK: Asked and answered.
23 Q Just yes or no.
24     MR. DUERK: Same objection.
25 **A I don't know that I can answer that. I**

112

1 don't know if providers have the knowledge of
2 1881A on their own. So I can't answer that.
3 Q Okay. And so should the Social Security
4 Administration follow Section 1881A?
5 **A Social Security Administration should**
6 **follow the laws and legislation that's provided**
7 **for us, yes.**
8     MR. BECHTOLD: Okay. Great. All right.
9 That's all the questions I have for now, Ms.
10 Nolan. Thank you for your help.
11     MR. DUERK: Ms. Nolan, I have a few
12 follow-up questions for you. But just to make
13 sure that I am streamlined, I'd like to take 5
14 minutes and return after a short break.
15     THE WITNESS: Okay.
16     MR. DUERK: Thank you.
17     THE VIDEOGRAPHER: We're going off the
18 record. The time is 1321.
19     (Thereupon, a recess was had.)
20     THE VIDEOGRAPHER: We're back on record.
21 The time is 1329.
22     RE-EXAMINATION BY COUNSEL FOR THE PLAINTIFF
23 BY MR. DUERK:
24 Q Thanks for that short break, Ms. Nolan. I
25 just have a few follow-up questions based on Mr.

**Exhibit C-28**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

113

1   Bechtold's cross-examination, okay?
2       **A. Yes.**
3       Q So first, in terms of the difference
4   between a clinical diagnosis or a diagnosis, do
5   you recall Mr. Bechtold's questions about your
6   understanding of the difference between a clinical
7   diagnosis or a diagnosis?
8       **A. Yes.**
9       Q All right.  If we could turn to Exhibit
10  135, page 17.  If we could go to the bottom.  I'm
11  looking at paragraph 41.  I believe Mr. Bechtold
12  asked about the question -- or the statement, CARD
13  has submitted EHH forms to the Social Security
14  Administration when CARD providers were aware that
15  the individual patient did not have a clinical
16  diagnosis of asbestos-related disease.  Do you see
17  that question?
18      (Thereupon, Exhibit 135 was marked for
19  identification.)
20      **A. Yes.**
21      Q And I believe there was some discussion
22  about that word, clinical diagnosis.  But I'd like
23  to point to the very next statement, CARD
24  continues its practice of submitting patients EHH
25  forms to SSA who do not have a diagnosis

114

1   asbestos-related disease.  Did I read that
2   correctly?
3       **A. Yes.**
4       Q Okay.  And Ms. Nolan, is it still SSA's
5   position that the practice of submitting patients'
6   EHH forms to the Social Security Administration
7   who do not have a diagnosis of asbestos-related
8   disease would not be consistent with the POMS?
9       **A. Yes.**
10      Q All right.  In terms of Mr. Bechtold's
11  questions about the differences in language
12  between the Affordable Care Act and the POMS, I'd
13  like to turn to Exhibit 305, the language that Mr.
14  Bechtold put in front of you in the Affordable
15  Care Act.  Specifically, if we could look at that
16  part of Exhibit 305 that has the highlighted
17  section, that would be helpful.
18      So what I'd like to do is go up just a
19  little bit to Section 2A, which should be a little
20  further up.  There we go.  Okay.  So Ms. Nolan, do
21  you remember the discussion about this section of
22  the Affordable Care Act during your direct -- your
23  cross-examination?
24      **A. Yes.**
25      Q Okay.  So I'd like to focus on the very

115

1   beginning of this section and the language there.
2   And I'll read it.  Please tell me if I've read it
3   correctly.
4       In general, for purposes of this section,
5   the term environmental exposure affected
6   individual means an individual described in
7   paragraph 2.
8       First, did I read that part of it
9   correctly?
10      **A. Yes.**
11      Q Okay.  And it also does reference, in
12  section B, an individual described in paragraph 3.
13  What I'd like to do is look at paragraph 2.  So
14  I'll read this section describing the
15  environmental exposure affected individual.
16  Please tell me if I've read the beginning part of
17  the law correctly.
18      Individual described.  In general, an
19  individual described in this paragraph is any
20  individual who is diagnosed with one or more
21  conditions described in subparagraph B.  Did I
22  read that correctly?
23      **A. Yes.**
24      Q Okay.  So then we go down to the
25  conditions described.  So if we could scroll down

116

1   so we can see the entire highlighted section, that
2   would be helpful.
3       Ms. Nolan, I'll read the conditions
4   described.  Please tell me if I've read it
5   correctly, okay?
6       **A. Yes.**
7       Q So now we're down into the conditions
8   described for those diagnosed individuals.
9       Conditions described.  For purposes of
10  subparagraph A, the following conditions are
11  described in this subparagraph; asbestosis,
12  pleural thickening, or pleural plaques as
13  established by 1, interpretation by a B reader
14  qualified physician of a plain chest x-ray or
15  interpretation of a computed tomographic
16  radiograph of the chest by a qualified physician
17  as determined by the Secretary.
18      Did I read that section correctly?
19      **A. Yes.**
20      Q Okay.  So if you look at this section of
21  the law, nowhere here does it say that B readers
22  diagnose when they read a plain chest x-ray or
23  interpret a CT scan, correct?
24      **A. Correct.**
25      Q All right.  So here's what I'm trying to

**Exhibit C-29**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

117

1  address, as squarely and simply as I can.  When it
2  comes to the Affordable Care Act and the POMS
3  section, based on the information you reviewed,
4  regardless of what minimum medical evidence is
5  used to establish a diagnosis, is it the Social
6  Security Administration's position that it is the
7  provider, the doctor, the physician, the medical
8  care provider who fills out the EHH form who
9  determines whether or not a diagnosis exists?
10  **A  Yes.**
11  Q  Okay.  So if we could go to Exhibit 76,
12  page 4.  I'll put the EHH form in front of you
13  again.  We'll be looking at the main box in
14  section 2 of the form, where Step 2 reads;
15  identify the asbestos related condition and its
16  date of diagnosis.  Do you see in parenthesis
17  completed by the provider?
18  **A  Yes.**
19  Q  Okay.  Mr. Bechtold asked you whether
20  there was language in the POMS or language in the
21  law that indicated that the diagnosis had to be
22  rendered by the provider.
23  Do you recall that part of your
24  cross-examination?
25  **A  Yes.**

118

1  Q  According to Step 2 in the Program
2  Operations Manual System from the Social Security
3  Administration, based on Step 2 here, is the
4  identification of the asbestos-related condition
5  or conditions and its date of diagnosis indicated
6  on the EHH form by the provider?
7  **A  I'm sorry.  Can you repeat the question?**
8  Q  Sure.  And thank you for asking for
9  clarification.  Based on what we see on this EHH
10  form, which is page 4 of the POMS policies, whose
11  responsibility is it to check the box next to a
12  diagnosed impairment?
13  **A  The provider.**
14  Q  All right.  So in terms of submitting the
15  Medicare claim form itself to the Social Security
16  Administration, it's the provider, or the CARD
17  physician in this instance, who checks the box
18  about the diagnosed impairment, the date of
19  diagnosis, and forwards the form to the Social
20  Security Administration; is that right?
21  **A  Yes.**
22  Q  Okay.  In terms of Mr. Bechtold's
23  questions, I was getting hung up on the way that
24  the language was used.  And I'll just establish
25  this, Ms. Nolan, if evidence in this trial

119

1  establishes that B readers do not diagnose and
2  that CARD providers know that B readers do not
3  diagnose and the evidence also establishes -- if
4  the evidence also establishes that the B readers
5  do not fill out these EHH forms and check the
6  boxes related to a diagnosis of asbestos-related
7  disease.  And if it turns out CARD is aware of all
8  of these points and they still fill out the form
9  certifying that there is a diagnosis of
10  asbestos-related disease, would it be problematic,
11  in your mind, if CARD, when they filled out this
12  form and checked all these boxes that a diagnosis
13  exists -- existed for the patient, would it be
14  problematic in your mind if a provider filled out
15  this form when they knew that that patient did not
16  have any diagnosis of asbestos-related disease of
17  whatever type or kind?
18  MR. BECHTOLD:  Foundation, leading.
19  Q  Go ahead.
20  **A  In my opinion it would be.  Because**
21  **Medicare benefits are being granted based on**
22  **completion of this form.**
23  Q  All right.  And in terms of whether or not
24  B readers diagnose, is that any kind of
25  information that the SSA has any knowledge of at

120

1  any point in this process, based on your review of
2  the policies that were part of your investigation
3  into this?
4  **A  No.**
5  Q  Okay.  Is it fair to say that the Social
6  Security Administration is relying on the
7  physician who certifies that a diagnosis exists on
8  an EHH form to make that determination?
9  **A  Yes.**
10  Q  Okay.  In terms of Mr. Bechtold's
11  questions about whether there was the minimum
12  evidence of a B-read interpreting -- well, the
13  language here on the form says interpretation by a
14  B reader qualified physician of a plain chest
15  x-ray or interpretation of computed tomographic
16  radiograph of the chest by a qualified physician.
17  Do you see that language?
18  **A  Yes.**
19  Q  Okay.  And again, just to clarify, there
20  may be an interpretation by a B reader qualified
21  physician of a plain chest x-ray in a certain
22  patient's case.  But in order for the patient to
23  get Medicare benefits, first, the minimum medical
24  evidence required would be that that
25  interpretation indicated that there was an

**Exhibit C-30**

121

1 asbestos-related disease, fair?
2     MR. BECHTOLD:  Foundation, leading.
3   Q Go ahead.
4   A Can you repeat that one more time?
5   Q Sure.  Maybe I'll address it this way; for
6 a moment, Ms. Nolan, in response to Mr. Bechtold's
7 cross-examination questions, I want you to assume
8 that, yes, we do have an interpretation by a B
9 reader of a plain chest x-ray in a patient's case,
10 okay?
11   A Okay.
12   Q And under the POMS form, the minimum
13 medical evidence required suggests that that's
14 evidence you would need establish, whether there's
15 a diagnosis of asbestos-related disease, right?
16   A Correct.
17   Q Okay.  But the minimum medical evidence
18 required, both in this column on the EHH form and
19 in the law, it doesn't indicate one way or another
20 what has to be included in that B reader
21 interpretation; is that fair?
22   A Yes.
23   Q Okay.  However, in order to form a
24 diagnosis, the EHH form and the law seem to
25 indicate that, at a minimum, you need to have

122

1 either an interpretation by a B reader or a
2 qualified physician of a chest x-ray or a CT; is
3 that a fair assumption?
4   A Repeat that for me one more time.
5   Q Sure.  And in terms of the minimum medical
6 evidence required, both the law and the POMS and
7 the EHH form required that you, at least, need to
8 have some interpretation of a CT or a B-read chest
9 x-ray, right?
10   A Correct.
11   Q Okay.  And if -- if you have that minimum
12 medical evidence, then the physician or the
13 provider can look at that minimum medical evidence
14 and determine whether there is a diagnosis of
15 asbestos-related disease; is that fair?
16   A Yes.
17   Q Okay.  So what I want to clarify here is
18 that while the minimum medical evidence required
19 here is that there is a scan read by a B reader or
20 a qualified CT reading physician, while there is
21 that requirement for a scan, it's not the scan
22 itself that is the diagnosis of asbestos-related
23 disease.  The scan can be the basis for a
24 diagnosis made by the provider when it comes to
25 the EHH form; is that a fair assumption?

123

1   A Yes.
2     MR. BECHTOLD:  Foundation and leading.
3   Q Okay.  So anyway you slice it, Ms. Nolan,
4 is a diagnosis of an asbestos-related disease from
5 a provider required in order for a person to get
6 Medicare benefits?
7   A Yes.
8   Q Okay.  There were some other questions
9 about whether -- from Mr. Bechtold about whether
10 or not you would change your -- change your
11 testimony.  And I just want to be sure that
12 nothing in your cross-examination changed any of
13 your testimony, based on that cross-examination,
14 okay?
15     If I could turn to Exhibit 135 again.  I'm
16 looking at page 16, paragraph 32.  Ms. Nolan, I
17 want to determine that this is still your
18 testimony today, if a person submits a B reader
19 chest x-ray interpretation to the SSA that
20 indicates a lung abnormality from a radiologist
21 related to sarcoidosis but not a diagnosis of
22 asbestos-related disease from a qualified
23 physician, is that patient eligible for EHH
24 Medicare benefits?
25     Earlier you testified, no, the patient is

124

1 not eligible for Medicare benefits.  Is that still
2 your testimony?
3     MR. BECHTOLD:  Beyond to scope.
4   A Yes.
5   Q In terms of Mr. Bechtold's
6 cross-examination, I want to make sure that none
7 of his questions or none the issues that he
8 brought up changed your testimony related to
9 paragraph 33?
10     If a person submits a chest x-ray
11 interpretation or a computed tomography
12 interpretation, CT scan, to the Social Security
13 Administration from a radiologist that indicates a
14 lung abnormality, but not a diagnosis of
15 asbestos-related disease, is she, that patient,
16 eligible for EHH Medicare benefits?
17     MR. BECHTOLD:  Beyond the scope.
18   Q Go ahead.
19   A No.
20   Q All right.  If we can go down to paragraph
21 35.  Ms. Nolan, what I'm trying to do is determine
22 whether or not any of Mr. Bechtold's questions
23 changed any of your answers related to paragraph
24 35.
25     If a health care provider submits an EHH

**Exhibit C-31**

Transcript of Monica Nolan, Designated Representative
Conducted on June 8, 2023

---

**125**

1   checklist form on behalf of a patient, when the
2   provider has actual knowledge that the patient
3   does not have a diagnosis of asbestos-related
4   disease, is that patient eligible for EHH Medicare
5   benefits?
6       A. No.
7       Q. If we could turn to paragraph 40.
8          THE COURT REPORTER:  I'm sorry, which
9   number did you say?
10         MR. DUERK:  I'm sorry.  Paragraph 40,
11  which should be on the very next page.
12  BY MR. DUERK:
13      Q. Ms. Nolan, I just want to clarify, you
14  know we've been through the different language of
15  the Affordable Care Act and the different language
16  of the POMS.  Mr. Bechtold asked if any of his
17  questioning changed your testimony.  I want to
18  make sure that none of the questions or issues
19  raised changed your testimony about paragraph 40.
20         That question is, are patients with signs
21  of a fractured rib on a B-read chest x-ray but no
22  diagnosis of asbestos-related disease eligible for
23  EHH Medicare benefits?
24         MR. BECHTOLD:  Beyond the scope.
25      Q. Go ahead.

---

**126**

1       A. No.
2       Q. All right.  Ms. Nolan, Mr. Bechtold talked
3   about communication with the SSA.  Is it your
4   understanding that, at any time, a health care
5   provider can call the Social Security
6   Administration for clarification about the Social
7   Security Administration's policies, including
8   these policies in the POMS related to eligibility
9   for Medicare benefits?
10      A. Yes.
11      Q. Okay.  And finally, in terms of the
12  questions asked by Mr. Bechtold, did any of the
13  questions asked by Mr. Bechtold change any of the
14  opinions that you expressed during this case in
15  your direct examination?
16      A. No.
17      Q. Okay.  So is it still your testimony -- as
18  an SSA deponent, is it still your testimony that
19  based on your review of the Social Security
20  Administration's policies, is it still the Social
21  Security Administration's position that a CARD
22  patient must have a diagnosis of an
23  asbestos-related disease certified by a medical
24  provider on an EHH form in order to be eligible
25  for Medicare benefits?

---

**127**

1       A. Yes.
2       Q. And the provider in these cases involving
3   CARD would be a provider or a physician from the
4   Center for Asbestos Related Disease; is that
5   right?
6       A. Repeat that for me, please?
7       Q. Sure.  And the provider that we're talking
8   about here, the provider that signs the EHH form,
9   that would be the provider from the Center for
10  Asbestos Related Disease, or CARD, in these cases?
11      A. Yes.
12         MR. DUERK:  Ms. Nolan, thank you very much
13  for your time at deposition today.  I appreciate
14  you being here.  I have no further questions.
15         THE WITNESS:  Thank you.
16         MR. BECHTOLD:  Thank you, Ms. Nolan.
17         THE WITNESS:  Thank you.
18         MR. DUERK:  Thank you, Ms. Nolan.
19         THE WITNESS:  Sure.
20         THE VIDEOGRAPHER:  All right.  Everyone
21  stand by and I'll read us off the video record.
22  This marks the end of the deposition of Monica
23  Nolan.  We're going off the video record at 1352.
24         (Off the record at 1:52 p.m.)
25

---

**128**

1          CERTIFICATE OF COURT REPORTER
2
3       I, SHAWN CAVALIERE, the officer before whom the
4   foregoing proceedings was taken, do hereby certify
5   that said proceedings were electronically recorded
6   by me; and that I am neither counsel for, related
7   to, nor employed by any of the parties to this
8   case and have no interest, financial or otherwise,
9   in its outcome.
10     IN WITNESS WHEREOF, I have hereunto set my hand
11  and affixed my notarial seal this 8th day of June,
12  2023.
13
14
15  _____
16  Shawn Cavaliere, Digital Court Reporter
17
18
19
20
21
22
23
24
25

---

**Exhibit C-32**

129

1    CERTIFICATE OF TRANSCRIBER
2
3      I, Janice Willier, do hereby certify that the
4  foregoing transcript is a true and correct record
5  of the recorded proceedings; that said proceedings
6  were transcribed to the best of my ability from
7  the audio and supporting information; and that I
8  am neither counsel for, related to, nor employed
9  by any of the parties to this case and have no
10 interest, financial or otherwise, in its outcome.
11
12    *Janice Willier*
13
14 Janice Willier
15 June 9, 2023
16
17
18
19
20
21
22
23
24
25

**Exhibit C-33**