*BNSF Railway Company v*
*The Center For Asbestos Related Disease, Inc.*

---

*Senator Max Baucus*
*May 25, 2023*

---

*Charles Fisher Court Reporting*

*442 East Mendenhall*

*Bozeman, MT  59715*

*(406) 587-9016*

*maindesk@fishercourtreporting.com*

**Min-U-Script® with Word Index**

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             FOR THE DISTRICT OF MONTANA
 3
 4   BNSF RAILWAY COMPANY, on behalf of
 5   THE UNITED STATES OF AMERICA,
 6
 7              Plaintiff,
 8
 9      vs.             Cause No. CV-19-40-M-DLC
10
11   THE CENTER FOR ASBESTOS RELATED
12   DISEASE, INC.,
13
14              Defendant.
15   _____
16      VIDEO DEPOSITION UPON ORAL EXAMINATION OF
17             SENATOR MAX BAUCUS
18   _____
19      BE IT REMEMBERED, that the videotaped deposition
20   upon oral examination of SENATOR MAX BAUCUS, appearing
21   at the instance of the Defendant, was taken at 224 East
22   Main, Bozeman, Montana, on May 25, 2023, beginning at
23   10:00 a.m., pursuant to Montana Rules of Civil Procedure,
24   before Robyn Ori English, Court Reporter - Notary Public.
25
```

Page 2

```
 1              APPEARANCES OF COUNSEL
 2
 3      ATTORNEY APPEARING ON BEHALF OF THE
 4      PLAINTIFF:
 5
 6           W. ADAM DUERK
 7           Knight Nicastro Mackay, LLC
 8           283 West Front Street, Suite 203
 9           Missoula, MT  59802
10           duerk@knightnicastro.com
11
12      ATTORNEY APPEARING ON BEHALF OF THE
13      DEFENDANT:
14
15           TIMOTHY BECHTOLD
16           Bechtold Law Firm, PLLC
17           P.O. Box 7051
18           Missoula, MT  59807
19           tim@bechtoldlaw.net
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2
 3
 4   EXAMINATION OF MAX BAUCUS BY:            PAGE:
 5
 6   Direct Examination by Mr. Tim Bechtold, Esq....... 6
 7   Cross-Examination by Mr. J. Adam Duerk, Esq....... 31
 8   Redirect Examination by Mr. Tim Bechtold, Esq..... 95
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              E X H I B I T S
 2
 3   DEPOSITION EXHIBITS:                     PAGE:
 4
 5   Exhibit 160  E-mail string from Tanis ...... 86
 6                Hernandez to Cheryl A.
 7                Williams - dated 5/4/2010
 8   Exhibit 161  Notification of the ........... 88
 9                Affordable Care Act from Max
10                Baucus
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1   **VIDEO OPERATOR:** This is the video-recorded subpoena
2   of Max Baucus, taken in the United States District Court
3   for the District of Montana, Civil Action No. 19-40-M-DLC,
4   BNSF versus CARD.
5   Today is May 25th, 2023. The time is 10:09 a.m.
6   We are present with the witness at 224 East Main Street,
7   in Bozeman, Montana. The Court Reporter is Robyn Ori
8   English, and the video operator is Nate Trejo with Fisher
9   Court Reporting.
10   The deposition is being taken pursuant to
11   Notice. I would now ask the attorneys to identified
12   themselves, who they represent, and whoever else is
13   present.
14   **MR. DUERK:** Adam Duerk for Relator BNSF.
15   **MR. BECHTOLD:** And I'm Tim Bechtold representing the
16   CARD clinic.
17   **VIDEO OPERATOR:** The Court Reporter will now
18   administer the oath.
19
20   WHEREUPON, the following proceedings were had and
21   testimony taken, to wit.
22
23   ..........
24   MAX BAUCUS,
25   called as a witness herein, having been first duly sworn,

Page 6

1   was examined and testified as follows:
2
3   **DIRECT EXAMINATION**
4
5   **BY MR. BECHTOLD:**
6   **Q. Could you spell your name -- say your**
7   **name and spell your last name for the Court**
8   **Reporter?**
9   A. Sure. Max Baucus, B-A-U-C-U-S.
10   **Q. And how would you prefer to be called**
11   **today? Mr. Baucus, Senator Baucus, Ambassador**
12   **Baucus, Max?**
13   A. Max.
14   **Q. All right. I'll call you Max.**
15   A. Okay.
16   **Q. Max, what is your current occupation?**
17   A. Well, I'm a -- self-employed. I
18   represent several companies. I consult with several
19   companies. I'm self-employed.
20   **Q. Okay. Could you outline your work**
21   **history for the jury?**
22   A. Well, I've been in public service most of
23   my life. I was in the State Legislature a couple
24   years in the early '70s. I represented Western
25   Montana. That's when we had two congressional

Page 7

1   districts. It's now back to two terms; '74 and 78.
2   And I represented Montana in the U.S.
3   Senate from '78 -- excuse me, 1978 to about 2014.
4   And I represented the United States of
5   America in China as U.S. Ambassador to China in 2013
6   to '17.
7   And then since then, I've been
8   self-employed.
9   **Q. And, Max, during your time in Congress,**
10   **how many laws were you involved in drafting and**
11   **passing?**
12   A. It seems like an infinite number. Many.
13   No question, many.
14   **Q. Is it fair to say that you're familiar**
15   **with the drafting and passage of laws in Congress?**
16   A. With a good number of them, yes. Those
17   that are most important to me and to Montana, yes.
18   **Q. Could you please tell the jury about your**
19   **involvement with the drafting of the language of the**
20   **Libby provision of the Affordable Care Act?**
21   A. Yeah. Generally, I spent a lot of time
22   working on the Affordable Care Act. Let's see, a
23   couple years. Because at that time, the United
24   States really did not have much of a healthcare
25   system. It was very rewarding to help try to put

Page 8

1   something together.
2   Two main purposes, one of which was
3   accomplished, was to give greater coverage to
4   Americans. A lot of Americans didn't have any
5   health insurance, about 40 million at that time, as
6   I recall.
7   The other was to -- goal was to help cut
8   costs because healthcare cost in the U.S. is just so
9   expensive.
10   But, at the same time, I was very
11   involved specifically with the problems that people
12   in Libby were having with asbestos-related diseases.
13   I spent a lot of time in Libby, visited Libby many,
14   many times on that issue, my staff maybe over a
15   hundred times on that issue. It's what you do to
16   help Libby receive justice because of all the
17   asbestos-related illnesses and diseases in Libby.
18   And so I thought I wanted to do something
19   to help Libby. Libby was not, in my judgment,
20   getting sufficient help in a lot of areas; one was
21   Superfund, a lot of asbestos out on the playgrounds.
22   It's just -- in the town of Libby. And the annex,
23   it was just -- to the mine, it was just stunning to
24   see these guys come off the mine just caked with
25   vermiculite. It was just awful.

Page 9

1 And at the same time, I met a lot of
2 people in Libby who were dying because of
3 asbestos-related diseases. One in particular is a
4 fella named Les Skramstad, and I spent some time
5 with Les. And Gayla Benefield, I think, is another
6 lady there who is very, very adamant and active in
7 making sure that people of Libby got justice.
8 And I remember sitting in Gayla's living
9 room talking to a group there, and Les Skramstad --
10 he explained the problems. And I said to Les, "Les,
11 I will do whatever it takes to bring justice to the
12 people of Libby, Montana."
13 And he looked me straight in the eye and
14 pointed his finger at me and said, "Well, Senator,
15 many people have said they're going to help Libby,
16 so I'll be watching."
17 And I thought to myself immediately, he
18 didn't have to watch because I'm going to do
19 whatever it took to bring justice to the people of
20 Libby.
21 And so a major action was to include in
22 the Affordable Care Act a provision which would give
23 Medicare coverage to the people who were diagnosed
24 with asbestos-related disease if Libby was declared
25 a national healthcare emergency. So I put that

Page 10

1 provision in the bill to make sure that Libby people
2 that have asbestos get coverage, so long as the
3 designation is made, an actual healthcare emergency
4 designation.
5 And, frankly, I tried two or three times
6 to get different administrations to invoke that
7 declaration. And, finally, we were able in the
8 Obama administration to get that designation through
9 then Secretary Sebelius, who was secretary of HHS.
10 And so, you know, I got familiar with
11 that part of the Affordable Care Act, and, frankly,
12 many parts of the Affordable Care Act, because I
13 spent about two or three years on that act to
14 finally get it passed.
15 Q. Max, I'd like to draw your attention to
16 Tab 3 of Exhibit 112, and then to page 9 of that
17 exhibit. So if you look at the bottom right-hand
18 corner, there's numbers.
19 A. Okay. Yeah.
20 Q. I guess it starts at -- let's start at
21 page -- it actually starts at page 6.
22 A. Okay, yeah.
23 Q. Could you tell the jury what we're
24 looking at?
25 A. Yeah, this -- it looks like a portion of

Page 11

1 the Congressional Record where I'm speaking about
2 this provision that is helping the people of Libby.
3 If you want, I can read parts, but that's
4 what this is.
5 Q. Okay. And why did you make that
6 statement in the Congressional Record?
7 A. Because I wanted the law to pass and I
8 wanted members of Congress, in this case U.S.
9 Senate, to understand the reasons to putting this
10 provision in the bill. It outlines what -- this
11 portion here outlines the basic provisions of the
12 bill that are relevant to Libby.
13 Q. And, Max, I'd like you now to go to Tab 7
14 in the exhibits, Exhibit 305.
15 A. All right.
16 Q. I'd like you to turn to the fifth page of
17 that exhibit. Could you tell the jury what that
18 exhibit is?
19 A. Well, this is basically an outline of the
20 Affordable Care Act. It lists various -- well,
21 there are various -- outlines various provisions,
22 sections of the bill and -- clearly not -- the whole
23 bill is not here, because, oh, god, it's over 800
24 pages.
25 Q. Right. So what I'd like you to look at

Page 12

1 is Section 1881A.
2 A. 1881A.
3 Q. And then if you go to Section 81A,
4 sub (e).
5 A. Yeah, I see that.
6 Q. Okay. And could you tell the jury
7 what -- who a environmental exposure affected
8 individual is defined as?
9 A. Well, the statute says, "In general," a
10 person's covered "who is diagnosed with one or more
11 conditions described in subparagraph (B)."
12 Subparagraph (B) is "Conditions Described" -- and
13 here I'm reading from the statute. "For purposes of
14 subparagraph (A), the following conditions are
15 described in this subparagraph." One, "asbestosis,
16 pleural thickening, or pleural plaques as
17 established by the interpretation of a B reader,
18 qualified physician of a plain chest x-ray or
19 interpretation of a computed tomographic
20 radiograph," I guess that's a CT, "of the chest by a
21 qualified physician as determined by the secretary"
22 and other -- "or such other diagnostic standards as
23 the secretary specifies."
24 Q. Okay. So to summarize, a person
25 qualifies if they have a diagnosis of one of those

Page 13

1  conditions described in -- is diagnosed with one or
2  more conditions described in that subparagraph B
3  which you just read.
4     A.  Yeah, that's what the statute says, and
5  that's what we -- and the statute is written that
6  way because we wanted people in Libby to be covered.
7     Q.  Now, Max, I'd like you to now draw your
8  attention to the first tab, Exhibit 108.
9     A.  Yeah, here it is.
10    Q.  And what is this exhibit?
11    A.  This is a declaration by me, Max Baucus.
12    Q.  And when did you provide that
13 declaration?
14    A.  Well, it's dated February 2002 -- 2022, a
15 while ago, earlier -- or last year.
16    Q.  And I understand that this declaration
17 was prepared by your staff working with other
18 people --
19    A.  Yeah, right.  Yeah, this is my
20 declaration.
21    Q.  And why did you give this declaration?
22    A.  First of all, because it's part of this
23 procedure, and second, I wanted to declare why I put
24 these provisions in the Affordable Care Act and what
25 they basically provide.

Page 14

1     Q.  Okay.
2     A.  The purpose was to make sure the people
3  in Libby, Montana with asbestos-related disease are
4  covered under Medicare, so long as if the
5  declaration is approved by the secretary, and that
6  is the case here.
7     Q.  So if we look at paragraph No. 4 of your
8  declaration, what does that read?
9     A.  "I worked closely with Kathleen Sebelius,
10 then Secretary of the Department of Health and Human
11 Services, and her staff, to draft language in the
12 Affordable Care Act to ensure that physicians at the
13 Center for Asbestos Related Disease," that is CARD,
14 "in Libby, Montana, would be qualified under the
15 language of the Act to diagnose asbestosis, pleural
16 thickening, and pleural plaques."
17    Q.  And so did the language that you just
18 read in the -- under Section 1881A provide that
19 language?
20    A.  Yes, it does.  Yes, I think so.
21    Q.  And then in paragraph 6, you state?
22    A.  Do you want me to read that?
23    Q.  Yes.
24    A.  Okay.  "After passage of the Affordable
25 Care Act, Secretary Sebelius' department determined

Page 15

1  that physicians at the Center for Asbestos Related
2  Disease are qualified under the language of the Act
3  to diagnose asbestos" -- I don't know that word --
4  "asbestosis, pleural thickening, or pleural plaques
5  by interpretation of a computed tomographic
6  radiograph of the chest."
7     Q.  Is that still your testimony?
8     A.  Yep.
9     Q.  And paragraph 7.
10    A.  7 reads, "Thus physicians at CARD are
11 qualified under the Act to diagnose asbestosis,
12 pleural thickening, pleural plaques by
13 interpretation of a computed tomographic radiograph
14 of the chest."
15    Q.  And that's still your testimony?
16    A.  It is.
17    Q.  And paragraph 8?
18    A.  8.  "Moreover, individuals diagnosed by
19 CARD physicians to have asbestosis, pleural
20 thickening, or pleural plaques are eligible for
21 Medicare benefits under the amendments to the Social
22 Security Act enacted by the Affordable Care Act."
23    Q.  Is that still your testimony?
24    A.  It is.
25    Q.  And that was the intention of passing the

Page 16

1  Act?
2     A.  Absolutely.
3     Q.  And paragraph 9?
4     A.  Ooh, it's longer.  Okay.  "It was my
5  express intention and the express intention of
6  Secretary Sebelius to have the language of the
7  Affordable Care Act enable physicians at CARD be
8  determined qualified to diagnose asbestosis, pleural
9  thickening, and pleural plaques by interpretation of
10 a computed tomographic radiograph of the chest.  It
11 was also my express intention and the express
12 intention of Secretary Sebelius that individuals
13 diagnosed by CARD physicians to have asbestosis,
14 pleural thickening, or pleural plaques would be
15 eligible for Medicare benefits under the amendments
16 to the Social Security Act enacted by the Affordable
17 Care Act."
18    Q.  And that's still your testimony?
19    A.  It is.
20    Q.  Doctor -- I mean, Senator, I'd like you
21 to take a look at Tab 6, Exhibit 301.
22    A.  All right.  Okay.
23    Q.  And do you recognize what that is?
24    A.  This is -- it says, "Overview
25 Information, Department of HHS," and it's -- I guess

Page 17

1   it's -- it relates to agency funding.
2       MR. DUERK: I'd object on foundation grounds.
3   Go ahead.
4       Q. (By Mr. Bechtold) Have you seen this
5   document before, Max?
6       A. I don't think so. Nope, I haven't seen
7   this.
8       Q. All right. Then I will carry on.
9       A. Okay.
10      Q. Let's look -- go back to your
11  declaration, and now to paragraph 10.
12      A. 10. "After passage of the Affordable
13  Care Act, B Reader qualified physicians may
14  diagnosis asbestosis, pleural thickening, and
15  pleural plaques based on review of plain chest
16  x-rays of individuals and individuals so diagnosed
17  by B Reader physicians are eligible for Medicare
18  benefits under the amendments to the Social Security
19  Act enacted by Affordable Care Act."
20      Q. Is that still your testimony?
21      A. It is, yep.
22      Q. And so your testimony is that B Readers
23  can diagnose individuals and make them eligible for
24  Medicare benefits?
25      A. Yeah, B Readers finds a positive reading,

Page 18

1   yeah, it qualifies.
2       Q. Okay. And how about paragraph 11?
3       A. "It is my express intention and the
4   express intention of Secretary to have the language
5   of the Affordable Care Act ensure that if a B Reader
6   qualified physicians diagnosed asbestosis, pleural
7   thickening, and pleural plaques based on review of
8   plain chest x-rays of individuals, these individuals
9   would be eligible for Medicare benefits under the
10  amendments to the Social Security Act enacted by the
11  Affordable Care Act." [As read]
12      Q. And is that still your testimony?
13      A. Yep, yes.
14      Q. Now, Max, I would like to draw your
15  attention to Tab 10.
16      A. Okay.
17      Q. You're not a medical doctor, are you?
18      A. I am not.
19      Q. But B Readers are doctors, are they not?
20      A. That's correct. They are.
21      Q. But you're aware that B Readers do not
22  make clinical diagnoses, correct?
23      A. Yes.
24      Q. And B Readers just interpret x-rays,
25  correct?

Page 19

1       A. That's correct.
2       Q. So why does the Affordable Care Act state
3   that a qualifying diagnosis is established by
4   interpretation by a B Reader qualified physician of
5   a plain chest x-ray or interpretation of a computed
6   tomographic radiograph of the chest by a qualified
7   physician as determined by the Secretary when
8   B Readers don't make clinical diagnoses?
9       MR. DUERK: Objection, foundation, no prior
10  disclosure for an expert opinion.
11      Go ahead.
12      THE WITNESS: Well, the intent here is to make sure
13  that any person in Libby related to Libby asbestos who has
14  asbestos-related disease is covered. That's the purpose.
15  And as I was helping people in Libby when doing all this,
16  it became apparent to me that it's difficult to read a lot
17  of these chest x-rays because the disease is so varied,
18  and different individuals have different variations of the
19  disease. So I want to make sure that is -- everybody is
20  covered. One doctor may miss a person who should be
21  covered, and another doctor will find it. I want to be as
22  inclusive as possible.
23      So the point of all this is to assure that even
24  the B Readers do not make, quote, diagnoses, but if a
25  B Reader finds a positive reading with the CT scan or

Page 20

1   x-ray, that that's sufficient to allow the patient to be
2   qualified.
3       So the main point being here that there's
4   various ways that a positive determination can be made.
5   One's a diagnosis at CARD, and another is a positive
6   reading by a B Reader. Even though the B Reader does not
7   technically diagnose, if the B Reader finds a positive
8   result, then that's sufficient to qualify for Medicare
9   coverage.
10      MR. DUERK: Same objections, move to strike.
11      Go ahead.
12      Q. (By Mr. Bechtold) And so in your
13  declaration when you testify that -- that -- in
14  paragraph 10 that B Reader qualified physicians may
15  diagnosis asbestosis, pleural thickening, and
16  pleural plaques, that's with the recognition that
17  these are not clinical diagnoses?
18      MR. DUERK: Same objections, foundation, no prior
19  disclosure, relevance, move to strike.
20      Go ahead.
21      THE WITNESS: Yes. Absolutely. No question.
22      Q. (By Mr. Bechtold) So why did Congress
23  include that in the Affordable Care Act?
24      A. Because I -- because I put it in. Pretty
25  simple. And I put it in for good reason. People in

Page 21

1  Libby needed justice, and the members of Congress
2  agreed with me. So the Act was passed.
3      Q.  And now I'd like to draw your attention
4  to Exhibit 112 again.
5      A.  Where's that?
6      Q.  Which is --
7      A.  Which tab?
8      Q.  It is Tab 3, sorry. And then go to
9  page 9. And, again, this is your testimony from the
10  Congressional Record?
11     A.  Right, that's right.
12     Q.  And could you take a look at the
13  paragraph that starts with "Medical Care in Libby"
14  about five paragraphs from the bottom?
15     A.  Page 9?
16     Q.  Yeah.
17     A.  Okay. "Medical care in Libby has
18  historically been limited due to Libby's isolated
19  location and economic situation, thus reducing the
20  chance of early detection and treatment of
21  asbestos-related disease."
22         Boy, that's true. That's my editorial on
23  it.
24         "This piece bears repeating.
25         "Let me refine that point. For a long

Page 22

1  time, we've been talking to lung specialists across
2  the country about the Libby tremolite asbestos, and
3  we got just so-so responses about how dangerous it
4  is. Why? Because virtually none of these doctors
5  experienced dealing with the pernicious kind of
6  asbestos we have in Libby. It took a long time to
7  get their attention. We finally got some doctors to
8  say this stuff in Libby is wicked stuff. That's
9  why, frankly, EPA has started to understand how bad
10  this really is.
11         "Essentially, the lack of access to
12  health care services in Libby, I will say it again,
13  has actually worsened the effects of this
14  contamination. It is worked to their disadvantage.
15         "The language before us today helps to
16  solve this. It allows us to fulfill the commitment
17  we made to the people of Libby when we passed the
18  Affordable Care Act 30 years ago. Heaven forbid, if
19  in the future another Superfund site like Libby
20  emerges, the bill before us today will allow the
21  Secretary to use the authorities in this provision
22  to fulfill our commitment to provide health care
23  services for those residents as well."
24     Q.  So, Max, when you stated earlier that
25  doctors didn't seem to recognize the --

Page 23

1      A.  Correct.
2      Q.  -- was this the sentiment you were --
3      A.  Yes, that's the sentiment. That's
4  basically the point. That's correct.
5      Q.  So why did you include the provision
6  about allowing B Readers and outside readers to have
7  interpretations qualify as diagnoses?
8      MR. DUERK: Objection, foundation, relevance, no
9  prior disclosure.
10     THE WITNESS: Because we wanted to make sure that
11  everybody who had the disease was covered. That meant the
12  statute to be read in an inclusive way. And inclusion
13  would mean not only a diagnosis determined by the CARD
14  clinic, but also if a B Reader were to find a positive
15  indication of asbestos-related disease, that that would be
16  enough to allow that person to be covered under Medicare.
17         So I wanted to make sure that if a case was
18  missed at CARD, by the CARD clinic, that it would be
19  picked up by someone else, by another doctor. We're
20  talking about doctors here, radiologists who would look at
21  CT scans and -- of the patient. And if that doctor finds
22  a positive indication of asbestos-related disease, that
23  that would be sufficient. I wanted to make sure that the
24  statute was sufficiently inclusive and people would not be
25  missed because of a missed diagnosis.

Page 24

1      Q.  (By Mr. Bechtold) So for purposes of the
2  statute, does the word "diagnosis" include
3  interpretations by B Readers?
4      MR. DUERK: Objection, foundation, no prior
5  disclosure, relevance.
6      THE WITNESS: Yes, absolutely. That's the whole
7  point of this.
8      Q.  (By Mr. Bechtold) And it sounds like
9  from your testimony before Congress that you were
10  aware that other doctors didn't always agree with
11  CARD doctors?
12     A.  No question, no question. Well, for a
13  lot of reasons. I mean, there's -- there's
14  different kinds of asbestos that is more pernicious
15  than asbestos found in other parts of the country.
16  We wanted to educate doctors that this is really
17  bad. It's bad asbestos that has to be picked up
18  early.
19     Q.  Max, I'm going to direct your attention
20  to Tab 5, which is Exhibit 76, and I'd like you to
21  go to page 4 of that.
22     A.  Okay.
23     Q.  Do you recognize what this document is?
24     A.  Yeah, I think that's a submission for
25  coverage.

Senator Max Baucus

---

1  MR. DUERK: Objection, no prior disclosure,
2  foundation.
3  Q. (By Mr. Bechtold) You didn't create this
4  form, did you?
5  A. Oh, no.
6  Q. Do you know who did?
7  A. I think HHS did, or maybe an agency of
8  HHS.
9  Q. But that's not something that was created
10  by statute, was it?
11  A. That's correct. That's a -- this is
12  after the statute was passed. HHS, pursuant to its
13  authority, designed -- or set up this procedure and
14  created this checklist.
15  Q. Okay. But if there's some confusion
16  between this checklist and the statute, which should
17  govern?
18  MR. DUERK: Objection, foundation, no prior
19  disclosure.
20  THE WITNESS: The statute, clearly the statute.
21  Q. (By Mr. Bechtold) And that was the
22  purpose of passing the statute, correct?
23  A. What was?
24  Q. The purpose of the -- the purpose, again,
25  of passing the statute was to afford as much

1  possible care as possible.
2  A. Oh, you asked about the purpose? Yeah,
3  exactly. I mean, people in Libby --
4  MR. DUERK: Objection, nonresponsive.
5  Q. (By Mr. Bechtold) Go ahead.
6  A. People -- I mean, it's a far corner part
7  of Montana. They just need help. They're just --
8  and I wanted to do all I could do to help. And I
9  wanted the statute to be broad, wanted the coverage
10  to be broad.
11  Q. Okay. Max, I'm going to draw your
12  attention now to Tab 4, which is Exhibit 137.
13  A. Okay.
14  Q. And I'd like to start at the last page,
15  page 3. And this is a document you've seen before,
16  correct?
17  A. Yes.
18  MR. DUERK: Objection, nondisclosure.
19  Go ahead.
20  Q. (By Mr. Bechtold) Now, were you aware --
21  if we look at Docket No. 97, SDF 292 at the very
22  bottom, were you aware that CARD has been signing
23  these environmental health hazard forms for patients
24  without a clinical diagnosis since they've been
25  getting money through the ATSDR grant?

1  A. Well, this says it's an undisputed fact.
2  The answer is I'm not personally aware, but it's
3  certainly possible.
4  Q. And you're aware that CARD has been
5  diagnosing individuals with asbestos-related
6  diseases even as qualified physicians under the Act,
7  correct?
8  A. Yes.
9  Q. And you're aware that B Readers have been
10  identifying people with asbestos-related disease
11  even though CARD doesn't find those same
12  individuals -- doesn't diagnose those same
13  individuals with an asbestos-related disease,
14  correct?
15  MR. DUERK: Objection, form, leading, nondisclosure.
16  Go ahead.
17  THE WITNESS: Yes.
18  Q. (By Mr. Bechtold) And your testimony
19  from your declaration is that either CARD
20  physicians' or B Readers' diagnoses may qualify for
21  Medicare, correct?
22  A. Yes.
23  Q. So have you been aware that CARD has been
24  submitting these individuals for environmental
25  health hazard checklist benefits through Medicare

1  when B Readers alone find an asbestos-related
2  disease?
3  MR. DUERK: Objection.
4  THE WITNESS: No. I just don't know.
5  Q. (By Mr. Bechtold) Max, I'm going to draw
6  your attention now to your -- to Tab 8, Exhibit 348.
7  MR. DUERK: Has this been admitted into evidence?
8  MR. BECHTOLD: Well, actually, theoretically
9  nothing's been admitted yet.
10  Q. (By Mr. Bechtold) I'm going to draw your
11  attention to Exhibit 348. Do you know what this is?
12  A. This is my deposition at an earlier date.
13  Q. Do you recall giving a declaration -- I
14  mean, giving a deposition in July of 2022?
15  A. I do.
16  Q. Do you recall being asked some questions
17  about your declaration in July of 2022?
18  A. I do.
19  Q. Can I draw your attention to page 9 and
20  10 of the deposition. So on page 9 --
21  A. Page 9. I see it. Yeah, page 9.
22  Q. So let's start on line 21. Just review
23  that to yourself, please.
24  A. Okay. Okay.
25  Q. Does that refresh your memory a little

Page 29

1   bit about the declaration?
2      A.  Yeah.
3      Q.  So is it still your testimony that this
4   declaration was drafted with the help of your staff?
5      A.  It is.
6      Q.  And that you signed it because you
7   believed it to be true?
8      A.  Yes.  And it is true.
9      Q.  Okay.  I'd like to now move on to
10  page 20.
11     A.  All right.  All right, 20.
12     Q.  And I'll draw your attention to line 13.
13  Just read through that to yourself and refresh your
14  memory.
15     A.  All right.
16     Q.  And then onto page 21.
17     A.  Yeah.  Yeah.
18     Q.  Okay.  So is your testimony still that
19  the idea behind the Affordable Care Act was to
20  provide Medicare benefits for people who were
21  exposed to Libby asbestos, correct?
22     A.  Yeah, right.  Yes.
23     Q.  And for -- to provide Medicare coverage
24  for those who were diagnosed with asbestos-related
25  diseases, correct?

Page 30

1      A.  Yes.
2      Q.  And based upon your understanding of your
3   drafting of the Affordable Care Act, how does one
4   individual get diagnosed with an asbestos-related
5   disease?
6      A.  Either by going to the CARD clinic and
7   getting diagnosed as having the disease or when a B
8   Reader finds a positive indication.  Either case,
9   that qualifies.
10     MR. BECHTOLD: Well, Max, thank you for your time.  I
11  have no more questions right now.
12     THE WITNESS: Okay.
13     MR. BECHTOLD: Mr. Duerk may have some
14  cross-examination questions --
15     THE WITNESS: Sure.
16     MR. BECHTOLD: -- at which time I can follow-up
17  afterward.
18     THE WITNESS: Sure.  All right.
19     MR. DUERK: Let's go ahead and take a short break.
20     THE WITNESS: Sure.
21     VIDEO OPERATOR: We're going off the record.  The
22  time is 10:46 a.m.
23
24          (Whereupon, a recess was taken)
25

Page 31

1      VIDEO OPERATOR: We are back on the record.  The time
2   is 10:56 a.m.
3
4          CROSS-EXAMINATION
5
6   BY MR. DUERK:
7      Q.  Senator Baucus, I'm Adam Duerk.  We've
8   taken your deposition once before today; is that
9   correct?
10     A.  That's correct.
11     Q.  That was July of 2022, last year?
12     A.  Sounds about right.
13     Q.  Sir, to begin with, I'd just like to
14  review with you what you did in anticipation of your
15  deposition today.  Who, if anyone, did you speak to
16  about your deposition prior to today?
17     A.  I spoke to Mr. Bechtold.
18     Q.  Okay.  And when did that conversation
19  occur?
20     A.  Yesterday.
21     Q.  How long was that conversation?
22     A.  Fifteen minutes, 20 minutes.
23     Q.  Did you speak with anyone else before
24  today's deposition?
25     A.  No.

Page 32

1      Q.  Okay.  So one conversation with Tim
2   Bechtold.
3      A.  Uh-huh.
4      Q.  We've reviewed some material together
5   during your deposition.
6      A.  Correct.
7      Q.  In that 15-minute conversation, did you
8   review those materials with Mr. Bechtold?
9      A.  Yes.
10     Q.  Between the time of your deposition last
11  July and this morning, have you spoken with anyone
12  else about your deposition?
13     A.  No.
14     Q.  And, sir, the reason that I ask is, at
15  your last deposition, we spoke about the declaration
16  that you signed; is that right?
17     A.  Yes.
18     Q.  That deposition lasted several hours.  Do
19  you recall that?
20     A.  Yes, I do.
21     Q.  Okay.
22     A.  It was a long time.
23     Q.  It was a long time.
24          And during that deposition, I asked you
25  about any of the materials that you reviewed in

Senator Max Baucus

Page 33

1    anticipation of that July 20, 2022 deposition.  And
2    do you recall, at the last deposition, you told me
3    that you didn't recall speaking with anyone prior to
4    that deposition about the basis of your testimony?
5        A.  Yes.
6        Q.  Okay.  I also asked in July of 2022,
7    whether you recalled reviewing any written records.
8    And during the last deposition, you indicated that
9    you had not reviewed anything in writing.  Do you
10   recall that?
11       A.  Yeah, I do.  Yes, I think that's right.
12       Q.  During that last deposition, likewise,
13   you testified that you had had a 15-minute
14   conversation with Dr. Black before the deposition,
15   but other than that 15-minute conversation, you
16   didn't recall any other conversations.
17       A.  That's correct.
18       Q.  Okay.  You didn't remember any written
19   information being sent to you other than a draft of
20   the declaration before your last deposition,
21   correct?
22       A.  Correct.
23       Q.  Okay.  So CARD sent you no written
24   materials prior to that last deposition, right?
25       A.  Correct.

Page 34

1        Q.  And so I didn't have an opportunity to
2    ask you any questions about any written materials
3    because you said you hadn't seen any.  Does that
4    sound accurate?
5        A.  Yeah, except clearly at some point I saw
6    the declaration, so I knew what was in the
7    declaration because I signed it.
8        Q.  Sure.  But aside from that declaration,
9    last time we were together, you had seen no written
10   pleadings, no copies of the complaint, no
11   depositions, no EHH forms, no written documents of
12   any kind, correct?
13       A.  Correct.
14       Q.  At the last deposition, you essentially
15   testified that your testimony was based on your
16   memory alone; is that right?
17       A.  Yes.
18       Q.  In terms of any file in this case, you
19   don't have a file related to this current lawsuit
20   related to the opinions that you have been offered?
21       A.  That's correct.
22       Q.  Okay.  You haven't talked to any
23   witnesses in this case, right?
24       A.  Correct.
25       Q.  Last time before you were deposed, you

Page 35

1    were not aware that you had been declared an expert
2    witness in this case, correct?
3        A.  All I know is Dr. Black asked me if I
4    wanted to testify, and I said yes.
5        Q.  But during the last deposition when I
6    asked you, it appeared you weren't aware that you'd
7    been declared an expert in this case.
8        A.  I think that's right.
9        Q.  Okay.  Sir, when we visited together in
10   July, you agreed with me that expert witnesses must
11   be armed with facts.  Does that sound right?
12       A.  Anybody who speaks should be armed with
13   facts.
14       Q.  Right.  And if someone is offered as an
15   expert witness in a federal trial, it would be
16   especially important for them to be --
17       A.  I don't know.  That's a legal
18   determination.  I'm not qualified to answer that.
19       Q.  Okay.  Sir, if you would look at Tab 20,
20   please.  I'm looking at page 36.
21       A.  Okay.
22       Q.  I'll start --
23       A.  This is -- this is the deposition?
24       Q.  Yes.  And, sir, this is your deposition
25   from July 19th, 2022.  I was there, you were there,

Page 36

1    Mr. Bechtold was there, and a Court Reporter was
2    there, correct?
3        A.  Hold on a second.  This thing is falling
4    apart.
5            Okay, say again.
6        Q.  Sure.  I'm -- I was there, you were
7    there --
8        A.  What page are you on?
9        Q.  We're at page 36, line 10.  We were
10   talking about the requirement for understanding
11   facts of the case.  So I'll read this part of your
12   deposition and please tell me if I've read --
13       A.  Page 36?
14       Q.  Page 36.  I'm starting at line 10, and
15   I'll continue to line 24.
16       A.  I'm trying to find the page number here.
17       Q.  Top left-hand corner of each of the
18   individual pages marked.
19       A.  35.  This only goes to 35.
20       Q.  If you would hand it to me, I can help.
21           You were on Tab 19.  Here's Tab 20.
22       A.  Okay.  That explains it.
23       Q.  All right.  Do you see a copy of a
24   transcript of your deposition taken July 19th, 2022?
25       A.  Yeah, I guess.

Senator Max Baucus

Page 37

1    Q.  If you would go to page 36.
2    A.  Page 36, okay.
3    Q.  I'll read lines 10 through 24.  Please
4  tell me if I've read them correctly.
5        "Okay.  Sir, in order to have meaningful
6  testimony --
7        "ANSWER: Right.
8        "QUESTION: -- a witness must be armed
9  with facts, fair?
10        "ANSWER: Generally.
11        "QUESTION: Okay.  Is there a situation
12  that you can imagine where it wouldn't be important
13  for a witness to know the facts of a case?
14        "ANSWER: No.
15        "QUESTION: So would you agree that in
16  order to offer any opinions about any matter, it's
17  important for a witness to be equipped with the
18  facts, fair?
19        "ANSWER: Yeah."
20        Did I read that correctly?
21    A.  Yep.
22    Q.  Okay.  So in terms of the facts of the
23  case that were before us last time, you had not
24  reviewed any of the pleadings in this case, any of
25  the deposition testimony.  You had not reviewed the

Page 38

1  statement of undisputed facts or any of the other
2  documents that Mr. Bechtold put in front of you
3  today.  Is that fair?
4    A.  Yep.
5    Q.  And, sir, in terms of the disclosure in
6  this case --
7
8        (Pause)
9
10    Q.  (By Mr. Duerk)  Sir, in terms of the
11  information in writing that I had from you about the
12  opinions you intended to express last time, the only
13  information that I had from you was your declaration
14  to the best of your knowledge, fair?
15    A.  I guess.  You tell me if that's all you
16  had.  I don't know what you had.
17    Q.  Yeah, right.  I'll represent to you that
18  that's all I had.
19    A.  Okay.  If that's case, that's the case.
20  It must be a fact.
21    Q.  Yeah, I was not aware of any documents
22  that you would be testifying about.
23        In terms of the testimony that you
24  provided related to your expert opinions last time,
25  I asked you about the Congressional Record and

Page 39

1  legislative history.  Do you recall --
2    A.  I do.
3    Q.  Okay.  And last time we were together at
4  deposition, you had not reviewed the Congressional
5  Record or the legislative history of this section of
6  the Affordable Care Act, correct?
7    A.  I have not read the record, that's
8  correct, because I was part of the record.  I spoke
9  on the floor of the Senate.  Part of the record was
10  a recording of what I said.
11    Q.  Sir, in terms of any communication that
12  you've had with the Social Security Administration
13  about the EHH provisions of the Affordable Care Act,
14  we have reviewed no communication between you and
15  the Social Security Administration at your
16  deposition today or prior, fair?
17    A.  Correct.
18    Q.  Okay.  And in terms of any communication
19  that you've had with the Social Security
20  Administration, have you had any communication with
21  the Social Security Administration in the last 10
22  years?
23    A.  No -- well, 10 years?  No.
24    Q.  Okay.  In terms of any communication with
25  the CARD clinic or any individual who has ever

Page 40

1  worked at the CARD clinic, have you had any
2  communication with anybody at the CARD clinic in the
3  last 10 years?
4    A.  Yes.
5    Q.  Okay.  Who?
6    A.  Dr. Black.
7    Q.  Okay.  Aside from Dr. Black, have you
8  communicated with anybody else at CARD?
9    A.  No.
10    Q.  And when was the last time you recall
11  talking to Dr. Black?
12    A.  Oh, maybe months ago, a year ago.  He
13  asked me if I would be a witness in this case, and I
14  said yes.
15    Q.  Okay.  Outside of Dr. Black asking that
16  question, do you recall any specifics of that
17  communication?
18    A.  No.  I just said I'd be honored.  I'd
19  love to.
20    Q.  Prior to that conversation with
21  Dr. Black, when was the last time you recall having
22  any conversations with him?
23    A.  Oh, I went up to the clinic.  They had a
24  dedication up there.
25    Q.  And, sir, that was in about 2009 or 2010?

Page 41

1   A.  I can't get it -- it could be, but it was
2   several years ago.
3   Q.  Okay.  I believe when we visited at your
4   last deposition, you said it was approximately
5   10 years ago, maybe more.  Does that sound about
6   right?
7   A.  It could -- it could be more.
8   Q.  Okay.  So that would put us at 2013 --
9   A.  Yeah.
10   Q.  -- perhaps earlier?
11   A.  Earlier.  Earlier.
12   Q.  Earlier than --
13   A.  Because I went to Beijing in 2013.
14   Q.  Okay.
15   A.  So it had to have been earlier.
16   Q.  In terms of that dedication ceremony,
17   what conversations, if any, do you remember having
18   with Dr. Black or any other CARD staff members?
19   A.  Just how this was moving along.
20   Q.  In terms of any communication with
21   anybody from the SSA during that time frame, do you
22   remember speaking with anybody at the Social
23   Security Administration?
24   A.  Nope.
25   Q.  Okay.  In terms of your involvement in

Page 42

1   passing legislation, the law is set forth in the
2   published statute itself, correct?
3   A.  Correct.
4   Q.  Okay.  And in terms of how that law is
5   interpreted or enforced, once legislation is passed
6   into law, it's no longer necessarily within your
7   purview to enforce that law, correct?
8   A.  Well, no.  I mean, if I have something to
9   do with passing a law, I make sure that the law is
10   upheld.  So I do have that interest.
11   Q.  Right.  But in terms of ensuring that the
12   law is adhered to, abided by, read, recognized, and
13   understood, that's not your task or your
14   responsibility at that point, fair?
15   A.  Certainly.
16   Q.  Sir, I'd like to talk specifically about
17   whether or not anyone at CARD has alerted you to
18   conversations that CARD has had with the Social
19   Security Administration about these provisions in
20   the Affordable Care Act related to a diagnosis of
21   asbestos-related disease?
22   A.  No.
23   Q.  No?  Okay.
24        Are you aware of the sworn testimony from
25   SSA employee Heather Hilman in this case?

Page 43

1   A.  No.
2   Q.  Have you seen or been alerted to any
3   e-mails from the Social Security office sent to CARD
4   that indicate to CARD that they are not to submit
5   patients who have not been diagnosed with an
6   asbestos-related disease for Medicare benefits?
7   A.  No.
8   Q.  And, sir, in your mind, both during your
9   deposition testimony today and last July, it appears
10   that you would be concerned if there were patients
11   who were submitted for Medicare benefits who did not
12   have a diagnosis of asbestos-related disease, fair?
13   A.  No, not fair.  Because it could be a
14   B Reader to find a positive determination, and then
15   that would indicate that that person has an
16   asbestos-related disease.
17   Q.  I understand what you're saying today.
18   I've not heard this testimony from you before.  So
19   I'll go about it this way --
20        MR. BECHTOLD:  Misstates his testimony.
21   Q.  (By Mr. Duerk)  I'll go about it this
22   way:  In order to be Medicare eligible, it is
23   important for a person to be sick with
24   asbestos-related disease, correct?
25   A.  Yep.

Page 44

1   Q.  Okay.  And your intent was to make sure
2   that individuals in Libby would receive Medicare
3   benefits if they were sick due to asbestos exposure,
4   correct?
5   A.  Correct.
6   Q.  Okay.  It was your intent and the intent
7   of other United States Senators to make sure that,
8   in order for a patient to be Medicare eligible, they
9   had to have been exposed to Libby asbestos and be
10   suffering from that exposure to Libby asbestos?
11   A.  Right.
12   Q.  It was not your intent to allow patients
13   to be submitted for lifetime Medicare benefits if
14   they were not sick due to an exposure to Libby
15   amphibole, correct?
16   A.  Correct.
17   Q.  So if you had a patient who CARD knew not
18   to be sick due to an exposure to Libby asbestos, it
19   was not your intent that that patient should be
20   submitted for lifetime Medicare benefits?
21   A.  That's a tough question to answer
22   because -- that's a loaded question.
23   Q.  Okay.  In the past --
24   A.  You guys have -- because basically --
25   I'll tell you why it's loaded.  Because you're

Senator Max Baucus

1  making -- you're assuming that the decision was made
2  knowing there's no -- with intent to deceive, and
3  I'm saying a diagnosis could be missed.
4      **Q.  I understand that diagnoses can be**
5  **missed, but if a clinician submits a patient for**
6  **lifetime Medicare benefits, you would expect that**
7  **that patient would be sick due to their exposure to**
8  **Libby amphibole, correct?**
9      A.  Yeah, uh-huh.
10     **Q.  Is that a "yes"?**
11     A.  Yes.
12     **Q.  And, sir, that's the very intent of the**
13 **Affordable Care Act Libby provisions related to**
14 **environmental health hazards in your mind, correct?**
15     A.  Well, in my mind, is it -- I don't know
16 quite -- I don't know what -- what words you used.
17 I didn't hear -- what exact words you used, but my
18 point is, and I've said this many times, if a
19 person's got the disease and the disease has been
20 diagnosed, diagnosed either by CARD or by a
21 B Reader, that's sufficient for coverage.
22     **Q.  Sir, in order to be eligible for Medicare**
23 **benefits under the Affordable Care Act, an**
24 **individual must have a diagnosis of an**
25 **asbestos-related disease, correct?**

1      A.  Depending what you mean by "diagnosis."
2      **Q.  All right.  That wasn't my question at**
3  **last summer's deposition.  So what I'd like to do is**
4  **show you that -- your response to that answer, and**
5  **I'd like to determine if it's still correct, okay?**
6      A.  Sure.
7      **Q.  All right.**
8
9          **(Whereupon, Clip No. 1 was played**
10            **for the jury)**
11
12    **VIDEO OPERATOR:** We are going off the record.  The
13 time is 11:17 a.m.
14
15         (Off the record discussion)
16
17    **VIDEO OPERATOR:** We are back on the record.  The time
18 is 11:18 a.m.
19     **Q.  (By Mr. Duerk)  Sir, did the three video**
20 **clips played during the July 19th, 2022 deposition**
21 **reflect your testimony under oath at that time?**
22     A.  At that time.
23     **Q.  Okay.  Sir, your intention and the**
24 **intention of the environmental health hazard**
25 **statutory provisions in the Affordable Care Act is**

1  that if you've got a diagnosis, you're covered.  If
2  there's no diagnosis, you're not covered.  It's very
3  simple.  Correct?
4      A.  That's what I said back then.
5      **Q.  Okay.  And you also testified that the**
6  **purpose of the environmental health hazard**
7  **provisions in the Affordable Care Act was to provide**
8  **Medicare benefits for people who were exposed to**
9  **Libby asbestos, not to provide Medicare benefits to**
10 **people who are not sick.**
11     A.  Correct.
12     **Q.  Okay.  And so, sir, at your -- at your**
13 **deposition, you had a couple of different**
14 **hypotheticals posed to you.**
15     A.  They sure were long and complicated.
16 They were very long and complicated.  I don't know
17 how relevant they were because they were just
18 hypotheticals.
19     **Q.  I understand what you're saying here, but**
20 **I'll see if I can make those --**
21     A.  Okay.
22     **Q.  -- hypotheticals a little bit easier.**
23         **So say we've got a patient with no**
24 **diagnosis.  We've got a patient with no diagnosis of**
25 **asbestos-related disease, and we've got a patient**

1  with a B Read that the B Reader says doesn't have a
2  diagnosis of asbestos-related disease, okay?
3      A.  So what's the question?
4      **Q.  The question is, should that person get**
5  **Medicare benefits for life?**
6      A.  Again, who is this person?  Describe that
7  person again?
8      **Q.  Sure.  The CARD patient is the subject**
9  **here.  Imagine a CARD patient with no diagnosis of**
10 **asbestos-related disease from anybody, from a**
11 **B Reader, from a pulmonologist, from the provider,**
12 **from CARD.  Imagine a patient who has no diagnosis**
13 **of asbestos-related disease, that patient should not**
14 **get Medicare.**
15     A.  Correct.
16     **Q.  Okay.  Now, during your deposition last**
17 **time, I asked you about B Readers and the diagnostic**
18 **standards for physicians at CARD.  And last time we**
19 **were together, you said you were not qualified to**
20 **answer any of those questions.  Do you recall that?**
21     A.  No, I do not.
22     **Q.  Okay.  If you could turn to page 59 of**
23 **your deposition.  I'm looking at line 2.**
24     A.  Okay.
25     **Q.  You don't hold yourself out nor have you**

Senator Max Baucus

Page 49

1  ever held yourself out as a physician, correct?
2  A. Correct.
3  Q. Okay. You didn't go to medical school,
4  correct?
5  A. Correct.
6  Q. You don't claim to know or understand the
7  intricacies of what's required for a diagnosis of
8  asbestos-related disease under the American Thoracic
9  Society standards, correct?
10  A. Right.
11  Q. Now, I'll put the question to you this
12  way. So if CARD physicians have admitted under oath
13  that B Readers, just radiologists who only look at a
14  film, did not diagnose, you would have no reason to
15  disagree with me, correct?
16  A. Based on what you just told me. Based on
17  only what you just said, yes. There may be more to
18  it, but that's based upon what you just said.
19  Q. Okay. And then I'll read what I asked
20  you precisely and what your answer is on page 59.
21  A. Okay.
22  Q. I'm looking at page 59, line 14.
23  "QUESTION: So if CARD physicians have
24  admitted under oath that B Readers, just
25  radiologists who only look at a film, do not

Page 50

1  diagnose, you wouldn't have a reason to disagree
2  with that?
3  "ANSWER: Again, if there's no diagnosis,
4  that person should not get -- should not be
5  covered."
6  Did I read that correctly?
7  A. You read that correctly.
8  Q. And then I asked you about -- a narrower
9  and specific question that I wanted to anchor your
10  testimony to. And that question was would you
11  dispute that radiologists --
12  A. Are you reading now, or is this something
13  new?
14  Q. This is something new.
15  Radiologists --
16  A. Okay. Go ahead.
17  Q. -- do not diagnose asbestos-related
18  disease and are not responsible for diagnosing
19  asbestos-related disease.
20  A. Correct.
21  Q. You say "correct" today, but during your
22  testimony in July you said you couldn't answer that
23  question. You had no basis to answer that question,
24  correct?
25  A. Yes, but also I want to do something else

Page 51

1  here. Earlier you said a witness should -- an
2  expert witness should have the facts. So I went
3  back and I reviewed so I'd be -- have -- so I'd have
4  the facts.
5  Q. All right.
6  A. I reviewed the statute to get the facts.
7  So now I have more facts, and now I can answer that
8  more accurately.
9  Q. And, sir, I appreciate that, but when I
10  deposed you in July of 2022, my intent was to get
11  all of the information from you that we could
12  anticipate here at trial so that I had a clear idea
13  of what your testimony was.
14  A. And now you have a better idea because I
15  have more facts.
16  Q. I have a better idea of what you're
17  saying here today.
18  A. Correct.
19  Q. But it's also fair to say that you didn't
20  say anything about what B Readers did or what a
21  radiologist's role was in the diagnostic process at
22  your July '22 deposition, correct?
23  MR. BECHTOLD: Misstates the testimony.
24  THE WITNESS: Before I refreshed my recollection by
25  going back and getting the facts.

Page 52

1  MR. BECHTOLD: Misstates the testimony.
2  Q. (By Mr. Duerk) Sir, in terms of your
3  declaration itself, I'm looking at Tab 17, what's
4  been marked as Exhibit 108 here. I'm looking at
5  paragraph 10. Do you see that?
6  A. Yeah.
7  Q. Okay. Paragraph 10 says, "After passage
8  of the Affordable Care Act, B Reader qualified
9  physicians may diagnose asbestosis, pleural
10  thickening, and pleural plaques based on review of
11  plain chest x-rays of individuals, and individuals
12  so diagnosed by B Reader physicians are eligible for
13  Medicare benefits under the amendments to the Social
14  Security Act enacted by the Affordable Care Act."
15  Did I read that correctly?
16  A. Yep.
17  Q. Okay. So your declaration says that
18  B Readers may diagnose; not that a B Read equals a
19  diagnosis, correct?
20  A. That's what it -- I'm sorry, ask the
21  question again.
22  Q. You said that B Readers may diagnose.
23  A. What -- when? Here?
24  Q. In your declaration.
25  A. Yeah, right.

Page 53

1    Q.   Right.  B Readers may diagnose; not that
2  a B Read equals a diagnosis, correct?
3    A.   Correct, uh-huh.  Right.
4    Q.   Okay.  And in the language of the
5  Affordable Care Act itself, Section 1881A, and I'm
6  handing you a copy here, I'm looking at page 2.  I'm
7  looking at individuals described under the
8  Affordable Care Act.  So right in the middle of the
9  page, do you see the section "Individual Described."
10  I believe we read this into the record earlier.
11    A.   Yes, we did.
12    Q.   "Individual Described.  In general, an
13  individual described in this paragraph is any
14  individual who is diagnosed with one or more
15  conditions described in subparagraph (B).
16       Did I read that correctly?
17    A.   Yep.
18    Q.   Okay.  So at least in terms of the law,
19  the law says that an individual must have a
20  diagnosis of asbestos-related disease, correct?
21    A.   That's one condition.  That's not --
22  that's not -- that's not the -- exclusive.
23    Q.   Well, let's go directly to the
24  conditions.  The conditions described are
25  asbestosis, pleural thickening, or pleural plaques,

Page 54

1  correct?
2    A.   Yep.
3    Q.   Okay.  And so here in the law, in order
4  to receive Medicare benefits, a patient must have a
5  diagnosis.  And this is a -- this is a proposition
6  that you agreed with during your prior deposition,
7  correct?
8    A.   Well, it all comes down to what the
9  definition of "diagnosis" is.
10    Q.   Right.
11    A.   That's what it's all about.
12    Q.   Right.
13    A.   And under the statute, a diagnosis at
14  large is a diagnosis by the CARD clinic or an
15  affirmative determination by a B Reader.
16    Q.   Okay.
17    A.   That is, at large, a diagnosis.
18    Q.   That is what you are saying --
19    A.   Correct.
20    Q.   -- but the law here --
21    A.   And that's what the law says, too.
22    Q.   Sir, the law says an individual must have
23  a diagnosis.
24    A.   I'm sorry.  I think you're quibbling.
25    Q.   No, I'm not quibbling.

Page 55

1    MR. BECHTOLD: Argumentative.
2    Q.   (By Mr. Duerk)  I'm going to offer it
3  this way.  Sir, in terms of the enforcement of this
4  law and its provisions, enforcement of the law comes
5  from the Social Security Administration, correct?
6    A.   Medicare.
7    Q.   Medicare and --
8    A.   CMS.
9    Q.   CMS.  And CMS and the Social Security
10  Administration have a field office in Kalispell,
11  Montana to the best of your knowledge?
12    A.   Right.  Uh-huh, right.
13    Q.   And the Medicare claim forms, the
14  EHH forms, are filled out and signed by Dr. Black
15  and providers at the CARD clinic to the best of your
16  knowledge, correct?
17    A.   Correct.
18    Q.   And those Medicare claim forms, to the
19  best of your knowledge, are then submitted to the
20  Social Security Administration field office in
21  Kalispell, Montana?
22    A.   I -- I guess -- I don't know.
23    Q.   Okay.  Have you ever spoken with any of
24  the field office personnel?
25    A.   No, no.

Page 56

1    Q.   Okay.  You're not aware of the policies
2  and procedures they have for handling CARD Medicare
3  claim forms?
4    A.   No.
5    Q.   You've never seen the program operations
6  manual system?
7    A.   No.
8    Q.   Okay.  You've never seen any e-mails back
9  and forth --
10    A.   Never.
11    Q.   Let me ask the question.
12    A.   I'm answering it anyways.  It's none.  Go
13  ahead.  Ask the question.
14    Q.   I'm sure you've seen some e-mails before,
15  but here's the question.  You've never seen any
16  e-mails between the CARD clinic and the Social
17  Security Administration field office personnel,
18  correct?
19    A.   Correct.
20    Q.   Okay.  And you've not seen any e-mails
21  recently between the CARD clinic and Social Security
22  Administration as recently as two weeks ago,
23  correct?
24    A.   Correct.
25    Q.   So if I told you that the Social Security

Page 57

1  Administration insisted that CARD patients have a
2  diagnosis of asbestos-related disease in order to be
3  eligible for Medicare benefits, you've not seen that
4  communication --
5      A.  Correct.
6      Q.  -- and you would have no reason to
7  disagree with me, correct?
8      A.  I have not seen it.
9      Q.  Okay.  In terms of how the Social
10 Security Administration treats these EHH Medicare
11 claim forms, that's not a job that you ever had,
12 correct?
13     A.  Correct.
14     Q.  And no one at CARD, prior to your
15 deposition, has shown you any communications
16 recently from SSA to CARD telling them that in order
17 to be Medicare eligible a patient must have a
18 diagnosis, correct?
19     A.  I haven't seen anything.
20     Q.  All right.
21     A.  I've not seen what you're describing.
22     Q.  Okay.  Sir, it was not your intent,
23 Kathleen Sebelius' intent or Christine Todd
24 Whitman's intent, to the best of your knowledge, to
25 draft legislation that would just make everyone in

Page 58

1  Libby Medicare eligible if they did not have an
2  asbestos-related disease, correct?
3      A.  That would not be my intent either.
4      Q.  Okay.  It was also never your intent to
5  make it easier to defraud the Medicare program based
6  on any provisions that you put in the Affordable
7  Care Act?
8      A.  Correct.
9      Q.  There is no provisions stated in
10 Section 1881 of the Affordable Care Act that creates
11 an exception for a patient to be eligible for
12 Medicare benefits without a diagnosis, correct?
13     A.  Well, I don't want to quibble myself if
14 it gets us around this word "diagnosis."
15     Q.  Let's do it this way:  During your
16 deposition last July in 2022, there was some
17 testimony to that point, correct?
18     A.  I guess.
19     Q.  Well, I'll play you what you said at that
20 time, okay?
21     MR. DUERK:  This is Clip 6.
22
23         (Whereupon, Clip No. 6 was played
24           for the jury)
25

Page 59

1      Q.  (By Mr. Duerk)  Did that accurately
2  record your testimony from last July?
3      A.  It did.  It did.
4      Q.  So if a patient does not have a diagnosis
5  of an asbestos-related disease, if a patient is not
6  sick from Libby amphibole, they should not be
7  submitted for Medicare benefits, no exceptions,
8  correct?
9      A.  Unless a B Reader finds a positive
10 designation.
11     Q.  Okay.  Let's look at Clip 8.
12
13         (Whereupon, Clip No. 8 was played
14           for the jury)
15
16     Q.  (By Mr. Duerk)  Does that accurately
17 reflect your sworn testimony from last July?
18     A.  Yes.
19     Q.  Okay.  Sir, last July, during your
20 testimony, there wasn't any testimony from you about
21 this provision that a B Read constituted a
22 diagnosis, correct?
23     A.  Correct.  To the best of my recollection,
24 correct.
25     Q.  All right.  And then in terms of your

Page 60

1  foundation about CARD's methodology for diagnosing,
2  that's not something that you ever made an inquiry
3  about, correct?
4      A.  Correct.
5      Q.  In terms of the specifics about the
6  intricacies of a diagnosis of asbestos-related
7  disease, you don't claim to understand what's
8  required for a diagnosis of ARD, correct?
9      A.  Correct.
10     Q.  In terms of the American Thoracic Society
11 standards, are you aware that Dr. Black and other
12 CARD employees have testified that in order to
13 establish a diagnosis of asbestos-related disease
14 that requires more than just a B Read?
15     A.  I'm not aware of that.
16     Q.  Okay.  Are you aware that, according to
17 the sworn testimony of Dr. Black, in order to have a
18 valid diagnosis of an asbestos-related disease, a
19 patient needs either a chest x-ray or a CT scan
20 interpreted showing an asbestos-related disease,
21 they need exposure history showing that the
22 individual was exposed to asbestos at some point,
23 and the patient needs a differential diagnosis
24 ruling out all other possible causes of those
25 radiographic findings?

**Charles Fisher Court Reporting**
**442 East Mendenhall, Bozeman MT  59715, (406) 587-9016**

Senator Max Baucus

Page 61

1   A.  That's a long question.  What in the
2  heck?  Ask it -- can you shorten that up, please?
3      Q.  I can.  I'll represent to you that under
4  the American Thoracic Society guidelines, a
5  diagnosis requires exposure history, a CT or chest
6  x-ray showing disease, and a differential diagnosis
7  ruling out other potential causes.  Were you aware
8  of that?
9      A.  No.
10     Q.  And would you defer to Dr. Black and
11 other medical professionals about what is required
12 for a diagnosis of an asbestos-related disease?
13     A.  I mean, Dr. Black's a physician.  I trust
14 Dr. Black.
15     Q.  All right.  Would you also trust the
16 NIOSH certified B Readers, the radiologists, M.D.
17 physicians that over-read all of that?
18     A.  I have no idea because I don't know them.
19 I know Dr. Black.
20     Q.  Sir, were you aware that the CARD
21 B Readers, in this case, NIOSH certified B Readers,
22 when they learned of CARD's practice of saying that
23 their B Reads served as the basis of diagnosis left
24 their contracts and will not be reading for CARD
25 anymore?

Page 62

1   A.  I'm unaware of that.
2      MR. BECHTOLD:  Misstates the evidence.
3      THE WITNESS:  I'm unaware of any of that.
4      Q.  (By Mr. Duerk)  Sir, have you heard any
5  information about B Readers, Dr. Kanne, Dr. Meyer,
6  or Dr. Lynch in this case who once served on CARD's
7  panel of expert outside NIOSH B Readers?
8      A.  No.
9      Q.  Would it cause you any concern if CARD's
10 thoracic radiologist B Readers, when they learned
11 about this B Read diagnosis practice at CARD,
12 terminated their contracts with the Center for
13 Asbestos-Related Disease?
14     A.  I would have to know the facts.  I
15 don't -- I cannot answer that without more facts.
16     Q.  All right.  If those facts were true and
17 those B Readers have all testified under oath that
18 their reads do not constitute a diagnosis nor could
19 they constitute a diagnosis of asbestos-related
20 disease, would that concern you?
21     A.  You're assuming your own answer by
22 putting it in.  I'd need more facts.  I just cannot
23 answer that question.
24     Q.  Okay.  I can provide more facts.  Are you
25 aware of what --

Page 63

1   A.  You're not going to -- you don't -- not
2  giving me enough.  I would have to do my own
3  independent examination, investigation --
4      Q.  And inquiry.
5      A.  -- before -- inquiry before I was able to
6  answer that question.
7      Q.  Right.  And you understand that that is
8  the jury's job in this current action to look at all
9  of the facts, look at what the B Readers have said,
10 what the B Readers have done, to look at all of the
11 testimony --
12     A.  Absolutely.  That's a different issue.
13 You've asked me a different question.
14     Q.  All right.
15     A.  Those are two different points.
16     Q.  So, sir, do you know what a B Reader is?
17     A.  I have an idea.
18     Q.  Okay.  What is your idea?
19     A.  It's a -- it's a -- either a
20 pulmonologist or somebody who's qualified to
21 determine whether or not there's a positive or
22 negative reading of an x-ray or a CT scan.
23     Q.  All right.
24     A.  With respect to asbestos.
25     Q.  And, sir --

Page 64

1   A.  A doctor.
2      Q.  A doctor.  Yep, an MD doctor?
3      A.  MD doctor, anesthesiologist who's an MD
4  doctor.  It could be an anesthesiologist who's an MD
5  doctor.
6      Q.  Okay.  And are you aware of what a
7  B Reading physician is indicating when they find
8  signs of an abnormality or a positive B Read when
9  they look at CARD patient films?
10     A.  I -- no, I don't know.
11     Q.  Okay.  So --
12     A.  I'm not a doctor.
13     Q.  Understood.  And, Senator Baucus, if it
14 turned out that when B Reading physicians were
15 looking for abnormalities they would note all
16 abnormalities, not just asbestos-related
17 abnormalities in their reports.
18     A.  So what's the question?
19     Q.  Were you aware of that?
20     A.  No.
21     Q.  Okay.  Sir, were you aware that a
22 positive B Read may indicate abnormalities like
23 emphysema or COPD or a history of smoking
24 cigarettes?
25     A.  I have no idea.  All I know is if there's

Page 65

1  a -- a doctor found a positive indication of
2  asbestos -- irrespective of emphysema or the
3  others -- asbestos, then that's sufficient.
4     Q.  All right.  Sir, are you aware that when
5  B Readers send their B Read reports back to CARD,
6  there isn't any indication on that form that says
7  whether or not that B Reader believes the patient
8  has an asbestos-related disease?
9     A.  I think that's accurate.  I think that's
10  accurate.
11     Q.  All right.  So a doctor, a B Reading
12  physician, may send a report back to CARD that
13  merely says there's an abnormality of emphysema.
14  Are you aware of that possibility?
15     MR. BECHTOLD:  Foundation.
16     THE WITNESS:  I'm also aware of the statute that says
17  if a B Read is determined by the B Reader -- if the
18  B Reader determines a positive indication, the statute
19  says that, in effect, is sufficient for coverage.
20     Q.  (By Mr. Duerk)  All right.  And, sir, I
21  understand that that's what your testimony is here
22  today.  But it's not your intent to have a B Reader
23  find that a patient has no asbestos-related disease
24  and still be submitted for Medicare coverage,
25  correct?

Page 66

1     A.  Correct.
2     Q.  Okay.  During your deposition last time,
3  we talked about a hypothetical involving a patient
4  with a fractured rib.  Sir, I'll represent to you
5  that a fractured rib shows up as an abnormality on a
6  B Read.  Do you have any reason to disagree with me
7  there?
8     A.  I have no reason to agree or disagree.
9     Q.  I understand.
10     A.  I just have no -- I'm not competent to
11  answer that question.
12     Q.  In your mind, if a patient suffered from
13  a fractured rib, but no signs of asbestos-related
14  disease, would it be proper to submit that patient
15  for lifetime Medicare benefits when they are not
16  sick with asbestos-related disease?
17     A.  It would not be proper.
18     Q.  Right.  Sir, in terms of that
19  fractured-rib patient, we discussed that
20  hypothetical during your deposition in July of last
21  year, right?
22     A.  I vaguely remember all of us talk about
23  fractured ribs, yes.
24     Q.  Okay.  So, in your mind, in patients with
25  a rib fracture, if a doctor had submitted Medicare

Page 67

1  claims for patients knowing that those individual
2  patients did not have a diagnosis of
3  asbestos-related disease, you would find that
4  problematic?
5     A.  Right.
6     Q.  In fact, if a doctor submitted patients
7  with a rib fracture or other non-related asbestos --
8  or problems not related to asbestos for lifetime
9  Medicare benefits, you would find that to be
10  fraudulent, correct?
11     A.  Well, fraud is intent.  So there may not
12  be intent to defraud.  It was maybe a mistake.  It
13  could be an oversight.
14     Q.  Sure.
15     A.  And I don't know if that's fraud or not.
16  That's a legal determination.
17     Q.  Sir, I'll go ahead and go about it this
18  way.  I'm going to play for you Video Clip 11.
19  Please tell me if this is accurately reflects your
20  testimony --
21     A.  I suppose it's in here, isn't it?  It's
22  in the deposition, right?
23
24        (Whereupon, Clip No. 11 was
25         played for the jury)

Page 68

1
2     Q.  (By Mr. Duerk)  Did that accurately
3  reflect your sworn testimony from last --
4     A.  Yes.
5     Q.  All right.  And, sir, have you ever seen
6  any correspondence from the CARD clinic where the
7  CARD clinic indicated to its own patients that the
8  patient did not have a diagnosis of asbestos-related
9  disease and yet they were submitting that patient
10  for Medicare benefits for life anyway?
11     A.  I'm unaware.
12     Q.  Did you ever see any correspondence from
13  the CARD clinic where CARD indicated to the patient
14  that a B Reader found an abnormality but this had no
15  indication of any health condition that should cause
16  the patient any concern but the patient was still
17  being submitted for Medicare benefits?
18     A.  I'm unaware of any of that.
19     Q.  Were you aware, sir, that in over 100
20  individual patient cases, CARD told the patient that
21  they didn't have a diagnosis of asbestos-related
22  disease from CARD or anywhere else, that the patient
23  did have an abnormality that was identified by an
24  outside Reader, but that that abnormality was
25  nothing that had significant health implications nor

Page 69

1   is it considered a diagnosis of an asbestos-related
2   disease?
3       MR. BECHTOLD: Misstates the testimony.
4       THE WITNESS: I'm unaware of any of that.
5       Q.  (By Mr. Duerk)  Okay.  And would that
6   cause concern in your mind?
7       A.  I would have to have more information.
8
9           (Pause)
10
11      Q.  Doctor, we also talked about a different
12  kind of hypothetical in your July 2022 deposition
13  that I'd like to cover that today, okay?
14          Last summer, we talked about a
15  hypothetical patient who went to the -- goes to a
16  clinic to determine whether or not there's a
17  diagnosis of asbestos-related disease.  And during
18  that time frame, the patient is never found to have
19  signs of an abnormality on either a chest x-ray or a
20  CT scan by any radiologist.
21          In this hypothetical, the patient returns
22  to the clinic year after year after year, and his CT
23  scans and his chest x-rays are read by radiologists,
24  thoracic radiologists, pulmonologists, and every
25  single time, over a multi-year period, that patient

Page 70

1   is always negative for asbestos-related disease.
2           If that patient were submitted for
3   Medicare benefits, would that concern you?
4       A.  Yes.
5       Q.  Why?
6       A.  Because the statute is not intending to
7   cover that.  The statute is not intending to cover a
8   person in that situation.  Although I will say, that
9   often, as I understand it, even though I'm not a
10  doctor, that the disease is not -- often is not
11  detected in the early stages but can be detected at
12  later stages in subsequent years.
13      Q.  Understood.  With this hypothetical
14  patient, I'd like for you to assume that they were
15  scanned in -- starting in 2013 -- I'm sorry,
16  starting in 2015, and they were scanned in 2016 and
17  2017.  Ultimately, that patient was sent to the Mayo
18  Clinic.  And not only was the patient scanned again
19  at the Mayo Clinic, but the radiologists at Mayo
20  went back and reviewed all prior scans.
21          In this hypothetical, the Mayo Clinic
22  found no signs of asbestos-related disease during
23  the current scan, the most recent scan, but also no
24  signs of asbestos-related disease going all the way
25  back to the patient's earliest scan.

Page 71

1           If that patient were submitted for
2   Medicare benefits, would it concern you?
3       MR. BECHTOLD: Foundation.
4       THE WITNESS: But that's not this case.  That's a
5   hypothetical.  And I just -- it's hard to deal with
6   hypotheticals.
7       Q.  (By Mr. Duerk)  I understand.  I'd like
8   you to assume that that hypothetical is true.
9       A.  Of course you would.  For your purposes,
10  yes.  I can't -- I just don't know.  It's a
11  hypothetical.  I can't -- it's hard for me to answer
12  a hypothetical.
13      Q.  All right.  Now, I'd like you to look at
14  page 62 of your deposition.
15      A.  What tab is that again?
16      Q.  Sorry, it's Tab 20.  So behind Tab --
17  there we go.  I'm looking at page 62.  I'm looking
18  at line 7.
19      A.  Okay.
20      Q.  Starting at line 7.
21      "Let's go into a separate hypothetical.
22  Assume there's the same doctor who sees a patient
23  and that patient had some experience in Libby,
24  Montana, so that they were in Libby for the
25  requisite period of time, and the doctor sent that

Page 72

1   patient's x-rays and CT scans out for a read from
2   either a B Reader or a thoracic radiologist, a
3   pulmonologist, someone with experience reading
4   films, and all of those films, all of those chest
5   x-rays came back as negative for asbestos-related
6   disease, not just once, but multiple times, year
7   after year.  Assuming there was no outside evidence,
8   according to radiologists and outside experts,
9   showing any signs consistent with asbestos-related
10  disease, would you find it problematic if that
11  doctor submitted that patient for Medicare
12  benefits?"
13      A.  Yep.
14      Q.  "ANSWER:  Yeah, if there's no basis for
15  finding disease, yeah."
16          Did I read that correctly?
17      A.  Yes.
18      Q.  Now, we talked about -- or Mr. Bechtold
19  talked about outside pulmonologists and outside
20  radiologists and outside doctors not necessarily
21  understanding Libby asbestos and asbestos-related
22  disease from Libby asbestos.  Do you remember your
23  testimony there?
24      A.  Yeah, uh-huh.
25      Q.  And I believe we looked at some

Senator Max Baucus

1  congressional testimony about doctors outside of
2  Libby really not understanding the problem; is that
3  right?
4      A.  Yeah.
5      Q.  And I believe that testimony on the
6  Congressional Record was given in support of the
7  changes in the Affordable Care Act, correct?
8      A.  I don't know about changes.  It was
9  supported -- the provision was put in the Act.
10     Q.  Right.  The provision -- I'm sorry.  The
11 provision that was to be put in the Act.  And I
12 think we could probably determine when that -- when
13 you gave that testimony or when you made --
14     A.  Oh, yeah, it would be in there.
15     Q.  Do you mind referring to the record just
16 to see what year that testimony was provided?
17     A.  It would have been after the passage of
18 the Act, so 2000 -- after 2010.  What tab is that?
19 Where do I find it?  Where do I find it?
20     MR. BECHTOLD: Tab 3.
21     THE WITNESS: Okay.  Oh, this is -- oh, this is '09.
22     Q.  (By Mr. Duerk)  So the remarks that you
23 made on the record about other physicians outside of
24 Libby not necessarily understanding the disease,
25 those remarks were made in 2009; is that correct?

1      A.  Looks like it.
2      Q.  Okay.  And in terms of any conversations
3  you've had with outside physicians or radiologists,
4  you didn't communicate with outside doctors about
5  their understanding of Libby disease?
6      A.  Oh, I did.
7      Q.  In terms of any conversations with
8  outside doctors, aside from Dr. Whitehouse --
9      A.  Other than Whitehouse, no.  Well, no,
10 there might have been a guy down in --
11     Q.  In Texas?
12     A.  Texas, yes.  Other than Dr. Whitehouse --
13 yes, Holm I think his name is, in Texas.
14     Q.  Holm in Texas?
15     A.  I think that's his name.
16     Q.  But aside from Dr. Whitehouse who worked
17 for the CARD clinic, who did work with the CARD
18 clinic, and this doctor in Texas, Dr. Holm, did you
19 speak with any other outside physician?
20     A.  I did not, but my staff could well have,
21 and I have a very good staff, and I depend a lot on
22 my staff to get the facts.
23     Q.  All right.  But in terms of --
24     A.  Personally, no.
25     Q.  Personally, right.  And so in terms of

1  this understanding that there were outside
2  physicians in Libby and the surrounding area in 2009
3  at the time you gave this testimony that didn't
4  understand Libby disease, aside from Dr. Whitehouse,
5  a CARD physician, and perhaps Dr. Holm, you,
6  yourself, didn't speak with other outside
7  physicians.
8      A.  No, but it's common knowledge.  It was
9  common knowledge.  I mean, lots of people knew.
10 Nobody disputed that.
11     Q.  Okay.  Back in 2009 is when you made
12 those statements on the record.  Since 2009, have
13 you spoken with any other outside radiologists,
14 pulmonologists, thoracic radiologists, or any other
15 doctors who have looked at, examined, scanned, and
16 interpreted images of CARD patients?
17     A.  No.
18     Q.  Okay.
19     MR. DUERK: I'm seeing a note that we should take a
20 break, so we will take a break.
21     THE WITNESS: Okay.
22     VIDEO OPERATOR: We're going off the record.  The
23 time is 12:00 p.m.
24
25     (Whereupon, a recess was taken)

1      VIDEO OPERATOR: We are back on the record.  The time
2  is 12:02 p.m.
3      Q.  (By Mr. Duerk)  And, Senator, just in
4  terms of your experience with physicians from the
5  Mayo Clinic, physicians from the Mayo Clinic aren't
6  quack doctors, correct?
7      A.  Correct.  Hope not.  I go there.
8      Q.  Doctor, in terms of the way in which
9  patients that are enrolled for Medicare, there are a
10 couple of different definitions and concepts within
11 the Social Security Act procedures, And I just want
12 to see if they square with your understanding of how
13 a disease is diagnosed, okay?
14     In the Medicare provisions, in the POMS,
15 there's reference to a physician as a provider.  And
16 the provider, the diagnosing physician, is one who
17 takes into account all of the information about that
18 patient before rendering a diagnosis.  Does that
19 concept make sense to you?
20     A.  Yeah.
21     MR. BECHTOLD: Foundation, relevance.
22     Q.  (By Mr. Duerk)  In terms of the types of
23 information that the provider needs to take into
24 account, they take into account the scans, or the CT
25 scans, or the chest x-rays.  The provider also

Page 77

1  performs an in-person assessment and looks at
2  medical history.
3       Are those concepts, do they square with
4  your understanding of what a provider does?
5  A.  Yes.
6  Q.  Okay.  In the Social Security
7  Administration Program Operation Manual Systems,
8  what I'll call the POMS, it's the provider, it's the
9  doctor who has the most information about the
10  patient who makes that diagnosis.
11       Does that square with your understanding
12  of how things work?
13  A.  Yeah.
14     MR. BECHTOLD:  Foundation, relevance.
15  Q.  (By Mr. Duerk)  All right.  If the
16  physician -- if the doctor with the most information
17  about a patient, the diagnosing physician, the
18  doctor who has read the CT scan and the chest x-ray,
19  the doctor who completed an inpatient assessment,
20  the doctor who reviewed the exposure history of the
21  patient, the diagnosing physician, if that doctor
22  says to the patient, "You're not sick.  You don't
23  have asbestos-related disease," based on your
24  understanding of the Affordable Care Act, would it
25  be proper for that patient to be submitted for

Page 78

1  Medicare benefits?
2  A.  Are we talking about generally?  Are we
3  talking about this Libby -- the Libby cases?  What
4  are we talking about?
5  Q.  Libby cases.
6  A.  No, that's -- I'm sorry.  The question is
7  way too long.  I couldn't remember it all.  Can you
8  ask a simpler question?
9  Q.  Sure.  If we've got the doctor with the
10  most --
11  A.  Now, we're talking about Libby?
12  Q.  We're talking about Libby.
13  A.  Okay.
14  Q.  If the doctor with the most information,
15  who's seen the CT scans, he's read them, interpreted
16  them, if the doctor who has taken the exposure
17  history, who's done the inpatient assessment, if
18  that doctor, seeing all of the information, tells
19  the patient, "You're not sick.  You don't have
20  asbestos-related disease," should that patient be
21  submitted for Medicare?
22  A.  Might.  Yes, possibly.
23  Q.  Might?  Why?
24  A.  Because it's a different doctor.  There
25  are different doctors involved here.  The statute

Page 79

1  says you're either diagnosed by CARD or by a
2  B Reader.  Technically, the term "diagnosis" is not
3  used by the B Reader, so it depends.  The point here
4  is -- in the statute is not to narrow the
5  determination down to one doctor and one doctor's
6  decision only.
7  Q.  Okay.  Let's look at page --
8  A.  So that's why I answered the question the
9  way I did.
10  Q.  Sure.  Let's look at page 58, lines 8.
11  A.  58.
12  Q.  Line 8.
13  A.  Yeah.
14  Q.  "Within the context of this hypothetical,
15  let's say that the doctor with the most information,
16  the diagnosing physician, the doctor who has the CT
17  scan and the chest x-ray, the doctor who's completed
18  an inpatient assessment, the doctor who's reviewed
19  the exposure history of the patient, the diagnosing
20  physician in this instance says, quote, "You are not
21  sick.  You don't have asbestos-related disease.
22       "Based on your understanding of the
23  Affordable Care Act, would it be proper for that
24  patient to be submitted for Medicare benefits?"
25  A.  Well, that's what I said there, but since

Page 80

1  then I've gone back --
2  Q.  Sorry, I'm not done.
3  A.  Okay, go ahead.
4  Q.  "ANSWER:  If the patient does not have
5  disease, the answer is no."
6       Did I read that correctly?
7  A.  You did, but I'm going to say that I've
8  gone back, and I have more facts now.  I'm an expert
9  witness.  I'm supposed to have more facts.
10  Q.  Okay.
11  A.  And I got more facts.  And what facts --
12  I went back and read the statute and refreshed my
13  recollection of the statute.  So that's why my
14  answer is -- it's not -- it would be different now
15  than what I said then.
16  Q.  Okay.  The question that I asked you back
17  then starting on line 22, page 58, "And so
18  consistent with the original purpose of the" --
19  A.  I'm sorry.  Where are you now?
20  Q.  Page 58, line 22.
21  A.  Okay.
22  Q.  "And so consistent with the original
23  purpose of the EHH provisions in the Affordable Care
24  Act, without a diagnosis, that patient shouldn't be
25  deemed Medicare eligible?"

Senator Max Baucus

Page 81

1          Your answer, "Without a diagnosis, that's
2   correct."
3      A.  Okay.  But --
4      Q.  That's what you said last year under
5   oath, correct?
6      A.  That's what I said back then.
7      Q.  All right.
8      A.  But I'm -- it's more complicated than
9   you're implying there.
10     Q.  Senator Baucus, in your mind, would it
11  ever be proper to knowingly submit a patient for
12  Medicare benefits when the physician knew that
13  patient wasn't sick with an asbestos-related
14  disease?
15     A.  It would be problematic.  Again, I want
16  to know more facts, want to know more facts.
17     Q.  Right.  And you've described that
18  scenario in the past as fraud, correct?
19     A.  I've used the word in the prior
20  deposition.  It would be fraudulent, all things
21  considered, if both the B Reader and -- in my
22  hypothetical, if both the B Reader and the CARD
23  physician intentionally knew that there was no
24  disease, that would be fraud.
25     Q.  Right.  Right.  So if the B Reader saw

Page 82

1   that the patient didn't have an asbestos-related
2   disease but instead chronic obstructive pulmonary
3   disease and CARD knew that, and they submitted a
4   Medicare claim form for lifetime Medicare benefits
5   anyway, that would be fraud, right?
6      A.  I don't know.  I'd have to have the
7   facts.  I can't answer that question.  That's way
8   too complicated.  There's too many assumptions in
9   that question.
10     Q.  And in terms of the facts in this case,
11  did you ask for more facts before you rendered your
12  expert witness opinions in this matter?
13     A.  Did I ask for more facts?
14     Q.  Yes.
15     A.  I asked myself.  I went back to -- I
16  refreshed my recollection of the statutes and
17  declaration.
18     Q.  Did CARD provide you with more facts?
19     A.  No.
20     Q.  Did CARD provide you with any medical
21  records related --
22     A.  No.
23     Q.  Did they provide you with any medical
24  records related to any of the individual CARD
25  patients that are the subject of the False Claims

Page 83

1   Act case here?
2      A.  No.
3      Q.  Okay.  In terms of the complaint itself,
4   the amended complaint, have you seen what the
5   precise allegations are against the CARD clinic?
6      A.  No.  I just want to help people in Libby.
7   That's my concern.
8      Q.  I understand.  And you understand, sir,
9   that this case is not about the people in Libby who
10  are sick with an asbestos-related disease.  This
11  fraud case is a case about the people in Libby who
12  are not sick.  Do you understand that?
13     A.  No.
14     Q.  Okay.  Okay.  That's helpful.  So if I
15  were to tell you that there is deposition testimony
16  from CARD patients who have said under oath that
17  they are aware -- one patient in particular I'm
18  thinking of has stated she's aware that she doesn't
19  have an asbestos-related disease because CARD told
20  her she doesn't have an asbestos-related disease,
21  and, yet, nevertheless, she's still getting gym
22  membership benefits under the Medicare program.  Is
23  that testimony that you've heard about before?
24     A.  I have not heard about anything like
25  that.

Page 84

1      Q.  All right.  And if there was a patient
2   who did actually fall into that category who has
3   been told by CARD repeatedly, "You are not sick.
4   You don't have asbestos-related disease," and, yet,
5   CARD submitted her for Medicare benefits for life so
6   that she could get gym membership paid for by the
7   people of the United States, would you find that
8   problematic?
9      A.  I find it concerning, but I need more
10  facts before making a decision.
11     Q.  Right.  And in terms of facts related to
12  this case, aside from your declaration and the
13  exhibits that I learned you were going to be talking
14  about today, you haven't seen any other written
15  information about those CARD patients, fair?
16     A.  That's true.
17     Q.  Okay.  Sir, I apologize if any of my
18  questions seem disrespectful here, but what I'm
19  trying to get at is -- I do appreciate the work that
20  you've done for the people of Libby.  I do.  But is
21  it benefitting the people of Libby, if there's fraud
22  in the system being perpetrated by CARD, to let that
23  fraud continue?
24     A.  I'm unaware of any fraud.
25     Q.  I'm well aware of that.  However, my

Page 85

1 question stands, does it benefit anybody in Libby,
2 if there's fraud in the way that CARD submits people
3 for Medicare benefits, to let that practice
4 continue?
5    A. I don't -- I'm against fraud.
6    Q. Understood. And you have not seen any of
7 the evidence of fraud in this case?
8    A. Correct.
9    Q. Okay. So is it fair to say that without
10 seeing any evidence of the alleged fraudulent
11 conduct in this case, you wouldn't be able to make
12 up your mind one way or another whether fraud had
13 occurred?
14    A. Correct.
15    Q. Okay. And CARD has not provided you with
16 any evidence other than what we've looked at on the
17 record today. Is that fair?
18    A. Right.
19    Q. Okay.
20    MR. DUERK: If we could take a short break, I might
21 be able to figure out how to shorten this up.
22    VIDEO OPERATOR: We're going off the record. The
23 time is 12:14 p.m.
24
25       (Whereupon, a recess was taken)

Page 86

1    VIDEO OPERATOR: We are back on the record. The time
2 is 12:28 p.m.
3    Q. (By Mr. Duerk) Senator Baucus, I'd like
4 you to look at what I'll mark as Exhibit 160 in this
5 case. It's at Tab 24 in your binder.
6    A. Okay.
7
8       (Deposition Exhibit No. 160 was marked
9          for identification)
10
11    Q. (By Mr. Duerk) Okay. Sir, if you would
12 look at page 2 of Exhibit 160.
13    A. Yep.
14    Q. Do you see an e-mail from Tanis Hernandez
15 to a number of other individuals?
16    A. I do, down at the bottom.
17    Q. Yep. The subject is "Baucus mailing"?
18    A. Yep.
19    Q. Sir, I can't imagine that you have seen
20 this e-mail before, but what I'm hoping to do is
21 show you this e-mail to try to refresh your
22 recollection about the subject here that says,
23 "Baucus mailing."
24    Sir, in about 2010, do you recall sending
25 out a community-wide mailer about the new provisions

Page 87

1 in the Affordable Care Act to the residents of
2 Libby, Montana?
3    A. It is something I would do, but I do not
4 specifically remember this one.
5    Q. All right. If we could look at the first
6 page of Exhibit 160. It appears that there's a back
7 and forth about the subject here, "Baucus mailing."
8 I'm looking at what I think is the very last e-mail
9 in this train from Tanis Hernandez to several other
10 people.
11    A. Are you at the top of the page?
12    Q. I am. It indicates that there are some
13 handwritten notes on the bottom of this mailing.
14 Sir, do you recall either the mailing itself or any
15 handwritten notes on the bottom of the mailing?
16    A. No.
17    Q. Okay. Let's do this. If we could turn
18 to the next tab. Tab 25. What I'll do is mark
19 this -- oops, I think you might be one back --
20 Tab -- behind Tab 25.
21    A. There it is. Found it.
22    Q. There we go.
23    A. There it is.
24    Q. I'll mark this as Exhibit 161 for the
25 record.

Page 88

1       (Deposition Exhibit No. 161 was marked
2          for identification)
3
4    Q. (By Mr. Duerk) Do you see what appears
5 to be the mailing referenced in the prior e-mails
6 with your signature on it?
7    A. Yes.
8    Q. Okay. Does the website at the bottom of
9 the page, www.baucus.senate.gov, is that your -- was
10 that one of your e-mails?
11    A. I presume.
12    Q. Okay. And does this appear to be a true
13 and accurate copy of a mailing titled "Dear Friends"
14 that was sent out --
15    A. As near as I can tell, yes.
16    Q. Okay.
17    MR. DUERK: So I would move to admit this exhibit.
18    Q. (By Mr. Duerk) If you would please start
19 from the beginning and just read this mailing, that
20 would be helpful, Senator.
21    A. All right. "I'm so pleased to be writing
22 you" -- excuse me. "I'm so pleased to be writing
23 you after the passage of the health care reform bill
24 that will lower costs and provide quality affordable
25 health coverage to all Montanans. In addition, the

Senator Max Baucus

Page 89

1  Patient Protection and Affordable Care Act sets up a
2  new system for screenings and medical care for
3  people affected by asbestos-related disease. In
4  June 2009, I joined the EPA Administrator Jackson
5  with the announcement that a public health emergency
6  was declared at the Libby/Troy Superfund site. I
7  have been pushing for this since it was first
8  considered by the EPA in 2001. The public health
9  emergency triggers screening and the medical care
10  for affected people.
11       "Before Libby, this process had never
12  been used, so there's no system set up. But the
13  health care reform bill does just that. I wrote the
14  section of the bill that provides funding for
15  screening services. If a person is determined to
16  have an asbestos-related disease that requires
17  treatment, it allows that person to enroll in
18  Medicare. This program is permanent. In addition,
19  it allots funds for a pilot program to provide
20  specialized medical services that are not covered by
21  Medicare. It will ensure that people affected by
22  asbestos-related disease from the W.R. Grace
23  operation in Libby, Montana will receive the health
24  care they need.
25       "Now that healthcare reform bill is law,

Page 90

1  we're working to get the system up and running. In
2  the meantime, people who need screening or medical
3  care for asbestos-related disease can enroll in the
4  FLASH program, the Federal Libby Asbestos Special
5  Healthcare program, funded with the $6 million grant
6  from the Department of Health and Human Services
7  that I secured in '09. This program will provide
8  coverage for services that aren't covered by -- but
9  are not covered by other insurance or
10  asbestos-related disease programs. For details on
11  how to enroll, contact my office toll free at
12  (800) 332-6106 or in Kalispell at (406) 756-1150."
13       Q.  And, sir, is that your signature on this
14  mailer?
15       A.  It is. Well, it looks like it.
16       Q.  Looks like it.
17            I'd like to look at the bottom of the
18  page in Exhibit 161 and see if you know the source
19  of it. First, I'll read it to you, and tell me if
20  I've read it correctly.
21       "If you 1) Have an asbestos-related
22  disease diagnosed by a medical provider, 2) Are not
23  on Medicare, call 1-888-482-3128 and say," quote,
24  "'I want to sign up for Medicare coverage due to my
25  asbestos-related disease that resulted from the

Page 91

1  Libby, Montana asbestos exposure,'" closed quote.
2            First, did I read that correctly?
3       A.  Yes, you did.
4       Q.  Okay. And, sir, in terms of this
5  mailing, was this consistent with the messaging that
6  was being sent out to the people of Libby about the
7  passage of the Affordable Care Act?
8       A.  It's -- it's consistent, yeah.
9       Q.  Okay. And, sir, in terms of the
10  handwritten language there, is this also consistent
11  with what your understanding is about the way that
12  patients would report their condition to the Social
13  Security Administration to get Medicare coverage?
14       A.  It's a good start.
15       Q.  Okay. And to the best of your knowledge,
16  what else is required to submit to the Social
17  Security Administration to get Medicare coverage?
18       A.  Well, I don't know. I never bought it.
19       Q.  Do you have any understanding of what
20  CARD would submit in support of Medicare benefits
21  for its patients?
22       A.  No, I just trust them to do the right
23  thing.
24       Q.  And this -- at least, according to the
25  e-mail that we see and your mailing, it says that

Page 92

1  CARD patients should report to Social Security if
2  they have an asbestos-related disease diagnosed by a
3  medical provider, correct?
4       A.  Right.
5       Q.  All right. And in terms of the
6  conversation we've had back and forth, the provider
7  is the doctor or the healthcare facility --
8       A.  Right.
9       Q.  -- itself, correct? Okay.
10            Nowhere on your mailing or this
11  handwritten note does it indicate that individuals
12  are eligible for Medicare based on a radiographic
13  report alone, correct?
14       A.  No, but that's the reason for the
15  telephone number, to get the facts.
16       Q.  Right. And when the Social Security
17  Administration is called about those facts, the
18  first fact that needs to be established is that the
19  patient has an asbestos-related disease diagnosed by
20  a medical provider, correct?
21       A.  Generally. I mean, it's -- the main
22  point is, the statute is there to help people. The
23  mailing's sent out to give notice, and here's a
24  telephone number to see if you qualify.
25       Q.  Right. Based on all of the material that

Page 93

1  I've seen about Medicare benefits from your office,
2  all of that material indicates that in order to get
3  Medicare, the person has to be sick due to
4  asbestos-related disease.  Is that your
5  understanding?
6     A.  Basically, yeah.
7     Q.  Yeah.  And I've never seen, sir, a
8  mailing from your office that indicates that
9  patients who aren't sick due to an exposure to Libby
10 asbestos are eligible for Medicare.  Is that your --
11    A.  You've said you've never seen it, and I
12 trust you haven't.
13    Q.  I haven't.  But let me ask it this way:
14 Are you aware of any communication --
15    A.  No.
16    Q.  Sorry.  Just for the record, I've got to
17 ask my question.
18        But are you aware of any communications
19 sent by your office that told individuals in Libby
20 that they were eligible for Medicare without being
21 sick due to an exposure to Libby asbestos?
22    A.  No.
23    Q.  Okay.  And in terms of the communication
24 that you've received from CARD that you're aware of,
25 have you ever received any communication from CARD

Page 94

1  that indicated to you that CARD was submitting
2  patients for Medicare benefits who CARD knew were
3  not sick due to an exposure to asbestos-related
4  disease?
5     A.  I'm not aware of anything.  Nothing --
6  nothing from CARD.
7     Q.  And in terms of any communications from
8  Medicare or the Social Security Administration -- I
9  know you know where I'm going, but I'll ask the
10 question.
11        Have you ever seen any communication from
12 the Social Security Administration that indicated
13 that Social Security was okay giving Medicare
14 benefits to people that CARD and everyone else knew
15 were not sick with asbestos-related disease?
16    A.  No, I've never seen anything like that.
17    Q.  And it is not your testimony here today
18 that it is okay for somebody without an
19 asbestos-related disease to get lifetime Medicare
20 benefits unless they've been exposed to Libby
21 asbestos and are actually sick with asbestos-related
22 disease due to that exposure, correct?
23    A.  Correct.
24    MR. DUERK:  Sir, thank you for your time today.  I
25 have no further questions at this point.

Page 95

1     THE WITNESS:  Okay.
2     MR. BECHTOLD:  I just have a couple follow-ups.
3
4            REDIRECT EXAMINATION
5
6  BY MR. BECHTOLD:
7     Q.  I'd like to take a look at Exhibit 161.
8     A.  Which book?
9     Q.  Right in front of you.  It's the --
10 your --
11    A.  Where is 161?
12    Q.  It's the one that you have right in front
13 of you now.  It's your letter to the people from
14 Libby.
15    A.  Okay.
16    Q.  In the second paragraph, the third
17 sentence, it says, "I wrote a section of the bill
18 that provides funding for screening services."
19        Do you see that?
20    A.  Second paragraph?  Yeah, I do.
21    Q.  So you wrote a section of the Act that we
22 looked at before, right?  Section --
23    A.  Right.
24    Q.  -- 1881A, correct?
25    A.  Uh-huh.

Page 96

1     Q.  And under Section 1881A, is a B Reader
2  interpretation of asbestosis, pleural thickening, or
3  pleural plaques is established by a B Reader, is
4  that a diagnosis under the Act?
5     MR. DUERK:  Objection, foundation, form,
6  nondisclosure, also calls for a legal interpretation.
7        Go ahead.
8     THE WITNESS:  It's not -- it's technically not a
9  diagnosis, but it's sufficient for coverage.
10    Q.  (By Mr. Bechtold)  And you wrote the Act,
11 right?
12    A.  Yes.
13    Q.  And that was your intention?
14    A.  Yes.  B Reader's positive -- a positive
15 determination is sufficient.
16    MR. BECHTOLD:  Nothing further.  Thank you.
17    VIDEO OPERATOR:  That concludes this deposition.  The
18 time is 12:42 p.m.
19
20        (Whereupon, the deposition concluded at
21        12:42 p.m. for the day)
22
23        (Signature waived)
24
25

Page 97

```
 1                 C E R T I F I C A T E

 2

 3    STATE OF MONTANA      )

 4                                  :ss

 5    COUNTY OF BEAVERHEAD )

 6         I, Robyn Ori English, Freelance Court Reporter and
      Notary Public for the State of Montana, residing in
 7    Dillon, do hereby certify:

 8         That I was duly authorized to and did swear in the
      witness and report the deposition of Max Baucus,
 9    in the above-entitled cause; that the foregoing pages of
      this deposition constitute a true and accurate
10    transcription of my stenotype notes of the testimony of
      said witness, all done to the best of my skill and
11    ability; that the reading and signing of the deposition by
      the witness has been expressly waived.

12

13         I further certify that I am not an attorney nor
      counsel of any of the parties, nor a relative or employee
14    of any attorney or counsel connected with the action, nor
      financially interested in the action.

15         IN WITNESS WHEREOF, I have hereunto set my hand and
      affixed by notarial seal on this, the 5th day of June,
16    2023.

17

18

19

20

21

22

23

24

25
```

**$**

**$6 (1)**
90:5

**[**

**[As (1)**
18:11

**A**

**abided (1)**
42:12
**able (4)**
10:7;63:5;85:11,21
**abnormalities (4)**
64:15,16,17,22
**abnormality (7)**
64:8;65:13;66:5;
68:14,23,24;69:19
**Absolutely (4)**
16:2;20:21;24:6;
63:12
**access (1)**
22:11
**accomplished (1)**
8:3
**according (3)**
60:16;72:8;91:24
**account (3)**
76:17,24,24
**accurate (4)**
34:4;65:9,10;88:13
**accurately (5)**
51:8;59:1,16;67:19;
68:2
**across (1)**
22:1
**Act (61)**
7:20,22;9:22;10:11,
12,13;11:20;13:24;
14:12,15,25;15:2,11,
22,22;16:1,7,16,17;
17:13,19,19;18:5,10,
11;19:2;20:23;21:2;
22:18;27:6;29:19;30:3;
39:6,13;42:20;45:13,
23;46:25;47:7;52:8,14,
14;53:5,8;58:7,10;
73:7,9,11,18;76:11;
77:24;79:23;80:24;
83:1;87:1;89:1;91:7;
95:21;96:4,10
**Action (3)**
5:3;9:21;63:8
**active (1)**
9:6
**actual (1)**
10:3
**actually (5)**
10:21;22:13;28:8;

84:2;94:21
**Adam (2)**
5:14;31:7
**adamant (1)**
9:6
**addition (2)**
88:25;89:18
**adhered (1)**
42:12
**administer (1)**
5:18
**administration (20)**
10:8;39:12,15,20,21;
41:23;42:19;55:5,10,
20;56:17,22;57:1,10;
77:7;91:13,17;92:17;
94:8,12
**administrations (1)**
10:6
**Administrator (1)**
89:4
**admit (1)**
88:17
**admitted (4)**
28:7,9;49:12,24
**affected (4)**
12:7;89:3,10,21
**affirmative (1)**
54:15
**afford (1)**
25:25
**Affordable (42)**
7:20,22;9:22;10:11,
12;11:20;13:24;14:12,
24;15:22;16:7,16;
17:12,19;18:5,11;19:2;
20:23;22:18;29:19;
30:3;39:6,13;42:20;
45:13,23;46:25;47:7;
52:8,14;53:5,8;58:6,
10;73:7;77:24;79:23;
80:23;87:1;88:24;89:1;
91:7
**afterward (1)**
30:17
**again (12)**
21:4;9:22:12;25:24;
36:5;48:6,7;50:3;
52:21;70:18;71:15;
81:15
**against (2)**
83:5;85:5
**agency (2)**
17:1;25:7
**ago (7)**
13:15;22:18;40:12,
12;41:2,5;56:22
**agree (3)**
24:10;37:15;66:8
**agreed (3)**
21:2;35:10;54:6
**ahead (13)**
17:3;19:11;20:11,20;

26:5,19;27:16;30:19;
50:16;56:13;67:17;
80:3;96:7
**alerted (2)**
42:17;43:2
**allegations (1)**
83:5
**alleged (1)**
85:10
**allots (1)**
89:19
**allow (4)**
20:1;22:20;23:16;
44:12
**allowing (1)**
23:6
**allows (2)**
22:16;89:17
**alone (3)**
28:1;34:16;92:13
**along (1)**
41:19
**Although (1)**
70:8
**always (2)**
24:10;70:1
**Ambassador (2)**
6:11;7:5
**amended (1)**
83:4
**amendments (5)**
15:21;16:15;17:18;
18:10;52:13
**America (1)**
7:5
**American (3)**
49:8;60:10;61:4
**Americans (2)**
8:4,4
**amphibole (3)**
44:15;45:8;59:6
**anchor (1)**
50:9
**anesthesiologist (2)**
64:3,4
**annex (1)**
8:22
**announcement (1)**
89:5
**answered (1)**
79:8
**anticipate (1)**
51:12
**anticipation (2)**
31:14;33:1
**anymore (1)**
61:25
**anyways (1)**
56:12
**apart (1)**
36:4
**apologize (1)**
84:17

**apparent (1)**
19:16
**appear (1)**
88:12
**appeared (1)**
35:6
**appears (3)**
43:9;87:6;88:4
**appreciate (1)**
51:9;84:19
**approved (1)**
14:5
**approximately (1)**
41:4
**ARD (1)**
60:8
**area (1)**
75:2
**areas (1)**
8:20
**Argumentative (1)**
55:1
**armed (3)**
35:11,12;37:8
**around (1)**
58:14
**asbestos (30)**
8:21;10:2;14:13;
15:1,3;19:13;22:2,6;
24:14,15,17;29:21;
44:3,9,10,18;47:9;
60:22;63:24;65:2,3;
67:7,8;72:21,22;90:4;
91:1;93:10,21;94:21
**asbestosis (13)**
12:15;14:15;15:4,11,
19;16:8,13;17:14;18:6;
20:15;52:9;53:25;96:2
**asbestos-related (78)**
8:12,17;9:3,24;14:3;
19:14;21:21;23:15,22;
27:5,10,13;28:1;29:24;
30:4;42:21;43:6,12,16,
24;45:25;47:25;48:2,
10,13;49:8;50:17,19;
53:20;57:2;58:2;59:5;
60:6,13,18,20;61:12;
62:13,19;64:16;65:8,
23;66:13,16;67:3;68:8,
21;69:1,17;70:1,22,24;
72:5,9,21;77:23;78:20;
79:21;81:13;82:1;
83:10,19,20;84:4;89:3,
16,22;90:3,10,21,25;
92:2,19;93:4;94:3,15,
19,21
**aside (6)**
34:8;40:7;74:8,16;
75:4;84:12
**assessment (4)**
77:1,19;78:17;79:18
**assume (2)**
70:14;71:8,22

**assuming (3)**
45:1;62:21;72:7
**assumptions (1)**
82:8
**assure (1)**
19:23
**ATSDR (1)**
26:25
**attention (11)**
10:15;13:8;18:15;
21:3;22:7;24:19;26:12;
28:6,11,19;29:12
**attorneys (1)**
5:11
**authorities (1)**
22:21
**authority (1)**
25:13
**aware (33)**
18:21;24:10;26:20,
22;27:2,4,9,23;35:1,6;
38:21;42:24;56:1;
60:11,15,16;61:7,20;
62:25;64:6,19,21;65:4,
14,16;68:19;83:17,18;
84:25;93:14,18,24;
94:5
**awful (1)**
8:25

**B**

**back (25)**
7:1;17:10;31:1;
46:17;47:4;51:3,25;
56:8;65:5,12;70:20,25;
72:5;75:11;76:1;80:1,
8,12,16;81:6;82:15;
86:1;87:6,19;92:6
**bad (3)**
22:9;24:17,17
**based (13)**
17:15;18:7;30:2;
34:15;49:16,16,18;
52:10;58:5;77:23;
79:22;92:12,25
**basic (1)**
11:11
**basically (5)**
11:19;13:25;23:4;
44:24;93:6
**basis (4)**
33:4;50:23;61:23;
72:14
**Baucus (14)**
5:2,24;6:9,11,11,12;
13:11;31:7;64:13;
81:10;86:3,17,23;87:7
**B-A-U-C-U-S (1)**
6:9
**bears (1)**
21:24
**became (1)**

19:16
**BECHTOLD (40)**
5:15,15;6:5;17:4;
20:12,22;24:1,8;25:3,
21;26:5,20;27:18;28:5,
8,10;30:10,13,16;
31:17;32:2,8;36:1;
38:2;43:20;51:23;52:1;
55:1;62:2;65:15;69:3;
71:3;72:18;73:20;
76:21;77:14;95:2,6;
96:10,16
begin (1)
31:13
beginning (1)
88:19
behind (3)
29:19;71:16;87:20
Beijing (1)
41:13
believes (1)
65:7
Benefield (1)
9:5
benefit (1)
85:1
benefits (41)
15:21;16:15;17:18,
24;18:9;27:25;29:20;
43:6,11;44:3,13,20;
45:6,23;47:8,9;48:5;
52:13;54:4;57:3;58:12;
59:7;66:15;67:9:68:10,
17;70:3;71:2;72:12;
78:1;79:24;81:12;82:4;
83:22;84:5;85:3;91:20;
93:1;94:2,14,20
benefitting (1)
84:21
best (7)
38:14;55:11,15,19;
57:24;59:23;91:15
better (2)
51:14,16
bill (11)
10:1;11:10,12,22,23;
22:20;88:23;89:13,14,
25;95:17
binder (1)
86:5
bit (2)
29:1;47:22
Black (14)
33:14;35:3;40:6,7,
11,15,21;41:18;55:14;
60:11,17;61:10,14,19
Black's (1)
61:13
BNSF (2)
5:4,14
book (1)
95:8
both (3)

43:8;81:21,22
bottom (8)
10:17;21:14;26:22;
86:16;87:13,15;88:8;
90:17
bought (1)
91:18
Boy (1)
21:22
Bozeman (1)
5:7
break (4)
30:19;75:20,20;
85:20
bring (2)
9:11,19
broad (2)
26:9,10

**C**

caked (1)
8:24
call (3)
6:14;77:8;90:23
called (3)
5:25;6:10;92:17
calls (1)
96:6
came (1)
72:5
can (17)
11:3;17:23;20:4;
28:19;30:16;36:20;
37:12;45:4;47:20;51:7;
61:2,3;62:24;70:11;
78:7;88:15;90:3
CARD (84)
5:4,16;14:13;15:10,
19;16:7,13;20:5;23:13,
18,18;24:11;26:22;
27:4,11,19,23;30:6;
33:23;39:25;40:1,2,8;
41:18;42:17,18;43:3,4;
44:17;45:20;48:8,9,12,
18;49:12,23;54:14;
55:15;56:2,16,21;57:1,
14,16;60:12;61:20,24;
62:11;64:9;65:5,12;
68:6,7,13,13,20,22;
74:17,17;75:5,16;79:1;
81:22;82:3,18,20,24;
83:5,16,19;84:3,5,15,
22;85:2,15;91:20;92:1;
93:24,25;94:1,2,6,14
CARD's (4)
60:1;61:22;62:6,9
Care (52)
7:20,22;9:22;10:11,
12;11:20;13:24;14:12,
25;15:22;16:7,17;
17:13,19;18:5,11;19:2;
20:23;21:13,17;22:12,

18,22;26:1;29:19;30:3;
39:6,13;42:20;45:13,
23;46:25;47:7;52:8,14;
53:5,8;58:7,10;73:7;
77:24;79:23;80:23;
87:1;88:23;89:1,2,9,13,
24;90:3;91:7
carry (1)
17:8
case (29)
11:8;14:6;23:17;
30:8;34:18,23;35:2,7;
36:11;37:13,23,24;
38:6,19,19;40:13;
42:25;61:21;62:6;71:4;
82:10;83:1,9,11,11;
84:12;85:7,11;86:5
cases (3)
68:20;78:3,5
category (1)
84:2
cause (3)
62:9;68:15;69:6
causes (2)
60:24;61:7
Center (3)
14:13;15:1;62:12
ceremony (1)
41:16
certainly (2)
27:3;42:15
certified (2)
61:16,21
chance (1)
21:20
changes (2)
73:7,8
checklist (3)
25:14,16;27:25
chest (19)
12:18,20;15:6,14;
16:10;17:15;18:8;19:5,
6,17;52:11;60:19;61:5;
69:19,23;72:4;76:25;
77:18;79:17
China (2)
7:5,5
Christine (1)
57:23
chronic (1)
82:2
cigarettes (1)
64:24
Civil (1)
5:3
claim (7)
49:6;55:13,18;56:3;
57:11;60:7;82:4
claims (2)
67:1;82:25
clear (1)
51:12
clearly (3)

11:22;25:20;34:5
clinic (25)
5:16;23:14,18;30:6;
39:25;40:1,2,23;54:14;
55:15;56:16,21;68:6,7,
13;69:16,22;70:18,19,
21;74:17,18;76:5,5;
83:5
clinical (4)
18:22;19:8;20:17;
26:24
clinician (1)
45:5
Clip (7)
46:9;58:21,23;59:11,
13;67:18,24
clips (1)
46:20
closed (1)
91:1
closely (1)
14:9
CMS (3)
55:8,9,9
commitment (2)
22:16,22
common (2)
75:8,9
communicate (1)
74:4
communicated (1)
40:8
communication (13)
39:11,14,18,20,24;
40:2,17;41:20;57:4;
93:14,23,25;94:11
communications (3)
57:15;93:18;94:7
community-wide (1)
86:25
companies (2)
6:18,19
competent (1)
66:10
complaint (3)
34:10;83:3,4
completed (2)
77:19;79:17
complicated (4)
47:15,16;81:8;82:8
computed (5)
12:19;15:5,13;16:10;
19:5
concept (1)
76:19
concepts (2)
76:10;77:3
concern (7)
62:9,20;68:16;69:6;
70:3;71:2;83:7
concerned (1)
43:10
concerning (1)

84:9
concluded (1)
96:20
concludes (1)
96:17
condition (3)
53:21;68:15;91:12
conditions (8)
12:11,12,14;13:1,2;
53:15,24,24
conduct (1)
85:11
confusion (1)
25:15
Congress (6)
7:9,15;11:8;20:22;
21:1;24:9
congressional (8)
6:25;11:1,6;21:10;
38:25;39:4;73:1,6
considered (3)
69:1;81:21;89:8
consistent (6)
72:9;80:18,22;91:5,
8,10
constitute (2)
62:18,19
constituted (1)
59:21
consult (1)
6:18
contact (1)
90:11
contamination (1)
22:14
context (1)
79:14
continue (2)
36:15;84:23;85:4
contracts (2)
61:24;62:12
conversation (8)
31:18,21;32:1,7;
33:14,15;40:20;92:6
conversations (6)
33:16;40:22;41:17;
42:18;74:2,7
COPD (1)
64:23
copies (1)
34:10
copy (3)
36:23;53:6;88:13
corner (3)
10:18;26:6;36:17
correctly (10)
37:4,20;50:6,7;
52:15;53:16;72:16;
80:6;90:20;91:2
correspondence (2)
68:6,12
cost (1)
8:8

costs (3)
8:8;88:24
country (2)
22:2;24:15
couple (5)
6:23;7:23;47:13;
76:10;95:2
course (1)
71:9
Court (6)
5:2,7,9,17;6:7;36:1
cover (3)
69:13;70:7,7
coverage (16)
8:3;9:23;10:2;20:9;
24:25;26:9;29:23;
45:21;65:19,24;88:25;
90:8,24;91:13,17;96:9
covered (14)
12:10;13:6;14:4;
19:14,20,21;23:11,16;
47:1,2;50:5;89:20;
90:8,9
create (1)
25:3
created (2)
25:9,14
creates (1)
58:10
cross-examination (2)
30:14;31:4
CT (13)
12:20;19:25;23:21;
60:19;61:5;63:22;
69:20,22;72:1;76:24;
77:18;78:15;79:16
current (4)
6:16;34:19;63:8;
70:23
cut (1)
8:7

D

dangerous (1)
22:3
date (1)
28:12
dated (1)
13:14
day (1)
96:21
deal (1)
71:5
dealing (1)
22:5
Dear (1)
88:13
deceive (1)
45:2
decision (3)
45:1;79:6;84:10
declaration (26)

10:7;13:11,13,16,20,
21;14:5,8;17:11;20:13;
27:19;28:13,17;29:1,4;
32:15;33:20;34:6,7,8;
38:13;52:3,17,24;
82:17;84:12
declare (1)
13:23
declared (4)
9:24;35:1,7;89:6
dedication (2)
40:24;41:16
deemed (1)
80:25
defer (1)
61:10
defined (1)
12:8
definition (1)
54:9
definitions (1)
76:10
defraud (2)
58:5;67:12
Department (4)
14:10,25;16:25;90:6
depend (1)
74:21
Depending (1)
46:1
depends (1)
79:3
deposed (2)
34:25;51:10
deposition (53)
5:10;28:12,14,20;
31:8,15,16,24;32:5,10,
12,15,18,24;33:1,2,4,8,
12,14,20,24;34:14;
35:5,23,24;36:12,24;
37:25;39:4,16;41:4;
43:9;46:3,20;47:13;
48:16,23;51:22;54:6;
57:15;58:16;66:2,20;
67:22;69:12;71:14;
81:20;83:15;86:8;88:1;
96:17,20
depositions (1)
34:11
Describe (1)
48:6
described (12)
12:11,12,15;13:1,2;
53:7,9,12,13,15,24;
81:17
describing (1)
57:21
designation (4)
10:3,4,8;59:10
designed (1)
25:13
details (1)
90:10

detected (2)
70:11,11
detection (1)
21:20
determination (7)
20:4;35:18;43:14;
54:15;67:16;79:5;
96:15
determine (4)
46:5;63:21;69:16;
73:12
determined (7)
12:21;14:25;16:8;
19:7;23:13;65:17;
89:15
determines (1)
65:18
diagnose (14)
14:15;15:3,11;16:8;
17:23;20:7;27:12;
49:14;50:1,17;52:9,18,
22;53:1
diagnosed (20)
9:23;12:10;13:1;
15:18;16:13;17:16;
18:6;29:24;30:4,7;
43:5;45:20,20;52:12;
53:14;76:13;79:1;
90:22;92:2,19
diagnoses (7)
18:22;19:8,24;20:17;
23:7;27:20;45:4
diagnosing (8)
27:5;50:18;60:1;
76:16;77:17,21;79:16,
19
diagnosis (62)
12:25;17:14;19:3;
20:5,15;23:13,25;24:2;
26:24;42:20;43:12;
45:3,24;46:1;47:1,2,24,
24;48:2,9,12;49:7;
50:3;52:19;53:2,20;
54:5,9,13,14,17,23;
57:2,18;58:12,14;59:4,
22;60:6,8,13,18,23;
61:5,6,12,23;62:11,18,
19;67:2;68:8,21;69:1,
17;76:18;77:10;79:2;
80:24;81:1;96:4,9
diagnostic (3)
12:22;48:17;51:21
different (13)
10:6;19:18,18;24:14;
47:13;63:12,13,15;
69:11;76:10;78:24,25;
80:14
differential (2)
60:23;61:6
difficult (1)
19:16
DIRECT (2)
6:3;24:19

directly (1)
53:23
disadvantage (1)
22:14
disagree (5)
49:15;50:1;57:7;
66:6,8
disclosure (7)
19:10;20:19;23:9;
24:5;25:1,19;38:5
discussed (1)
66:19
discussion (1)
46:15
disease (90)
9:24;14:3,13;15:2;
19:14,17,19;21:21;
23:11,15,22;27:10,13;
28:2;30:5,7;42:21;
43:6,12,16,24;45:19,
19,25;47:25;48:2,10,
13;49:8;50:18,19;
53:20;57:2;58:2;59:5;
60:7,13,18,20;61:6,12;
62:13,20;65:8,23;
66:14,16;67:3;68:9,22;
69:2,17;70:1,10,22,24;
72:6,10,15,22;73:24;
74:5;75:4;76:13;77:23;
78:20;79:21;80:5;
81:14,24;82:2,3;83:10,
19,20;84:4;89:3,16,22;
90:3,10,22,25;92:2,19;
93:4;94:4,15,19,22
diseases (5)
8:12,17;9:3;27:6;
29:25
dispute (1)
50:11
disputed (1)
75:10
disrespectful (1)
84:18
District (2)
5:2,3
districts (1)
7:1
Docket (1)
26:21
Doctor (41)
16:20;18:17;19:20,
21;23:19,21;64:1,2,2,3,
4,5,12;65:1,11;66:25;
67:6;69:11;70:10;
71:22,25;72:11;74:18;
76:8;77:9,16,18,19,20,
21;78:9,14,16,18,24;
79:5,15,16,17,18;92:7
doctors (15)
18:19;22:4,7,25;
23:20;24:10,11,16;
72:20;73:1;74:4,8;
75:15;76:6;78:25

doctor's (1)
79:5
document (3)
17:5;24:23;26:15
documents (3)
34:11;38:2,21
done (4)
63:10;78:17;80:2;
84:20
down (4)
54:8;74:10;79:5;
86:16
Dr (24)
33:14;35:3;40:6,7,
11,15,21;41:18;55:14;
60:11,17;61:10,13,14,
19;62:5,5,6;74:8,12,16,
18;75:4,5
draft (3)
14:11;33:19;57:25
drafted (1)
29:4
drafting (4)
7:10,15,19;30:3
draw (9)
10:15;13:7;18:14;
21:3;26:11;28:5,10,19;
29:12
due (11)
21:18;44:3,14,18;
45:7;90:24;93:3,9,21;
94:3,22
Duerk (45)
5:14,14;17:2;19:9;
20:10,18;23:8;24:4;
25:1,18;26:4,18;27:15;
28:3,7;30:13,19;31:6,
7;38:10;43:21;46:19;
52:2;55:2;58:21;59:1,
16;62:4;65:20;68:2;
69:5;71:7;73:22;75:19;
76:3,22;77:15;85:20;
86:3,11;88:4,17,18;
94:24;96:5
duly (1)
5:25
during (18)
7:9;32:5,24;33:8,12;
35:5;41:21;43:8;46:20;
48:16;50:21;54:6;
58:15;59:19;66:2,20;
69:17;70:22
dying (1)
9:2

E

earlier (10)
13:15;22:24;28:12;
41:10,11,11,12,15;
51:1;53:10
earliest (1)
70:25

**early (4)**
  6:24;21:20;24:18;
  70:11
**easier (2)**
  47:22;58:5
**East (1)**
  5:6
**economic (1)**
  21:19
**editorial (1)**
  21:22
**educate (1)**
  24:16
**effect (1)**
  65:19
**effects (1)**
  22:13
**EHH (5)**
  34:11;39:13;55:14;
  57:10;80:23
**either (11)**
  27:19;30:6,8;45:20;
  58:3;60:19;63:19;
  69:19;72:2;79:1;87:14
**eligible (17)**
  15:20;16:15;17:17,
  23;18:9;43:22;44:8;
  45:22;52:12;57:3,17;
  58:1,11;80:25;92:12;
  93:10,20
**else (9)**
  5:12;23:19;31:23;
  32:12;40:8;50:25;
  68:22;91:16;94:14
**e-mail (5)**
  86:14,20,21;87:8;
  91:25
**e-mails (5)**
  43:3;56:8,14,16,20;
  88:5,10
**emergency (1)**
  9:25;10:3;89:5,9
**emerges (1)**
  22:20
**emphysema (3)**
  64:23;65:2,13
**employee (1)**
  42:25
**employees (1)**
  60:12
**enable (1)**
  16:7
**enacted (5)**
  15:22;16:16;17:19;
  18:10;52:14
**enforce (1)**
  42:7
**enforced (1)**
  42:5
**enforcement (2)**
  55:3,4
**English (1)**
  5:8

**enough (2)**
  23:16;63:2
**enroll (3)**
  89:17;90:3,11
**enrolled (1)**
  76:9
**ensure (3)**
  14:12;18:5;89:21
**ensuring (1)**
  42:11
**environmental (6)**
  12:7;26:23;27:24;
  45:14;46:24;47:6
**EPA (3)**
  22:9;89:4,8
**equals (2)**
  52:18;53:2
**equipped (1)**
  37:17
**especially (1)**
  35:16
**Essentially (2)**
  22:11;34:14
**establish (1)**
  60:13
**established (4)**
  12:17;19:3;92:18;
  96:3
**even (5)**
  19:23;20:6;27:6,11;
  70:9
**everybody (2)**
  19:19;23:11
**everyone (1)**
  57:25;94:14
**evidence (6)**
  28:7;62:2;72:7;85:7,
  10,16
**exact (1)**
  45:17
**exactly (1)**
  26:3
**EXAMINATION (3)**
  6:3;63:3;95:4
**examined (2)**
  6:1;75:15
**except (1)**
  34:5
**exception (1)**
  58:11
**exceptions (1)**
  59:7
**exclusive (1)**
  53:22
**excuse (2)**
  7:3;88:22
**Exhibit (23)**
  10:16,17;11:14,17,
  18;13:8,10;16:21;21:4;
  24:20;26:12;28:6,11;
  52:4;86:4,8,12;87:6,
  24;88:1,17;90:18;95:7
**exhibits (2)**

  11:14;84:13
**expect (1)**
  45:6
**expensive (1)**
  8:9
**experience (3)**
  71:23;72:3;76:4
**experienced (1)**
  22:5
**expert (10)**
  19:10;35:1,7,10,15;
  38:24;51:2;62:7;80:8;
  82:12
**experts (1)**
  72:8
**explained (1)**
  9:10
**explains (1)**
  36:22
**exposed (5)**
  29:21;44:9;47:8;
  60:22;94:20
**exposure (15)**
  12:7;44:3,10,14,18;
  45:7;60:21;61:5;77:20;
  78:16;79:19;93:9,21;
  94:3,22
**exposure' (1)**
  91:1
**express (7)**
  16:5,5,11,11;18:3,4;
  38:12
**eye (1)**
  9:13

**F**

**facility (1)**
  92:7
**fact (4)**
  27:1;38:20;67:6;
  92:18
**facts (36)**
  35:11,13;36:11;37:9,
  13,18,22;38:1;51:2,4,6,
  7,15,25;62:14,15,16,
  22,24;63:9;74:22;80:8,
  9,11,11;81:16,16;82:7,
  10,11,13,18;84:10,11;
  92:15,17
**fair (13)**
  7:14;37:9,18;38:3,
  14;39:16;42:14;43:12,
  13;51:19;84:15;85:9,
  17
**fall (1)**
  84:2
**falling (1)**
  36:3
**False (1)**
  82:25
**familiar (2)**
  7:14;10:10

**far (1)**
  26:6
**February (1)**
  13:14
**federal (2)**
  35:15;90:4
**fella (1)**
  9:4
**field (4)**
  55:10,20,24;56:17
**Fifteen (1)**
  31:22
**fifth (1)**
  11:16
**figure (1)**
  85:21
**file (2)**
  34:18,19
**filled (1)**
  55:14
**film (2)**
  49:14,25
**films (3)**
  64:9;72:4,4
**finally (3)**
  10:7,14;22:7
**find (15)**
  19:21;23:14;27:11;
  28:1;36:16;43:14;64:7;
  65:23;67:3,9;72:10;
  73:19,19;84:7,9
**finding (1)**
  72:15
**findings (1)**
  60:25
**finds (6)**
  17:25;19:25;20:7;
  23:21;30:8;59:9
**finger (1)**
  9:14
**first (8)**
  5:25;13:8,22;87:5;
  89:7;90:19;91:2;92:18
**Fisher (1)**
  5:8
**five (1)**
  21:14
**FLASH (1)**
  90:4
**floor (1)**
  39:9
**following (2)**
  5:20;12:14
**follows (1)**
  6:1
**follow-up (1)**
  30:16
**follow-ups (1)**
  95:2
**forbid (1)**
  22:18
**form (5)**
  25:4;27:15;65:6;

**forms (7)**
  26:23;34:11;55:13,
  14,18;56:3;57:11
**forth (4)**
  42:1;56:9;87:7;92:6
**found (6)**
  24:15;65:1;68:14;
  69:18;70:22;87:21
**foundation (13)**
  17:2;19:9;20:18;
  23:8;24:4;25:2,18;
  60:1;65:15;71:3;76:21;
  77:14;96:5
**fracture (2)**
  66:25;67:7
**fractured (4)**
  66:4,5,13,23
**fractured-rib (1)**
  66:19
**frame (2)**
  41:21;69:18
**frankly (3)**
  10:5,11;22:9
**fraud (13)**
  67:11,15;81:18,24;
  82:5;83:11;84:21,23,
  24;85:2,5,7,12
**fraudulent (3)**
  67:10;81:20;85:10
**free (1)**
  90:11
**Friends (1)**
  88:13
**front (3)**
  38:2;95:9,12
**fulfill (2)**
  22:16,22
**funded (1)**
  90:5
**funding (3)**
  17:1;89:14;95:18
**funds (1)**
  89:19
**further (2)**
  94:25;96:16
**future (1)**
  22:19

**G**

**gave (2)**
  73:13;75:3
**Gayla (1)**
  9:5
**Gayla's (1)**
  9:8
**general (2)**
  12:9;53:12
**Generally (4)**
  7:21;37:10;78:2;
  92:21
**gets (1)**

**far (1)** 82:4;96:5

58:14

**given (1)**
73:6

**giving (4)**
28:13,14;63:2;94:13

**goal (1)**
8:7

**god (1)**
11:23

**goes (2)**
36:19;69:15

**good (4)**
7:16;20:25;74:21;
91:14

**govern (1)**
25:17

**Grace (1)**
89:22

**grant (2)**
26:25;90:5

**greater (1)**
8:3

**grounds (1)**
17:2

**group (1)**
9:9

**guess (7)**
10:20;12:20;16:25;
36:25;38:15;55:22;
58:18

**guidelines (1)**
61:4

**guy (1)**
74:10

**guys (2)**
8:24;44:24

**gym (2)**
83:21;84:6

## H

**hand (1)**
36:20

**handing (1)**
53:6

**handling (1)**
56:2

**handwritten (4)**
87:13,15;91:10;
92:11

**hard (2)**
71:5,11

**hazard (4)**
26:23;27:25;46:24;
47:6

**hazards (1)**
45:14

**health (18)**
8:5;14:10;22:12,22;
26:23;27:25;45:14;
46:24;47:6;68:15,25;
88:23,25;89:5,8,13,23;
90:6

**healthcare (7)**
7:24;8:8;9:25;10:3;
89:25;90:5;92:7

**hear (1)**
45:17

**heard (4)**
43:18;62:4;83:23,24

**Heather (1)**
42:25

**Heaven (1)**
22:18

**heck (1)**
61:2

**held (1)**
49:1

**help (12)**
7:25;8:7,16,19,20;
9:15;26:7,8;29:4;
36:20;83:6;92:22

**helpful (2)**
83:14;88:20

**helping (1)**
11:2;19:15

**helps (1)**
22:15

**herein (1)**
5:25

**Here's (3)**
36:21;56:15;92:23

**Hernandez (2)**
86:14;87:9

**HHS (5)**
10:9;16:25;25:7,8,12

**Hilman (1)**
42:25

**historically (1)**
21:18

**history (10)**
6:21;39:1,5;60:21;
61:5;64:23;77:2,20;
78:17;79:19

**Hold (2)**
36:3;48:25

**Holm (4)**
74:13,14,18;75:5

**honored (1)**
40:18

**Hope (1)**
76:7

**hoping (1)**
86:20

**hours (1)**
32:18

**Human (2)**
14:10;90:6

**hundred (1)**
8:15

**hypothetical (14)**
66:3,20;69:12,15,21;
70:13,21;71:5,8,11,12,
21;79:14;81:22

**hypotheticals (1)**
47:14,18,22;71:6

'

**'I (1)**
90:24

## I

**idea (8)**
29:19;51:12,14,16;
61:18;63:17,18;64:25

**identification (2)**
86:9;88:2

**identified (2)**
5:11;68:23

**identifying (1)**
27:10

**illnesses (1)**
8:17

**images (1)**
75:16

**imagine (4)**
37:12;48:9,12;86:19

**immediately (1)**
9:17

**implications (1)**
68:25

**implying (1)**
81:9

**important (5)**
7:17;35:16;37:12,17;
43:23

**include (4)**
9:21;20:23;23:5;
24:2

**inclusion (1)**
23:12

**inclusive (3)**
19:22;23:12,24

**independent (1)**
63:3

**indicate (4)**
43:4,15;64:22;92:11

**indicated (5)**
33:8;68:7,13;94:1,12

**indicates (3)**
87:12;93:2,8

**indicating (1)**
64:7

**indication (7)**
23:15,22;30:8;65:1,
6,18;68:15

**individual (15)**
12:8;30:4;36:18;
39:25;45:24;53:9,12,
13,14,19;54:22;60:22;
67:1;68:20;82:24

**individuals (19)**
15:18;16:12;17:16,
16,23;18:8,8;19:18;
27:5,12,13,24;44:2;
52:11,11;53:7;86:15;
92:11;93:19

**infinite (1)**
7:12

**Information (15)**
16:25;33:19;38:11,
13;51:11;62:5;69:7;
76:17,23;77:9,16;
78:14,18;79:15;84:15

**inpatient (3)**
77:19;78:17;79:18

**in-person (1)**
77:1

**inquiry (3)**
60:2;63:4,5

**insisted (1)**
57:1

**instance (1)**
79:20

**instead (1)**
82:2

**insurance (2)**
8:5;90:9

**intended (1)**
38:12

**intending (2)**
70:6,7

**intent (17)**
19:12;44:1,6,6,12,
19;45:2,12;51:10;
57:22,23,24;58:3,4;
65:22;67:11,12

**intention (10)**
15:25;16:5,5,11,12;
18:3,4;46:23,24;96:13

**intentionally (1)**
81:23

**interest (1)**
42:10

**interpret (1)**
18:24

**interpretation (9)**
12:17,19;15:5,13;
16:9;19:4,5;96:2,6

**interpretations (2)**
23:7;24:3

**interpreted (4)**
42:5;60:20;75:16;
78:15

**into (8)**
28:7;42:6;53:10;
71:21;76:17,23,24;
84:2

**intricacies (2)**
49:7;60:6

**investigation (1)**
63:3

**invoke (1)**
10:6

**involved (5)**
7:10;8:11;78:25

**involvement (2)**
7:19;41:25

**involving (1)**
66:3

**irrespective (1)**
65:2

**isolated (1)**
21:18

**issue (3)**
8:14,15;63:12

## J

**Jackson (1)**
89:4

**job (2)**
57:11;63:8

**joined (1)**
89:4

**judgment (1)**
8:19

**July (20)**
28:14,17;31:11;
32:11;33:1,6;35:10,25;
36:24;43:9;46:20;
50:22;51:10,22;58:16;
59:2,17,19;66:20;
69:12

**June (1)**
89:4

**jury (9)**
6:21;7:18;10:23;
11:17;12:6;46:10;
58:24;59:14;67:25

**jury's (1)**
63:8

**justice (5)**
8:16;9:7,11,19;21:1

## K

**Kalispell (3)**
55:10,21;90:12

**Kanne (1)**
62:5

**Kathleen (2)**
14:9;57:23

**kind (3)**
22:5;34:12;69:12

**kinds (1)**
24:14

**knew (8)**
34:6;44:17;75:9;
81:12,23;82:3;94:2,14

**knowing (2)**
45:2;67:1

**knowingly (1)**
81:11

**knowledge (8)**
38:14;55:11,16,19;
57:24;75:8,9;91:15

## L

**lack (1)**
22:11

**lady (1)**

9:6

**language (11)**
7:19;14:11,15,17,19;
15:2;16:6;18:4;22:15;
53:4;91:10

**large (2)**
54:14,17

**last (38)**
6:7;13:15;26:14;
31:11;32:10,15;33:2,8,
12,20,24;34:9,14,25;
35:5;37:23;38:12,24;
39:3,21;40:3,10,21;
41:4;43:9;46:3;48:16,
18;58:16;59:2,17,19;
66:2,20;68:3;69:14;
81:4;87:8

**lasted (1)**
32:18

**later (1)**
70:12

**law (17)**
11:7;42:1,4,6,7,9,9,
12;53:18,19;54:3,20,
21,22;55:4,4;89:25

**laws (2)**
7:10,15

**lawsuit (1)**
34:19

**leading (1)**
27:15

**learned (3)**
61:22;62:10;84:13

**least (2)**
53:18;91:24

**left (1)**
61:23

**left-hand (1)**
36:17

**legal (3)**
35:17;67:16;96:6

**legislation (3)**
42:1,5;57:25

**legislative (2)**
39:1,5

**Legislature (1)**
6:23

**Les (5)**
9:4,5,9,10,10

**letter (1)**
95:13

**Libby (76)**
7:20;8:12,13,13,16,
17,19,19,22;9:2,7,12,
15,20,24;10:1;11:2,12;
13:6;14:3,14;19:13,13,
15;21:1,13,17;22:2,6,8,
12,17,19;26:3;29:21;
44:2,9,10,14,18;45:8,
13;47:9;58:1;59:6;
71:23,24;72:21,22;
73:2,24;74:5;75:2,4;
78:3,3,5,11,12;83:6,9,

11;84:20,21;85:1;87:2;
89:11,23;90:4;91:1,6;
93:9,19,21;94:20;
95:14

**Libby/Troy (1)**
89:6

**Libby's (1)**
21:18

**life (4)**
6:23;48:5;68:10;
84:5

**lifetime (7)**
44:13,20;45:6;66:15;
67:8;82:4;94:19

**likewise (1)**
33:12

**limited (1)**
21:18

**line (12)**
28:22;29:12;36:9,14,
15;48:23;49:22;71:18,
20;79:12;80:17,20

**lines (2)**
37:3;79:10

**lists (1)**
11:20

**little (2)**
28:25;47:22

**living (1)**
9:8

**loaded (2)**
44:22,25

**location (1)**
21:19

**long (11)**
10:2;14:4;21:25;
22:6;31:21;32:22,23;
47:15,16;61:1;78:7

**longer (2)**
16:4;42:6

**look (24)**
10:17;11:25;14:7;
16:21;17:10;21:12;
23:20;26:21;35:19;
49:13,25;59:11;63:8,9,
10;64:9;71:13;79:7,10;
86:4,12;87:5;90:17;
95:7

**looked (5)**
9:13;72:25;75:15;
85:16;95:22

**looking (12)**
10:24;35:20;48:23;
49:22;52:3,4;53:6,7;
64:15;71:17,17;87:8

**looks (5)**
10:25;74:1;77:1;
90:15,16

**lot (9)**
7:21;8:4,13,20,21;
9:1;19:16;24:13;74:21

**lots (1)**
75:9

**love (1)**
40:19

**lower (1)**
88:24

**lung (1)**
22:1

**Lynch (1)**
62:6

**M**

**mailer (2)**
86:25;90:14

**mailing (13)**
86:17,23;87:7,13,14,
15;88:5,13,19;91:5,25;
92:10;93:8

**mailing's (1)**
92:23

**Main (4)**
5:6;8:2;20:3;92:21

**major (1)**
9:21

**makes (1)**
77:10

**making (3)**
9:7;45:1;84:10

**manual (2)**
56:6;77:7

**many (9)**
7:10,12,13;8:13,14;
9:15;10:12;45:18;82:8

**mark (3)**
86:4;87:18,24

**marked (4)**
36:18;52:4;86:8;
88:1

**material (3)**
32:4;92:25;93:2

**materials (4)**
32:8,25;33:24;34:2

**matter (2)**
37:16;82:12

**Max (19)**
5:2,24;6:9,12,13,14,
16;7:9;10:15;11:13;
13:7,11;17:5;18:14;
22:24;24:19;26:11;
28:5;30:10

**May (14)**
5:5;17:13;19:20;
20:14;27:20;30:13;
49:17;52:9,18,22;53:1;
64:22;65:12;67:11

**maybe (5)**
8:14;25:7;40:12;
41:5;67:12

**Mayo (6)**
70:17,19,19,21;76:5,
5

**MD (5)**
61:16;64:2,3,3,4

**mean (11)**

16:20;23:13;24:13;
26:3,6;28:14;42:8;
46:1;61:13;75:9;92:21

**meaningful (1)**
37:5

**meant (1)**
23:11

**meantime (1)**
90:2

**medical (15)**
18:17;21:13,17;49:3;
61:11;77:2;82:20,23;
89:2,9,20;90:2,22;92:3,
20

**Medicare (77)**
9:23;14:4;15:21;
16:15;17:17,24;18:9;
20:8;23:16;27:21,25;
29:20,23;43:6,11,22;
44:2,8,13,20;45:6,22;
47:8,9;48:5,14;52:13;
54:4;55:6,7,13,18;
56:2;57:3,10,17;58:1,5,
12;59:7;65:24;66:15,
25;67:9;68:10,17;70:3;
71:2;72:11;76:9,14;
78:1,21;79:24;80:25;
81:12;82:4,4;83:22;
84:5;85:3;89:18,21;
90:23,24;91:13,17,20;
92:12;93:1,3,10,20;
94:2,8,13,19

**members (3)**
11:8;21:1;41:18

**membership (2)**
83:22;84:6

**memory (3)**
28:25;29:14;34:16

**merely (1)**
65:13

**messaging (1)**
91:5

**met (1)**
9:1

**methodology (1)**
60:1

**Meyer (1)**
62:5

**middle (1)**
53:8

**might (5)**
74:10;78:22,23;
85:20;87:19

**million (2)**
8:5;90:5

**mind (9)**
43:8;45:14,15;66:12,
24;69:6;73:15;81:10;
85:12

**mine (2)**
8:23,24

**minutes (2)**
31:22,22

**miss (1)**
19:20

**missed (5)**
23:18,25,25;45:3,5

**Misstates (5)**
43:20;51:23;52:1;
62:2;69:3

**mistake (1)**
67:12

**money (1)**
26:25

**Montana (15)**
5:3,7;6:25;7:2,17;
9:12;14:3,14;26:7;
55:11,21;71:24;87:2;
89:23;91:1

**Montanans (1)**
88:25

**months (1)**
40:12

**more (26)**
12:10;13:2;24:14;
30:11;41:5,7;49:17;
51:7,8,15;53:14;60:14;
62:15,22,24;69:7;80:8,
9,11;81:8,16,16;82:11,
13,18;84:9

**Moreover (1)**
15:18

**morning (1)**
32:11

**most (8)**
6:22;7:17;70:23;
77:9,16;78:10,14;
79:15

**move (4)**
20:10,19;29:9;88:17

**moving (1)**
41:19

**much (2)**
7:24;25:25

**multiple (1)**
72:6

**multi-year (1)**
69:25

**must (8)**
35:10;37:8;38:20;
45:24;53:19;54:4,22;
57:17

**myself (3)**
9:17;58:13;82:15

**N**

**name (5)**
6:6,7,7;74:13,15

**named (1)**
9:4

**narrow (1)**
79:4

**narrower (1)**
50:8

**Nate (1)**

5:8
**national (1)**
9:25
**near (1)**
88:15
**necessarily (3)**
42:6;72:20;73:24
**need (6)**
26:7;60:21;62:22;
84:9;89:24;90:2
**needed (1)**
21:1
**needs (4)**
60:19,23;76:23;
92:18
**negative (3)**
63:22;70:1;72:5
**nevertheless (1)**
83:21
**new (4)**
50:13,14;86:25;89:2
**next (1)**
87:18
**NIOSH (3)**
61:16,21;62:7
**Nobody (1)**
75:10
**nondisclosure (3)**
26:18;27:15;96:6
**none (2)**
22:4;56:12
**non-related (1)**
67:7
**nonresponsive (1)**
26:4
**Nope (2)**
17:6;41:24
**nor (3)**
48:25;62:18;68:25
**note (3)**
64:15;75:19;92:11
**notes (2)**
87:13,15
**nothing's (1)**
28:9
**Notice (2)**
5:11;92:23
**Nowhere (1)**
92:10
**number (6)**
7:12,16;36:16;86:15;
92:15,24
**numbers (1)**
10:18

**O**

**oath (7)**
5:18;46:21;49:12,24;
62:17;81:5;83:16
**Obama (1)**
10:8
**object (1)**

17:2
**Objection (10)**
19:9;23:8;24:4;25:1,
18;26:4,18;27:15;28:3;
96:5
**objections (2)**
20:10,18
**obstructive (1)**
82:2
**occupation (1)**
6:16
**occur (1)**
31:19
**occurred (1)**
85:13
**off (6)**
8:24;30:21;46:12,15;
75:22;85:22
**offer (2)**
37:16;55:2
**offered (1)**
34:20;35:14
**office (9)**
43:3;55:10,20,24;
56:17;90:11;93:1,8,19
**often (2)**
70:9,10
**once (4)**
31:8;42:5;62:6;72:6
**one (22)**
8:2,20;9:3;12:10,15,
25;13:1;19:20;30:3;
32:1;53:14,21;57:14;
76:16;79:5,8;83:17;
85:12;87:4,19;88:10;
95:12
**One's (1)**
20:5
**only (8)**
23:13;36:19;38:12;
49:13,17,25;70:18;
79:6
**onto (1)**
29:16
**Ooh (1)**
16:4
**oops (1)**
87:19
**Operation (2)**
77:7;89:23
**operations (1)**
56:5
**OPERATOR (12)**
5:1,8,17;30:21;31:1;
46:12,17;75:22;76:1;
85:22;86:1;96:17
**opinion (1)**
19:10
**opinions (5)**
34:20;37:16;38:12,
24;82:12
**opportunity (1)**
34:1

**order (11)**
37:5,16;43:22;44:8;
45:22;54:3;57:2,16;
60:12,17;93:2
**Ori (1)**
5:7
**original (2)**
80:18,22
**others (1)**
65:3
**out (13)**
8:21;48:25;49:1;
55:14;60:24;61:7;
64:14;72:1;85:21;
86:25;88:14;91:6;
92:23
**outline (2)**
6:20;11:19
**outlines (3)**
11:10,11,21
**outside (18)**
23:6;40:15;62:7;
68:24;72:7,8,19,19,20;
73:1,23;74:3,4,8,19;
75:1,6,13
**over (4)**
8:14;11:23;68:19;
69:25
**over-read (1)**
61:17
**oversight (1)**
67:13
**Overview (1)**
16:24
**own (3)**
62:21;63:2;68:7

**P**

**page (39)**
10:16,21,21;11:16;
21:9,15;24:21;26:14,
15;28:19,20,21,21;
29:10,16;35:20;36:8,9,
13,14,16;37:1,2;48:22;
49:20,22;53:6,9;71:14,
17;79:7,10;80:17,20;
86:12;87:6,11;88:9;
90:18
**pages (2)**
11:24;36:18
**paid (1)**
84:6
**panel (1)**
62:7
**paragraph (14)**
14:7,21;15:9,17;
16:3;17:11;18:2;20:14;
21:13;52:5,7;53:13;
95:16,20
**paragraphs (1)**
21:14
**part (6)**

10:11;13:22;26:6;
36:11;39:8,9
**particular (2)**
9:3;83:17
**parts (3)**
10:12;11:3;24:15
**pass (1)**
11:7
**passage (7)**
7:15;14:24;17:12;
52:7;73:17;88:23;91:7
**passed (5)**
10:14;21:2;22:17;
25:12;42:5
**passing (6)**
7:11;15:25;25:22,25;
42:1,9
**past (2)**
44:23;81:18
**patient (67)**
20:1;23:21;44:8,17,
19;45:5,7;47:23,24,25;
48:8,9,12,13;54:4;
57:17;58:11;59:4,5;
60:19,23;64:9;65:7,23;
66:3,12,14,19;68:8,9,
13,16,16,20,20,22;
69:15,18,21,25;70:2,
14,17,18;71:1,22,23;
72:11;76:18;77:10,17,
21,22,25;78:19,20;
79:19,24;80:4,24;
81:11,13;82:1;83:17;
84:1;89:1;92:19
**patients (20)**
26:23;43:5,10;44:12;
57:1;66:24;67:1,2,6;
68:7;75:16;76:9;82:25;
83:16;84:15;91:12,21;
92:1;93:9;94:2
**patient's (2)**
70:25;72:1
**Pause (2)**
38:8;69:9
**people (39)**
8:11;9:2,7,12,15,19,
23;10:1;11:2;13:6,18;
14:2;19:15;20:25;
22:17;23:24;26:3,6;
27:10;29:20;47:8,10;
75:9;83:6,9,11;84:7,20,
21;85:2;87:10;89:3,10,
21;90:2;91:6;92:22;
94:14;95:13
**performs (1)**
77:1
**perhaps (2)**
41:10;75:5
**period (2)**
69:25;71:25
**permanent (1)**
89:18
**pernicious (2)**

22:5;24:14
**perpetrated (1)**
84:22
**person (14)**
12:24;19:13,20;
23:16;43:15,23;48:4,6,
7;50:4;70:8;89:15,17;
93:3
**personally (3)**
27:2;74:24,25
**personnel (2)**
55:24;56:17
**person's (2)**
12:10;45:19
**physician (19)**
12:18,21;19:4,7;
49:1;61:13;64:7;65:12;
74:19;75:5;76:15,16;
77:16,17,21;79:16,20;
81:12,23
**physicians (24)**
14:12;15:1,10,19;
16:7;13:17;13,17;18:6;
20:14;27:6;48:18;
49:12,23;52:9,12;
61:17;64:14;73:23;
74:3;75:2,7;76:4,5
**physicians' (1)**
27:20
**picked (2)**
23:19;24:17
**piece (1)**
21:24
**pilot (1)**
89:19
**plain (5)**
12:18;17:15;18:8;
19:5;52:11
**plaques (13)**
12:16;14:16;15:4,12,
20;16:9,14;17:15;18:7;
20:16;52:10;53:25;
96:3
**play (2)**
58:19;67:18
**played (5)**
46:9,20;58:23;59:13;
67:25
**playgrounds (1)**
8:21
**pleadings (1)**
34:10;37:24
**please (8)**
7:18;28:23;35:20;
36:12;37:3;61:2;67:19;
88:18
**pleased (2)**
88:21,22
**pleural (26)**
12:16,16;14:15,16;
15:4,4,12,12,19,20;
16:8,9,14,14;17:14,15;
18:6,7;20:15,16;52:9,

10;53:25,25;96:2,3

**pm (6)**
75:23;76:2;85:23;
86:2;96:18,21

**point (13)**
19:23;20:3;21:25;
23:4;24:7;34:5;42:14;
45:18;58:17;60:22;
79:3;92:22;94:25

**pointed (1)**
9:14

**points (1)**
63:15

**policies (1)**
56:1

**POMS (2)**
76:14;77:8

**portion (2)**
10:25;11:11

**posed (1)**
47:14

**positive (17)**
17:25;19:25;20:4,5,
7;23:14,22;30:8;43:14;
59:9;63:21;64:8,22;
65:1,18;96:14,14

**possibility (1)**
65:14

**possible (5)**
19:22;26:1,1;27:3;
60:24

**possibly (1)**
78:22

**potential (1)**
61:7

**practice (3)**
61:22;62:11;85:3

**precise (1)**
83:5

**precisely (1)**
49:20

**prefer (1)**
6:10

**prepared (1)**
13:17

**present (2)**
5:6,13

**presume (1)**
88:11

**Pretty (1)**
20:24

**prior (16)**
19:9;20:18;23:9;
24:4;25:1,18;31:16;
33:3,24;39:16;40:20;
54:6;57:14;70:20;
81:19;88:5

**probably (1)**
73:12

**problem (1)**
73:2

**problematic (4)**
67:4;72:10;81:15;

84:8

**problems (3)**
8:11;9:10;67:8

**procedure (2)**
13:23;25:13

**procedures (2)**
56:2;76:11

**proceedings (1)**
5:20

**process (2)**
51:21;89:11

**professionals (1)**
61:11

**program (9)**
56:5;58:5;77:7;
83:22;89:18,19;90:4,5,
7

**programs (1)**
90:10

**proper (5)**
66:14,17;77:25;
79:23;81:11

**proposition (1)**
54:5

**Protection (1)**
89:1

**provide (15)**
13:12,25;14:18;
22:22;29:20,23;47:7,9;
62:24;82:18,20,23;
88:24;89:19;90:7

**provided (3)**
38:24;73:16;85:15

**provider (11)**
48:11;76:15,16,23,
25;77:4,8;90:22;92:3,
6,20

**providers (1)**
55:15

**provides (2)**
89:14;95:18

**provision (11)**
7:20;9:22;10:1;11:2,
10;22:21;23:5;59:21;
73:9,10,11

**provisions (14)**
11:11,21;13:24;
39:13;42:19;45:13;
46:25;47:7;55:4;58:6,
9;76:14;80:23;86:25

**public (3)**
6:22;89:5,8

**published (1)**
42:2

**pulmonary (1)**
82:2

**pulmonologist (3)**
48:11;63:20;72:3

**pulmonologists (3)**
69:24;72:19;75:14

**purpose (9)**
14:2;19:14;25:22,24,
24;26:2;47:6;80:18,23

**purposes (4)**
8:2;12:13;24:1;71:9

**pursuant (2)**
5:10;25:12

**purview (1)**
42:7

**pushing (1)**
89:7

**put (11)**
7:25;9:25;13:23;
20:24,25;38:2;41:8;
49:11;58:6;73:9,11

**putting (2)**
11:9;62:22

**Q**

**quack (1)**
76:6

**qualified (17)**
12:18,21;14:14;15:2,
11;16:8;17:13;18:6;
19:4,6;20:2,14;27:6;
35:18;48:19;52:8;
63:20

**qualifies (3)**
12:25;18:1;30:9

**qualify (4)**
20:8;23:7;27:20;
92:24

**qualifying (1)**
19:3

**quality (1)**
88:24

**quibble (1)**
58:13

**quibbling (2)**
54:24,25

**quite (1)**
45:16

**quote (4)**
19:24;79:20;90:23;
91:1

**R**

**radiograph (5)**
12:20;15:6,13;16:10;
19:6

**radiographic (2)**
60:25;92:12

**radiologist (3)**
62:10;69:20;72:2

**radiologists (14)**
23:20;49:13,25;
50:11,15;61:16;69:23,
24;70:19;72:8,20;74:3;
75:13,14

**radiologist's (1)**
51:21

**read (43)**
11:3;13:3;14:8,18,
22;19:16;23:12;29:13;

36:11,12;37:3,4,20;
39:7;42:12;48:1;49:19;
50:6,7;52:15,18;53:2,
10,16;59:21;60:14;
62:11;64:8,22;65:5,17;
66:6;69:23;72:1,16;
77:18;78:15;80:6,12;
88:19;90:19,20;91:2

**read] (1)**
18:11

**reader (35)**
12:17;17:13,17;18:5;
19:4,25;20:6,6,7,14;
23:14;30:8;43:14;
45:21;48:1,11;52:8,12;
54:15;59:9;63:16;65:7,
17,18,22;68:14,24;
72:2;79:2,3;81:21,22,
25;96:1,3

**Readers (29)**
17:22,25;18:19,21,
24;19:8,24;23:6,6;
24:3;27:9;28:1;48:17;
49:13,24;51:20;52:18,
22;53:1;61:16,21,21;
62:5,7,10,17;63:9,10;
65:5

**Readers' (1)**
27:20

**Reader's (1)**
96:14

**reading (11)**
12:13;17:25;19:25;
20:6;50:12;61:24;
63:22;64:7,14;65:11;
72:3

**reads (3)**
15:10;61:23;62:18

**really (4)**
7:24;22:10;24:16;
73:2

**reason (8)**
20:25;32:14;49:14;
50:1;57:6;66:6,8;92:14

**reasons (2)**
11:9;24:13

**recall (15)**
8:6;28:13,16;32:19;
33:2,3,10,16;39:1;
40:10,16,21;48:20;
86:24;87:14

**recalled (1)**
33:7

**receive (4)**
8:16;44:2;54:4;
89:23

**received (2)**
93:24,25

**recent (1)**
70:23

**recently (2)**
56:21,22;57:16

**recess (3)**

30:24;75:25;85:25

**recognition (1)**
20:16

**recognize (2)**
16:23;22:25;24:23

**recognized (1)**
42:12

**recollection (5)**
51:24;59:23;80:13;
82:16;86:22

**Record (26)**
11:1,6;21:10;30:21;
31:1;38:25;39:5,7,8,9;
46:12,15,17;53:10;
59:2;73:6,15,23;75:12,
24;76:1;85:17,22;86:1;
87:25;93:16

**recording (1)**
39:10

**records (3)**
33:7;82:21,24

**REDIRECT (1)**
95:4

**reducing (1)**
21:19

**reference (1)**
76:15

**referenced (1)**
88:5

**referring (1)**
73:15

**refine (1)**
21:25

**reflect (3)**
46:21;59:17;68:3

**reflects (1)**
67:19

**reform (3)**
88:23;89:13,25

**refresh (3)**
28:25;29:13;86:21

**refreshed (3)**
51:24;80:12;82:16

**Related (12)**
14:13;15:1;19:13;
34:19,20;38:24;42:20;
45:13;67:8;82:21,24;
84:11

**relates (1)**
17:1

**Relator (1)**
5:14

**relevance (5)**
20:19;23:8;24:5;
76:21;77:14

**relevant (2)**
11:12;47:17

**remarks (2)**
73:22,25

**remember (8)**
9:8;33:18;41:17,22;
66:22;72:22;78:7;87:4

**rendered (1)**

82:11

**rendering (1)**
76:18

**repeatedly (1)**
84:3

**repeating (1)**
21:24

**report (4)**
65:12;91:12;92:1,13

**Reporter (4)**
5:7,17;6:8;36:1

**Reporting (1)**
5:9

**reports (2)**
64:17;65:5

**represent (5)**
5:12;6:18;38:17;
61:3;66:4

**represented (3)**
6:24;7:2,4

**representing (1)**
5:15

**required (4)**
49:7;60:8;61:11;
91:16

**requirement (1)**
36:10

**requires (3)**
60:14;61:5;89:16

**requisite (1)**
71:25

**residents (2)**
22:23;87:1

**respect (1)**
63:24

**response (1)**
46:4

**responses (1)**
22:3

**responsibility (1)**
42:14

**responsible (1)**
50:18

**result (1)**
20:8

**resulted (1)**
90:25

**returns (1)**
69:21

**review (6)**
17:15;18:7;28:22;
31:14;32:8;52:10

**reviewed (12)**
32:4,25;33:9;37:24,
25;39:4,14;51:3,6;
70:20;77:20;79:18

**reviewing (1)**
33:7

**rewarding (1)**
7:25

**rib (5)**
66:4,5,13,25;67:7

**ribs (1)**

66:23

**right (83)**
6:14;11:15,25;13:19;
16:22;17:8;21:11,11;
29:11,11,15,22;30:11,
18;31:12;32:16;33:11,
24;34:16,23;35:8,11,
14;36:23;37:7;38:17;
41:6;42:11;44:11;46:2,
7;49:10;51:5;52:25;
53:1,3,8;54:10,12;
55:12,12;57:20;59:25;
61:15;62:16;63:7,14,
23;65:4,11,20;66:18,
21;67:5,22;68:5;71:13;
73:3,10;74:23,25;
77:15;81:7,17,25,25;
82:5;84:1,11;85:18;
87:5;88:21;91:22;92:4,
5,8,16,25;95:9,12,22,
23;96:11

**right-hand (1)**
10:17

**Robyn (1)**
5:7

**role (1)**
51:21

**room (1)**
9:9

**ruling (2)**
60:24;61:7

**running (1)**
90:1

## S

**same (7)**
8:10;9:1;20:10,18;
27:11,12;71:22

**saw (2)**
34:5;81:25

**saying (6)**
43:17;45:3;47:19;
51:17;54:18;61:22

**scan (9)**
19:25;60:19;63:22;
69:20;70:23,23,25;
77:18;79:17

**scanned (4)**
70:15,16,18;75:15

**scans (7)**
23:21;69:23;70:20;
72:1;76:24,25;78:15

**scenario (1)**
81:18

**school (1)**
49:3

**screening (4)**
89:9,15;90:2;95:18

**screenings (1)**
89:2

**SDF (1)**
26:21

Sebelius (4)
10:9;14:9;16:6,12

**Sebelius' (2)**
14:25;57:23

**second (4)**
13:23;36:3;95:16,20

**secretary (12)**
10:9,9;12:21,23;
14:5,10,25;16:6,12;
18:4;19:7;22:21

**Section (12)**
12:1,3;14:18;39:5;
53:5,9;58:10;89:14;
95:17,21,22;96:1

**sections (1)**
11:22

**secured (1)**
90:7

**Security (28)**
15:22;16:16;17:18;
18:10;39:12,15,19,21;
41:23;42:19;43:3;
52:14;55:5,9,20;56:17,
21,25;57:10;76:11;
77:6;91:13,17;92:1,16;
94:8,12,13

**seeing (3)**
75:19;78:18;85:10

**seem (2)**
22:25;84:18

**seems (1)**
7:12

**sees (1)**
71:22

**self-employed (3)**
6:17,19;7:8

**Senate (3)**
7:3;11:9;39:9

**Senator (9)**
6:11;9:14;16:20;
31:7;64:13;76:3;81:10;
86:3;88:20

**Senators (1)**
44:7

**send (2)**
65:5,12

**sending (1)**
86:24

**sense (1)**
76:19

**sent (9)**
33:19,23;43:3;70:17;
71:25;88:14;91:6;
92:23;93:19

**sentence (1)**
95:17

**sentiment (2)**
23:2,3

**separate (1)**
71:21

**served (2)**
61:23;62:6

**service (1)**

6:22

**Services (8)**
14:11;22:12,23;
89:15,20;90:6,8;95:18

**set (3)**
25:13;42:1;89:12

**sets (1)**
89:1

**several (5)**
6:18,18;32:18;41:2;
87:9

**short (2)**
30:19;85:20

**shorten (1)**
61:2;85:21

**show (2)**
46:4;86:21

**showing (4)**
60:20,21;61:6;72:9

**shown (1)**
57:15

**shows (1)**
66:5

**sick (21)**
43:23;44:3,14,18;
45:7;47:10;59:6;66:16;
77:22;78:19;79:21;
81:13;83:10,12;84:3;
93:3,9,21;94:3,15,21

**sign (1)**
90:24

**signature (3)**
88:6;90:13;96:23

**signed (4)**
29:6;32:16;34:7;
55:14

**significant (1)**
68:25

**signing (1)**
26:22

**signs (6)**
64:8;66:13;69:19;
70:22,24;72:9

**simple (2)**
20:25;47:3

**simpler (1)**
78:8

**single (1)**
69:25

**site (2)**
22:19;89:6

**sitting (1)**
9:8

**situation (3)**
21:19;37:11;70:8

**Skramstad (2)**
9:4,9

**smoking (1)**
64:23

**Social (28)**
15:21;16:16;17:18;
18:10;39:12,15,19,21;
41:22;42:18;43:3;

52:13;55:5,9,20;56:16,
21,25;57:9;76:11;77:6;
91:12,16;92:1,16;94:8,
12,13

**Society (3)**
49:9;60:10;61:4

**solve (1)**
22:16

**somebody (2)**
63:20;94:18

**someone (3)**
23:19;35:14;72:3

**sorry (10)**
21:8;52:20;54:24;
70:15;71:16;73:10;
78:6;80:2,19;93:16

**so-so (1)**
22:3

**sound (3)**
34:4;35:11;41:5

**sounds (2)**
24:8;31:12

**source (1)**
90:18

**speak (4)**
31:15,23;74:19;75:6

**speaking (3)**
11:1;33:3;41:22

**speaks (1)**
35:12

**Special (1)**
90:4

**specialists (1)**
22:1

**specialized (1)**
89:20

**specific (1)**
50:9

**specifically (3)**
8:11;42:16;87:4

**specifics (2)**
40:16;60:5

**specifies (1)**
12:23

**spell (2)**
6:6,7

**spent (4)**
7:21;8:13;9:4;10:13

**spoke (3)**
31:17;32:15;39:8

**spoken (3)**
32:11;55:23;75:13

**square (3)**
76:12;77:3,11

**SSA (3)**
41:21;42:25;57:16

**staff (8)**
8:14;13:17;14:11;
29:4;41:18;74:20,21,
22

**stages (2)**
70:11,12

**standards (4)**

12:22;48:18;49:9;
60:11
**stands (1)**
85:1
**start (6)**
10:20;26:14;28:22;
35:22;88:18;91:14
**started (1)**
22:9
**starting (5)**
36:14;70:15,16;
71:20;80:17
**starts (2)**
10:20,21;21:13
**State (3)**
6:23;14:21;19:2
**stated (3)**
22:24;58:9;83:18
**statement (2)**
11:6;38:1
**statements (1)**
75:12
**States (5)**
5:2;7:4,24;44:7;84:7
**statute (27)**
12:9,13;13:4,5;
23:12,24;24:2;25:10,
12,16,20,20,22,25;
26:9;42:2;51:6;54:13;
65:16,18;70:6,7;78:25;
79:4;80:12,13;92:22
**statutes (1)**
82:16
**statutory (1)**
46:25
**still (12)**
15:7,15,23;16:18;
17:20;18:12;29:3,18;
46:5;65:24;68:16;
83:21
**straight (1)**
9:13
**Street (1)**
5:6
**strike (2)**
20:10,19
**stuff (2)**
22:8,8
**stunning (1)**
8:23
**sub (1)**
12:4
**subject (5)**
48:8;82:25;86:17,22;
87:7
**submission (1)**
24:24
**submit (5)**
43:4;66:14;81:11;
91:16,20
**submits (2)**
45:5;85:2
**submitted (17)**

43:11;44:13,20;
55:19;59:7;65:24;
66:25;67:6;68:17;70:2;
71:1;72:11;77:25;
78:21;79:24;82:3;84:5
**submitting (3)**
27:24;68:9;94:1
**subparagraph (6)**
12:11,12,14,15;13:2;
53:15
**subpoena (1)**
5:1
**subsequent (1)**
70:12
**suffered (1)**
66:12
**suffering (1)**
44:10
**sufficient (9)**
8:20;20:1,8;23:23;
45:21;65:3,19;96:9,15
**sufficiently (1)**
23:24
**summarize (1)**
12:24
**summer (1)**
69:14
**summer's (1)**
46:3
**Superfund (3)**
8:21;22:19;89:6
**support (2)**
73:6;91:20
**supported (1)**
73:9
**suppose (1)**
67:21
**supposed (1)**
80:9
**Sure (24)**
6:9;9:7;10:1;14:2;
19:12,19;23:10,17,23;
30:15,18,20;34:8;36:6;
42:9;44:1,7;46:6;
47:15;48:8;56:14;
67:14;78:9;79:10
**surrounding (1)**
75:2
**sworn (5)**
5:25;42:24;59:17;
60:17;68:3
**system (6)**
7:25;56:6;84:22;
89:2,12;90:1
**Systems (1)**
77:7

**T**

**Tab (24)**
10:16;11:13;13:8;
16:21;18:15;21:7,8;
24:20;26:12;28:6;

35:19;36:21,21;52:3;
71:15,16,16;73:18,20;
86:5;87:18,18,20,20
**talk (2)**
42:16;66:22
**talked (6)**
34:22;66:3;69:11,14;
72:18,19
**talking (11)**
9:9;22:1;23:20;
36:10;40:11;78:2,3,4,
11,12;84:13
**Tanis (2)**
86:14;87:9
**task (1)**
42:13
**technically (3)**
20:7;79:2;96:8
**telephone (2)**
92:15,24
**telling (1)**
57:16
**tells (1)**
78:18
**term (1)**
79:2
**terminated (1)**
62:12
**terms (37)**
7:1;34:18;37:22;
38:5,10,23;39:11,18,
24;41:16,20,25;42:4,
11;52:2;53:18;55:3;
57:9;59:25;60:5,10;
66:18;74:2,7,23,25;
76:4,8,22;82:10;83:3;
84:11;91:4,9;92:5;
93:23;94:7
**testified (6)**
6:1;33:13;34:15;
47:5;60:12;62:17
**testify (2)**
20:13;35:4
**testifying (1)**
38:22
**testimony (48)**
5:21;15:7,15,23;
16:18;17:20,22;18:12;
21:9;24:9;27:18;29:3,
18;33:4;34:15;37:6,25;
38:23;42:24;43:9,18,
20;46:21;50:10,22;
51:13,23;52:1;58:17;
59:2,17,20,20;60:17;
63:11;65:21;67:20;
68:3;69:3;72:23;73:1,
5,13,16;75:3;83:15,23;
94:17
**Texas (5)**
74:11,12,13,14,18
**theoretically (1)**
28:8
**thickening (13)**

35:19;36:21,21;52:3;
12:16;14:16;15:4,12,
20;16:9,14;17:14;18:7;
20:15;52:10;53:25;
96:2
**thinking (1)**
83:18
**third (1)**
95:16
**Thoracic (7)**
49:8;60:10;61:4;
62:10;69:24;72:2;
75:14
**though (3)**
20:6;27:11;70:9
**thought (2)**
8:18;9:17
**three (3)**
10:5,13;46:19
**Thus (2)**
15:10;21:19
**Tim (2)**
5:15;32:1
**times (5)**
8:14,15;10:5;45:18;
72:6
**titled (1)**
88:13
**Today (19)**
5:5;6:11;22:15,20;
31:8,15,16;38:3;39:16;
43:9,17;50:21;51:17;
65:22;69:13;84:14;
85:17;94:17,24
**today's (1)**
31:24
**Todd (1)**
57:23
**together (6)**
8:1;32:4;34:9;35:9;
39:3;48:19
**told (7)**
33:2;49:16;56:25;
68:20;83:19;84:3;
93:19
**toll (1)**
90:11
**tomographic (5)**
12:19;15:5,13;16:10;
19:6
**took (2)**
9:19;22:6
**Top (2)**
36:17;87:11
**tough (1)**
44:21
**town (1)**
8:22
**train (1)**
87:9
**transcript (1)**
36:24
**treatment (2)**
21:20;89:17

**treats (1)**
57:10
**Trejo (1)**
5:8
**tremolite (1)**
22:2
**trial (2)**
35:15;51:12
**tried (1)**
10:5
**triggers (1)**
89:9
**true (5)**
21:22;29:7,8;62:16;
71:8;84:16;88:12
**trust (4)**
61:13,15;91:22;
93:12
**try (2)**
7:25;86:21
**trying (2)**
36:16;84:19
**turn (3)**
11:16;48:22;87:17
**turned (1)**
64:14
**two (7)**
6:25;7:1;8:2;10:5,
13;56:22;63:15
**types (1)**
76:22

**U**

**Ultimately (1)**
70:17
**unaware (6)**
62:1,3;68:11,18;
69:4;84:24
**under (26)**
14:4,14,18;15:2,11,
21;16:15;17:18;18:9;
23:16;27:6;45:23;
46:21;49:8,12,24;
52:13;53:7;54:13;61:3;
62:17;81:4;83:16,22;
96:1,4
**understood (4)**
42:13;64:13;70:13;
85:6
**undisputed (2)**
27:1;38:1
**United (5)**
5:2;7:4,23;44:7;84:7
**Unless (1)**
59:9;94:20
**up (13)**
23:19;24:17;25:13;
40:23,24;61:2;66:5;
85:12,21;89:1,12;90:1,
24
**upheld (1)**
42:10

**upon (2)**
30:2;49:18
**use (1)**
22:21
**used (5)**
45:16,17;79:3;81:19;
89:12

**V**

**vaguely (1)**
66:22
**valid (1)**
60:18
**variations (1)**
19:18
**varied (1)**
19:17
**various (4)**
11:20,21,21;20:4
**vermiculite (1)**
8:25
**versus (1)**
5:4
**VIDEO (14)**
5:1,8,17;30:21;31:1;
46:12,17,19;67:18;
75:22;76:1;85:22;86:1;
96:17
**video-recorded (1)**
5:1
**virtually (1)**
22:4
**visited (3)**
8:13;35:9;41:3

**W**

**waived (1)**
96:23
**watch (1)**
9:18
**watching (1)**
9:16
**way (17)**
13:6;23:12;43:19,22;
49:12;55:3;58:15;
67:18;70:24;76:8;78:7;
79:9;82:7;85:2,12;
91:11;93:13
**ways (1)**
20:4
**website (1)**
88:8
**weeks (1)**
56:22
**weren't (1)**
35:6
**Western (1)**
6:24
**what's (5)**
48:3;49:7;52:3;60:7;
64:18

**Where's (1)**
21:5
**WHEREUPON (9)**
5:20;30:24;46:9;
58:23;59:13;67:24;
75:25;85:25;96:20
**Whitehouse (5)**
74:8,9,12,16;75:4
**Whitman's (1)**
57:24
**whole (2)**
11:22;24:6
**who's (7)**
63:20;64:3,4;78:15,
17;79:17,18
**wicked (1)**
22:8
**wit (1)**
5:21
**within (3)**
42:6;76:10;79:14
**without (8)**
26:24;58:12;62:15;
80:24;81:1;85:9;93:20;
94:18
**witness (32)**
5:6,25;19:12;20:21;
23:10;24:6;25:20;
27:17;28:4;30:12,15,
18,20;35:2,15;37:8,13,
17;40:13;51:1,2,24;
62:3;65:16;69:4;71:4;
73:21;75:21;80:9;
82:12;95:1;96:8
**witnesses (2)**
34:23;35:10
**word (4)**
15:3;24:2;58:14;
81:19
**words (2)**
45:16,17
**work (4)**
6:20;74:17;77:12;
84:19
**worked (4)**
14:9;22:14;40:1;
74:16
**working (3)**
7:22;13:17;90:1
**worsened (1)**
22:13
**WR (1)**
89:22
**writing (4)**
33:9;38:11;88:21,22
**written (8)**
13:5;33:7,18,23;
34:2,9,11;84:14
**wrote (4)**
89:13;95:17,21;
96:10
**wwwbaucussenategov (1)**
88:9

**X**

**x-ray (9)**
12:18;19:5;20:1;
60:19;61:6;63:22;
69:19;77:18;79:17
**x-rays (9)**
17:16;18:8,24;19:17;
52:11;69:23;72:1,5;
76:25

**Y**

**year (11)**
13:15;31:11;40:12;
66:21;69:22,22,22;
72:6,7;73:16;81:4
**years (10)**
6:24;7:23;10:13;
22:18;39:22,23;40:3;
41:2,5;70:12
**Yep (14)**
15:8;17:21;18:13;
37:21;38:4;43:25;
52:16;53:17;54:2;64:2;
72:13;86:13,17,18
**Yesterday (1)**
31:20

**0**

**09 (2)**
73:21;90:7

**1**

**1 (2)**
46:9;90:21
**10 (14)**
17:11,12;18:15;
20:14;28:20;36:9,14;
37:3;39:21,23;40:3;
41:5;52:5,7
**10:09 (1)**
5:5
**10:46 (1)**
30:22
**10:56 (1)**
31:2
**100 (1)**
68:19
**108 (2)**
13:8;52:4
**11 (3)**
18:2;67:18,24
**11:17 (1)**
46:13
**11:18 (1)**
46:18
**112 (2)**
10:16;21:4
**12:00 (1)**

**75:23**
**12:02 (1)**
76:2
**12:14 (1)**
85:23
**12:28 (1)**
86:2
**12:42 (2)**
96:18,21
**13 (1)**
29:12
**137 (1)**
26:12
**14 (1)**
49:22
**15-minute (3)**
32:7;33:13,15
**160 (4)**
86:4,8,12;87:6
**161 (5)**
87:24;88:1;90:18;
95:7,11
**17 (2)**
7:6;52:3
**1881 (1)**
58:10
**1881A (6)**
12:1,2;14:18;53:5;
95:24;96:1
**1-888-482-3128 (1)**
90:23
**19 (1)**
36:21
**19-40-M-DLC (1)**
5:3
**1978 (1)**
7:3
**19th (3)**
35:25;36:24;46:20

**2**

**2 (4)**
48:23;53:6;86:12;
90:22
**20 (7)**
29:10,11;31:22;33:1;
35:19;36:21;71:16
**2000 (1)**
73:18
**2001 (1)**
89:8
**2002 (1)**
13:14
**2009 (6)**
40:25;73:25;75:2,11,
12;89:4
**2010 (3)**
40:25;73:18;86:24
**2013 (4)**
7:5;41:8,13;70:15
**2014 (1)**
7:3

**2015 (1)**
70:16
**2016 (1)**
70:16
**2017 (1)**
70:17
**2022 (12)**
13:14;28:14,17;
31:11;33:1,6;35:25;
36:24;46:20;51:10;
58:16;69:12
**2023 (1)**
5:5
**21 (2)**
28:22;29:16
**22 (3)**
51:22;80:17,20
**224 (1)**
5:6
**24 (3)**
36:15;37:3;86:5
**25 (2)**
87:18,20
**25th (1)**
5:5
**292 (1)**
26:21

**3**

**3 (4)**
10:16;21:8;26:15;
73:20
**30 (1)**
22:18
**301 (1)**
16:21
**305 (1)**
11:14
**332-6106 (1)**
90:12
**348 (2)**
28:6,11
**35 (2)**
36:19,19
**36 (6)**
35:20;36:9,13,14;
37:1,2

**4**

**4 (3)**
14:7;24:21;26:12
**40 (1)**
8:5
**406 (1)**
90:12

**5**

**5 (1)**
24:20
**58 (4)**

79:10,11;80:17,20
**59 (3)**
  48:22;49:20,22

**6**

**6 (5)**
  10:21;14:21;16:21;
58:21,23
**62 (2)**
  71:14,17

**7**

**7 (5)**
  11:13;15:9,10;71:18,
20
**70s (1)**
  6:24
**74 (1)**
  7:1
**756-1150 (1)**
  90:12
**76 (1)**
  24:20
**78 (2)**
  7:1,3

**8**

**8 (7)**
  15:17,18;28:6;59:11,
13;79:10,12
**800 (2)**
  11:23;90:12
**81A (1)**
  12:3

**9**

**9 (8)**
  10:16;16:3;21:9,15;
28:19,20,21,21
**97 (1)**
  26:21