IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BNSF, | CV 19–40–M–DLC |
| Relator, | |
| v. | FINAL JURY INSTRUCTIONS |
| CARD, | |
| Defendant. | |

DATED this 28th day of June, 2023.

Dana L. Christensen, District Judge
United States District Court

- 1 -



## INSTRUCTION NO. F-1

Members of the jury: Now that you have heard all of the evidence and the arguments of the attorneys, it is my duty to instruct you on the law that applies to this case.

Each of you has received a copy of these instructions that you may take with you to the jury room to consult during your deliberations.

It is your duty to find the facts from all the evidence in the case. To those facts you will apply the law as I give it to you. You must follow the law as I give it to you whether you agree with it or not. And you must not be influenced by any personal likes or dislikes, opinions, prejudices or sympathy. That means that you must decide the case solely on the evidence before you. You will recall that you took an oath to do so.

Please do not read into these instructions, or anything that I may say or do or have said or done, that I have an opinion regarding the evidence or what your verdict should be.



## INSTRUCTION NO. F-2

The evidence you are to consider in deciding what the facts are consists of:

1.    the sworn testimony of any witness;

2.    the exhibits which are to be received into evidence;

3.    any facts to which the lawyers have agreed; and

4.    any facts that I have instructed you to accept as proved.



**INSTRUCTION NO. F-3**

The parties have agreed to certain facts which you should treat as having been proved:

1.    CARD is a Montana non-profit corporation. Its registered agent for service of process is Tracy McNew, 214 East 3rd Street, Libby, Montana 59923.

2.    Defendant, CARD, was born, and evolved, in response to raised awareness of asbestos exposure in the Libby, Montana area that surfaced in 1999. In 2000, CARD was established as a department of St. John's Lutheran Hospital to provide screening, diagnosis, treatment and monitoring for those exposed to Libby amphibole asbestos. In April 2003, CARD separated from St. John's Lutheran Hospital and became a stand-alone organization.

3.    Since its inception, CARD and its medical providers have screened thousands of patients for the presence of Asbestos Related Disease ("ARD").

4.    CARD states in its Patient Education literature that it, "provides a comprehensive asbestos health screening that is important for all people with a history of asbestos exposure in Lincoln, County."

5.    CARD further states that it provides: "Specialty Libby Amphibole Pulmonary Health Care: Disease management and treatment services are available at the CARD Clinic in Libby, Montana. This specialty care is valuable for the approximately 7,000 patients followed by CARD and the new patients who present

- 4 -



daily for screening assessment and information regarding the possible effects of their asbestos exposure."

6.      CARD is primarily funded by the receipt of federal grant monies administered by the Agency for Toxic Substances Disease Registry ("ATSDR") which is part of the Centers for Disease Control ("CDC").

7.      Since 2011, CARD's primary screening grant awards have totaled approximately $2.4M annually: "PPHF-14-Libby Montana's Public Health Emergency: Asbestos Health Screening" (Grant #U61TS000179 from 2011-2015; Grant #NU61TS000251 from 2016-2018 and Grant # NU61TS000295 in 2019).

8.      From 2011 until the present, CARD has been awarded over $20M dollars in federal funds through the primary screening grant alone.

9.      The first four-year grant period ran from July 1, 2011, to June 2015.

10.     The federal government extended the grant by another four years on August 21, 2015.

11.     The term of this extension ran from September 1, 2015, to August 31, 2019 at a rate of between $2.3M and $2,499,995 per year.

12.     The federal government extended CARD's grant by another five years on July 19, 2019.



13.   These grant funds pay for CARD staff salaries, education and outreach related to Asbestos Related Disease ("ARD") and for screening services and radiographic studies such as chest x-rays and Computed Tomography (CT scans).

14.   As a condition of these grant monies, CARD has reporting requirements related to the scope of CARD's screening program and the expenditure of grant funds as set forth by federal law. *See* C.F.R. 74 et seq. (2011).

15.   The Medicare Pilot Program for Asbestos Related Disease ("Pilot Program") provides comprehensive care for individuals diagnosed with a qualified asbestos related condition, including services not normally covered under Medicare, for residents in Lincoln, Flathead, Glacier, Lake, Mineral, Missoula, and Sanders counties in Montana or Ferry, Lincoln, Pend d'Orielle, Spokane, Stevens, and Whitman counties in Washington, or Benewah, Bonner, Boundary, Clearwater, Kootenai, Latah, and Shoshone counties in Idaho.

16.   Subsequent to its creation in 2011, individuals enrolled in the Pilot Program were entitled to Medicare coverage benefits for complete healthcare, not just asbestos related healthcare.

17.   These Medicare coverage provisions appear in a special section of the affordable Care Act specifically focused on the diagnosis of asbestos related disease. This provision is titled "Medicare coverage for individuals exposed to environmental health hazards." 111 Pub. L. No. 111-148, § 10323, 124 Stat. 119, 954 (2010) [42



U.S.C. § 139rr-l]; amending Title XVIII of the Social Security Act (42 U.S.C. § 1395 et seq.) by inserting 42 U.S.C. § 1881A.

18.   A qualifying condition for Medicare coverage and Pilot Program benefits is that CARD patients must be diagnosed with one of the qualifying conditions on the Environmental Health Hazards Checklist.

19.   Three of the primary qualifying impairments are "Asbestosis, pleural thickening, or pleural plaques" 42 U.S.C. § 1881A(e)(2)(B)(i).

20.   "Asbestosis" and "Pleural thickening/Pleural plaques" share an EHH Checklist Diagnosis Code of "5010".

21.   The "Environmental Health Hazards Checklist" Form ("EHH") is signed and dated by a physician and submitted by CARD to the federal government to allow CARD patients to get an EHH designation on their Medicare coverage.

22.   The EHH Checklist quotes parts of 42 USC § 1881A(e)(2)(B)(i)(I), (II).

23.   CARD stated in its Answer that CARD's diagnoses of ARD have been based on American Thoracic Society (ATS 2004 criteria).

24.   In order to satisfy ATS 2004 criteria, a diagnosis of ARD must include:

(a)   Evidence of structural pathology consistent with asbestos related disease as observed by imaging (chest x-ray or CT scan) or histology (microscopic examination);

- 7 -



(b)    Evidence of causation by asbestos as documented by the occupation and environmental history, markers of exposure (usually pleural plaques), recovery of asbestos bodies or other means;

(c)    Exclusion of alternative plausible causes for the findings.

25.    Dr. Black has been with CARD since the clinic's inception.

26.    Dr. Black is a pediatrician by specialty.

27.    Dr. Black is not a board-certified pulmonologist.

28.    Dr. Black is not a board-certified radiologist.

29.    Dr. Black is not a Certified B Reader.

30.    CARD does not currently employ a board-certified pulmonologist, a board-certified radiologist, or a NIOSH certified B Reader.

31.    No medical care providers at CARD are certified, licensed or formally trained as radiologists or formally trained or credentialed in diagnostic radiographic interpretation.

32.    No staff or employees at CARD are certified or formally trained radiology technicians.

33.    Furthermore, CARD's facility has no x-ray or CT scanning equipment on site.

34.    Dr. Black and other medical providers at CARD have diagnosed lamellar pleural thickening as an asbestos-related disease.



35.  Dr. Black claims that signs of asbestos related disease caused by the Libby amphibole are nonspecific and difficult to detect.

36.  Dr. Black has stated that he can perceive signs of asbestos related disease on CT scan caused by the Libby amphibole, and Dr. Black has stated, "what the mind does not know, the eye does not see."

37.  Lamellar pleural thickening is a basis for CARD's certification on EHH Checklists forms that patients have an asbestos related disease.

38.  CARD's contract with ATSDR requires radiologists to review x-rays and CT scans.

39.  One provision of the grant award language states that *all radiologic exams will be sent for outside reads to a panel of expert B-readers and radiologists that will be established by CARD and ATSDR.*

40.  Lincoln County received a grant in 2009 for asbestos screening.

41.  Radiology technicians take x-rays and CT scans of CARD patients.

42.  Images ordered by CARD at Cabinet Peaks are read by a local radiologist.

43.  CARD's ATSDR grant requires an outside read radiologist panel, which is composed of five radiologists who are NIOSH-certified B readers, and three of whom are thoracic radiologists.



44.    CARD physicians often diagnose patients with ARD before the patient's CT scan is interpreted by qualified outside radiologists.

45.    It is well-known to CARD and its staff that CARD often diagnoses patients without an outside radiologist's CT interpretation.

46.    Internal data generated by clinic staff as part of the federal grant requirement shows that CARD is aware of the results of every outside CT and chest x-ray interpretation received by CARD.

47.    CARD is aware of the differences between the readings of CT scans by Dr. Black and outside radiologists.

48.    CARD has diagnosed patients with ARD whose CT scans were not found to have abnormalities by thoracic radiologists on the B reader panel.

49.    The fact that an "abnormality" exists does not mean that the outside CT reader has diagnosed the patient with ARD. This merely signifies that the patient's CT showed signs that might be "consistent with" ARD.

50.    Abnormalities could be consistent with rib fractures, prior thoracic surgery, radiation therapy, or the use of certain medications, or autoimmune disease.

51.    As part of its federal grant requirements, CARD submits CT scans to the aforementioned "Peer Review" panel of radiologists.



52.   Since 2010, CARD has submitted over two-hundred CT scans to its peer review panel that Dr. Black has read as positive for signs of asbestos related disease.

53.   The peer review panel selected by ATSDR to review CT scans often disagrees with Dr. Black's diagnoses.

54.   CARD submitted all of its patients diagnosed with ARD for Medicare coverage if the patient so desired.

55.   Federal grant awards to organizations and individuals are predicated on true and accurate grant applications and other statements to the federal government.

56.   Receipt of grant awards also involves certain continuing conditions, responsibilities and obligations: "These responsibilities include accountability for the appropriate use of funds awarded and the performance of the grant supported project or activities as specified in the approved application." *See* U.S. Dept. of Health and Human Services, *HHS Grants Policy Statement* (January 1, 2007); *https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf*

57.   One of the conditions involved in obtaining federal grant funds is to share true, accurate and complete information with the granting agency. Penalties, including revocation of the grant, can be imposed if information contained in or submitted as a part of a grant application or other required reports is found to be

- 11 -



false, fictitious or fraudulent. *Id.* at p. I-7 et seq.; *See* 45 C.F.R. pt. 74 (2011); *See also* 45 C.F.R. § 79.3 (2011).

58.     Another condition for keeping and renewing these government grants, is that CARD must certify that all federal monies used are consistent with the original grant purpose. 45 C.F.R. § 74.20 et seq. (2011).

59.     CARD has an annual audit and prepares an Annual Progress Report, a Final Progress Report, and a Federal Financial Report.

60.     These reports are uploaded by CARD to the grants management system, and expenses are reimbursed by grant funds.

61.     These same federal provisions also require that grant recipients must take steps to avoid fraud, waste or abuse of government funds and must report any knowledge of fraud, waste or abuse to the government. *Id.*; 45 C.F.R. § 74.51 et seq. (2011); 45 C.F.R. pt. 74, app. E (2011).

62.     CARD requests reimbursements through the grants management system, called GrantSolutions.

63.     By accepting the award, and drawing from funds, the recipient (CARD) acknowledges acceptance of the terms and conditions of the award and is obligated to perform in accordance with the requirements of the award.

•



64.   The federal government has awarded CARD grant money totaling approximately $500,000 annually to pay outside readers to interpret CT scans and x-rays.

65.   CARD diagnoses patients before outside CT scan reports are received by CARD.

66.   "Outside" CT interpretations do not arrive at CARD until months after patients have already been diagnosed.

67.   CARD does not consider B-reader chest x-ray or reports for any asbestos-related diagnostic purposes.

68.   Pursuant to rules governing federal grants (referenced herein) CARD itself has an obligation to prevent and report fraud, waste and abuse related to its own use of any federal grant funds. 45 C.F.R. pt. 74 et seq. (2011).

69.   CARD has also received "sub award" grant funding from the Mount Sinai School of Medicine in New York.

70.   This sub award grant exceeded $300,000 in 2013 (Prime Award No. 5 R01 TS000099-04); (Sub Award No. 0254-5674-4609).

71.   Like other federal grant awards CARD receives, by drawing down or otherwise obtaining funds from the grant payments system, the recipient acknowledges acceptance of the terms and conditions of the award and is obligated



to perform in accordance with the requirements of the award. 45 C.F.R. pt. 74 et seq. (2011).

72.     By drawing funds, the federal grant Awardee certifies that proper financial management controls and accounting systems to include personnel policies and procedures have been established to adequately administer Federal awards and funds drawn down are being used in accordance with federal cost principles, regulations and the President's Budget and Congressional Intent.

73.     As part of the Subaward Agreement, CARD stated that there were no conflicts of interest or "Significant Financial Interests" that prevented the receipt of federal grant monies from the Prime Award.

74.     CARD clinicians have a long-standing personal and professional relationships with Mount Sinai clinicians.

75.     Both CARD and Mount Sinai study and treat ARD.

76.     Dr. Black serves as an adjunct professor at Mount Sinai School of Medicine.

77.     Dr. Black and Mount Sinai doctors have co-authored studies on asbestos related issues in the past.

78.     The program director and principal investigator of the Mount Sinai Prime Award was a B Reader funded by CARD's grants.

- 14 -



79.     According to Mount Sinai grant sub award documents, Dr. Black and other CARD staff members were paid a total of $137,112 in salary from Mt. Sinai sub award funds.

80.     The sub award also awarded CARD $106,808 for "Patient Care Costs."

81.     That sub-award issued CARD $5,500 for "CT scans only at CARD." (Sub Award No. 0254-5674-4609).

82.     CARD has not ever had a CT scanner at its facility.

83.     By accepting the Mount Sinai funds, CARD certified that it had no conflicts of interest and that the funds would be used in accordance with federal rules and regulations governing federal grants.

84.     When CARD diagnoses patients with ARD, the diagnosis is notated on the Environmental Health Hazards Checklist and this qualifies patients for Medicare coverage.

85.     CARD's patients who are enrolled in Medicare have their medical treatments covered by Medicare.

86.     When CARD diagnoses patients with asbestosis or pleural thickening pleural plaques, the diagnosis is notated on the Environmental Health Hazards Checklist, and this may help qualify patients for Social Security Disability benefits.

- 15 -



87.     When CARD diagnoses patients with asbestosis or pleural thickening pleural plaques, the diagnosis is notated on the Environmental Health Hazards Checklist and CARD provides patients with Form SSA-827.

88.     CARD has a case manager whose responsibilities include assisting CARD patients with Pilot Program benefits.

89.     When CARD diagnoses patients with asbestosis or pleural thickening pleural plaques, the diagnosis is notated on the Environmental Health hazards Checklist, and CARD provides patients with Pilot Program forms.

90.     CARD physicians have prescribed narcotic and opioid pain medications.

91.     These prescription pain medications include scheduled opioid drugs and narcotic painkillers including Oxycodone, Hydrocodone, OxyContin, Vicodin, Lortab, Percocet, Tramadol, Codeine, Morphine, Fentanyl and other controlled substances.

92.     CARD has patients on disability status due to ARD who receive opioid pain medication.



## INSTRUCTION NO. F-4

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.



## INSTRUCTION NO. F-5

The following things are not evidence, and you must not consider them as

evidence in deciding the facts of this case:

1.    statements and arguments of the attorneys;

2.    questions and objections of the attorneys;

3.    testimony that I have instructed you to disregard; and

4.    anything you may seen or heard when the court was not in session
      even if what you saw or heard was done or said by one of the parties
      or by one of the witnesses.



## INSTRUCTION NO. F-6

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe.  You may believe everything a witness says, or part of it, or none of it.

In considering the testimony of any witness, you may take into account:

(1)   the opportunity and ability of the witness to see or hear or know the things testified to;

(2)   the witness's memory;

(3)   the witness's manner while testifying;

(4)   the witness's interest in the outcome of the case, if any;

(5)   the witness's bias or prejudice, if any;

(6)   whether other evidence contradicted the witness's testimony;

(7)   the reasonableness of the witness's testimony in light of all the evidence; and

(8)   any other factors that bear on believability.

Sometimes a witness may say something that is not consistent with something else he or she said. Sometimes different witnesses will give different versions of what happened.  People often forget things or make mistakes in what they remember.  Also, two people may see the same event but remember it differently.  You may consider these differences, but do not decide that testimony is untrue just because it differs from other testimony.



However, if you decide that a witness has deliberately testified untruthfully about something important, you may choose not to believe anything that witness said.  On the other hand, if you think the witness testified untruthfully about some things but told the truth about others, you may accept the part you think is true and ignore the rest.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify.  What is important is how believable the witnesses were, and how much weight you think their testimony deserves.



**INSTRUCTION NO. F-7**

You have heard testimony from multiple individuals who testified about their opinions and the reasons for those opinions. This opinion testimony is allowed, because of the specialized knowledge, skill, experience, training, or education of those witnesses.

Such opinion testimony should be judged like any other testimony. You may accept it or reject it and give it as much weight as you think it deserves, considering the witness's specialized knowledge, skill, experience, training, or education, the reasons given for the opinion, and all the other evidence in the case.



## INSTRUCTION NO. F-8

Certain charts and summaries have been admitted into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the testimony or other admitted evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.



## INSTRUCTION NO. F-9

I remind you that when a party has the burden of proving any claim by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.



## INSTRUCTION NO. F-10

Defendant CARD is a non-profit corporation organized under the laws of Montana.  Under the law, a corporation is considered to be a person.  It can only act through its employees, agents, directors, or officers.  Therefore, a corporation is responsible for the acts of its employees, agents, directors, and officers performed within the scope of authority.



## INSTRUCTION NO. F-11

All parties are equal before the law and a corporation is entitled to the same fair and conscientious consideration as any party.



## INSTRUCTION NO. F-12

CARD's employees, officers, and directors are agents of CARD, and,

therefore, any act or omission of CARD's employees, officers, and directors were

the acts or omissions of CARD.

- 26 -



**INSTRUCTION NO. F-13**

31 U.S.C. § 3729(a)(1)(A) of the False Claims Act prohibits a defendant

from knowingly presenting or causing to be presented false or fraudulent claims

for payment or approval to the United States government.

For you to find CARD liable under this provision of the False Claims Act,

BNSF must show by a preponderance of the evidence the following:

(1) CARD presented, or caused to be presented, a claim for payment or approval to an officer, employee, or contractor of the United States;

(2) the claim was false or fraudulent;

(3) the falsity was material to a decision to pay the claim; and

(4) CARD acted knowingly.



## INSTRUCTION NO. F-14

31 U.S.C. § 3729(a)(1)(B) of the False Claims Act prohibits a defendant from knowingly making, using, or causing to be made or used a false statement or record material to a false or fraudulent claim.

For you to find CARD liable under this provision of the False Claims Act, BNSF must show by a preponderance of the evidence the following:

(1) CARD made, used, or caused to be made or used, a statement or record;

(2) the statement or record was false;

(3) CARD acted knowingly; and

(4) The statement or record was material to a decision to pay a false or fraudulent claim.



## INSTRUCTION NO. F-15

Under the False Claims Act, a defendant "causes" a false claim to be presented or "causes" a false statement or record to be made or used if it is the natural, ordinary, and reasonable consequence of the defendant's conduct. The False Claims Act makes no distinction between the entity that causes a false claim to be presented or a false state or record to be made or used and the entity that actually presents the false claim or makes or uses the false statement or record.



## INSTRUCTION NO. F-16

For the False Claims Act, "claim" means any request or demand for money that is made to a United States Governmental agency, or to a contractor to the United States Government for services provided to beneficiaries of a Government healthcare program such as Medicare or Medicaid.



## INSTRUCTION NO. F-17

The term "material" means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.

The materiality standard is demanding, and materiality cannot be found where noncompliance is minor or insubstantial.

When evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.

For example, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated and has signaled no change in position, that is strong evidence that the requirements are not material.



**INSTRUCTION NO. F-18**

The False Claims Act requires the knowing presentation of what is known to be false, and the phrase "known to be false" does not mean scientifically untrue; it means a lie.  The Act is concerned with ferreting out wrongdoing, not scientific errors.

A statement or record is "false" or "fraudulent" if it is an assertion that is untrue when made or when used, or if it is an assertion that is made in reckless disregard of its truth or falsity.  A subjective opinion is false if it implies the existence of facts that do not exist, or if it is not honestly held.  A claim may be false or fraudulent not only by affirmative misrepresentation of fact, but also by the failure to disclose material facts without which the claim may be considered misleading.



## INSTRUCTION NO. F-19

Physicians applying their clinical judgment about a patient can disagree with one another.  A properly formed and honestly held clinical judgment is not untrue even if a different physician contends that the judgment is wrong.

A clinical judgment under Medicare cannot be deemed false, for purposes of the False Claims Act, when there is only a reasonable disagreement between medical experts about the accuracy of that conclusion, with no other evidence to prove the falsity of the assessment.



## INSTRUCTION NO. F-20

Under the False Claims Act, a defendant acted "knowingly" if one of the following is true:

> (1) the defendant had actual knowledge of the truth or falsity of the information; or
>
> (2) the defendant acted in deliberate ignorance of the truth or falsity of the information; or
>
> (3) the defendant acted in reckless disregard of the truth or falsity of the information.

A defendant acts with deliberate ignorance if the defendant, like an ostrich that buries its head in the sand, fails to make simple inquiries which would alert him that false claims are being submitted or that statements or records material to a claim were false.

A defendant acts with reckless disregard if the defendant had reason to know of facts that would lead a reasonable person to realize that false claims are being submitted or that statements or records material to a claim were false.

Innocent mistakes, mere negligent misrepresentations, and differences in interpretations will not suffice to create liability. A defendant who relies on a good faith interpretation of a regulation is not subject to liability under the Act, even if that interpretation is objectively unreasonable.



In evaluating a defendant's knowledge, you may consider that parties who seek public funds are expected to know the law and may not rely on the conduct of Government agents contrary to law.

It is not necessary for BNSF to prove that CARD acted with actual intent to defraud anyone.



## INSTRUCTION NO. F-21

You may not consider as a defense to the False Claims Act any negligent or unreasonable conduct on behalf of the Government or any failure by Government personnel to perform their duties.



## INSTRUCTION NO. F-22

Under a provision of the Affordable Care Act titled "Medicare coverage for individuals exposed to environmental health hazards," an individual determined to be an Environmental Exposure Affected Individual is eligible for Medicare, regardless of age.



**INSTRUCTION NO. F-23**

To be eligible for Medicare as an Environmental Exposure Affected

Individual, a person must satisfy both of the following requirements:

    1.  be diagnosed with one or more of the following impairments:

        A. Asbestosis;

        B. pleural thickening;

        C. pleural plaques;

        D. Mesothelioma; or

        E. Malignancies of the lung, colon, rectum, larynx, stomach, esophagus, pharynx, or ovary;

    AND

    2.  Demonstrate presence in Lincoln County, Montana, for a total of at least 6 months during a period ending not less than 10 years prior to his or her diagnosis.

Certification of a person as eligible for Medicare coverage under the

Environmental Health Hazard provision of the Affordable Care Act for a person

who does not satisfy these requirements is a false claim.



## INSTRUCTION NO. F-24

For purposes of the Affordable Care Act, there is no distinction between a "diagnosis" and a "clinical diagnosis." A "diagnosis" is a determination of the nature of a disease, injury, or congenital defect from its signs and symptoms. A diagnosis under the ACA requires a diagnosis by a qualified physician. An abnormality noted on a chest x-ray by a "B Reader" qualified physician or on a computed tomographic radiograph of the chest by a qualified physician is not, by itself, a diagnosis. In accordance with the American Thoracic Society Guidelines and the ACA, a diagnosis of asbestosis, pleural thickening, or pleural plaques requires:

1. evidence of structural pathology consistent with asbestos related disease as established by:

   a. an interpretation of a plain chest x-ray by a "B Reader" qualified physician; or

   b. interpretation of a computed tomographic radiograph of the chest by a qualified physician;

2. evidence of exposure to asbestos; and

3. exclusion of other plausible conditions.

The Secretary of the Department of Health and Human Services determines whether a physician is a "qualified physician" under the ACA.

- 39 -



**INSTRUCTION NO. F-25**

To be eligible for payment by Medicare, items or services must be "reasonable and necessary for the diagnosis or treatment of illness or injury."

To be "reasonable and necessary," an item or service must be:

1) safe and effective;

2) not experimental or investigational; and

3) appropriate, including the duration and frequency that is considered appropriate for the item or service, in terms of whether it is:

   a) furnished in accordance with accepted standards of medical practice for the diagnosis or treatment of the patient's condition or to improve the function of a malformed body member;

   b) furnished in a setting appropriate to the patient's medical needs and condition;

   c) ordered and furnished by qualified personnel;

   d) one that meets, but does not exceed, the patient's medical need; and

   e) at least as beneficial as an existing and available medically appropriate alternative.

If an item or service fails to meet any one of these criteria, it is not eligible for payment under Medicare. A claim to Medicare for items or services that are not eligible for payment is a false claim.



## INSTRUCTION NO. F-26

Every Medicare claim includes an express or implied certification that treatment was medically necessary. "Medically necessary" means health care services that are needed to diagnose or treat an illness, injury, condition, disease, or its symptoms and that meet accepted standards of medicine.



## INSTRUCTION NO. F-27

If you find that CARD violated the False Claims Act, you must then identify the number of False Claims Act violations CARD committed.

Each separate demand for payment of Government money that you determine is false or fraudulent, and each separate creation of a false record or statement material to a false or fraudulent claim is a violation of the False Claims Act.

There will be a space in the verdict form for you to place this number should you find that CARD violated the False Claims Act.



## INSTRUCTION NO. F-28

If you find that CARD has violated the False Claims Act, you must

determine the amount of damages, if any, sustained by the Government because of

the violations.  The measure of damages under the False Claims Act is the amount

of money that the Government paid out by reason of the false claim or statement.

If you find that CARD procured a federal grant through false or fraudulent

statements in violation of the False Claims Act, then the amount of damages may

be the entire amount of money that CARD received under the grant.  However, no

showing of damages is required to establish a False Claims Act violation.



## INSTRUCTION NO. F-29

BNSF must prove damages by a preponderance of the evidence.  However, in computing any damages, you do not have to determine actual damages with mathematical precision of absolute certainty.  Reasonable certainty is sufficient.  Damages should be liberally calculated to effectuate the purposes of the False Claims Act and to afford the Government a full and complete recovery of all its damages.



## INSTRUCTION NO. F-30

BNSF has brought this case on behalf of the United States.  The United States is the real party in interest.  Under the False Claims Act, BNSF is entitled to receive a percentage of whatever amount, if any, you award to the United States.  After you reach a verdict, I will make the final determination of how much money BNSF receives, but, if there is an award, most of it will go to the United States.



**INSTRUCTION NO. F-31**

Because you must decide this case based only on the evidence received in the case and on my instructions as to the law that applies, you must not be exposed to any other information about the case or to the issues it involves during the course of your jury duty. Thus, until the end of the case or unless I tell you otherwise:

Do not communicate with anyone in any way and do not let anyone else communicate with you in any way about the merits of the case or anything to do with it. This includes discussing the case in person, in writing, by phone or electronic means, via email, text messaging, or any internet chat room, blog, website or application, including but not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn, Snapchat, TikTok, or any other forms of social media. This applies to communicating with your fellow jurors until I give you the case for deliberation, and it applies to communicating with everyone else including your family members, your employer, the media or press, and the people involved in the trial, although you may notify your family and your employer that you have been seated as a juror in the case, and how long you expect the trial to last. But, if you are asked or approached in any way about your jury service or anything about



this case, you must respond that you have been ordered not to discuss the

matter and report the contact to the court.

Do not read, watch or listen to any news or media accounts or

commentary about the case or anything to do with it, although I have no

information that there will be news reports about this case; do not do any

research, such as consulting dictionaries, searching the Internet, or using

other reference materials; and do not make any investigation or in any other

way try to learn about the case on your own.  Do not visit or view any place

discussed in this case, and do not use Internet programs or other devices to

search for or view any place discussed during the trial.  Also, do not do any

research about this case, the law, or the people involved—including the

parties, the witnesses or the lawyers—until you have been excused as jurors.

If you happen to read or hear anything touching on this case in the media,

turn away and report it to me as soon as possible.

These rules protect each party's right to have this case decided only on

evidence that has been presented here in court.  Witnesses here in court take an

oath to tell the truth, and the accuracy of their testimony is tested through the trial

process.  If you do any research or investigation outside the courtroom, or gain any

information through improper communications, then your verdict may be

influenced by inaccurate, incomplete or misleading information that has not been

- 47 -



tested by the trial process.  Each of the parties is entitled to a fair trial by an impartial jury, and if you decide the case based on information not presented in court, you will have denied the parties a fair trial.  Remember, you have taken an oath to follow the rules, and it is very important that you follow these rules.

A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result that would require the entire trial process to start over.  If any juror is exposed to any outside information, please notify the court immediately.

You will not be allowed to have your cell phone in the jury room during your deliberations.



## INSTRUCTION NO. F-32

Some of you have taken notes during the trial.  Whether or not you took notes, you should rely on your own memory of what was said.  Notes are only to assist your memory.  You should not be overly influenced by your notes or those of your fellow jurors.



**INSTRUCTION NO. F-33**

Those exhibits received in evidence that are capable of being displayed electronically will be provided to you in that form, and you will be able to view them in the jury room.  A computer, projector, printer, and accessory equipment will be available to you in the jury room.

A court technician will show you how to operate the computer and other equipment; how to locate and view the exhibits on the computer.  You will also be provided with a paper copy of all exhibits received in evidence.  If you need additional equipment or supplies or if you have questions about how to operate the computer or other equipment, you may send a note to the bailiff, signed by your foreperson or by one or more members of the jury.  Do not refer to or discuss any exhibit you were attempting to view.

If a technical problem or question requires hands-on maintenance or instruction, a court technician may enter the jury room with the bailiff present for the sole purpose of assuring that the only matter that is discussed is the technical problem.  When the court technician or any nonjuror is in the jury room, the jury shall not deliberate.  No juror may say anything to the court technician or any nonjuror other than to describe the technical problem or to seek information about operation of the equipment.  Do not discuss any exhibit or any aspect of the case.

- 50 -



The sole purpose of providing the computer in the jury room is to enable jurors to view the exhibits received in evidence in this case.  You may not use the computer for any other purpose.  At my direction, technicians have taken steps to ensure that the computer does not permit access to the Internet or to any "outside" website, database, directory, game, or other material.  Do not attempt to alter the computer to obtain access to such materials.  If you discover that the computer provides or allows access to such materials, you must inform the court immediately and refrain from viewing such materials.  Do not remove the computer or any electronic data from the jury room, and do not copy any such data.



## INSTRUCTION NO. F-34

Before you begin your deliberations, elect one member of the jury as your presiding juror. The presiding juror will preside over the deliberations and serve as the spokesperson for the jury in court.

You shall diligently strive to reach agreement with all of the other jurors if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to their views.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not be unwilling to change your opinion if the discussion persuades you that you should. But do not come to a decision simply because other jurors think it is right, or change an honest belief about the weight and effect of the evidence simply to reach a verdict.



## INSTRUCTION NO. F-35

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror should complete the verdict form according to your deliberations, sign and date it, and advise the bailiff that you are ready to return to the courtroom.



**INSTRUCTION NO. F-36**

If it becomes necessary during your deliberations to communicate with me, you may send a note through the bailiff, signed by your foreperson or by one or more members of the jury.  No member of the jury should ever attempt to communicate with me except by a signed writing, and I will respond to the jury concerning the case only in writing, or here in open court.  If you send out a question, I will consult with the lawyers before answering it, which may take some time.  You may continue your deliberations while waiting for the answer to any question.  Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged.

