1   JoAnn Jett Corson
    Registered Diplomate Reporter
2   Certified Realtime Reporter
    P. O. Box 8006
3   Missoula, Montana 59807-8006
    406/829-7123 office
4   joann_corson@mtd.uscourts.gov

5   United States Court Reporter

6

7

8

9           IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF MONTANA
10                  MISSOULA DIVISION

11  BNSF RAILWAY COMPANY, on behalf  )
    of THE UNITED STATES OF AMERICA, )  No. CV 19-40-M-DLC
12                         Relator,)
         vs.                       )  **VOLUME 8 EXCERPT** *REDACTED*
13                                 )  **TRANSCRIPT OF JURY TRIAL**
    THE CENTER FOR ASBESTOS RELATED )
14  DISEASE, INC.,                  )  TESTIMONY OF CHARLES
                          Defendant.)  BRADFORD BLACK, M.D.
15  _____)

16

17      **BEFORE THE HONORABLE DANA L. CHRISTENSEN**
           **UNITED STATES DISTRICT COURT JUDGE**
18            **FOR THE DISTRICT OF MONTANA**

19

        Russell Smith United States Courthouse
20              201 East Broadway
              Missoula, Montana 59802
21            Thursday, June 22, 2023
               09:20:02 to 14:23:40
22

23

24

          Proceedings recorded by machine shorthand
25    Transcript produced by computer-assisted transcription

```
1                        APPEARANCES

2    For the Relator:              MR. W. ADAM DUERK
                                   MR. SEAMUS M. MOLLOY
3                                  Attorneys at Law
                                   KNIGHT NICASTRO MACKAY, LLC
4                                  283 West Front Street, Suite 203
                                   Missoula, Montana 59802
5
                                   MS. CINDY HANENBURG
6                                  Paralegal
                                   KNIGHT NICASTRO MACKAY, LLC
7
     For the Defendant:            MR. TIMOTHY M. BECHTOLD
8                                  Attorney at Law
                                   BECHTOLD LAW FIRM
9                                  P.O. Box 7051
                                   Missoula, Montana 59807-7051
10
                                   MR. JOHN DAY
11                                 Attorney at Law
                                   THE JOHN DAY LAW OFFICE
12                                 505 Cerrillos Road, Suite 205
                                   Santa Fe, New Mexico 87501
13
                                   MS. TRACY McNEW
14                                 Executive Director
                                   THE CENTER FOR ASBESTOS
15                                    RELATED DISEASE, INC.

16
                           CONTENTS
17
```

Requested Excerpt ....................................... 3

Reporter's Certificate ................................ 141

```
20                          WITNESS
```

**For the Relator:**

Charles Bradford Black, M.D.
     Direct Examination by Mr. Duerk ................... 3

```
23


24          REPORTER'S NOTE:  "Uh-huh" and "Um-hmm" indicate
     affirmative responses.  "Huh-uh" and "Hm-umm" indicate
25   negative responses.
```

<pre>
1                     REQUESTED EXCERPT
2          (Open court.)
3          (Jury present.)
4              THE COURT:  Mr. Duerk, you may call your next
5  witness.
6              MR. DUERK:  Relator calls Dr. Black to the stand.
7          (Oath administered to the witness.)
8              THE COURT:  Mr. Duerk, you may proceed.
9              MR. DUERK:  Thank you, Your Honor.
10             WHEREUPON,
11                   CHARLES BRADFORD BLACK, M.D.,
12 called for examination by counsel for relator, after having
13 been first duly sworn to testify the truth, the whole truth,
14 and nothing but the truth, testified as follows:
15                   DIRECT EXAMINATION
16 BY MR. DUERK:
17 Q    Would you please state your full legal name, spelling
18 your last name for the record?
19 A    Charles Bradford Black, B-l-a-c-k.
20 Q    You work at the CARD Clinic in Libby, Montana today.
21 Correct?
22 A    Yes.
23 Q    You worked at the CARD Clinic for years as the medical
24 director.  Correct?
25 A    Correct.
</pre>

1   Q     You have retired from your position as the medical

2   director.   Correct?

3   A     Yes.

4   Q     Dr. Black, is it acceptable to submit a patient for

5   Medicare benefits when you have never seen the patient, did

6   not have any kind of exposure history for that patient, have

7   not reviewed or even seen any X-ray or CT scans, and have not

8   conducted a differential diagnosis?

9   A     Would I, would I make a diagnosis?   Is that what you're

10  asking?

11  Q     Would it be acceptable to --

12  A     Acceptable.

13  Q     -- to submit a patient for Medicare benefits in that set

14  of circumstances?

15  A     There would be -- for the most part, yes.   There's

16  obviously exceptions within our population, so.

17  Q     So it would be acceptable, in your mind, to submit a

18  patient for Medicare benefits when you've never seen them,

19  never seen any of their X-rays, never seen any of their

20  CT scans, haven't reviewed any exposure history, and haven't

21  conducted a differential diagnosis?

22  A     No, that would not acceptable.

23  Q     So just to be clear, it's unacceptable to submit a

24  patient for Medicare benefits in that set of circumstances

25  when you've never seen them face to face, never seen their

1    scans, never conducted an exposure history or a differential

2    diagnosis.  Correct?

3    A    That's in general.  For making a clinical diagnosis,

4    that's absolutely true.

5    Q    Okay.  Dr. Morrissette has admitted to doing exactly that

6    at the CARD Clinic.  Correct?

7         (Pause.)

8         THE WITNESS:  I'm thinking on that.  Maybe there

9    might have been one instance I can think of where she might

10   have done it without that information.

11   BY MR. DUERK:

12   Q    What if she did it in a thousand cases?  It's just as

13   wrong to do it in one case as a thousand.  Correct?

14   A    No.  There are exceptions occasionally.

15   Q    I understand that you believe there to be exceptions

16   occasionally, but in this case, you're aware of an instance

17   where Dr. Morrissette never saw the patient, never saw any of

18   the CT scans, never saw any chest X-rays, never interpreted

19   any of those scans, didn't conduct a differential diagnosis,

20   and still submitted that patient for Medicare.  Correct?

21   A    I believe, if I'm thinking right on the case you're

22   talking about, there was a patient that was dealt with long

23   distance.  Shouldn't call them a patient; an individual that

24   had been exposed, had been long distance, could not get back

25   to Libby, and had a positive B-read --

1   Q    Doctor, my question was:  Are you aware that
2   Dr. Morrissette has submitted a patient for Medicare benefits
3   in the set of circumstances that I just named?  Yes or no.
4   A    I don't think I heard you say was there a B-read done
5   elsewhere.  Did you say that at all or no?
6   Q    I did not say that there was a B-read conducted anywhere.
7        In this set of circumstances, I'll ask you to assume that
8   there was not any kind of outside diagnosis from anywhere
9   else.
10  A    Or B-read?
11  Q    Sir, I'm gonna go about it this way.
12       Can I have a copy of his deposition?
13           MS. HANENBURG:  (Handing.)
14           MR. DUERK:  Your Honor, may I approach?
15           THE COURT:  You may.
16           MR. DUERK:  (Handing.)  Please let the record
17  reflect that I'm handing the doctor a copy of his deposition
18  taken January 19, 2022 at 9 a.m.
19  BY MR. DUERK:
20  Q    Doctor, you recall your deposition being taken January 19
21  of 2022.  Correct?
22  A    Yes.
23  Q    I was there.  You were there.
24  A    Yes.
25  Q    The court reporter was there.

1  A     Sure.

2  Q     And you have a transcript in front of you from that

3  deposition.  Correct?

4  A     Yes.

5  Q     I'd like you to refer to page 89.

6  A     Okay.

7  Q     Okay.  And in terms of Dr. Morrissette's testimony, you

8  were aware that Dr. Morrissette, the current clinical director

9  at CARD, had been deposed right before your deposition in

10 January.  Correct?

11 A     Yes.

12 Q     Okay.  In terms of the patient that Dr. Morrissette

13 reviewed, I'd like you to assume these facts:

14      That she had a letter from the patient from some years

15 back that may have referred to an outside -- we'll assume it's

16 a B-read;

17      That she had not seen that patient in person;

18      That she had not reviewed any scans;

19      That she had not conducted a differential diagnosis, nor

20 did she have any type of exposure history.

21      Do you understand those circumstances?

22 A     Yeah, yeah.  And my awareness on that is that she had

23 good evidence this patient had a B-read.  And a B-read, once

24 again, whether we diagnose them clinically, a B-read is a

25 statutory diagnosis under the public health law.

1  Q    I understand --

2          THE COURT:  Dr. Black, that was nonresponsive.

3          Do you want me to repeat the question?

4          MR. DUERK:  Yes, please.

5          THE COURT:  "Okay.  In terms of the patient that

6  Dr. Morrissette reviewed, I'd like you to assume these facts:

7          "That she had a letter from the patient from some

8  years back that may have referred to an outside -- we'll

9  assume it's a B-read;

10          "That she had not seen that patient in person;

11          "That she had not reviewed any scans;

12          "That she had not conducted a differential

13  diagnosis, nor did she have any type of exposure history.

14          "Do you understand those circumstances?"

15          THE WITNESS:  Under those circumstances, I would

16  say --

17          MR. DUERK:  Objection.  Nonresponsive.

18          THE COURT:  The question was:  "Do you understand

19  those circumstances," as Mr. Duerk described them?

20          THE WITNESS:  Yes.  Yes, I do.

21          THE COURT:  Okay.

22  BY MR. DUERK:

23  Q    And do you understand that in this particular patient's

24  case, there was not a B-read form or checklist available in

25  this patient's case?  Do you understand that?

1   A    No, I don't understand all of it.

2   Q   I would like you to assume that in this patient's case,

3   an individual CARD patient named Gerald N., who had never been

4   to the clinic, that the only information Dr. Morrissette had

5   was not a B-reader checklist form but a letter from over a

6   decade ago referencing some type of outside scan.  Do you

7   understand the facts in Gerald N.'s case as I've recited them

8   to you now?

9   A    Yes.

10   Q   In that set of circumstances, where the patient does not

11   even have evidence of a B-read, does not even have evidence of

12   a B-read check form, checklist form, does not have a B-read

13   interpretive report from the B-reader that sets forth the date

14   of the scan or the type of scan used, in those circumstances,

15   without a B-read interpretive form, in your mind, would it be

16   appropriate to diagnose that patient with an asbestos-related

17   disease and submit them for lifetime Medicare benefits?

18   A    I would have to have seen the communication before I

19   would -- could answer that.

20   Q   In terms of the communication, do you mean the letter

21   from over a decade ago referencing that there may have been

22   some sort of scan done?

23   A    If it was a quality report from a physician and I had

24   confidence that that, that provider gave solid information

25   about the patient having a B-read, I would feel comfortable.

1    But it's the circumstances of the letter that makes a lot of

2    difference.

3    Q    Sure.  And if that letter didn't mention even the name of

4    the provider, it didn't mention the type of scan, it didn't

5    mention the asbestos-related disease, it didn't even mention

6    the type of abnormality, would that still somehow qualify, in

7    your mind, as a sufficient basis for submitting a patient for

8    Medicare benefits for life?

9    A    I would say in general, no, but I haven't seen the

10   letter.  The letter would be everything.  It would create a

11   confidence that you're looking at a valid piece of

12   information.

13   Q    So in your mind, for this entire B-read-only category of

14   patients, of which there are more than a hundred, you are now

15   saying to this jury that you don't even need a B-reader

16   checklist form?  You just need a letter from anybody without

17   any details of that B-read interpretation?  No date?  No scan

18   referenced?  Not even an abnormality referenced?  On the basis

19   of a letter alone, it would be perfectly acceptable, in your

20   mind, to submit over a hundred patients for lifetime Medicare

21   benefits?

22   A    I would tend not to, of course.  I would not, I would not

23   accept it.

24   Q    Sir, you would tend not to or you would not accept it?

25   A    Well, I qualified it because of the exceptions of the

1    information that was provided and by whom.

2    Q    So what if you didn't have any idea who provided that

3    letter in terms of the identity of the B-reader?

4    A    Well, then I would be hesitant to accept that.

5    Q    Hesitant.

6    A    Well, I would, I would not accept that.  Right.

7    Q    You would not accept it --

8    A    Right, right.

9    Q    -- if you didn't know who the B-reader was.  Correct?

10   A    If I didn't know the person that was transferring the

11   information.

12   Q    So if you knew the person who was transferring the

13   information about some kind of reader but you didn't know who

14   the B-reader was, you didn't know the date of the scan, you

15   didn't know the abnormality that the B-reader or any reader

16   found, it would be acceptable so long as you knew the identity

17   of the person who sent the letter from over a decade ago?

18   A    Well, if it was a board-certified pulmonologist or

19   somebody knowledgable in asbestos and they clearly stated it

20   and you had that kind of confirmation --

21   Q    Sure.  In this case, I'd like you to assume that you

22   don't even know the identity of the person who sent the

23   letter.  Understood?

24   A    I don't, no.

25   Q    Right.  So in that set of circumstances, would it be

1   acceptable, in your mind, to submit over a hundred patients

2   for lifetime Medicare benefits on the basis of a letter whose

3   author you don't know?

4   A    No.

5   Q    Okay.  In Dr. Morrissette's example, when she was

6   deposed, I'll represent to you that she didn't know the

7   identity of the author who sent the letter.  Okay?

8   A    (No response.)

9   Q    Does that make sense?

10  A    Yes.

11  Q    So in this instance, regarding patient Gerald N., this

12  would be an inappropriate way to submit a claim for lifetime

13  Medicare benefits.  Correct?

14  A    I'll say yes because that's most commonly what I would

15  do, based on what you've presented.

16  Q    Right.  So in Gerald N.'s case, if Dr. Morrissette and

17  CARD asserted to the Social Security Administration that that

18  patient had a diagnosis of an asbestos-related disease, that

19  Medicare claim form, that EHH form, would contain false

20  information.  Correct?

21  A    If, in fact, I was not comfortable, once again, with

22  that, that would be correct.

23  Q    That would be a false claim.  Correct?

24  A    It could be, yes.

25  Q    No, not "could be."  That would be a false claim.  Right?

1    A    In gen- -- I would say yes.

2    Q    Not "in general." Not without qualification. In that

3    set of circumstances, if a patient was submitted for lifetime

4    Medicare benefits based on the information described related

5    to Gerald N., that would be a false claim. Correct?

6    A    I am still, once again, stuck on the issue. It's hard to

7    answer that question.

8    Q    It's difficult for you to answer that question.

9    A    It's difficult because of the circumstances.

10   Q    Sir, we've covered the circumstances in Gerald N.'s case

11   exhaustively. I would like to just get a clear answer

12   finally, at long last, in this case so the jury can move on.

13        Dr. Black, in this set of circumstances, if CARD signs

14   and dates an EHH form with a date of diagnosis for a patient

15   in support of lifetime Medicare benefits and there is no

16   diagnosis, not even from a B-reader, that would constitute a

17   false claim. Correct?

18   A    No.

19   Q    It would not. So this practice is perfectly acceptable

20   to you and can be replicated thousands of times at CARD, and

21   you would recommend doing it again. Correct?

22   A    No.

23   Q    Here's the tension. It's inappropriate to submit

24   patients for Medicare benefits on a claim like Gerald N.'s

25   case. Right?

1    A      No.

2    Q      It's not inappropriate.

3    A      (No response.)

4           MR. DUERK:  If we could put Exhibit 46, page 1, on

5    the screen?

6           MS. HANENBURG:  (Complied with request.)

7    BY MR. DUERK:

8    Q      Let the record reflect that I'm showing you an EHH form

9    for Judy P.  Do you see it in front of you?

10   A      Yes.

11   Q      Do you see that Judy P. has a diagnosis of the

12   asbestos-related impairment asbestosis on this form?

13   A      Yes.

14          MR. DUERK:  If we could go down to the date of

15   diagnosis?

16          MS. HANENBURG:  (Complied with request.)

17   BY MR. DUERK:

18   Q      Do we see that there's a date of diagnosis of August 20,

19   2013 on this form?

20   A      Yes.

21   Q      Do we see what appears to be a rubber-stamp signature on

22   this form representing your signature?

23   A      Yes.

24   Q      And do we see that apparently this form was submitted to

25   the Social Security Administration on or about August 21,

1    2013?

2    A    Yes.

3    Q    Sir, we've talked about Judy P.'s EHH form in the past.

4    Correct?

5    A    Yes.

6    Q    At deposition on January 19, 2022, we talked about

7    Judy P.'s deposition -- or Judy P.'s EHH form at length.

8    Fair?

9    A    Yes.

10   Q    And at that time, sir, you stated under oath that there

11   was false information, untrue information, on Judy P.'s EHH

12   form.  Correct?

13   A    Yes.

14   Q    So you have admitted, sir, that the CARD Clinic has

15   submitted EHH forms to the Social Security Administration in

16   support of Medicare benefits for life with false information

17   on those forms.  Correct?

18   A    No.  There's an explanation for this.

19   Q    Sir, we'll go about it this way.  Let's talk about

20   Judy P.'s EHH form directly.

21        You recall testifying that there were false statements,

22   untrue statements, on J.P.'s EHH during your sworn testimony

23   on January 19 of last year.  Correct?

24   A    Yes.

25   Q    So you testified, under oath, there were false statements

1   on J.P.'s EHH form when it was submitted to the Social

2   Security Administration.  Correct?

3   A     Not at the -- not at that time, no.  This is one that we

4   had discovered.  It happened as a result of an employee that

5   was filling these out and had not -- had problems with it, so

6   we had to correct all of that, and we did, so.

7   Q     Sir, I'd like you to turn to page 68 of your deposition

8   from January 19.  I'd like you to reference line 6.

9   A     Which page?  I'm sorry.

10  Q     Page 68, line 6.  And I'm referencing the date of

11  diagnosis in my questions here.

12        Do you see the date of diagnosis on Judy P.'s EHH form

13  submitted to Medicare?

14  A     Yes.

15  Q     That information is false.  Correct?

16  A     Right.  It was another error made by --

17  Q     No.  Sir -- objection.  Nonresponsive.

18        Sir, that information is incorrect?

19  A     It's incorrect.  That's right.

20  Q     All right.  In fact, the EHH form in Judy P.'s case

21  mentions in multiple places that she has to have an

22  asbestos-related condition and its date of diagnosis listed on

23  that EHH that went to Social Security.  Correct?

24  A     Yes.

25  Q     The form itself says, "Check the box next to the

1   diagnosed impairment and print the date of diagnosis."

2   Correct?

3   A    Yes.

4   Q    There's a diagnosis code here listed for asbestosis.

5   Correct?

6   A    Yes.

7   Q    And the diagnosed impairment in her case was asbestosis.

8   Correct?

9   A    That was entered, yes.

10  Q    Judy P. did not have asbestosis.   Correct?

11  A    No.

12  Q    Judy P. did not have the asbestos-related disease of

13  asbestosis.   Is that right?

14  A    Not asbestosis.

15  Q    Okay.   So any information on that form that suggests that

16  Judy P. was diagnosed with asbestosis on August 20, 2013 is

17  not true.   Correct?

18  A    That entry is not correct.

19  Q    Sir, if you would turn to page 69, I'd like to read your

20  deposition testimony from that day.   Please tell me if I've

21  read it correctly.

22       Are you at page 69, line 5?

23  A    Yes.

24  Q    I'll read the question and the answer.   Please tell me if

25  I've read it correctly.   Okay?

1       Question:  "All right.  So any information on that form

2   that suggests that Judy [P.] was diagnosed with asbestosis on

3   August 20th, 2013 is not true; correct?"

4       Answer:  "The way it reads, yes."

5       Did I read that correctly?

6   A   I'm trying to find that yet.  I'm sorry.  Where was it,

7   exactly?

8   Q   Page 69, line 4, to --

9   A   Okay.

10  Q   -- page 69, line 8.

11  A   Okay.

12  Q   Sir, my only question was:  Did I read that section

13  correctly?

14  A   Yes.

15  Q   Okay.

16      Sir, there are multiple places on J.P.'s EHH form that

17  have untrue information.  Correct?

18  A   There's two.

19  Q   Okay.  I'll go through some of them.

20      First of all, Judy P. does not have asbestosis.  Correct?

21  A   That's correct.

22  Q   And so that part of her EHH form is false.  Correct?

23  A   Yes.

24  Q   Judy P. was not diagnosed by the provider, that being

25  you, for asbestos-related disease.  Correct?

```
 1   A    That's correct.

 2   Q    So that part of Judy P.'s form also is false.  Correct?

 3   A    Which part?  I'm sorry.  Which part?

 4   Q    Judy P. was not diagnosed by the healthcare provider.

 5   A    Right.

 6   Q    You did not diagnose Judy P. with asbestos-related

 7   disease.  Correct?

 8   A    That's correct.

 9   Q    So that part of Judy P.'s form is false.  Correct?

10   A    Which part?

11   Q    Sir, we'll blow it up for you.

12        If you look at the date of diagnosis at the bottom --

13   A    Yes, yes.

14   Q    -- of this page -- now I'd like to just make a clear

15   record.

16        So Judy P. was not diagnosed by the provider at CARD,

17   that being you, with asbestosis on August 20, 2013.  Correct?

18   A    That's correct.

19   Q    So this part of Judy P.'s EHH form is also false.

20   Correct?

21   A    Yes.  Oh, the date is wrong.  Yes.

22   Q    In terms of Judy P. and her CT scan read by you or anyone

23   else indicating asbestosis, no one read Judy P.'s scan as

24   interpreting asbestosis in her case.  Correct?

25   A    That's correct.
```

1   Q    So suggesting otherwise, suggesting she had a CT scan

2   supporting a diagnosis of asbestos-related disease from you,

3   the provider, is false.  Correct?

4   A    Well, you mean by what's entered right now on the form,

5   the part that -- of asbestosis?  Or what -- I don't quite get

6   this.  I haven't entered anything to indicate --

7   Q    Sir, this form was --

8   A    -- my opinion.

9   Q    -- checked with asbestosis as the diagnosed impairment.

10  Correct?

11  A    Yes.  That's what's on the form.  Yes.

12  Q    Yes.  And you didn't diagnose Judy P. with asbestosis.

13  Correct?

14  A    No.

15  Q    The CTs did not indicate to you that Judy P. had

16  asbestosis.  Correct?

17  A    No.

18  Q    So representing to anyone at the Social Security

19  Administration that the CTs in her case served as the basis

20  for your diagnosis of asbestosis, that would be incorrect?

21  A    What happened is we discovered that was not --

22  Q    Sir, I don't need --

23  A    So --

24  Q    Sir, I don't need any background explanations.  There

25  were no background explanations offered during your deposition

1    of January 19, 2022 about Judy P.'s EHH form.  Correct?

2    A    At that time, no.  After my review of it, I realized what

3    happened.

4    Q    And in terms of after your review, you realized, you say,

5    what happened after your deposition where I had sworn

6    testimony from you.  Correct?

7    A    Yes.

8    Q    And you had an opportunity to revise your deposition and

9    make any corrections on the errata sheet and send it back to

10   the court reporter after your deposition was taken.  Were you

11   aware of that?

12   A    Well, I'm aware you can do that.  Yeah.

13   Q    Yes.  And you did not do that in terms of your deposition

14   related to these questions --

15   A    I had --

16   Q    -- about Judy P.  Correct?

17   A    Correct.  I had not had a --

18   Q    Sir, you've answered my question.

19   A    All right.

20   Q    In terms of discovery in this case, are you aware that

21   since two years ago, I've been asking CARD repeatedly for any

22   explanations about any of the defenses it intends to offer at

23   trial in this matter?  Are you aware that that discovery

24   request was propounded on you and CARD?

25   A    I guess so.

1    Q    And I've never received a response from you or CARD about

2    Judy P.'s EHH form that, "Oh, there's more background story."

3    Fair?

4    A    I don't know.

5    Q    Dr. Black, in terms of this EHH form, you've already

6    testified that there's false information on it.  I'd like to

7    continue with some of the other categories that I believe to

8    be false.  Understood?

9    A    Yes.

10   Q    You did not interpret any of Judy P.'s records, any of

11   her CT scans, any of her B-reads at any time that caused you

12   to diagnose Judy P. with an asbestos-related disease.

13   Correct?

14   A    I had other information, so I would say, no, that's not

15   correct.  I had --

16              THE COURT:  Nonresponsive.

17              MR. DUERK:  Could we read the question back, please?

18              THE WITNESS:  All right.

19              THE COURT:  "You did not interpret any of Judy P.'s

20   records, any of her CT scans, any of her B-reads at any time

21   that caused you to diagnose Judy P. with an asbestos-related

22   disease.  Correct?"

23              THE WITNESS:  Yes, a clinical diagnosis.

24              THE COURT:  The question was:  "You did not

25   interpret any of Judy P.'s records, any of her CT scans, any

1    of her B-reads at any time that caused you to diagnose Judy P.

2    with an asbestos-related disease.  Correct?"

3            THE WITNESS:  Yes.

4    BY MR. DUERK:

5    Q    Doctor, you didn't have any CT-scan reads by anyone else

6    indicating that Judy P. had asbestosis.  Correct?

7    A    Did you say CT reads?

8    Q    I said CT scans.

9    A    CT scans.  No.

10   Q    Sir, I'm getting caught on the double negatives, so I'll

11   ask you this again.

12        Judy P. did not have any CT scan read by you or anyone

13   else indicating asbestosis.  Correct?

14   A    Correct.

15   Q    Okay.  And so any representation that Judy P. had any

16   CT scan read by you or anyone else indicating an

17   asbestos-related disease that's indicated on this form in any

18   way, that would be false, too.  Right?

19   A    Repeat that.

20   Q    Sir, let me deal with it this way.

21   A    Please.

22   Q    A CT scan is vastly more defined and specific than a

23   B-read chest X-ray.  Correct?

24   A    For the most part, yes.

25   Q    For the most part --

1   A      Yes.

2   Q      -- or is it at all in dispute in this case that a CT scan

3   is much more thorough than a chest X-ray?

4   A      Yes, it is.

5   Q      All right.  And in terms of chest X-rays, it would be

6   disingenuous at best to look at somebody's CT scan and find

7   that it's absolutely negative for asbestos-related disease but

8   then somehow claim that the chest X-ray has a better read on

9   that person's thoracic cavity, particularly their lungs and

10  their pleural spaces.  Correct?

11  A      No.

12  Q      It would not --

13  A      No.

14  Q      -- in the instance where you have a CT scan -- you agree

15  that CT scans are vastly more thorough than chest X-rays.

16  A      Yes.

17  Q      And if a CT scan doesn't show something, are you saying

18  that a chest X-ray would, at times, be a better interpretive

19  scan?

20  A      At times, there's images that are easy -- easier to see

21  on a chest X-ray.

22  Q      Who do you know in the medical community in Libby or

23  Kalispell, or anyone else, that would say a chest X-ray is

24  more thorough than a CT scan?

25  A      No.

1  Q    So you don't know of any medical expert that would say a

2  chest X-ray is better than a CT scan.  Correct?

3  A    Correct.

4  Q    And it is an undisputed fact in this case that CARD does

5  not use B-read chest X-rays for any diagnostic purpose.

6  Correct?

7  A    We don't do B-reading.  I'm not qualified.

8  Q    That was not my question.

9  A    Okay.

10  Q    It is an undisputed fact in this case that CARD does not

11  now nor has it ever, within the time frame of the Affordable

12  Care Act, ever used a B-read chest X-ray for any diagnostic

13  purpose.

14  A    No, not for clinical diagnosis.

15  Q    Right.  So in this situation where we've got a chest

16  X-ray but a CT scan indicates the patient is entirely clear of

17  any signs of asbestos-related disease, trying to pin a

18  diagnosis on a chest X-ray that shows less than a CT, that

19  would be problematic at best.  Fair?

20  A    No.

21  Q    It wouldn't be problematic for you?

22  A    No, no.

23  Q    That's the situation in Judy P.'s case and dozens and

24  dozens and dozens of other cases.  Fair?  There was a CT scan

25  available that showed nothing, but CARD claimed that a B-read

1   chest X-ray was a sufficient basis for submitting that claim

2   for Medicare benefits.   Correct?

3   A     Specifically on this?   On Judy PXXXX?

4   Q     Yes.

5   A     Yes.

6   Q     And that practice was employed by CARD over and over and

7   over for this B-read category of patients.   Correct?

8   A     Yes.

9   Q     And so in that set of circumstances, CARD knowingly was

10  looking at the more thorough scan, the CT scan, seeing that

11  there was nothing there, and yet still knowingly submitting

12  those same patients for lifetime Medicare beneficiary status

13  on a scan that was clearly inferior, a chest X-ray, to the

14  CT scan that is clearly superior in terms of its resolution.

15  Correct?

16  A     Yes.

17  Q     Judy P.'s form here has a box checked -- or not checked,

18  sorry -- a box available to the CARD provider right above the

19  date of diagnosis.   Do you see it?

20  A     Yes.

21  Q     And that box says, "Individual does not have an

22  impairment listed above."   Did I read that correctly?

23  A     Yes.

24  Q     So in Judy P.'s case, and in over 100 other cases, the

25  CARD provider, you, had the option of checking this box,

1  acknowledging that Judy P. doesn't have asbestosis.  Correct?

2  A    Correct.

3  Q    This box wasn't checked, clearly, in Judy P.'s case.

4  Correct?

5  A    Correct.

6  Q    And this individual, Judy P., does not have an impairment

7  of asbestosis in this case.  Correct?

8  A    Correct.

9  Q    So it would have been true to merely check this box,

10  telling the Social Security Administration that the individual

11  does not have an impairment listed above.  Correct?

12  A    Yes.

13  Q    CARD didn't do that here, and CARD didn't do it in any of

14  the other B-read-only patients for those hundred-plus other

15  EHH forms.  Correct?

16  A    No.

17  Q    So in terms of the information on J.P.'s form and over a

18  hundred other B-read-only patient forms, there is untrue

19  information on each of those forms.  Correct?

20  A    No.

21  Q    I'm sorry; again, double negative.

22       On J.P.'s form as well as over a hundred other

23  B-read-only patients, there is untrue, incorrect, false

24  information on those EHH forms submitted to Medicare.  Right?

25  A    No.

1   Q    Are you disagreeing with me, or are you acknowledging
2   that there is false information on J.P.'s form?
3   A    On J.P.'s, there is.
4   Q    Okay.  And in over a hundred other EHH forms similar to
5   J.P., would you acknowledge that there's false information on
6   those forms, also?
7   A    No.
8   Q    You would not.
9   A    No.
10  Q    In terms of the hundred other EHH forms, it's true that
11  those other B-read-only patients have a date of diagnosis
12  listed on the EHH form itself.  Correct?
13  A    Yes.
14  Q    It's also true, on a hundred other forms, that you, the
15  CARD provider, checked a box for a diagnosed impairment of
16  asbestosis or a diagnosed impairment of pleural thickening and
17  pleural plaques.  Correct?
18  A    Would you please repeat that?
19  Q    Sure.
20       In over a hundred forms, you, as the provider at CARD,
21  checked the diagnosed impairment of either asbestosis or
22  pleural thickening and pleural plaques.  Correct?
23  A    Yes.
24  Q    And you checked those boxes when you knew those patients
25  did not have a diagnosis of asbestos-related disease.

1  Correct?

2  A     Yes.

3  Q     So that information, in over 100 EHH patient forms, was

4  not true when those forms were submitted to Medicare through

5  SSA.   Correct?

6  A     No, they were sub- -- no.   The answer is no.

7  Q     You didn't diagnose any of those patients.   Correct?

8  A     No.

9  Q     Are you -- sir, I'm sorry, but in J.P.'s case, Judy P.'s

10  case, you didn't diagnose the patient with asbestos-related

11  disease.   Correct?

12  A     Correct.

13  Q     And in all of those other B-read patients, over a hundred

14  of them, you did not diagnose those patients with

15  asbestos-related disease, either.   Correct?

16  A     Correct.

17  Q     But you submitted forms with the diagnosed impairments of

18  either asbestosis or pleural thickening, pleural plaques, to

19  the Social Security Administration.   Correct?

20  A     Yes.

21  Q     And those forms all had the date of diagnosis section of

22  the EHH form filled out, too.   Correct?

23  A     Yes.

24  Q     And then either you signed the form or it sounds like

25  most of those forms were rubber-stamped with those signatures

1   and sent on to the SSA.  Correct?

2   A    Yes.

3   Q    So at least in terms of the date of diagnosis box and the

4   impairments boxes above, the information on those 100-plus

5   other B-read-only patients was not true.  Correct?

6   A    No.

7   Q    Sir, are you saying that there were untrue sections on

8   the other 100-plus EHH forms or not?

9   A    Please rephrase that.

10  Q    Sure.

11       Dr. Black, there are sections on Judy P.'s EHH form that

12  are false.  Right?

13  A    Yes.

14  Q    There are sections on those other EHH patient forms that

15  were submitted on a B-read-only that are also false.  Right?

16  A    No.

17  Q    The date of diagnosis for each of those patients -- those

18  patients didn't have a diagnosis, either.  Correct?

19  A    Did not have a clinical diagnosis.  Correct.

20  Q    And we can talk about splitting hairs later.  But they

21  did not have a diagnosis from you or anyone at CARD for

22  asbestos-related disease.  Correct?

23  A    Yes.

24  Q    All right.  So when CARD submitted those EHH forms

25  indicating that a CARD provider had diagnosed that patient

1   with asbestos-related disease, that information was false.

2   Correct?

3   A     No.

4   Q     I don't want to hear about whether a B-reader had

5   interpreted this form.  I am only focusing on the CARD

6   provider completing Section 2 of the EHH form.  Do you

7   understand that?

8   A     Yes.

9   Q     When a CARD provider asserted that there was a CARD

10  provider's diagnosis of asbestos-related disease for these

11  patients, that would be untrue.  Correct?

12  A     If it was a B-reader, no.

13  Q     Sir, it's an undisputed fact in this case that B-readers

14  do not diagnose.  Correct?

15  A     In -- under the -- no, it's not correct.

16          THE COURT:  Let me reread to the jury Stipulated

17  Fact 67.  I believe you'll see this on the instruction that I

18  allowed you to have.

19          Stipulated Fact 67, I believe, reads:  "CARD does

20  not consider B-reader chest x-ray or reports for any

21  asbestos-related diagnostic purposes."

22  BY MR. DUERK:

23  Q     Did you hear that instruction?

24  A     Yes.

25  Q     It is an undisputed fact that CARD does not consider

1   B-reader chest X-ray or reports for any asbestos-related

2   diagnostic purposes.   Correct?

3   A     Correct.

4            MR. DUERK:  If we could turn to Exhibit 109?  If we

5   could look at paragraph 15 -- I'm sorry.  If we could look at

6   paragraph 52, please?

7            MS. HANENBURG:  (Complied with request.)

8            THE COURT:  Amanda, has this been admitted?

9            THE CLERK:  Yes.  It was preadmitted.

10  BY MR. DUERK:

11  Q    I'll read these.  Please tell me if I've read them

12  correctly.

13       "On or about August 20, 2013, CARD told patient J.P. that

14  she did not have a diagnosis of asbestos related disease."

15       "Undisputed."

16       That's an undisputed fact in this case.  Correct?

17  A     Yes.

18            MR. DUERK:  If we could go to page 109, page 14,

19  paragraph 50?

20            MS. HANENBURG:  (Complied with request.)

21  BY MR. DUERK:

22  Q    I'll read it.  Please tell me if I've read it correctly.

23       "CARD has stated in writing that an abnormality detected

24  by a B-reader is not considered a diagnosis of asbestos

25  related disease."

1        "Undisputed."

2        Did I read that correctly?

3   A    Yes.

4            MR. DUERK:  If we could turn to paragraph 49?

5            MS. HANENBURG:  (Complied with request.)

6   BY MR. DUERK:

7   Q    Dr. Black, "B-readers do not diagnose asbestos related

8   disease in CARD patients because a 'diagnosis of asbestos

9   related disease is based on exposure histories, time since

10  exposure, medical provider assessment and radiographic

11  images.'  CARD admits that B-readers who identify

12  abnormalities do not have the rest of this information."

13       "Undisputed."

14       I read that correctly.  Right?

15  A    Yes, yes.

16  Q    Paragraph 48:  "A B-reader interpretive report is not a

17  diagnosis because the physician has not seen the patient,

18  taken an exposure history, or ruled out a differential

19  diagnosis."

20       "Undisputed."

21       Did I read that correctly?

22  A    Yes.

23            MR. DUERK:  If we could go to paragraph 47?

24            MS. HANENBURG:  (Complied with request.)

25  ///

33

1    BY MR. DUERK:

2    Q    "The B-reader forms for both chest x-rays and CT scans

3    used by CARD do not have a box indicating a 'diagnosis.'"

4         "Undisputed."

5         Did I read that correctly?

6    A    Yes.

7    Q    Paragraph 46:   "B-readers mark boxes on a form related to

8    lung abnormalities, but B-readers do not diagnose."

9         "Undisputed."

10        Did I read that correctly?

11   A    Yes.

12   Q    Paragraph 45:   "Dr. Black has stated in sworn testimony

13   that CT scans are vastly more useful for diagnosing

14   asbestos-related disease than chest x-rays."

15        "Undisputed."

16        Did I read that correctly?

17   A    Yes.

18   Q    Paragraph 44:   "CARD does not consider B-reader chest

19   x-rays or reports for any asbestos-related diagnostic

20   purposes."

21        "Undisputed."

22        Did I read that correctly?

23   A    Yes.

24   Q    And, finally, paragraph 43.   Put very plainly, sir,

25   "B-readers do not diagnose."

1        "Undisputed."

2        Did I read that correctly?

3   A    Yes.

4   Q    In terms of the B-reader testimony in this case, were you

5   present for the testimony from Dr. Meyer and Dr. Kanne, the

6   B-readers from the University of Wisconsin?

7   A    Yes.

8   Q    Both of those B-readers testified under oath in front of

9   this jury that they do not diagnose.  Correct?

10  A    Yes.

11  Q    You know that the University of Wisconsin, where both of

12  those B-readers work, after learning of your practice, CARD's

13  practice, of submitting patients on a B-read-only to Social

14  Security for lifetime Medicare beneficiary status, both of

15  those B-readers quit.  Correct?

16  A    Yes.

17  Q    Dr. Lynch, a physician at National Jewish Hospital, the

18  third thoracic radiologist on CARD's expert B-read panel, when

19  he learned about this practice, he followed suit with

20  Dr. Meyer and Dr. Kanne, and Dr. Lynch will no longer serve as

21  a B-reader for CARD.  Correct?

22  A    Yes.

23  Q    Let's return to J.P.  Let's continue with Exhibit 109,

24  page 15.  I'll start with paragraph 52.

25       Sir, "On or about August 20, 2013, CARD told patient J.P.

1    that she did not have a diagnosis of asbestos related

2    disease."

3          "Undisputed."

4          Correct?

5    A    I'm having trouble with my hearing aids.  Just a second,

6    please.

7    Q    We can take a moment.

8    A    There.  I think they're working now.

9    Q    All right.

10         If we could return to paragraph 52, sir.

11   A    Yes.

12   Q    I'll read it.  Please tell me if I've read it correctly.

13         "On or about August 20, 2013, CARD told patient J.P. that

14   she did not have a diagnosis of asbestos related disease."

15         "Undisputed."

16         Correct?

17   A    Correct.

18   Q    Paragraph 53:  "Dr. Black determined that J.P. did not

19   have a diagnosis of asbestos-related disease."

20         "Undisputed."

21         Correct?

22   A    Correct.

23   Q    Paragraph 54:  "CARD's chart note, and all of the

24   radiographic scans read by both the local radiologist and CARD

25   providers prior to August 20, 2013, indicate J.P. did not have

1    a diagnosis of asbestos related disease."

2         Correct?

3    A    Correct.

4    Q    Paragraph 55:  "CARD records show J.P. does not have a

5    clinical diagnosis of asbestos-related disease."

6         "Undisputed."

7         Did I read that correctly?

8    A    Yes.

9    Q    Paragraph 56:  "However, Dr. Black signed J.P.'s EHH form

10   to include a date of diagnosis of August 20, 2013 -- the same

11   date CARD records show Dr. Black determined J.P. did not have

12   a diagnosis of asbestos related disease."

13        "Undisputed."

14        Did I read that correctly?

15   A    Yes.

16   Q    Now in J.P.'s case, the diagnosed impairment that CARD

17   checked on her EHH form was asbestosis.  Correct?

18   A    Yes.

19   Q    And that was untrue.  Correct?

20   A    Correct.

21   Q    CARD's own records indicate that J.P. received pilot

22   program benefits based on CARD's EHH form showing she had a

23   diagnosis by a CARD provider for asbestos-related disease.

24   Correct?

25   A    Correct.

1   Q    J.P. received pilot program benefits in the form of

2   indoor assistance with housekeeping and outdoor assistance

3   with yard work paid for by the Medicare pilot program based on

4   CARD's diagnosis of asbestos-related disease.  Correct?

5   A    That's correct.

6   Q    J.P. did not have an asbestos-related disease.  Correct?

7   A    Correct.

8   Q    The Medicare pilot program benefits that were awarded to

9   J.P. were based on Dr. Black's -- your -- determination that

10  they were medically necessary due to the presence of

11  asbestos-related disease.  Correct?

12  A    Correct.

13  Q    Now you and CARD based J.P.'s claim that she was eligible

14  for Medicare benefits on a B-reader detection of an

15  abnormality on J.P.'s radiographic scan.  Correct?

16  A    Correct.

17  Q    But you have testified, both at deposition and today,

18  that the B-reader did not diagnose J.P. with anything because

19  B-reading radiologists do not see the patient, take an

20  exposure history, or rule out differential diagnoses.

21  Correct?

22  A    Please repeat that.  I'm sorry.

23  Q    Let's do it this way.

24       If we could look at Exhibit 109, page 17, paragraph 62?

25            MS. HANENBURG:  (Complied with request.)

1   BY MR. DUERK:

2   Q    I'll read some undisputed facts in this case.  Please

3   tell me if I've read them correctly.

4        "Dr. Black testified the B-reader did not diagnose J.P.

5   with anything, because B reading radiologists do not see the

6   patient, take an exposure history or rule out differential

7   diagnoses."

8        That fact is undisputed in this case.  Correct?

9   A    Yes.  I see it there, so.

10  Q    I --

11  A    Yes.

12  Q    It's undisputed.  Correct?  Not you "see it there."

13  That's an undispu- --

14  A    I saw it.  Yes, I said that.  Yes.

15  Q    And it's an undisputed fact in this case.  Correct?

16  A    Correct.

17  Q    Paragraph 63:  "J.P.'s radiographic interpretive reports

18  indicate that the patient showed signs of a fractured rib --

19  not asbestos-related disease."

20       That is an undisputed fact in this case.  Correct?

21  A    Yes.

22  Q    Paragraph 64:  "A broken rib is not a condition related

23  to any kind of asbestos-related disease."

24       "Undisputed."

25       That, sir, is an undisputed fact in this case.  Correct?

1    A     Correct.

2    Q     Now in terms of J.P.'s case, there's even a letter in her

3    file that indicates that CARD was aware J.P. had no

4    asbestos-related disease diagnosis.  Correct?

5    A     Correct.

6    Q     Okay.  And that letter exists in a number of other

7    B-read-only patient files.   True?

8    A     Would you repeat the whole --

9    Q     I'll go about it this way.  You were here for the

10   testimony of both Liz Voorhies and Nurse Tami Reatz this

11   morning.  Correct?

12   A     Yes.  Correct.

13   Q     And Exhibit 40, page 2, was put up on the screen during

14   the testimony for, I believe it was, Ms. Voorhies' testimony.

15   Do you recall seeing Exhibit 40, page 2, what I'll reference

16   as the B-reader letter, this morning?

17   A     Yes.

18   Q     And this letter indicates that in Marilyn E.'s case, in

19   Judy P.'s case, in Patrick W.'s case, in Tonsie J.'s case, in

20   Jay J.'s case, in Sheila B.'s case -- and I could go down the

21   list of over 100 patients -- there are letters indicating that

22   CARD said, in some form or fashion to each of those patients,

23   that they were eligible for Medicare benefits even though they

24   did not have a diagnosis of asbestos-related disease.

25   Correct?

1   A    Correct.

2   Q    This letter in Marilyn E.'s case, in Judy P.'s case, and

3   other B-read-only patient cases reads as follows:

4        "You participated in . . . health screening on [a certain

5   date] and at that time you were not diagnosed with an asbestos

6   related disease (ARD).  You received a letter at the

7   conclusion of your appointment that informed you that your

8   chest x-ray and CT would be sent out for a second read by

9   other doctors specially trained in reading radiographic images

10  for dust diseases (like asbestos)."

11       Did I read the first section of this letter correctly?

12  A    Yes.

13  Q    The next paragraph:

14       "One of these doctors did identify a small abnormality on

15  your chest x-ray.  It is nothing that has significant health

16  implications nor is it considered a diagnosis of an asbestos

17  related disease."

18       Did I read that correctly?

19  A    Yes.

20  Q    "A diagnosis of asbestos related disease is based on

21  exposure histories, time since exposure, medical provider

22  assessment, and radiographic images.  The reader who

23  identified the abnormality did not have the rest of this

24  information."

25       Did I read that correctly?

1    A    Yes.

2    Q    Letters at CARD went out to these patients, however, that

3    said something along the lines of the following:

4        "We are notifying you of this finding because any type of

5    abnormality identified by the outside reader, even if it is

6    not a diagnosis of asbestos related disease, qualifies you for

7    certain medical benefits."  This section is bolded:  "You are

8    now eligible for the Medicare Pilot Program for

9    [asbestos-related disease] that covers medically necessary

10   services not covered by usual medical insurance programs,

11   ([example] mileage, fitness club memberships, assistance with

12   daily living).  Information about these programs is enclosed."

13       Did I read that correctly?

14   A    Yes.

15   Q    So, Dr. Black, during the testimony this morning, we

16   heard that occasionally CARD patients would call the clinic

17   and speak to Liz Voorhies, confused about this letter.

18   Correct?

19   A    Yes.

20   Q    Sometimes they would have questions for CARD about, "How

21   can I be eligible for Medicare benefits when I don't have an

22   asbestos-related disease?" and other related questions,

23   according to Ms. Voorhies' testimony this morning.  Correct?

24   A    Correct.

25   Q    Ms. Voorhies testified that these questions came up more

42

1   than once at CARD in this B-read-only category of patients.
2   Correct?
3   A    Correct.
4   Q    Ms. Voorhies testified that this was a conversation that
5   she had with multiple CARD patients to try to explain that
6   confusion.   Correct?
7   A    Correct.
8   Q    This whole notion that a patient doesn't have to have a
9   diagnosis of asbestos-related disease but can still get
10  Medicare benefits, pilot program benefits, and other benefits
11  for life, on its face, seems confusing.   Correct?
12  A    Yes.
13  Q    Your clinic is called the Center for Asbestos Related
14  Disease.   Correct?
15  A    Correct.
16  Q    It is not called the Center for Signing People Up for
17  Medicare Benefits Who Do Not Have Asbestos-Related Disease.
18  Correct?
19  A    Yes.   For clinical.   Yeah.
20  Q    So, sir, despite all of these ongoing questions at the
21  CARD Clinic among this entire set of over a hundred
22  B-read-only patients, did it occur to you or anyone else at
23  CARD that maybe you should carry this question forward to the
24  Social Security Administration?
25  A    No.

1    Q    Never.  Not one time did anybody at CARD approach the

2    Social Security Administration in a ten-plus-year span of time

3    to clarify whether CARD's conduct was correct, legitimate, or

4    nonfraudulent until April of 2023.  Correct?

5    A    I'm gonna ask you to rephrase that.

6    Q    I will.

7         Sir, when I deposed you, you testified that neither you

8    nor anyone at CARD, aside from Tanis Hernandez -- Tanis

9    Hernandez is a former CARD employee.  Correct?

10   A    Yes.

11   Q    Tanis Hernandez was the lead person at CARD when it came

12   to issues of communicating with the SSA.  Correct?

13   A    Yeah.  She was our administrator.

14   Q    She was your administrator at CARD.

15        Aside from Tanis Hernandez's communication with SSA, you

16   didn't reference in your deposition any other communication

17   with SSA in writing, over the phone, or face to face in any

18   form or fashion that CARD had carried this question forward to

19   the SSA about whether it was proper to submit B-read-only

20   patients for lifetime Medicare benefits without a diagnosis of

21   asbestos-related disease.  Correct?

22   A    Correct.

23   Q    And in terms of this question coming up, the question

24   about B-read-only patients being submitted for Medicare, it

25   kept coming up.  Even the patients themselves would call CARD

1   year after year after year after year after year, according to

2   Liz Voorhies's testimony.   Correct?

3   A     Correct.

4   Q     And not one time did you ever call the Social Security

5   Administration to determine whether this practice was okay.

6   Correct?

7   A     Not that I know of.

8             THE COURT:   Mr. Duerk, we'll take our morning

9   recess.

10            We'll be in recess for about 15 minutes.

11        (Recess taken from 10:27:43 to 10:51:09.)

12        (Open court.)

13        (Jury present.)

14            THE COURT:   Please be seated.

15            Mr. Duerk, you may proceed with your examination.

16            MR. DUERK:   Thank you, Your Honor.

17   BY MR. DUERK:

18   Q     Before we left, we were talking about times that CARD

19   patients would call with questions about this B-read-only

20   program.   Do you recall that part of your testimony?

21   A     Yes.

22   Q     I'd like to move on to a different topic now.

23        Sir, when you were deposed in January of 2022, we talked

24   about some representations that you made on the record about

25   who from the SSA taught CARD to fill out EHH forms in

1   B-read-only patient cases.  Do you recall that topic coming up

2   in January of 2022?

3   A    Yes, I do.

4   Q    Sir, you were under oath during your deposition in

5   January of 2022, and it was your obligation to tell the truth,

6   the whole truth, and nothing but the truth, so help you.

7   Correct?

8   A    Correct.

9   Q    That is your obligation today.  Correct?

10  A    Yes.

11  Q    At that deposition, you told me that the SSA taught CARD

12  to fill out EHH forms in B-read-only patient cases like

13  Judy P.'s.  Correct?

14  A    Correct.

15  Q    You told me that someone at the SSA taught, directed,

16  explained, and instructed CARD to fill out EHH forms for

17  B-read-only patients.  Correct?

18  A    Correct.

19  Q    I asked you who, who instructed CARD to fill out EHH

20  forms this way, and under oath you told me that it was a

21  representative from the Social Security Administration.

22  Correct?

23  A    Correct.

24  Q    And I asked the question, "Yes, but who at the Social

25  Security Administration taught you how to fill out these

1   forms?"  And at first, you didn't tell me who the identity of

2   that SSA individual was.  Correct?

3   A    Correct.

4   Q    And so I asked you again, twice, and finally you came up

5   with a name.  You told me it was someone named Sonya.

6   Correct?

7   A    Correct.

8   Q    I asked you when Sonya told you that it was okay to fill

9   out EHH forms this way, and you said "early on."  Correct?

10  A    Yes, I believe so.

11  Q    I asked what year Sonya at the SSA told you that, and you

12  guessed that it must have been in 2011.  Correct?

13  A    Correct.

14  Q    I asked you where, where did this meeting with Sonya

15  happen.  Correct?

16  A    Correct.

17  Q    And you said that Sonya, the SSA, came to Libby.

18  Correct?

19  A    Yes.

20  Q    You said that they came to the CARD Clinic in Libby.

21  Correct?

22  A    Correct.

23  Q    You said they sat down with your staff.  Correct?

24  A    Correct.

25  Q    You said that Sonya from the SSA was the leader of that

```
 1   group.  Correct?
 2   A     (No response.)
 3   Q     Yes?
 4   A     The leader?
 5   Q     The leader of that group.
 6   A     Yeah.  Yes.
 7   Q     Correct?
 8   A     (Nodded head affirmatively.)
 9   Q     Is that a yes?
10   A     Yes.
11   Q     Thank you.
12         You said, and I'll quote, "[T]hey went over in detail how
13   to fill these out because of the quandary -- I mean, the
14   awkwardness of trying to fit in a positive B-read and, you
15   know, when you didn't diagnose, yet, by the law, they have
16   access.  And so they explained to do it this way, and that's
17   the way our staff has done it, by the book."
18         That's what you told me in January of 2022.  Correct?
19   A     I don't know how I said it exactly, but, anyway --
20   Q     If you would turn --
21   A     -- I did, I did say that, I'm sure, so.
22   Q     If you would turn to page 72?
23   A     Yes.
24   Q     If you would look at lines 5 -- I'm sorry, lines 2 to 10.
25         I'll read it.  Please tell me if I've read it correctly.
```

1      Your words:  "They came to Libby.  They came to the CARD

2   Clinic and they sat down with our staff, and I understand

3   Sonya was the leader of that group, and they went over in

4   detail how to fill these out because of the quandary -- I

5   mean, the awkwardness of trying to fit in a positive B-read

6   and, you know, when you didn't diagnose, yet, by the law, they

7   have access.  And so they explained to do it this way, and

8   that's the way our staff has done it, by the book."

9      Did I read that correctly?

10  A    Yes.  Yes, you did.

11  Q    Then I asked who else was at this Sonya meeting, and you

12  told me you didn't know because you weren't there.  Correct?

13  A    That's correct.

14  Q    I asked if you had any record of that meeting, and you

15  said no.

16  A    No.

17  Q    You didn't have any record of that meeting between Sonya

18  and CARD staff.  Correct?

19  A    No, I didn't.

20  Q    I asked you twice at your deposition if you had any

21  written authorization from the Social Security Administration

22  to enroll people in Medicare under the pilot program or

23  Medicare for life on the basis of an outside B-read-only.  Do

24  you recall that?

25  A    Yes.

1   Q    And you said that's something that was in the details,

2   that I'd have to ask the right people, that you didn't know.

3   Correct?

4   A    (No response.)

5   Q    If you would look at page 73, lines 10 -- lines 6

6   through 11.

7        I asked:  "Do you have any written authorization from the

8   Social Security Administration to enroll people in Medicare

9   under the Pilot Program or Medicare for life on the basis of

10  an outside B-read-only?"

11       Your answer:  "That's something in the details you'll

12  have to ask the right people.  I don't know."

13       Did I read that correctly?

14  A    Yes.

15  Q    Then I asked who the right people were, and you indicated

16  that Sonya was the right person to talk to.  Correct?

17  A    Yes.

18  Q    "The right people."  So this jury heard from the Social

19  Security Administration.  You're aware of that, correct?

20  A    Yes.

21  Q    Heather Hillmann, the Medicare lead, and Monica Nolan,

22  the Social Security Administration policy expert, testified

23  before this jury under oath.  Correct?

24  A    Correct.

25  Q    These would also be the right people.  Correct?

1    A    I don't, I don't know those people, but they would appear
2    to be now, so, yeah.
3    Q    Right.  And Ms. Nolan and Ms. Hillmann were designated by
4    the Social Security Administration as 30(b)(6) witnesses.
5    Correct?
6    A    Yes.
7    Q    Okay.  And I'll try to hack through the legalese, but a
8    30(b)(6) representative is someone who either has personal
9    knowledge or, through investigation, research, communication,
10   and inquiry, is supposed to obtain actual knowledge.  Does
11   that make sense to you?
12   A    Yes.
13   Q    So Monica Nolan and Heather Hillmann would clearly be the
14   right people to respond to this inquiry about the B-read-only
15   program?
16   A    Yeah, I don't know where they fit in the, in the -- over
17   time.  I'm not sure where they fit.
18   Q    That, that's right.  You weren't here for Ms. Nolan or
19   Ms. Hillmann's testimony.  Correct?
20   A    I caught part of it, anyway, so.
21   Q    "Caught part of it."
22   A    Yeah.
23   Q    Whose testimony?
24   A    I was trying to think who it was.  I think, I think it
25   was Hillmann, I believe, so.

1   Q    You didn't stay for all of it.  Correct?

2   A    I think it was on one day and I missed part of it, and

3   then I picked it up the next day.

4   Q    Did you hear that Ms. Hillmann was the Medicare lead

5   during her testimony?

6   A    I think I picked that up, yes.

7   Q    Did you pick up that Ms. Hillmann, as part of her

8   inquiry, had communicated with field staff in the Kalispell

9   office, including Terra Whiteman, the Kalispell field office

10  supervisor and manager?

11  A    Yeah.  I think she said Sonya was gone so they didn't

12  have any contact there, so, yeah.

13  Q    Did you hear that Ms. Hillmann conducted interviews and

14  an inquiry of whether the SSA ever taught, directed,

15  explained, or instructed CARD to fill out EHH forms in the way

16  that you were suggesting that the SSA taught, directed,

17  explained, and instructed Tanis Hernandez to fill out those

18  forms?

19  A    I wasn't surprised because I, I --

20  Q    That's not, that's not my question.

21  A    Oh.  Go ahead.

22  Q    Did you hear their testimony?  Did you hear Heather

23  Hillmann's testimony that no one at SSA taught, directed,

24  explained, or instructed to anyone at CARD how to fill out EHH

25  forms for patients who did not have a diagnosis?

1   A     Yes.

2   Q     So back to your deposition in January of 2022.

3         At your deposition, I asked you who at CARD was present

4   on behalf of CARD for that meeting with Sonya.  Right?

5   A     Yes.

6   Q     And you said Tanis Hernandez, during your deposition.

7   Right?

8   A     That's who I thought, yes.

9   Q     That's who you said in your sworn deposition.

10  A     Said, okay.  Said, yeah.

11  Q     You heard Tanis Hernandez's sworn deposition testimony

12  that was read into the record during this trial.  Correct?

13  A     Yes.

14  Q     You were here for that.  Right?

15  A     Yes.

16  Q     And you heard Tanis Hernandez state under oath that she

17  would have been the lead person at CARD for these types of

18  discussions with the SSA.  Correct?

19  A     Yes.

20  Q     And during your deposition last year, the only CARD staff

21  member you mentioned that attended this meeting between Sonya

22  and CARD was Tanis Hernandez.  Correct?

23  A     Yes.

24  Q     You didn't mention any other names.  Correct?

25  A     Correct.

1   Q    You had a chance after your deposition to review your

2   testimony and submit corrections in the errata sheet.

3   Correct?

4   A    Yes.

5   Q    And you did not do that.  Correct?

6   A    I didn't.

7   Q    So Tanis Hernandez.  Tanis Hernandez was the only person

8   that apparently you could recall that attended this meeting

9   with Sonya Hymas from the SSA.  Right?

10  A    Yes.

11  Q    Now Tanis Hernandez left CARD in 2015?

12  A    It must have been around there.  I'm not quite sure on

13  the years.

14  Q    That's okay.

15       To the best of your knowledge, Tanis moved to a little

16  town in Washington State somewhere in the shadow of

17  Mt. Rainier.  Correct?

18  A    Yes.

19  Q    Tanis was the very next deposition in this case, I'll

20  represent to you, after your January 19, 2022 deposition.

21  Right?

22  A    Right.

23  Q    On February 16, 2022, I'll represent to you that less

24  than one month after your deposition, Tanis Hernandez was

25  under oath.  Do you have any reason to disagree with me?

1    A      No.

2    Q      Yeah.  And you heard her testimony.  Correct?

3    A      Yes.

4    Q      You heard her testimony from that February 2022

5    deposition.  Right?

6    A      Yes.

7    Q      And she testified that she never, never met with Sonya.

8    Correct?

9    A      Correct.

10   Q      She testified she never, never met with any SSA official

11   at CARD for a meeting about EHH forms.  Correct?

12   A      Correct.

13   Q      She testified she never met with anyone at SSA to talk

14   about EHH forms.  Correct?

15   A      Correct.

16   Q      She testified that she never was taught, directed,

17   explained to, or instructed how to fill out EHH forms for

18   B-read-only patients.  Correct?

19   A      Correct.

20   Q      And you heard, in her testimony, that I asked her this

21   specific question multiple ways, multiple different times.

22   Correct?

23   A      Correct.

24   Q      The facts related to Tanis Hernandez and a meeting with

25   SSA that never happened is an undisputed fact in this case as

1    well.  Correct?

2    A    I did say it at that time, yes.

3    Q    And you're aware that there is no dispute from you or

4    CARD that a meeting with Tanis Hernandez and Sonya Hymas to

5    fill out EHH forms in this way ever happened?

6    A    No.  It didn't happen.

7              MR. DUERK:  If we could go to Exhibit 109, page 26?

8              MS. HANENBURG:  (Complied with request.)

9    BY MR. DUERK:

10   Q    Sir, I'll assert to you that I'm about to put some

11   undisputed facts on the screen in front of you.

12        Just, just to be clear, focusing on paragraph 100, this

13   reads, "Dr. Black testified that the Social Security

14   Administration 'taught' CARD to put incorrect entries on

15   patient EHH forms."

16        That fact is undisputed.  Correct?

17   A    It doesn't sound right, but I guess I did, so.

18   Q    That fact is undisputed in this case.  Correct?

19   A    Yes.

20             MR. DUERK:  If we could go to paragraph 101?

21             MS. HANENBURG:  (Complied with request.)

22   BY MR. DUERK:

23   Q    "Dr. Black testified that SSA employee Sonya 'taught'

24   CARD staff how to fill out EHH forms for patients with a

25   positive B-read."

1          That fact, also, undisputed.  Correct?

2    A    Yes.

3          Could I ask you a favor?  My hearing aids don't pick up

4    your voice as well, and if you could talk a little slower,

5    please, so I can pick up everything you're saying?

6    Q    I will, sir, and I'll step into the microphone.  Is this

7    a little better?

8    A    Yeah.  It's more the speed, though, the voice.  I think I

9    hear, you know, your words, but it's just the -- when you go

10   fast, you don't pick the words up as fast, so.

11   Q    Understood.  I'll beg the jury's patience.

12        Paragraph 102:  It is an undisputed fact in this case

13   that "Dr. Black testified that Sonya provided that instruction

14   sometime around 2011, in Libby Montana, at the CARD Clinic."

15        That fact is undisputed in this matter.  Correct?

16   A    That's correct.

17   Q    Paragraph 103:  "Dr. Black admitted he was not at the

18   meeting."

19        Did I read that correctly?

20   A    Yes.

21   Q    And, "Dr. Black admitted he had no record of a meeting

22   with Sonya taking place or any written authorization for CARD

23   to follow the B-reader procedure he described."

24        Correct?

25   A    Correct.

1    Q    Okay.  Now, Dr. Black, in terms of Tanis Hernandez's

2    testimony, I asked her who she consulted with at the Social

3    Security Administration, who she reached out to for advice on

4    this issue, whether any lawyers instructed her that submitting

5    patients on a B-read alone was okay, and she stated that she

6    had not consulted with anyone.

7         You heard that testimony as well.  Correct?

8    A    Yes.

9    Q    And you did not mention in your deposition that you met

10   with anyone at SSA about this issue, either.  Correct?

11   A    Right.  No firsthand.

12   Q    No firsthand.  And no secondhand, either.  You didn't

13   meet with the Social Security Administration to speak with

14   them directly about this issue.  Correct?

15   A    Correct.

16   Q    And, furthermore, this discussion about whether the

17   Social Security Administration approved of this process went

18   no further than Sonya.  Correct?

19   A    Correct.

20   Q    And when we closed out this topic during your deposition

21   testimony, you stated that this meeting happened sometime in

22   2010 or 2011, that that's when the meeting with Sonya

23   occurred.  Correct?

24   A    Yes.

25   Q    Everything in your testimony about a meeting between

1    Tanis Hernandez and Sonya Hymas to fill out EHH forms was

2    false.   Correct?

3    A    Yes.   I was wrong.

4    Q    And in terms of any follow-up communication from the SSA

5    between Tanis and the Social Security Administration, Tanis

6    admitted that she had no record, no authorization, no emails,

7    no anything that showed that a communication occurred between

8    Tanis and the SSA about the B-read-only practice, either.

9    Right?

10   A    Right.   Yes.

11   Q    We also heard from Heather Hillmann about this whole

12   topic of whether there was any communication between the SSA

13   and CARD.   Were you here for Hillmann's testimony where she

14   said she looked into this, and she never found any evidence

15   that the SSA taught CARD to fill out EHH forms?

16   A    Yes.   I heard that, yeah.

17   Q    Okay.   Were you also here for Ms. Hillmann's testimony

18   when she described this practice at CARD of submitting

19   patients who hadn't been diagnosed with an asbestos-related

20   disease as fraud?   Did you hear that from her?

21   A    I did hear that, yes.

22   Q    She said, in several different ways, that that kind of

23   practice would be fraudulent.   Correct?

24   A    Yes.

25   Q    I'd like to turn the page.   There are some other

1    undisputed facts in this case that I think might streamline

2    things going forward.

3         If we could look at Exhibit 109, page 4, paragraph 9?

4              MS. HANENBURG:   (Complied with request.)

5    BY MR. DUERK:

6    Q    "According to CARD, the purpose of the Environmental

7    Health Hazard (EHH) provisions in the Affordable Care Act was

8    to provide benefits for people who were exposed to Libby

9    asbestos, not to provide Medicare benefits to people who are

10   not sick."

11        Would you agree with that statement?

12   A    Yes.

13             MR. DUERK:   If we could turn to page 3 of

14   Exhibit 109?   I'm looking at paragraph 6.

15             MS. HANENBURG:   (Complied with request.)

16   BY MR. DUERK:

17   Q    "There is no provision stated in Section 1881A of the

18   Affordable Care Act that creates an exception for a patient to

19   be eligible for Medicare benefits without a diagnosis."

20        Did I read that correctly?

21   A    Yes.

22             MR. DUERK:   If we could turn to paragraph 30 on

23   page 109-10?

24             MS. HANENBURG:   (Complied with request.)

25   ///

1    BY MR. DUERK:

2    Q    "At CARD it is the individual treating physician who

3    diagnoses asbestos-related disease."

4         Did I read that correctly?

5    A    Yes.

6    Q    Now you knew all of these facts when you were deposed on

7    January 19, 2022.  Is that right?

8    A    Yes.

9    Q    And you knew all of the facts in Document 109 related to

10   the alleged meeting between Tanis Hernandez and the Social

11   Security Administration.  Correct?

12   A    I'm sorry; would you --

13   Q    That's okay.

14        It's undisputed in this case that there are over a

15   hundred patients who fall into the B-read-only category at

16   CARD.  Correct?

17   A    Correct.

18   Q    In fact, when asked, CARD produced EHH forms for patients

19   who fell into this category to my law office.  Correct?

20   A    I'm sorry; would you --

21   Q    Sure.  CARD forwarded 160 patient EHH forms in the

22   category of patients who had no diagnosis of an

23   asbestos-related disease.  Correct?

24   A    Correct.

25   Q    I'm sorry; did you say --

1    A    Correct.  I'm sorry.

2    Q    Okay.  So in terms of those patients, it's an undisputed

3    fact in this case that there are over a hundred patients with

4    no diagnosis of asbestos-related disease who nevertheless have

5    been submitted for Medicare benefits.  Correct?

6    A    As far as clinical diagnosis, correct.

7    Q    There are even more patients.

8         If we could go to Exhibit 109, page 37, please?  I'm

9    sorry; Exhibit 109, page 37, paragraph 138, please.

10             MS. HANENBURG:  (Complied with request.)

11   BY MR. DUERK:

12   Q    This reads:  "These EHH forms were sent in response to

13   Relator's Request for Production No. 7 related to the 344

14   entries for 'outside read only' patients in CARD's Screening

15   Database referenced in Chris Ekstedt's deposition."

16        Correct?

17   A    Yes.

18   Q    Okay.  I'll try to clean this up somewhat.

19        I'll represent to you that at some point in the discovery

20   process, I learned that there were 344 patient entries in

21   CARD's master dataset that apparently fell into this category

22   of B-read-only or outside-read-only patients.  Fair?

23   A    Sounds like the number I've heard before.

24   Q    And in terms of the EHH forms of patients that fell into

25   this category, CARD forwarded 160 individual EHH patient forms

1    for patients who had no diagnosis of asbestos-related disease
2    but nevertheless had been submitted to the Social Security
3    Administration for Medicare.  Correct?
4    A    A little slower, please.
5              MR. DUERK:  If we can go to paragraph 137?
6              MS. HANENBURG:  (Complied with request.)
7    BY MR. DUERK:
8    Q    Sir, "CARD forwarded 160 patient EHH forms in the
9    'Medicare Eligible based on an outside read' category to
10   Relator."
11        This fact is undisputed.  Correct?
12   A    Correct.
13   Q    And in terms of those EHH forms, we're talking about
14   patients who did not have a CARD diagnosis of asbestos-related
15   disease.  Correct?
16   A    Correct.
17   Q    Sir, I'd like to turn your attention to some articles
18   that this jury has heard about related to Libby amphibole
19   disease.
20        We heard about some of the articles that you've published
21   in this matter.  Correct?
22   A    Yes.
23   Q    In terms of those articles, one of them is titled "Rapid
24   progression of pleural disease due to exposure to Libby
25   amphibole:  'Not your grandfather's asbestos related

1    disease.'"  Correct?

2    A     Correct.

3    Q     That article was published in November of 2014.  Correct?

4    A     I think that is right, that time, yes.

5    Q     That article focuses on lamellar pleural thickening and

6    five illustrative cases from CARD.  Correct?

7    A     Yes.

8    Q     That article discusses the rapid progression of

9    asbestos-related disease in Libby that you allege is one of

10   the defining features of Libby disease.  Correct?

11   A     Yes.

12   Q     You and Dr. Whitehouse concluded in this article that

13   exposure to Libby asbestos causes disease that is more rapidly

14   progressive and more severe than ordinary asbestos-related

15   disease.  Correct?

16   A     Dr. Whitehouse and several other investigators were

17   involved in that, so, yes.

18   Q     And Dr. Whitehouse, you, and some other authors concluded

19   that Libby asbestos causes disease that is more rapidly

20   progressive and more severe than the usual asbestos-related

21   disease.  Correct?

22   A     That's one phenomenon, yes.

23   Q     Okay.  Now in terms of that period of rapid progression,

24   you stated in the article, and you've stated to others over

25   the course of many years, that Libby disease progresses from

1   the earliest sign of detection to severe disease, even death,

2   in a period that sometimes is as little as six years.

3   Correct?

4   A    Yes.

5   Q    Okay.  You and Dr. Whitehouse disclosed no conflicts of

6   interest in that 2014 study.  Correct?

7   A    Correct.

8            MR. DUERK:  Your Honor, I'd like to offer

9   Impeachment Exhibit 272.  I intend to use this as a

10  demonstrative only.  May I approach?

11           THE COURT:  You may.

12           MR. DUERK:  (Handing.)

13           THE COURT:  Any objection, Mr. Bechtold?

14           MR. BECHTOLD:  No, Your Honor.

15           THE COURT:  272 is admitted -- do you wish to have

16  it admitted solely for demonstrative purposes?

17           MR. DUERK:  Solely for demonstrative purposes.

18           THE COURT:  It is admitted for demonstrative

19  purposes.

20       (Demonstrative Exhibit 272 was received in evidence.)

21           THE CLERK:  Am I publishing?

22           THE COURT:  It may be published.

23           MR. DUERK:  If we could publish page 1 of

24  Exhibit 272?

25           THE CLERK:  (Complied with request.)

1   BY MR. DUERK:

2   Q    Dr. Black, in terms of this article, I'd just like to

3   highlight the disclosure section here.  Do you see it?

4   A    Yes.

5   Q    Do you see the disclosure section here states that

6   authors Drs. Black, Szeinuk, Whitehouse, Levin, and Flores

7   have no conflicts of interest to disclose?

8   A    I see that, yes.

9   Q    You would acknowledge that in terms of conflicts of

10  interest for academic papers, conflicts of interest such as

11  cooperating or testifying on behalf of plaintiff's attorneys,

12  receiving gifts or donations from special interests, those are

13  the types of things that should be disclosed in these

14  peer-reviewed academic journals prior to publication.

15  Correct?

16  A    I would assume so, yes.

17  Q    Not -- I'm not asking if you would assume so.  If you

18  know or you don't know, either is fine.  But we've heard

19  testimony about multiple articles being submitted for

20  publication by you and others at CARD.  Correct?

21  A    Yes.

22  Q    And in terms of submitting those articles for publication

23  in academic journals, the conflict of interest or the

24  disclosure section is fairly standard.  Correct?

25  A    That's correct, yes.

1    Q    And when it comes to filling in the blanks here with

2    disclosures or conflicts of interest, there's an obligation in

3    the medical community and the academic community to be true,

4    accurate, and complete about disclosures related to conflicts

5    of interest.  Correct?

6    A    Correct.

7             MR. DUERK:  Okay.  You can take this off the screen.

8             THE CLERK:  (Complied with request.)

9    BY MR. DUERK:

10   Q    Doctor, there was a mortality study that was authored in

11   part by Dr. Alan Whitehouse from the CARD Clinic.  Correct?

12   A    Yes.

13   Q    The mortality study began and had its genesis at CARD

14   sometime well before it was published in an academic journal

15   last year.  Correct?

16   A    Yes.

17   Q    And Dr. Whitehouse and you and others worked on the

18   underlying data for that mortality study that was eventually

19   published in 2022 for almost a decade.  Fair?

20   A    Yes.

21   Q    The underlying data for that mortality study was based in

22   part on CARD's records of patient care in Libby, Montana.

23   Correct?

24   A    They were CARD patients in the mortality, yes.

25   Q    All right.  And when that published study came out in

1   2022, it also included a conflict of interest and disclosure

2   section for each of its authors.  Correct?

3   A    Yes.

4   Q    Dr. Black, CARD has a foundation that collects funds that

5   are used to benefit CARD.  Correct?

6   A    We used to.  We no longer do, but we used to have a

7   foundation, yes.

8   Q    That CARD Foundation used to serve CARD by raising funds

9   from various individuals and entities.  Correct?

10  A    Yes, and events and things like that.  We would try --

11  the foundation would try to build some reserve for special

12  needs in CARD.

13  Q    You've been deposed about the CARD Foundation in the past

14  by me.  Correct?

15  A    Yes.

16  Q    And during your deposition testimony, you were careful to

17  say that CARD doesn't receive direct financial contributions;

18  it is the foundation that receives direct financial

19  contributions.  Correct?

20  A    Right.

21          MR. DUERK:  If we could turn to Exhibit 54, page 1?

22          MS. HANENBURG:  (Complied with request.)

23  BY MR. DUERK:

24  Q    Sir, CARD has a newsletter that it's published in the

25  past?

1   A    (No response.)

2            THE CLERK:  You can put it up.  It's not in.

3            MR. DUERK:  Oh, Exhibit 54 is not in?  I apologize.

4   Thank you.

5            I would move the admission of Exhibit 54, CARD

6   newsletter.

7            THE COURT:  Any objection?

8            MR. BECHTOLD:  No, Your Honor.

9            THE COURT:  Fifty-four is admitted --

10           MR. DUERK:  Thanks.  My apologies.

11           THE COURT:  -- and may be published.

12       (Exhibit 54 was received in evidence.)

13  BY MR. DUERK:

14  Q    If we could look at Exhibit 54, page 1, do you see

15  something noted as the Libby Montana News Archive?

16  A    Yes.

17  Q    Sir, you were asked questions about the Montana -- or,

18  I'm sorry, the Libby Montana News Archive during your

19  deposition in January of '22?

20  A    I do remember something, some questions, yes.

21           MR. DUERK:  If we could blow up the photo and

22  caption here?

23           MS. HANENBURG:  (Complied with request.)

24  BY MR. DUERK:

25  Q    Sir, does this part of the newsletter talk about a

1    donation to CARD?

2    A    Yes.

3    Q    In terms of this donation, it's hard to read the check,

4    but the newsletter itself talks about individuals at CARD

5    posing with a check in the amount of $24,381.94.  Correct?

6    A    Correct.

7    Q    Now this letter indicates that this check was donated to

8    the CARD Clinic by the CARD Foundation.  Correct?

9    A    Correct.

10   Q    CARD has received other donations directly from lawyers.

11   Correct?

12   A    Yes.

13   Q    And so these, these are funds that did not come through

14   the CARD Foundation itself.  Right?

15   A    The contributions went to the foundation.  You asked me

16   what?  I'm sorry.

17            MR. DUERK:  I'd offer Exhibit 15.  This is likewise

18   a CARD newsletter.

19            THE COURT:  Any objection, Mr. Bechtold?

20            MR. BECHTOLD:  No objection, Your Honor.

21            THE COURT:  Exhibit 15 is admitted.

22       (Exhibit 15 was received in evidence.)

23            MR. DUERK:  If we could turn to page 15 of

24   Exhibit 15?

25            MS. HANENBURG:  (Complied with request.)

1    BY MR. DUERK:

2    Q     In 2016, in September, the CARD Foundation received a

3    $10,000 donation from Simmons Hanley Conroy, a national law

4    firm based in Illinois.  Correct?

5    A     Correct.  Yes.

6    Q     "They are dedicated to their clients, employees and

7    communities who have been affected by asbestos related

8    disease."

9          Correct?

10   A     Correct.

11   Q     "Simmons Hanley Conroy make it a priority to give back to

12   the people and communities they represent and are one of the

13   nation's leading contributors to mesothelioma cancer research.

14   This was their second $10,000 donation."

15         Did I read that correctly?

16   A     Correct.

17   Q     Okay.  Now these donations went directly to CARD, not

18   through the foundation.  Correct?

19   A     Correct.

20   Q     So in terms of the times that I deposed you about all

21   donations going through the CARD Foundation, these donations

22   went directly to the clinic.  Correct?

23   A     Yes.

24   Q     These donations here in CARD's newsletter are not the

25   only funds from lawyers that CARD has received through the

1   foundation.  Correct?

2   A     Correct.

3         MR. DUERK:  If we could -- I would offer Exhibit 9

4   into evidence.

5         THE COURT:  Any objection?

6         MR. BECHTOLD:  No, Your Honor.

7         THE COURT:  Exhibit 9 is admitted.

8      (Exhibit 9 was received in evidence.)

9         MR. DUERK:  If we can show (indicating) just this

10  portion?

11        MS. HANENBURG:  (Complied with request.)

12  BY MR. DUERK:

13  Q   Dr. Black, in terms of CARD donations through the years,

14  does Exhibit 9 show different donations from various

15  plaintiffs' attorneys in Montana?

16  A     Yes.

17  Q   Do we see, in 2012, a $50,000 donation from a plaintiff's

18  attorney?

19  A     Yes.

20  Q   In 2013, do we see a $10,000 donation from the same

21  plaintiff's attorney?

22  A     Yes.

23  Q   In 2014, do we see a $5,000 donation from a plaintiff's

24  attorney?

25  A     Yes.

1  Q     In 2014, do we see a $30,000 donation that's described in

2  parentheses as the "Mortality Study Grant"?

3  A     Yes.

4  Q     We'll get back to that in a moment.

5        But in 2015, do we see another $10,000 donation?

6  A     Yes.

7  Q     Do we see, in 2016, a $3,000 donation?

8  A     Yes.

9  Q     In 2017, another $3,000 donation?

10 A     Yes.

11 Q     And then again in 2017, do we see a donation from what's

12 titled the Kovacich Law Firm for $5,000?

13 A     Correct.

14 Q     Over the years, do we see a total donation amount of

15 $116,000 from plaintiffs' attorneys?

16 A     Yes.

17 Q     Now these are donations, to be clear, that were made to

18 the CARD Foundation and then funneled to CARD.  Correct?

19 A     Yes.

20 Q     This list of donations in Exhibit 9 does not include the

21 two $10,000 donations from a national plaintiff's law firm.

22 Correct?

23 A     Correct.

24 Q     And this list of donations also does not capture the

25 donation to the CARD Foundation in the amount of $24,000 for

1    the new parking lot.  Correct?

2    A    Correct.

3    Q    Now back to the mortality study.  We see a $30,000

4    donation for the mortality study referenced in these attorney

5    donations.  Correct?

6    A    Correct.

7    Q    One of the projects funded by the CARD Foundation was

8    Dr. Alan Whitehouse's mortality study.  Correct?

9    A    Correct.

10   Q    Dr. Whitehouse's mortality study was eventually published

11   in some form in an academic journal.  Correct?

12   A    Correct.

13   Q    Dr. Alan Whitehouse was paid approximately $30,000 for

14   that study.  Right?

15   A    I don't know that for a fact, but he did receive

16   reimbursement for his work, yes.

17           MR. DUERK:  I'd move the admission of Exhibit 116.

18   This is an excerpt from CARD's general ledger dated

19   December 31, 2014.

20           THE COURT:  Any objection?

21           MR. BECHTOLD:  No, Your Honor.

22           THE COURT:  116 is admitted.

23       (Exhibit 116 was received in evidence.)

24   BY MR. DUERK:

25   Q    Do you see Exhibit 116 on your screen, Dr. Black?

1   A     116?  160?

2   Q     Exhibit 116 --

3   A     Oh.  Got it here, yeah.

4   Q     -- is indicated on your screen.

5   A     Yeah.

6   Q     Correct?

7   A     Yeah.

8   Q     If we could continue down towards the bottom of this

9   exhibit, sir, do you see several columns, a column for date

10  range, a column for references, and columns related to check

11  amounts in this exhibit?

12  A     Yes.

13  Q     Do you see that on or about August 24, 2014, there was a

14  check paid in the amount of $30,000 that apparently looks like

15  this check was paid by CARD to Dr. Alan Whitehouse?

16          MR. BECHTOLD:  Misstates the testimony, Your Honor.

17          MR. DUERK:  Let me rephrase.  I'll double-check.

18  BY MR. DUERK:

19  Q     Now in terms of Dr. Whitehouse's mortality study, are you

20  aware of whether or not Dr. Whitehouse was paid for that

21  mortality study?

22  A     I think that that money went to do his work on it, yes.

23  Q     Understood.

24          And here I'm specifically asking whether that set of

25  $30,000 funds went into Dr. Whitehouse's pocket or went into

1    CARD's pocket that came from plaintiffs' attorneys.

2    A    No, it would go to Dr. Whitehouse.

3    Q    Okay.  Now in terms of the mortality study itself, there

4    were also CARD resources of the clinic that were used to

5    assist with that study.  Correct?

6    A    CARD -- you said CARD what?

7    Q    CARD resources such as staff time, clinic staff efforts

8    to help with Dr. Alan Whitehouse's work on the mortality

9    study.

10   A    Yes.

11   Q    And plaintiff attorneys paid for those expenses, too.

12   Correct?

13   A    I don't know about that.  I'm not sure.

14           MR. DUERK:  I would offer Exhibit 117 into evidence,

15   an email from Jon Heberling to Tanis Hernandez, November 18,

16   2011.

17           THE COURT:  Any objection?

18           MR. BECHTOLD:  No, Your Honor.

19           THE COURT:  117 is admitted.

20       (Exhibit 117 was received in evidence.)

21           MR. DUERK:  If we could look at the bottom of

22   Exhibit 117?

23           MS. HANENBURG:  (Complied with request.)

24   BY MR. DUERK:

25   Q    Now, Dr. Black, you were familiar with a plaintiff's

1   attorney named Jon Heberling?

2   A    Yes.

3   Q    Okay.  This appears to be an email sent on or about

4   November 18, 2011 from Tanis Hernandez at CARD to what appears

5   to be Jon Heberling.  Fair?

6   A    Yes.

7   Q    I'd like to read this.  Please tell me if I've read it

8   correctly.

9        "Jon, I talked with Brad regarding how best to move

10  forward with the mortality study.  This is a recap of the plan

11  as I just wanted to make sure that we are all on the same

12  page.

13       "1) CARD staff will scan records of 62 people onto disk

14  to be given directly to Alan Whitehouse."

15       Have I read that correctly so far?

16  A    Yes.

17  Q    "2) Brad suggested that Alan contact him directly to

18  request the information.

19       "3) We will need to ask staff to work outside of their

20  regularly scheduled hours to do this project.  We wondered if

21  your firm would be willing to offer compensation like when we

22  the [sic] spouse screening project for the state settlement.

23  Would you be agreeable to a rate of $25/hour to cover staff

24  time and supplies?"

25       Did I read that correctly?

1    A    Yes.

2         MR. DUERK:  If we could scroll up to Mr. Heberling's

3    response?

4         MS. HANENBURG:  (Complied with request.)

5    BY MR. DUERK:

6    Q    Mr. Heberling states, related to the CARD mortality

7    study, "Tanis, yes we can pay.  I am sending the recap on to

8    Dr. W."

9         Did I read that correctly?

10   A    Yes.

11   Q    So in addition to the $30,000 paid to Dr. Whitehouse,

12   there were plaintiffs' attorneys who paid for staff time at

13   CARD to do work on the mortality study.  Correct?

14   A    Correct.

15   Q    The mortality study was used by plaintiff attorneys to

16   make the point that Libby amphibole was a dangerous substance

17   and created a dangerous disease.  Correct?

18   A    No.

19   Q    If we could turn to your deposition at page 120?  I'm

20   sorry.  I'm sorry; 130, line 2 to line 8.

21        I'll read it.  Please tell me if I read it correctly.

22        "And the mortality study was used by plaintiffs'

23   attorneys, some of the plaintiffs' attorneys who paid for that

24   mortality study, to make the point that Libby amphibole was a

25   dangerous mineralogical substance and created a dangerous

1    disease; correct?"

2         Answer:  "Yeah."

3         Did I read that correctly?

4    A    It does say that here, yes.

5    Q    Now when it comes to that published study itself, the

6    "Case-fatality study of workers and residents with

7    radiographic asbestos disease in Libby, Montana" was first

8    published December 27, 2021.  Correct?

9    A    Yes.

10   Q    The authors of the study, in addition to Alan C.

11   Whitehouse, Dr. Whitehouse, were Dr. Arthur L. Frank,

12   Dr. Albert Miller, you, and others.  Correct?

13   A    Yes.  Well, Dr. Whitehouse had passed away --

14   Q    Understood.

15   A    -- and we all finished, we finished the work on that, so.

16        MR. DUERK:  Your Honor, I'd like to publish

17   Exhibit 271 for demonstrative purposes only as an impeachment

18   exhibit.

19        THE COURT:  Any objection, Mr. Bechtold?

20        MR. BECHTOLD:  Not to a demonstrative exhibit,

21   Your Honor.

22        THE COURT:  It is admitted for demonstrative

23   purposes and may be published.

24        (Demonstrative Exhibit 271 was received in evidence.)

25        MR. DUERK:  If we could put Exhibit 271, page 1, on

1   the screen?

2          MS. HANENBURG:  (Complied with request.)

3   BY MR. DUERK:

4   Q    Dr. Black, do you see Exhibit 271, page 1, on the screen

5   in front of you?

6   A    Yes.

7   Q    Is this essentially the culminating result of efforts on

8   the mortality study?

9   A    Yes.

10         MR. DUERK:  If we could publish the byline, so to

11  speak?  Blow up the byline.

12         MS. HANENBURG:  (Complied with request.)

13  BY MR. DUERK:

14  Q    Dr. Black, I'd like to focus on just a few of the

15  coauthors of this study.

16         We see Dr. Alan Whitehouse's name here.  Correct?

17  A    Yes.

18  Q    Now Dr. Albert Miller, M.D., Dr. Miller is one of the

19  physicians that CARD intends to call as an expert witness at

20  this trial.  Correct?

21  A    Yes.

22  Q    And Dr. Arthur L. Frank, M.D. is also another witness

23  that CARD intends to provide testimony at this trial.  Right?

24  A    Yes.

25  Q    I'd like to continue to the last page of this study,

1    what's marked as Exhibit 271, page 11.

2        Sir, do you see the conflict of interest section of this

3    study on page 11?

4    A    Yes.

5    Q    It says:  "Authors Alan C. Whitehouse, Arthur L. Frank,

6    Gregory Loewen, Albert Miller, and Charles B. Black have

7    provided expert medical consultative services for several law

8    firms in behalf of CARD or for other asbestos disease

9    patients."

10       Did I read that correctly?

11   A    Yes.

12   Q    Nowhere on this conflict of interest section does it

13   indicate in any way, shape, manner, or form that the

14   underlying work on this study was performed based on payments

15   from plaintiff attorneys.  Correct?

16   A    Correct.

17   Q    Dr. Black, when I deposed you in January of 2022, you

18   denied that CARD has referred patients to plaintiff attorneys

19   in Montana.  Correct?

20   A    Correct.

21           MR. DUERK:  If I could, I will offer Exhibit 10 into

22   evidence.

23           THE COURT:  Any objection to Exhibit 10,

24   Mr. Bechtold?

25           MR. BECHTOLD:  No, Your Honor.

1          THE COURT:  Exhibit 10 is admitted and may be

2     published.

3          (Exhibit 10 was received in evidence.)

4          MR. DUERK:  If we could blow this up, please?

5          MS. HANENBURG:  (Complied with request.)

6     BY MR. DUERK:

7     Q    Now despite the testimony from you denying that CARD has

8     referred patients to plaintiff law firms in Montana, I'd like

9     to read the text of this article -- or the text of this email.

10    This is from Tracy McNew to all staff at the CARD Clinic dated

11    January 8, 2018.  Correct?

12    A    Yes.

13    Q    It reads:  "Here is a link to the Daily Inerlake [sic]

14    article that details legal concerns effecting [sic] some of

15    our patients."

16         Did I read that correctly?

17    A    Correctly, yeah.

18    Q    "If patients ask about this, please refer them to a

19    lawyer."

20         Did I read that sentence correctly?

21    A    Yes.

22    Q    It continues:  "The two lawyers that are representing the

23    majority of Libby asbestos cases," and it identifies those

24    lawyers.

25         Correct?

1    A    Yes.

2    Q    Now it does say:  "Please do not recommend a lawyer as a

3    representative of CARD."

4         Correct?

5    A    Yes.

6              MR. DUERK:  You can take it down.

7              MS. HANENBURG:  (Complied with request.)

8    BY MR. DUERK:

9    Q    Doctor, the language of the mortality study article, when

10   it was published in 2021, stated that you provided consulting

11   services to plaintiffs' attorneys in the past.  Correct?

12   A    Yes.

13   Q    You have also provided expert witness testimony on behalf

14   of plaintiffs in the past as well.  Correct?

15   A    I have been -- testimony on behalf of patients.

16   Q    Yes.  You provided testimony in the *Holly Warboys* case,

17   for example.  Correct?

18   A    Yes.

19   Q    In Ms. Warboys' case, you diagnosed her with

20   asbestos-related disease.  Correct?

21   A    Correct.

22   Q    And I'm mentioning her name here in open court because

23   this is a published decision.  You understand that.  Correct?

24   A    Yes.

25   Q    In Ms. Warboys' case, despite the fact that CARD had

1    diagnosed her with asbestos-related disease, no other treating

2    physician agreed with you.  Correct?

3    A    I don't know.

4    Q    You don't recall that no radiologist found any evidence

5    of asbestos-related disease on CT scans or chest X-rays in

6    Ms. Warboys' case?

7    A    I'm aware of some of those, but I think -- my

8    understanding was there was another reader that had recognized

9    them, but I don't have the details, so.

10   Q    Fair enough.  But you found that Ms. Warboys had lamellar

11   pleural thickening in that case.  Correct?

12   A    Pleural thickening, yes.

13           MR. DUERK:  If we could, I would move the admission

14   of Exhibit 114.  This is the workers' comp decision on the

15   *Holly Warboys* case.

16           THE COURT:  Any objection?

17           MR. BECHTOLD:  No, Your Honor.

18           THE COURT:  114 is admitted.

19       (Exhibit 114 was received in evidence.)

20           MR. DUERK:  If we can turn to page 5 of Exhibit 114?

21           MS. HANENBURG:  (Complied with request.)

22   BY MR. DUERK:

23   Q    Dr. Black, I'd like to show you a couple of statements

24   that came up in the *Warboys* case.

25           If we could focus on paragraphs 25 and 26?  I'm sorry; if

1    we could focus on 25, 26, and 27, please?

2            MS. HANENBURG:   (Complied with request.)

3    BY MR. DUERK:

4    Q    Dr. Black, focusing on paragraph 27 first, on the issue

5    of lamellar pleural thickening, "Dr. Black explained that the

6    CARD Clinic's working group coined the term 'lamellar' pleural

7    thickening to describe a smooth, thin pleural thickening as

8    opposed to a 'standard diffuse pleural thickening.'"

9            Did I read that correctly?

10   A    Yes.

11   Q    Apparently you testified that "'lamellar pleural

12   thickening is in itself not a disease, it is a characteristic

13   of fibrosis, but it progresses and then becomes thick, so it

14   does lose its thinner nature, and some people can die just

15   basically [from] what appears to be restrictive pleural

16   disease.'"

17           Did I read that accurately?

18   A    Yes.

19   Q    So the topic of lamellar pleural thickening did come up

20   in the *Holly Warboys* case.   Correct?

21   A    Yes.

22   Q    In this case, you acknowledged that Ms. Warboys' CT scan

23   by itself showed "a 'nonspecific thickening of the lining of

24   the pleura.'"

25           Did I read that correctly?

1   A   Yes.

2   Q   And in this case, you testified that "the thickening is

3   too thin to measure its density on a CT scan"; thus, you rely

4   solely on what you see.

5       Did I read that right?

6   A   Yes.  My experience of what I see, yes.

7   Q   Yes.

8       And in terms of testimony about lamellar pleural

9   thickening, you were in the courtroom for Dr. Haber's

10  testimony yesterday.  Correct?

11  A   Yes.

12  Q   Dr. Haber had some testimony about lamellar pleural

13  thickening and whether or not there were any objective or

14  characteristic signs of lamellar pleural thickening that had

15  been described by you or by any other medical authority

16  related to the disease's specific characteristics.  Correct?

17  A   No, no other -- I'm sorry.  Let me -- I didn't get all of

18  that.  I'm sorry.

19  Q   That's okay, Doctor.  I'll back up.

20      First, when it comes to lamellar pleural thickening, no

21  other physician in the country has diagnosed lamellar pleural

22  thickening in any patient.  Correct?

23  A   I'm not aware of that, no.

24  Q   And in terms of lamellar pleural thickening, we've heard

25  testimony from multiple witnesses in this case that they can't

1    see it.  Correct?

2    A    Correct.

3    Q    In terms of Dr. Haber's testimony, you heard him testify

4    that in terms of any kind of description from you about

5    lamellar pleural thickening, he has not heard from you or from

6    anyone else any of the specific diagnostic characteristics of

7    what would constitute lamellar pleural thickening other than

8    it's thin and it's in the pleura.  Correct?

9    A    That's what he said, yes.

10   Q    Right.  And in terms of anything that you have said about

11   lamellar pleural thickening, in terms of categorizing how

12   thick or thin lamellar pleural thickening is, you have never

13   published a range of how thick lamellar pleural thickening is

14   in terms of millimeters.  Correct?

15   A    Not on a larger article, no.

16   Q    Right.  And there's never been a peer-reviewed or

17   control-group study related to lamellar pleural thickening.

18   Correct?

19   A    Correct.

20   Q    In terms of detecting lamellar pleural thickening, aside

21   from you, now, lamellar pleural thickening is something that

22   is too thin to measure its density on a CT scan; thus, the

23   observer has to rely solely on what they see with their eyes,

24   according to you.  Correct?

25   A    Correct.

1  Q    So there's no way, according to you, to verify that

2  lamellar pleural thickening exists when relying on the typical

3  measures for determining density on the lining of a pleura

4  with CT-scan tools.  Correct?

5  A    (No response.)

6  Q    Did I lose you?

7  A    Yeah.  I didn't follow that.

8  Q    I apologize.

9  A    Yeah.

10 Q    Sir, you're familiar with the term "Hounsfield units."

11 Correct?

12 A    Yes.

13 Q    You're familiar with the ability to use the

14 Hounsfield-unit density scale on a CT scan.  Correct?

15 A    Yes.

16 Q    In terms of using the Hounsfield-unit density tool on a

17 CT scan, you would move the cursor on the screen of the CT and

18 put a target on the tissue that's density you want to measure.

19 Correct?

20 A    Correct.

21 Q    And at the bottom of the CT-scan screen, when you place

22 that target on the affected tissue, you'll see a reading in

23 Hounsfield-unit density scale numbers at the bottom of that

24 screen.  Correct?

25 A    Yes.

1   Q    And you heard Dr. Becker's testimony about the method for

2   using that Hounsfield-unit target to determine whether there

3   is pleural thickening on the lining of someone's lungs.

4   Correct?

5   A    I heard that, yes.

6   Q    Yes.  And you've looked at Hounsfield-unit measurements

7   in the past.  Correct?

8   A    Yes.

9   Q    Okay.  But you have not been formally trained as a

10  radiologist in terms of using any of these tools on a CT scan.

11  Correct?

12  A    I have used them for 20 years, so that's a lot of

13  experience with it, so.  Yeah, but not a radiologist, no.

14  Q    Not my question.

15  A    Yeah.

16  Q    In terms of being trained as a radiologist, you are not a

17  radiologist.  Correct?

18  A    Correct.

19  Q    You've not done a residency in radiology.  Correct?

20  A    Correct.

21  Q    You have not worked in a radiology clinic.  Correct?

22  A    Correct.

23  Q    You could not be hired as a radiologist to work in a

24  radiology clinic.  Correct?

25  A    Correct.

1   Q     You have never had privileges at any hospital, clinic, or

2   any other medical setting to work as a radiologist.   Correct?

3   A     Correct.

4   Q     So in terms of the Hounsfield-unit scale and the target

5   on a CT scan, that's not a tool that you regularly employ,

6   yourself.   Correct?

7   A     If it's of value, I do, yes.

8   Q     And in this case, if you were to put a target directly on

9   pleural thickening or tissue that you suspect would be likely

10  pleural thickening, that Hounsfield-unit target would show you

11  whether or not the density of that tissue indicated pleural

12  thickening or merely pleural fat.   Correct?

13  A     It depends on the thickness.

14  Q     Again, I'm not talking about the thickness here.   I'm

15  talking about the tissue.

16        If you place the bull's-eye target on pleural fat, the

17  Hounsfield-unit measurement would indicate that tissue is

18  lighter than water.   Correct?

19  A     Yes.

20  Q     And in terms of fibrotic tissue or scar tissue or any

21  other tissue, if you place the Hounsfield-unit bull's-eye

22  right on that tissue, that would have a different reading

23  under the Hounsfield-unit scale than pleural fat.   Correct?

24  A     Yes.

25  Q     That tissue would be heavier than water.   Correct?

1   A    Yes.

2   Q    Your testimony and your expert opinion in the *Holly*

3   *Warboys* case was that the thickening was too thin to measure

4   its density on a CT scan; thus, you have to rely solely on

5   what you see.  Correct?

6   A    That is correct.

7   Q    Ms. Warboys, we heard testimony -- and I want to be

8   respectful here, but the testimony was that she had a fairly

9   significant body mass index.  Fair?

10  A    Yes.

11  Q    And in individual patients with a high BMI, or body mass

12  index, those people are -- well, at a BMI of over 50 was the

13  testimony from Dr. Haber.

14       Ms. Warboys had a fair amount of fatty tissue in her

15  thoracic region.  Fair?

16  A    Fair, yes.

17  Q    Okay.  Now in the *Warboys* case, there were several other

18  experts that testified about what they saw in terms of

19  Ms. Warboys' alleged pleural thickening.  Correct?

20  A    I wasn't directly involved with that.  I just -- so I, I

21  don't know who that would be.

22            MR. DUERK:  If we could go to the top of this page?

23  I'd like to continue to page 114 -- Exhibit 114, page 6,

24  please.

25            MS. HANENBURG:  (Complied with request.)

1    BY MR. DUERK:

2    Q    Sir, one of the other medical experts in this case was

3    Dr. Stephen Becker, a radiologist in Libby that is well known

4    to this jury at this point.   Correct?

5    A    Yes.

6    Q    Dr. Becker and also Dr. Steven Haber provided testimony

7    in the *Warboys* case.   Correct?

8    A    Yes.

9    Q    Both of those witnesses in the *Warboys* case said that the

10   findings on CT indicated that Ms. Warboys had pleural fat.

11       I believe Dr. Becker -- or Dr. Haber's testimony the

12   other day was that there was an abundance of pleural fat in

13   Ms. Warboys' case.   Correct?

14   A    Yes.

15           MR. DUERK:   If we could go back to Exhibit 114,

16   page 5?

17           MS. HANENBURG:   (Complied with request.)

18           MR. DUERK:   Thank you.

19   BY MR. DUERK:

20   Q    Now pleural fat in not just Ms. Warboys' case but in

21   hundreds of other cases involving Libby patients -- pleural

22   fat is a fairly common finding among the CARD patients that

23   you've seen.   Correct?

24   A    Yes.

25   Q    Pleural fat does not equal asbestos-related disease.

1   Correct?

2   A     Correct.

3   Q     The alternative, plausible cause for the thickening that

4   you saw in Ms. Warboys' case was pleural fat, and you've even

5   testified that it is very difficult to see the difference

6   between pleural fat and pleural thickening.   Correct?

7   A     It's challenging.

8   Q     Yes.

9   A     No question.   Yes.

10  Q     You've testified that a lot of times lamellar pleural

11  thickening could be mistaken for pleural fat.   Correct?

12  A     Sure.   In certain cases, yes.

13  Q     You are the only one who has difficulty distinguishing

14  lamellar pleural thickening, alleged by you, and pleural fat?

15  That certainly was the situation in the *Warboys* case.

16  Correct?

17  A     In that case, yes.

18  Q     Dr. Becker, Dr. Haber, the other physicians in that case

19  except for, I believe, a Dr. Schonfeld, who was a forensic

20  expert, neither Dr. Haber nor Dr. Becker had any difficulty

21  distinguishing pleural fat from what you call lamellar pleural

22  thickening in Holly Warboys' case.   Correct?

23  A     Correct.

24  Q     And in other cases -- in fact, hundreds of other cases --

25  where you have found lamellar pleural thickening, Dr. Becker

1    and other radiologists have said to you, in patient treatment

2    records, to other colleagues, "This is not lamellar pleural

3    thickening.  This is pleural fat."  Correct?

4    A    That's their opinion, yes.

5    Q    And that opinion is one that you've been aware of for

6    years.  Correct?

7    A    There's varied opinion all over.  In the radiologic

8    reads, there's lots of differences in the opinions on that, so

9    I don't think it's just everybody, so.  I see it read

10   differently.

11   Q    You heard my question.

12   A    Oh, okay.  Go ahead.  I'll try to get it right here, so.

13   Q    You're aware that other doctors have said for years that

14   they don't agree with your opinion that pleural fat is

15   lamellar pleural thickening in your view.  Correct?

16   A    I don't think it is, either.  Correct.

17   Q    Okay.  And you heard Liz Voorhies' testimony this

18   morning.  Correct?

19   A    Yes.

20   Q    You heard Tami Reatz's testimony this morning.  Correct?

21   A    Yes, yes.

22   Q    And Tami Reatz testified that at CARD, you told her and

23   other people that other doctors didn't know what they were

24   doing when it came to doing these reads.  Correct?

25   A    I didn't say it like that, but, yes, I did tell them the

94

1  difference, but I indicated that there was a lack of

2  understanding.

3  Q    Okay.  Now in terms of the *Holly Warboys* case, in terms

4  of what you said about the CT scan itself and whether or not

5  you could see it, you offered "if one were to just look at

6  that" -- and by "that" I mean nonspecific thickening of the

7  lining of the pleura.  "[I]f one were to just look at that

8  without a [Libby] exposure history, one would really not be

9  able to diagnose."

10     That was your testimony in *Warboys*.  Correct?

11 A    Yeah.  It follows ATS criteria, so.

12 Q    Right.  And when it comes to ATS criteria, if you didn't

13 have exposure history and you only looked at Holly Warboys'

14 CT scan, if you just looked at that scan without an exposure

15 history, even you wouldn't be able to diagnose.  Correct?

16 A    I think we've talked about a CT not --

17 Q    I'm not asking --

18 A    Okay.

19 Q    -- for explanation.

20     My question was:  Even you would not have been able to

21 diagnose lamellar pleural thickening in Holly Warboys' case if

22 you didn't have an exposure history.  Right?

23 A    Right.

24 Q    So I want to focus on one element of the three ATS

25 criteria.  Those are:  signs of structural abnormality on a CT

1    or chest X-ray.  Correct?

2    A    Correct.

3    Q    That's one element.  If you don't have that element, you

4    don't have disease.  Right?

5    A    Right.

6    Q    The other two elements are:  exposure history and a

7    differential diagnosis.  Fair?

8    A    Yes.

9    Q    Here, you are saying that if you were to just look at the

10   radiographic scan, if you were to just look at the CT scan,

11   even you wouldn't really be able to diagnose.  Correct?

12   A    I don't think most people could, on nonspecific pleural

13   thickening, be able to know a hundred percent --

14   Q    Right.

15   A    -- without the rest of --

16   Q    But the --

17   A    -- the other pieces.  You need all of the three

18   determinants of the diagnosis.

19   Q    I'm not focusing on the other pieces right now.

20   A    Yeah.

21   Q    I'm only focusing on structural abnormality.  Do you

22   understand that?

23   A    Yes.

24   Q    And here, even in Holly Warboys' case, you wouldn't have

25   even been able to diagnose her without referencing her

96

1    exposure history.  Correct?

2    A    No.  Obviously we take an exposure history first and

3    decide if we might have a high likelihood of finding an

4    abnormality.  Then we go -- when we look at -- for structural

5    abnormality, when we get nonspecific pleural thickening, you

6    cannot make a diagnosis unless you know strong -- you have

7    strong confidence that that change you're seeing is a

8    structural change from asbestos.

9    Q    Exactly right.

10   A    Yes.

11   Q    But here is what I want to highlight:  You just said

12   unless you have exposure history with nonspecific lamellar

13   pleural thickening, you cannot make a diagnosis.  Correct?

14   A    (No response.)

15   Q    That's what you just said.

16   A    Without what, now?

17   Q    Without --

18   A    An exposure history?

19   Q    -- exposure history.

20   A    Okay.  Right.  Right.

21   Q    Right.

22   A    Right.  You wouldn't.

23   Q    We're on the same page.

24        THE COURT:  Mr. Duerk, it's 12:10.  Are we at a

25   point where we could take a noon recess?

1           MR. DUERK:  Of course, Your Honor.

2           THE COURT:  All right.

3           We'll be in recess until 1:15.

4      (Recess taken from 12:14:39 to 13:19:29.)

5      (Open court.)

6      (Jury present.)

7           THE COURT:  Please be seated.

8           Mr. Duerk.

9           MR. DUERK:  Thank you, Your Honor.

10  BY MR. DUERK:

11  Q    Dr. Black, you heard testimony from Dr. Haber in which he

12  said that in order to be considered a qualified physician, one

13  must follow the standards of care.  Correct?

14  A    No.

15  Q    You didn't hear him say that?

16  A    No.

17  Q    Okay.  Let's go about it this way.

18      You would agree that in order to be considered a

19  qualified physician, you must follow the standards of care.

20  Correct?

21  A    We call them the guidelines of care, but, yes.

22  Q    Okay.  In terms of those standards of care, within the

23  general field of medicine, you would agree that there are

24  standards of care within the practice of medicine generally

25  overall.  Correct?

1    A    Like I say, they're guidelines, yes.

2    Q    And you would agree that the standard of care can be

3    defined as a diagnostic and treatment process that a clinician

4    must follow for a certain type of patient, illness, or

5    clinical circumstance.   Correct?

6    A    They're guidelines, once again, but, yes.

7    Q    The standard of care can be defined as the level at which

8    the average, prudent provider would practice within a given

9    field of medical specialty; would you agree?

10   A    Yes.

11   Q    Would you agree that a qualified physician is one who

12   follows the standards of care?

13           MR. BECHTOLD:   Objection, Your Honor.

14           THE COURT:   On what grounds?

15           MR. BECHTOLD:   Legal conclusion.

16           THE COURT:   Overruled.

17   BY MR. DUERK:

18   Q    Doctor, I'll ask the question again.

19        Would you agree that a qualified physician is one who

20   follows the standards of care?

21   A    Once again, they follow guidelines.

22   Q    So, sir, are you disputing that a qualified physician

23   would follow the standards of care?

24   A    I think there's not, there's not rigid standards in

25   medicine.   They're guidelines that we should abide, try to

1   abide by.

2   Q    Well, there are rigid standards of care in the field of

3   medicine in terms of first doing no harm.  Correct?

4   A    Well, correct, yes.

5   Q    That is a rigid guideline stated in the Hippocratic Oath

6   itself.

7   A    Yes.

8   Q    Fair?

9   A    Fair.

10  Q    And there are other very clear guidelines within the

11  field of medicine.  For example, you cannot call yourself a

12  qualified physician if you ignore the standards of care.

13  Correct?

14  A    Yes.

15  Q    That sounded to me a bit equivocal.

16       Would you agree that a qualified physician is one who

17  follows the standards of care for medicine?

18  A    Yes.

19  Q    Would you agree that the standards of care for qualified

20  physicians are not optional?

21  A    Yes.

22  Q    Would you agree that a qualified physician is one who

23  does not knowingly deviate from the standards of care?

24  A    Yes.

25  Q    Would you agree that a qualified physician would not bill

1    anyone for unnecessary services?

2    A    Yes.

3    Q    Would you agree that a qualified physician does not

4    perform medically unnecessary services?

5    A    Yes.

6    Q    Would you agree that a qualified physician uses the most

7    accurate and thorough diagnostic methods and tests?

8    A    Yes.

9    Q    Would you agree that a qualified physician shares true,

10   accurate, and complete information with his or her patients

11   and the government?

12   A    Yes.

13   Q    In terms of the standards of care, I'd like to speak

14   briefly just about what I'll call the specialist's standards

15   of care.

16        Would you agree that in order to be deemed a qualified

17   physician, a doctor who practices outside his or her field of

18   specialty must conform to that specialist's standards of care?

19            MR. BECHTOLD:  Relevance, Your Honor.

20            THE COURT:  Overruled.

21   BY MR. DUERK:

22   Q    Doctor, would you agree with that general proposition?

23   A    I'm sorry; what was it, again?

24   Q    Sir, let's go about it this way.  I'll give you a

25   hypothetical just to explain what I'm getting at.  Okay?

1          If a patient comes to you with an orthopedic injury, or

2   comes to a general practitioner, and that general practitioner

3   elects to perform orthopedic surgery on that patient and the

4   physician is not, herself or himself, a surgeon, essentially

5   that doctor would buy the specialist's standard of care for an

6   orthopedic surgeon.  Would you agree?

7   A    Yes.

8   Q    Would you agree that the standard of care for diagnosing

9   asbestos-related disease is set forth by the American Thoracic

10  Society guidelines?

11  A    Once ag- -- oh.  Yes.

12  Q    The standards of care for reading radiographic studies to

13  detect asbestos-related disease are also set forth by the

14  National Institute for Occupational Safety and Health.

15  Correct?

16  A    I don't know that.  I'm not sure.

17  Q    You don't know that.

18  A    I'm not sure about that, right.

19  Q    And you are likewise not sure about the standards of care

20  for radiologists based on the standards promulgated by the

21  American College of Radiology.  Correct?

22  A    I'm sorry; you said not or -- would you say that?

23  Q    That's okay.

24       Doctor, you are not, yourself, a radiologist, as we have

25  established.  Correct?

1    A    Correct.

2    Q    And you are not a member of the American College of

3    Radiology.  Correct?

4    A    Right.

5    Q    You do not recall ever reading the American college of

6    radiologists' standards of care.  Correct?

7    A    Correct.

8    Q    However, you would agree that the standards of care for

9    radiologists are set forth in the ACR, the American college of

10   radiologists' standards of care.  Correct?

11   A    Yes.

12   Q    Would you agree that in terms of the standards of care

13   for NIOSH-certified B-readers, NIOSH-certified B-readers also

14   have standards of care that they must abide by in order to be

15   determined qualified physicians?

16   A    Standards of care?  For a B-reader?

17   Q    Yes.

18   A    I don't know of those.  I don't know.

19   Q    Have you ever reviewed the B-reader ethics, which have

20   already been presented as evidence in this case?

21   A    Yeah.  I just didn't know it was called a standard of

22   care.  There seems to be a clinical standard in the B-reader

23   program that's certainly different than that.

24   Q    Are you aware of the B-reader ethics that state that a

25   B-reader will not have a read that equals a diagnosis of

1  asbestos-related disease or any other of the diseases in the
2  pneumoconiosis family?
3  A    I am not familiar with the B-reader system.
4  Q    And you would defer to B-readers on the -- that front of
5  the B-reader code of ethics.  Correct?
6  A    Do I -- would you ask that a little differently, please?
7  Q    Sure.
8       Dr. Haber is a B-reader.  Correct?
9  A    That's what he said, yes.
10 Q    Do you have any reason to doubt him?
11 A    No.  I just said that's what he said, yes.
12 Q    In terms of his certification as a NIOSH-certified
13 B-reader, he is one of approximately 200-plus B-readers in the
14 United States and one of only approximately 300 B-readers in
15 the world.  Correct?
16 A    I don't know this.  I'm not sure of those facts, though.
17 Q    Regardless, if Dr. Haber testified in front of this jury
18 that the B-reader code of ethics state that a B-reader's
19 interpretation should not be considered a diagnosis, would you
20 have any reason to disagree with him?
21          MR. BECHTOLD:  Objection.  Misstates the testimony.
22          THE COURT:  Well, the jury, I'm sure, remembers the
23 testimony.  I'm gonna overrule the objection.
24 BY MR. DUERK:
25 Q    Go ahead.

1    A    (No response.)

2    Q    Sir, in terms of the B-reader code of ethics, would you

3    have any reason to disagree with Dr. Haber's testimony that a

4    B-reader's interpretation on a B-read --

5    A    I don't know --

6    Q    -- should not be considered a diagnosis?

7    A    I don't know how the B-readers define that.  I have not,

8    I have not seen all that information, so.

9    Q    And in terms of deferring to Dr. Haber on that point, a

10   NIOSH-certified B-reader, would you defer to Dr. Haber related

11   to his interpretation and view on the B-reader code of ethics,

12   a document which apparently you have not seen?

13   A    Right.  I haven't seen it.

14   Q    Okay.  And so you wouldn't oppose or contradict

15   Dr. Haber's testimony on that point?

16   A    I don't know enough about it to even respond to that.

17   Q    Okay.

18        A qualified doctor would not deprive, discourage, or deny

19   patients of a second opinion.  Correct?

20   A    Correct.

21   Q    A qualified doctor shares a differential diagnosis with

22   his or her patients under the standard of care.  Correct?

23   A    Correct.

24   Q    A qualified doctor educates patients about reasonable

25   medical alternatives involving treatment under the standard of

1    care.  Agree?

2    A     Yes.

3    Q     And that would include reasonable alternative treatments

4    to opioid, medical -- or opioid medication.  Correct?

5    A     Correct.

6    Q     Would you agree that patients rely on doctors who have

7    superior medical knowledge and a greater understanding of

8    information related to medical issues than the patient him- or

9    herself?

10   A     That was too fast.  Can you say that a little slower,

11   please?

12   Q     Doctor, would you agree that patients rely on doctors who

13   have superior medical knowledge and a greater understanding of

14   information related to medical issues than the patient himself

15   or herself?

16   A     Yes, in general.  Yeah.

17   Q     A qualified doctor would refer a patient for a second

18   opinion in a complex case under the standards of care.

19   Correct?

20   A     Yes.  If there's a complex case that they are unsure of,

21   they would do that, so.

22   Q     Well, in terms of any complex case, a qualified doctor

23   takes second opinions into account when forming a diagnosis or

24   treatment plan under the standard of care.  Correct?

25   A     Yes.

1   Q    A qualified doctor takes second opinions into account

2   when forming a diagnosis.  Correct?

3   A    If necessary, yes.

4   Q    Well, even if not absolutely necessary, would a doctor

5   routinely ignore or disregard all second opinions in a complex

6   case?

7   A    I don't think there's a fixed answer on that, but in

8   general you would say yes.  If it's, if it's complex and it's

9   uncertain, you would certainly want to do that.

10  Q    You'd certainly want to look; at least consider second

11  opinions.

12  A    Sure.

13  Q    Correct?

14  A    Sure.

15  Q    Doctor, in terms of the B-reader program here, it's an

16  established fact in this case that CARD doesn't look at any of

17  the B-readers' interpretations for any diagnostic purpose.

18  Correct?

19  A    Correct.

20  Q    In terms of the B-readers, the panel of thoracic

21  radiologists in this case, CARD routinely diagnoses patients

22  before ever looking at B-reader interpretations.  Correct?

23  A    Yes.

24  Q    In fact, CARD diagnoses before even the local

25  radiologists' interpretation return to CARD.  Correct?

1    A    Yes.

2    Q    So it's fair to say that in terms of CARD's practice,

3    when it comes to second opinions on issues like the CT

4    interpretation from radiologists about whether or not patients

5    have an asbestos-related disease, CARD routinely disregards

6    all second opinions.  Correct?

7    A    No.

8    Q    How is not even looking at the local radiologists', the

9    B-reading thoracic radiologists', the peer-review thoracic

10   radiologists' opinions about CT scans and chest X-rays, how is

11   disregarding all of those interpretations and just diagnosing

12   a patient before you ever have any of those interpretations

13   considering all reasonable outside sources of information?

14   A    I think we certainly depend on an over-read for any other

15   conditions that might be of concern to our patients.

16   Q    Sir, you don't even look at any of the over-reads from

17   CARD's own panel of experts until months after you've

18   diagnosed those CARD patients.  Right?

19   A    Right.  Yeah.

20   Q    And in terms of those B-reads, the only reason that you

21   look at any of those over-reads, apparently, is in the set of

22   patients who you've already determined do not have an

23   asbestos-related disease, to somehow claim that a chest X-ray

24   from a B-reader warrants lifetime Medicare benefits.  Correct?

25   A    Can you do -- please repeat it.  I'm just --

1  Q    Sure.

2  A    I'm having trouble with your speed of everything.  I

3  hope -- I'm sorry.  It's just the way it is.  I can't help it,

4  so.

5  Q    That's okay.

6       Doctor, if we've got a patient who goes in to CARD on a

7  Monday and CARD visits with that patient, that patient is

8  sometimes sent out to Cabinet Peaks for a radiology read from

9  Dr. Stephen Becker that afternoon.  Correct?

10 A    Yes.

11 Q    The next day, that patient may return to CARD for their

12 diagnostic visit.  Correct?

13 A    Yes.

14 Q    And you have testified that in multiple cases, CARD will

15 share the diagnosis of asbestos-related disease with that

16 patient before any interpretive reads have come in, even from

17 the local radiologist.  Correct?

18 A    Yes.  I was referring to the fact that we, we depend on

19 our radiologists, the local radiologists, to make sure we

20 don't miss anything, and that's very important to us, so.

21 Q    Do you?  And the reason I ask this pointedly is because

22 CARD's own internal records show, as your testimony has

23 confirmed, that you diagnose patients before you get any

24 radiologist's interpretation back to CARD.

25      What happens here, and correct me if I'm wrong, but on a

1    Monday, you'll send the patient out for a scan, they'll return

2    on a Tuesday, and, before any of the radiologists' reads have

3    come back from anybody, CARD will diagnose that patient with

4    an asbestos-related disease.  In thousands of cases.  Correct?

5    A    I don't know how many, but, yes, we do that.

6    Q    Actually, you do.  Sir, there's a Preliminary

7    Instruction 5 here that sets out the undisputed or stipulated

8    facts in this case.  And I'll represent to the jury that

9    Preliminary Instruction 5 has several paragraphs in it that

10   say that CARD is aware of the results of every read that comes

11   through that facility, your facility.  Correct?

12   A    Yes.  I think we record that, yes.

13   Q    So, I mean, your response here that you're not quite sure

14   about whether or not CARD is aware of the results of every

15   read, that's just not true.  Right?

16   A    I don't know the results of every read, right.

17   Q    As a routine practice, CARD will diagnose patients at the

18   facility before any interpretive reads come back.  Correct?

19   A    Yes.

20   Q    And CARD's own internal records, the master dataset, show

21   that CARD diagnoses patients long before B-reads come back

22   from the outside panel of NIOSH-certified readers who are

23   based in Wisconsin, in Denver at National Jewish, and other

24   facilities.  Correct?

25   A    Yes.

1  Q    So to say that CARD relies on the radiologists'

2  interpretations in forming a diagnosis, that's just not true.

3  Correct?

4  A    Correct.

5  Q    I'd like to focus on just the B-read-only patients in

6  that scenario.

7       So on a Monday, a patient comes to CARD.  They're sent

8  for an X-ray or CT from the local radiologist.  Those scans

9  come back to CARD in this B-read-only scenario.  And CARD,

10 looking at the CT scans, says to the patient on Tuesday, "You

11 do not have an asbestos-related disease."

12      Are you with me?

13 A    Yes.

14 Q    For that B-read group of patients, the scans are then

15 sent out to Wisconsin or Denver or New York to the panel of

16 thoracic radiologist B-readers.  Correct?

17 A    Yes.

18 Q    And those scans sometimes don't return to the CARD

19 facility for several months.  Correct?

20 A    Correct.

21 Q    So even in these B-read-only patients where CARD has

22 said, "J.P., you've got a fractured rib.  You don't have

23 asbestos-related disease.  We're not diagnosing you with ARD,"

24 there are times when CARD will get the B-read back from

25 New York or Wisconsin or Denver, and they'll call the patient

1    back in after showing that patient the letter that we saw on

2    Exhibit 40, page 2.

3          Can we have that on the screen?

4              MS. HANENBURG:   (Complied with request.)

5    BY MR. DUERK:

6    Q    Are you with me in terms of that general process?

7    A    Yes.

8    Q    Okay.  And the only reason I'm bringing up this letter

9    again is in the interim period of time, after CARD has said to

10   the patient, "You're not sick.  You don't have a diagnosis,"

11   CARD gets the B-read back from out of state, and they tell

12   that patient -- you don't have a diagnosis.  You don't even

13   have a read from an outside reader that shows any significant

14   health implications.  CARD is telling that patient, again,

15   "You're not sick, but we've got this B-read that may show a

16   fractured rib."  And what happens at that stage of the process

17   is the patient is called back in to CARD.  Correct?

18   A    Yes.

19   Q    And you don't see them again.  You don't rediagnose them

20   again.  In fact, you and CARD tell that patient, "We don't

21   think you have a diagnosis.  We don't think you're sick."  At

22   that point, somebody at CARD rubber-stamps an EHH form and

23   submits it to the Social Security Administration.  Correct?

24   A    We don't rubber-stamp it.

25   Q    We've heard testimony from multiple witnesses that there

1    was a rubber stamp at CARD for years.   Correct?

2    A     There was.   Early on, when I was by myself and we had a

3    huge volume of patients, we had to facilitate the process, and

4    we did for a while use a rubber, a rubber -- a stamp

5    signature.

6    Q     So I apologize.

7    A     We don't do that anymore.

8    Q     You don't do that anymore, but you did for years.

9    Correct?

10   A     Out of necessity, we did, yes.

11   Q     You did that for years.   Right?

12   A     I don't know how long.

13   Q     You did it for multiple years.   If we look at the EHH

14   forms, as these jurors do, will do, and will see that these

15   EHH forms were signed and stamped in 2011, 2012, 2013 with the

16   exact same signature, in the exact same configuration, in the

17   exact same way.   Do you have any reason to disagree with any

18   of what I just said?

19   A     That's what I said.   I said that.   We did that for a

20   while when I was overloaded, and once -- I -- we've been

21   doing --

22   Q     Sir?

23   A     We've been signing them ever -- you know.

24   Q     Sir, I'm gonna stop you.

25   A     I can't tell you when we started, so.

1    Q    My only question was whether you did that for years.

2    A    Yes.

3    Q    CARD did that for years.  Correct?

4    A    Several years, yes.

5    Q    All right.  So during that era, whenever it ended, the

6    patients would be informed that they had benefits under

7    Medicare.  They'd come back in, and they'd get an EHH form

8    with a rubber-stamped signature on it from CARD.  Correct?

9    A    Yes.

10   Q    You wouldn't see the patient face to face during that

11   time.  You didn't rediagnose the patient.  You still had the

12   opinion, as expressed in this letter that we've seen, that the

13   patient didn't have a diagnosis.  Correct?

14   A    Correct.

15   Q    All right.  And at no time did you tell the Social

16   Security Administration, at any point while you were using a

17   rubber stamp on dozens of these EHH forms, that that's what

18   you were doing.  Correct?

19   A    Correct.

20   Q    So do you still agree with the statement that a qualified

21   doctor shares true, accurate, and complete information about

22   medical research -- I'm sorry; a qualified doctor shares true,

23   accurate, and complete information with their patient and the

24   government under the standard of care?

25   A    Yes.

1   Q     Would you agree that a qualified doctor shares true,

2   accurate, and complete information about medical research with

3   scientific study participants and administrators under the

4   standard of care?

5   A     Yes.

6   Q     Full disclosure, peer review, and open dialogue are key

7   components of medical research.  Agree?

8   A     Yes.

9   Q     Qualified doctors use the scientific method.  Agree?

10  A     Depends on what you're using it for.  That's a broad

11  question.

12          MR. DUERK:  May I approach?

13          THE COURT:  You may.

14          MR. DUERK:  (Handing.)  Let the record reflect that

15  I'm handing the witness what contains a deposition taken

16  November 8, 2019 at the Center for Asbestos Related Disease.

17  BY MR. DUERK:

18  Q     Doctor, I'm looking at page 23, line 21.

19      My question was:  "Qualified doctors use the scientific

20  method.  Agree?"

21  A     "Yes."

22  Q     "The scientific method can be described as a procedure

23  consisting of systematic observation and the formulation,

24  testing, and modification of a -- of a hypothesis.  Agree?"

25  A     "Yes."

1    Q    "Criticism is the backbone of the scientific method.
2    Agree?"
3    A    "Yes."
4    Q    So, Doctor, part of the scientific method in the medical
5    community is to encourage alternative viewpoints.  Correct?
6    A    Yes.
7    Q    Part of the scientific method is to encourage second
8    opinions from other respected individuals.  Correct?
9    A    Yes.
10   Q    The scientific method encourages listening to alternative
11   viewpoints, not shutting them out.  Correct?
12   A    Correct.
13   Q    In terms of the standard of care, if you are disregarding
14   the standards of care, or not adhering to the American
15   Thoracic Society's guidelines, if you're disregarding commonly
16   known principles in the medical community, you can't be said
17   to be practicing as a qualified physician.  Correct?
18   A    Can you ask that again?
19   Q    Doctor, if you're basically disregarding the second
20   opinions of other more qualified professionals, you can't be
21   said to be practicing as a qualified physician.  Right?
22   A    Right.
23   Q    In terms of screening and treatment, there's a difference
24   at CARD between the two programs, screening versus treatment.
25   Is that fair?

116

1   A     Yes.

2   Q     The screening for asbestos-related disease is offered

3   free to qualifying Libby residents.   Correct?

4   A     Yes.

5   Q     Screening is paid for by the federal grant itself.

6   Correct?

7   A     Screening is, yes.

8   Q     Once a patient is diagnosed with an asbestos-related

9   disease, however, and enrolled in Medicare, screening is no

10   longer free to that patient; that is to say, Medicare picks up

11   the bill for that afterwards.   Right?

12   A     Yes.   And treatment, yeah.

13   Q     And if the patient's Medicare is based on a CARD

14   diagnosis, Medicare picks up the bill not just for that

15   patient's treating appointments at CARD but for that patient's

16   medical appointments at all other facilities.   Correct?

17   A     Correct.

18   Q     That's true for patients who receive a script for opioids

19   as well; paid for by Medicare.   Correct?

20   A     Some -- I'm sure some are, yes.

21   Q     Right.   So if the patient is diagnosed with an

22   asbestos-related disease and submitted for Medicare benefits

23   and CARD writes that patient a script for opioids, in the same

24   way that Medicare picks up the tab for any treatment that

25   patient receives at an outside provider's office, Medicare

1    would also pay for that patient's opioid prescriptions.

2    Correct?

3    A    If medically necessary, yes.

4    Q    Right.  In terms of those opioid patients, not only does

5    Medicare pay for their OxyContin, for their fentanyl, for

6    their morphine sulfate, for tramadol, Medicare would also pay

7    for any medical appointments those patients attend related to

8    pain management.  Correct?

9    A    Yes.

10   Q    So if you have a patient diagnosed with an

11   asbestos-related disease who receives Medicare under the EHH

12   program, and that patient goes to Kootenai Drug or Granite

13   Pharmacy with a script from CARD, and their fentanyl costs

14   them $50 with a $20 co-pay and the government picks up the

15   remainder of that tab, those Medicare payments, those federal

16   dollars, resulted from the CARD script.  Correct?

17   A    Yes.

18   Q    And if that patient doesn't have an asbestos-related

19   disease or if that patient can show no medical necessity for

20   those opioids, Medicare shouldn't pay those bills on that

21   script.  Correct?

22   A    If there's not medical necessity, no.

23   Q    All right.  In the same way that some of those pain

24   management patients who have Medicare because of CARD's

25   diagnosis under the EHH program go to other care facilities

1    and Medicare pays those other facilities, if that pain

2    management patient, on Medicare due to an asbestos-related

3    disease, receives one-on-one pain management treatment at

4    CARD, CARD gets paid for that treatment visit as well.

5    Correct?

6    A    Yes.

7    Q    And it is a requirement under the standard of care for

8    any physician who is prescribing opioids to do an in-person

9    pain assessment for opioid patients on a regular basis.

10   Correct?

11   A    In general, yes.

12   Q    So when patients on opioids, based on your prescription,

13   come to CARD for pain management visits, Medicare pays CARD

14   for those patient visits.  Correct?

15   A    Yes.

16   Q    Other provider visits for those opioid patients are paid

17   for as well.  So, for example, if a CARD patient winds up in

18   the emergency room due to a drug overdose, Medicare is picking

19   up the tab for that as well.  Correct?

20   A    I'm sure.

21   Q    In each of these examples -- in some of them, CARD may

22   not be getting paid money, federal money, directly for the

23   opioid scripts that CARD writes, for the visits of these

24   patients to other providers, but Medicare money is being paid

25   for these patients in other ways based on a CARD diagnosis of

1    asbestos-related disease or a CARD prescription for opioid

2    drugs when CARD is asserting that that opioid pain medication

3    is medically necessary.  Correct?

4    A    Can you give me the short version?

5    Q    Sure.

6         I'm a patient that has a prescription from you.  That

7    prescription is for fentanyl.

8    A    Um-hmm.

9    Q    Your allegation or your diagnosis of me is that that

10   opioid script is medically necessary for whatever reason.  I

11   have Medicare from whatever source.  And I go to a pharmacy,

12   and I submit my script, and Medicare picks up part of that

13   payment, and I pay the rest of the co-pay.

14   A    Correct.

15   Q    Are we on the same page?

16   A    Yes.

17   Q    Okay.

18   A    Correct.

19   Q    So federal funds have paid for my opioids.  Right?

20   A    Right.

21   Q    If my opioids are not medically necessary and the federal

22   government is still picking up the tab, that's improper.

23   Correct?

24   A    Well, it's not good for the patient or Medicare.

25   Q    Right.  It's not good for the patient.  It's not good for

1   Medicare.

2   A     Right.

3   Q     And opioid scripts that aren't medically necessary, it's

4   improper.  Correct?

5   A     Yes.

6   Q     In terms of CARD Patient Dan Q., we've heard testimony

7   that you prescribed 450 morphine milligram equivalents in one

8   day.  You're aware of that.  Correct?

9   A     No.

10  Q     When I deposed you, I asked you to calculate or to look

11  at the morphine milligram equivalents for Mr. Q.  Do you

12  recall that?

13  A     Yes, I do.

14  Q     I also asked you about other care providers in the Libby

15  area who may have lost their medical licenses because of their

16  script-writing practices.  Do you remember that?

17  A     Yes.

18  Q     You are familiar with a Dr. Knecht, K-n-e-c-h-t.

19  Correct?

20  A     Yes.

21  Q     In Dr. Knecht's case, you're aware that Dr. Knecht was

22  writing morphine milligram equivalent scripts in amounts

23  between 150 and 180 morphine milligram equivalents per day.

24  Correct?

25  A     I don't know that.

1          MR. DUERK:  If we could -- I would offer Exhibit 57

2    for demonstrative purposes alone.

3          THE COURT:  Any objection, Mr. Bechtold?

4          MR. BECHTOLD:  No objection, Your Honor.

5          THE COURT:  Fifty-seven is admitted for

6    demonstrative purposes alone.

7      (Demonstrative Exhibit 57 was received in evidence.)

8          MR. DUERK:  If we could publish page 2, please?

9          MS. HANENBURG:  (Complied with request.)

10   BY MR. DUERK:

11   Q    Doctor, do you see Exhibit 57-1 on the screen?  I'll

12   represent to you that this is an article about the

13   overprescribing practices of Dr. Knecht.

14   A    Yes.

15         MR. DUERK:  If we could turn to page 3?

16         MS. HANENBURG:  (Complied with request.)

17   BY MR. DUERK:

18   Q    I know the print is very small.  We'll try to increase

19   it.

20        Do you see -- the article is dated December 24, 2015.

21   A    Yes.

22   Q    Sir, does this refresh your recollection that Dr. Clyde

23   Knecht, a physician who practices in Libby, had a number of

24   practice violations, including excessive prescribing of

25   narcotics?

```
 1  A    Yes.  I'm aware of that, so.
 2           MR. DUERK:  All right.  If we could scroll down,
 3  please?  Please stop.
 4           MS. HANENBURG:  (Complied with request.)
 5  BY MR. DUERK:
 6  Q    Do you see that this article references the reason for
 7  the violations in Dr. Knecht's case?
 8  A    I just see dosage amounts.
 9  Q    Okay.  And in terms of the dosage amounts in this case,
10  Dr. Knecht prescribed opioids in a range of 150 morphine
11  milligram equivalents per day up until 170 morphine milligram
12  equivalents per day.
13  A    Correct.
14  Q    And does that refresh your recollection about some of the
15  reasons that Dr. Knecht lost his license for overprescribing
16  in Libby?
17  A    I don't think that was the reason, no.
18  Q    You don't think that was the reason?
19  A    No.
20  Q    But you do see that Dr. Knecht was writing scripts for a
21  morphine milligram equivalent in a range of 150 to 170
22  morphine milligram equivalents per day.  Correct?
23  A    I see that, yes.
24  Q    In terms of your deposition, we discussed your treatment
25  of Dan Q.  Do you recall that?
```

1    A    Yes.

2    Q    And in terms of calculating the dose here, we discussed

3    the different dosages of morphine milligram equivalents for

4    oxycodone 15 as well as Mr. QXXXX's -- Mr. Q's other

5    prescriptions.  Correct?

6    A    Yes.

7    Q    You heard the testimony that Dan Q. received a script

8    from you in the range of 450 morphine milligram equivalents

9    per day as calculated by Dr. Heppe.  Correct?

10   A    Yeah.

11   Q    So you prescribed almost three times the daily morphine

12   milligram equivalents to Dan Q. over what the patient in

13   Dr. Knecht's case had.  Correct?

14   A    Correct, but I -- he was already on --

15   Q    Doctor, I only asked --

16   A    Okay.  Right.

17   Q    -- if you were aware of it.

18   A    All right.

19   Q    You were here for Eric Hines' testimony yesterday?

20   A    (No response.)

21   Q    Eric Hines was the forensic economist --

22   A    Yes.

23   Q    -- from Boston?

24   A    Yes.

25   Q    Mr. Hines testified that over 1,000 patients had signed

1    EHH forms from the Center for Asbestos Related Disease without

2    any corroborating radiologist's scan finding any signs of

3    asbestos-related disease in those patients.  Correct?

4    A    I think he said something around that amount.  I didn't

5    see exactly the number, so.

6    Q    Well, it wasn't "something around that amount."

7         If we could pull up Exhibit 269, page 1?  I'm sorry; if

8    we could pull up 269, page 8?

9         MS. HANENBURG:  (Complied with request.)

10   BY MR. DUERK:

11   Q    Mr. Hines testified yesterday that there were 1,099

12   individual patients "for which CARD completed, signed and

13   dated an EHH form, but there are no outside reads supporting

14   the diagnosis.  These include patients only supported by a

15   CARD [chest X-ray] and/or CT [scan], and those with no

16   supporting tests."

17        Did I read that correctly?

18   A    Yes.

19   Q    In terms of any figures that would refute Mr. Hines'

20   number, you're aware of nothing in CARD's records that would

21   say anything different than Mr. Hines' assessment based on

22   CARD's own internal records.  And by the "internal records,"

23   here I'm talking about the master dataset or the Libby

24   screening dataset.  Correct?

25   A    No, I don't.  Correct.

1   Q    Okay.

2        Doctor, in terms of you, yourself, you diagnosed yourself

3   with asbestos-related disease on September 7, 2012.  Correct?

4   A    Yes.

5   Q    In terms of your own EHH form, however, you didn't sign

6   it.  You had Nurse Boltz sign it.  Correct?

7   A    Yeah.  I --

8   Q    Let's go ahead and put Exhibit --

9   A    I approved of it, and she signed it, so.

10       MR. DUERK:  Let's go ahead and put Exhibit 202 on

11  the screen.

12       MS. HANENBURG:  (Complied with request.)

13  BY MR. DUERK:

14  Q    Doctor, based on the master dataset, after Michelle Boltz

15  signed this form, it appears you stopped getting any annual

16  chest X-rays or CT scans.  Is that right?

17  A    Yeah.  I don't think I -- I haven't done any of those

18  since then, so.

19  Q    Since 2012, you didn't have any other chest X-rays or

20  CT scans taken.

21  A    No.

22  Q    Right?

23  A    No.

24  Q    Doctor, anytime somebody's submitted to a chest X-ray or

25  a CT, there's possible harm that could be caused to that

1    patient due to radiation exposure.  Correct?

2    A    I think a single one is not creating a problem.  It's

3    just how many in this period of time.  It increases risk from

4    radiation.

5    Q    Sure.  In Judy P.'s case, for example, the master dataset

6    will show that she was scanned year after year after year,

7    even though the clinic knew she didn't have a diagnosis of

8    asbestos-related disease.  Correct?

9    A    I don't know that.

10   Q    In terms of Judy P.'s master dataset excerpt -- what is

11   the number?

12        (Discussion off the record at counsel table.)

13        MR. DUERK:  207.  I believe this has already been

14   admitted into evidence.

15        THE COURT:  It has.

16   BY MR. DUERK:

17   Q    Do we see that Judy P. apparently had scans in 2013,

18   2014?  It looks like another one in 2015.  Regardless of the

19   number or the precise years, it looks like Judy P. was

20   submitted to radiation at least six times during the screening

21   program.  Correct?

22   A    Yeah.  It looks like, looks like six, yeah.

23   Q    Okay.

24   A    Over that period, time frame, um-hmm.

25        MR. DUERK:  If we could go to page 2?

1              MS. HANENBURG:   (Complied with request.)

2    BY MR. DUERK:

3    Q    And in terms of those six times, looking at the ARD

4    column, CARD's internal records show that never, not one time,

5    did CARD ever consider J.P. to have a diagnosis of

6    asbestos-related disease based on CARD's own internal records.

7    A    Correct.  Yeah.

8              MR. DUERK:  If we could look at -- I believe

9    Exhibit 202 has already been -- I'm sorry.  Exhibit 56 has

10   already been admitted into evidence?

11        (Discussion off the record at counsel table.)

12             THE COURT:  Yes.

13   BY MR. DUERK:

14   Q    Dr. Black, your master dataset excerpt indicates that

15   you're absolutely right.  After 2012, it appears that you

16   didn't have any more exposure to radiation in your case after

17   you were diagnosed.  Correct?

18   A    Right.

19   Q    And in your case, aside from your own read of the

20   CT scan, there were no other radiologists -- pardon me.  You

21   were not a radiologist.

22        There were no radiologists who agreed with your

23   interpretation that you had positive signs of an abnormality

24   on your CT.  Correct?

25   A    I don't know that.

```
 1              MR. DUERK:  If we could go to (indicating) this
 2    section?
 3              MS. HANENBURG:  (Complied with request.)
 4    BY MR. DUERK:
 5    Q    Sir, in 2010 in terms of your chest X-rays, and in 2012
 6    in terms of your chest X-rays, all of those reads were read by
 7    the radiologists in the B-reader panel as negative.  Correct?
 8    A    Yes.
 9              MR. DUERK:  If we could go to the next set of data
10    below?
11              MS. HANENBURG:  (Complied with request.)
12    BY MR. DUERK:
13    Q    The peer-review radiologists -- this is a level of
14    NIOSH-certified, X-ray-reading radiologists above the
15    B-readers -- they came back and discussed your B-reads in
16    2010, and all of them found that you were negative for
17    asbestos-related disease as well.  Correct?
18    A    Correct.
19              MR. DUERK:  If we could go to the next dataset?
20              MS. HANENBURG:  (Complied with request.)
21    BY MR. DUERK:
22    Q    And in terms of your CT scans from the local radiologists
23    here designated as the outside radiologists, your CT scans
24    were read by radiologists as negative for asbestos-related
25    disease.
```

1    You were the only one who found any positive findings in

2    your case.  Correct?

3    A    Yes.  That's according to this, yes.

4    Q    So every single radiologist from the local radiologist

5    through the B-readers to the peer-review readers, every single

6    scan in your case was read as negative by everyone.  The only

7    positive read that suggested any kind of abnormality on a CT

8    was read by you.  Correct?

9    A    Yes.

10   Q    And after you found a positive sign of an abnormality,

11   you stopped screening.  Correct?

12   A    No.  My pain stopped finally.

13   Q    Right.  And you haven't had it since.  Correct?

14   A    I had it for about a year.  I had pain in my chest.  It's

15   uncomfortable.  Kept me awake at night, and I finally got

16   screened.  That's why I went and got screened.

17   Q    Yeah.

18   A    And so I had -- my nurse practitioner, Michelle Boltz,

19   had read a lot of films with me.  She had a very -- had a

20   sharp eye for looking for pleural disease.  And I had her read

21   it first because I said, "Why don't you do it, because it's

22   mine, and I want you to look at it."  And she identified it

23   right away.  And then I looked at it, and I said, "Yeah" --

24   Q    So, so --

25   A    -- "there's a mild, mild pleural thickening with it."

1   So, yeah.

2   Q    Yeah.  So your pain went away that year.  Correct?

3   A    It took -- it was over a year.

4   Q    Okay.  But your pain went away?

5   A    Yeah.  And then I didn't -- yeah, so I didn't feel the

6   need to keep -- you know, to go ahead and do more, any more

7   study with it, so.

8   Q    So my questions are these:  Your pain went away.

9   Correct?

10  A    Yes.

11  Q    But your Medicare benefits didn't.  Correct?

12  A    Right.  I think I was 63, maybe, so I might have had it

13  for a couple years, so.

14  Q    I understand.

15  A    Yeah.

16  Q    It was improper for Nurse Boltz to sign the EHH form for

17  her mother.  Correct?

18  A    Yeah.  I -- we -- they shouldn't have let that happen,

19  but it happened, so.  But I did read, I read her --

20  Q    Sir --

21  A    Okay.

22  Q    -- it's a yes or no question.

23  A    Yes.  Okay.

24  Q    It was improper for Nurse Boltz to sign the EHH for her

25  mother.  It was improper for Nurse Boltz to sign the EHH form

1   for you.  Correct?

2   A    Yes.

3   Q    It would be improper for a nurse practitioner or a

4   physician's assistant to sign an EHH form.  Correct?

5   A    Yes.  It says a physician, and that was my mistake, so.

6   Q    Right.  So it was improper for, it's improper for a nurse

7   practitioner or a P.A. to sign an EHH form.  It needs to be a

8   physician.  Correct?

9   A    Correct.

10  Q    We heard testimony this morning from -- I forget if it

11  was Tami Reatz or Liz Voorhies, but Miles Miller is a

12  physician's assistant at the asbestos -- the clinic for

13  asbestos-related disease at CARD.  Correct?

14  A    Yes.

15  Q    You heard that testimony from Nurse Reatz today.  Right?

16  A    Yes.

17  Q    You heard Nurse Reatz testify that EHH forms were signed

18  at CARD with a rubber stamp by Miles Miller and submitted to

19  the federal government.  Correct?

20  A    I would have made -- I was directly involved --

21  Q    Not my question.

22  A    Oh, okay.

23  Q    You heard that testimony.

24  A    Yeah, I heard it.  I heard it, yes.

25  Q    You heard the testimony --

1   A    Right.

2   Q    -- that Miles Miller, a physician assistant,

3   rubber-stamped your signature on an EHH form and submitted it

4   to the Social Security Administration office in Kalispell.

5   Correct?

6   A    That's correct.

7   Q    And that is not proper, either.  Correct?

8   A    The rubber stamp, right, right.

9   Q    Sir, you're still working today at the Center for

10  Asbestos Related Disease?

11  A    Not in clinic.  I work on research projects.

12  Q    Okay.  And you're still active in your research projects?

13  A    Yes.

14  Q    You're still active in the outdoors.  Correct?

15  A    Well, I try to.

16  Q    Yeah.  Your staff have all described you as busy and

17  energetic.  Is that accurate?

18  A    Well, as much as you can be at my age, but, yeah.  I try

19  to stay that way, so.

20  Q    Okay.  Michelle Boltz came in here and admitted that she

21  signed your EHH form, but she testified that she didn't

22  remember that she had done so, nor was she aware of any

23  providers at the clinic who had asbestos-related disease.  Do

24  you recall her testimony?

25  A    I don't know.  Yeah, I, I'm trying to remember that.  I

1    don't.

2    Q    That's okay.

3         Before being confronted with her signature on your EHH

4    form, she said she didn't know of any providers at CARD who

5    had an asbestos-related disease.   Fair?

6    A    I -- yeah.

7    Q    Okay.   In terms of the research responsibilities that you

8    have, do you still maintain a busy travel schedule with some

9    of those activities?

10   A    No.   Just mostly through Zoom and transfer of images and

11   stuff back and forth to our thoracic radiologists and our

12   computer engineer that we work with on the imaging research,

13   on automated imaging we're working on with Cornell, so.

14   Q    And "Cornell" is Cornell University --

15   A    Yes.

16   Q    -- in Upstate New York?

17   A    Right.   We're doing that to try to work on the issues

18   that we're arguing about today, in recognizing pleural

19   disease, so.

20   Q    In terms of other travel, do you still go to the Asbestos

21   Disease Awareness Organization conferences in Washington, D.C.

22   or anywhere else on the Eastern Seaboard?

23   A    I haven't.   I still serve as a scientific advisor for the

24   organization, but we have not met since COVID, really.   We

25   have just not met, so.

1    Q     The American -- or, I'm sorry, the Asbestos Disease

2    Awareness Organization, that's in part an advocacy group.

3    Correct?

4    A     Yeah, for the banning of asbestos.

5    Q     Right.

6    A     That's the whole --

7    Q     And in terms of traveling to the American -- or, I'm

8    sorry, the Asbestos Disease Awareness Organization's

9    conferences in New York, Chicago, other cities in the United

10   States for a time, that's something that you and other CARD

11   employees did year after year.  Correct?

12   A     Yes.

13   Q     You would travel to Washington, D.C., for example, and

14   stay in a hotel with other CARD employees, attend the

15   conferences for multiple days, stay in hotels, go out for

16   meals, and all of that was paid for with CARD grant funds.

17   Correct?

18   A     I'm not sure on all of that.  I think some, somewhat.  We

19   used some CARD funds.  It was an out-, it was an outreach for

20   our organization --

21   Q     Okay.

22   A     -- and so that would be included in our grant, yes.

23   Q     And so some grant funds --

24   A     (Nodded head affirmatively.)

25   Q     -- were used to pay for your and other CARD employees'

1    attendance at an advocacy group meeting in Washington, D.C.

2    Correct?

3    A    Yeah.  I -- like I said, yeah.  I think -- and I don't

4    know how much.

5    Q    That's okay.

6    A    But, anyway, yes, some, some monies were.

7    Q    In terms of other travel that you've done in the past on

8    behalf of CARD, at one point you traveled to Perth, Australia.

9    Correct?

10   A    Yes.

11   Q    And you traveled to Perth, Australia using, in part,

12   federal funds under the grant.  Correct?

13   A    No.  The Center for Asbestos Related Disease in Perth had

14   invited me to speak at their annual mesothelioma conference.

15   They wanted me to talk on Libby amphibole, and so it was paid

16   by them.  We went there, so.

17   Q    But in terms of that travel to Perth, Australia, it takes

18   about a day and a half to get there.  Correct?

19   A    It takes a week to get over it, too, so.

20   Q    Yeah.  But in terms of your travel schedule, during the

21   time that you were clinical director at the Center for

22   Asbestos Related Disease, fair to say that you had a busy

23   travel schedule.  Correct?

24   A    I did at one time, yeah.

25   Q    Okay.  In terms of your asbestos-related disease

1   diagnosis, it hasn't caused any restrictions in your

2   activities in any way.  Correct?

3   A    No.  I did pretty well, yeah.

4   Q    Yep.

5   A    Lucky.

6   Q    Last summer, you had an intern at the Center for Asbestos

7   Related Disease.  Was that in 2022?

8   A    (No response.)

9   Q    Is this -- did you have -- have you had interns at the

10  Center for Asbestos Related Disease at any point?

11  A    You'd have to say a name, I think.

12  Q    Sure.  A young woman named Destiny?

13  A    Oh.  Yeah.

14  Q    She was from Georgia.  Correct?

15  A    Right, right, right.

16  Q    Destiny wrote about her internship in an article titled

17  "Surreal, Intimidating & Affirming."  Did you ever read that

18  article?

19  A    I didn't get to see that one.

20  Q    You remember Destiny, though.

21  A    Yes.

22  Q    Correct?

23  A    Yeah, in public health, so, yeah.

24          MR. DUERK:  Can I approach?

25          THE COURT:  You may.

1    BY MR. DUERK:

2    Q     (Handing.)

3    A     Oh.

4    Q     Dr. Black, is this a photograph of you and Destiny?

5    A     It sure is, yeah.

6    Q     Does it appear to be true and accurate?

7    A     Oh, yeah.  You bet, so.

8    Q     You took a hike with Destiny.  Correct?

9    A     Yeah, Destiny and Chris, who will be here, I think, too,

10   so.

11   Q     Chris Ekstedt.  Correct?

12   A     Yeah.  She, she went that day, too.  We all went up to

13   the top there, so.

14   Q     You went to the top of what mountain?

15   A     Flat Iron.

16   Q     And you were above tree line for quite a while during

17   that hike.  Correct?

18   A     Yeah.  They -- yeah, I managed to get up there, yeah.

19   Q     And in terms of that hike, that hike was thousands of

20   feet in elevation above the valley floor.  Correct?

21   A     Yes.

22   Q     You wore a backpack.  Right?

23   A     No.  I just had a light pack on there, so.

24   Q     So you had a light pack on.

25   A     Yeah.

1  Q    But it was on your back.  Correct?

2  A    Yes, um-hmm.

3  Q    You wore hiking boots.  Correct?

4  A    Must be.

5  Q    Destiny had hiking poles.  Correct?

6  A    Yes.

7         MR. DUERK:  If we could publish?  I would move to

8  publish Exhibit 273.

9         THE COURT:  Any objection?

10         MR. BECHTOLD:  No objection, Your Honor.

11         THE COURT:  273 is admitted and may be published.

12      (Exhibit 273 was received in evidence.)

13  BY MR. DUERK:

14  Q   Sir, so we see a backpack.  We see some hiking boots.

15  We see some hiking poles in this photo.  Correct?

16  A    Yes.

17  Q    The one piece of equipment that we do not see in this

18  photo is an oxygen tank.  Fair?

19  A    I didn't need it.

20      (Discussion off the record at counsel table.)

21         MR. DUERK:  I have no further questions at this

22  time.

23         THE COURT:  Mr. Bechtold, do you wish to examine

24  Dr. Black at this time or reserve?

25         MR. BECHTOLD:  May I have a moment, Your Honor?

1              THE COURT:  You may.

2              MR. BECHTOLD:  Thank you.

3         (Discussion off the record at counsel table.)

4              MR. BECHTOLD:  Your Honor, we'll reserve questions

5    for our case in chief.

6              THE COURT:  All right.  Thank you, Mr. Bechtold.

7              Dr. Black, you may -- you're excused at this time.

8              THE WITNESS:  Thank you.

9         (End of requested excerpt, 14:23:40.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    REPORTER'S CERTIFICATE

 2          I, JoAnn Jett Corson, a Registered Diplomate

 3  Reporter and Certified Realtime Reporter, certify that the

 4  foregoing transcript is a true and correct record of the

 5  proceedings given at the time and place hereinbefore

 6  mentioned; that the proceedings were reported by me in machine

 7  shorthand and thereafter reduced to typewriting using

 8  computer-assisted transcription; that after being reduced to

 9  typewriting, a certified copy of this transcript will be filed

10  electronically with the Court.

11          I further certify that I am not attorney for, nor

12  employed by, nor related to any of the parties or attorneys to

13  this action, nor financially interested in this action.

14          IN WITNESS WHEREOF, I have set my hand at Missoula,

15  Montana this 5th day of July, 2023.

16                              /s/ JoAnn Jett Corson
                                _____
17                              JoAnn Jett Corson
                                United States Court Reporter
18

19
            I certify that the foregoing is a true and correct
20  copy of the transcript originally filed with the clerk of
    court which incorporates redactions of personal identifiers
21  requested by counsel of record in accordance with Judicial
    Conference policy.  Redacted characters appear as an X in the
22  transcript.
            Dated this 27th day of July, 2023.
23
                                /s/ JoAnn Corson Bacheller
24                              _____
                                JoAnn Corson Bacheller
25                              United States Court Reporter
```

141